**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC, | |
| Plaintiffs, | **Civil Action No. _____** |
| v. | |
| APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC, | **COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.      This is a tale of two monopolists joining forces to ensure their continued dominance in a world rapidly driven by the most powerful technology humanity has ever created: artificial intelligence ("AI"). Working in tandem, Defendants Apple and OpenAI have locked up markets to maintain their monopolies and prevent innovators like X and xAI from competing.[1] Plaintiffs bring this suit to stop Defendants from perpetrating their anticompetitive scheme and to recover billions in damages.

2.      AI is fundamentally reshaping our world. Technology powered by AI has not only become embedded in our daily lives but is also transforming critical sectors like healthcare, education, and finance. The consensus among global business leaders, academics, and scientists is that AI adoption is both unavoidable and transformational—and businesses that do not plan for it risk falling behind.

---

[1] Apple Inc. is referred to as "Apple." OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC are collectively referred to as "OpenAI." Apple and OpenAI are collectively referred to as "Defendants." X Corp. is referred to as "X" and X.AI LLC is referred to as "xAI." X and xAI are collectively referred to as "Plaintiffs."

3.      Apple illustrates the risks that can befall a company that fails to innovate in AI. With its myopic focus on making iterative changes to its smartphones—a market in which Apple has a 65 percent share and has long enjoyed a monopoly—Apple was blindsided by major innovations in AI. And when Apple, years after other technology companies, finally attempted to engage with and integrate AI, many, including those within the company, felt it was too little, too late.

4.      As Apple now recognizes, AI poses an existential threat to its business. For example, AI is rapidly advancing the rise of "super apps"—i.e., multi-functional platforms that offer many of the services of smartphones, such as social connectivity and messaging, financial services, e-commerce, and entertainment—that do not require a customer to be tied to a particular device. In other words, super apps, like those being developed by X and xAI, stand ready to upend the smartphone market and Apple's entrenched monopoly in it.

5.      The writing is on the wall. Apple's Senior Vice President for Services, Eddy Cue, has expressed worries that AI might destroy Apple's smartphone business, just as Apple's iPhone did to Nokia's handsets.

6.      Apple knows it cannot escape the inevitable—at least not alone. In a desperate bid to protect its smartphone monopoly, Apple has joined forces with the company that most benefits from inhibiting competition and innovation in AI: OpenAI, a monopolist in the market for generative AI chatbots.

7.      OpenAI quickly rose to dominance in the generative AI chatbot market after introducing its flagship service, ChatGPT, in 2022. Today, OpenAI controls at least 80 percent of the market. Because of OpenAI's monopoly, other generative AI chatbots have struggled to gain

share. xAI's Grok has yet to gain more than a few percent of the market despite accolades about its superior features.

8.      Just like Apple, OpenAI has incentive to protect its monopoly by thwarting competition and innovation in the generative AI chatbot market. And just like Apple, it has done so in violation of the antitrust laws.

9.      In June 2024, Apple and OpenAI announced that Apple would integrate OpenAI's ChatGPT into Apple's iPhone operating system ("iOS"). Apple and OpenAI's exclusive arrangement has made ChatGPT the only generative AI chatbot integrated into the iPhone. This means that if iPhone users want to use a generative AI chatbot for key tasks on their devices, they have no choice but to use ChatGPT, even if they would prefer to use more innovative and imaginative products like xAI's Grok. An OpenAI strategy document recognized the importance of competition in this emerging and transformational space: "Real choice drives competition and benefits everyone. Users should be able to pick their AI assistant." Yet Apple and OpenAI have colluded to prevent exactly that.

10.      Generative AI chatbots improve their models based on a continuous feedback loop. More users beget more prompts, and more prompts offer more opportunities to train the model, whose better features then attract even more users.

11.      As a result of Apple and OpenAI's exclusive arrangement, ChatGPT is the *only* generative AI chatbot that benefits from billions of user prompts originating from hundreds of millions of iPhones. This makes it hard for competitors of ChatGPT's generative AI chatbot and super apps powered by generative AI chatbots to scale and innovate.

12.      Worse still, Apple has taken further steps to protect its monopoly in smartphones and to preference OpenAI by deprioritizing the apps of competing generative AI chatbots and

super apps in its App Store rankings, and it has dragged out its App Store app review processes for those competitors.

13. As a result of Apple and OpenAI's anticompetitive conduct, Plaintiffs have been foreclosed from a significant number of generative AI chatbot prompts, deprived of scale, and thwarted in their abilities to innovate and improve the quality and competitiveness of their offerings. Moreover, due to the presence of network effects and other scale advantages, the harm from this foreclosure on competition is amplified.

14. In a competitive market for generative AI chatbots, usage of chatbots would be determined by customer choice. Generative AI chatbots would vigorously compete with one another to get customers to use their generative AI chatbot over rival ones. Defendants' anticompetitive conduct has prevented this competition by handing a substantial portion of the market to ChatGPT. This conduct prevents ChatGPT's rivals, such as Grok, from fairly competing with ChatGPT.

15. The result of this scheme is that customers have less choice and receive generative AI chatbots with fewer features and capabilities than they would absent Defendants' anticompetitive conduct.

16. Just as Defendants' conduct has harmed competition in the market for generative AI chatbots, it has locked up the market for smartphones. In a competitive market for smartphones, Apple would compete by lowering prices or innovating to develop features like generative AI to compete against super apps. Instead, Apple has stifled competition. Apple's conduct inhibits the growth of AI and super apps by allowing OpenAI to maintain its monopoly and curtail innovation and investment in generative AI chatbots that would develop into super apps that replace iPhone functionality.

17.     Customers in the smartphone market are harmed by this conduct because they cannot readily switch to less expensive smartphones and use generative AI chatbots and super apps that match or replace the features offered by the iPhone. Absent Defendants' misconduct, consumers would be able to pay less for smartphones and achieve the same or higher quality.

18.     Defendants' conduct has also harmed Plaintiffs by reducing Grok's ability to scale and introduce new features, thus interfering with Plaintiffs' efforts to build super apps. If not for Defendants' conduct, Plaintiffs' apps would be more widely used, generating more revenue for Plaintiffs and accelerating their innovation.

19.     Unless the Court enjoins Apple and OpenAI's unlawful conduct, Defendants will continue to thwart competition, and their competitors, like Plaintiffs, will continue to suffer the anticompetitive consequences. Plaintiffs bring this action to stop Apple and OpenAI from continuing to engage in their anticompetitive scheme and to recover the damages that have been caused—and will be caused—by Apple and OpenAI's misconduct.

## **PARTIES**

20.     Plaintiff X Corp. is a corporation organized and existing under the laws of Nevada, with its principal place of business in Bastrop, Texas. X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through X.com, twitter.com, and various mobile applications. X Corp. merged with Twitter, Inc. in April 2023, and was acquired by X.AI Holdings Corp. in March 2025.

21.     Plaintiff X.AI LLC is a limited liability company formed under the laws of Nevada, with a place of business in Palo Alto, California. Its ultimate parent company is X.AI Holdings Corp.

22. Defendant Apple Inc. is a corporation organized and existing under the laws of California, with a place of business in Cupertino, California. Apple designs, markets, and sells smartphones (the iPhone), personal computers (Macs), tablets (the iPad), wearables, and accessories, as well as a variety of related services. Apple also owns and operates the Apple App Store.

23. Defendant OpenAI, Inc. is a registered nonprofit organization incorporated under the laws of Delaware, with a place of business in San Francisco, California.

24. Defendant OpenAI, L.L.C. is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California and members that are citizens of Texas.

25. Defendant OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware, with a place of business in California and members that are citizens of Texas.

## JURISDICTION AND VENUE

26. The Court has subject-matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

27. The Court has personal jurisdiction over all Defendants under 15 U.S.C. § 22. Alternatively, the Court has personal jurisdiction over all Defendants under Texas's long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, because Defendants transact substantial business within Texas and this District, and this action arises from that business.

28. For example, Apple sells smartphones in Texas—including at its nearly 20 Apple Stores within the state—and to Texas residents, and the OpenAI entities sell ChatGPT or otherwise make it available to residents of Texas and are constructing a data center in Abilene,

Texas. Defendants likewise force iPhone users within Texas who enable Apple Intelligence to use ChatGPT as the integrated generative AI chatbot on their devices, and Defendants have caused fewer Texas iPhone users to download Plaintiffs' apps by manipulating App Store rankings and delaying approval for updates to xAI's Grok app.

29.    Moreover, a substantial portion of the antitrust injury resulting from Defendants' business in Texas forms the basis of this lawsuit because Defendants have targeted X, a Texas resident, in an effort to stifle X's ability to function as a super app. Defendants have also used X's platform to spread disinformation about their anticompetitive scheme.

30.    Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 because Defendants transact a substantial volume of business in the United States and in this District, including without limitation selling smartphones to customers located in this District (Apple) and selling or making ChatGPT available to customers in this District (OpenAI). A substantial portion of the affected interstate trade and commerce described herein has been carried out in this District. Defendants' conduct has harmed the U.S. markets for smartphones and generative AI chatbots, including harming customers within this District.

31.    Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

32.    Because Apple sells smartphones and OpenAI sells or otherwise makes ChatGPT available throughout the United States, across state lines, and internationally, Defendants' conduct substantially affects interstate commerce.

## FACTUAL ALLEGATIONS

**A.**    ***The Rise of AI: From Turing to Billions***

33.    Can machines think? Within a century after Alan Turing, the recognized father of artificial intelligence, first asked that question, machines are not only thinking; they are thinking for us faster than we ever could. AI could beat its programmer at checkers by 1959, engage in conversation by 1966 (ELIZA), defeat the world's reigning chess champion by 1997 (IBM Deep Blue), and topple former *Jeopardy!* champions by 2011 (IBM Watson).

34.    ELIZA was the world's first chatbot—i.e., AI that can simulate human conversation. While ELIZA could simulate a conversation with a psychotherapist, it used keyword recognition to produce replies to questions from a set of predefined scripts and could not produce new responses outside that set of scripts.

35.    Unlike ELIZA, generative AI chatbots today can generate new content in response to a user's prompt (i.e., a user question or request) and are not limited to answers from a predefined set of information. For example, if a user were discussing Shakespeare but suddenly pivoted to talking about lunch, a generative AI chatbot would be able to keep up with that drastic change in topic, while a non-generative AI chatbot would be limited to preexisting topics and keywords it had access to, breaking the natural flow of the conversation.

36.    2022 saw the launch of a wave of generative AI products that the general public could use, including products that generate images in response to text prompts (Meta's Make-A-Scene, OpenAI's DALL-E-2, and Stability's Stable Diffusion), and generative AI chatbots like ChatGPT, which can mimic human interactions by predicting the word most statistically likely to appear next.

37.    Since then, generative AI chatbots have only become a bigger part of our daily lives. By 2024, two years after generative AI chatbots became available to the general public, 39 percent of working-age adults in the U.S. reported using generative AI chatbots, either for work or personal use. Researchers have credited the rapidity of this widespread use to several factors, including that generative AI chatbots do not require purchasing additional, specialized hardware to use.

38.    Large-scale investment in generative AI, particularly from private sources, has quickly followed, signaling the move of generative AI from a niche academic field into a cash cow industry worth billions. Private investment in generative AI globally was $33.9 billion in 2024, an increase of 18.7 percent from the prior year. Of those private investments, the U.S. alone exceeded the combined total investment from China, the European Union, and the U.K. by $25.4 billion.

**B.**    ***OpenAI Emerges As A Dominant Player In Generative AI Chatbots***

39.    Founded in 2015 with the stated goal of developing AI tools to "benefit humanity as a whole, unconstrained by a need to generate financial return," OpenAI quickly rose to dominance in the market for generative AI chatbots. Today, OpenAI reigns as a monopolist in generative AI chatbots, controlling more than 80 percent of the market based on web usage, with an even higher share of mobile app usage.

40.    OpenAI released the first iteration of its flagship product, now known as ChatGPT, in 2022. A mere 5 days after launch, ChatGPT had acquired 1 million users, making it the fastest-growing application in history at that time. By comparison, it took Instagram 2.5 months and Netflix 3.5 *years* to reach the same 1-million-user metric.

41.     ChatGPT's exponential growth has only continued. Two months after launch, OpenAI had amassed 100 million monthly active users for ChatGPT, and today ChatGPT has approximately 700 million weekly active users worldwide. ChatGPT can be accessed through a web browser—and as Apple's arrangement with OpenAI has demonstrated, it is increasingly accessed as an app or through a native integration on smartphones.

### C.     *OpenAI Shifts From Benefitting Humanity To Putting Profit Over Safety*

42.     The blockbuster success of ChatGPT seduced OpenAI into taking actions at odds with its altruistic beginnings. When OpenAI first applied for tax-exempt status in 2016, it stated that it would "be a nonprofit corporation organized exclusively for charitable and/or educational purposes"; that "the specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence"; and that "[t]he corporation is not organized for the private gain of any person." It also promised that "OpenAI does not plan to play any role in developing commercial products or equipment."

43.     OpenAI's philanthropic ideals lasted only three years. Lured by the size of the AI startup investment pie (which by 2019 totaled $40.4 billion globally), OpenAI announced on March 11, 2019 the formation of OpenAI LP, a for-profit entity that would ostensibly help "raise investment capital and attract employees" by promising its investors "a capped return" of "100x their investment"—a cap that OpenAI buried in the text of the announcement.

44.     OpenAI's switch to focus on profit coincided with a slew of concerns about the privacy and security of ChatGPT. In 2021, eleven members of OpenAI's safety team left to form a rival generative AI startup, Anthropic, because they were concerned that beyond simply "scaling models up," generative AI needed better safety, including privacy and storage of customer data. Anthropic cofounder Dario Amodei had written most of OpenAI's charter, which

committed OpenAI to its high-minded ideals. He shared years after his departure that he had to leave OpenAI because he believed in responsible AI development that was both ethical and profitable, and "it [was] incredibly unproductive to try and argue with someone else's vision."

45.     On March 30, 2023, the Center for AI and Digital Policy submitted a 46-page complaint to the U.S. Federal Trade Commission (the "FTC"), alleging violations of Section 5 of the FTC Act for unfair and deceptive practices and urging an investigation into OpenAI's cybersecurity and data privacy risks. One incident described in the complaint involved a stunning privacy breach in which users reported seeing the prompt history from *other ChatGPT users*.

46.     In July 2023, the FTC launched an investigation into OpenAI's security and data privacy practices, including "how the start-up trains its A.I. models and treats personal data" and "how the company collects, sources, and retains data, as well as how it trains ChatGPT and evaluates the accuracy and reliability of its outputs."

47.     That same month, OpenAI established a team called "Superalignment" to address concerns about ChatGPT around security, monitoring, safety, and social impact. OpenAI further promised to dedicate 20 percent of its then-available computing resources to support that team's efforts.

48.     By November 2023, OpenAI's own Board believed the company had strayed so far from its original mission to "benefit humanity as a whole" that they ousted CEO Sam Altman from the company. In their November 17, 2023 press release, the OpenAI Board stated that Altman was "not consistently candid in his communications with the [B]oard, hindering its ability to exercise its responsibilities," and that the Board "no longer ha[d] confidence in his ability to continue leading OpenAI." However, this too was short-lived: the Board caved to

11

pressure from Microsoft and other investors and reinstated Altman only a few days later, with Altman making vague promises to be more responsible.

49.    Soon after Altman returned, the FTC launched yet another inquiry into OpenAI's practices on January 25, 2024, this time focused on antitrust concerns.

50.    The FTC inquiry was followed by a May 21, 2024 *Fortune* article, which revealed that the team that OpenAI had promised would address safety concerns had quietly been disbanded. Former team members revealed that not only did OpenAI never provide them with the promised 20 percent of computing resources—OpenAI actively denied them access to resources needed to fulfill the team's stated mission. The veteran OpenAI researcher leading the team resigned, later posting on the X platform that "safety culture and processes have taken a backseat to shiny products."

51.    Others at OpenAI shared that former researcher's sentiments. In June 2024, eleven current and former OpenAI employees published an open letter to "advanced AI companies," flagging the need to keep the public informed about the inherent risks involved in AI and urging that those companies protect their employees' rights to raise risk-related concerns, including refraining from enforcing any non-disparagement agreements. That all the current OpenAI employees who signed on felt the need to do so anonymously is telling.

52.    In December 2024, OpenAI announced that it was restructuring its core business into a for-profit corporation that would no longer be controlled by its nonprofit Board and that it would give Altman equity in the for-profit corporation. This announcement was particularly tone-deaf given the continued alarms about OpenAI's practices sounding from inside and outside the company. OpenAI has since walked back this plan after public backlash.

53.    OpenAI's rapid growth—fueled by the controversial business decisions for which it has been criticized and investigated—has so entrenched its dominance that it is now widely recognized that "[t]his company, more than any other, has set the tone for the generative-AI era." Yet the concerns that have dogged OpenAI since it first established a for-profit arm remain, with former OpenAI employees and Board members accusing OpenAI of putting profit over safety.

### D.    *AI And Super Apps Threaten Apple's Monopoly Over Smartphones*

54.    OpenAI's rapid growth in developing generative AI tools stands in stark contrast to that of Apple, which was blindsided by ChatGPT's launch in 2022 and has been scrambling to develop its AI capabilities ever since.

55.    Apple is the dominant provider of smartphones in the United States. Siri, Apple's voice-activated chatbot, has been a household name since its launch and integration with the iPhone in 2011. But instead of investing in Apple's own generative AI for iPhones, Apple has been content to provide routine annual tweaks to the iOS and use its cash to buy back its own stock ($77 billion in the 2023 fiscal year).

56.    According to an Apple executive, Apple's only generative AI offering, Apple Intelligence, "wasn't even an idea" when ChatGPT launched. Not until June 2024—thirteen years after Siri—did Apple finally launch Apple Intelligence, which is built into iOS. And although Apple announced in September 2024 that the iPhone 16 had been "built from the ground up" for Apple Intelligence, the iPhone 16 did not have any AI features when it launched later that month, triggering a slew of ongoing class actions on behalf of customers who believed they had purchased AI-enabled devices. Apple does not offer its own generative AI chatbot, and its executives have recently confirmed that the company is not building a publicly available generative AI chatbot.

57.    Members of Apple's AI team have admitted that Apple's failure to innovate in the AI space reflects "a crisis" and that Apple's AI effort has "been sinking for a long time." Indeed, Apple's Senior Vice President for Services, Eddy Cue, has expressed worries that AI could obliterate Apple out of relevance, just as the iPhone did to Nokia's handsets.

58.    AI poses an existential threat to Apple because, among other things, generative AI chatbots and related super apps stand to reduce consumers' dependence on smartphones like Apple's iPhone. Put differently, as Cue testified under oath, the development of AI means that consumers "may not need an iPhone 10 years from now."

59.    A world in which iPhones are irrelevant would be devastating for Apple. Smartphones are the heart of Apple's business, with the iPhone driving approximately half of Apple's overall revenue every year since at least 2012. And with 65 percent market share, Apple is the dominant player in the United States smartphone market.

60.    Smartphones like Apple's iPhone offer users a range of functionality. Much of the iPhone's functionality is available through apps that users can download through Apple's digital storefront, the App Store. Through various apps, smartphone users can, among other things, make phone calls and send messages; access the Internet; access entertainment such as music, videos, and games; receive up-to-date information on a range of topics like current weather or stock prices; shop; manage banking; and create content. Apple controls which apps it allows on the App Store through its "App Review Guidelines."

61.    Generative AI chatbots have already replaced much of the functionality smartphone users desire. For example, many things that require separate apps on an iPhone—like checking the weather, learning about a particular topic, following current events, getting

directions, editing photos, and tracking current stock prices—can be accomplished through a single generative AI chatbot.

62.     Generative AI chatbots have also accelerated the rise of super apps, which combine additional functions offered by smartphones—like banking, messaging a friend, or playing a game—into a single platform that can work the same across any browser or device. In other words, super apps can host apps and services without relying on a smartphone's operating system. And when leveraging the capabilities of AI, super apps become even more powerful and take on even more functionality.

63.     The more a user relies on the functionality offered by a generative AI chatbot for a significant number of tasks, the less important other features of a smartphone become. For example, a user who relies on a generative AI chatbot to edit photos will become agnostic to the relative quality in photo-editing tools offered on various smartphones, such as Apple Photos on the iPhone. As this becomes true for more and more categories of functionality, it begins to erode Apple's value proposition that it is worth spending up to $1,599 on an iPhone when a user could access his or her preferred generative AI chatbot through some less expensive option. In other words, generative AI chatbots reduce switching costs for users in the smartphone market.

64.     Similarly, the more a user interacts with a super app, the more the user turns to the super app itself rather than the smartphone software hosting the app. Eventually, a user can rely solely on the super app for the functionality he or she desires and can port that functionality across smartphones or devices. In this way, super apps likewise reduce switching costs for users in the smartphone market. Super apps also lower barriers to entry for smartphone competitors. Users who have the functionality they desire in a super app can purchase a simpler—and less

expensive—smartphone to run the super app and replace the functionality offered by the iPhone, which is priced above competitive levels.

65.     Apple understands that demand for smartphones like the iPhone decreases as super apps become more popular, and it has characterized the rise of super apps as a "major headwind" to iPhone sales in countries where those apps are popular. This is why Apple for years effectively blocked app developers from developing super apps and denied its users access to certain functionalities offered by those apps—conduct that the U.S. Department of Justice (the "DOJ") recently alleged to be anticompetitive in a lawsuit filed in the District of New Jersey that has survived a motion to dismiss. As alleged in the DOJ case, one Apple manager explained that allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate." Apple has also acknowledged the risk that a potential super app created by a specific U.S. company would "replace[ ] usage of native OS and apps resulting in commoditization of smartphone hardware." From Apple's perspective, super apps are "fundamentally disruptive" to "existing app distribution and development paradigms." This "paradigm" maintains Apple's monopoly because with super apps, "demand for iPhone[s] is reduced."

66.     Apple has similar incentives to stymie AI innovation: as one super app developer touts on its website, AI "will be a cornerstone of super app evolution." A tech company CEO agrees: "With the advent and mass adoption of generative AI . . . super apps have the potential to become more powerful and expand the scope of use cases further."

**E.     *X And xAI Leverage AI Capabilities To Compete With OpenAI and Apple***

67.     Fueled by a vision to make an "everything app," Plaintiffs are working collaboratively to develop super apps. For example, X is creating a super app combining social

connectivity and messaging, financial services, and AI-driven tools. Among the steps X has taken to make this vision a reality in the past year alone, X partnered with Visa to help build the financial services portion of its super app (which will serve as an alternative to Apple Pay), partnered with Crush Capital to license and distribute its interactive investment show, and partnered with Shopify to allow users to shop. Indeed, X has been building its app to be a super app ever since it merged with Twitter—for example, soon after the 2023 merger, it added features that allow users to make audio and video calls.

68.     xAI's generative AI chatbot, Grok, is a key piece of Plaintiffs' super app endeavor. Launched by xAI in November 2023, Grok—which is available through web browsers and apps, and can be made available through integrations with devices or other apps—directly competes with ChatGPT. Since its launch, Grok has received overwhelmingly positive feedback. For example, one tech executive testified that Grok is "really, really strong." The Grok app currently has over 500,000 reviews and a rating of 4.9 stars in Apple's App Store, and it is consistently ranked by independent sources as one of the most (if not the most) intelligent generative AI chatbots. But despite these accolades, Grok has yet to attain more than a few percent of the generative AI chatbot market, stifled by anticompetitive actions taken by Apple and OpenAI.

69.     X's integration of Grok's functionality into its digital town square is a major undertaking that has required substantial investment.

## F.     *The Exclusive Apple-OpenAI Arrangement*

70.     Rather than contending on the merits with the competitive threat posed by Plaintiffs, Apple and OpenAI instead joined forces to stifle competition in their respective markets.

71.     In June 2024, Apple and OpenAI announced a deal: Apple would integrate ChatGPT into iOS. This deal is exclusive. Apple has not integrated with any other generative AI chatbots, including xAI's Grok. xAI has asked Apple to integrate Grok with iOS, but Grok has not been allowed to do so.

72.     Others have also been locked out of integration with iOS due to Apple and OpenAI's illegal arrangement. As Google's CEO Sundar Pichai testified earlier this year, Google could not reach an agreement to integrate with Apple because Apple had decided to integrate ChatGPT. Anthropic was also an unsuccessful competitor for the deal with Apple that ChatGPT won.

73.     Apple's head of AI, John Giannandrea, lobbied against the deal with OpenAI, voicing concerns that OpenAI is untrustworthy. But in the end, Apple's corporate development team overruled the concerns of the AI product team and allowed the integration to proceed.

74.     As a result of the Apple-OpenAI deal, ChatGPT is not just the default—it is the *only* generative AI chatbot with a first-party integration into Apple's smartphones. As reflected in Figure 1, this means that iPhone users who want to use a generative AI chatbot for certain tasks on their iPhones can use *only* ChatGPT.

*Figure 1*



75.    With this integration, users who use Apple Intelligence on their iPhones can do

things like receive answers from Apple's voice assistant, Siri, based on information provided by

ChatGPT; natively use their iPhone camera to learn information from ChatGPT about the places or objects around them; and use ChatGPT with Apple's Writing Tools to compose text from a description. So if an iPhone user wants to ask Siri a question and receive a response that taps into generative AI chatbot capabilities, the user can do so only through ChatGPT. There is nothing the iPhone user can do—no app the user can download, no setting the user can change—that allows the user to receive information from Siri provided by any other generative AI chatbot.

76.    As reflected in Figures 2 and 3, iPhone users have posted on Apple's official Support Community that they would like to be able to choose between ChatGPT and other alternatives like Grok and Gemini:

*Figure 2*



*Figure 3*



## Can I switch from Siri to Gemini on iPhone?

I want to use Gemini instead of Siri as my assistant how can I make this switch

[Re-Titled by Moderator]

*iPhone 15 Pro Max, iOS 18*
Posted on Dec 31, 2024 11:37 AM

77.    Although iPhone users can still access other generative AI chatbots on their iPhones by using a web browser or by downloading a particular generative AI chatbot's app, those options do not provide the same level of functionality, usability, integration, or access to user prompts as ChatGPT's first-party integration with Apple. For example, there is currently no

way for Siri to provide answers from a generative AI chatbot other than ChatGPT. This means that ChatGPT has exclusive access to billions of potential prompts. Additionally, Apple's Writing Tools (e.g., using AI to draft emails) and Apple's camera application have native integrations with ChatGPT. This, too, provides ChatGPT exclusive access to user prompts in these apps.

78.    Moreover, because OpenAI's ChatGPT is the only generative AI chatbot integrated with Apple's iPhone and can be accessed by users through that integration, users that might otherwise download other generative AI chatbots from Apple's App Store have no reason to do so. In other words, other generative AI chatbots not only miss out on user prompts they would be able to access were they given the ability to integrate with iOS like ChatGPT; they also miss out on prompts by users who never download a generative AI chatbot through the App Store because the integration makes it unnecessary for them to do so. In addition, ChatGPT is advantaged even as to users who do download generative AI chatbots through the App Store because Apple's integration with ChatGPT amounts to an endorsement and award of default status.

### G.    *Apple Further Protects Its Smartphone Monopoly And Its Anticompetitive Arrangement With OpenAI*

79.    Beyond promoting ChatGPT by making it the sole generative AI chatbot integrated with iOS, Apple has taken further and separate steps to protect not only its dominant position in the smartphone market, but also OpenAI's dominant position in the market for generative AI chatbots.

80.    For example, Apple has deprioritized the apps of super app and generative AI chatbot competitors, like the products offered by Plaintiffs, in its App Store rankings to favor OpenAI and undermine developing threats to its own monopoly.

81.     Being prominently featured in Apple's App Store rankings is crucial for app developers like Plaintiffs because the rankings influence an app's number of downloads, which in turn affects the revenue generated by the app. Indeed, App Store rankings are so important that there is now an entire ecosystem of tools and services aimed at facilitating "app store optimization," or the art of increasing a given app's visibility through its App Store rankings.

82.     Though Apple provides little transparency about the selection criteria and processes for its App Store rankings, it has publicly stated that it features apps using "algorithmic recommendations" and "curated lists selected by experts." Both methods are prone to bias, and that bias has played out in favor of Apple and OpenAI. Phillip Shoemaker, the former director of app review for Apple's App Store, acknowledged that App Store rules are often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors." He also admitted that Apple has favored its own apps over those of competitors and has used pretextual reasons to remove apps from Apple's competitors.

83.     When accessed from an iPhone, the "Apps" landing page on the App Store contains various lists of recommended apps—for example, "Must-Have Apps" and "Top Free Apps." The category of "Must-Have Apps" is the first to appear and thus has the most visibility to iPhone users. Apple exercises more editorial control over the "Must-Have Apps" rankings than it does over other lists.

84.     The X app and the Grok app are consistently highly ranked in Apple's subject-specific "Top Apps" charts in the App Store, which take into account criteria such as usability, positive reviews and ratings, and downloads. As reflected in Figure 4 below, on August 24, 2025, the X app ranked as the number 1 free app for "News" and the Grok app ranked as the number 2 free app for "Productivity."

*Figure 4*



85.    Despite their high rankings in the subject-matter-based "Top Apps" lists, neither the X app nor the Grok app appeared in the "Must-Have Apps" section of the App Store on August 24, 2025. Instead, as reflected in Figure 5 below, the first 11 listed apps in the "Must-Have Apps" section on August 24, 2025 do not include the X app or the Grok app. Neither the X app nor the Grok app appears further down on the list, either. This is also true of other generative AI chatbot and super app competitors. In fact, ChatGPT is the *only* generative AI chatbot with an app that appeared in the "Must-Have Apps" section of the App Store on August 24, 2025.

*Figure 5*



86.    By contrast, other apps that are ranked lower than the X app and the Grok app in their respective "Top Apps" lists are featured in the "Must-Have Apps" section of the App Store. For example, on August 24, 2025, Dropbox was featured in "Must-Have Apps" despite being ranked as the 24th free app for "Productivity." Similarly, Tinder was featured second in "Must-Have Apps" despite being ranked as the 9th free app for "Lifestyle."

87.    Apple's statements that the App Store "is designed to be fair and free of bias" are undermined by the mismatch in the popularity of the X app and the Grok app and those apps' visibility in the App Store.

88.    In addition to deprioritizing the X app and the Grok app in its App Store rankings, Apple has also protected its arrangement with OpenAI and OpenAI's dominant market position by delaying approvals for updates to the Grok app and by rejecting numerous requests by xAI for

the Grok app to be featured in the App Store, including when it launched and when innovative

enhancements were added to its offering, such as its new "Imagine" feature.

89.    Just last year, the DOJ alleged in its lawsuit against Apple that Apple had engaged

in widespread "use [of] App Store rules and restrictions to penalize and restrict developers that

take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode

Apple's monopoly power." Apple is doing just that to Plaintiffs.

### H.    *The Apple-OpenAI Arrangement Entrenches The Two Monopolists' Positions In Their Respective Markets*

90.    The exclusive Apple-OpenAI arrangement helps both monopolists fend off

emerging competition.

91.    OpenAI's strategy is to build "moats" to protect its monopoly position. OpenAI's

exclusive deal with Apple creates a moat—and thus protects OpenAI—because of Apple's

monopoly in smartphones. Specifically, ChatGPT's status as the exclusive default generative AI

chatbot for the iPhone drives prompt volume exclusively to ChatGPT through that access point.

With Apple controlling 65 percent of the smartphone market, the integration gives ChatGPT

exclusive access to potentially billions of user prompts originating from hundreds of millions of

iPhones.

92.    Prompt volume is critical for generative AI chatbots like ChatGPT because

generative AI chatbots derive significant advantages from scale. More prompts result in more

responses, giving the AI model more training data. Because generative AI chatbots continually

improve their algorithms as they receive additional user prompts, additional prompts improve a

generative AI chatbot's model. These improvements draw in more users and create more

prompts. And because the Apple-OpenAI arrangement deprives other generative AI chatbots of

all prompts natively originating from iPhones, it deprives those competitors of scale and opportunities to improve their technology.

93.    Nick Turley, OpenAI's head of ChatGPT, testified that "the more people use [ChatGPT], especially for niche things, the more we're able to improve [it]." This creates a feedback loop: scale begets more scale, making it hard for rivals to grow. A blog post from the FTC's Bureau of Competition and Office of Technology has recognized this phenomenon in generative AI chatbots: "A first mover could secure a significant advantage over its competitors because its models, by virtue of having interacted with a greater number of users over a longer period, are able to generate more engaging and useful content than rival products. Because positive feedback loops can improve the performance of generative AI models, generative AI products can get better the more people use them." The blog post concluded that "network effects can supercharge a [generative AI chatbot] company's ability and incentive to engage in unfair methods of competition."

94.    The importance of scale is evidenced by the Apple-OpenAI arrangement. OpenAI charges fees for ChatGPT integrations with other products. This is because these integrations create additional prompts that, in the aggregate, are tremendously costly due to the computing resources required to generate a response. But OpenAI has provided ChatGPT to Apple for free and is functionally paying for the arrangement itself. A report explained the reason for doing so: "Apple . . . pushing OpenAI's brand and technology to hundreds of millions of its devices is of equal or greater value than monetary payments." In other words, the access to exclusive prompts that ChatGPT receives is so valuable—allowing ChatGPT to insulate its market position from competition due to network advantages and other advantages from scale—that OpenAI is willing to sacrifice short-term profits in exchange for such access.

95.     Apple benefits from the arrangement's denial of prompts to rival generative AI chatbots because the resulting hindrance to scale and innovation slows or prevents those generative AI chatbots from emerging as part of AI-powered super apps, which Apple hopes will squeeze out OpenAI's competitors so the two monopolists can continue to benefit from each other's monopoly rents. In fact, as discussed further below, Apple and OpenAI have already agreed on a way to share those rents as the arrangement between Apple and OpenAI grows.

96.     Moreover, there is no telling how long this exclusive arrangement will last. OpenAI itself has complained that a six-month moratorium on its AI-development work would be enough for its competition to catch up. Plaintiffs suffer harm every moment they are illegally denied access to these prompts.

97.     While Apple currently receives OpenAI's product for free, Apple ultimately aims to further profit from the deal by striking a revenue-sharing agreement with OpenAI through which Apple gets an eventual cut of OpenAI's monetization of ChatGPT prompts through its iPhones and other devices. In other words, OpenAI will be supplying Apple with its technology and paying Apple for that privilege, while ChatGPT becomes the default generative AI for iPhone and other Apple device users. OpenAI strategy documents reveal that OpenAI plans to increase its "Pro" subscription from its current pricing of $20 per month to $44 per month by 2029—annualized price increases of approximately 20 percent per year. Apple will in turn take its slice of these monopoly rents extracted by OpenAI.

**I.     _There Is No Valid Business Reason for Apple And OpenAI's Conduct_**

98.     There is no valid business reason for the Apple-OpenAI deal to be exclusive. Any benefits to users from integrating the iPhone with ChatGPT could have been accomplished without providing exclusivity to OpenAI's ChatGPT, instead allowing customers to choose

which generative AI chatbot to use. OpenAI has recognized as much, acknowledging in a strategy document that "[r]eal choice drives competition and benefits everyone" and that "[u]sers should be able to pick their Al assistant."

99.     Potential security issues also do not justify Apple's choice to integrate only with OpenAI. In fact, although Apple CEO Tim Cook posted on the X platform that the Apple-OpenAI integration is "built to protect user privacy at every step," Apple still partnered with OpenAI despite internal concerns over OpenAI's safety and security so that both companies could jointly pursue their anticompetitive ends.

100.     Plaintiffs are also aware of no technical reason preventing Apple from integrating with multiple generative AI chatbots. Other generative AI chatbots, like Grok, offer Application Programming Interfaces ("APIs") that can integrate with third-party applications like Apple's Siri.

101.     Moreover, by making the deal exclusive, Apple sacrificed the profits it would have earned had it integrated with multiple generative AI chatbots. Apple will earn a revenue share from its integration with ChatGPT. But by limiting the integration to ChatGPT, Apple forgoes a revenue share from other generative AI chatbots. Such chatbots would drive additional usage of their tools through Apple Intelligence and would thus cause additional revenue to flow to Apple. Instead, Apple has sacrificed short-term profits in lieu of a share of OpenAI's future monopoly rents.

102.     If not for its exclusive deal with OpenAI, Apple would have no reason to refrain from more prominently featuring the X app and the Grok app in its App Store. Indeed, Apple's explanations for the ranking inconsistencies are nothing more than pretext. For example, while Apple touts on its website that apps offered on the App Store "are held to the highest standards

for privacy, security, and content," many of the apps Apple promotes or has promoted in its "Must-Have Apps" raise content or security issues. The streaming app Crunchyroll, for instance, was embroiled in litigation alleging that it disclosed users' personally identifiable information to third parties without their consent, and the streaming app Twitch has been sued for unlawfully prohibiting users from criticizing the site.

**J.      *The Effects Of The Apple-OpenAI Arrangement***

103.     The Apple-OpenAI arrangement has foreclosed competition among generative AI chatbots, deprived competing generative AI chatbots of scale, and reduced quality and innovation. All of these impacts have, in turn, helped OpenAI and Apple maintain their monopolies.

104.     In and of itself, ChatGPT's exclusive access to prompts from Siri represents a substantial share of the generative AI chatbot market that is now closed to generative AI chatbot competitors. As of 2024, Siri represented 1.5 billion user requests per day globally. This is more than the total prompts for generative AI chatbots in 2024 and amounts to giving OpenAI exclusive access to up to 55 percent of all potential generative AI chatbot prompts. On information and belief, Siri prompts represent a similar percentage of U.S. generative AI chatbot prompts. And these percentages are even higher when considering only generative AI chatbot prompts from smartphones, the market in which Apple maintains its monopoly.

105.     Beyond Siri, ChatGPT's exclusive access to prompts sent from iPhones when using Apple's Writing Tools (e.g., using ChatGPT to help draft an email in Apple's email application) or using Apple's camera application (e.g., prompts for information about objects in the camera's view) represent additional prompts available to ChatGPT that are unavailable to rival generative AI chatbots.

106.     OpenAI is also advantaged by Apple using its dominant position in smartphones to preference the ChatGPT app in Apple's App Store, boosting its downloads relative to other generative AI chatbots.

107.     The Apple-OpenAI arrangement has driven scale to ChatGPT and away from ChatGPT's rivals, including Grok. Generative AI chatbots involve significant network effects and scale advantages that exacerbate the economic effects of foreclosure. Where scale begets scale, exclusive access to a massive number of prompts has cemented and will continue to cement ChatGPT's market position and insulate it from competition. ChatGPT was already the largest AI chatbot before the arrangement with Apple. Since Apple and OpenAI entered into the arrangement, rivals have had little hope to catch up on the scale needed to fairly compete with ChatGPT.

108.     The network effects are so strong that despite billions in investments by established tech companies, no competitor has been able to challenge ChatGPT's stranglehold on the market, with a market share of 80 percent or more.

109.     The Apple-OpenAI arrangement also discourages innovation. Because OpenAI has been able to deprive rivals of scale, the amount of investment and innovation in the industry is lower than it would be but for the unlawful agreement between the two monopolists: scale affects the availability of data used for product development, which in turn affects competitors' ability to obtain funding for continued innovation and product development. Moreover, ChatGPT's competitors' innovative efforts have been stymied because they do not have native integration into iPhones. In a but-for world where Apple allowed iPhone users to choose which generative AI chatbot to use, generative AI chatbots would compete for users by innovating—for example, by developing new technologies to incorporate into the existing Siri functionality—to

be selected by users as their generative AI chatbot within the iPhone. (Other smartphone manufacturers have shown that this approach is feasible: Motorola, for example, has made deals with multiple generative AI chatbots to provide users choice among AI tools.) Instead, the competition ended before it even began: Apple's users have been served to OpenAI. The result is that OpenAI does not need to spend much effort to innovate, because its position has been secured by the Apple-OpenAI arrangement.

110.    The Apple-OpenAI arrangement also discourages investment in startups. OpenAI's dominant position and power over price have attracted immense funding. In March 2025, OpenAI had an investment round attracting an additional $40 billion in investment valuing OpenAI at $300 billion. While funding has coalesced around the market leader, funding for other generative AI chatbot startups has been limited in comparison. A leaked memo from Anthropic (whose generative AI chatbot, Claude, competes with ChatGPT) revealed that Anthropic's CEO decided to court investment from the Middle East, despite having moral qualms about doing so, because he thought it was necessary to stay competitive.

111.    These effects on the market—less competition, less scale necessary to compete, less investment, and less innovation—ultimately harm consumers through lower quality, less choice, and higher prices than would exist in the but-for world without Defendants' anticompetitive conduct.

112.    The anticompetitive conduct done to maintain ChatGPT's dominant position helps Apple maintain its smartphone monopoly and harms smartphone customers.

113.    Apple has long feared a smartphone market where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device." In that world, customers do not need to pay

supracompetitive iPhone prices to achieve high-level functionality, because they can substitute iPhone functionality with that from super apps integrating generative AI chatbots.

114.     Apple has recognized that the "stickiness" of iPhones—customers' inability to switch to competing products—is due in part to the lack of super apps in the United States. Apple's presentations to its Board have highlighted that Apple faces "headwinds" in countries where super apps are common. Apple has also expressed concern about the competitive threat of cloud computing to its smartphone monopoly due to cloud computing's ability to replace features offered through Apple's iPhone.

115.     Defendants' conduct has inhibited super apps from taking hold. As described above, super apps prominently feature generative AI chatbots. Thus, the better the generative AI chatbot, the more attractive the super app. But Defendants' conduct has made all generative AI chatbots other than ChatGPT less attractive. Put another way, by disadvantaging Grok relative to ChatGPT, Defendants have also made it harder for users to switch to cheaper smartphones.

### K.     *Relevant Markets*

#### 1.     *Smartphones*

116.     Smartphones are a relevant antitrust market.

117.     Smartphones are mobile telephones that incorporate a display screen and an operating system that allows software systems to be installed on the smartphone. Smartphones also typically incorporate hardware such as cameras for recording and transmitting photos and videos, and technology for accessing Wi-Fi.

118.     "Feature phones" are not reasonable substitutes for smartphones. Feature phones have basic operating systems compared to smartphones and have limited support for third-party software, such as mobile apps. Feature phones offer only basic versions of calendar, email, and

browsers, while smartphones have versions of these tools that are integrated with the smartphone's operating system (or can be supplied via mobile apps), allowing more features unavailable on feature phones, such as push notifications. Smartphones are substantially more expensive than feature phones.

119.    Other portable devices, such as laptops and other computing devices (e.g., tablets and smart watches) are not reasonable substitutes for smartphones. Smartphones are designed to be usable with one hand and can typically fit in a person's pocket, unlike tablets and laptops. And unlike tablets and laptops, smartphone hardware emulates traditional phones—with a receiver and speaker corresponding to where a user's ear and mouth are—making smartphones better suited for phone calls, particularly when the smartphone user is on the go. Smartwatches have smaller displays than smartphones, making smartwatches unsuitable to many smartphone use cases (e.g., watching a movie via a streaming platform is not feasible on a smartwatch). Apple's own smartwatches are designed to be used with an iPhone and offer specific features that cannot be used without a customer using both the Apple Watch and the iPhone.

120.    Given the feature and price differences, a hypothetical monopolist of smartphones could implement a small but significant non-transitory increase in smartphone prices without smartphone customers switching to feature phones or other portable digital devices to discipline such a price increase.

121.    Smartphones are recognized as distinct from other products by industry sources and by the public at large. Apple and Samsung, for example, market "smartphones" on their websites.

122.    The relevant geographic market for smartphones is the United States.

123.    U.S. smartphone customers often purchase smartphones together with a mobile phone plan. In such cases, the carrier helps the customer set up the smartphone. Additionally, U.S. mobile carriers often provide promotions where the smartphone and phone plan are discounted when purchased together. Any customer who would purchase a smartphone outside of the United States would lose access to these benefits. Additionally, smartphone warranties are typically restricted to the country of purchase, which means that U.S. purchases of smartphones abroad are done at the customers' own risk of manufacturing or other defects.

124.    Smartphones made for regions outside the U.S. use different components designed for use with different cellular technologies than those used in the United States. Mobile networks outside the U.S. can use different cellular bands than are used within the United States. The difference in cellular technologies in the U.S. and the country of purchase can limit the functionality of smartphones purchased abroad or even render them unusable in the United States.

125.    U.S. regulations—including Federal Communications Commission and trade regulations—also constrain the sale of non-U.S. smartphones within the United States.

126.    Because U.S. smartphone customers cannot reasonably substitute to non-U.S. smartphones, the relevant geographic market for smartphones is the United States.

### 2.    *Generative AI Chatbots*

127.    Generative AI chatbots are a relevant antitrust market.

128.    Generative AI chatbots are artificial intelligence systems that engage in human-like conversations based on a user's prompt. These products rely on innovative technologies—including large language models ("LLMs"), deep learning, and natural language understanding (i.e., understanding prompts and responding using human-like communication)—to create new

content as opposed to relying on scripted replies. Generative AI chatbots can recognize, summarize, translate, predict, and create content in response to a user prompt. Generative AI chatbots are self-learning: they continually improve their algorithms as they receive additional user prompts.

129.    OpenAI's ChatGPT provided the following definition of a generative AI chatbot:

*Figure 6*

what is a generative AI chatbot?

A **generative AI chatbot** is an artificial intelligence system designed to simulate human-like conversation and **generate original responses** based on input it receives. Unlike rule-based chatbots that rely on predefined scripts, **generative chatbots use machine learning models**—especially large language models (LLMs)—to understand context, infer meaning, and produce coherent, often creative, replies.

130.    ChatGPT recognizes itself as an "AI chatbot" that "can understand and generate human-like text":

*Figure 7*

what is chatgpt

ChatGPT is an **AI chatbot developed by OpenAI**. It's based on a family of advanced language models called **GPT (Generative Pre-trained Transformer)**. ChatGPT can understand and generate human-like text, making it useful for a wide range of tasks like:

- Answering questions
- Writing and editing text (emails, essays, code, etc.)
- Translating languages
- Explaining concepts
- Brainstorming ideas
- Simulating conversations

131.    Generative AI chatbots can be accessed on websites, by downloading an app onto a smartphone, and by interacting with a generative AI chatbot that has been integrated into a device, including via APIs. For example, a user could submit a prompt to ChatGPT by going to

chatgpt.com or by using the Siri assistant feature on iPhone. Generative AI chatbot prompts are increasingly submitted via smartphones.

132.    Non-chatbot generative AI tools are not reasonable substitutes for generative AI chatbots. For example, generative AI tools that are limited to making images and videos (like Midjourney) are not substitutes for generative AI chatbots because they cannot respond to the diverse range of prompts that a generative AI chatbot can respond to. Midjourney, for example, cannot answer a user's questions or provide human-like responses to user prompts. Other specialized generative tools—like computer-coding assistants—similarly cannot respond to the broad range of prompts that a generative AI chatbot can and instead are limited to a single purpose. Generative AI chatbots provide unique value to customers by providing responses to the entire spectrum of potential prompts.

133.    Non-generative AI tools, including non-generative AI chatbots, are not reasonable substitutes for generative AI chatbots because generative AI chatbots provide significant additional functionality. Non-generative AI tools cannot understand natural language prompts, and they provide scripted—not natural language—responses. A non-generative AI chatbot relies on scripted flows in conversations and provides scripted responses. Accordingly, such chatbots have limited flexibility in responding to novel user prompts and will provide non-responsive answers. Other AI chatbots that do not use LLMs or deep learning struggle with complexities and nuances and thus provide less accurate responses than generative AI chatbots. And unlike other non-generative AI chatbots, generative AI chatbots can produce completely new content, including conversation, computer code, images, videos, and music.

134.    As an example, the below images in Figure 8 were created using xAI's Grok by typing in the input "Draw a giraffe playing chess against an android."

*Figure 8*



135.    A chatbot without generative AI technology—such as a tool to help a customer in making orders or managing their bank account—cannot generate new content like the images in Figure 8.

136.    Vertical AI chatbots—which focus on a specific industry vertical such as healthcare and typically do not have built-in generative AI functionality—are not reasonable substitutes for generative AI chatbots. Users of generative AI chatbots desire responses to *all* of the user's prompts. They cannot reasonably substitute to vertical AI chatbots that can provide responses to only a narrow set of pre-specified topics. Nor can vertical AI chatbots readily enter the market for generative AI chatbots. To do so, the vertical AI chatbot would have to find completely new data sources to ingest and retrain its algorithms to be able to respond to general—and not vertical-based—prompts.

37

137.    Search engines are not reasonable substitutes for generative AI chatbots. Search engines like Bing or vertical search engines like Amazon rely on different technologies than generative AI chatbots. Moreover, as an internal OpenAI document recognizes, search engines do not provide the same features that generative AI chatbots do. Generative AI is a general-purpose technology with many uses entirely unrelated to search, including the ability to create new content. This could include creating a travel itinerary, teaching a user how to code, or even providing emotional support. Accordingly, search engines do not constrain generative AI chatbots.

138.    Industry and public sources support that generative AI chatbots are distinct from other products. An OpenAI strategy document recognizes an "AI chatbot space"—i.e., that ChatGPT's only competitors are other generative AI chatbots. Other industry sources recognize similar competitors. The FTC has also recognized generative AI chatbots as a distinct product market.

139.    A hypothetical monopolist could implement a small but significant non-transitory increase in the price of generative AI chatbots without customers switching to non-generative AI tools or search engines to discipline such a price increase.

140.    There is also a subset of generative AI chatbot customers that use such products via smartphones. For such customers, using a generative AI chatbot via a desktop or laptop computer is not a substitute for using a generative AI chatbot via a smartphone because a smartphone is highly portable and allows access to generative AI almost anywhere. Over 60 percent of generative AI use today is on mobile devices. Reflecting such demand, technology companies have integrated generative AI chatbots into their smartphones.

141.    The relevant geographic market for generative AI chatbots is the United States.

142.    U.S. customers are most familiar with generative AI chatbots offered by U.S. companies, and the lack of brand recognition is an impediment for foreign generative AI chatbots to attract U.S. customers.

143.    Differences in language also affect the performance of U.S. generative AI chatbots relative to ex-U.S. generative AI chatbots. Generative AI chatbots have better performance in the languages where the AI model has more inputs and does more training. For example, U.S. chatbots train more on English language inputs and thus have higher accuracy when responding to prompts in English. Non-U.S. chatbots—that train more on non-English inputs—will perform worse in responding to English prompts, which is another impediment for attracting U.S. customers.

144.    In the alternative, the relevant geographic market for generative AI chatbots is worldwide.

### L.    *Monopoly Power*

#### 1.    *Apple Has Monopoly Power In The Relevant Market For Smartphones*

145.    Apple is the dominant provider of smartphones in the United States.

146.    As of 2025, Apple's share of smartphones in the United States is 65 percent. Apple's U.S. market share has steadily increased over the past decade.

147.    Apple's dominant position in the smartphone market is protected by multiple barriers to entry that inhibit the entrance of new competitors and discourage switching from iPhone to other smartphones.

148.    Smartphones exhibit significant network effects. iPhones, for example, have functionalities that are severely limited unless the iPhone user communicates with another iPhone user. For example, messages sent from iPhones to non-iPhones are displayed in green (rather than blue, which creates stigma for the green texters), are not encrypted, and transmit

videos at lower resolutions. Apple's FaceTime can be initiated only by an iPhone user and can be used by non-iPhone users only if the iPhone user provides a link (as opposed to being able to join a call by swiping or pressing a button). Given the iPhone's dominance, non-iPhone users are encouraged to switch to iPhones to reduce friction when communicating with others (who mostly use iPhones) and discouraged to switch to rivals. When faced with a complaint from an iPhone user who could not send videos to his mother's Android, Apple CEO Tim Cook responded, "Buy your mom an iPhone."

149.    There are also significant network effects due to the incentives of mobile app developers. App developers must configure their apps to work with the operating systems of the smartphone manufacturer. A new phone manufacturer that wants to provide an innovative operating system in its smartphone—e.g., something besides the incumbent iOS and Android operating systems—faces significant challenges to attract app developers to make apps for that operating system. The smartphone must attract enough users so that app developers make apps for the operating system, but to attract users, a smartphone needs sufficient coverage of mobile apps. There is thus a chicken-or-egg problem that provides a significant hurdle to potential new smartphone entrants.

150.    The smartphone market is also marked by high switching costs that discourage customers from switching away from the iPhone. Customers seeking to change smartphones face additional hurdles, including the costs associated with learning how to use a new operating system and user interface, transferring all the relevant data (e.g., phone contacts, email addresses, photos) and apps between devices, and changing the management of subscriptions. These switching costs help lock in Apple's position as the dominant incumbent. In countries where

super apps have become prominent, these switching costs are reduced because many of the smartphone functions are handled within the app (e.g., management of subscriptions).

151.    The effect of these frictions is that iPhone users continue to use the iPhone despite increases in price and reductions in quality. Most Americans—91 percent—already own a smartphone, meaning most smartphone purchases are to replace an existing smartphone. And almost all iPhone customers—89 percent—replace their iPhone with another iPhone.

152.    These barriers to switching that keep iPhone customers using iPhones have prevented well-capitalized technology companies from successfully entering the market. There are multiple examples of companies that attempted to enter the U.S. smartphone market but failed due to the significant barriers to entry and high customer switching costs. Prominent examples include Amazon (which exited in 2015), Microsoft (which exited in 2017), and LG (which exited in 2021).

153.    Apple's monopoly power is also demonstrated by its ability to earn consistent monopoly profits. Apple's net income has been positive since at least 2009 and reached over $93 billion in 2024, driven largely by iPhone sales. In January 2025, Apple CEO Tim Cook boasted that "Apple is reporting our best quarter ever," marked by record-high earnings per share.

154.    Beyond indirect indicia of Apple's monopoly power, Apple has exhibited direct evidence of monopoly power through its ability to control prices and exclude competitors.

155.    Apple has been able to consistently raise the price of its iPhones. In 2020, for example, Apple implemented a nearly 20 percent increase in the price of the iPhone. Such a large price increase indicates that Apple is not constrained by smartphone rivals in setting its prices. Industry sources report that Apple will increase the price of its iPhones again this fall by more than five percent.

156.    Apple's monopoly power is also evident from its ability to impede the threat from super apps. Apple's control of the App Store and the intentional lack of interoperability with other smartphones allows it to protect itself from competitive challengers.

### 2. *OpenAI Has Monopoly Power In The Relevant Market For Generative AI Chatbots*

157.    An OpenAI executive testified under oath that ChatGPT's 2024 U.S. market share reached 85 percent, and other executives in the industry have testified that ChatGPT is the "market leader." Other sources similarly demonstrate that ChatGPT's U.S. market share based on web usage is around 80 percent and that ChatGPT enjoys a similar market share globally. Few rivals to ChatGPT have ever reached a market share in excess of 10 percent. When limited to mobile phones, ChatGPT's market share based on web usage is close to 90 percent both in the U.S. and globally.

158.    ChatGPT's mobile app has been downloaded 938 million times as of July 2025, nearly five times more than the second place mobile app (200 million). Total global spending on the ChatGPT app reached $2 billion in August 2025—30 times higher than the combined spending on rival generative AI chatbot mobile apps—yielding a revenue-based market share above 90 percent.

159.    ChatGPT receives over 5 billion visits monthly as of 2025, more than ten times the number of monthly visits of other leading generative AI chatbots.

160.    OpenAI's dominant market position is protected because the market for generative AI chatbots is marked by several barriers to entry that inhibit entry and discourage customer switching.

161.    Generative AI chatbots exhibit significant network effects. Chatbots with more users receive more prompts, allowing more model training and improvement and, in turn,

attracting more customers. Additional customers using a generative AI chatbot will thus attract additional customers in the future. Academic research has labeled these network effects as "data network effects" and has found that the success of AI companies is dependent on such network effects. Given these network effects, an FTC blog post explained, "[t]he volume and quality of data required to pre-train a generative AI model from scratch may impact the ability of new players to enter the market." A new entrant must absorb these costs to even develop a generative AI model, meaning there is significant financial risk for entrants if the data collection does not result in a viable generative AI model.

162.    According to ChatGPT, network effects among generative AI chatbots "play a pivotal role in shaping competition":

*Figure 9*

How do network effects affect competition among generative AI chatbots?

Network effects play a **pivotal** role in shaping competition among generative-AI chatbots—both reinforcing dominance for incumbents and making it increasingly tough for new entrants to catch up. Here's how they operate in this space:

163.    Additionally, resource scarcity poses another impediment to entry and expansion. Generative AI chatbots require immense investments in computing resources, including graphics processing units ("GPUs"). Demand for GPUs from generative AI tools and other sources (such as cryptocurrency mining) has made securing sufficient computing resources a challenge for new market entrants. Highly skilled AI scientists and engineers are also in limited supply.

164.    The Apple-OpenAI arrangement represents another barrier to new entry or expansion. Because a substantial amount of generative AI prompts are locked up by the illegal agreement between Apple and OpenAI, new entrants or expanding competitors have fewer

opportunities to gain scale. This hurts their ability to improve their models. Moreover, the Apple integration with ChatGPT gives ChatGPT exclusive access to data about how users interact via native iPhone features like Siri. OpenAI—and not its rivals—can use this information to improve ChatGPT's models and thus attract more iPhone users. By interacting with a greater number of users and exploiting access to vast quantities of data, an essential input, ChatGPT can leverage network effects by creating a powerful positive feedback loop that locks in users and locks out rivals. Access to data is critical to develop generative AI models, and ChatGPT's unique data access inhibits entry and expansion by rival generative AI chatbots.

165.    Brand recognition also serves as a barrier to entry and expansion. ChatGPT is the most widely recognized brand in generative AI chatbots, with some rivals fearing that it has become synonymous with AI.

166.    OpenAI has also demonstrated monopoly power directly by its ability to control prices and exclude competitors.

167.    OpenAI documents reveal a plan to double the price of its "plus" subscription over the next four years. Such a plan would be unfeasible unless OpenAI has power over marketwide prices.

168.    Additionally, OpenAI has been able to take action to exclude competitors. The Apple-OpenAI arrangement did just that by providing ChatGPT exclusive access to prompts based on native iPhone usage.

**M.    *Apple and OpenAI's Conduct Has Injured Competition, Plaintiffs, And The Public***

169.    Apple and OpenAI's exclusive deal and related conduct harm competition in the generative AI chatbot and smartphone markets.

170.    Their unlawful agreement has excluded ChatGPT's rivals—including xAI's Grok—from iPhone-based integrated prompts (e.g., via Siri), and together with the other conduct favoring ChatGPT on iPhones (including promoting ChatGPT in the App Store while delaying approval of rival apps), has prevented super app competitors from disrupting the smartphone market.

171.    Defendants' conduct has harmed competition in the market for generative AI chatbots by providing ChatGPT massive scale advantages while depriving ChatGPT's rivals, like Grok, from obtaining the scale needed to improve their generative AI models and thus attract more customers. Defendants have completely foreclosed Grok and other rivals from a massive pool of valuable native iPhone user prompts that are available only to ChatGPT. On top of this, Apple's use of its monopoly power to favor ChatGPT in its App Store rankings and to delay reviews of Grok app updates prevents Grok—one of the biggest threats to ChatGPT—from gaining access to user prompts needed to scale.

172.    The deprivation of scale through substantial foreclosure has augmented effects due to the significant data network effects exhibited in the generative AI chatbot market. Without scale, generative AI models perform worse and cannot effectively compete with ChatGPT, the dominant incumbent.

173.    Apple and OpenAI's anticompetitive conduct also discourages investment and innovation in the generative AI chatbot market. The foreclosure caused by the unlawful agreement inhibits innovation on iPhones—the dominant smartphone—because ChatGPT's rivals have no reason to develop better models for native iPhone prompts they cannot access. The denial of scale caused by Defendants' conduct limits rival generative AI chatbots from developing new innovations. Moreover, with ChatGPT's lock on the market through its

exclusive deal with Apple and with Apple's thumb pressed firmly on the scale for ChatGPT in its App Store, investors face significant risk in backing anyone but the dominant market leader. While OpenAI raised $40 billion in a single funding round, other generative AI startups have struggled to raise the funding needed to compete while at the same time being raided by established tech companies for their employees.

174.    Because Defendants' conduct has harmed competition in the market for generative AI chatbots, Defendants' conduct has also harmed competition in the market for smartphones.

175.    Super apps are a competitive threat to Apple's iPhone monopoly. Apple's iPhone offers a number of features and functionality, including serving as a platform for mobile apps. Super apps similarly offer the ability to serve as a platform for the functions offered by other apps that a user might download from Apple's App Store. Super apps threaten Apple's monopoly position in smartphones because super apps take over much of the functionality that is offered by the iPhone. Super apps commoditize native functionality offered by the iPhone (including its default apps), which allows customers to pick a super app first and then decide which smartphone will best support that app (as opposed to picking a smartphone first and being locked into that smartphone's ecosystem).

176.    Defendants' conduct harms competition by inhibiting the development of super apps. As described above, Defendants engaged in multiple acts to limit Grok (and other competitors) from becoming competitive threats to ChatGPT. By inhibiting competition in generative AI chatbots—including by excluding a substantial portion of the generative AI market and exercising bias against Plaintiffs' apps—Defendants have reduced innovation that would facilitate the development by X and xAI of super apps providing a meaningful alternative to

smartphone users. By eliminating the threat from super apps, Apple maintains the flow of monopoly rents it receives on iPhone sales.

177.    Consumers have been harmed by Defendants' anticompetitive conduct. In the but-for world, customers would have more choice because they could choose Grok or other generative AI chatbots like Claude to fulfill their native iPhone prompts. Instead, they are forced to take ChatGPT. Customers in the but-for world would also have access to higher-functionality generative AI chatbots because Defendants' conduct would not have deprived ChatGPT's rivals of scale. And by impeding the super app threat, Defendants prevent customers from replacing their iPhones with cheaper smartphones complemented by super apps. Instead, customers must pay supracompetitive prices for their iPhones.

178.    xAI and X have both been injured by this conduct, which has already caused them significant damages that will amount to billions of dollars in combined lost sales and enterprise values.

179.    But for Defendants' anticompetitive conduct—including making ChatGPT the exclusive integrated generative AI chatbot for iPhone users, causing the Grok app to perform worse in Apple's App Store rankings, and delaying reviews to Grok app updates—xAI would not have been foreclosed from a substantial portion of the market and would have more customers; more app downloads, sales, and profits; and greater scale than it has. Instead, more users would pick Grok for their prompts, either via native iPhone integrations or via mobile app downloads, which would give Grok more scale. This self-reinforcing scale would allow more innovations in Grok's models and attract both more customers and more investment.

180.    In turn, the harms to xAI and its generative AI chatbot, Grok, also harm X's "everything app." Because Grok's functionality is a key feature of the X app, the X app is more

47

attractive the better Grok performs. And because Defendants' conduct makes Grok less able to fairly compete with ChatGPT, X's app (and thus X) suffers in the process. This results in fewer X app customers and subscriptions, and less revenue and profits, ultimately creating a depressed enterprise value for X relative to the but-for world. This injury has been compounded by Apple's biasing of the rankings in its App Store—aimed at inhibiting its growth and corresponding evolution into a super app—which further decreases X's revenues, profits, and enterprise value.

## CAUSES OF ACTION

### First Claim For Relief: Unlawful Agreement In Violation Of Section 1 Of The Sherman Act 15 U.S.C. § 1
### (Against All Defendants)

181.    Plaintiffs incorporate the allegations of paragraphs 1 through 180 above.

182.    Defendants, by and through their officers, directors, employees, or other representatives, entered into an unlawful agreement with each other in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

183.    Defendants entered an unlawful agreement to leverage Apple's monopoly power in the U.S. smartphone market to maintain OpenAI's monopoly power in generative AI chatbots and foreclose OpenAI's rivals, and, relatedly, to leverage OpenAI's monopoly power in generative AI chatbots to maintain Apple's monopoly power in the U.S. smartphone market and foreclose super app competitors.

184.    Smartphones in the U.S. is a relevant antitrust market.

185.    Generative AI chatbots in the U.S. is a relevant antitrust market. Alternatively, generative AI chatbots worldwide is a relevant antitrust market.

186.    OpenAI possesses significant market power in the U.S. and worldwide generative AI chatbot markets.

187.    Apple possesses significant market power in the U.S. smartphone market.

188.    Defendants' agreement harms competition. The agreement forecloses OpenAI's rivals from a substantial share of the relevant generative AI chatbot market and the scale necessary to compete while artificially advantaging ChatGPT, the dominant generative AI chatbot. This conduct, in turn, prevents super apps from effectively competing in the U.S. market for smartphones. Defendants' unlawful agreement reduces customer choice, competition, and marketwide innovation and investment. As a result, both the ability to innovate and output in the market for generative AI chatbots is significantly lower than in the but-for world without the anticompetitive agreement. Moreover, if not for Defendants' agreement, super apps would emerge to provide customers more flexibility and choice when choosing a smartphone. In that but-for world, customers could substitute lower-priced smartphones (in combination with the use of super apps), increasing consumer welfare. And where lower-priced smartphones are a more viable option, marketwide smartphone prices would decline with a corresponding increase in marketwide output.

189.    xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of Defendants' unlawful agreement. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful agreement, xAI has less scale and receives less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

190.    X's injury likewise flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of Defendants' unlawful agreement. X is a user of generative AI chatbots and has incorporated Grok functionality into the

X app. Defendants' conduct deprives Grok of scale and investment, which, among other harms, reduces Grok's ability to innovate and develop product features relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on Grok functionality to add value to the X app, X is injured by the loss of innovation for Grok that Defendants' anticompetitive conduct causes. X also suffers a loss in the value of its business as the reduced innovation in the X app depresses the number of X app users and thus X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

191.    There are no procompetitive justifications for Defendants' unlawful agreement. Defendants' anticompetitive agreement has no purpose or effect other than to reduce competition between generative AI chatbots and to insulate Apple from competition from super apps.

### *Second Claim For Relief: Monopolization Of The Market For Smartphones In Violation Of Section 2 Of The Sherman Act*
### *15 U.S.C. § 2*
### *(Against Apple)*

192.    Plaintiffs incorporate the allegations of paragraphs 1 through 191 above.

193.    Smartphones in the U.S. is a relevant antitrust market.

194.    Apple possesses monopoly power in the U.S. smartphone market.

195.    Apple willfully maintains its monopoly power through its anticompetitive conduct. Apple's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with OpenAI, manipulating the App Store rankings to cause the X and Grok apps to perform worse, and delaying reviews of updates to the Grok app. Apple's conduct harms competition in the U.S. smartphone market. But for Apple's conduct, rival developers would be able to compete against the iPhone by offering super apps as an alternative to iPhone features. Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away from the iPhone.

196.    Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

197.    xAI's and X's injuries flow from the same conduct causing this harm to competition. xAI and X were injured, and continue to be injured, as a proximate cause of Apple's unlawful conduct maintaining its monopoly. Super apps are a threat to the iPhone's monopoly position as they can replace functionality offered by the iPhone. Apple's conduct reduces scale, investment, and innovation on apps like Grok and X, and it prevents these and other apps from evolving into replacements for iPhone features. But for Apple's conduct, Grok and the X app would be higher quality (i.e. have more features) and have more customers, which would substantially increase the revenues and values of xAI and X.

198.    There are no procompetitive justifications for Apple's anticompetitive conduct. Apple's conduct has no purpose or effect other than to inhibit the threat from super apps to protect Apple's monopoly power in smartphones.

### Third Claim For Relief: Attempted Monopolization Of The Market For Smartphones In Violation Of Section 2 Of The Sherman Act
### 15 U.S.C. § 2
### (Against Apple)

199.    Plaintiffs incorporate the allegations of paragraphs 1 through 198 above.

200.    Smartphones in the U.S. is a relevant antitrust market.

201.    Apple has a dangerous probability of monopolizing the U.S. smartphone market. Apple has significant market power in that market and has increased its market power through the acts described below.

202.    Apple is aware that super apps are a competitive threat to iPhones.

203.    Apple engages in anticompetitive conduct with the specific intent to monopolize the U.S. smartphone market. Apple's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with OpenAI, manipulating the App Store rankings to cause the X and Grok apps to perform worse, and delaying reviews to updates to the Grok app. Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away from iPhones to rival manufacturers.

204.    Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

205.    xAI's and X's injuries flow from the same conduct causing harm to competition. xAI and X were injured, and continue to be injured, as a proximate cause of Apple's unlawful conduct maintaining its monopoly. Super apps are a threat to the iPhone's monopoly position as they can replace functionality offered by the iPhone. Apple's conduct reduces scale, investment, and innovation on apps like Grok and X, and it prevents these and other apps from evolving into replacements for iPhone features. But for Apple's conduct, Grok and the X app would be higher quality (i.e., have more features) and have more customers, which would substantially increase the revenues and values of xAI and X.

206.    There are no procompetitive justifications for Apple's anticompetitive conduct. Apple's conduct has no purpose or effect other than to inhibit the threat from super apps to protect Apple's monopoly power in smartphones.

### Fourth Claim For Relief: Monopolization Of The Market For Generative AI Chatbots In Violation Of Section 2 Of The Sherman Act
### 15 U.S.C. § 2
### (Against OpenAI)

207.    Plaintiffs incorporate the allegations of paragraphs 1 through 206 above.

208.    Generative AI chatbots in the U.S. is a relevant antitrust market. In the alternative, generative AI chatbots worldwide is a relevant antitrust market.

209.    OpenAI possesses monopoly power in the U.S. and worldwide generative AI chatbot markets.

210.    OpenAI willfully maintains its monopoly power through its anticompetitive conduct. OpenAI's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with Apple. But for OpenAI's conduct, rival generative AI chatbots would be able to compete against ChatGPT by developing scale through access to prompts locked up by the Apple-OpenAI arrangement. OpenAI's conduct forecloses rivals from a substantial portion of the relevant market, deprives rivals of scale, and suppresses innovation and investment in the market for generative AI chatbots, foreclosing customer choice and resulting in generative AI chatbots with fewer new features.

211.    Compared to the but-for world absent OpenAI's anticompetitive conduct, customers have less choice, and generative AI chatbots have fewer new features and higher prices, lowering marketwide output.

212.    xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful agreement, xAI has less scale and has received less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

213.    X's injury flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. X is a user of generative AI chatbots and has incorporated the Grok functionality into its popular X app. OpenAI's conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on the Grok functionality to add value to the X app, X is injured by the loss of product improvement data for the Grok functionality that OpenAI's anticompetitive conduct causes. X also suffers a loss in the value of its business as reduced innovation for the X app depresses the number of X app users and, thus, X revenue relative to the but-for world without OpenAI's anticompetitive conduct.

214.    There are no procompetitive justifications for OpenAI's anticompetitive conduct. OpenAI's conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to deprive them of the scale necessary to effectively compete.

### Fifth Claim For Relief: Attempted Monopolization Of The Market For Generative AI Chatbots In Violation Of Section 2 Of The Sherman Act 15 U.S.C. § 2 (Against OpenAI)

215.    Plaintiffs incorporate the allegations of paragraphs 1 through 214 above.

216.     Generative AI chatbots in the U.S. is a relevant antitrust market. In the alternative, generative AI chatbots worldwide is a relevant antitrust market.

217.    OpenAI has a dangerous probability of monopolizing the U.S., or alternatively worldwide, generative AI chatbot markets. OpenAI has significant market power in those markets and has increased its market power through the acts described below.

218.    OpenAI engages in anticompetitive conduct with specific intent to monopolize the relevant market for generative AI chatbots. OpenAI's conduct includes, but is not limited to,

entering into an exclusive agreement with Apple. OpenAI's conduct forecloses rivals from a substantial portion of the relevant market, deprives rivals of scale, and suppresses innovation and investment in the markets for generative AI chatbots, foreclosing customer choice and resulting in generative AI chatbots with fewer new features. OpenAI expects to be able to charge supracompetitive prices in the future.

219.    Compared to the but-for world absent OpenAI's anticompetitive conduct, customers have less choice, and generative AI chatbots have fewer new features and higher prices, lowering marketwide output.

220.    xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful agreement, xAI has less scale and has received less investment to develop innovations to its generative AI models, which has depressed xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

221.    X's injury flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. X is a user of generative AI chatbots and has incorporated Grok functionality into its popular X app. OpenAI's conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on Grok functionality to add value to the X app, X is injured by the loss of product improvement data for the Grok functionality that OpenAI's anticompetitive conduct causes. X also suffers a loss in the value of its business as the

reduced innovation for the X app depresses the number of X app users and, thus, X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

222.    There are no procompetitive justifications for OpenAI's anticompetitive conduct. OpenAI's conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to deprive them of the scale necessary to effectively compete.

### Sixth Claim For Relief: Conspiracy To Monopolize The Markets For Generative AI Chatbots And Smartphones In Violation Of Section 2 Of The Sherman Act 15 U.S.C. § 2 (Against All Defendants)

223.    Plaintiffs incorporate the allegations of paragraphs 1 through 222 above.

224.    Defendants, by and through their officers, directors, employees, or other representatives, entered into a conspiracy to monopolize the markets for smartphones and generative AI chatbots in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

225.    Defendants entered an unlawful agreement and conspiracy to leverage Apple's monopoly power in the U.S. smartphone market to maintain OpenAI's monopoly power in generative AI chatbots and foreclose OpenAI's rivals, and, relatedly, to leverage OpenAI's monopoly power in generative AI chatbots to maintain Apple's monopoly power in the U.S. smartphone market and foreclose super app competitors.

226.    Smartphones in the U.S. is a relevant antitrust market.

227.    Generative AI chatbots in the U.S. is a relevant antitrust market. Alternatively, generative AI chatbots worldwide is a relevant antitrust market.

228.    Defendants are taking overt acts in furtherance of their conspiracy including, but not limited to, entering into an exclusive agreement, deprioritizing competing apps in Apple's App Store, and delaying review processes for competing apps.

229.    Defendants engage in anticompetitive conduct with the specific intent to monopolize the relevant smartphone and generative AI chatbot markets. For example, Apple is aware that super apps are a competitive threat to iPhones. Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away from iPhones to rival manufacturers. Similarly, OpenAI expects to be able to charge supracompetitive prices in the generative AI chatbot market in the future.

230.    Defendants' conspiracy has the effect of harming competition. The conspiracy forecloses OpenAI's rivals from a substantial share of the relevant generative AI chatbot market and the scale necessary to compete while artificially advantaging ChatGPT, the dominant generative AI chatbot. This conduct, in turn, prevents super apps from effectively competing in the U.S. market for smartphones. Defendants' unlawful conspiracy reduces customer choice, competition, and marketwide innovation and investment. As a result, both the ability to innovate and output in the market for generative AI chatbots is significantly lower than in the but-for world without the anticompetitive agreement. Moreover, if not for Defendants' agreement, super apps would emerge to provide customers more flexibility and choice when choosing a smartphone. In that but-for world, customers could substitute lower-priced smartphones (in combination with the use of super apps), increasing consumer welfare. And where lower-priced smartphones are a more viable option, marketwide smartphone prices decline with a corresponding increase in marketwide output.

231.    xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of Defendants' unlawful conspiracy. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful conspiracy, xAI has less scale and

receives less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

232.    X's injury likewise flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of Defendants' unlawful conspiracy. X relies on generative AI chatbots and has incorporated Grok functionality into the X app. Defendants' conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on Grok functionality to add value to the X app, X is injured by the loss of product improvement data for the Grok functionality that Defendants' anticompetitive conduct causes. X also suffers a loss in the value of its business as the reduced innovation for the X app depresses the number of X app users and thus X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

233.    There are no procompetitive justifications for Defendants' unlawful conspiracy. Defendants' anticompetitive conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to insulate Apple from competition from super apps.

### Seventh Claim For Relief: Civil Conspiracy
### (Against All Defendants)

234.    Plaintiffs incorporate the allegations of paragraphs 1 through 233 above.

235.    Defendants, by and through their officers, directors, employees, or other representatives, conspire to violate the antitrust and other competition laws, including without limitation Sections 1 and 2 of the Sherman Act.

236.    Defendants acted on this conspiracy by entering into an unlawful agreement in restraint of trade.

237.    Defendants' conspiracy causes ongoing injury to Plaintiffs, which are injured by reductions of sales and loss of value of their ongoing businesses.

### Eighth Claim For Relief: Unfair Competition
### (Against All Defendants)

238.    Plaintiffs incorporate the allegations of paragraphs 1 through 237 above.

239.    Defendants, through their conspiracy, have committed one or more illegal acts, including violations of antitrust law.

240.    Defendants' conduct is contrary to honest practice in commercial matters and interferes with Plaintiffs' ability to conduct their businesses, including Plaintiffs' ability to attract and retain users and to scale their apps.

241.    Defendants' conduct threatens an incipient violation of the antitrust laws or violates the policy and spirit of those laws.

242.    The harm from Defendants' conduct outweighs the utility of that conduct.

243.    Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

### Ninth Claim For Relief: Violations Of Texas Free Enterprise & Antitrust Act
### (Against All Defendants)

244.    Plaintiffs incorporate the allegations of paragraphs 1 through 243 above.

245.    Defendants' conduct violates Texas Business and Commerce Code § 15.01 *et seq.*, including § 15.05(a), because Defendants are engaging in a contract, combination, or conspiracy in restraint of trade.

246.    Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

### *Tenth Claim For Relief: Violations Of Texas Free Enterprise & Antitrust Act (Against All Defendants)*

247.     Plaintiffs incorporate the allegations of paragraphs 1 through 246 above.

248.     Defendants' conduct violates Texas Business and Commerce Code § 15.01 *et seq.*, including § 15.05(b), because Defendants are monopolizing, attempting to monopolize, and/or conspiring to monopolize their respective relevant markets.

249.     Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

250.     Defendants' conduct is willful. Apple and OpenAI have joined together to exercise their monopoly power to harm competition and customers. Their targeting of Plaintiffs through an anticompetitive agreement reflects their anticompetitive intent.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

a.     A permanent injunction enjoining Defendants from repetition of acts similar to the wrongful acts described above;

b.     A money judgment against Defendants for that amount of ordinary damages, trebled damages, punitive damages, and/or restitution, in an amount to be determined at trial;

c.     Pre- and post-judgment interest;

d.     Costs of the suit, including reasonable attorneys' fees and expenses; and

e.     Such other relief as the Court deems equitable and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:   August 25, 2025

Respectfully submitted,

*/s/ Alex More*
_____
Alex More
TX State Bar No. 24065789
Monica E. Gaudioso
TX State Bar No. 24084570
Robert C. Rowe
TX State Bar No. 24086253
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202
T: (214) 855-3000
F: (214) 580-2641
amore@ccsb.com
mgaudioso@ccsb.com
rrowe@ccsb.com

Bradley Justus*
DC Bar No. 1007988
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
T: (202) 912-4700
F: (202) 912-4701
bjustus@axinn.com

Caroline P. Boisvert*
CT State Bar No. 441323
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: (860) 275-8100
F: (860) 275-8101
cboisvert@axinn.com

Craig M. Reiser*
NY State Bar No. 4886735
Scott A. Eisman*
NY State Bar No. 4905287
Eva Yung*
NY State Bar No. 5497300
Christopher Erickson*
NY State Bar No. 5800628
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
T: (212) 728-2200
F: (212) 728-2201
creiser@axinn.com
seisman@axinn.com
eyung@axinn.com
cerickson@axinn.com

*pro hac vice forthcoming*

*Attorneys For Plaintiffs X Corp. and X.AI LLC*

61