# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| X CORP. and X.AI LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:25-cv-00914-P |
| | § | |
| APPLE INC., OPENAI, INC., OPENAI, L.L.C., | § | |
| and OPENAI OPCO, LLC, | § | |
| | § | |
| Defendants. | § | |

## BRIEF OF DEFENDANT APPLE INC. IN SUPPORT OF MOTION TO DISMISS

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    The Integration of ChatGPT with Apple Intelligence............................................. 3

    B.    Plaintiffs' Claims .................................................................................................... 5

    C.    Plaintiffs' Alleged Relevant Markets ..................................................................... 8

        1.    *"Smartphone" Market* ................................................................................ 8

        2.    *"Generative AI Chatbot" Market* ............................................................. 9

LEGAL STANDARD....................................................................................................... 9

ARGUMENT ............................................................................................................... 10

I.    Plaintiffs' Antitrust Claims Should Be Dismissed Because Plaintiffs Do Not
Plausibly Allege Exclusionary Conduct. ................................................................ 10

    A.    Plaintiffs Have Not Plausibly Alleged that the Agreement Between Apple
and OpenAI Is Exclusive. .................................................................................. 11

    B.    Plaintiffs Fail to Plausibly Allege that the ChatGPT Integration Foreclosed
a Substantial Share of Competition....................................................................... 13

    C.    Plaintiffs' Allegations Regarding Apple's Management of Its App Store
Are Contradictory and Conclusory. ..................................................................... 17

    D.    Plaintiffs' Attempted Monopolization and Conspiracy Claims Should Be
Dismissed for Additional Reasons......................................................................... 19

II.    Plaintiffs' Antitrust Claims Should Be Dismissed for Lack of Standing. ........................ 20

    A.    Plaintiffs' Alleged Harms Are Too Indirect and Speculative to Support
Antitrust Standing for Any Claim......................................................................... 21

    B.    Plaintiffs Lack Antitrust Injury to Assert Smartphone-Market Claims
Under the Fifth Circuit's Decision in *Norris*. ..................................................... 22

III.    Plaintiffs' State-Law Claims Fall with Their Sherman Act Claims and Should Be
Dismissed........................................................................................................... 24

CONCLUSION............................................................................................................. 25

## TABLE OF AUTHORITIES

<span style="font-variant: small-caps">**CASES**</span>

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016) ............................................................................11

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010) ..............................................................................14

*In re Aluminum Warehousing Antitrust Litig.*,
   833 F.3d 151 (2d Cir. 2016)................................................................................24

*Am. Airlines, Inc. v. Travelport Ltd.*,
   No. 4:11-CV-244-Y, 2012 WL 12884823 (N.D. Tex. Aug. 16, 2012) ............20, 23

*AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*,
   638 S.W.3d 198 (Tex. 2022)...............................................................................25

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ..............................................................................15

*Arcell v. Google LLC*,
   No. 22-CV-02499-RFL, 2024 WL 1090009 (N.D. Cal. Feb. 5, 2024)..................16

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................9, 10, 16, 19, 24

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)...........................................................................................21

*Bakay v. Apple Inc.*,
   No. 24-CV-00476-RS, 2024 WL 3381034 (N.D. Cal. July 11, 2024) ..................22

*In re Beef Indus. Antitrust Litig.*,
   713 F. Supp. 971 (N.D. Tex. 1988) .....................................................................19

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................1, 9, 10, 12, 15, 25

*Bodine v. First Co.*,
   No. 3:20-CV-3116-BT, 2021 WL 5505562 (N.D. Tex. Nov. 24, 2021) ..........20, 21

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
   49 F.4th 520 (5th Cir. 2022) ......................................................10, 14, 15

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)...........................................................................................22

*Campbell v. Wells Fargo Bank, N.A.*,
  781 F.2d 440 (5th Cir. 1986) ............................................................................21

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)..........................................................................................18

*Great Escape, Inc. v. Union City Body Co.*,
  791 F.2d 532 (7th Cir. 1986) ............................................................................19

*Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*,
  465 S.W.3d 778 (Tex. App.—Dallas 2015, no pet.)..........................................25

*Harmon v. City of Arlington*,
  16 F.4th 1159 (5th Cir. 2021) ...............................................................10, 12, 16

*Hughes v. Tobacco Inst., Inc.*,
  278 F.3d 417 (5th Cir. 2001) ......................................................................22, 24

*Jebaco, Inc. v. Harrah's Operating Co.*,
  587 F.3d 314 (5th Cir. 2009) ...............................................................20, 23, 24

*Johnson v. Hosp. Corp. of Am.*,
  95 F.3d 383 (5th Cir. 1996) ..............................................................................18

*McCullough v. Zimmer, Inc.*,
  382 F. App'x 225 (3d Cir. 2010) .......................................................................23

*MM Steel, L.P. v. JSW Steel (USA) Inc.*,
  806 F.3d 835 (5th Cir. 2015) ............................................................................14

*Moody v. NetChoice, LLC*,
  603 U.S. 707 (2024)..........................................................................................18

*N. Miss. Commc'ns, Inc. v. Jones*,
  792 F.2d 1330 (5th Cir. 1986) ..........................................................................19

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007) ...............................................2, 20, 22, 23, 24, 25

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
  No. 3:12-CV-3515-B, 2014 WL 5460450 (N.D. Tex. Oct. 27, 2014)....................12

*Public Health Equip. & Supply Co., Inc. v. Clarke Mosquito Control Prods., Inc.*,
  No. SA-08-CA-895-OG, 2009 WL 10670089 (W.D. Tex. June 5, 2009)..............12

*Pulse Network, L.L.C. v. Visa, Inc.*,
  30 F.4th 480 (5th Cir. 2022) .................................................................11, 20, 21, 22

*RTLC AG Prods., Inc. v. Treatment Equip. Co.*,
    195 S.W.3d 824 (Tex. App.—Dallas 2006, no pet.)..............................................................25

*Sanger Ins. Agency v. HUB Int'l, Ltd.*,
    802 F.3d 732 (5th Cir. 2015) ..............................................................................................25

*Tesla, Inc. v. La. Auto. Dealers Ass'n*,
    113 F.4th 511 (5th Cir. 2024) ..............................................................................................20

*United States v. Apple Inc.*,
    No. 24-CV-4055 (JXN)(LDW), 2025 WL 1829127 (D.N.J. June 30, 2025) .........................11

*Vinci v. Waste Mgmt., Inc.*,
    80 F.3d 1372 (9th Cir. 1996) ..............................................................................................24

*Walker v. U-Haul Co. of Miss.*,
    747 F.2d 1011 (5th Cir. 1984) .......................................................................................21, 22

STATUTES

15 U.S.C. § 1 ...........................................................................................................................7

15 U.S.C. § 2 ...........................................................................................................................7

TEX. BUS. & COM. CODE ANN. § 15.04 (West 2025)................................................................24

PUBLIC ARTICLES AND WEBSITES

APPLE, *WWDC24 Keynote*, https://developer.apple.com/videos/play/wwdc2024/
    101...................................................................................................................................3, 4

Brandon Vigilario, *X's Grok AI Is Great – If You Want to Know How to Hot Wire
    a Car, Make Drugs, or Worse*, THE REGISTER (Apr. 2, 2024), https://www.
    theregister.com/2024/04/02/elon_musk_grok_ai/ ..................................................................5

Christine Ji, *Google's Gemini Now Tops the App Store on Nano Banana Frenzy.
    Is ChatGPT in Trouble?*, MARKETWATCH (Sept. 15, 2025), https://www.
    marketwatch.com/story/googles-gemini-now-tops-the-app-store-on-nano-
    banana-frenzy-is-chatgpt-in-trouble-0cc69c4c?mod=mw_FV...............................................6

Elon Musk (@elonmusk), X (Aug. 11, 2025, at 9:07 PM ET), https://x.com/
    elonmusk/status/1955073616996975095.............................................................................7

*Introducing Apple Intelligence*, APPLE (June 10, 2024), https://www.apple.com/
    newsroom/2024/06/introducing-apple-intelligence-for-iphone-ipad-and-mac/ .................3, 17

Jess Weatherbed, *Apple and OpenAI Aren't Paying Each Other Yet, Says
    Bloomberg*, THE VERGE (June 13, 2024), https://www.theverge.com/2024/6/
    13/24177550/apple-openai-chatgpt-deal-payment-revenue-sharing-chatbot ..........................4

Josh Tyrangiel, *How Will Apple's New AI Change Your Phone? I Asked Tim Cook*, WASH. POST (June 11, 2024), https://www.washingtonpost.com/opinions/2024/06/11/tim-cook-apple-interview/ ....................................................4

Marcus Mendes, *Google Pokes a Banana-Shaped Hole in Musk's Claims of Apple's Bias Towards OpenAI*, 9 TO 5 MAC (Sept. 16, 2025), https://9to5mac.com/2025/09/16/google-pokes-a-banana-shaped-hole-in-musks-claims-of-apples-bias-towards-openai/?extended-comments=1 ...............................6

Mark Gurman, *Apple to 'Pay' OpenAI for ChatGPT Through Distribution, Not Cash*, BLOOMBERG (June 12, 2024), https://www.bloomberg.com/news/articles/2024-06-12/apple-to-pay-openai-for-chatgpt-through-distribution-not-cash ....................................................................................................4

Mark Gurman et al., *Apple Eyes Move to AI Search, Ending Era Defined by Google*, BLOOMBERG (May 7, 2025), https://www.bloomberg.com/news/articles/2025-05-07/apple-working-to-move-to-ai-search-in-browser-amid-google-fallout....................................................................................4

*Urgent Request for Investigation Into xAI's "Grok Imagine" and its Role in Facilitating Non-Consensual Intimate Imagery*, CONSUMER FED'N OF AM. (Aug. 14, 2025), https://consumerfed.org/wp-content/uploads/2025/08/Spicy-Grok-Request-for-Investigation-Consumer-Coalition.pdf........................................5

## INTRODUCTION

Last year, Apple announced Apple Intelligence, a suite of personal intelligence features that uses the power of generative artificial intelligence ("AI") models to deliver information that is useful and relevant, while setting a new standard for privacy in AI. As part of Apple Intelligence, Apple integrated access to a leading generative AI chatbot—OpenAI's ChatGPT—into certain experiences on its newer devices. This integration is delivering cutting-edge benefits to users, allowing them to seamlessly tap into ChatGPT's capabilities without the need to move between tools.

Plaintiffs X Corp. and X.AI, LLC attempt to recast this pro-consumer innovation as an antitrust violation. Plaintiffs' case centers on their allegation that the agreement between Apple and OpenAI is unlawful because it is "exclusive," prohibiting Apple from integrating with any other generative AI chatbot. But their complaint provides no facts to support that claim. Apple and OpenAI's agreement is expressly *not* exclusive, and it is public and widely known that Apple intends to partner with other generative AI chatbots. Plaintiffs' bare assertions that the agreement is "exclusive" are therefore insufficient under basic pleading requirements, and the Court can and should dismiss the entire case on that basis. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Without any basis to allege that Apple agreed to work only with ChatGPT and not with any of ChatGPT's competitors, Plaintiffs' claims boil down to the assertion that it was unlawful for Apple to integrate with ChatGPT *first*. In other words, Plaintiffs say that Apple cannot partner with OpenAI to create an innovative feature for iPhone users without *simultaneously* partnering with every *other* generative AI chatbot—regardless of quality, privacy or safety considerations, technical feasibility, stage of development, or commercial terms. Of course, the antitrust laws do not require that, and for good reason: imposing such a rule on businesses would slow innovation,

reduce quality, and increase costs, all ultimately harming the very consumers the antitrust laws are meant to protect.

Plaintiffs' failure to plausibly allege exclusivity guts their entire case, but the complaint should be dismissed for additional reasons. To start, exclusive agreements are only unlawful if, among other things, they eliminate a substantial share of competition in a relevant market. Plaintiffs' case against Apple is based on alleged harm to competition in a "smartphone" market. But Plaintiffs do not and cannot allege facts indicating that the ChatGPT integration reduces competition in that market. Plaintiffs' allegations also fail to show that the ChatGPT integration reduces competition among generative AI chatbots in the alleged "generative AI chatbot" market: the complaint concedes that chatbots have significant alternative sources of user prompts besides Apple Intelligence. Consumers access AI chatbots from a wide range of sources, including web browsers and apps on iPhone, not to mention tablets, computers, and non-Apple phones.

Finally, Plaintiffs fail to meet the antitrust laws' simple, yet stringent standing requirements for private plaintiffs to bring a claim. First, only parties that suffer a *direct* injury may bring antitrust claims. Plaintiffs have not alleged direct injury and instead rely on a multi-step chain of speculation on top of speculation—one that begins with supposed harm to Plaintiffs' chatbot, Grok; jumps next to even more uncertain harm to Plaintiffs' social media app, X; and somehow ends up with reduced competition among smartphone manufacturers, with many intermediate steps along the way. Second, and separately, the Fifth Circuit has held that only "consumers [or] competitors in the market attempted to be restrained" have standing to bring antitrust claims. *Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir. 2007). Here, Plaintiffs' claims against Apple are premised on harm to a smartphone market in which Plaintiffs are neither competitors nor

customers. Under controlling Fifth Circuit law, Plaintiffs' smartphone-based claims against Apple should be dismissed.

In short, Plaintiffs' claims are foreclosed by their failure to plead that Apple and OpenAI's agreement is exclusive, by basic antitrust law, and by controlling Fifth Circuit precedent. This Court should dismiss the complaint.

## **BACKGROUND**

### A.     The Integration of ChatGPT with Apple Intelligence.

In June 2024, Apple introduced "Apple Intelligence"—a suite of AI-powered features for newer-model iPhones and other Apple products. *See* Compl. ¶¶ 9, 56; *Introducing Apple Intelligence*, APPLE (June 10, 2024), https://www.apple.com/newsroom/2024/06/introducing-apple-intelligence-for-iphone-ipad-and-mac/ [https://perma.cc/5TX7-TVAA]. As part of this announcement, Apple unveiled that two features—Siri and Writing Tools—would be integrated with access to OpenAI's generative AI chatbot, ChatGPT, allowing users to access ChatGPT without the need to jump between tools—for example, from Siri to the ChatGPT app. *See* Compl. ¶¶ 9, 71, 75, 157–59 & Figure 1. Today, users of the latest-model iPhones can opt into accessing ChatGPT through Siri and Writing Tools without creating a separate ChatGPT account. *See Introducing Apple Intelligence*, *supra*; Compl. ¶ 75 & Figure 1.

The ChatGPT integration also includes built-in privacy protections for users. Among other protections, users must affirmatively opt in to enable the integration, and their IP addresses are obscured. *See* Compl. Figure 1; *see also* APPLE, *WWDC24 Keynote*, at 1:38:16, https://developer.apple.com/videos/play/wwdc2024/101/?time=5896 [https://perma.cc/UG8G-9VNB] ("Your requests and information will not be logged."). For users who choose to connect their ChatGPT accounts, ChatGPT's data-use policies apply, maximizing users' control over how they use ChatGPT. *See Introducing Apple Intelligence, supra.*

Plaintiffs' case rests on their allegation that Apple entered an "exclusive arrangement" with OpenAI to integrate ChatGPT. *See, e.g.*, Compl. ¶¶ 11, 71, 91, 169, 195, 203, 228. But Plaintiffs allege no facts supporting that assertion, and it is wrong: the agreement expressly states that the ChatGPT integration is non-exclusive and that Apple remains free to partner with other AI chatbots. This fact has been widely and publicly reported prior to Plaintiffs filing this complaint. For example, even at the initial announcement of the ChatGPT integration, Apple made clear that it "intend[s] to add support for other AI models in the future." *See* APPLE, *WWDC24 Keynote*, at 1:38:38, https://developer.apple.com/videos/play/wwdc2024/101/?time=5918 [https://perma.cc/UG8G-9VNB]. Apple's CEO also publicly stated in a June 2024 press interview that although Apple decided to integrate with OpenAI "first . . . because they're best," Apple is working on "integrating with other people as well." Josh Tyrangiel, *How Will Apple's New AI Change Your Phone? I Asked Tim Cook*, WASH. POST (June 11, 2024), https://www.washingtonpost.com/opinions/2024/06/11/tim-cook-apple-interview/ (App'x 004 (Ex. A)).[1] And numerous press articles and reports—including a report quoted in the complaint, Compl. ¶ 94—confirm that "Apple's deal with OpenAI isn't exclusive," and that Apple is engaged with other generative AI chatbots about other partnerships.[2]

---

[1] "App'x" refers to the Appendix in support of Apple's Motion to Dismiss filed herewith.

[2] Mark Gurman, *Apple to 'Pay' OpenAI for ChatGPT Through Distribution, Not Cash*, BLOOMBERG (June 12, 2024), https://www.bloomberg.com/news/articles/2024-06-12/apple-to-pay-openai-for-chatgpt-through-distribution-not-cash (App'x 010 (Ex. B)) (quoted at Compl. ¶ 94); *see also* Mark Gurman et al., *Apple Eyes Move to AI Search, Ending Era Defined by Google*, BLOOMBERG (May 7, 2025), https://www.bloomberg.com/news/articles/2025-05-07/apple-working-to-move-to-ai-search-in-browser-amid-google-fallout (App'x 013–14 (Ex. C)) (noting that Apple is expected to integrate with other generative AI partners in the near future); Jess Weatherbed, *Apple and OpenAI Aren't Paying Each Other Yet, Says Bloomberg*, THE VERGE (June 13, 2024), https://www.theverge.com/2024/6/13/24177550/apple-openai-chatgpt-deal-payment-revenue-sharing-chatbot [https://perma.cc/3MEQ-V6TY] (noting that Apple's agreement with OpenAI "isn't exclusive").

Plaintiffs' allegations suggest only that Apple integrated with ChatGPT *first*, not "*exclusively*." And even the complaint acknowledges many lawful reasons why ChatGPT would be a logical choice as an initial integration partner, including that (1) ChatGPT is the leading AI chatbot and would create the best experience for iPhone users, *id.* ¶¶ 157–63, 165; (2) OpenAI allegedly "has provided ChatGPT to Apple for free and is functionally paying for the arrangement itself," *id.* ¶ 94; and (3) the decision to integrate a chatbot's "functionality . . . is a major undertaking" requiring "substantial investment," *id.* ¶ 69, and careful vetting of potential partners.[3]

### B.    Plaintiffs' Claims

Plaintiff X Corp. owns the social media platform X (formerly known as Twitter). *Id.* ¶ 20. Plaintiff X.AI LLC ("xAI") is a separate AI company responsible for developing Grok, a generative AI chatbot. *Id.* ¶¶ 21, 68. Users can access Grok and other generative AI chatbots from all kinds of devices, including computers, tablets, and phones (including iPhone), "by using a web browser or by downloading a particular generative AI chatbot's app." *Id.* ¶ 77; *see also id.* ¶¶ 68–69, 131, 140. Indeed, X Corp. has integrated Grok—and only Grok—into the X social media platform as "a key feature" of that app. *See id.* ¶¶ 68–69, 180. Grok thus has exclusive access to the AI chatbot prompts of hundreds of millions of X users.

The complaint alleges that Grok and X are "consistently highly ranked" based on download volume in the Top Charts in Apple's App Store, from which iPhone users can download apps. *Id.*

---

[3] Vetting of partners is particularly important given some of the concerns about generative AI chatbots, including on child safety issues, nonconsensual intimate imagery, and "jailbreaking"—feeding input to a chatbot so it ignores its own safety guardrails. *See, e.g.*, *Urgent Request for Investigation Into xAI's "Grok Imagine" and its Role in Facilitating Non-Consensual Intimate Imagery*, CONSUMER FED'N OF AM. (Aug. 14, 2025), https://consumerfed.org/wp-content/uploads/2025/08/Spicy-Grok-Request-for-Investigation-Consumer-Coalition.pdf [https://perma.cc/4WWP-L9F3]; Brandon Vigilario, *X's Grok AI Is Great – If You Want to Know How to Hot Wire a Car, Make Drugs, or Worse*, THE REGISTER (Apr. 2, 2024), https://www.theregister.com/2024/04/02/elon_musk_grok_ai/ [https://perma.cc/K6QR-KZYG].

¶¶ 60, 84. Plaintiffs claim that as recently as last month, X was ranked the number one free app for "News," and Grok was ranked the number two free app for "Productivity." *Id.* ¶ 84 & Figure 4. Despite this success, the complaint asserts that Apple deprioritized Grok and other generative AI chatbots in the App Store because on one specific date—August 24, 2025—ChatGPT was the only generative AI chatbot included on the App Store's curated, Must-Have Apps List, which reflects Apple's own recommendations and editorial judgment.[4] *Id.* ¶¶ 80, 83, 85. Regardless, the complaint does not allege that X's and Grok's absences from the Must-Have Apps List have harmed their popularity. In fact, it alleges just the opposite. *See id.* ¶ 84 (alleging that "[t]he X app and the Grok app are consistently highly ranked").

---

[4] In focusing on a single date in August 2025, the complaint fails to acknowledge that multiple generative AI chatbots besides ChatGPT have topped the App Store rankings even after ChatGPT's integration, including Gemini, DeepSeek, and Perplexity. *See* Marcus Mendes, *Google Pokes a Banana-Shaped Hole in Musk's Claims of Apple's Bias Towards OpenAI*, 9 ᴛᴏ 5 Mᴀᴄ (Sept. 16, 2025), https://9to5mac.com/2025/09/16/google-pokes-a-banana-shaped-hole-in-musks-claims-of-apples-bias-towards-openai/?extended-comments=1 [https://perma.cc/G7HE-7FE6]; Christine Ji, *Google's Gemini Now Tops the App Store on Nano Banana Frenzy. Is ChatGPT in Trouble?*, MᴀʀᴋᴇᴛWᴀᴛᴄʜ (Sept. 15, 2025), https://www.marketwatch.com/story/googles-gemini-now-tops-the-app-store-on-nano-banana-frenzy-is-chatgpt-in-trouble-0cc69c4c?mod=mw_FV (App'x 017 (Ex. D)).

On August 11, 2025, Elon Musk, chief executive of both Plaintiffs, posted on X about OpenAI's ranking in the App Store and threatened legal action:



Elon Musk (@elonmusk), X (Aug. 11, 2025, at 9:07 PM ET), https://x.com/elonmusk/status/1955073616996975095 [https://perma.cc/FA63-TXNW].

Following this post, Apple employees explained the objective reasons why Grok was not included on certain lists, and identified app improvements that would help Plaintiffs to qualify for certain editorially curated lists in the App Store. Nonetheless, on August 25, Plaintiffs filed this antitrust lawsuit alleging that the integration of ChatGPT into Apple Intelligence violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2 (Counts 1–6); violates the Texas Free Enterprise & Antitrust Act (Counts 9–10); and constitutes common law civil conspiracy and unfair competition (Counts 7–8). The complaint asserts four categories of claims. First, Plaintiffs allege that Apple monopolized or attempted to monopolize a market for smartphones by entering into an "exclusive" agreement (Counts 2 and 3). Second, Plaintiffs allege that OpenAI monopolized or attempted to

monopolize a market for generative AI chatbots (Counts 4 and 5). Third, Plaintiffs allege that Apple and OpenAI entered into an agreement or conspiracy to harm competition in both the alleged smartphone and generative AI chatbot markets through their supposedly "exclusive" agreement (Counts 1 and 6). Finally, Plaintiffs bring four additional claims under Texas law that are derivative of their federal antitrust claims (Counts 7–10).

### C. Plaintiffs' Alleged Relevant Markets.

Plaintiffs' claims are based on alleged harm to competition in two alleged markets: (1) a "smartphone" market, and (2) a "generative AI chatbot" market.

#### 1. *"Smartphone" Market*

Plaintiffs' claims against Apple concern an alleged market for "smartphones," which the complaint defines as "mobile telephones that incorporate a display screen and an operating system that allows software systems to be installed on the smartphone." Compl. ¶ 117. Plaintiffs do not allege that they make (or plan to make) smartphones. Instead, the connection between the alleged conduct and the smartphone market is based on an attenuated, multi-step chain of causation. Specifically, Plaintiffs contend that if Apple never integrated ChatGPT:

1. Consumers would choose to send additional prompts to Grok (rather than other generative AI chatbots);

2. The additional prompts would result in Grok achieving scale and quality it could not otherwise achieve;

3. As a result, the X app would grow in popularity because it is integrated with Grok;

4. X and xAI would therefore be better positioned to build so-called "super apps" in the future, which the complaint defines as "multi-functional" apps that offer "social connectivity and messaging, financial services, e-commerce, and entertainment";

5. Once developed, consumers might choose to use X's "super app" for various functions;

6. "Super apps" would replace much of the functionality of smartphones and consumers would care less about the quality of their physical phones and rely instead on these hypothetical "super apps";

7. Smartphone manufacturers would respond by offering more basic models of smartphones with less functionality; and

8. iPhone users would decide to replace their iPhones with more "basic smartphones" with "super apps."

*Id.* ¶¶ 16, 18, 115, 169–80.

Based on this alleged conjectural chain of events, Plaintiffs accuse Apple of monopolizing and attempting to monopolize the market for smartphones (Counts 2 and 3) and entering into an agreement or conspiracy with OpenAI to reduce competition in the market for smartphones (Counts 1 and 6).

### 2.    *"Generative AI Chatbot" Market*

Plaintiffs also allege that Apple's integration with ChatGPT harms competition in a market for "generative AI chatbots," which the complaint defines as "artificial intelligence systems that engage in humanlike conversations based on a user's prompt." *Id.* ¶ 128. According to the complaint, the integration of ChatGPT with Apple Intelligence deprives other generative AI chatbots of "a significant number of generative AI chatbot prompts," hindering their ability to compete. *Id.* ¶ 13. The complaint admits, however, that AI chatbots receive prompts through many other means, including through web browsers and apps on iPhone as well as other Apple and non-Apple devices. *Id.* ¶¶ 77, 131, 140. Most of Plaintiffs' claims relating to the alleged generative AI chatbot market are asserted solely against OpenAI because Apple is not itself a generative AI chatbot provider. *Id.* ¶ 56.

### LEGAL STANDARD

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Allegations that are "'merely consistent with' a defendant's liability" are not enough because they "'stop[] short of the line between possibility

and plausibility of 'entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). The court does not "presume true a number of categories of statements, including legal conclusions; mere labels; threadbare recitals of the elements of a cause of action; conclusory statements; and naked assertions devoid of further factual enhancement." *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (citation modified).

## ARGUMENT

**I.    Plaintiffs' Antitrust Claims Should Be Dismissed Because Plaintiffs Do Not Plausibly Allege Exclusionary Conduct.**

Plaintiffs bring antitrust claims under both Section 1 and Section 2 of the Sherman Act. Section 1 prohibits agreements between multiple parties that harm competition, while Section 2 prohibits a single party from monopolizing or attempting to monopolize a market. *See BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526, 528–29 (5th Cir. 2022). To survive a motion to dismiss on either type of claim, Plaintiffs must plausibly allege that the business practice they challenge is "anticompetitive" or "exclusionary." *See, e.g.*, *id.* at 528–32.

Plaintiffs have tried to meet their burden here by baldly claiming, with no supportive facts, that Apple and OpenAI entered an "exclusive" agreement to integrate ChatGPT, suggesting that the agreement precludes Apple from partnering with other generative AI chatbots, such as xAI's Grok. Compl. ¶ 71. Indeed, the complaint uses the words "exclusive" or "exclusively" 31 times. *See, e.g.*, *id.* ¶ 11 (challenging "Apple and OpenAI's exclusive arrangement"); *id.* ¶ 71 ("This deal is exclusive."); *id.* ¶ 91 ("OpenAI's exclusive deal with Apple creates a moat."); *id.* ¶ 169 ("Apple and OpenAI's exclusive deal and related conduct harm competition in the generative AI chatbot and smartphone markets"); *id.* ¶¶ 195, 203, 228 (accusing Apple of monopolization by "entering into an exclusive agreement with OpenAI").

In antitrust jargon, Plaintiffs are asserting an "exclusive dealing" claim—that is, a claim that Apple agreed to partner *only* with ChatGPT and cannot partner with any other chatbot. *See, e.g.*, *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494 n.23 (5th Cir. 2022) (exclusive dealing involves "a buyer agree[ing] to purchase certain goods or services *only* from a particular seller" (emphasis added) (citation modified)). But an exclusive dealing claim—or any other antitrust claim premised on exclusivity—cannot succeed if the agreement at issue is not actually exclusive. Here, Plaintiffs have not alleged any facts indicating that the agreement between Apple and OpenAI is exclusive, and in fact it is expressly *non*-exclusive. All of Plaintiffs' claims should be dismissed for that reason alone. Additionally, Plaintiffs do not allege facts showing that the ChatGPT integration reduced competition in a substantial share of the smartphone or chatbot markets, which is another requirement to survive a motion to dismiss on an exclusive dealing claim.[5]

### A.    Plaintiffs Have Not Plausibly Alleged that the Agreement Between Apple and OpenAI Is Exclusive.

An "exclusive" dealing claim requires an agreement that is in fact exclusive, meaning an agreement in which a party agrees to deal "only" with one counterparty. *Pulse Network*, 30 F.4th at 494 n.23 (citation modified); *see also, e.g.*, *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) ("a prerequisite to any exclusive dealing claim is an agreement to deal exclusively" (citation modified)). Plaintiffs have not—and cannot—satisfy this fundamental requirement.

---

[5] The complaint makes a passing reference to a case brought by the Department of Justice ("DOJ") against Apple in the District of New Jersey, *see* Compl. ¶ 65, but that case is inapposite. DOJ's action has nothing to do with Apple Intelligence or ChatGPT, challenges an entirely different set of practices, and does not assert the "exclusive dealing" claims that Plaintiffs allege here. *See, e.g.*, *United States v. Apple Inc.*, No. 24-CV-4055 (JXN)(LDW), 2025 WL 1829127, at *2–4 (D.N.J. June 30, 2025).

The complaint repeatedly declares Apple's integration with ChatGPT "exclusive." *See, e.g.*, Compl. ¶ 71 ("This deal is exclusive."). But that conclusory label is not enough to survive a motion to dismiss without supporting facts. *See Harmon*, 16 F.4th at 1162–63. Plaintiffs allege no facts indicating that Apple has agreed with OpenAI not to integrate any of ChatGPT's competitors, nor could they, because the agreement is expressly non-exclusive. *See supra* pp. 4–5. In fact, a public source quoted in the complaint—which is incorporated by reference—explicitly confirms that "Apple's deal with OpenAI isn't exclusive" and that Apple is actively discussing partnerships with other generative AI chatbots.[6] The complaint should be dismissed based on this pleading failure alone. *See Harmon*, 16 F.4th at 1162–63 (court may ignore "mere labels," "conclusory statements," and "naked assertions devoid of further factual enhancement"); *Public Health Equip. & Supply Co., Inc. v. Clarke Mosquito Control Prods, Inc.*, No. SA-08-CA-895-OG, 2009 WL 10670089, at *3 (W.D. Tex. June 5, 2009) ("[T]he conclusory allegation of an exclusive distributorship agreement does not satisfy the *Twombly* requirements without additional factual support.").

Without any basis to allege exclusivity, Plaintiffs' grievance is reduced to displeasure that Apple has not *yet* "integrated with any other generative AI chatbots" beyond ChatGPT, such as those created by xAI, Google, and Anthropic. Compl. ¶¶ 71–72. But launching a new feature with one partner before undertaking the substantial investment required to integrate with other partners is not unlawful. If it were, the implication would be that a business (here, Apple) could not partner

---

[6] Paragraph 94 of the complaint quotes a "report," which is an article by Bloomberg about the ChatGPT integration. The complaint omits the portion of the article that confirms that the Apple-OpenAI agreement is not exclusive, but the Court is "entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn." *Twombly*, 550 U.S. at 568 n.13; *see also In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*, No. 3:12-CV-3515-B, 2014 WL 5460450, at *6 n.21 (N.D. Tex. Oct. 27, 2014) (same).

with one supplier (here, ChatGPT) unless it *immediately* and *simultaneously* partnered with *every* competing supplier—regardless of cost, feasibility, efficiency, proposed commercial terms, safety or reputational concerns, or any other factor.[7]

The antitrust laws do not impose such a rule, which would harm consumers. Plaintiffs' own complaint shows why: it identifies the many entirely pro-consumer reasons why Apple might choose to integrate with ChatGPT first. Plaintiffs allege, for instance, that ChatGPT is by far the leading AI chatbot and preferred by users. *See, e.g.*, *id.* ¶¶ 157–63. They also allege that "X's integration of Grok's functionality" into the X app was a "major undertaking that has required substantial investment," *id.* ¶ 69—a concession that underscores the massive resources Apple would need to devote to integrating *every* AI chatbot into Apple Intelligence, *see, e.g.*, *id.* ¶ 109. And they claim that OpenAI "has provided ChatGPT to Apple for free and is functionally paying for the arrangement itself," *see id.* ¶ 94—favorable terms that would justify Apple's choice to integrate with ChatGPT first.

In sum, Plaintiffs' Sherman Act claims are predicated on the assumption that the integration of ChatGPT into Apple Intelligence is an "exclusive" arrangement. *See id.* ¶¶ 9, 11, 70-78, 90–91, 195, 203. Because that foundational assumption is unsupported by factual allegations and incorrect, Plaintiffs' claims should be dismissed.

### B. Plaintiffs Fail to Plausibly Allege that the ChatGPT Integration Foreclosed a Substantial Share of Competition.

Plaintiffs' claims should be dismissed for a second, independent reason: Plaintiffs do not plausibly allege that the integration of ChatGPT harms competition. Many, if not most, exclusive agreements are lawful; "frequently," they have "procompetitive justifications," benefit consumers,

---

[7] By Plaintiffs' own logic, X may be required to integrate all other chatbots—including ChatGPT—on its own social media platform.

and are permitted under the antitrust laws. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 849 (5th Cir. 2015). An exclusive dealing claim must therefore be dismissed unless the plaintiff has plausibly alleged not only that the agreement is exclusive, but also that it forecloses a "substantial" share of competition in each relevant market. *See BRFHH Shreveport*, 49 F.4th at 530 ("Substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim."); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010) (same for Section 1 claims). In other words, to survive a motion to dismiss, Plaintiffs must allege facts showing that the integration of ChatGPT into Apple Intelligence eliminates the ability of competitors to reach such a large and significant portion of potential consumers in the AI chatbot (and smartphone) market that those other chatbots (and smartphone manufacturers) cannot effectively compete.

**Smartphone Market.** The complaint does not allege that the integration of ChatGPT into Apple Intelligence has foreclosed *any* competition in the smartphone market. Put differently, Plaintiffs have not alleged—nor could they—that any smartphone manufacturer is somehow prevented from competing because Apple has integrated ChatGPT into certain Apple Intelligence features. Apple, Samsung, Google, and other mobile phone manufacturers instead remain just as free to compete for users as they were before the ChatGPT integration. In fact, the complaint alleges that some users might prefer to use a smartphone with Grok or another generative AI chatbot, *see* Compl. ¶ 68, which could give other phone manufacturers a competitive opportunity to attract new customers.

Plaintiffs' only allegation of "foreclosure" in the complaint is limited to the alleged *chatbot* market. *See id.* ¶¶ 13, 107, 172–73; *see also id.* ¶¶ 103–11. Those allegations are conclusory and implausible, *see infra* pp. 16–17, but also irrelevant because the substantial foreclosure

requirement is market-specific. *See BRFHH Shreveport*, 49 F.4th at 530–31 (requiring pleading of substantial foreclosure in *each* relevant market, and affirming dismissal of exclusive dealing claim on that basis); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002) (courts must determine "whether the arrangement foreclosed competition in a substantial share *of the established market*" (emphasis added)).

Not only do Plaintiffs fail to allege *substantial* foreclosure of competition as required for their exclusive dealing claim, their allegations are insufficient to show *any* harm in the alleged smartphone market. Specifically, Plaintiffs speculate that in the absence of Apple and OpenAI's agreement: (1) users would send more generative AI prompts to Grok (rather than to other chatbots); (2) the additional prompts would result in Grok achieving "scale" it cannot achieve through the many sources of prompts currently available to it, and Grok would therefore grow in quality and popularity; (3) because the X app is exclusively integrated with Grok, the X app in turn would grow in popularity; (4) X would therefore be better able to develop into a "super app" at some unidentified point in the future; (5) consumers would flock to X's super app once developed at considerable scale; (6) those consumers might become less interested in the functionality of smartphones; (7) smartphone manufacturers might respond by offering more basic models of smartphones; and (8) consumers may therefore someday replace their iPhones with more basic "smartphones complemented by super apps." Compl. ¶¶ 16, 18, 115, 169–80. And even if every one of these developments came to pass, Plaintiffs allege that the assumed disruption of the smartphone market by not-yet-developed "super apps" is perhaps a decade away. *See id.* ¶ 58.

Those allegations do not "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Each step in the chain requires the court to guess what might happen in the future and make predictions about the conduct of third parties (including chatbot providers, smartphone users,

and smartphone manufacturers), X's own ability to develop a super app, and much more. Plaintiffs'
antitrust claims about the smartphone market (Counts 1, 2, 3, and 6) should therefore be dismissed
for lack of any plausible allegations of foreclosure of competition in that market.

**Generative AI Chatbot Market.** Plaintiffs likewise fail to plausibly allege that the
ChatGPT integration foreclosed a substantial share of competition in the chatbot market. Plaintiffs'
theory here is that the integration of ChatGPT into Apple Intelligence gives OpenAI exclusive
access to Apple Intelligence generative AI prompts, "driv[ing] scale to ChatGPT and away from
ChatGPT's rivals, including Grok." Compl. ¶ 107; *see also id.* ¶¶ 103–08. But Plaintiffs concede
that Grok and other chatbots still access prompts from iPhone users through web browsers and the
App Store, where Apple enables consumers to download a wide range of other chatbots—
including Grok, Gemini, Copilot, Claude, Perplexity, DeepSeek, and MetaAI. *Id.* ¶ 77. Chatbots
also receive prompts from users of all manner of other devices, including tablets, computers, and
non-Apple mobile phones. *Id.* ¶¶ 77, 131, 140. And they plead no facts indicating that those are
insufficient sources of scale.

Instead, Plaintiffs again stretch logic, asserting that because Siri received 1.5 billion user
requests per day globally last year, the integration gives OpenAI "exclusive access to *up to* 55
percent of all potential generative AI chatbot prompts." *Id.* ¶ 104 (emphasis added). The Court is
not required to accept this unexplained conclusory allegation. *See Harmon*, 16 F.4th at 1162–63.
But at any rate, "up to" 55 percent could mean well less than 55 percent (or even zero). Such an
allegation at most is "merely consistent with" substantial foreclosure and thus inadequate. *Iqbal*,
556 U.S. at 678 (citation modified); *see also Arcell v. Google LLC*, No. 22-CV-02499-RFL, 2024
WL 1090009, at *4 (N.D. Cal. Feb. 5, 2024) (dismissing for failure to plausibly allege substantial
foreclosure where plaintiff alleged exclusive agreement covered 36 percent of search queries, but

"allege[d] no facts to support this conclusory assertion, such as identifying the source of the figure").

Moreover, Plaintiffs' 55 percent figure appears to rest on speculative and implausible assumptions that the agreement gives ChatGPT exclusive access to *all* Siri requests from *all* Apple devices (including older models), and that OpenAI may use all such requests to train ChatGPT and achieve scale. *See* Compl. ¶ 104. Those assumptions are contradicted by other facts alleged in the complaint that are accepted as true, including that (1) the ChatGPT integration is only available on newer-model iPhones, *see id.* ¶ 56; (2) individual iPhone users must affirmatively opt in to the ChatGPT integration, *see id.* ¶¶ 28, 75 & Figure 1; *Introducing Apple Intelligence*, *supra*; and (3) not all Siri requests, even by users who have enabled devices and opt in, result in ChatGPT prompts that OpenAI can use to train its models, *see* Compl. ¶ 75. Plaintiffs' conjecture that some undefined portion of Siri-enabled prompts on a subset of iPhone models within a broader market for smartphones—and within the even broader set of devices like tablets and computers that consumers use to access AI chatbots—does not amount to facts indicating substantial foreclosure of competition. The chatbot-market Sherman Act claims against Apple (Counts 1 and 6) should therefore be dismissed on this basis as well.

### C. Plaintiffs' Allegations Regarding Apple's Management of Its App Store Are Contradictory and Conclusory.

Unable to allege an antitrust claim based on ChatGPT's integration into Apple Intelligence, Plaintiffs also toss in a few threadbare allegations regarding the Must-Have Apps List on Apple's App Store. These allegations assert that Apple has "deprioritized the apps of super app and generative AI chatbot competitors" on the Must-Have Apps List. *See id.* ¶¶ 80–88. Those allegations are contradictory, conclusory, and do not constitute anticompetitive conduct.

To begin, the allegations are irrelevant to Plaintiffs' claim under Section 1 of the Sherman Act (Count 1). Section 1 prohibits only anticompetitive agreements "between *separate* entities." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984); *see also Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996). But the complaint does not and could not allege that Apple's App Store policies are pursuant to an agreement between Apple and OpenAI (or anyone else). The Court should therefore disregard these allegations for the purposes of Plaintiffs' Section 1 claim (Count 1).

The allegations likewise offer no support to Plaintiffs' remaining claims. The Top Charts in the App Store are based on recent download volume, while the Must-Have Apps List is editorially curated. Plaintiffs complain about their exclusion from the latter, but Apple's curation of its Must-Have Apps List involves editorial speech that is protected by the First Amendment and does not create a basis for antitrust liability. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 731–32 (2024). Regardless, far from being deprioritized in App Store rankings, Plaintiffs contend that X and Grok are "consistently highly ranked" in Top Charts, with X ranked as the number one free app for "News" and Grok the number two free app for "Productivity" as of late August 2025. Compl. ¶ 84. Plaintiffs' grievance thus seems to be that Grok does not appear on the Must-Have Apps List, even though it ranks highly in certain Top Charts. *Id.* ¶¶ 85–86. That assumes that the Apple-curated Must-Have Apps List must be distorted if it does not strictly parrot App Store Top Charts. But that assumption is illogical: there would be little point in maintaining a Must-Have Apps List if all it did was restate what Top Charts say, rather than offer Apple's editorial recommendations to users.

Plaintiffs thus allege no facts plausibly supporting their assertion that Apple intentionally "deprioritized" their apps as part of an illegal conspiracy or monopolization scheme. Nor do they

allege any facts showing that they suffered any harm from not being included on the Must-Have Apps List, particularly given their high placement on the App Store's Top Charts. The App Store allegations cannot save the Plaintiffs' claims.

###### D. Plaintiffs' Attempted Monopolization and Conspiracy Claims Should Be Dismissed for Additional Reasons.

Plaintiffs' Section 2 attempted monopolization and conspiracy to monopolize claims (Counts 3 and 6) should also be dismissed for another reason: Plaintiffs have not alleged the requisite intent. Plaintiffs must plausibly allege *facts* showing that Apple had "specific intent to monopolize" the alleged smartphone market. *N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986); *see Iqbal*, 556 U.S. at 678. But again, all the complaint offers is conclusory speculation. *See* Compl. ¶¶ 203, 229.

The only fact Plaintiffs allege to support their conclusory statement that Apple specifically intended to monopolize is that Apple entered the agreement with OpenAI while "aware that super apps are a competitive threat to iPhones." *Id.* ¶ 229. But contemporaneous awareness of a supposed competitive threat does not imply specific intent to eliminate that threat through anticompetitive means. After all, "[a]ll lawful competition aims to defeat and drive out competitors," so "the mere intention to exclude competition and to expand one's own business is not sufficient to show a specific intent to monopolize." *In re Beef Indus. Antitrust Litig.*, 713 F. Supp. 971, 979 (N.D. Tex. 1988) (internal quotation marks omitted) (quoting *Great Escape, Inc. v. Union City Body Co.*, 791 F.2d 532, 541 (7th Cir. 1986)). Given the speculative nature of Plaintiffs' alleged chain of causation and the existence of procompetitive rationales for Apple's conduct, *see supra* p. 13, specific intent cannot be inferred from mere awareness here.

## II.    Plaintiffs' Antitrust Claims Should Be Dismissed for Lack of Standing.

Even if Plaintiffs *had* plausibly alleged anticompetitive or exclusionary conduct, their claims would still fail for lack of standing. "Antitrust law has its own threshold for standing" for private plaintiffs to sue that is stricter than the Article III standard. *Tesla, Inc. v. La. Auto. Dealers Ass'n*, 113 F.4th 511, 527 (5th Cir. 2024). To satisfy this higher bar, Plaintiffs must plausibly allege each of the following: "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Pulse Network*, 30 F.4th at 488 (citation modified).[8] Courts in this Circuit routinely dismiss antitrust complaints when plaintiffs fail to allege facts establishing each of these three requirements. *See, e.g.*, *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318–22 (5th Cir. 2009); *Norris*, 500 F.3d at 464–69; *Bodine v. First Co.*, No. 3:20-CV-3116-BT, 2021 WL 5505562, at *7–9 (N.D. Tex. Nov. 24, 2021), *aff'd*, No. 21-11266, 2022 WL 2462022 (5th Cir. July 6, 2022); *Am. Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 12884823, at *3 (N.D. Tex. Aug. 16, 2012).

The Court should dismiss the complaint for lack of antitrust standing for two independent reasons. *First*, as earlier explained, Plaintiffs' theory of injury is far too indirect and speculative. Plaintiffs therefore cannot establish the proximate causation necessary to support standing. *Second*, under the Fifth Circuit's decision in *Norris*, 500 F.3d at 464–69, Plaintiffs—who do not make

---

[8] The proper plaintiff status inquiry further considers (1) "whether the plaintiff's injuries or their causal link to the defendant are speculative"; (2) "whether other parties have been more directly harmed"; and (3) "whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Pulse Network*, 30 F.4th at 493 (citation modified).

smartphones and are not suing as smartphone consumers—cannot bring their claims based on harm in a smartphone market.[9]

### A.    Plaintiffs' Alleged Harms Are Too Indirect and Speculative to Support Antitrust Standing for Any Claim.

To have standing, an antitrust plaintiff must have suffered injury that is "a direct consequence of the alleged antitrust violation" and which is "determinable and not speculative." *Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1014 (5th Cir. 1984). In other words, to survive a motion to dismiss, the plaintiff must plausibly allege that the defendant's anticompetitive conduct "proximately caused" the plaintiff's injuries. *Pulse Network*, 30 F.4th at 488. Antitrust claims are routinely dismissed where they allege chains of causation "contain[ing] several somewhat vaguely defined links." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983) ("*AGC*"); *see also, e.g.*, *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir. 1986) (affirming dismissal where "the injuries claimed [were] not a direct consequence of the alleged activities of the defendants").

Plaintiffs have not come close to plausibly alleging proximate cause. As explained above, their alleged injuries are based on a lengthy and complex causal chain "contain[ing] several somewhat vaguely defined links." *AGC*, 459 U.S. at 540; *see supra* pp. 15–16. Plaintiffs allegations rest on at least eight different steps to reach from the ChatGPT integration to alleged harm in a smartphone market. Those links, moreover, involve speculation about the potential conduct of numerous third parties (including other chatbot providers, smartphone users, and smartphone manufacturers), X's own ability to develop a super app, and more. That chain is plainly

---

[9] Plaintiffs' failure to plausibly allege antitrust standing also disposes of Plaintiffs' state law antitrust claims. *See Bodine*, 2021 WL 5505562, at *9 (affirming dismissal of claims under the Texas Antitrust Act for lack of antitrust standing); *infra* Part III.

too indirect and speculative to give plaintiffs standing to bring their claims. *See* Compl. ¶¶ 90–97, 112–15, 169–80. Indeed, it fails even at its earliest steps, because the bald assertion that the integration of ChatGPT may prevent chatbots (like Grok) from achieving adequate scale and, in turn, would-be "super apps" (like X) from developing is itself indirect and speculative. *See supra* pp. 16–17; *Bakay v. Apple Inc.*, No. 24-CV-00476-RS, 2024 WL 3381034, at *5–7 (N.D. Cal. July 11, 2024) (dismissing claims for lack of antitrust standing where plaintiffs' alleged chain of causation involved too many steps and relied on independent decisions by third parties).

Plaintiffs' claimed harm is therefore not a "direct consequence of the alleged antitrust violation," and is anything but "determinable and not speculative." *Walker*, 747 F.2d at 1014. Because Plaintiffs have not plausibly alleged proximate causation, they lack standing to assert their antitrust claims and the complaint should be dismissed.

## B.    Plaintiffs Lack Antitrust Injury to Assert Smartphone-Market Claims Under the Fifth Circuit's Decision in *Norris*.

Plaintiffs independently lack antitrust standing, at least to the extent their claims involve the smartphone market, because they have not suffered the required, specific, "antitrust injury." *Pulse Network*, 30 F.4th at 488 (citation modified); *Norris*, 500 F.3d at 465. Not all injuries "'causally linked to' an antitrust violation" are "antitrust injur[ies]." *Norris*, 500 F.3d at 465 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Instead, an antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick*, 429 U.S. at 489. The Fifth Circuit has held that only "consumers [or] competitors in the market attempted to be restrained" have an "antitrust injury." *Norris*, 500 F.3d at 467. And a plaintiff whose injuries "are experienced in another market do not suffer antitrust injury." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001).

Controlling Fifth Circuit precedent requires dismissal of Plaintiffs' claims in the alleged smartphone market (Counts 1, 2, 3, and 6) because Plaintiffs are not competitors or consumers in that market. Plaintiffs do not make smartphones: X Corp. runs a social media platform, and xAI is a generative AI chatbot provider. And Plaintiffs' alleged injuries are lost profits and subscribers for those apps, not injuries suffered as smartphone consumers. *See* Compl. ¶¶ 178–80. Plaintiffs thus lack antitrust standing to bring their claims involving a smartphone market.

*Norris* is on point. There, the Fifth Circuit affirmed the dismissal of claims brought by distributors of the Houston Chronicle for lack of antitrust injury. 500 F.3d at 465. The distributors brought claims against the Chronicle's publisher, alleging that they were unlawfully terminated for refusing to certify the paper's inflated subscriber numbers. The complaint alleged that the Chronicle wanted higher subscriber numbers to increase its share of newspaper advertising sales and boost advertising revenue. *Id.* at 463, 466. The Fifth Circuit held that the distributors lacked antitrust injury because they were "neither consumers (buyers of advertising, or users of advertising such as subscribers) nor competitors (sellers of advertising) in the relevant market." *Id.* at 466; *see also Jebaco*, 587 F.3d at 320 (affirming dismissal for lack of antitrust injury because the plaintiff was "neither a consumer nor a competitor" in the relevant market).

*Travelport* is similarly instructive. There, the airline reservation system Travelport sued American Airlines for allegedly monopolizing the market for non-stop air travel. The court dismissed the claims for lack of antitrust injury because Travelport was "neither a consumer nor a competitor in the [relevant] market." 2012 WL 12884823, at *3. As the court explained, "the competitors in these markets are airlines, and the consumers are travel agents and passengers. Travelport is neither." *Id*. Other courts have reached similar conclusions. *See, e.g.*, *McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 229 (3d Cir. 2010) ("mere intermediaries in the supply chain"

were not "competitors or consumers" in the "market for surgical orthopedic devices" and thus "suffered no cognizable antitrust injury"); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372, 1376–77 (9th Cir. 1996) (similar).

As in *Norris* and in *Travelport*, Plaintiffs here lack antitrust injury for their smartphone-related claims because they are not competitors or consumers in a smartphone market.[10] Plaintiffs thus have no basis to bring their smartphone claims based on injuries that they allegedly suffered in an entirely separate market. *See Hughes*, 278 F.3d at 423 (noting that "[p]arties whose injuries . . . are experienced in another market do not suffer antitrust injury").[11]

### III. Plaintiffs' State-Law Claims Fall with Their Sherman Act Claims and Should Be Dismissed.

In addition to their Sherman Act claims, Plaintiffs assert four claims under Texas state law (Counts 7, 8, 9, and 10). Those fall with Plaintiffs' Sherman Act claims and should be dismissed.

*First*, relying on the same allegations that undergird their Sherman Act claims and on "threadbare recitals of [the] cause of action's elements," *Iqbal*, 556 U.S. at 663, Plaintiffs assert two claims under the Texas Free Enterprise & Antitrust Act. *See* Compl. ¶¶ 244–50. But that Act specifically provides that it "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes." Tex. Bus. & Com. Code Ann. § 15.04 (West 2025). Both the Supreme Court of Texas and the Fifth Circuit have thus treated claims under the Act as standing

---

[10] There is a narrow exception to the "consumer/competitor" rule for situations where a plaintiff's injuries are how a defendant achieves its illegal ends and thus are "inextricably intertwined" with the antitrust violation. *See Norris*, 500 F.3d at 467 & n.18 (construing the exception). In those situations, however, the plaintiff must show its injuries were necessary for the defendant to carry out the alleged antitrust violation. *Id.*; *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 161 (2d Cir. 2016). Plaintiffs make no such showing here.

[11] For similar reasons, X Corp. (a social media platform) lacks antitrust injury to assert claims regarding the chatbot market (Counts 1 and 6, 7, 8, 9, and 10). It does not allege that it is a chatbot maker or consumer and thus lacks antitrust injury in the chatbot market itself. *See Norris*, 500 F.3d at 466; *Jebaco*, 587 F.3d at 320.

or falling with parallel federal claims. *See, e.g.*, *AMC Ent. Holdings, Inc. v. iPic-Gold Class Ent., LLC*, 638 S.W.3d 198, 206–18 (Tex. 2022); *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 736–41 (5th Cir. 2015); *Norris*, 500 F.3d at 463 n.13. Plaintiffs' state-law antitrust claims therefore fail for the same reasons as their Sherman Act claims.

*Second*, Plaintiffs' common-law civil conspiracy and unfair competition claims, *see* Compl. ¶¶ 234–43, likewise fall with Plaintiffs' antitrust claims because they are for "derivative tort[s]." *Greenville Automatic Gas Co. v. Automatic Propane Gas & Supply, LLC*, 465 S.W.3d 778, 788 (Tex. App.—Dallas 2015, no pet.). As Texas courts have explained, "[w]ithout some finding of an independent substantive tort or other illegal conduct, liability cannot be premised on the tort of 'unfair competition.'" *RTLC AG Prods., Inc. v. Treatment Equip. Co.*, 195 S.W.3d 824, 833 (Tex. App.—Dallas 2006, no pet.). The same goes for Plaintiffs' civil conspiracy claim: "a defendant's liability for conspiracy depends on participation in some underlying tort." *Id.* And here, all the complaint offers to support these claims—beyond the allegations underlying their meritless antitrust claims—is "a formulaic recitation of the elements of a cause of action," which does not suffice. *Twombly*, 550 U.S. at 555. These claims, too, thus cannot stand if Plaintiffs' Sherman Act claims are dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint.

Dated: September 30, 2025                    Respectfully submitted,

                                             */s/ Dee J. Kelly, Jr.*
                                             Dee J. Kelly, Jr.
                                             State Bar No. 11217250
                                             dee.kelly@kellyhart.com
                                             Julia G. Wisenberg
                                             State Bar No. 24099146
                                             julia.wisenberg@kellyhart.com
                                             KELLY HART & HALLMAN LLP
                                             201 Main Street, Suite 2500
                                             Fort Worth, TX 76102
                                             Telephone: (817) 332-2500
                                             Facsimile: (817) 878-9280

                                             Emily Johnson Henn (admitted *pro hac vice*)
                                             ehenn@cov.com
                                             COVINGTON & BURLING LLP
                                             3000 El Camino Real
                                             5 Palo Alto Square, 10th Floor
                                             Palo Alto, CA 94306
                                             Telephone: (650) 632-4700

                                             Henry Liu (admitted *pro hac vice*)
                                             hliu@cov.com
                                             Lauren Willard Zehmer (admitted *pro hac vice*)
                                             lzehmer@cov.com
                                             Carol Szurkowski Weiland (admitted *pro hac vice*)
                                             cweiland@cov.com
                                             COVINGTON & BURLING LLP
                                             One CityCenter
                                             850 Tenth Street, NW
                                             Washington, DC 20001
                                             Telephone: (202) 662-6000
                                             Facsimile: (202) 662-6302

                                             **ATTORNEYS FOR DEFENDANT APPLE INC.**

26

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 30, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Julia G. Wisenberg*
Julia G. Wisenberg