**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC., OPENAI, INC., OPENAI,<br>L.L.C., and OPENAI OPCO, LLC,<br><br>    Defendants. | Civil Action No. 4:25-cv-00914-P |

**BRIEF OF DEFENDANTS OPENAI, INC., OPENAI, L.L.C., AND
OPENAI OPCO, LLC IN SUPPORT OF THEIR MOTION TO DISMISS**

WACHTELL, LIPTON,
  ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone: (212) 403-1000
Facsimile: (212) 403-2000

LYNN PINKER HURST
  & SCHWEGMANN LLP
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
Telephone: (214) 981-3800
Facsimile: (214) 981-3839

Dated: September 30, 2025

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND ....................................................................................... 2

    A.    OpenAI launches ChatGPT, a groundbreaking generative AI service. ................................................................................... 2

    B.    xAI launches a competing generative AI service, Grok. ....................... 3

    C.    Elon Musk pursues a campaign of litigation against OpenAI. .............. 4

    D.    Apple announces Apple Intelligence, through which users of late-model iPhones have the option of enabling native integration with ChatGPT. ............................................................................... 5

    E.    X and xAI wait over nine months after the ChatGPT integration and then sue, alleging an "exclusive arrangement" between OpenAI and Apple. .................................................................... 7

ARGUMENT ............................................................................................ 8

    I.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST OPENAI UNDER THE SHERMAN ACT ......................... 9

        A.    Plaintiffs fail to plead facts that, if proven, would plausibly establish the existence of an exclusive dealing agreement or conspiracy. .......................................................................... 10

        B.    Plaintiffs fail to allege facts that, if proven, would plausibly establish "substantial foreclosure" in unreasonable restraint of trade. ............................................................................ 12

        C.    Plaintiffs do not plausibly allege specific intent by OpenAI to attempt or conspire to monopolize.................................... 15

        D.    Plaintiffs lack antitrust standing for want of injury. ................ 17

    II.    THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST OPENAI UNDER TEXAS STATE LAW ........................ 20

CONCLUSION.......................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*,
　776 F.3d 321 (5th Cir. 2015) ........................................................................15 n.17

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*,
　836 F.3d 1171 (9th Cir. 2016) ................................................................................11

*Apani Sw., Inc.* v. *Coca-Cola Enters.*,
　300 F.3d 620 (5th Cir. 2002) ......................................................................8, 9, 20

*Ashcroft* v. *Iqbal*,
　556 U.S. 662 (2009) ............................................................................................8, 14

*Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*,
　472 U.S. 585 (1985) ................................................................................................15

*Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*,
　459 U.S. 519 (1983) ....................................................................................18, 19, 20

*Bell Atlantic Corp.* v. *Twombly*,
　550 U.S. 544 (2007) ..................................................................................................8

*Bell* v. *Dow Chem. Co.*,
　847 F.2d 1179 (5th Cir. 1988) ................................................................................17

*Blue Shield of Va.* v. *McCready*,
　457 U.S. 465 (1982) ................................................................................................17

*BRFHH Shreveport, LLC* v. *Willis-Knighton Med. Ctr.*,
　49 F.4th 520 (5th Cir. 2022) ........................................................................ *passim*

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
　429 U.S. 477 (1977) ................................................................................................19

*Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*,
　485 U.S. 717 (1988) ................................................................................................10

*Campbell* v. *Wells Fargo Bank, N.A.*,
　781 F.2d 440 (5th Cir. 1986) ............................................................................17, 18

*CTUnify, Inc.* v. *Nortel Networks, Inc.*,
　115 F. App'x 831 (6th Cir. 2004) ............................................................................19

*Denison Mattress Factory* v. *Spring-Air Co.*,
    308 F.2d 403 (5th Cir. 1962) ................................................................12

*Dexon Comput., Inc.* v. *Cisco Sys., Inc.*,
    2023 WL 2941414 (E.D. Tex. Feb. 7, 2023) ........................................16

*Eastman* v. *Quest Diagnostics Inc.*,
    724 F. App'x 556 (9th Cir. Feb. 12, 2018) ..........................................15

*Hawaii* v. *Standard Oil Co.*,
    405 U.S. 251 (1972)..............................................................................19

*Hereford* v. *Carlton*,
    2016 WL 7042230 (E.D. Tex. Mar. 16, 2016) ..................................6 n.8

*Honeywell Int'l Inc.* v. *Lone Star Aerospace, Inc.*,
    2024 WL 4093183 (N.D. Tex. Sept. 4, 2024)......................................16

*Housey* v. *Procter & Gamble Co.*,
    2022 WL 874731 (S.D.N.Y. Mar. 24, 2022) .......................................11

*Hughes* v. *Tobacco Inst., Inc.*,
    278 F.3d 417 (5th Cir. 2001) ...............................................................19

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
    44 F.4th 959 (10th Cir. 2022) ..............................................................16

*Izadjoo* v. *Helix Energy Sol. Grp., Inc.*,
    237 F. Supp. 3d 492 (S.D. Tex. Feb. 14, 2017) ....................7 n.11, 7 n.12

*JSW Steel (USA) Inc.* v. *Nucor Corp.*,
    586 F. Supp. 3d 585 (S.D. Tex. 2022),
    *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17, 2025) ..............................20

*N. Miss. Commc'ns, Inc.* v. *Jones*,
    792 F.2d 1330 (5th Cir. 1986) .............................................................15

*Neal* v. *Trans Ova Genetics, Inc.*,
    2013 WL 12131198, at *4 (W.D. Tex. May 13, 2013)....................15 n.17

*Omega Env't, Inc.* v. *Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) .............................................................13

*Pulse Network, L.L.C.* v. *Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ..............................................10, 17, 19

*Schott* v. *Babb*,
    2023 WL 7201157 (W.D. Tex. Sept. 27, 2023)..................................6 n.8

*Tampa Elec. Co.* v. *Nashville Coal Co.*,
   365 U.S. 320 (1961) ...................................................................................................11

*Taylor Pub. Co.* v. *Jostens, Inc.*,
   216 F.3d 465 (5th Cir. 2000) .....................................................................................21

*Tesla, Inc.* v. *Louisiana Auto. Dealers Ass'n*,
   113 F.4th 511 (5th Cir. 2024) ...................................................................................17

*United Shoe Mach. Corp.* v. *United States*,
   258 U.S. 451 (1922) ...................................................................................................11

*Walker* v. *U-Haul Co. of Miss.*,
   747 F.2d 1011 (5th Cir. 1984) ...................................................................................17

**Statutes and Rules**

15 U.S.C. § 1 *et seq.* ......................................................................................... *passim*

Fed. R. Civ. P. 8(a)(2) .......................................................................................................8

Fed. R. Civ. P. 12(b)(6) .....................................................................................................8

TEX. BUS. & COM. CODE. ANN. § 15.01 *et seq.* ..........................................................20

**Other Authorities**

HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY (1st ed. 1994) ...........................13

PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF
   ANTITRUST PRINCIPLES AND THEIR APPLICATION (5th ed. 2025) ......................10, 19

## PRELIMINARY STATEMENT

This lawsuit is the latest effort by the world's wealthiest man to stifle competition in the world's most innovative industry. Elon Musk is waging a campaign of lawfare against the leading artificial intelligence company, OpenAI, and its groundbreaking product, ChatGPT. While plowing billions into his AI competitor, xAI, Musk has repeatedly sued OpenAI in California's state and federal courts for his own competitive advantage — just last week, he had xAI file another of these federal suits, in California — and has urged regulators to interfere with OpenAI's plans and operations. Now, Musk has chosen a new forum for his California-headquartered company and its subsidiary to attack the California-headquartered OpenAI and Apple. His effort to leverage this Court for an edge should fail; the Complaint does not state a claim and should be dismissed.

Musk's pretext for litigation this time is that Apple chose to offer ChatGPT as an optional add-on for several built-in applications on its latest iPhones. Musk, xAI, and Musk's social network X wish that Apple had simultaneously chosen to integrate xAI's Grok, the AI service that recently gained notoriety for calling itself "MechaHitler." Seeking to give their business grievance a legal patina, Plaintiffs assert that Apple and OpenAI entered into an arrangement that is "exclusive" in violation of federal and state antitrust laws — supposedly excluding any other competitors from a putative market of "generative AI chatbots." The complaint comes nowhere close to stating a valid claim of exclusive dealing, for several independent reasons.

*First*, Plaintiffs do not (and cannot) plead that Apple and OpenAI have entered into any agreement, tacit or express, that excludes competitors. Indeed, materials incorporated into their own complaint preclude that claim, as they reveal that "*Apple's deal with OpenAI isn't exclusive.*"[1]

---

[1]     *See* Mark Gurman, *Apple to 'Pay' OpenAI for ChatGPT Through Distribution, Not Cash*, BLOOMBERG (June 12, 2024), https://tinyurl.com/Jun122024BB (quoted at Compl. ¶ 94) (emphasis added) (App'x Tab 1 at A004).

*Second*, the pleadings make clear that iPhone users can still freely access all of ChatGPT's competitors (including Grok) just as before, through browsers and mobile apps — disposing of any argument that Defendants' supposed agreement foreclosed "substantial" portions of the claimed market for "generative AI chatbots," as required to plead antitrust liability. *Third*, even if Plaintiffs had pleaded "exclusive dealing" and market impact, their claims of attempted monopolization would still fail for want of "specific intent" by OpenAI to attempt or conspire to monopolize the market — a defect courts regularly find fatal to asserted antitrust claims.

*Finally*, even if the claims did not suffer from these pleading-stage flaws, Plaintiffs would lack standing to assert them. Plaintiffs have not alleged any non-speculative harm rising directly out of ChatGPT's integration as an option for certain features on certain iPhones — and certainly not the species of unlawful, anticompetitive harm targeted by antitrust law. Instead, the outcome Plaintiffs seek would mark a perversion of that law, transforming a statute designed to address the unreasonable restraint of trade into a weapon against technological development and free-market competition. The Court should reject this effort and dismiss the suit with prejudice.

## BACKGROUND[2]

### A.    OpenAI launches ChatGPT, a groundbreaking generative AI service.

OpenAI was established in 2015 as a non-profit dedicated to developing artificial intelligence tools to benefit humanity as a whole. ¶¶ 39, 42. To attract resources needed to continue developing its technology, OpenAI launched a capped for-profit subsidiary (OpenAI, L.P., later OpenAI OpCo, LLC) in March 2019 that continues to be governed by the non-profit. ¶¶ 25, 43.

In November 2022, OpenAI publicly released its generative AI service ChatGPT, which

---

[2]    "Apple" refers to Apple Inc., "OpenAI" to OpenAI, Inc., OpenAI, L.L.C., and OpenAI OpCo, LLC, "X" to X Corp., and "xAI" to X.AI LLC. "¶ __" refers to paragraphs in the complaint filed in this action. Dkt. No. 1 ("Complaint" or "Compl."). "App'x Tab __" refers to the tab in the Appendix in Support of OpenAI's Motion to Dismiss filed herewith.

engages in human-like conversation by providing dynamic responses to natural language prompts. ¶¶ 40, 128. The AI model underlying ChatGPT is also capable of extended reasoning and can perform sophisticated tasks like computer programming, image recognition, and spatial processing. ¶¶ 133, 134. ChatGPT — like other generative AI services — was developed by "training" custom OpenAI software on large volumes of data, including text, images, and audio recordings. ¶¶ 10, 161, 164. OpenAI's software identifies patterns in this "training" data, which it then uses to develop sophisticated responses to users' queries. *E.g.*, ¶ 92. The Complaint alleges that this training data also includes "user prompts" — an industry term referring to the messages that a user sends to a generative AI service during a conversation. *Id.*

ChatGPT was the first generative AI service to gain domestic and international prominence and has remained on the cutting edge of innovation in the space. OpenAI's products have thus attracted a large and growing userbase, with over 700 million people using ChatGPT every week. ¶ 41. Since launch, users have been able to access ChatGPT for free on many platforms, including web browsers and mobile applications. ¶¶ 41, 94. OpenAI also markets premium versions of ChatGPT for a fee. *E.g.*, ¶ 97.

**B.    xAI launches a competing generative AI service, Grok.**

While ChatGPT was a first mover in the generative AI industry, it has many well-capitalized competitors. Among those rivals is Gemini, a sophisticated service developed by the multitrillion-dollar technology conglomerate Alphabet, which trains its generative AI model on billions of daily user interactions with its search engine Google and its other enormously popular websites. *See* ¶ 76. Other competitors include Claude (developed by Anthropic, valued at $183 billion), Meta AI (developed by the social media company formerly known as Facebook), DeepSeek (a cutting-edge model developed at a reported cost of just $6 million by a small Chinese hedge fund) — and the list goes on. *See* ¶ 110.

3

In November 2023, xAI joined this highly competitive space with the launch of what it dubs its "generative AI chatbot, Grok."[3] ¶ 68. Since inception, Grok has attained commercial visibility. It is currently available with a 4.9-star rating on Apple's App Store, the digital marketplace operated by Apple that allows users of the company's iPhone to download apps that offer everything ranging from entertainment access to content creation. *Id.* Beyond that, Grok is highly ranked by Apple's "Top Apps" charts and independent sources. ¶¶ 68, 84.

xAI is a subsidiary of X.AI Holdings Corp., which is also the parent company for X Corp., owner and operator of the social media platform X (formerly known as Twitter). ¶¶ 20, 21. X.AI Holdings Corp. is in turn controlled by its majority shareholder, Elon Musk, whose estimated net worth of $490 billion qualifies him as the wealthiest person in the world. Grok's functionality is integrated into X as a feature of the X app and network, *see* ¶¶ 69, 180, giving Grok access to training data from the network's hundreds of millions of users.

### C.    Elon Musk pursues a campaign of litigation against OpenAI.

Although Musk was an early donor to OpenAI, his relations with the company soured long ago. After founding xAI, Musk launched a public media campaign attacking OpenAI's leadership and denigrating the company. For example, in March 2023, Musk signed an open letter that urged a six-month "moratorium" on developing AI more advanced than OpenAI's then-most recent model, which the letter warned posed "profound risks to society and humanity."[4] Musk has

---

[3]    The Complaint uses the term "chatbot" to refer to the generative AI services of xAI, *e.g.*, ¶ 68, OpenAI, *e.g.*, ¶ 9, and all others in a supposed market for "generative AI chatbots," *e.g.*, ¶ 8, without addressing the distinction in generative AI between the access a chatbot provides as a user interface and the broader services provided by the technology's underlying model. As the present motion does not rely on that distinction, OpenAI uses Plaintiffs' terminology where appropriate for purposes of this filing alone.

[4]    *Pause Giant AI Experiments: An Open Letter*, Future of Life Institute (Mar. 22, 2023), https://tinyurl.com/Mar22OpenLetter (App'x Tab 2 at A007, A012).

publicly called OpenAI "evil" and its chief executive a swindler.[5]

In February 2024, Musk took his campaign to the courts, alleging in a California state proceeding that OpenAI had breached a purported "founding agreement" with him. *See Musk* v. *Altman*, No. CGC-24-612746 (Cal. Super. Ct.), ECF No. 1.[6] Musk then abruptly withdrew that complaint, only to file a revamped action in California federal court asserting a hodgepodge of new theories against OpenAI, *see Musk* v. *Altman*, No. 4:24-cv-04722-YGR (N.D. Cal.), ECF 1 — including, in his later amended complaint, claims under the same federal antitrust laws, overlapping with the same market of generative AI technology, as the action before this Court. *Id.*, ECF 170, ¶¶ 202, 205. In November 2024, Musk sought emergency relief to enjoin the company from a rumored restructuring and to halt large parts of its business, *id.*, ECF 46, while simultaneously pressing the Attorneys General of California and Delaware to force an auction of OpenAI's assets. *Id.*, ECF 103-5. Those efforts failed. *Id.*, ECF 121 at 1.[7]

### D. Apple announces Apple Intelligence, through which users of late-model iPhones have the option of enabling native integration with ChatGPT.

Apple develops and manufactures the popular iPhone smartphone. ¶ 55. Among the iPhone's features is Siri, an integrated voice assistant that has been available to users since 2011. *Id.* Siri is automated but is not a generative AI service. ¶¶ 55, 131.

On June 10, 2024, Apple announced "Apple Intelligence," a personal artificial intelligence system built into the operating system of new iPhones, which would introduce new features like

---

[5]    @elonmusk, X (Oct. 2, 2024 1:30 AM), https://tinyurl.com/Oct22024X (App'x Tab 3, at A016); @elonmusk, X (Nov. 15, 2024 8:03 PM), https://tinyurl.com/Oct152024X (App'x Tab 4 at A108); @elonmusk, X (Aug. 12, 2025 12:03 PM), https://tinyurl.com/Aug122025X (App'x Tab 5 at A020).

[6]    The Court "may take judicial notice of prior court proceedings as matters of public record." *BRFHH Shreveport, LLC* v. *Willis-Knighton Med. Ctr.*, 49 F.4th 520, 523 (5th Cir. 2022).

[7]    Musk's newest legal attack on OpenAI was filed on September 24, 2025 in the Northern District of California. *See X.AI Corp.* v. *OpenAI, Inc.*, No. 3:25-cv-08133-RL (N.D. Cal.), ECF 1.

automated proofreading and summarizing. ¶¶ 56, 75. That same day, Apple also announced that ChatGPT would be available as an optional, integrated component in the upcoming model of iPhones. ¶¶ 56, 71. The integration meant that ChatGPT could be accessed from within certain applications on the iPhone — Siri, writing tools, and the Camera app — without the need to download additional apps or open a web browser. ¶¶ 75, 77.

The ChatGPT integration is not enabled by default — it must be activated by iPhone users "who *want* to use a generative AI chatbot." ¶ 74 (emphasis added). And in both the press release announcing the integration and in privacy policies published since, Apple explained that "OpenAI won't store requests" for users of the integrated ChatGPT service, unless users "choose to connect their account" to OpenAI and then also opt to leave OpenAI data storage enabled.[8] Accordingly, OpenAI only stores training data from the ChatGPT integration if the owner of a late-model iPhone: (1) chooses to enable ChatGPT; and then (2) chooses to connect the iPhone to an existing ChatGPT account; and then (3) chooses not to deactivate OpenAI data storage.[9] As Apple CEO Tim Cook said at the time, this integration was "built to protect user privacy at every step." ¶ 99.

While ChatGPT is presently the only generative AI service for which Apple has implemented native integration, ¶¶ 71-72, iPhone users can access other generative AI services

---

[8]    APPLE, *Introducing Apple Intelligence* (June 10, 2024), https://tinyurl.com/Jun102024Apple (discussed and relied upon at Compl. ¶ 71) (App'x Tab 6 at A022, A034-36); *see also* APPLE, *ChatGPT Extension & Privacy* (Sept. 15, 2025), https://tinyurl.com/Sep152025Chat (referenced and relied upon at Compl. ¶ 74) (App'x Tab 7 at A038-39). OpenAI announced the same. *See* OPENAI, *OpenAI and Apple Announce Partnership* (June 10, 2024), https://tinyurl.com/Jun102024ApplePship (discussed and relied upon at Compl. ¶ 71) (App'x Tab 8 at A041-42). These press releases and privacy policy are properly before the Court, due to their incorporation by reference in the Complaint. *See, e.g.*, *Hereford* v. *Carlton*, 2016 WL 7042230, at *4 (E.D. Tex. Mar. 16, 2016); *see also Schott* v. *Babb*, 2023 WL 7201157, at *1 (W.D. Tex. Sept. 27, 2023), *report and recommendation adopted*, 2023 WL 7190725 (W.D. Tex. Oct. 30, 2023) (appropriately considering video "which Plaintiff attached to his Complaint via hyperlinks and which the parties incorporated into the present motion-to-dismiss briefing").

[9]    *See ChatGPT Extension & Privacy*, *supra* (App'x Tab 7 at A038-39).

elsewhere on their iPhones, either through web browsers or mobile apps. ¶¶ 77, 131. Apple also has made clear from its earliest announcement of Apple Intelligence that it "intend[s] to add support for other AI models in the future."[10] Consistent with that statement, as recently as April 2025 the CEO of Alphabet testified to his understanding that "Apple plans to expand [its generative AI integration] to other providers" within the year, explaining that he hopes to "execute a Gemini distribution agreement with Apple."[11] And the financial press has likewise confirmed the public understanding that "Apple's deal with OpenAI isn't exclusive."[12]

### E.    X and xAI wait over nine months after the ChatGPT integration and then sue, alleging an "exclusive arrangement" between OpenAI and Apple.

Apple's integration of ChatGPT went live on December 11, 2024. More than nine months later, Plaintiffs brought these claims against OpenAI and Apple under Sections 1 and 2 of the Sherman Antitrust Act, along with parallel claims under Texas's antitrust statute and common law. Compl. ¶¶ 181-250. As against OpenAI, the crux of the claims is that because ChatGPT is currently the only generative AI service natively integrated into the iPhone — a circumstance Plaintiffs summarily label an "exclusive arrangement" — OpenAI and Apple have entered into an "unlawful agreement with each other in restraint of trade and commerce." *E.g.*, ¶¶ 182-83. Plaintiffs assert this arrangement "makes it hard for competitors of ChatGPT[] . . . to scale and innovate," because

---

[10]    APPLE, *2024 World Wide Developers Conference Keynote*, https://tinyurl.com/2024WWDC (cited at Compl. ¶ 71) at 1:38:31 (App'x Tab 9 at A044). The keynote address announcing Apple Intelligence is incorporated by reference in the Complaint.

[11]    Tr. of Remedies H'rg Proceedings at 2496:12-22; 2497:8-2498:6, *United States, et al.* v. *Google, LLC*, No. 20-3010 (D.D.C. Apr. 30, 2025) (discussed and relied upon at Compl. ¶ 72) (App'x Tab 10 at A059-60). Mr. Pichai's testimony is properly before the Court, because Plaintiffs reference the testimony at Paragraph 72 of the Complaint. *Izadjoo* v. *Helix Energy Sol. Grp., Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. Feb. 14, 2017).

[12]    *See Apple to 'Pay' OpenAI for ChatGPT Through Distribution, Not Cash*, *supra* (quoted at Compl. ¶ 94) (App'x Tab 1 at A004). Plaintiffs quote and rely upon the same article in their pleadings, without disclosing this salient detail. *See Izadjoo*, 237 F. Supp. 3d at 506.

it allegedly ensures that ChatGPT "is the *only* generative AI chatbot that benefits from billions of user prompts originating from hundreds of millions of iPhones." ¶ 11. Among other remedies, Plaintiffs seek a permanent injunction that broadly bars Apple and OpenAI from "repetition of acts similar to the wrongful acts" described in the 250-paragraph Complaint. Compl. at p. 60.

## ARGUMENT

To overcome a motion to dismiss under Rule 12(b)(6), a plaintiff must plead facts sufficient to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009); *see also* Fed. R. Civ. P. 8(a)(2). The asserted misconduct must be more than just "conceivable" to state a valid claim; it must be "plausible on its face." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007). Under this "plausibility" standard, a complaint "cannot survive . . . by stating facts 'merely consistent with' liability." *BRFHH Shreveport, LLC* v. *Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (quoting *Twombly*, 550 U.S. at 557). And while the Court must accept all well-pleaded facts as true in reviewing a Rule 12(b)(6) motion, that presumption does not extend to "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Id.* at 525 (quotation omitted).

Courts in this Circuit routinely dismiss antitrust claims for failure to state a claim under this pleading standard. *See, e.g.*, *BRFHH*, 49 F.4th at 530; *Apani Sw., Inc.* v. *Coca-Cola Enters.*, 300 F.3d 620, 638 (5th Cir. 2002). The same result should follow here.[13]

---

[13]    OpenAI joins and incorporates by reference the arguments made in Apple's motion to dismiss Plaintiffs' claims in connection with the putative market for smartphones. *See generally* Brief of Defendant Apple Inc. in Support of Motion to Dismiss.

I.    **THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST OPENAI UNDER THE SHERMAN ACT**

The Complaint asserts that OpenAI violated Sections 1 and 2 of the Sherman Act by entering into an agreement with Apple to integrate its generative AI service natively as an option in certain iPhone functions. *See* ¶¶ 181-91 (Claim 1); ¶¶ 207-14 (Claim 4); ¶¶ 215-22 (Claim 5); ¶¶ 223-33 (Claim 6). As Plaintiffs do not assert a *per se* statutory violation, the claims are governed by the rule of reason — Plaintiffs must plead that the alleged agreement "unreasonably restrained trade," *Apani*, 300 F.3d at 627 (quotation omitted), through conduct that substantially foreclosed the asserted market, *see BRFHH*, 49 F.4th at 530. These claims hinge on the assertion that OpenAI and Apple entered an agreement for "exclusive" integration that forecloses competition in the putative generative AI "chatbot" market by blocking competitors' access to user prompts on which to train their own AI models. That theory fails on the pleadings for several independent reasons:

*First*, the Complaint offers no well-pleaded allegation that OpenAI and Apple arranged for ChatGPT integration on an "exclusive" basis, a proposition that in any case is refuted by documents incorporated into the Complaint.

*Second*, Plaintiffs have not alleged any meaningful limitation on Plaintiffs' access to user prompts, nor any plausible reason why such a limitation would foreclose competition from generative AI services, including xAI's Grok. Accordingly, the Complaint does not plead the required "substantial foreclosure" of the putative market.

*Third*, Plaintiffs have not plausibly alleged facts supporting an inference of specific intent by OpenAI to attempt or conspire to monopolize.

*Finally*, even if the Complaint did supply well-pleaded allegations sufficient to state a claim on each of these points, Plaintiffs would lack standing to assert those claims. Plaintiffs fail to plead any plausible, non-speculative harm specific to X and xAI arising out of ChatGPT's

integration into a handful of the iPhone's native functions, and in any event the losses they assert from competition fall far short of the "antitrust injury" required for standing under the statute.

### A.    Plaintiffs fail to plead facts that, if proven, would plausibly establish the existence of an exclusive dealing agreement or conspiracy.

Anticompetitive conduct in restraint of trade is the foundation of any Sherman Act claim. *Bus. Elecs. Corp.* v. *Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (Section 1 "was intended to prohibit only unreasonable restraints of trade"); *BRFHH*, 49 F.4th at 529 (Section 2 requires element of "anticompetitive (or 'exclusionary') conduct"). To plead that element, Plaintiffs attempt to frame the ChatGPT integration as exclusive dealing, a species of "agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *Pulse Network, L.L.C.* v. *Visa, Inc.*, 30 F.4th 480, 495 n.23 (5th Cir. 2022); *see also* PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1821 (5th ed. 2025) (hereinafter AREEDA) ("Unlawful exclusive dealing requires (1) an *agreement* (2) *not to deal* in the goods of another."). This theory cannot be sustained, however, absent well-pleaded facts showing that defendants entered into such an exclusive agreement — which Plaintiffs have not supplied here. That foundational pleading defect, standing alone, dooms the federal antitrust claims against OpenAI.

In the Complaint, Plaintiffs assert over and again that Apple and OpenAI have entered a "deal" that Plaintiffs call "exclusive," ¶¶ 71, 101, 102, or an "exclusive arrangement," *e.g.*, ¶¶ 9, 11, 96. But Plaintiffs' own pleadings expose the limits of this summary label, which is supported only by the fact that "Apple has not integrated with any other generative AI chatbots, including xAI's Grok" to date. ¶ 71. Plaintiffs nowhere adequately allege that the parties' contract — or any other agreement, tacit or express — constrains Apple from onboarding xAI's Grok or any other new generative AI services. The Complaint thus lacks the basic "prerequisite to any exclusive

10

dealing claim": "[A]n agreement to deal exclusively." *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016) (quotation omitted). And that omission is fatal, because the relevant question is whether allegedly "exclusive" contracts "contain[ed] specific agreements not to use the [products] of a competitor." *United Shoe Mach. Corp.* v. *United States*, 258 U.S. 451, 456-57 (1922); *Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 326 (1961) (same); *BRFHH*, 49 F.4th at 529-32 (affirming dismissal for failure to plead existence of exclusive agreement); *Aerotec Int'l*, 836 F.3d at 1181 (exclusive-dealing "inquiry requires that we look at the actual terms of the agreements").

Moreover, sources incorporated into the Complaint — and therefore properly before the Court — make plain that Plaintiffs could not have pleaded the requisite "exclusivity." *Housey* v. *Procter & Gamble Co.*, 2022 WL 874731, at *6 (S.D.N.Y. Mar. 24, 2022) (rejecting plaintiff's plea to rely on "merely her characterization of the evidence as alleged in her complaint," rather than "the articles she cite[d]"). *See supra* pp. 6-7. Notwithstanding the Complaint's cursory assertion that "[t]his deal is exclusive," ¶ 71, a source incorporated into the Complaint just a few pages later flatly establishes the contrary proposition: "Apple's deal with OpenAI isn't exclusive."[14] This echoes Apple's own public statements, which have explained that the company "intend[s] to add support for other AI models in the future," after the "ChatGPT integration" on Apple's operating system.[15] And while the Complaint alleges that Google's CEO, Mr. Pichai, "testified earlier this year [that] Google could not reach an agreement to integrate with Apple because Apple had decided to integrate ChatGPT," ¶ 72, the full testimony recorded in open court reveals Mr. Pichai attesting to his understanding that "Apple plans to expand to other providers for

---

[14]    *Apple to 'Pay' OpenAI for ChatGPT Through Distribution*, *supra* (quoted at Compl. ¶ 94) (App'x Tab 1 at A004).

[15]    *2024 WWDC Keynote*, *supra*, at 1:38:31 (App'x Tab 9 at A044).

Generative AI distribution" and that "[a]s CEO of Google, [he is] hoping to execute a Gemini distribution agreement with Apple" later in 2025.[16]

Bereft of any non-conclusory allegation that OpenAI contracted for or otherwise caused Apple to refrain from integrating competing generative AI services into the iPhone, the Complaint cannot sustain its theory of "exclusive dealing" and thus fails to state a Sherman Act claim against OpenAI.

### B. Plaintiffs fail to allege facts that, if proven, would plausibly establish "substantial foreclosure" in unreasonable restraint of trade.

Plaintiffs also fail to plead that the "competition foreclosed by" the ChatGPT integration "constitutes a substantial share of" the asserted generative AI chatbot market, as required to state a claim against OpenAI under Sections 1 and 2 of the Sherman Act. *BRFHH*, 49 F.4th at 530 (substantial foreclosure is prerequisite to Section 2 liability); *Denison Mattress Factory* v. *Spring-Air Co.*, 308 F.2d 403, 410 (5th Cir. 1962) (same for Section 1). To carry that burden, Plaintiffs must allege they were "shut out of" or "prevented . . . from providing [generative AI chatbot] services" to much of the relevant market. *BRFHH*, 49 F.4th at 530-31. The Complaint pleads no such thing. Instead, it rests on the bare assertion that because users have the *option* to use ChatGPT in certain features on certain iPhones, OpenAI now has "exclusive access to up to 55 percent of all potential generative AI chatbot prompts," ¶ 104 — one of the data sources that companies use to train AI models — thus "mak[ing] it hard for competitors . . . to scale and innovate," ¶ 11. This falls far short of "substantial foreclosure."

To begin, the Complaint pleads "[g]enerative AI chatbots" as the relevant antitrust market, ¶ 127, not "potential generative AI chatbot prompts." ¶ 104. User prompts are just one of many

---

[16]    Tr. of Remedies H'rg Proceedings at 2496:12-22, *United States, et al.* v. *Google, LLC*, No. 20-3010 (D.D.C. Apr. 30, 2025) (App'x Tab 10 at A059).

inputs that can be used to refine a generative AI service. ¶ 92. And regardless of what fraction of that particular feedstock is available to whom, iPhone users remain free to interact with ChatGPT's competitors in myriad ways, most importantly through iPhone web browsers and mobile applications. ¶¶ 77, 131. The Complaint does not even hazard a guess at what portion of this "generative AI chatbot" market — the one they allege as relevant — is purportedly "foreclosed," nor how OpenAI's supposedly exclusive access to "up to 55 percent" of user prompts will translate into *any* foreclosure of competition. *See Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1162-63 (9th Cir. 1997) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available" (quoting HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY § 10.8 at 391 (1st ed. 1994))). Under controlling law of this Circuit, on this basis alone the Complaint warrants dismissal. *See BRFHH*, 49 F.4th at 531.

Indeed, Plaintiffs' "high-level assertions about how wonderful things would be if [Apple] hadn't formed an exclusive-dealing arrangement with [OpenAI]" are exactly the type of conclusory allegations that the Fifth Circuit consistently has found inadequate. *BRFHH*, 49 F.4th at 531. The *BRFHH* court, for example, rejected as conclusory an allegation that, save for the defendant's "anticompetitive activities," the plaintiff "would have been a significantly more successful competitor," "would have reduced [the defendant's] dominant market share," and would have embarked on "a laundry list of efficiency-enhancing, cooperative . . . projects." *Id.* at 530-31. So too, here, where Plaintiffs assert that the ChatGPT integration "forecloses OpenAI's rivals from a substantial share of the relevant" market and the "scale necessary to compete." ¶ 188. As in *BRFHH*, this pleading does not "tell a coherent story about how the arrangement prevented" Plaintiffs from competing in the market and is "miles away from plausibly alleging that [defendants] came close to substantially foreclosing" the market. *BRFHH*, 49 F.4th at 531.

Nor, in any event, does the Complaint even plausibly plead that OpenAI's "exclusive arrangement" gives it access to a substantial portion of "potential generative AI chatbot prompts." Plaintiffs' aspirational claim is that OpenAI alone can process "*up to*" 55% of those potential prompts, but what matters is the lower bound of this estimation, not a hypothetical maximum. That is to say, "up to 55%" could mean 0%, 55%, or anything in between — it pleads next to nothing about how much of the market is actually impacted. At best, this allegation is "merely consistent with . . . liability," *Iqbal*, 556 U.S. at 678, not enough to plead *any* amount of foreclosure under the plausibility standard.

And the Complaint's methodology is not remotely plausible. Plaintiffs' 55% figure was evidently calculated by assuming that Siri fields "1.5 billion user requests per day globally," then dividing that quantity by the "total prompts for generative AI chatbots in 2024." ¶ 104. This back-of-the-envelope math warrants no credit from the Court, even at the pleadings stage, because it ignores the facts on the record, namely: ChatGPT integration is only available on the latest models of iPhones; even for newer iPhones, users must opt into ChatGPT integration; and even for the group of users who opt into ChatGPT integration, OpenAI cannot store data or train its model *unless* the user also logs into his or her existing ChatGPT account. *See supra* pp. 6-7. By the logic of the Complaint itself, the relevant set of Siri prompts thus cannot plausibly be 1.5 billion per day, but is instead an unknown, unpleaded fraction of a fraction of a fraction of that number. And the Complaint's estimate for the total size of the "potential prompts" market — apparently 2.7 billion per day — is equally unmoored from any well-pleaded fact. Plaintiffs do not explain, for example, the logic of using a year-old estimate of the number of prompts, when the pleadings elsewhere acknowledge that the industry is experiencing "exponential growth." ¶ 41. Nor do the pleaded figures even purport to address generative AI services' access to prompts through competing

14

smartphone platforms or any other devices. As a result, Plaintiffs have not "allege[d] a sufficient factual basis from which it is possible to infer that any particular portion of the [putative generative AI chatbot] market was foreclosed as a result of exclusive dealing." *Eastman* v. *Quest Diagnostics Inc.*, 724 F. App'x 556, 558-59 (9th Cir. Feb. 12, 2018) (citing, *inter alia*, the failure to plead "the market share[]" impacted by supposedly anticompetitive conduct).

Plaintiffs cannot satisfy their pleading burden with baseless estimates, from concededly different time periods, directed to the wrong market. Accordingly, the federal antitrust claims also fail for want of well-pleaded facts showing substantial foreclosure of the alleged market for "generative AI chatbots."[17]

### C. Plaintiffs do not plausibly allege specific intent by OpenAI to attempt or conspire to monopolize.

Plaintiffs' attempted monopolization and conspiracy to monopolize claims against OpenAI (Claims 5 and 6) should also be dismissed for another independent reason: Plaintiffs have not carried their burden of pleading that OpenAI acted with specific intent to monopolize. *See N. Miss. Commc'ns, Inc.* v. *Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986) (Section 2 attempted monopolization and conspiracy to monopolize claims require as "an essential element" "[a] specific intent to monopolize"). For those claims, "it is necessary to prove a 'specific intent' to accomplish the forbidden objective . . . an intent which goes beyond the mere intent to do the act." *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) (quotation omitted).

---

[17]    For the same reasons, Plaintiffs have also failed to plausibly allege that OpenAI's conduct caused harm to competition, a required element of a claim for monopolization under Section 2 of the Sherman Act. *Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015) (Section 2 requires showing that alleged monopolist "exercise[d] its power to control prices or exclude competitors from the relevant market"); *see also infra* Point I.D (setting out failure to plead antitrust injury consistent with the purpose of the statute). On this ground alone, Plaintiffs' cause of action for monopolization (Claim 4), is due to be dismissed. *See Neal* v. *Trans Ova Genetics, Inc.*, 2013 WL 12131198, at *4 (W.D. Tex. May 13, 2013).

The Complaint asserts that OpenAI "engages in anticompetitive conduct with specific intent to monopolize the . . . generative AI chatbot market," including by "entering into an exclusive agreement with Apple" and "expect[ing] to be able to charge supracompetitive prices in the future." ¶ 218; *see also* ¶ 229. But even genuinely exclusive dealing contracts are not *per se* anticompetitive. To the contrary, as "[c]ourts [have] repeatedly explain[ed,] . . . exclusive dealing agreements are often entered into for entirely procompetitive reasons and pose very little threat to competition even when utilized by a monopolist." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 983 (10th Cir. 2022) (collecting cases). For these reasons, even a valid pleading of entry into an "exclusive" agreement does not suffice to "show that [OpenAI] stepped back and concluded that maintaining [a] monopol[y] was a goal that [it] [itself] desired to accomplish." *Dexon Comput., Inc.* v. *Cisco Sys., Inc.*, 2023 WL 2941414, at *22 (E.D. Tex. Feb. 7, 2023), *report and recommendation adopted*, 2023 WL 2730656 (E.D. Tex. Mar. 31, 2023) (quotation omitted).

Nor do Plaintiffs carry their burden by a threadbare pleading about OpenAI's purported ability to charge supracompetitive prices in the hypothetical future, which is just the type of "conclusory allegation[], without factual allegations to support [it]," that this Court has ruled is "not enough" at the motion to dismiss stage to allege specific intent to monopolize. *Honeywell Int'l Inc.* v. *Lone Star Aerospace, Inc.*, 2024 WL 4093183, at *3 (N.D. Tex. Sept. 4, 2024) (rejecting as conclusory plaintiff's allegations that "[defendant] has the power to control prices" and that "[defendant's] actions . . . evidence its specific intent to restrain competition to monopolize the relevant market"). The Complaint thus fails to present any basis to infer that OpenAI acted with an intent to monopolize.

**D.      Plaintiffs lack antitrust standing for want of injury.**

Finally, Plaintiffs lack standing to assert any of these claims under the Sherman Act. "Antitrust law has its own threshold for standing," which requires "an antitrust plaintiff [to] do more than meet the requirements of Article III." *Tesla, Inc.* v. *Louisiana Auto. Dealers Ass'n*, 113 F.4th 511, 528 (5th Cir. 2024) (quotation omitted). Plaintiffs flunk two elements of this test: (1) "injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct," and (2) the specialized requirement of "antitrust injury," *Pulse Network, L.L.C.*, 30 F.4th at 488. For these independent reasons, all Sherman Act claims against OpenAI are due to be dismissed.

*First*, Plaintiffs' theory of causation is far too attenuated to plead injury-in-fact. To allege the requisite linkage, the Complaint must supply a "physical and economic nexus between the alleged violation and the harm to the plaintiff," akin to "proximate cause," *Blue Shield of Va.* v. *McCready*, 457 U.S. 465, 477-78 (1982), based on a "direct and determinable injury" that "was a direct consequence of the alleged antitrust violation" that is "not speculative." *Walker* v. *U-Haul Co. of Miss.*, 747 F.2d 1011, 1014 (5th Cir. 1984). The Fifth Circuit has affirmed the dismissal of claims where "plaintiffs' injuries were not a direct consequence of the defendants' activities," *Campbell* v. *Wells Fargo Bank, N.A.*, 781 F.2d 440, 443 (5th Cir. 1986), and admonished courts to "be cautious in granting antitrust standing to parties that offer 'speculative, abstract, or impractical damages theories.'" *Bell* v. *Dow Chem. Co.*, 847 F.2d 1179, 1183-84 (5th Cir. 1988) (quoting *Blue Shield of Va.*, 457 U.S. at 475 n.11); *see id.* (denying standing where "other causal possibilities abound").

That admonition squarely applies here, where Plaintiffs assert damages far removed from any act by OpenAI. Plaintiffs' alleged injuries depend on the assumption that, but for Apple's choice to start its integration roll-out with ChatGPT, xAI's Grok would have been selected instead

17

(or in addition).[18] But that's just the first step in a long and tortured chain of reasoning, which hinges on speculative assumptions, including:

- xAI could have successfully implemented the kind of Apple integration from which they claim exclusion;

- xAI's failure to secure integration into the iPhone has deprived it of necessary user queries;

- the training data from the hypothetical integration would have generated sufficient scale to materially improve xAI's models;

- such improvements would have attracted more xAI users; and

- this rise in usage would have resulted in greater profits and enterprise value for xAI.

*See* ¶¶ 92, 180.

And that's not all. Piling speculation upon speculation, Plaintiffs have not even plausibly alleged (1) the scope of their proposed "integrat[ion of] Grok with iOS"; (2) when they sought such an integration; (3) what terms, investment, privacy, safety, or quality control commitment Plaintiffs offered; (4) that Apple refused to negotiate or consider such an integration; (5) that Plaintiffs' "APIs" are technically sufficient to implement such an integration; (6) that Plaintiffs had the capacity to service the potential volume of Siri users and absorb the computing for queries that Plaintiffs now say they want; or (7) how the benefits of a hypothetical integration would exceed the immediate and significant costs. *See, e.g.*, ¶ 71. Each of these "somewhat vaguely defined links," *Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983), further weakens Plaintiffs' inferential causal chain and demonstrates that their alleged injuries were "not a direct consequence of the defendants' activities." *Campbell*, 781

---

[18]    Any purported "injury" to X is entirely derivative of — and thus even more remote than — the injury asserted by xAI. X's asserted injury is too far removed from OpenAI to plead a distinct basis of proximate cause for standing as an antitrust plaintiff.

F.2d at 443; *see also Hughes* v. *Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) ("speculative nature of the damages" weighs against antitrust standing). As a result, Plaintiffs have not plausibly pleaded injury-in-fact.

*Second*, Plaintiffs also fail to plead the specialized requirement of "antitrust injury," *Pulse Network*, 30 F.4th at 488, which demands a showing that the harm allegedly suffered is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 534 (quoting *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972)). Rather, "the antitrust injury requirement precludes recovery for losses resulting from competition, even though such competition was actually caused by conduct violating the antitrust laws." *Pulse Network*, 30 F.4th at 488 (quoting AREEDA, ¶ 337a (4th ed. 2014)); *CTUnify, Inc.* v. *Nortel Networks, Inc.*, 115 F. App'x 831, 836 (6th Cir. 2004) (no "cognizable antitrust injury" arises where plaintiff's "injuries flow from the fact that it was not chosen to be a preferred vendor"); AREEDA, ¶ 337a (antitrust injury test "forces antitrust courts to connect the alleged injury to the purposes of the antitrust laws").

The Complaint lacks any allegations plausibly tracing purported harm to alleged anticompetitive acts. There is *no* pleaded basis to infer that users would have preferred xAI's offerings over a competing integration from OpenAI or other providers — especially at a rate higher than users' current respective app preferences. "Loss from competition itself — that is, loss in the form of customers[] choosing the competitor's goods and services over the plaintiff's — does not constitute antitrust injury." *Pulse Network*, 30 F.4th at 489.

Instead, Plaintiffs' allegations support the opposing inference: that Apple, recognizing the significant "safety and security" concerns regarding the integration of generative AI models into its products, ¶ 99, chose to integrate first with the trusted standard-bearer of the industry. ¶ 47.[19] Absent plausible allegations that Plaintiffs' alleged harms flow from the purported violations intended to be addressed by the antitrust law, Plaintiffs' implausibly pleaded antitrust standing allegations "weigh heavily against judicial enforcement." *Associated Gen. Contractors of Cal., Inc.*, 459 U.S. at 545.

## II.   THE COMPLAINT DOES NOT STATE A VALID CLAIM AGAINST OPENAI UNDER TEXAS STATE LAW

The Complaint also asserts a grab bag of shotgun-pleaded claims under Texas law. Each turns on the same meritless theory that underlies Plaintiffs' federal claims — that defendants "conspire[d] to violate the antitrust and other competition laws, including without limitation Sections 1 and 2 of the Sherman Act." ¶ 235 (civil conspiracy claim); *see also* ¶ 239 (asserting unfair competition based on "illegal acts, including violations of antitrust law"); ¶¶ 244-50 (asserting claims under the Texas Free Enterprise & Antitrust Act, which incorporates "federal standards for determining violations" of the federal antitrust statutes, *Apani*, 300 F.3d at 628). Because Plaintiffs' unfair competition and civil conspiracy claims each require "an independently tortious or unlawful act" and are thus "tied . . . to the asserted antitrust violations, the claims rise and fall together." *JSW Steel (USA) Inc.* v. *Nucor Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex.

---

[19]   Plaintiffs' allegations are also consistent with the inference that Apple declined to integrate with Grok for business reasons, not to foreclose competition. For example, given its same alleged "safety and security" concerns, Compl. ¶ 99, Apple might have been reluctant to entrust its integration and the resulting user experience to an AI model that reportedly "published a number of antisemitic posts," including calling itself "MechaHitler," which was "its second flurry of controversial responses to users in recent months." Alexander Saeedy, *Elon Musk's Grok Chatbot Publishes Series of Antisemitic Posts*, WALL ST. J. (July 8, 2025), https://tinyurl.com/44aadrpx (App'x Tab 11 at A086-87).

2022) (quotation omitted), *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17, 2025); *Taylor Pub. Co.* v. *Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (absent independently illegal or tortious act, plaintiff's "unfair competition claim founders").

Accordingly, these Texas law claims should likewise be dismissed for failure to plead an exclusive-dealing arrangement, substantial foreclosure of the putative market for generative AI "chatbots," specific intent to monopolize, or proximate causation of damages. *See supra* Point I.

## **CONCLUSION**

For the foregoing reasons, and the reasons stated in Apple's brief, the Complaint should be dismissed with prejudice.

Dated: September 30, 2025   Respectfully submitted,


*/s/  Michael K. Hurst*
Michael K. Hurst
mhurst@lynnllp.com
Texas Bar No. 10316310
Chris W. Patton
cpatton@lynnllp.com
Texas Bar No. 24083634
Andy Kim
akim@lynnllp.com
Texas Bar No. 24136638
**LYNN PINKER HURST & SCHWEGMANN
LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 (Telephone)
(214) 981-3839 (Facsimile)


William Savitt (*pro hac vice* forthcoming)
WDSavitt@wlrk.com
Kevin S. Schwartz (*pro hac vice* forthcoming)
KSchwartz@wlrk.com
Stephen D. Levandoski (*pro hac vice* forthcoming)
SDLevandoski@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
(212) 403-1000 (Telephone)
(212) 403-2000 (Facsimile)


*Attorneys for Defendants OpenAI, Inc., OpenAI,
L.L.C., and OpenAI OpCo, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 30, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

<u>*/s/ Michael K. Hurst*</u>
Michael K. Hurst