**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI,<br>L.L.C.; and OPENAI OPCO, LLC,<br><br>　　　Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**APPENDIX TO BRIEF OF PLAINTIFFS X CORP. AND X.AI LLC
<ins>IN RESPONSE TO COURT ORDER REGARDING VENUE</ins>**

Bradley Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036

Caroline P. Boisvert
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103

Craig M. Reiser
Scott A. Eisman
Eva Yung
Christopher Erickson
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111

Alex More
Monica E. Gaudioso
Robert C. Rowe
CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202

App. 1

**APPENDIX TO BRIEF OF PLAINTIFFS X CORP. AND X.AI LLC
IN RESPONSE TO COURT ORDER REGARDING VENUE**

| Tab No. | Pages of Brief | Description | Full URL / Tiny URL | Appendix Pages(s) |
|---|---|---|---|---|
| Tab 1 | 1 | September 18, 2025 Keynote Address by Assistant Att'y Gen. Gail Slater at Fordham Competition Law Institute's 52nd Annual Conference on International Antitrust Law and Policy | https://tinyurl.com/yy53j5wh | App. 12–22 |
| Tab 2 | 2, 5 | X Terms of Service | https://x.com/en/tos | App. 23–43 |
| Tab 3 | 2 | OpenAI Model Release Notes | https://tinyurl.com/m2yk6v6z | App. 44–60 |
| Tab 4 | 2 | August 13, 2024 X News Release titled *Grok-2 Beta Release* | https://x.ai/news/grok-2 | App. 61–64 |
| Tab 5 | 2 | February 19, 2025 X News Release titled *Grok 3 Beta — The Age of Reasoning Agents* | https://x.ai/news/grok-3 | App. 65–70 |
| Tab 6 | 2 | July 9, 2025 X News Article titled *Grok 4* | https://x.ai/news/grok-4 | App. 71–76 |
| Tab 7 | 2 | September 12, 2025 X News Article titled *Grok 4 Fast* | https://x.ai/news/grok-4-fast | App. 77–82 |
| Tab 8 | 2, 7 | September 23, 2025 Article by Sharon Goldman titled *OpenAI Plans to Build 5 Giant U.S. "Stargate" Datacenters a $400B Challenge to Meta and Microsoft in the Relentless AI Arms Race* | https://tinyurl.com/mtf9cm82 | App. 83–86 |

| Tab No. | Pages of Brief | Description | Full URL / Tiny URL | Appendix Pages(s) |
|---|---|---|---|---|
| Tab 9 | 4, 7 | September 6, 2022 Article by Brandon J. Call titled *North Texas Is the Country's New Semiconductor Manufacturing Capital* | https://tinyurl.com/2mtrmrsd | App. 87–95 |
| Tab 10 | 4, 7 | August 13, 2025 Article by Quincy Preston titled *Fort Worth Lands Adom Industries' $229M AI-Native Cloud Factory and HQ* | https://tinyurl.com/3kt7ad23 | App. 96–98 |
| Tab 11 | 4, 7 | August 21, 2025 Dallas Business Journal article by Seth Bodine titled *Nvidia Partner Wistron Confirms Fort Worth Supercomputer Plants, $750 Million-Plus Investment* | https://tinyurl.com/485mwfsy | App. 99–102 |
| Tab 12 | 5 | X Account for Apple Support | https://x.com/applesupport | App. 103–04 |
| Tab 13 | 5 | X Account for Tim Cook | https://x.com/tim_cook | App. 105–06 |
| Tab 14 | 5 | X Account for Apple | https://x.com/apple | App. 107–08 |
| Tab 15 | 5 | X Account for OpenAI | https://x.com/openai | App. 109–10 |
| Tab 16 | 5 | X Account for Sam Altman | https://x.com/sama | App. 111–12 |
| Tab 17 | 5 | X Account for ChatGPT | https://x.com/ChatGPTapp | App. 113–14 |
| Tab 18 | 6, 7 | September 23, 2025 Article by Matt O'Brien titled *OpenAI Shows Off Stargate AI Data Center in Texas and Plans 5 More Elsewhere with Oracle, Softbank, KCRA3* | https://tinyurl.com/236fb9s6 | App. 115–18 |

| Tab No. | Pages of Brief | Description | Full URL / Tiny URL | Appendix Pages(s) |
|---|---|---|---|---|
| Tab 19 | 6, 12, 13 | June 30, 2025 Table C-5 – U.S. District Courts – Civil Statistical Tables for the Federal Judiciary | https://tinyurl.com/msms368t | App. 119–24 |
| Tab 20 | 7 | February 14, 2025 Press Release titled *Attorney General Ken Paxton Announces Investigation into DeepSeek and Notifies the Chinese AI Company of Its Violation of Texas State Law* | https://tinyurl.com/672fwz4y | App. 125–27 |
| Tab 21 | 13 | June 30, 2025 Table X-1A – U.S. District Courts – Civil Statistical Tables for the Federal Judiciary | https://tinyurl.com/3my94nm3 | App. 128–32 |
| Tab 22 | 13 | June 30, 2025 Table C-1 – U.S. District Courts – Civil Statistical Tables for the Federal Judiciary | https://tinyurl.com/mpvuua3z | App. 133–37 |
| Tab 23 | 13 | September 16, 2025 Order by Chief Judge O'Connor in *X Corp. v. Media Matters for Am.*, No. 4:23-CV-01175-O, at 11 (N.D. Tex.) | | App. 138–54 |
| Tab 24 | 2, 5 | xAI Terms of Service | https://x.ai/legal/terms-of-service | App. 155–72 |

App. 4

Dated: October 8, 2025                                          Respectfully submitted,


/s/ Bradley Justus                                             /s/ Craig M. Reiser
Bradley Justus*                                                Craig M. Reiser*
DC Bar No. 1007988                                             NY State Bar No. 4886735
AXINN, VELTROP & HARKRIDER LLP                                 Scott A. Eisman*
1901 L Street NW                                               NY State Bar No. 4905287
Washington, DC 20036                                           Eva Yung*
T: (202) 912-4700                                              NY State Bar No. 5497300
F: (202) 912-4701                                              Christopher Erickson*
bjustus@axinn.com                                              NY State Bar No. 5800628
                                                               AXINN, VELTROP & HARKRIDER LLP
Caroline P. Boisvert*                                          630 Fifth Avenue, 33rd Floor
CT State Bar No. 441323                                        New York, NY 10111
AXINN, VELTROP & HARKRIDER LLP                                 T: (212) 728-2200
90 State House Square                                          F: (212) 728-2201
Hartford, CT 06103                                             creiser@axinn.com
T: (860) 275-8100                                              seisman@axinn.com
F: (860) 275-8101                                              eyung@axinn.com
cboisvert@axinn.com                                            cerickson@axinn.com


*admitted *pro hac vice*                                       /s/ Alex More
                                                               Alex More
                                                               TX State Bar No. 24065789
                                                               Monica E. Gaudioso
                                                               TX State Bar No. 24084570
                                                               Robert C. Rowe
                                                               TX State Bar No. 24086253
                                                               CARRINGTON, COLEMAN, SLOMAN &
                                                               BLUMENTHAL, L.L.P.
                                                               901 Main Street, Suite 5500
                                                               Dallas, TX 75202
                                                               T: (214) 855-3000
                                                               F: (214) 580-2641
                                                               amore@ccsb.com
                                                               mgaudioso@ccsb.com
                                                               rrowe@ccsb.com

                                                               *Attorneys for Plaintiffs X Corp. and X.AI
                                                               LLC*

App. 5

**CERTIFICATE OF SERVICE**

I hereby certify that, on October 8, 2025, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing. A notice of electronic filing was transmitted to all ECF registrants of record.

/s/ Craig M. Reiser
Craig M. Reiser

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| X CORP. and X.AI LLC,<br><br>  Plaintiffs,<br><br>   v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>  Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**DECLARATION OF EVA YUNG IN SUPPORT OF BRIEF OF PLAINTIFFS X CORP.
AND X.AI LLC IN RESPONSE TO COURT ORDER REGARDING VENUE**

App. 7

I, Eva Yung, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am an attorney admitted to practice *pro hac vice* before this Court, and I am a counsel at the law firm of Axinn, Veltrop & Harkrider LLP, counsel for Plaintiffs X Corp. ("X") and X.AI LLC ("xAI") in the above-captioned matter. I submit this declaration in support of Plaintiffs' Response to Court Order Regarding Venue. The matters in this declaration are within my personal knowledge and are true and correct.

2.      Attached hereto as Tab 1 is a true and correct copy of Assistant Attorney General Gail Slater's Keynote Address at Fordham Competition Law Institute's 52nd Annual Conference on International Antitrust Law and Policy, delivered on September 18, 2025.

3.      Attached hereto as Tab 2 is a true and correct copy of X's Terms of Service, effective November 15, 2024.

4.      Attached hereto as Tab 3 is a true and correct copy of OpenAI's Model Release Notes, retrieved on October 7, 2025.

5.      Attached hereto as Tab 4 is a true and correct copy of a news article titled *Grok-2 Beta Release*, published by X on August 13, 2024.

6.      Attached hereto as Tab 5 is a true and correct copy of a news article titled *Grok 3 Beta — The Age of Reasoning Agents*, published by X on July 9, 2025.

7.      Attached hereto as Tab 6 is a true and correct copy of a news article titled *Grok 4*, published by X on September 12, 2025.

8.      Attached hereto as Tab 7 is a true and correct copy of a news article titled *Grok 4 Fast*, published by X on September 23, 2025.

9.      Attached hereto as Tab 8 is a true and correct copy of a news article by Sharon Goldman titled *OpenAI Plans to Build 5 Giant U.S. "Stargate" Datacenters a $400B Challenge to Meta and Microsoft in the Relentless AI Arms Race*, published by Fortune on September 23, 2025.

10.     Attached hereto as Tab 9 is a true and correct copy of a news article by Brandon J. Call titled *North Texas Is the Country's New Semiconductor Manufacturing Capital*, published by D Magazine on September 6, 2022.

11.     Attached hereto as Tab 10 is a true and correct copy of a news article by Quincy Preston titled *Fort Worth Lands Adom Industries' $229M AI-Native Cloud Factory and HQ*, published by Dallas Innovates on August 13, 2025.

12.     Attached hereto as Tab 11 is a true and correct copy of a news article by Seth Bodine titled *Nvidia Partner Wistron Confirms Fort Worth Supercomputer Plants, $750 Million-Plus Investment*, published by the Dallas Business Journal on August 21, 2025.

13.     Attached hereto as Tab 12 is a true and correct copy of a screen capture of the X account for "Apple," retrieved on October 6, 2025.

14.     Attached hereto as Tab 13 is a true and correct copy of a screen capture of the X account for "Apple Support," retrieved October 6, 2025.

15.     Attached hereto as Tab 14 is a true and correct copy of a screen capture of the X account for "Tim Cook," retrieved October 6, 2025.

16.     Attached hereto as Tab 15 is a true and correct copy of a screen capture of the X account for "OpenAI," retrieved on October 6, 2025.

17.     Attached hereto as Tab 16 is a true and correct copy of a screen capture of the X account for "Sam Altman," retrieved on October 6, 2025.

18.     Attached hereto as Tab 17 is a true and correct copy of a screen capture of the X account for "ChatGPT," retrieved on October 6, 2025.

19.     Attached hereto as Tab 18 is a true and correct copy of a news article by Matt O'Brien titled *OpenAI Shows Off Stargate AI Data Center in Texas and Plans 5 More Elsewhere with Oracle, Softbank*, published by KCRA3 on September 23, 2025.

20.     Attached hereto as Tab 19 is a true and correct copy of Table C-5, titled "Median Time From Filing to Disposition of Civil Cases, by Action Taken," of the United States District Courts' Civil Statistical Tables For The Federal Judiciary for the 12-month period ending June 30, 2025.

21.     Attached hereto as Tab 20 is a true and correct copy of a press release by Ken Paxton, Attorney General of Texas titled *Attorney General Ken Paxton Announces Investigation into DeepSeek and Notifies the Chinese AI Company of its Violation of Texas State Law*, published on February 14, 2025.

22.     Attached hereto as Tab 21 is a true and correct copy of Table X-1A, titled "Weighted and Unweighted Filings per Authorized Judgeship," of the United States District Courts' Civil Statistical Tables For The Federal Judiciary for the 12-month periods ending June 30, 2024 and 2025.

23.     Attached hereto as Tab 22 is a true and correct copy of Table C-1, titled "Civil Cases Filed, Terminated, and Pending, by Jurisdiction," of the United States District Courts' Civil Statistical Tables For The Federal Judiciary for the 12-month period ending June 30, 2025.

24.     Attached hereto as Tab 23 is a true and correct copy of Order by Chief Judge Reed O'Connor in *X Corp. v. Media Matters for Am.*, Case No. 4:23-CV-01175-O, filed at Dkt. No. 242

App. 10

in the United States District Court for the Northern District of Texas, Fort Worth Division, on September 16, 2025.

25.   Attached hereto as Tab 24 is a true and correct copy of xAI's Terms of Service, effective June 9, 2025.

Dated: October 8, 2025                              Respectfully submitted,

                                                   */s/ Eva Yung*
                                                   Eva Yung

# TAB 1



**SPEECH**

# Assistant Attorney General Gail Slater Delivers Keynote at Fordham Competition Law Institute's 52nd Annual Conference on International Antitrust Law and Policy

Thursday, September 18, 2025

**Location**

150 W 62nd St
New York, NY 10023
United States

*Remarks as Prepared for Delivery, "Winning the Race in Artificial Intelligence Through Real Competition"*

Thank you for the kind introduction. Thanks to the organizers and to those who have traveled from near and far to exchange ideas at this conference. It's always a pleasure to see the depth of expertise and the breadth of interest in competition policy gathered in one place, and I am looking forward to hearing the debate. Of course, much like debate in general, debate about competition policy takes courage. As my grandmother liked to say, debate requires us to take a step back and recognize that God gave us two ears and one mouth for a reason. I wish us all the courage to listen to one another, because as C.S. Lewis wrote in the Screwtape Letters, "Courage is not simply one of the virtues, but the first of every virtue at the testing point."

**Introduction**

App. 13

We find ourselves in the midst of a transformative time. Artificial intelligence is the new technological frontier. Its power promises to usher in a new era of technological, industrial, and informational change. Generative AI will revolutionize every sector of the economy and change how every business operates.

The tremendous potential of AI calls upon us to seize this moment with courage. President Trump and Vice President Vance have made it a priority to maintain AI dominance as part of the economic dynamism that is core to our success.[1]  The success of the American economy is a testament to the fact that our free-market system works. Prioritizing innovation, supporting new technologies and startups, keeping the markets open for competition — these have long been the secret sauce of Silicon Valley and the cornerstones of American economic success. And these same core principles are what will help America lead the global race for AI.

The Trump-Vance Administration issued America's AI Action Plan at the White House in July, outlining the three pillars of our administration strategy: innovation, infrastructure, and international diplomacy and security.[2] Today, I'd like to focus on the first pillar, accelerating AI innovation. The antitrust laws have a lot to offer the innovation pillar, which is a core element of competition. Wherever there is a need for innovation, there is a need for competition, and this is where antitrust finds a home.

The good news is that the Antitrust Division is already fighting to keep AI markets competitive, and we are winning key battles in that arena. Earlier this month, the U.S. District Court for the District of Columbia issued its remedies decision in the Google Search case.[3] For more than a decade, Google illegally monopolized search markets, shutting out competitors, reducing innovation, and taking away choice from American consumers. In other words, the free market was frozen in place and innovation was therefore stymied. In the remedies decision, the district court held that "Google cannot use the same anticompetitive playbook" for GenAI as it did for search.[4] The judge ordered Google to share competitively critical data with qualified competitors, a group that the court made clear includes AI companies.[5] These data remedies, along with requirements that Google syndicate its search results to these competitors, are already setting the foundation for a more innovative and competitive AI industry.

## Promoting AI Innovation Through Antitrust

As the Google Search example demonstrates, antitrust enforcement can help pave the way for innovation, dynamic competition, and development in AI. Let me explain how this works:

*First*, antitrust is, of course, the law of competition. A competitive environment is a prerequisite for innovation. As the AI Action Plan recognizes, it is critical that we "create the conditions where private-sector-led innovation can flourish."[6] Those conditions are those that incentivize and reward innovators and entrepreneurs. The story of American economic success is the story

App. 14

of innovative, disruptive Little Tech that grows up to become tomorrow's Big Tech.[7] Tomorrow's AI advances will be seeded by today's innovators.

Vice President Vance — who I had the pleasure of working for when he was Senator — put it best in Paris earlier this year: "This administration will not be the one to snuff out the start-ups and the grad students producing some of the most groundbreaking applications of artificial intelligence. Instead, our laws will keep Big Tech, Little Tech, and all other developers on a level playing field."[8] The antitrust laws are there to do just that.

Antitrust enforcement focuses on creating a level playing field for businesses big and small and ensuring that market incumbents do not unfairly hinder newcomers and startups. This is always important, but it is crucial where the technology is still developing rapidly. As the D.C. Circuit said in *Microsoft* — the last great monopolization case before the Google Search and Google Ad Tech cases — "[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will — particularly in industries marked by rapid technological advance and frequent paradigm shifts."[9] Antitrust has a framework that is uniquely equipped to help protect nascent competitors.[10]

*Second,* competition is also the key for opening up choices for consumers. Generative AI (GenAI) will have a profound impact on how we gather information, how we engage with media, and how our children learn. As Justice Thomas observed in 2021, today's digital platforms exert "unprecedented . . . concentrated control of so much speech in the hands of a few private parties."[11]  The concentration of control created by AI may well surpass that. How AI is built — particularly at the foundation model level — can have the effect of imposing broad, implicit preferences over a wide swath of GenAI products. As the AI Action Plan correctly notes, this creates a significant risk of top-down ideological bias.[12]

How do we counter this risk of bias? The best way is to make sure that there is competition. Economic competition and viewpoint competition in the marketplace of ideas are closely intertwined. In a recent statement of interest, the Antitrust Division rejected the view that the antitrust laws play no part in protecting viewpoint competition in news markets.[13] Instead, antitrust can account for behavior that shuts out alternative, competing viewpoints. So too with AI. Ensuring that the AI markets are open to competition means that rivals with different approaches can compete on the merits. The availability of different AI systems and products can ensure that consumers have choices to pick from, safeguarding the free flow of information in our democracy. Different viewpoints can rise to the top in the marketplace of ideas.

*Third,* antitrust enforcement is a targeted tool suited for emerging fields like AI. In this regard, I like to compare the sledgehammer of regulation to the scalpel of antitrust. Premature regulation can be particularly harmful in incipient industries at the early stages of development because it imposes broad, *ex ante* rules, and these rules have the effect of limiting the direction of innovation across the entire industry.[14]  From a competition standpoint, regulations can

App. 15

further entrench incumbent players, because only those incumbents can afford to pay the costs of compliance.[15] In fact, many powerful monopolists and incumbents lobby for regulations that raise barriers to entry and that ultimately harm market entrants and small businesses.[16]

By contrast, antitrust is law enforcement. It only intervenes *ex post*, in response to where illegal conduct has taken place, and it targets only specific conduct by specific bad actors on a case-by-case basis, rather than applying a one-size-fits-all approach to an entire industry. Such targeted enforcement strikes the right balance in emerging fields by finetuning the competitive conditions to make sure that the incentives are aligned for innovation to flourish. And if done correctly, timely, limited antitrust intervention can stave off the need for broad regulatory interference by letting the free market do what it does best.[17]

### Ensuring the Competitiveness of AI Markets

So how does antitrust ensure that AI markets are competitive? To promote innovation, antitrust enforcement must focus on preventing exclusionary conduct over the resources that are needed to build competitive AI systems and products.

Building competitive models requires resources at every layer, from the infrastructure layer, to the foundation models, to the deployment of user-facing applications. The competitive dynamics at each layer of the AI stack and how they interrelate, with a particular eye toward exclusionary behavior that forecloses access to key inputs and distribution channels, are legitimate areas of antitrust inquiry.

Innovation is supported by the availability of key inputs, and so one important question is whether foundation models are open or closed. As our AI Action Plan rightly recognizes, open-source and open-weight AI models that are made available to developers "have unique value for innovation because startups can use them flexibly without being dependent on a closed model provider."[18] Of course, a truly open-source model must be one that is not unilaterally maintained by a single vendor that exerts unwarranted influence and imposes restrictions. If done correctly, a truly open model can promote competition by making available a key piece of input into AI products. The ability to build on open foundation models to develop products removes a significant barrier to entry for startups and Little Tech.[19]

At another layer, an enormously consequential input for AI innovation is data. There is no question that AI intensifies the need for data as a critical input into progress in AI development. Enormous troves of quality data are needed to train, develop, and improve GenAI and LLMs. LLMs are pre-trained on large amounts of text, creating a base, or foundation model. The LLM's ability to predict the next item in a sequence depends on both the quality and the quantity of the data that it is trained on.

The centrality of data is not a new phenomenon in itself. Over the years, we have seen data grow in importance in the digital industries. Search is a good example of this. In finding Google liable,

App. 16

the district court noted that greater query volume yielded valuable user data that enabled Google to attain economies of scale and improve the quality of its search product.[20] Such a data advantage creates a flywheel effect: greater exposure to consumers leads to more data, which enables the product to be even better, which attracts more users, and so on. Companies that can amass and harness the power of big data gain an enormous advantage, while companies who lose out on data are shut out of the market.

These effects are not easy to overcome. That's why the Department of Justice and the plaintiff States asked for robust data sharing and syndication remedies in the Google Search case. And the district court agreed. The court recognized that "[s]earch index quality is critically important not only for traditional search engines, but also for emerging GenAI products,"[21] and that Google's data gave it a key competitive advantage over AI companies like ChatGPT.[22] And so the court imposed data remedies that require Google to provide qualified competitors access to its data and syndication of its search results, so that Google cannot continue to singularly exploit the data advantage it gained from years of illegal conduct. The data that is shared will give competitors — including emerging AI companies — a leg up to overcome the data gap and compete on a more even playing ground. The court was forward-looking, and it made it clear that "Google cannot be permitted to leverage its dominance in general search to the GenAI product space."[23]

While the scale advantages of data are not new, there is every indication that these dynamics will play out in a much bigger way with AI. The prospect of GenAI expands the competitive utility of data across every industry. Think about data on crop yields and local weather enabling more effective agriculture, or health data enabling more effective approaches in insurance. Now every industry is a data industry. As many have observed, data is the new oil. It fuels the engine of progress in every sector of the economy.

The finite amount of publicly available data also means that there will be more and more of a premium on developing proprietary sources of data. Access to high-volume, high-quality, proprietary data is a significant competitive advantage that could prove extremely difficult for competitors to surmount. Strong demands for data may drive the forces of consolidation. For example, vertical integration may become more attractive, especially in industries where downstream businesses may have access to valuable and sensitive data like healthcare data. We may also increasingly see the desire to acquire data, or to deprive rivals of data, play a role in driving transactions.[24]

Finally, I would be remiss not to say a few words about consumer data privacy. Having spent a large chunk of my career at the Federal Trade Commission and at various tech organizations, I am well versed in privacy issues and the intersection between competition and consumer protection. Data privacy is of course an important consideration, especially when data functions as an input into technology. But monopolists may also use privacy concerns as a pretext for gatekeeping data and refusing interoperability. We must closely scrutinize such claims.[25]

App. 17

Innovation around AI will likely be greater the more that AI products and services and their inputs are able to interoperate with each other.

## Conclusion

In sum, there is a great deal that antitrust law can do to deliver the competition and innovation that will usher in the next golden era of AI. Races are won, and records are broken, through rivals pushing each other to do better — in other words, real competition. We will continue to fight for the competitive conditions needed to support American innovation and dominance in AI. And we will continue to support and play a role as needed in our Administration's AI Action Plan.

Thank you.

[1] Exec. Order No. 14,179, *Removing Barriers to American Leadership in Artificial Intelligence*, 90 Fed. Reg. 8741 (Jan. 23, 2025) ("It is the policy of the United States to sustain and enhance America's global AI dominance in order to promote human flourishing, economic competitiveness, and national security.").

[2] The White House, Winning the Race: America's AI Action Plan 1 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

[3] Press Release, US Dep't of Justice, Department of Justice Wins Significant Remedies Against Google (Sept. 2, 2025), https://www.justice.gov/opa/pr/department-justice-wins-significant-remedies-against-google; *see also* Press Release, US Dep't of Justice, Assistant Attorney General Gail Slater Delivers Remarks Before Opening Arguments in Google Search Remedies Trial (Apr. 21, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-remarks-opening-arguments-google-search.

[4] *United States v. Google LLC*, No. 20-CV-3010, 2025 WL 2523010, at *48 (D.D.C. Sept. 2, 2025).

[5] *Id.* at *50.

[6] The White House, Winning the Race: America's AI Action Plan 3 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

[7] Press Release, US Dep't of Justice, Assistant Attorney General Gail Slater Delivers Keynote Address at the 2025 Georgetown Law Global Antitrust Enforcement Symposium (Sept. 16, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-keynote-address-2025-georgetown-law.

App. 18

[8] *Remarks by the Vice President at the Artificial Intelligence Action Summit in Paris, France*, The American Presidency Project (Feb. 11, 2025), www.presidency.ucsb.edu/documents/remarks-the-vice-president-the-artificial-intelligence-action-summit-paris-france.

[9] *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001) (en banc) (per curiam).

[10] *See, e.g.*, US Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 2.6 (2023), https://www.justice.gov/atr/2023-merger-guidelines.

[11] *Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring).

[12] The White House, Winning the Race: America's AI Action Plan 4 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

[13] Press Release, US Dep't of Justice, Justice Department Files Statement of Interest on Suppression of Competition in the Marketplace of Ideas Through Deplatforming of Rival Viewpoints (July 11, 2025), https://www.justice.gov/opa/pr/justice-department-files-statement-interest-suppression-competition-marketplace-ideas.

[14] *See, e.g.*, Exec. Order No. 14,319, *Preventing Woke AI in the Federal Government*, 90 Fed. Reg. 35389 (July 23, 2025) (recognizing "the Federal Government should be hesitant to regulate the functionality of AI models in the private marketplace"); *see also* Exec. Order No. 14,267, *Reducing Anti-Competitive Regulatory Barriers*, 90 Fed. Reg. 15,629 (Apr. 9, 2025); Press Release, US Dep't of Justice, Justice Department Launches Anticompetitive Regulations Task Force (Mar. 27, 2025), https://www.justice.gov/opa/pr/justice-department-launches-anticompetitive-regulations-task-force.

[15] Press Release, US Dep't of Justice, Assistant Attorney General Gail Slater Delivers First Antitrust Address at University of Notre Dame Law School (Apr. 28, 2025), https://www.justice.gov/opa/speech/assistant-attorney-general-gail-slater-delivers-first-antitrust-address-university-notre.

[16] *See* Press Release, US Dep't of Justice, Justice Department Launches Anticompetitive Regulations Task Force (Mar. 27, 2025), https://www.justice.gov/opa/pr/justice-department-launches-anticompetitive-regulations-task-force.

[17] *See* Press Release, US Dep't of Justice, Assistant Attorney General Makan Delrahim Delivers Keynote Address at American Bar Association's Antitrust Fall Forum (Nov. 16, 2017), https://www.justice.gov/archives/opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar ("[A]ntitrust is law enforcement, it's not regulation. At its best, it supports reducing regulation, by encouraging competitive markets that, as a result, require less government intervention. That is to say, proper and timely antitrust enforcement

App. 19

helps competition police markets instead of bureaucrats in Washington, D.C. doing it. Vigorous antitrust enforcement plays an important role in building a less regulated economy in which innovation and business can thrive, and ultimately the American consumer can benefit.").

[18] The White House, Winning the Race: America's AI Action Plan at 4 (July 2025), https://www.whitehouse.gov/wp-content/uploads/2025/07/Americas-AI-Action-Plan.pdf.

[19] *See id.* at 5 (supporting plan to "help drive adoption of open-source and open-weight models by small and medium-sized businesses").

[20] *United States v. Google LLC*, 747 F. Supp. 3d 1, 49-50 (D.D.C. 2024).

[21] *United States v. Google LLC,* No. 20-CV-3010, 2025 WL 2523010, at *67 (D.D.C. Sept. 2, 2025).

[22] *Id.*

[23] *Id.* at *51.

[24] *See, e.g.,* US Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines § 2.9 (2023), https://www.justice.gov/atr/2023-merger-guidelines ("Mergers that involve firms that provide other important inputs to platform services can enable the platform operator to deny rivals the benefits of those inputs. For example, acquiring data that helps facilitate matching, sorting, or prediction services may enable the platform to weaken rival platforms by denying them that data.").

[25] *See Remarks by the Vice President at the Artificial Intelligence Action Summit in Paris, France,* The American Presidency Project (Feb. 11, 2025), www.presidency.ucsb.edu/documents/remarks-the-vice-president-the-artificial-intelligence-action-summit-paris-france ("And I'd ask, if you step back a moment and ask yourself: Who is most aggressively demanding that we — meaning political leaders gathered here today — do the most aggressive regulation?  It is very often the people who already have an incumbent advantage in the market. And when a massive incumbent comes to us asking us for safety regulations, we ought to ask whether that safety regulation is for the benefit of our people or whether it's for the benefit of the incumbent.").

**Speaker**

[Assistant Attorney General](#)

**Topic**

App. 20

## ANTITRUST

**Component**

[Antitrust Division](#)

*Updated September 22, 2025*

# Related Content

**PRESS RELEASE**

### Two Companies and Three Executives Indicted for Fraudulently Selling Chinese Forklifts to U.S. Government as "Made in America" and Evading Tariffs

A federal grand jury in Denver returned an [indictment](#) on August 21, 2025, charging two Denver-area companies and the companies' top executives for defrauding the federal government on sales of...

September 30, 2025

**PRESS RELEASE**

### Justice Department, Federal Trade Commission, and Japan Fair Trade Commission Meet in Washington to Continue Their Long History of Engagement

September 29, 2025

App. 21

**PRESS RELEASE**

## Justice Department and USDA Coordinate to Protect Competition in Agricultural Inputs

The Justice Department's Antitrust Division and the United States Department of Agriculture (USDA) announced a [Memorandum of Understanding](#) (MOU) formalizing a partnership to protect competition in key agricultural markets such…

September 29, 2025

✉ **Office of Public Affairs**

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington DC 20530

📞 Office of Public Affairs Direct Line

202-514-2007

Department of Justice Main Switchboard

202-514-2000

App. 23

# TAB 2

X

# X Terms of Service

---

## Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement – a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services without X's express written permission, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or

App. 24

others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.

- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms. If you are a recipient of the X Service in the European Union, you may challenge certain decisions we make under the Digital Services Act (Regulation (EU) 2022/2065) via our internal process or via out-of-court dispute settlement as described here.

Please also note that these Terms incorporate our Privacy Policy (https://x.com/privacy) as well as other terms applicable to your use of the Services and your Content. Finally, these Terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

---

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

---

# X Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your and other users' access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services

([https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates](https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, with its registered office at 865 FM 1209, Building 2, Bastrop, TX 78602 U.S.A. The words "we," "us," and "our" mean X Corp.

---

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy ([https://x.com/privacy](https://x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

App. 26



Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that

App. 27



this license includes the right for us to (i) analyze text and other information you provide and to otherwise provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

App. 28

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards), Public API (https://developer.x.com/docs), or Sign in with X (https://docs.x.com/resources/fundamentals/authentication/guides/log-in-with-x), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).



# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any



system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies, including our Misuse of Reporting Features Policy; or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.



# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

NOTWITHSTANDING ANY OTHER TERMS TO THE CONTRARY, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY USER OR THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.



BY AGREEING TO THESE TERMS OR USING THE SERVICES, YOU AGREE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THAT THE X ENTITIES ARE NOT RESPONSIBLE OR LIABLE TO YOU OR OTHERS FOR THE ACTIONS OR CONDUCT OF USERS AND THIRD PARTIES ON THE SERVICES, OR FOR ANY CONTENT USERS AND THIRD PARTIES SHARE ON THE SERVICES, INCLUDING OFFENSIVE, DEFAMATORY, ILLEGAL OR OTHER OBJECTIONABLE CONTENT.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - $15,000 USD per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or other equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any

App. 33

purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of Texas (excluding choice of law).

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

**Effective:** November 15, 2024

Archive of Previous Terms

App. 34



# X Terms of Service

## If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your and other users' access to and use of the services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our [other covered services](https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) ([https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates](https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Internet Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services, with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we," "us," and "our," mean X Internet Unlimited Company.

---

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our [Privacy Policy](https://x.com/privacy) ([https://x.com/privacy](https://x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to



the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. Content recommendations are made based on a combination of factors: how you engage with the Services, the topics you have indicated that you are interested in, and what other users who share your similar interests like. Adjustments can be made in your settings, and additional information can be found in our Help Center (https://help.x.com/resources/recommender-systems). All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602

App. 36



Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to (i) provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary

App. 37



permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-card), Public API (https://developer.x.com/docs), or Sign in with X (https://docs.x.com/resources/fundamentals/authentication/guides/log-in-with-x), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express

App. 39



written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our [Platform Manipulation and Spam Policy](#) or any other [Rules and Policies](#), including our [Misuse of Reporting Features Policy](#); or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See



https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies; (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that X Internet Unlimited Company, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - €15,000 EUR per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or equitable relief, in addition to monetary damages.



# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

To the extent permitted by law, all disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively before a competent court in Ireland without regard to conflict of law provisions and will be governed by Irish law, notwithstanding any other agreement between you and us to the contrary. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

**Effective:** November 15, 2024

Archive of Previous Terms

# TAB 3

> **Sora Launch**
>
> (i) We are gradually enabling access to the Sora app to users to ensure a smooth experience for everyone. If you don't receive access just yet, we appreciate your patience and enthusiasm as we expand access.
>
> Dismiss

# OpenAI

English　United States　　　Login

Q　Search for articles...

All collections  >  ChatGPT  >  Model Release Notes

# Model Release Notes

Updated: 4 days ago

## Updating GPT-5 (October 3, 2025)

We're updating **GPT-5 Instant** to better recognize and support people in moments of distress.

The model is trained to more accurately detect and respond to potential signs of mental and emotional distress. These updates were guided by mental health experts, and help ChatGPT de-escalate conversations and point people to real-world crisis resources when appropriate, while still using language that feels supportive and grounding.

As we shared in a recent blog, we've been using our real-time router to direct sensitive parts of conversations—such as those showing signs of acute distress—to reasoning models. GPT-5 Instant now performs just as well as GPT-5 Thinking on these types of questions. When GPT-5 Auto or a non-reasoning model is selected, we'll instead route

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 46 of 172    PageID 418

these conversations to GPT-5 Instant to more quickly provide helpful and beneficial responses. ChatGPT will continue to tell users which model is active when asked.

**This update to GPT-5 Instant is starting to roll out to ChatGPT users today.** We're continuing to work on improvements and will keep updating the model to make it smarter and safer over time.

## GPT-5-codex now available in Responses API (Sep 23, 2025)

We're excited to announce that GPT-5-codex is now available in the Responses API, in addition to codex surfaces. For more information, refer to the GPT-5-codex model page.

*Note: GPT-5-Codex is not currently supported in ChatGPT.*

## Introducing GPT-5-codex (Sep 15, 2025)

We're adding GPT-5-codex, a GPT-5 variant optimized for agentic coding in Codex. It's available everywhere you use Codex: default for cloud tasks and code review, and selectable for local workflows via the Codex CLI and IDE extension. Use GPT-5-codex for coding-focused work in Codex, or Codex-like environments; use GPT-5 for general, non-coding tasks.

In day-to-day use, GPT-5-codex supports fast interactive edits and can run independently on longer tasks when needed. For frontend/UI work, it accepts images or screenshots alongside text as input. For more information, please review the announcement blog.

*Note: GPT-5-Codex is not currently supported in ChatGPT.*

## Updating the OpenAI Model Spec (September 12, 2025)

We've made a few updates to the Model Spec, a living document that outlines intended behavior for OpenAI's models, to better reflect how our systems are evolving. The

App. 46

changes focus on strengthening clarity and guardrails as our models move beyond chat into more agentic use cases, refining authority levels and priorities, expanding guidance on personalities and safety, and incorporating public feedback.

## Updated authority levels

The top authority level has been renamed from Platform to Root and elevated above System, making clear which parts of the Model Spec cannot be overridden in any conversation (previously, Platform and System were assigned the same authority). The new authority order is Root → System → Developer → User → Guideline.

## Agentic principles

With the release of ChatGPT Agent and related research, we've added principles for agents that can take actions in the world:

1. Act within an agreed-upon scope of autonomy: like a consultant operating under a Scope of Work for a client, the assistant is authorized to act only with explicit or implicit agreement with the user on permitted actions, subgoals, and costs.
2. Control and communicate side effects: the assistant should minimize and disclose irreversible actions, prefer reversible approaches, and favor minimal disruption.

## Other notable changes

Additional highlights from the open-source changelog include:

1. Improvements to the Chain of Command, with a new No other objectives section and clarifications on handling mistaken or implicitly quoted instructions.
2. Expanded context on OpenAI's goals for safe model behavior and usage in the Overview, along with clarifications for consistency across the Model Spec.
3. Expanded principles and examples for default model personality in Use appropriate style.
4. Clarified language in Stay in bounds and Seek the truth together around system and developer message confidentiality, as well as several other improvements based on public input gathered via a Collective Alignment process.
5. Updated refusal style to safe completion, which should lead to more helpful and transparent model responses around safety boundaries.

As always, the latest version of the Model Spec can be found at https://model-spec.openai.com/.

App. 47

Case 4:25-cv-00914-P      Document 46      Filed 10/08/25      Page 48 of 172      PageID 420

## GPT-5

GPT-5 is slowly rolling out to all users on ChatGPT Plus, Pro, Team, and Free plans worldwide across web, mobile, and desktop. GPT-5 will be available to ChatGPT Enterprise and Edu plans soon.

GPT-5 in ChatGPT is our next flagship model and the new default for all logged-in users. It simplifies ChatGPT to a single auto-switching system that brings together the best of our previous models into a **smart, fast model.**

GPT-5 is available to all ChatGPT Tiers. Users on Paid tiers - Plus, Pro, and Team - have access to the model picker, which enables you to manually select GPT-5 or GPT-5 Thinking. Pro and Team tier users have access to GPT-5 Thinking Pro, which takes a bit longer to think but delivers the accuracy you need for complex tasks.

Learn more about GPT-5 in ChatGPT.

## Introducing two open-weight models: gpt-oss-120b and gpt-oss-20b (August 5, 2025)

We're releasing two open-weight reasoning models, **gpt-oss-120b** and **gpt-oss-20b**. Designed for teams that want to run and customize models on their own infrastructure or with hosting providers, these text-only models support common developer patterns like function calling and structured outputs.

For more information, please visit our open models and help center.

## Launching OpenAI o3-pro—available now for Pro users in ChatGPT and in our API (June 10, 2025)

Like o1-pro, o3-pro is a version of our most intelligent model, o3, designed to think longer and provide the most reliable responses. Since the launch of o1-pro, users have favored this model for domains such as math, science, and coding—areas where o3-pro continues to excel, as shown in academic evaluations. Like o3, o3-pro has access to

App. 48

Case 4:25-cv-00914-P     Document 46     Filed 10/08/25     Page 49 of 172     PageID 421

tools that make ChatGPT useful—it can search the web, analyze files, reason about visual inputs, use Python, personalize responses using memory, and more. Because o3-pro has access to tools, responses typically take longer than o1-pro to complete. We recommend using it for challenging questions where reliability matters more than speed, and waiting a few minutes is worth the tradeoff.

In expert evaluations, reviewers consistently prefer o3-pro over o3 in every tested category and especially in key domains like science, education, programming, business, and writing help. Reviewers also rated o3-pro consistently higher for clarity, comprehensiveness, instruction-following, and accuracy.



OpenAI o3-pro: comparative evaluations with human testers

o3-pro win-rate vs o3

- All Queries: 64%
- Scientific Analysis: 64.9%
- Personal Writing: 66.7%
- Computer Programming: 62.7%
- Data Analysis: 64.3%

Academic evaluations show that o3-pro consistently outperforms both o1-pro and o3.

App. 49



## OpenAI o3-pro: pass@1 evaluation benchmarks

**Methodology**
1. Evals were run for all models using default (medium) ChatGPT thinking time.
2. The Codeforces evals for o3 and o3-pro were run using an updated set of Codeforces questions with more difficult tasks, as the previous version (used for o1-pro) was close to saturation.

To assess the key strength of o3-pro, we once again use our rigorous "4/4 reliability" evaluation, where a model is considered successful only if it correctly answers a question in all four attempts, not just one:



## OpenAI o3-pro: 4/4 reliability evaluation benchmarks

**Methodology**
1. Evals were run for all models using default (medium) ChatGPT thinking time.
2. In the "4/4 reliability" evaluation, a model is considered successful only if it correctly answers a question in all four attempts, not just one.
3. The Codeforces evals for o3 and o3-pro were run using an updated set of Codeforces questions with more difficult tasks, as the previous version (used for o1-pro) was close to saturation.
4. In Codeforces competitions, contestants can submit multiple solutions. In the 4/4 reliability Elo evaluation, each submission represents the worst-performing solution out of four samples generated by the model.

App. 50

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 51 of 172    PageID 423

o3-pro is available in the model picker for Pro and Team users starting today, replacing o1-pro. Enterprise and Edu users will get access the week after.

As o3-pro uses the same underlying model as o3, full safety details can be found in the o3 system card.

**Limitations**

At the moment, temporary chats are disabled for o3-pro as we resolve a technical issue.

Image generation is not supported within o3-pro—please use GPT-4o, OpenAI o3, or OpenAI o4-mini to generate images.

Canvas is also currently not supported within o3-pro.

# Updates to Advanced Voice Mode for paid users (June 7, 2025)

We're upgrading Advanced Voice in ChatGPT for paid users with significant enhancements in intonation and naturalness, making interactions feel more fluid and human-like. When we first launched Advanced Voice, it represented a leap forward in AI speech—now, it speaks even more naturally, with subtler intonation, realistic cadence (including pauses and emphases), and more on-point expressiveness for certain emotions including empathy, sarcasm, and more.

Voice also now offers intuitive and effective language translation. Just ask Voice to translate between languages, and it will continue translating throughout your conversation until you tell it to stop or switch. It's ready to translate whenever you need it—whether you're asking for directions in Italy or chatting with a colleague from the Tokyo office. For example, at a restaurant in Brazil, Voice can translate your English sentences into Portuguese, and the waiter's Portuguese responses back into English—making conversations effortless, no matter where you are or who you're speaking with.

This upgrade to Advanced Voice is available for all paid users across markets and platforms—just tap the Voice icon in the message composer to get started.

This update is in addition to improvements we made earlier this year to ensure fewer interruptions and improved accents.

App. 51

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 52 of 172    PageID 424

**Known Limitations**

In testing, we've observed that this update may occasionally cause minor decreases in audio quality, including unexpected variations in tone and pitch. These issues are more noticeable with certain voice options. We expect to improve audio consistency over time.

Additionally, rare hallucinations in Voice Mode persist with this update, resulting in unintended sounds resembling ads, gibberish, or background music. We are actively investigating these issues and working toward a solution.

# Update to o4-mini (June 6, 2025)

We are rolling back an o4-mini snapshot, that we deployed less than a week ago and intended to improve the length of model responses, because our automated monitoring tools detected an increase in content flags.

# Releasing GPT-4.1 in ChatGPT for all paid users (May 14, 2025)

Since its launch in the API in April, GPT-4.1 has become a favorite among developers—by popular demand, we're making it available directly in ChatGPT.

GPT-4.1 is a specialized model that excels at coding tasks. Compared to GPT-4o, it's even stronger at precise instruction following and web development tasks, and offers an alternative to OpenAI o3 and OpenAI o4-mini for simpler, everyday coding needs.

Starting today, Plus, Pro, and Team users can access GPT-4.1 via the "more models" dropdown in the model picker. Enterprise and Edu users will get access in the coming weeks. GPT-4.1 has the same rate limits as GPT-4o for paid users.

# Introducing GPT-4.1 mini, replacing GPT-4o mini, in ChatGPT for all users (May 14, 2025)

Case 4:25-cv-00914-P     Document 46     Filed 10/08/25     Page 53 of 172     PageID 425

GPT-4.1 mini is a fast, capable, and efficient small model, delivering significant improvements compared to GPT-4o mini—in instruction-following, coding, and overall intelligence. Starting today, GPT-4.1 mini replaces GPT-4o mini in the model picker under "more models" for paid users, and will serve as the fallback model for free users once they reach their GPT-4o usage limits. Rate limits remain the same.

Evals for GPT-4.1 and GPT-4.1 mini were originally shared in the blog post accompanying their API release. They also went through standard safety evaluations. Detailed results are available in the newly launched Safety Evaluations Hub.

## Improvement to GPT-4o (May 12, 2025)

We've improved GPT-4o's system instructions to help ensure the image generation tool is called when you want to generate an image in ChatGPT.

## Update to GPT-4o (April 29, 2025)

We've reverted the most recent update to GPT-4o due to issues with overly agreeable responses (sycophancy).

We're actively working on further improvements. For more details, check out our blog post explaining what happened and our initial findings, and this blog post where we expand on what we missed with sycophancy and the changes we're going to make going forward.

## Improvements to GPT-4o (April 25, 2025)

We're making additional improvements to GPT-4o, optimizing when it saves memories and enhancing problem-solving capabilities for STEM. We've also made subtle changes to the way it responds, making it more proactive and better at guiding conversations toward productive outcomes. We think these updates help GPT-4o feel more intuitive and effective across a variety of tasks–we hope you agree!

# OpenAI o3 and o4-mini (April 16, 2025)

**OpenAI o3** is our most powerful reasoning model that pushes the frontier across **coding, math, science, visual perception,** and more. It sets a new SOTA on benchmarks including Codeforces, SWE-bench (without building a custom model-specific scaffold), and MMMU. It's ideal for complex queries requiring multi-faceted analysis and whose answers may not be immediately obvious. It performs especially strongly at visual tasks like analyzing images, charts, and graphics. In evaluations by external experts, o3 makes 20 percent fewer major errors than OpenAI o1 on difficult, real-world tasks— especially excelling in areas like programming, business/consulting, and creative ideation. Early testers highlighted its analytical rigor as a thought partner and emphasized its ability to generate and critically evaluate novel hypotheses— particularly within biology, math, and engineering contexts.

**OpenAI o4-mini** is a smaller model optimized for fast, cost-efficient reasoning—it achieves remarkable performance for its size and cost, particularly in **math, coding, and visual tasks.** It is the best-performing benchmarked model on AIME 2024 and 2025. In expert evaluations, it also outperforms its predecessor, o3-mini, on non-STEM tasks as well as domains like data science. Thanks to its efficiency, o4-mini supports significantly higher usage limits than o3, making it a strong high-volume, high-throughput option for questions that benefit from reasoning.

# Improvements to GPT-4o (March 27, 2025)

We've made improvements to GPT-4o—it now feels more intuitive, creative, and collaborative, with enhanced instruction-following, smarter coding capabilities, and a clearer communication style.

**Smarter problem-solving in STEM and coding:**

GPT-4o has further improved its capability to tackle complex technical and coding problems. It now generates cleaner, simpler frontend code, more accurately thinks through existing code to identify necessary changes, and consistently produces coding outputs that successfully compile and run, streamlining your coding workflows.

**Enhanced instruction-following and formatting accuracy:**

GPT-4o is now more adept at following detailed instructions, especially for prompts containing multiple or complex requests. It improves on generating outputs according to the format requested and achieves higher accuracy in classification tasks.

App. 54

**"Fuzzy" improvements:**

Early testers say that the model seems to better understand the implied intent behind their prompts, especially when it comes to creative and collaborative tasks. It's also slightly more concise and clear, using fewer markdown hierarchies and emojis for responses that are easier to read, less cluttered, and more focused. We're curious to see if our users also find this to be the case.

This model is now available in ChatGPT and in the API as the newest snapshot of chatgpt-4o-latest. We plan to bring these improvements to a dated model in the API in the coming weeks.

## Introducing GPT-4.5 (February, 27, 2025)

We're releasing a research preview of GPT-4.5—our largest, and best model for chat, yet. GPT-4.5 is a step forward in scaling up pretraining and post-training. By scaling unsupervised learning, GPT-4.5 improves its ability to recognize patterns, draw connections, and generate creative insights without reasoning.

Early testing shows that interacting with GPT-4.5 feels more natural. Its broader knowledge base, improved ability to follow user intent, and greater "EQ" make it useful for tasks like improving writing, programming, and solving practical problems. We also expect it to hallucinate less.

We're sharing GPT-4.5 as a research preview to better understand its strengths and limitations. We're still exploring what it's capable of and are eager to see how people use it in ways we might not have expected.

> GPT-4.5 is available worldwide for users on the Pro plan in ChatGPT. Eventually this will be available to all paid plans (Plus, Pro, Teams, Enterprise, and Edu) with a ChatGPT account.

## Introducing OpenAI o3-mini (January 31, 2025)

We're excited to release o3-mini, our newest cost-efficient reasoning model optimized for coding, math, and science.

App. 55

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 56 of 172    PageID 428

On the API, o3-mini supports Structured Outputs, function calling, developer messages, and streaming. It offers three adjustable reasoning efforts (low, medium, and high), so you can balance speed with depth for your use case.

ChatGPT Team, Pro, Plus, and Free plan users can access o3-mini starting today. Additionally, o3-mini now works with search to find up-to-date answers with links to relevant web sources. This is an early prototype as we work to integrate search across our reasoning models.In side-by-side testing, o3-mini delivered results on par with o1 at a lower latency, and outperformed o1-mini on advanced STEM tasks.
Expert evaluators preferred o3-mini's answers 56% of the time over o1-mini's, citing improved clarity and fewer critical errors on difficult questions. We look forward to your feedback and will keep refining o3-mini as we expand our family of advanced reasoning models.

# Updates to GPT-4o in ChatGPT (January 29, 2025)

We've made some updates to GPT-4o–it's now a smarter model across the board with more up-to-date knowledge, as well as deeper understanding and analysis of image uploads.

**More up-to-date knowledge:** By extending its training data cutoff from November 2023 to June 2024, GPT-4o can now offer more relevant, current, and contextually accurate responses, especially for questions involving cultural and social trends or more up-to-date research. A fresher training data set also makes it easier for the model to frame its web searches more efficiently and effectively.

**Deeper understanding and analysis of image uploads:**
GPT-4o is now better at understanding and answering questions about visual inputs, with improvements on multimodal benchmarks like MMMU and MathVista. The updated model is more adept at interpreting spatial relationships in image uploads, as well as analyzing complex diagrams, understanding charts and graphs, and connecting visual input with written content. Responses to image uploads will contain richer insights and more accurate guidance in areas like spatial planning and design layouts, as well as visually driven mathematical or technical problem-solving.

**A smarter model, especially for STEM:** GPT-4o is now better at math, science, and coding-related problems, with gains on academic evals like GPQA and MATH. Its improved score on MMLU—a comprehensive benchmark of language comprehension,

App. 56

Case 4:25-cv-00914-P     Document 46     Filed 10/08/25     Page 57 of 172     PageID 429

knowledge breadth, and reasoning—reflects its ability to tackle more complex problems across domains.

**Increased emoji usage** ⬆️ : GPT-4o is now a bit more enthusiastic in its emoji usage (perhaps particularly so if you use emoji in the conversation ✨ ) — let us know what you think.

## Introducing GPT-4o with scheduled tasks (January 14, 2025)

Today we're rolling out a beta version of tasks—a new way to ask ChatGPT to do things for you at a future time. Whether it's one-time reminders or recurring actions, tell ChatGPT what you need and when, and it will automatically take care of it.

Scheduled tasks is in early beta for Plus, Pro, and Teams. Eventually this will be available to anyone with a ChatGPT account.

## Update to GPT-4o (November 20, 2024)

We've updated GPT-4o for ChatGPT users on all paid tiers. This update to GPT-4o includes improved writing capabilities that are now more natural, audience-aware, and tailored to improve relevance and readability. This model is also better at working with uploaded files, able to provide deeper insights and more thorough responses.

## Update to GPT 4o-mini (November 5, 2024)

Today, we've updated GPT-4o mini for ChatGPT users on the Free, Plus, and Team tier, along with users that use ChatGPT while logged out.

## Introducing GPT-4o with canvas (October 3, 2024)

We trained GPT-4o to collaborate as a creative partner. The model knows when to open a canvas, make targeted edits, and fully rewrite. It also understands broader context to provide precise feedback and suggestions.

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 58 of 172    PageID 430

Canvas is in early beta, and we plan to rapidly improve its capabilities.

## Advanced voice (September 24, 2024)

Advanced voice uses GPT-4o's native audio capabilities and features more natural, real-time conversations that pick up on non-verbal cues, such as the speed you're talking, and can respond with emotion. Usage of advanced Voice (audio inputs and outputs) by Plus and Team users is limited on a daily basis.

## Introducing OpenAI o1-preview and o1-mini (September 12, 2024)

We've developed a new series of AI models designed to spend more time thinking before they respond. They can reason through complex tasks and solve harder problems than previous models in science, coding, and math.

Today, we are releasing the first of this series in ChatGPT and our API. This is a preview and we expect regular updates and improvements.

ChatGPT Plus and Team users will be able to access o1 models in ChatGPT starting today. Both o1-preview and o1-mini can be selected manually in the model picker, and at launch, weekly rate limits will be 30 messages for o1-preview and 50 for o1-mini. We are working to increase those rates and enable ChatGPT to automatically choose the right model for a given prompt.

## Update to GPT-4o (September 3, 2024)

Today, we've updated GPT-4o in ChatGPT. This version is better at incorporating uploaded files and updating memory with key parts of a conversation to make future interactions more helpful and relevant.

## Update to GPT-4o (August 12, 2024)

"Bug fixes and performance improvements" ... we've introduced an update to GPT-4o that we've found, through experiment results and qualitative feedback, ChatGPT users

Case 4:25-cv-00914-P     Document 46     Filed 10/08/25     Page 59 of 172     PageID 431

tend to prefer. It's not a new frontier-class model. Although we'd like to tell you exactly how the model responses are different, figuring out how to granularly benchmark and communicate model behavior improvements is an ongoing area of research in itself (which we're working on!).

Sometimes we can point to new capabilities and specific improvements — and we'll try our best to communicate that whenever possible. In the meantime, our team is constantly iterating on the model by adding good data, removing bad data, and experimenting with new research methods based on user feedback, offline evaluations, and more. That's the case with this model update.

We'll continue to keep you posted as best as we can. Thank you for your patience!

## Introducing GPT-4o mini (July 18, 2024)

We're introducing GPT-4o mini, the most capable and cost-efficient small model available today. GPT-4o mini surpasses GPT-3.5 Turbo and other small models on academic benchmarks across both textual intelligence and multimodal reasoning and supports the same range of languages as GPT-4o. It also demonstrates strong performance in function calling, which can enable developers to build applications that fetch data or take actions with external systems, and improved long-context performance compared to GPT-3.5 Turbo.

You can read more about GPT-4o mini in the blog announcement.

## Related articles

ChatGPT agent - release notes                                                >

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 60 of 172    PageID 432

## What is the ChatGPT model selector?                    >

Switch between different models in ChatGPT depending on your plan and your
needs

## ChatGPT Business - Release Notes                    >

A changelog of the latest updates for ChatGPT Business plan

# Was this article helpful?



Additional feedback (optional)

Submit



ChatGPT     API     Service Status     Cookie Preferences

# **TAB 4**

xAI    GROK    API    COMPANY    COLOSSUS    CAREERS    NEWS                    TRY GROK

←

AUGUST 13, 2024

# Grok-2 Beta Release

We announce our new Grok-2 and Grok-2 mini models.

We are excited to release an early preview of Grok-2, a significant step forward from our previous model Grok-1.5, featuring frontier capabilities in chat, coding, and reasoning. At the same time, we are introducing Grok-2 mini, a small but capable sibling of Grok-2. An early version of Grok-2 has been tested on the LMSYS leaderboard under the name "sus-column-r." At the time of this blog post, it is outperforming both Claude 3.5 Sonnet and GPT-4-Turbo.

Grok-2 and Grok-2 mini are currently in beta on 𝕏, and we are also making both models available through our enterprise API later this month.

## Grok-2 language model and chat capabilities

We introduced an early version of Grok-2 under the name "sus-column-r" into the LMArena.ai Chatbot Arena, a popular competitive language model benchmark. It outperforms both Claude and GPT-4 on the LMSYS leaderboard in terms of its overall Elo score.

←  →



Overall ELO scores on Chatbot Arena



Win Rate of Grok-2 Against Competing Models on Chatbot Arena                    Grok's response quality

Internally, we employ a comparable process to evaluate our models. Our AI Tutors engage with our models across a variety of tasks that reflect real-world interactions with Grok. During each interaction, the AI Tutors are presented with two responses generated by Grok. They select the superior response based on specific criteria outlined in our guidelines. We focused on evaluating model capabilities in two key areas: following instructions and providing accurate, factual information. Grok-2 has shown significant improvements in reasoning with retrieved content and in its tool use capabilities, such as correctly identifying missing information, reasoning through sequences of events, and discarding irrelevant posts.

## Benchmarks

We evaluated the Grok-2 models across a series of academic benchmarks that included reasoning, reading comprehension, math, science, and coding. Both Grok-2 and Grok-2 mini demonstrate significant improvements over our previous Grok-1.5 model. They achieve performance levels competitive to other frontier models in areas such as graduate-level science knowledge (GPQA), general knowledge (MMLU, MMLU-Pro), and math competition problems (MATH). Additionally, Grok-2 excels in vision-based tasks, delivering state-of-the-art performance in visual math reasoning (MathVista) and in document-based question answering (DocVQA).



| Benchmark | | Grok-1.5 | Grok-2 mini* | Grok-2* | GPT-4 Turbo* | Claude 3 Opus† | Gemini Pro 1.5 | Llama 3 405B | GPT-4o* | Claude 3.5 Sonnet† |
|---|---|---|---|---|---|---|---|---|---|---|
| GPQA | | 35.9% | 51.0% | 56.0% | 48.0% | 50.4% | 46.2% | 51.1% | 53.6% | 59.6% |
| MMLU | | 81.3% | 86.2% | 87.5% | 86.5% | 85.7% | 85.9% | 88.6% | 88.7% | 88.3% |
| MMLU-Pro | | 51.0% | 72.0% | 75.5% | 63.7% | 68.5% | 69.0% | 73.3% | 72.6% | 76.1% |
| MATH§ | | 50.6% | 73.0% | 76.1% | 72.6% | 60.1% | 67.7% | 73.8% | 76.6% | 71.1% |
| HumanEval¶ | | 74.1% | 85.7% | 88.4% | 87.1% | 84.9% | 71.9% | 89.0% | 90.2% | 92.0% |
| MMMU | | 53.6% | 63.2% | 66.1% | 63.1% | 59.4% | 62.2% | 64.5% | 69.1% | 68.3% |
| MathVista | | 52.8% | 68.1% | 69.0% | 58.1% | 50.5% | 63.9% | — | 63.8% | 67.7% |
| DocVQA | | 85.6% | 93.2% | 93.6% | 87.2% | 89.3% | 93.1% | 92.2% | 92.8% | 95.2% |

\* GPT-4-Turbo and GPT-4o scores are from the May 2024 release.

† Claude 3 Opus and Claude 3.5 Sonnet scores are from the June 2024 release.

‡ Grok-2 MMLU, MMLU-Pro, MMMU and MathVista were evaluated using 0-shot CoT.

§ For MATH, we present maj@1 results.

¶ For HumanEval, we report pass@1 benchmark scores.

## Experience Grok with real-time information on 𝕏

Over the past few months, we've been continuously improving Grok on the 𝕏 platform. Today, we're introducing the next evolution of the Grok experience, featuring a redesigned interface and new features.



X App Grok page with Grok mini

Photo of a meme and Grok's explanation



Grok's response to a coding question

𝕏 Premium and Premium+ users will have access to two new models: Grok-2 and Grok-2 mini. Grok-2 is our state-of-the-art AI assistant with advanced capabilities in both text and vision understanding, integrating real-time information from the 𝕏 platform, accessible through the Grok tab in the 𝕏 app. Grok-2 mini is our small but capable model that offers a balance between speed and answer quality. Compared to its predecessor, Grok-2 is more intuitive, steerable, and

App. 63

versatile across a wide range of tasks, whether you're seeking answers, collaborating on writing, or solving coding tasks. In collaboration with Black Forest Labs, we are experimenting with their FLUX.1 model to expand Grok's capabilities on X. If you are a Premium or Premium+ subscriber, make sure to update to the latest version of the X app in order to beta test Grok-2.

### Build with Grok using the Enterprise API

We are also releasing Grok-2 and Grok-2 mini to developers through our new enterprise API platform later this month. Our upcoming API is built on a new bespoke tech stack that allows multi-region inference deployments for low-latency access across the world. We offer enhanced security features such as mandatory multi-factor authentication (e.g. using a Yubikey, Apple TouchID, or TOTP), rich traffic statistics, and advanced billing analytics (incl. detailed data exports). We further offer a management API that allows you to integrate team, user, and billing management into your existing in-house tools and services. Join our newsletter to get notified when we launch later this month.

### What is next?

Grok-2 and Grok-2 mini are being rolled out on X. We are very excited about their applications to a range of AI-driven features, such as enhanced search capabilities, gaining deeper insights on X posts, and improved reply functions, all powered by Grok. Soon, we will release a preview of multimodal understanding as a core part of the Grok experience on X and API.

Since announcing Grok-1 in November 2023, xAI has been moving at an extraordinary pace, driven by a small team with the highest talent density. We have introduced Grok-2, positioning us at the forefront of AI development. Our focus is on advancing core reasoning capabilities with our new compute cluster. We will have many more developments to share in the coming months. We are looking for individuals to join our small, focused team dedicated to building the most impactful innovations for the future of humanity. Apply to our positions here.

| TRY GROK ON | PRODUCTS | COMPANY | RESOURCES |
|---|---|---|---|
| Web | Grok | Company | Documentation |
| iOS | API | Careers | Privacy policy |
| Android | Grok Enterprise | Contact | Security |
| Grok on X | | News | Safety |
| | | | Legal |
| | | | Status |

App. 64

App. 65

# **TAB 5**

xAI    GROK    API    COMPANY    COLOSSUS    CAREERS    NEWS                    TRY GROK

←

FEBRUARY 19, 2025

# Grok 3 Beta — The Age of Reasoning Agents

We are thrilled to unveil an early preview of Grok 3, our most advanced model yet, blending superior reasoning with extensive pretraining knowledge.

## Next-Generation Intelligence from xAI

We are pleased to introduce Grok 3, our most advanced model yet: blending strong reasoning with extensive pretraining knowledge. Trained on our Colossus supercluster with 10x the compute of previous state-of-the-art models, Grok 3 displays significant improvements in reasoning, mathematics, coding, world knowledge, and instruction-following tasks. Grok 3's reasoning capabilities, refined through large scale reinforcement learning, allow it to think for seconds to minutes, correcting errors, exploring alternatives, and delivering accurate answers. Grok 3 has leading performance across both academic benchmarks and real-world user preferences, achieving an Elo score of 1402 in the Chatbot Arena. Alongside it, we're unveiling Grok 3 mini, which represents a new frontier in cost-efficient reasoning. Both models are still in training and will evolve rapidly with your feedback. We are rolling out Grok 3 to users in the coming days, along with an early preview of its reasoning capabilities.

## Thinking Harder: Test-time Compute and Reasoning

Today, we are announcing two beta reasoning models, Grok 3 (Think) and Grok 3 mini (Think). They were trained using reinforcement learning (RL) at an unprecedented scale to refine its chain-of-thought process, enabling advanced reasoning in a data-efficient manner. With RL, Grok 3 (Think) learned to refine its problem-solving strategies, correct errors through backtracking, simplify steps, and utilize the knowledge it picked up during pretraining. Just like a human when tackling a complex problem, Grok 3 (Think) can spend anywhere from a few seconds to several minutes reasoning, often considering multiple approaches, verifying its own solution, and evaluating how to precisely meet the requirements of the problem.

Wha

Both models are still in training, but already they show remarkable performance across a range of benchmarks. We tested these models on the 2025 American Invitational Mathematics Examination (AIME), which was released just 7 days ago on Feb 12th. With our highest level of test-time compute (cons@64), Grok 3 (Think) achieved 93.3% on this competition. Grok 3 (Think) also attained 84.6% on graduate-level expert reasoning (GPQA), and 79.4% on LiveCodeBench for code generation and problem-solving. Furthermore, Grok 3 mini reaches a

new frontier in cost-efficient reasoning for STEM tasks that don't require as much world knowledge, reaching 95.8% on AIME 2024 and 80.4% on LiveCodeBench.

### AIME'25
Competition Math

| Model | Score |
|---|---|
| Grok 3 Beta (Think) | 93.3 |
| Grok 3 mini Beta (Think) | 90.8 |
| DeepSeek-R1 | 70 |
| Gemini 2.0 Flash Thinking | 53.5 |
| o1 (medium) | 79 |
| o3 mini (high) | 86.5 |
| o3 mini (medium) | 76.5 |

### AIME'24
Competition Math

| Model | Score |
|---|---|
| Grok 3 Beta (Think) | 93.3 |
| Grok 3 mini Beta (Think) | 95.8 |
| DeepSeek-R1 | 79.8 |
| Gemini 2.0 Flash Thinking | 73.3 |
| o1 | 83.3 |
| o3 mini (high) | 87.3 |
| o3 mini (medium) | 79.6 |

### GPQA
Graduate-Level Google-Proof Q&A (Diamond)

| Model | Score |
|---|---|
| Grok 3 Beta (Think) | 84.6 |
| Grok 3 mini Beta (Think) | 84 |
| DeepSeek-R1 | 71.5 |
| Gemini 2.0 Flash Thinking | 74.2 |
| o1 | 78 |
| o3 mini (high) | 79.7 |
| o3 mini (medium) | 76.8 |

### LCB
Code Generation: 10/1/2024 - 2/1/2025

| Model | Score |
|---|---|
| Grok 3 Beta (Think) | 79.4 |
| Grok 3 mini Beta (Think) | 80.4 |
| Deepseek-R1-Preview | 64.3 |
| Gemini 2.0 Flash Thinking | 45.8 |
| o1 (high) | 72.9 |
| o3 mini (high) | 74.1 |
| o3 mini (medium) | 66.3 |

### MMMU
Multimodal Understanding

| Model | Score |
|---|---|
| Grok 3 Beta (Think) | 78 |
| Gemini 2.0 Flash Thinking | 75.4 |
| o1 | 78.2 |

To use Grok 3's reasoning capabilities, just press the `Think` button. Grok 3 (Think)'s mind is completely open, allowing users to inspect not only the final answer but the reasoning process of the model itself. We have found that Grok 3 (Think)'s performance generalizes across diverse problem domains. Here are some Grok 3 reasoning examples.

Research samples                    Coding    ASCII Art    Puzzle    Math

Create a game that is a mixture of two classic games. Make it in pygame and make it look pretty.

💡 Thought for 6 seconds
   Click to read my mind                                                   ⌄

Below is a complete solution to your query: a Pygame game called "Break-Pong," which combines elements of **Pong** and **Breakout**. In this game, two players control paddles on opposite sides of the screen, hitting a ball to break a central wall of bricks. Points are scored by breaking bricks and by letting the ball pass the opponent's paddle. The game includes smooth animations, colorful graphics, and particle effects to make it visually appealing. Here's the implementation:

### Code Implementation

```python
python

import pygame
import sys
import random
```

Left: 0                                                      Right: 0



## Pretraining on a Massive Scale

With reasoning turned off, Grok 3 gives instant, high quality responses. Grok 3 delivers state-of-the-art results across diverse academic benchmarks among non reasoning models, including: graduate-level science knowledge (GPQA), general knowledge (MMLU-Pro), math competition problems (AIME). Grok 3 also excels in image understanding (MMMU) and video understanding (EgoSchema) tasks.

| Benchmark | | Grok 3 Beta | Grok 3 mini Beta | Gemini 2.0 | DeepSeek-V3 | GPT 4o | Claude 3.5 Sonnet |
|---|---|---|---|---|---|---|---|
| AIME'24 | | 52.2% | 39.7% | — | 39.2% | 9.3% | 16.0% |
| GPQA | | 75.4% | 66.2% | 64.7% | 59.1% | 53.6% | 65.0% |
| LCB | | 57.0% | 41.5% | 36.0% | 33.1% | 32.3% | 40.2% |
| MMLU-pro | | 79.9% | 78.9% | 79.1% | 75.9% | 72.6% | 78.0% |
| LOFT (128k) | | 83.3% | 83.1% | 75.6% | — | 78.0% | 69.9% |
| SimpleQA | | 43.6% | 21.7% | 44.3% | 24.9% | 38.2% | 28.4% |
| MMMU | | 73.2% | 69.4% | 72.7% | — | 69.1% | 70.4% |
| EgoSchema | | 74.5% | 74.3% | 71.9% | — | 72.2% | — |

With a context window of 1 million tokens — 8 times larger than our previous models — Grok 3 can process extensive documents and handle complex prompts while maintaining instruction-following accuracy. On the LOFT (128k) benchmark, which targets long-context RAG use cases, Grok 3 achieved state-of-the-art accuracy (averaged across 12 diverse tasks), showcasing its powerful information retrieval capabilities.

Grok 3 also demonstrates improved factual accuracy and enhanced stylistic control. Under the codename `chocolate`, an early version of Grok 3 topped the LMArena Chatbot Arena leaderboard, outperforming all competitors in Elo scores across all categories. As we continue to scale, we are preparing to train even larger models on our 200,000 GPU cluster.

ELO Scores on Chatbot Arena



1400

## Grok Agents: Combining Reasoning and Tool Use

To understand the universe, we must interface Grok with the world. Equipped with code interpreters and internet access, Grok 3 models learn to query for missing context, dynamically adjust their approach, and improve their reasoning based on feedback.

As a first step towards this vision, we are rolling out DeepSearch —our first agent. It's a lightning-fast AI agent built to relentlessly seek the truth across the entire corpus of human knowledge. DeepSearch is designed to synthesize key information, reason about conflicting facts and opinions, and distill clarity from complexity. Whether you need to access the latest real-time news, seek advice about your social woes, or conduct in-depth scientific research, DeepSearch will take you far beyond a browser search. Its final summary trace results in a concise and comprehensive report, to help you keep up with a world that never slows down.

**DeepSearch Showcase**                                    ← →

How are X users reacting to the Grok 3 launch?

## Grok 3 API Coming Soon

In the coming weeks, we will release Grok 3 and Grok 3 mini via our API platform, offering

access to both the standard and reasoning models. DeepSearch will also be released to Enterprise partners via our API.

## What's Next for Grok 3?

Grok 3's training is ongoing, with frequent updates planned over the next few months. We are excited to roll out new features in the Enterprise API, including tool use, code execution, and advanced agent capabilities. Following our RMF (Risk Management Framework) release last week, we are particularly interested in accelerating progress in scalable oversight and adversarial robustness during training.

Grok 3 is now available to X Premium and Premium+ users on X and Grok.com. X Premium+ users will also immediately gain access to Think and DeepSearch . In addition, Grok 3 capabilities are being rolled out to all Grok users with usage limits. X Premium+ users will have higher limits and access to advanced capabilities.

## Join the Journey

Since launching Grok 1 in November 2023, xAI's small, talent-dense team has driven historic progress, positioning us at the forefront of AI innovation. With Grok 3, we are advancing core reasoning capabilities using our expanded Colossus supercluster, with exciting developments to come. If you are passionate about building AI for humanity's future, apply to join our team at x.ai/careers.

| TRY GROK ON | PRODUCTS | COMPANY | RESOURCES |
|---|---|---|---|
| Web | Grok | Company | Documentation |
| iOS | API | Careers | Privacy policy |
| Android | Grok Enterprise | Contact | Security |
| Grok on X | | News | Safety |
| | | | Legal |
| | | | Status |

App. 70

# **TAB 6**



## Native Tool Use

Grok 4 was trained with reinforcement learning to use tools. This allows Grok to augment its thinking with tools like a code interpreter and web browsing in situations that are usually challenging for large language models. When searching for real-time information or answering difficult research questions, Grok 4 chooses its own search queries, finding knowledge from across the web and diving as deeply as it needs to craft a high-quality response.

We also trained Grok to use powerful tools to find information from deep within X. Grok can use advanced keyword and semantic search tools and even view media to improve the quality of its answers.



## Grok 4 Heavy

We have made further progress on parallel test-time compute, which allows Grok to consider multiple hypotheses at once. We call this model Grok 4 Heavy, and it sets a new standard for performance and reliability. Grok 4 Heavy saturates most academic benchmarks and is the first model to score 50% on Humanity's Last Exam, a benchmark "designed to be the final closed-ended academic benchmark of its kind."





Thought for 10 minutes

## Frontier Intelligence

Grok 4 represents a leap in frontier intelligence, setting a new state-of-the-art for closed models on ARC-AGI V2 with 15.9% (nearly double Opus's ~8.6%, +8pp over previous high). On the agentic Vending-Bench, it dominates with $4694.15 net worth and 4569 units sold (averages across 5 runs), vastly outpacing Claude Opus 4 ($2077.41, 1412 units), humans ($844.05, 344 units), and others. Grok 4 Heavy leads USAMO'25 with 61.9%, and is the first to score 50.7% on Humanity's Last Exam (text-only subset), demonstrating unparalleled capabilities in complex reasoning through scaled reinforcement learning and native tool use.



**GPQA**
Science

| | |
|---|---|
| Grok 4 Heavy w/ Python | 88.4 |
| Grok 4 | 87.5 |
| Gemini 2.5 Pro | 86.4 |
| o3 | 83.3 |
| Claude Opus 4 | 79.6 |

**LiveCodeBench (Jan - May)**
Competitive Coding

| | |
|---|---|
| Grok 4 Heavy w/ Python | 79.4 |
| Grok 4 w/ Python | 79.3 |
| Grok 4 | 79 |
| Gemini 2.5 Pro | 74.2 |
| o3 | 72 |

**USAMO 2025**
Olympiad Math Proofs

| | |
|---|---|
| Grok 4 Heavy w/ Python | 61.9 |
| Gemini Deep Think | 49.4 |
| Grok 4 | 37.5 |
| Gemini 2.5 Pro | 34.5 |
| o3 | 21.7 |

**HMMT 2025**
Competitive Math

| | |
|---|---|
| Grok 4 Heavy w/ Python | 96.7 |
| Grok 4 w/ Python | 93.9 |
| Grok 4 | 90 |
| Gemini 2.5 Pro | 82.5 |
| o3 | 77.5 |
| Claude Opus 4 | 58.3 |

**AIME'25**
Competition Math

| | |
|---|---|
| Grok 4 Heavy w/ Python | 100 |
| Grok 4 w/ Python | 98.8 |
| o3 w/ Python | 98.4 |
| Grok 4 | 91.7 |
| o3 | 88.9 |
| Gemini 2.5 Pro | 88 |
| Claude Opus 4 | 75.5 |

**ARC-AGI-2**
Abstraction and Reasoning

| | |
|---|---|
| Grok 4 | 15.9 |
| Claude Opus 4 | 8.6 |
| o3 | 6.5 |
| Gemini 2.5 Pro | 4.9 |

## Grok 4 API

The Grok 4 API empowers developers with frontier-level multimodal understanding, a 256,000 context window, and advanced reasoning capabilities to tackle complex tasks across text and vision. It integrates real-time data search across X, the web, and various news sources via our newly launched live search API, enabling up-to-date, accurate responses powered by native tool use. With enterprise-grade security and compliance—including SOC 2 Type 2, GDPR, and CCPA certifications—the API ensures robust protection for sensitive applications. Grok 4 is coming soon to our hyperscaler partners, making it easier for enterprises to deploy at scale for innovative AI solutions.

## Grok 4 Voice Mode

Speak with Grok in our upgraded Voice Mode, which features enhanced realism,

responsiveness, and intelligence. We introduce a serene, brand-new voice and redesign conversations to make them even more natural.



And now, Grok can see what you see! Point your camera, speak right away, and Grok pulls live insights, analyzing your scene and responding to you in real-time from within the voice chat experience. We are proud to present this model trained in-house, with our state-of-the-art reinforcement learning framework and speech compression techniques.



Enable video during your voice chat and Grok
will look at what it sees when talking to you.

## What's Next

xAI will continue scaling reinforcement learning to unprecedented levels, building on Grok 4's advancements to push the boundaries of artificial intelligence. We plan to expand the scope from verifiable rewards in controlled domains to tackling complex real-world problems, where models can learn and adapt in dynamic environments. Multimodal capabilities will see ongoing improvements, integrating vision, audio, and beyond for more intuitive interactions. Overall, our focus remains on making models smarter, faster, and more efficient, as we drive toward systems that truly understand and assist humanity in profound ways.

App. 76

TRY GROK ON

Web

iOS

Android

Grok on X

PRODUCTS

Grok

API

Grok Enterprise

COMPANY

Company

Careers

Contact

News

RESOURCES

Documentation

Privacy policy

Security

Safety

Legal

Status

# **TAB 7**

https://x.ai/news/grok-4-fast

October 7, 2025 at 12:31 PM EDT

xAI    GROK    API    COMPANY    COLOSSUS    CAREERS    NEWS    TRY GROK

←

SEPTEMBER 19, 2025

# Grok 4 Fast

Pushing the Frontier of Cost-Efficient Intelligence



We're thrilled to present Grok 4 Fast, our latest advancement in cost-efficient reasoning models. Built on xAI's learnings from Grok 4, Grok 4 Fast delivers frontier-level performance across Enterprise and Consumer domains—with exceptional token efficiency. This model pushes the boundaries for smaller and faster AI, making high-quality reasoning accessible to more users and developers. Grok 4 Fast features state-of-the-art (SOTA) cost-efficiency, cutting-edge web and X search capabilities, a 2M token context window, and a unified architecture that blends `reasoning` and `non-reasoning` modes in one model.

## Advancing Cost-Efficient Intelligence

Grok 4 Fast sets a new frontier in cost-efficient intelligence, outperforming Grok 3 Mini across reasoning benchmarks while slashing token costs.

| Benchmark pass@1 | | Grok 4 Fast | Grok 4 | Grok 3 Mini (High) | GPT-5 (High) | GPT-5 Mini (High) |
|---|---|---|---|---|---|---|
| GPQA Diamond | | 85.7% | 87.5% | 79.0% | 85.7% | 82.3% |
| AIME 2025 (no tools) | | 92.0% | 91.7% | 83.0% | 94.6% | 91.1% |
| HMMT 2025 (no tools) | | 93.3% | 90.0% | 74.0% | 93.3% | 87.8% |
| HLE (no tools) | | 20.0% | 25.4% | 11.0% | 24.8% | 16.7% |
| LiveCodeBench (Jan-May) | | 80.0% | 79.0% | 70.0% | 86.8% | 77.4% |

We used large-scale reinforcement learning to maximize the intelligence density of Grok 4 Fast. In our evaluations, Grok 4 Fast achieves comparable performance to Grok 4 on benchmarks while using 40% fewer thinking tokens on average.

**Intelligence Density**  Maximum performance at minimum cost

AIME 2024 (no tools)                    AIME 2025 (no tools)

Grok 4 Fast   Grok 4

App. 78



This 40% increase in Grok 4 Fast's token efficiency, combined with a significantly lower price per token, results in a 98% reduction in price to achieve the same performance on frontier benchmarks as Grok 4. As verified by an independent review from Artificial Analysis, Grok 4 Fast exhibits a state-of-the-art (SOTA) price-to-intelligence ratio compared to other publicly available models on the Artificial Analysis Intelligence Index.



## Native Tool Use with SOTA Search

Grok 4 Fast was trained end-to-end with tool-use reinforcement learning (RL). It excels at deciding when to invoke tools like code execution or web browsing.

For instance, Grok 4 Fast exhibits frontier agentic search capabilities, seamlessly browsing the web and X to augment queries with real-time data. It hops through links, ingests media (including images and videos on X), and synthesizes findings at light speed.

| Benchmark pass@1 | | Grok 4 Fast | Grok 4 | Grok 3 (No Reasoning) |
|---|---|---|---|---|
| BrowseComp | | 44.9% | 43.0% | — |
| SimpleQA | | 95.0% | 94.0% | 82.0% |



| | | 66.0% | 58.0% | 37.0% |
|---|---|---|---|---|
| Reka Research Eval | | | | |
| BrowseComp (zh) | | 51.2% | 45.0% | 10.8% |
| X Bench Deepsearch (zh) | | 74.0% | 66.0% | 27.0% |
| X Browse* | | 58.0% | 53.2% | 20.8% |

*X Browse is an internal benchmark evaluating agent's multihop search and browsing capabilities on X

## Frontier of General Post-training

Grok 4 Fast also establishes a new cost-effective frontier on general domain. We are excited to share Grok 4 Fast's result on LMArena, where it has been privately battle-testing on the Search and Text Arenas.

In LMArena's Search Arena, `grok-4-fast-search` (code name: `menlo`) claims **#1** with **1163** Elo — a commanding margin of **17** over `o3-search`. Its superior reasoning efficiency and intelligence density enable it to surpass much larger models on real-world, search-related tasks.



| Rank (UB) ↑ | Rank (Style Control) ↑↓ | Model ↑↓ | Score ↑↓ | 95% CI (±) ↑↓ | Votes ↑↓ | Organization ↑↓ | License ↑↓ |
|---|---|---|---|---|---|---|---|
| 1 | 3 ↓ | grok-4-fast-search | 1163 ⓘ Preliminary | ±7 | 5,899 | xAI | Proprietary |
| 2 | 1 ↑ | o3-search | 1146 | ±5 | 10,463 | OpenAI | Proprietary |
| 2 | 3 ↓ | gemini-2.5-pro-grounding | 1142 | ±5 | 10,505 | Google | Proprietary |
| 2 | 1 ↑ | gpt-5-search | 1136 | ±5 | 10,391 | OpenAI | Proprietary |
| 2 | 7 ↓ | grok-4-search | 1136 | ±5 | 10,167 | xAI | Proprietary |
| 6 | 3 ↑ | claude-opus-4-search | 1125 | ±5 | 10,487 | Anthropic | Proprietary |
| 6 | 3 ↑ | claude-opus-4-1-search | 1125 | ±5 | 10,320 | Anthropic | Proprietary |
| 6 | 7 ↓ | ppl-sonar-pro-high | 1115 | ±5 | 9,706 | Perplexity | Proprietary |
| 6 | 7 ↓ | ppl-sonar-reasoning-pro-high | 1115 | ±5 | 10,020 | Perplexity | Proprietary |
| 10 | 10 | diffbot-small-xl | 1030 | ±10 | 3,288 | Diffbot | Apache 2.0 |

In LMArena's Text Arena, `grok-4-fast` (code name: `tahoe`) ranks **#8**, performing on par with `grok-4-0709` and highlighting its remarkable intelligence density. Notably, it significantly outperforms peers in its weight class, where all comparable size models rank **18th** or below.



| Rank (UB) ↑ | Model ↑↓ | Score ↑↓ | 95% CI (±) ↑↓ | Votes ↑↓ | Organization ↑↓ | License ↑↓ |
|---|---|---|---|---|---|---|
| 1 | gemini-2.5-pro | 1456 | ±5 | 46,291 | Google | Proprietary |
| 1 | claude-opus-4-1-20250805-thinking-16k | 1449 | ±6 | 14,843 | Anthropic | Proprietary |
| 2 | o3-2025-04-16 | 1441 | ±4 | 46,083 | OpenAI | Proprietary |
| 2 | chatgpt-4o-latest-20250326 | 1441 | ±5 | 35,807 | OpenAI | Proprietary |
| 2 | gpt-4.5-preview-2025-02-27 | 1441 | ±6 | 14,644 | OpenAI | Proprietary |
| 2 | gpt-5-high | 1440 | ±6 | 17,636 | OpenAI | Proprietary |
| 2 | claude-opus-4-1-20250805 | 1438 | ±6 | 23,612 | Anthropic | Proprietary |
| 3 | qwen3-max-preview | 1430 | ±7 | 11,851 | Alibaba | Proprietary |
| 5 | gpt-5-chat | 1430 | ±6 | 14,876 | OpenAI | Proprietary |
| 8 | claude-opus-4-20250514-thinking-16k | 1421 | ±5 | 30,101 | Anthropic | Proprietary |
| 8 | grok-4-fast | 1421 ⓘ Preliminary | ±11 | 3,144 | xAI | Proprietary |
| 8 | grok-4-0709 | 1420 | ±5 | 23,994 | xAI | Proprietary |
| 8 | qwen3-235b-a22b-instruct-2507 | 1419 | ±5 | 21,971 | Alibaba | Apache 2.0 |
| 9 | deepseek-v3.1 | 1417 | ±6 | 13,851 | DeepSeek | MIT |

Here are some examples of Grok 4 Fast in action:



Path of Exile    X Search    Research

App. 80

What is the maximum number of experience points possible in Path of Exile 2?

💡 Thought for 24 seconds

**Investigating game details**

The request is about finding the maximum experience points in Path of Exile 2.

Path of Exile 2 is an action RPG, possibly still in early access as of September 10, 2025.

🔍 Searching for maximum exp...    SHOW ENTIRE TRACE

Ø **4,250,334,444**

In Path of Exile 2, the maximum character level is 100, which requires a total of 4,250,334,444 experience points (XP) to reach from level 1. This value is the cumulative sum of XP needed for each level-up, based on the game's fixed experience table (identical to the original Path of Exile). After reaching level 100, additional XP can still be earned but does not grant further levels or meaningful progression.

To arrive at this total, the game's experience system uses a predefined table where each level requires progressively more XP. The "total XP" for level 100 is the sum of all XP thresholds from level 1 to 100. Here's how it's calculated step by step:

1. **Understand the XP structure:** Each level has an XP requirement to advance to the next (e.g., level 1 to 2 requires 525 XP). The total for a given level is the running sum of these requirements up to that point. Level 1 starts at 0 XP.
2. **Reference the experience table:** The official Path of Exile 2 data sources provide the full table. For example:
   - Level 2: 525 total XP (525 to gain from level 1).
   - Level 3: 1,760 total XP (1,235 to gain from level 2).
   - ...and so on, up to level 100.
3. **Sum the requirements:** Add up the XP needed for all 99 level-ups (from 1 to 100). This can be computed programmatically or from the table's cumulative values, yielding 4,250,334,444.

## Unified Model: Reasoning and Non-Reasoning

Previously, separate reasoning modes required distinct models. Grok 4 Fast introduces a unified architecture where `reasoning` (long chain-of-thought) and `non-reasoning` (quick responses) are handled by the same model weights, steered via system prompts. This unification reduces end-to-end latency as well as token costs, making Grok 4 Fast ideal for real-time applications.

In grok.com, this results in smooth transitions: responding instantly for simple queries or engaging in extended reasoning for complex ones. In the xAI API, developers can fine-tune this behavior, optimizing for speed or depth.

## Grok 4 Fast in grok.com, iOS, and Android apps



Ø  Open
Grok.com      Open
Grok on iOS      Open
Grok on Android

Grok 4 Fast is available now for all users. In `Fast` and `Auto` modes, you will see a significant improvement in search and information seeking queries. Additionally, difficult queries in `Auto` mode will use Grok 4 Fast, which will provide a much faster experience without loss of quality. For the first time, all users, including free users, will have access to our latest model without restrictions, marking a step toward democratizing advanced AI.

## Grok 4 Fast on OpenRouter, Vercel AI Gateway, and the xAI API

For a limited time, Grok 4 Fast will be available for free on OpenRouter and Vercel AI Gateway.

We're also rolling out Grok 4 Fast as two models: `grok-4-fast-reasoning` and `grok-4-fast-non-reasoning`, each with a 2M token context window. This allows developers to tune the amount of test-time compute applied to their use cases.

`grok-4-fast-reasoning` and `grok-4-fast-non-reasoning` are generally available via the xAI API according to the following pricing:

| Token Type | <128k tokens | ≥128k tokens |
|---|---|---|

| | | |
|---|---|---|
| Input tokens | $0.20 / 1M | $0.40 / 1M |
| Output tokens | $0.50 / 1M | $1.00 / 1M |
| Cached input tokens | | $0.05 / 1M |

## What's Next

We will continuously ship model improvements to Grok 4 Fast based on your feedback on x.com. Stay tuned for further integrations, including enhanced multimodal capabilities and agentic features.

Read the Grok 4 Fast model card here.

That's all for now - so long, and thanks for all the fish!

| TRY GROK ON | PRODUCTS | COMPANY | RESOURCES |
|---|---|---|---|
| Web | Grok | Company | Documentation |
| iOS | API | Careers | Privacy policy |
| Android | Grok Enterprise | Contact | Security |
| Grok on X | | News | Safety |
| | | | Legal |
| | | | Status |

App. 82

# **TAB 8**



**Xfinity's New Internet Plans**

Xfinity launches new everyday price plans nationwide – now all Xfinity Internet packages have simple, predictable pricing.

SPONSORED BY COMCAST

Learn More

# FORTUNE

☰  Search

Home    News    Fortune 500    Tech    Finance    Leadership    Lifestyle    Rankings    Multimedia

AI · OPENAI

# OpenAI plans to build 5 giant U.S. 'Stargate' datacenters, a $400B challenge to Meta and Microsoft in the relentless AI arms race

 BY SHARON GOLDMAN
AI REPORTER

September 23, 2025 at 5:06 PM EDT



Set in West Texas's Big Country, the Stargate data center in Abilene became the stage for OpenAI and Oracle's expansion announcement.

▶  **Listen to the article now**
00:00 ————————— 08:19

Powered by: Trinity Audio

In Abilene, Texas—in the heart of what locals call the Big Country, long defined by ranching, farming, shale oil exploration, and now dotted with wind turbines—OpenAI and Oracle staged a carefully crafted media showcase on Tuesday to talk about the latest boom underway. Throngs of journalists from across the country were escorted by police to a half-completed 800-acre data center complex, guided through halls packed with tens of thousands of state-of-the-art Nvidia GPUs, and greeted by the company CEOs and by policymakers including Texas Senator Ted Cruz.

## Recommended Video



The event was a victory lap of sorts, as OpenAI CEO Sam Altman and Oracle's new co-CEO Clay Magouryk pushed back against critics who have questioned the progress of their high-profile and ambitious "Stargate" AI infrastructure project.

At Tuesday's event, the two companies, joined by Japan's SoftBank, announced a big step forward for Stargate, touting an expansion of the Abilene site, as well as plans to build five massive, new data center complexes across the U.S. over the next several years. Altogether, the initiative calls for hundreds of billions of dollars of investment in a project of a mind-boggling scale. In Abilene alone, a crew of 6,400 workers have already moved massive amounts of soil to flatten the hills, and laid down enough fiber optic cable to wrap the Earth 16 times.

PATH TO SUCCESS
LEARN MORE

"We cannot fall behind in the need to put the infrastructure together to make this revolution happen," OpenAI's Altman said during a Q&A with reporters. "What you saw today is just like a

small fraction of what this site will eventually be, and this site is just a small fraction or building, and this project will be enough to serve tens of Quintillion," he said. He meant OpenAI's flagship AI product.

The buildout attests to the towering expectations surrounding AI, as tech companies like OpenAI, Alphabet, Microsoft, and Meta race to put in place the infrastructure necessary to power their latest large language models. In July, Meta CEO Mark Zuckerberg said the company would spend hundreds of billions of dollars building a network of data centers with names like Prometheus and Hyperion to create "superintelligence."



SHARON GOLDMAN

Abilene, as well as the newly-announced data centers, are all part of the Stargate project, a half-trillion-dollar joint initiative that OpenAI unveiled in January that aims to create a nationwide backbone for training its ever-larger AI models. Stargate has been touted as a public–private partnership with the Trump administration—part of a bid to keep AI compute infrastructure in the U.S. and push projects past regulatory hurdles.

"Message number one: America will beat China in the race for AI," Texas Senator Ted Cruz proclaimed at the event.

Other guests and speakers included Congressman Jodey Arrington, and local dignitaries including the mayor of Abilene and even a county judge. Each emphasized Texas' appeal as a hub for AI infrastructure. "Sam, Clay, welcome to Silicon Prairie," Arrington said on stage, referring to the CEOs of OpenAI and Oracle.

The five new Stargate projects—in Texas, New Mexico, Ohio, and in an undisclosed Midwest location—will bring Stargate's current pipeline to nearly 7 gigawatts and more than $400 billion in investment over the next three years. In the data center world, "gigawatts" are shorthand for how much electricity a facility can draw—and therefore how much AI compute it can deliver. A 1-gigawatt facility, for instance, requires enough substations, cooling, and transmission to sustain the power demand of nearly a million homes.



Check out why Zoom is named in the 2025 Gartner® Magic Quadrant™ for CCaaS

Read the report   zoom

Until recently, the data center facilities owned and operated by the largest cloud computing companies—the so-called hyperscalers—topped out at a few hundred megawatts. But Microsoft and Meta have recently unveiled multi-gigawatt projects in Wisconsin and Louisiana.

And in a sign of the ever-increasing stakes in AI arms race, OpenAI and its partners promised Tuesday to reach a 10-gigawatt, $500 billion target by the end of 2025—ahead of schedule. Oracle pointed out that the campus in Abilene, Texas is already up and running on Oracle Cloud Infrastructure (OCI), continues to progress rapidly, and is on track to provide OpenAI with the "world's largest supercluster" when fully built.

## A network of gigawatt data centers

Tuesday's announcement included an expansion in Abilene on another site which will draw 600 megawatts—enough to power roughly 450,000–600,000 homes' worth of electricity demand, which is about four times the actual population of Abilene. The new projects—in Texas, New Mexico, Ohio, and in an undisclosed Midwest location—will bring Stargate's current pipeline to nearly 7 gigawatts and more than $400 billion in investment over the next three years.

Three of the new sites will be built with Oracle, expanding a July deal to develop up to 4.5 gigawatts of capacity worth more than $300 billion over five years. Two others — in Lordstown, Ohio, and Milam County, Texas — will be developed with SoftBank, which has promised "fast-build" facilities that can scale quickly to multiple gigawatts. The five sites emerged from a January site-selection contest that drew more than 300 proposals from 30 states, underscoring how aggressively local governments courted the Stargate project.

But Stargate's expansion is certain to draw criticism on multiple fronts. In Abilene and other communities hosting mega AI data centers, residents and activists worry about the trade-offs: billions in tax abatements, the risk of gas-fired generation worsening local air quality, and the likelihood that permanent jobs will number far fewer than the headlines suggest. National energy analysts, meanwhile, warn that multi-gigawatt campuses could strain fragile power grids and lock in huge new demands for water and fossil fuels at a time when utilities are already struggling to keep up with AI's growth.

For example, the planned Stargate site in Dona Ana County, New Mexico has garnered mixed reactions, with opponents raising concerns about water usage and pollution, arguing these issues outweigh the economic benefits. According to a county presentation, the project will bring 800

permanent jobs and 2,500 construction jobs over three years.



The Stargate plans were unveiled amid ongoing debate about whether overheated expectations about AI were creating an industry bubble that will eventually burst. Asked about the risk, Altman said that he fully expects there will be "booms and busts" related to AI. But, he said, "over the arc that we have to plan over, we are confident that this technology will drive a new way of unprecedented economic growth, and not just economic growth, but people's lives much better."

The day before the event, Nvidia, the leading AI chipmaker, pledged to invest up to $100 billion into OpenAI's infrastructure. Under the terms of letter of intent announced on Monday, Nvidia will contribute GPU-powered systems capable of drawing up to 10 gigawatts of electricity — the equivalent demand of 7 to 10 million homes.

Citing the Nvidia deal at Tuesday's event, Altman said the most significant piece of the announcement wasn't just the new sites but the financing model behind them. Rather than paying billions for chips up front, OpenAI will be able to spread those costs over time as revenue scales.

"We can kind of like pay as we go, like what's on cloud services," he said. "The chips are a humongous percentage of the capex, and it's harder for us to pay for that all up front, because our revenue comes in over the many months that customers run service among those chips. So that really helps projects like this."

But when it came to OpenAI's energy demands, Senator Ted Cruz cast the stakes in both geopolitical and local terms. "Texas is ground zero for AI," he added. "What do you want when you're building AI data centers? Number one, you want abundant, low-cost energy. Welcome to the great state of Texas."

**Fortune Global Forum** returns Oct. 26–27, 2025 in Riyadh. CEOs and global leaders will gather for a dynamic, invitation-only event shaping the future of business. Apply for an invitation.

## About the Author



**SHARON GOLDMAN**
AI Reporter



Sharon Goldman is an AI reporter at *Fortune* and co-authors Eye on AI, *Fortune*'s flagship AI newsletter. She has written about digital and enterprise tech for over a decade.

SEE FULL BIO >

## Sponsored Stories



**Buy the Dip: 5 AI Stocks With Strong Growth Potential**
Discover 5 AI stocks with strong ratings and growth...
SeekingAlpha.com



**Experts think this could be like buying Amazon at $0.77.**
The Motley Fool



**7 Cards Charging 0% Interest Until Nearly 2027**
NerdWallet



**District Of Columbia Drivers With No DUI's Getting A Pay Day On Monday**
Are you being overcharged by your insurance company? Ta...
Comparisons.org



**AI Issues "3-Day Notice" That Could Impact Your Stock Portfolio**
Revolutionary neural network processes 630 data points pe...
VantagePoint



**The 7 Things I Wish I Knew Before Rescuing My Dog**
Online Shopping Tools







# **TAB 9**

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 88 of 172    PageID 460

Making Dallas an
Even Better Place

Oct 6, 2025
Dallas, TX
● 69° F

Menu                                                                    Subscribe    🔍

Business

# North Texas Is the Country's New Semiconductor Manufacturing Capital

Development may be softening in some DFW suburbs, but the U.S. 75 corridor north of McKinney is taking off.

By Brandon J. Call    |    September 6, 2022    |    2:48 pm    |    Images Courtesy of City of Anna and Megatel



**Boom Town** Anna's population has more than doubled in the last decade—and it is poised to see even more growth.



It's being compared to Silicon Valley. Some have dubbed it Silicon Alley—or more aptly, Silicon Prairie. And if you haven't already bought land for development along the 30-mile stretch of U.S. 75 north of McKinney to Sherman, you're facing skyrocketed land prices.

In a tale that's similar to what happened with the suburbs of Plano, Frisco, and Richardson some 20 to 30 years ago, the once sleepy towns of Anna, Melissa, Sherman, and Van Alstyne are becoming the new hotbed for the region's growth, with the promise of an estimated 4,500 jobs coming to the area within the next five years.

App. 88

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 89 of 172    PageID 461

Last November, Texas Instruments announced that it would build a $30 billion, 4.7-million-square-foot semiconductor fabrication plant in Sherman—the largest electronic production facility in the state and among the biggest manufacturing facilities in the country. Fending off a bid to bring the plant to Singapore, the town with a population of 44,873 located about 60 miles north of Dallas landed its big fish, bringing with it a projected 3,000 jobs that will pay an average of $55,000 per year. TI broke ground on the first two phases of the project in May and is expected to begin delivering products from its Sherman plants by 2025.

---

**Portfolio**

Major Projects at a Glance

**Texas Instruments**

The hometown icon is planning four 300-millimeter semiconductor wafer fabrication plants in Sherman. The new manufacturing facilities will produce millions of analog and embedded processing chips that go into electronics.

**GlobiTech**

A subsidiary of Taiwan-based Global Wafers Co., GlobiTech was founded by three former TI employees. The new $5 billion Sherman facility will create 1,500 jobs and represents the first new silicon wafer facility to open in the United States in two decades.

**Anacapri**

The Anacapri housing development in Anna, located west of Anna High School, is a lagoon-anchored, 1,239-home development that will cost approximately $800 million. In addition to the crystal lagoon, it will include two beaches—one that is open to the public—as a tourist draw for the area.

---

Just about a month later, in June, global semiconductor manufacturer GlobiTech awarded its $5 billion, 1,500-job project to Sherman, too. To lure GlobiTech's semiconductor plant, the Sherman Economic Development Corp. offered $20 million in cash payments and the sale of nearly 150 acres of land worth more than an estimated $14.4 million. The Texas Enterprise Fund added an additional $15 million grant to the incentive package. Meanwhile, the city of Sherman, Grayson County, and Grayson College offered tax incentives and discounted utilities. The global semiconductor manufacturer was also considering sites in Ohio and South Korea before choosing to make North Texas its permanent home.

"These are once-in-a-lifetime projects for our region," says Kent Sharp, president of the Sherman Economic Development Corp. "You work your

App. 89

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 90 of 172    PageID 462

entire career in economic development with the hopes of being part of a deal that has a 'B' in front of it—and we've landed two in the past year."

## Rooftops and Residents

Homebuilders have taken notice of the flurry of semiconductor projects coming soon to Sherman—and it is having a ripple effect for towns along the Highway 75 corridor. "Anna is one of the fastest-growing towns in North Texas, and we're proud to be a part of the positive growth story there," said Mehrdad Moayedi, president and CEO of Farmers Branch-based Centurion American, when he broke ground on the Villages of Hurricane Creek development earlier this year. Phase one of the project is underway and, in total, will include 1,794 single-family lots, 400 multifamily units, and 60,000 square feet of new commercial development.

Anacapri by Megatel is another housing project that broke ground earlier this year. Announced in October 2021, the $800 million development includes 1,239 single-family homes, 600 multifamily units, and a 2.3-acre crystal lagoon. Megatel has sold every phase one lot in the forthcoming development.



**Blue Lagoon** Anna is the latest city in North Texas to join the lagoon craze with the new Anacapri development.

National homebuilders are getting in on the action, too. Construction is set to commence later this year on Bloomfield Homes' Crystal Park in Anna, which includes 981 single-family lots and 82 acres of mixed-use. D.R. Horton plans 942 single-family lots and 600 multifamily units at its new The Woods at Lindsey Place development in Anna. And Meritage Homes will add 456 homes at Wolf Creek Farms, The Quarry at Stoneridge, and Bryant Farms in Melissa.

It all adds up to more residents making the Highway 75 corridor home. According to the most recent U.S. Census Bureau population estimates, Melissa has seen 21.8 percent population growth since 2020, growing from 13,941 to an estimated 16,983. For Anna, its population is up 19.5 percent from 16,935 to 20,243. Sherman has added more than 6,000 residents in the last two years, seeing its population balloon from 38,521 at the 2010 census to its current population estimate of 44,873.

App. 90

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 91 of 172    PageID 463

Though its neighbors to the south, McKinney and Frisco, have seen double-digit drops in homebuilding permits in the first half of 2022, Anna's residential permits are up 15 percent for 635 permits this year. Meanwhile, Melissa saw a 2 percent gain at mid-year over a year ago, with 522 total permits. Sherman's housing permits have more than doubled, from 154 in June of 2021 to 316 permits at the halfway point of 2022.

And there are few signs of slowing, says Anna's economic development director Joey Grisham. As Texas Instruments and GlobiTech complete their initial phases in the coming years, he expects to see spinoff companies, suppliers, and customers from these two giants move to the area, similar to what happened with TI in Dallas and Richardson in decades prior.

"My phone has been ringing off the hook with interest," Grisham says. "It's definitely an exciting time for the Dallas-Fort Worth region as a whole—and there's no better time than now to do business in north Collin County."

---

### Author



**Brandon J. Call**

**View Profile** ⟶

Brandon J. Call is the former executive editor for *D CEO* magazine. An award-winning business and data journalist, Call previously served as data editor for the *Dallas Business Journal* and research director for *Albuquerque Business First*. Prior to that, he held various editorial posts at *Albuquerque The Magazine* and *New Mexico Magazine*.

Texas Instruments



# Get the D CEO Newsletter

Stay up to speed on DFW's fast-moving business community with weekly news reports, interviews, and insights.

Email*                                    Sign Up

App. 91

## Billion Acquisition of Mr. Cooper Closes

es Pieces Technologies and Village Homes of Fort Worth set to file for



## Father of Aerobics

an founded a fitness empire in North Dallas, but his wellness revolution
t is today.



Case 4:25-cv-00914-P     Document 46     Filed 10/08/25     Page 93 of 172     PageID 465

o Host Inaugural Summit, Pitch Competition in Dallas

on Illian, and AT&T's Michael Peterson will headline the three-day event,
that lead with mission and impact.



---

**D Magazine Directories**

Find what you're looking for



Attractions



Bars and
Clubs



Shops



Restaurants

View all Directories

---

Advertisement

Advertisement

App. 93



Buy This Issue

Get a Print Subscription

Give a Gift

Manage Your Subscription

View Our Other Titles

S U B S C R I B E   N O W

# Get The D Brief Newsletter

Dallas' most important news stories of the week,
delivered to your inbox each Monday.

| Email* | Sign Up |



## Making Dallas an Even Better Place

750 North St. Paul St. Suite 2100 Dallas, Texas 75201
**Tel:** 214.939.3636  **Fax:** 214.748.4579

**About**
About Us
Our History
Careers
Internships
Masthead
Contact Us
Newsletters

**Magazines**
D Magazine
D CEO
D Home
D Weddings
Subscribe
Browse the Archives
Shop Back Issues
Manage Subscription

**Advertise**
Advertise with Us
Reprints
Plaques
D Custom

**Best Lists**

**Guides**

App. 94

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 95 of 172    PageID 467

| | |
|---|---|
| Best Restaurants Right Now | Travel Guide |
| The Ultimate Bar Guide | Things to Do This Weekend |
| Best BBQ | Concert Calendar |
| Best Pizza | 55 Date Ideas |
| Best Burgers | Newcomer's Guide |
| Best Brunches | D Home Room Guide |
| Best Indian Restaurants | Texas Bill Tracker |
| Best Italian Food | Outdoor Guide |
| Best Fried Chicken | Ultimate Guide to the State Fair of Texas |



Copyright © 2025, D Magazine Partners, Inc.
All Rights Reserved.

Privacy Policy

App. 95

**TAB 10**

https://fortworthedp.com/fort-worth-lands-adom-industries-229m-ai-native-cloud-factory-and-hq/

October 6, 2025 at 3:27 PM EDT

ABOUT    SERVICES    NEWS    CONTACT    **WHY FORT WORTH**

# FORT WORTH LANDS ADOM INDUSTRIES' $229M AI-NATIVE CLOUD FACTORY AND HQ

AUGUST 13, 2025    |    NEWS

*The Fort Worth City Council unanimously approved $15 million in incentives Tuesday night as founder John Lauer commits to making Fort Worth home for what he calls the world's first cloud-connected electronics prototyping facility. "This is going to completely revolutionize the electronics industry," he says.*



*From left: Kelly Baggett, Fort Worth Innovation Coordinator; District 10 Councilmember Alan Blaylock; John Lauer, Founder and CEO of Adom Industries; City Manager Jay Chapa; and Michael Hennig, Economic Development Manager, in chambers after Fort Worth City Council unanimously approved $15 million in incentives for Adom's $229 million cloud-connected electronics factory Tuesday night.*

by Quincy Preston in Dallas Innovates | Aug. 13, 2025
**It's official: Adom Industries is planting roots in Fort Worth.**

After a unanimous City Council vote on Aug. 12 approving $15 million in incentives, Adom founder John Lauer says it's "full steam ahead" on making the city the home of his $229 million headquarters-and-factory project.

"We are ready to plant our tree roots there and let those roots grow as deep as the Trinity aquifer," Lauer told Dallas Innovates after Tuesday's vote, noting the startup remains in stealth mode.

The decision capped a competitive site search in which Fort Worth emerged as a leading contender, alongside locations including Arizona, Tennessee, and Oklahoma. Lauer said those options were still under consideration until the council's vote.

It's a notable win for a city working to expand its semiconductor and advanced manufacturing profile—and for an entrepreneur with a track record of building and scaling.

Lauer previously co-founded Zipwhip, the business texting pioneer that Twilio acquired in 2021 in a deal worth $952 million at closing. "Adom," he says, "should be even bigger."

### Bringing 'Shenzhen Speed' to the U.S. in Fort Worth

Adom Industries is building what Lauer calls the world's first cloud-connected electronics prototyping factory. "We're a data center to a large degree," he said, "but for atoms, not bits."

The concept allows engineers anywhere in the world to design, test, and prototype electronics remotely while robots in Fort Worth handle the physical work—then ship prototypes nationwide, "overnight, when they need their prototype boards."

The facility will sit in North Texas' logistics corridor, near Alliance and DFW airports, part of what drew Lauer to the region along with competitive electricity costs.

His technology aims to solve a fundamental time problem: "What takes minutes in software takes months in hardware." Today, many hardware engineers still travel to Shenzhen, China, to access dense supply chains and rapid-prototyping capacity.

Adom's cloud-connected factory aims to compress those months-long development cycles into near real-time processes, with engineers working from their laptops while AI-connected robots handle testing and production at the Fort Worth facility.

"This will be one of the most high-tech factories in the world," Lauer said in an earlier interview with Dallas Innovates.

### Motion carries: 11 Yea, 0 Nay

At Tuesday's council meeting, District 10 City Councilmember Alan Blaylock praised the project's potential impact. "I'm thrilled to move to approve this agreement to bring Adom Industries to Fort Worth," he said. "Adom

App. 97

will develop and expand microelectronic prototyping in Fort Worth and create a semiconductor fabricating facility accessible to a wide range of users.

Blaylock told the council, "More R&D activity will boost our GDP, attract specialized talent, [and] create opportunities for other companies that strengthen industry here," as he welcomed Lauer during the proceedings.

"You've been a real trooper, sticking out this whole meeting," Blaylock added, noting that the Adom vote came as the very last agenda item of the night. "But I think this is a high note to finish on."

Councilmember Macy Hill, who seconded the motion, congratulated Lauer, who noted it was his first Fort Worth City Council meeting.

Following the vote, city innovation coordinator Kelly Baggett, who works on Fort Worth's economic development innovation project, confirmed that the council's approval landed the deal to bring Adom's headquarters-and-factory project to Fort Worth.

District 10 City Councilmember Blaylock added in an emailed statement that the Economic Development Program Agreement "supports a cutting-edge project and positions Fort Worth at the forefront of technological innovation.

"I look forward to welcoming Adom Industries, the world's first AI native cloud factory, to North Fort Worth, and I'm excited to see their platform revolutionize the microelectronics industry."

## $15M in performance-based grants

The approved incentive package provides up to $15 million in performance-based grants over 15 years, tied to Adom's commitment to create 267 jobs with an average salary of $91,000 and invest more than $240 million in research and development.

Adom plans to expand over four phases from 2027 to 2033, starting with its current Alliance Texas location at 4400 Alliance Gateway Freeway and growing into additional Fort Worth facilities.

The company is also seeking $20 million from the Texas Semiconductor Investment Fund and $10 million from the National Science Foundation to support the project.

Lauer envisions customers ranging from defense contractors and major semiconductor companies like Texas Instruments to healthcare firms, startups, and universities seeking cloud-based access to expensive testing equipment.

Read our in-depth profile for more on the deal, how Adom's technology works, and what it means for electronics manufacturing,

Content retrieved from: https://dallasinnovates.com/fort-worth-lands-adom-industries-229m-ai-native-cloud-factory-and-hq/.



# **TAB 11**

## *Nvidia partner Wistron confirms Fort Worth supercomputer plants, $750 million-plus investment*

Dallas Business Journal (Texas)

August 21, 2025 Thursday

Copyright 2025 American City Business Journal, Inc. All Rights Reserved

# Dallas Business Journal

**Length:** 606 words

**Byline:** Seth Bodine

## Body

Wistron Corp., a Taiwanese company partnering with Nvidia to assemble supercomputers, has officially confirmed that it will establish a huge base in Fort Worth - where it plans to spend hundreds of millions of dollars and hire nearly 900 employees across a pair of sites.

Wistron's U.S. subsidiary, Wistron Infocomm USA, has quietly been purchasing land and *securing tax breaks on the city and county level* for the past few months as the company prepares to partner with Nvidia Corp. (Nasdaq: NVDA) on a $500 billion initiative to build artificial intelligence infrastructure. Other companies involved in the effort include Foxconn and TSMC.

Wistron announced Aug. 21 that the two Fort Worth plants represent a $761 million investment - about $100 million more than initially presented during meetings of Fort Worth City Council. The company eventually plans to hire 888 employees, according to city and county presentations.

Wistron *purchased two sites* for the factories in June and July: the 766,994-square-foot Westport 14 at 14601 Mobility Way, which it purchased from Hillwood, and a 324,598-square-

foot building from Trammell Crow. Co. called 35 Eagle at 15200 Heritage Pkwy. Wistron has deemed the former Trammell Crow building as its primary site and allocated $580 million for land acquisition, factory purchase, property improvements and equipment. The company is allocating $181 million for the former Hillwood building. Both sites are expected to open in early 2026.

Wistron is an original design manufacturer - a company that manufactures technology for other businesses. It is considered one of the largest technology manufacturing companies in the world. Originally part of Acer Inc., Wistron spun off in 2001.

Jackie Lai, Wistron's senior vice president of global manufacturing for American and European operations, outlined the importance of the factories as it continues to expand artificial intelligence-related product capabilities.

"Establishing manufacturing operations in the United States is a critical step in meeting the needs of our customers and advancing our global vision," he said. "After a thorough evaluation of key factors such as talent availability, robust logistics infrastructure and a vibrant industrial ecosystem, Fort Worth, Texas, emerged as the optimal choice."

Ross Perot Jr., chairman of Hillwood and Perot Companies, said Wistron's entry into North Texas is indicative of the larger effort to bring more manufacturing to the U.S.

"Wistron's decision arrives at an opportune moment when reshoring is redefining America's industrial future, with AllianceTexas at the forefront of this movement. With a skilled and growing workforce available and backed by strong support from the City of Fort Worth, Denton County, the State of Texas and our private-sector partners, Wistron will find the support and resources it needs to succeed. We look forward to the economic impact and innovation this project will bring," Perot said in a statement.

It's a full circle moment for the area. In the late 1990s, *Intel Corp.* planned to locate a chip manufacturing plant in the area. Intel spent around $65 million to develop the site but suspended

App. 101

construction in 1998 and ultimately decided to sell the 524 acres instead of constructing a $2 billion manufacturing facility.

Other major manufacturing efforts happening in north Fort Worth include MP Materials' rare earth magnet factory, which secured a *$500 million partnership* with Apple, part of a larger push by the iPhone maker to *produce more in the United States*.

Did you find this article useful? Why not *subscribe* to Dallas Business Journal for more articles?

**Load-Date:** August 21, 2025

---

**End of Document**

App. 102

# **Tab 12**



# **TAB 13**



# **TAB 14**



# **TAB 15**



**TAB 16**



App. 112

**TAB 17**



# **TAB 18**

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 116 of 172    PageID 488



**Personal Branding**
Online Certificate Course

Harvard Business School Online

Learn More →

Advertisement

# OpenAI shows off Stargate AI data center in Texas and plans 5 more elsewhere with Oracle, Softbank



Ad removed. Details

Advertisement

**AP**  Updated: 5:27 PM PDT Sep 23, 2025    **Editorial Standards** ⓘ

By MATT O'BRIEN AP Technology Writer

**ABILENE, Texas** — The afternoon sun was so hot that OpenAI CEO Sam Altman traded his usual crewneck sweater for a T-shirt on the last legs of a Tuesday visit to the massive Stargate artificial intelligence data center complex that will power the future of ChatGPT.

OpenAI announced Tuesday that its flagship AI data center in Texas will be joined by five others around the U.S. as the ChatGPT maker aims to make good on the $500 billion infrastructure investment promoted by President Donald Trump earlier this year.



Stargate, a joint venture between OpenAI, Oracle and Softbank, said it is building two more data center complexes in Texas, one in New Mexico, one in Ohio and another in a Midwest location it hasn't yet disclosed.

But it's the project in Abilene, Texas, that promised to be the biggest of them all, transforming what the city's mayor called an old railroad town.



**Everything you need to know about Stargate, the massive AI infrastructure initiative**

Advertisement

Oracle executives who visited the eight-building complex said it is already on track to be the world's largest AI supercluster once fully built, a reference to its network of hundreds of thousands of AI chips that will be running in its massive, H-shaped buildings.

Altman said, "When you hit that button on ChatGPT, you really don't — I don't, at least" — think about what happens inside the data halls used to build and operate the chatbot.

He and Oracle's new co-CEO Clay Magouyrk also sought to emphasize the steps they've taken to reduce the energy-hungry complex's environmental effects on a drought-prone region of West Texas, where temperatures hit 97 degrees Fahrenheit (36 degrees Celsius) on Tuesday.

"We're burning gas to run this data center," said Altman, but added that "in the long trajectory of Stargate" the hope is to rely on many other power sources.

The complex will require about 900 megawatts of electricity to power the eight buildings and their hundreds of thousands of specialized AI chips.

One of the buildings is already operating, and a second that Altman and Magouyrk visited Tuesday is nearly complete. Each server rack in those buildings holds 72 of Nvidia's GB200 chips, which are specially designed for the most intensive AI workloads. Each building is expected to have about 60,000 of them.

More than 6,000 workers now commute to the massive construction project each day, in what Mayor Weldon Hurt described as a significant boost to the local economy. The campus and nearby expansion will provide nearly 1,700 jobs onsite when fully operational, Oracle said, with "thousands more indirect jobs" predicted to be created.

 **Attorneys general warn OpenAI and other tech companies to improve chatbot safety**

Hand-made signs lining the roads to the center market "move-in-ready" homes for workers.

"AI WORKERS? HUGE DISCOUNTS" says one promising homes with one to six bedrooms.

But Hurt also acknowledged that residents have mixed feelings about the project due to its water and energy needs.

The city's chronically stressed reservoirs were at roughly half-capacity this week. Residents must follow a two-day-a-week outdoor watering schedule, trading off based on whether their address numbers are odd or even.

One million gallons of water from the city's municipal water systems provides an "initial fill" for a closed-loop system that cools the data center's computers and keeps the water from evaporating. After that initial fill, Oracle expects each of the eight buildings to need another 12,000 gallons per year, which it describes as a "remarkably low figure for a facility of this scale."

"These data centers are designed to not use water," Magouyrk said. "All of the data centers that we're building (in) this part of Stargate are designed to not use water. The reason we do that is because it turns out that's harmful for the environment and this is a better solution."

The closed-loop system shows that the developer is "taking its impact on local public water supplies seriously," but the overall environmental effect is more nuanced because such systems require more electricity, which also means higher indirect water usage through power generation, said Shaolei Ren, a professor at the University of California, Riverside, who has studied AI's environmental toll.

Indeed, the data center complex includes a new gas-fired power plant, using natural gas turbines similar to those that power warships. The companies say the plant is meant to provide backup power for the data halls and is a better option than traditional diesel generators. Most of the power comes from the local grid, sourced from a mix of natural gas with the sprawling wind and solar farms that dot the windy and sunny region.

Ren said that "even with emission-reduction measures, the health impacts of essentially turning the data center site into a power plant deserve further study for nearby communities."

Arlene Mendler, a Stargate neighbor, said she wished she had more say in the project that eliminated a vast tract of mesquite shrubland, home to coyotes and roadrunners.

"It has completely changed the way we were living," said Mendler, who lives across the street. "We moved up here 33 years ago for the peace, quiet, tranquility. After we got home from work, we could ride horses down the road. It was that type of a place."

Now, she doesn't know what to do about the constant cacophony of construction sounds or the bright lights that have altered her nighttime views. The project was essentially a done deal once she found out about it.

"They took 1,200 acres and just scraped it to bare dirt," said her husband, Fred Mendler.

The first time most residents heard of Stargate — at least by that name — was when Trump announced the project shortly after returning to the White House in January. Originally planned as a facility to mine cryptocurrency, developers had pivoted and expanded their designs to tailor the project to the AI boom sparked by ChatGPT.

The partnership said at that time it was investing $100 billion — and eventually up to $500 billion — to build large-scale data centers and the energy generation needed to further AI development. More recently, OpenAI signed a deal to buy $300 billion of computing capacity from Oracle. It's a huge bet for the San Francisco-based AI startup, which was founded as a nonprofit.

OpenAI and Oracle invited media and politicians, including U.S. Sen. Ted Cruz, a Texas Republican, to tour the site for the first time Tuesday.

Cruz called Texas "ground zero for AI" because if "you're building a data center, what do you want? No. 1, you want abundant, low-cost energy."

 **AI Apocalypse? Why language surrounding tech is sounding increasingly religious**

Of the other five Stargate data center projects announced Tuesday, Oracle is working with OpenAI to build one just northeast of Abilene, in Shackelford County, Texas, and another in New Mexico's Doña Ana County. It also said it is working to build one in the Midwest.

Softbank said it has broken ground on two more in Lordstown, Ohio, and in Milam County, Texas.



KCRA WEATHER — Latest Forecast

79°F SUNNY FEELS LIKE 79°F

HOURLY   DAILY

1 PM 79° /0%   2 PM 80° /0%   3 PM 82° /0%   4 PM 84° /0%   5 PM 84° /0%

RADAR   TRAFFIC

PAST   3:30 PM

RECOMMENDED

Blaze consumes home of South Carolina judge and former state senator; investigation underway

A new rule means some 401(k) contributions will no longer be tax-deferred. Here's who will be affected

At least 5 people were killed in a large-scale Russian attack on Ukraine

Government shutdown: How many federal employees will be furloughed?



Learn more

Advertisement

The projects offer OpenAI a way to break out from its longtime partnership with Microsoft, which until recently was the startup's only development partner. Altman told the audience that the company has been "severely limited for the value we can offer to people."

"ChatGPT is slow. It's not as smart as we'd like to be. Many users can't use it as much as they would like," Altman said. "We have many other ideas and products we want to build."

Share   🔗

Infinite Scroll Enabled ⬤

## TOP PICKS

   

| | | | |
|---|---|---|---|
| Radio station only aired Spanish songs and shows in 2001 | Walmart launching 'Walmart Deals' holiday savings event that will be seven days long | 'Fight or flight takes over': Transportation employees save cardiac arrest victim's life | Gold prices hit record highs — Here's what's driving the rush |

SPONSORED CONTENT

 **Seniors Born 1939-1969 Receive 11 Benefits This Month If They Ask** ↗
By Super Saving Online
Seniors at Washington Should Claim These Benefits

Advertisement

## After suicide attempt, South Lake Tahoe mayor admits to stealing church funds

In a letter, Tamara Wallace said she did not want to "lie, hide, and delay the consequences."

App. 118

# **TAB 19**

**Table C-5.**

**U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | During Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| Total | 444,071 | 22.5 | 64,001 | 7.5 | 354,124 | 29.8 | 24,460 | 15.1 | 1,486 | 30.7 |
| DC | 3,204 | 7.5 | 883 | 5.5 | 2,298 | 8.4 | 12 | 50.4 | 11 | 49.9 |
| 1st | 5,188 | 11.3 | 1,614 | 4.7 | 2,754 | 14.6 | 767 | 17.9 | 53 | 35.0 |
| ME | 422 | 7.2 | 131 | 4.5 | 267 | 7.8 | 22 | 21.2 | 2 | - |
| MA | 2,578 | 7.4 | 1,094 | 4.2 | 800 | 6.4 | 652 | 17.8 | 32 | 35.6 |
| NH | 1,087 | 50.5 | 77 | 3.7 | 945 | 53.9 | 62 | 15.6 | 3 | - |
| RI | 460 | 8.7 | 218 | 9.4 | 223 | 7.6 | 16 | 29.6 | 3 | - |
| PR | 641 | 14.1 | 94 | 7.9 | 519 | 14.5 | 15 | 21.0 | 13 | 31.4 |
| 2nd | 23,227 | 5.8 | 5,077 | 2.7 | 15,072 | 6.0 | 2,916 | 14.4 | 162 | 51.1 |
| CT | 1,487 | 6.9 | 228 | 3.3 | 833 | 5.3 | 414 | 13.8 | 12 | 34.8 |
| NY,N | 1,305 | 8.3 | 221 | 4.4 | 807 | 7.0 | 265 | 17.2 | 12 | 48.0 |
| NY,E | 7,708 | 6.4 | 1,680 | 2.8 | 5,153 | 6.8 | 832 | 13.7 | 43 | 47.5 |
| NY,S | 9,609 | 5.6 | 1,679 | 3.5 | 6,509 | 5.1 | 1,341 | 13.9 | 80 | 59.2 |
| NY,W | 1,630 | 8.1 | 101 | 7.3 | 1,464 | 7.8 | 53 | 18.3 | 12 | 56.2 |
| VT | 1,488 | 2.5 | 1,168 | 2.3 | 306 | 5.0 | 11 | 28.2 | 3 | - |
| 3rd | 19,882 | 7.4 | 3,843 | 3.9 | 11,925 | 6.6 | 3,972 | 12.2 | 142 | 31.6 |
| DE | 1,335 | 10.3 | 248 | 3.4 | 985 | 11.3 | 59 | 21.4 | 43 | 42.2 |
| NJ | 9,207 | 9.4 | 370 | 3.8 | 6,539 | 6.7 | 2,278 | 14.4 | 20 | 36.0 |
| PA,E | 5,708 | 5.1 | 1,876 | 3.3 | 2,870 | 4.6 | 908 | 9.8 | 54 | 16.0 |
| PA,M | 1,580 | 8.3 | 664 | 5.8 | 886 | 10.6 | 21 | 35.9 | 9 | - |
| PA,W | 1,927 | 6.9 | 606 | 4.5 | 633 | 5.7 | 677 | 8.5 | 11 | 39.2 |
| VI | 125 | 12.7 | 79 | 9.6 | 12 | 19.2 | 29 | 25.7 | 5 | - |
| 4th | 15,125 | 7.9 | 5,577 | 8.6 | 8,176 | 6.8 | 1,287 | 11.4 | 85 | 26.5 |

Printed on: 31/07/25

**Table C-5.**
**U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| | | | | | Before Pretrial | | During or After Pretrial | | During Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
|---|---|---|---|---|---|---|---|---|---|---|
| MD | 3,149 | 6.9 | 149 | 5.8 | 2,513 | 6.1 | 467 | 13.8 | 20 | 31.6 |
| NC,E | 1,140 | 8.5 | 644 | 8.5 | 488 | 8.2 | 4 | - | 4 | - |
| NC,M | 592 | 8.0 | 381 | 6.6 | 190 | 10.3 | 18 | 19.6 | 3 | - |
| NC,W | 1,017 | 6.5 | 183 | 2.9 | 554 | 5.5 | 270 | 12.7 | 10 | 22.9 |
| SC | 4,988 | 11.7 | 2,931 | 14.0 | 2,004 | 8.8 | 37 | 10.4 | 16 | 36.0 |
| VA,E | 2,976 | 5.4 | 1,213 | 5.0 | 1,298 | 4.7 | 452 | 8.9 | 13 | 11.9 |
| VA,W | 526 | 9.2 | 49 | 5.5 | 457 | 9.6 | 11 | 13.6 | 9 | - |
| WV,N | 304 | 10.3 | 7 | - | 276 | 10.1 | 18 | 15.0 | 3 | - |
| WV,S | 433 | 10.3 | 20 | 2.8 | 396 | 10.3 | 10 | 16.3 | 7 | - |
| **5th** | **29,564** | **11.6** | **9,666** | **10.6** | **14,822** | **9.9** | **4,857** | **27.0** | **219** | **26.6** |
| LA,E | 9,229 | 64.3 | 2,851 | 83.7 | 3,420 | 13.3 | 2,938 | 86.8 | 20 | 23.3 |
| LA,M | 1,152 | 13.2 | 204 | 13.5 | 929 | 12.9 | 13 | 26.0 | 6 | - |
| LA,W | 1,784 | 15.4 | 346 | 10.7 | 981 | 16.0 | 432 | 16.8 | 25 | 27.8 |
| MS,N | 635 | 6.5 | 129 | 2.3 | 269 | 3.6 | 236 | 11.8 | 1 | - |
| MS,S | 1,057 | 9.2 | 618 | 8.7 | 408 | 9.3 | 23 | 19.0 | 8 | - |
| TX,N | 3,927 | 5.8 | 792 | 4.1 | 3,094 | 6.2 | 8 | - | 33 | 19.3 |
| TX,E | 2,648 | 7.1 | 1,033 | 5.1 | 1,570 | 8.4 | 10 | 28.8 | 35 | 24.8 |
| TX,S | 5,648 | 7.8 | 2,538 | 6.0 | 2,188 | 7.6 | 870 | 11.3 | 52 | 32.6 |
| TX,W | 3,484 | 7.8 | 1,155 | 6.1 | 1,963 | 7.6 | 327 | 13.6 | 39 | 36.9 |
| **6th** | **12,546** | **8.4** | **3,086** | **5.1** | **6,801** | **7.3** | **2,570** | **14.5** | **89** | **30.2** |
| KY,E | 696 | 8.0 | 113 | 7.0 | 569 | 8.0 | 7 | - | 7 | - |
| KY,W | 986 | 8.4 | 148 | 4.8 | 821 | 9.4 | 16 | 23.1 | 1 | - |
| MI,E | 2,803 | 9.0 | 395 | 2.9 | 1,154 | 4.5 | 1,238 | 15.2 | 16 | 35.8 |
| MI,W | 1,035 | 7.5 | 90 | 2.6 | 736 | 6.7 | 204 | 13.7 | 5 | - |
| OH,N | 1,961 | 7.1 | 380 | 3.3 | 955 | 6.3 | 615 | 12.1 | 11 | 26.5 |

**Table C-5.**
**U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Before Pretrial | | During or After Pretrial | | During Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| OH,S | 2,142 | 8.7 | 934 | 5.9 | 836 | 8.2 | 362 | 15.7 | 10 | 47.9 |
| TN,E | 971 | 9.5 | 154 | 7.4 | 723 | 9.0 | 75 | 20.0 | 19 | 32.3 |
| TN,M | 1,144 | 8.3 | 554 | 7.3 | 537 | 8.3 | 45 | 14.2 | 8 | - |
| TN,W | 808 | 8.8 | 318 | 8.7 | 470 | 8.5 | 8 | - | 12 | 27.1 |
| **7th** | **19,638** | **8.0** | **6,472** | **9.1** | **10,900** | **6.0** | **2,167** | **18.2** | **99** | **42.3** |
| IL,N | 12,270 | 7.1 | 4,911 | 9.3 | 7,015 | 5.5 | 296 | 12.8 | 48 | 60.9 |
| IL,C | 730 | 7.8 | 316 | 5.9 | 405 | 9.8 | 3 | - | 6 | - |
| IL,S | 1,272 | 13.6 | 812 | 13.7 | 446 | 13.3 | 5 | - | 9 | - |
| IN,N | 1,303 | 8.3 | 74 | 2.7 | 914 | 7.7 | 305 | 14.1 | 10 | 43.6 |
| IN,S | 2,497 | 12.2 | 57 | 2.3 | 1,092 | 5.4 | 1,342 | 33.1 | 6 | - |
| WI,E | 1,034 | 6.0 | 135 | 3.0 | 854 | 6.5 | 37 | 12.4 | 8 | - |
| WI,W | 532 | 7.0 | 167 | 2.9 | 174 | 5.0 | 179 | 14.1 | 12 | 24.4 |
| **8th** | **8,649** | **7.8** | **3,317** | **5.7** | **4,590** | **8.3** | **661** | **13.1** | **81** | **30.0** |
| AR,E | 758 | 11.3 | 400 | 13.4 | 348 | 8.9 | 0 | - | 10 | 29.8 |
| AR,W | 484 | 9.0 | 42 | 4.1 | 374 | 8.7 | 66 | 11.5 | 2 | - |
| IA,N | 240 | 7.4 | 62 | 8.6 | 174 | 6.4 | 0 | - | 4 | - |
| IA,S | 390 | 8.3 | 174 | 9.3 | 203 | 6.4 | 3 | - | 10 | 20.9 |
| MN | 2,678 | 8.7 | 1,386 | 4.9 | 735 | 11.7 | 548 | 13.0 | 9 | - |
| MO,E | 1,569 | 6.9 | 467 | 4.5 | 1,076 | 7.8 | 15 | 16.1 | 11 | 27.0 |
| MO,W | 1,397 | 6.9 | 505 | 5.6 | 858 | 7.6 | 18 | 50.4 | 16 | 25.4 |
| NE | 703 | 5.5 | 200 | 3.0 | 486 | 7.2 | 11 | 25.3 | 6 | - |
| ND | 191 | 10.6 | 4 | - | 180 | 10.1 | 0 | - | 7 | - |
| SD | 239 | 9.8 | 77 | 9.4 | 156 | 10.4 | 0 | - | 6 | - |
| **9th** | **41,903** | **7.0** | **15,135** | **7.4** | **24,209** | **6.1** | **2,257** | **14.6** | **302** | **30.8** |
| AK | 221 | 11.7 | 30 | 11.0 | 185 | 11.6 | 2 | - | 4 | - |

**Table C-5.**
**U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | During Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| AZ | 2,466 | 6.2 | 121 | 2.2 | 1,973 | 5.3 | 356 | 14.6 | 16 | 32.9 |
| CA,N | 10,353 | 20.5 | 7,262 | 22.3 | 1,994 | 8.6 | 1,065 | 15.0 | 32 | 42.4 |
| CA,E | 2,923 | 8.1 | 1,042 | 5.8 | 1,818 | 9.0 | 41 | 29.6 | 22 | 65.2 |
| CA,C | 15,258 | 3.9 | 4,390 | 3.1 | 10,651 | 4.4 | 88 | 19.9 | 129 | 24.2 |
| CA,S | 2,157 | 5.8 | 585 | 3.2 | 1,068 | 5.7 | 488 | 11.4 | 16 | 41.1 |
| HI | 589 | 5.2 | 181 | 3.6 | 386 | 5.9 | 12 | 33.7 | 10 | 27.5 |
| ID | 412 | 10.0 | 65 | 4.6 | 305 | 9.8 | 37 | 23.6 | 5 | - |
| MT | 401 | 9.6 | 171 | 6.0 | 109 | 7.9 | 117 | 14.0 | 4 | - |
| NV | 2,045 | 8.2 | 280 | 5.8 | 1,727 | 8.5 | 21 | 8.0 | 17 | 60.1 |
| OR | 1,686 | 9.6 | 320 | 5.1 | 1,335 | 10.3 | 12 | 38.3 | 19 | 33.1 |
| WA,E | 624 | 6.4 | 81 | 6.0 | 534 | 6.4 | 2 | - | 7 | - |
| WA,W | 2,743 | 6.2 | 596 | 3.4 | 2,113 | 6.8 | 14 | 29.0 | 20 | 25.3 |
| GU | 17 | 16.7 | 5 | - | 9 | - | 2 | - | 1 | - |
| NMI | 8 | - | 6 | - | 2 | - | 0 | - | 0 | - |
| **10th** | **7,772** | **7.5** | **1,843** | **5.8** | **5,179** | **7.1** | **669** | **15.6** | **81** | **28.3** |
| CO | 2,654 | 7.4 | 542 | 8.1 | 2,008 | 6.7 | 70 | 26.2 | 34 | 38.7 |
| KS | 935 | 7.0 | 208 | 4.5 | 636 | 6.9 | 75 | 18.6 | 16 | 20.2 |
| NM | 902 | 7.8 | 169 | 4.4 | 493 | 6.7 | 236 | 13.2 | 4 | - |
| OK,N | 532 | 6.4 | 93 | 3.9 | 425 | 6.9 | 10 | 42.1 | 4 | - |
| OK,E | 332 | 7.4 | 14 | 4.1 | 312 | 7.3 | 4 | - | 2 | - |
| OK,W | 1,025 | 6.9 | 386 | 4.7 | 440 | 7.0 | 195 | 12.2 | 4 | - |
| UT | 1,175 | 9.0 | 361 | 7.0 | 802 | 9.4 | 2 | - | 10 | 58.2 |
| WY | 217 | 8.8 | 70 | 5.1 | 63 | 5.3 | 77 | 15.3 | 7 | - |
| **11th** | **257,373** | **44.8** | **7,488** | **38.9** | **247,398** | **45.6** | **2,325** | **11.9** | **162** | **23.0** |
| AL,N | 1,409 | 9.0 | 97 | 2.3 | 1,285 | 9.6 | 9 | - | 18 | 32.6 |

Printed on: 31/07/25

**Table C-5.**
**U.S. District Courts–Median Time Intervals From Filing to Disposition of Civil Cases Terminated, by District and Method of Disposition, During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total Cases | | No Court Action | | Court Action | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Before Pretrial | | During or After Pretrial | | During Trial | |
| | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months | Number of Cases | Median Time Interval in Months |
| AL,M | 543 | 7.8 | 45 | 3.4 | 487 | 7.9 | 11 | 27.1 | 0 | - |
| AL,S | 359 | 8.4 | 103 | 6.4 | 237 | 7.7 | 9 | - | 10 | 32.1 |
| FL,N | 232,339 | 48.2 | 5,367 | 45.6 | 226,962 | 48.3 | 3 | - | 7 | - |
| FL,M | 6,869 | 5.8 | 45 | 3.5 | 6,461 | 5.4 | 325 | 14.0 | 38 | 23.3 |
| FL,S | 8,134 | 3.5 | 902 | 3.1 | 7,160 | 3.5 | 20 | 13.4 | 52 | 16.2 |
| GA,N | 6,507 | 4.4 | 649 | 3.0 | 3,897 | 2.1 | 1,933 | 11.4 | 28 | 29.1 |
| GA,M | 674 | 7.3 | 254 | 6.1 | 401 | 7.1 | 13 | 34.7 | 6 | - |
| GA,S | 539 | 6.9 | 26 | 4.9 | 508 | 7.0 | 2 | - | 3 | - |

NOTE: Median time intervals are not computed when fewer than 10 cases reported. This table excludes land condemnations, prisoner petitions, deportation reviews, recovery of overpayments, and enforcement of judgments. Includes cases filed in previous years as consolidated cases that thereafter were severed into individual cases. For fiscal years prior to 2001, this table included data on recovery of overpayments and enforcement of judgments.

App. 124

# **TAB 20**

KEN PAXTON
ATTORNEY GENERAL *of* TEXAS

(/)

**February 14, 2025 | Press Release**

# Attorney General Ken Paxton Announces Investigation into DeepSeek and Notifies the Chinese AI Company of its Violation of Texas State Law

Attorney General Ken Paxton has announced an investigation into DeepSeek—a Chinese artificial intelligence ("AI") company with ties to the Chinese Communist Party ("CCP")—regarding the privacy practices of its AI platform and its claims that its AI model rivals the most advanced AI models in the world, including OpenAI's Model o1.

Attorney General Paxton has also notified DeepSeek that its platform violates the Texas Data Privacy and Security Act. As part of the investigation, Attorney General Paxton sent third-party Civil Investigative Demands ("CIDs") to Google and Apple requesting their analysis of the DeepSeek application, as well as the documentation DeepSeek was required to submit to them before they made DeepSeek's app available to consumers.

App. 126

"DeepSeek appears to be no more than a proxy for the CCP to undermine American AI dominance and steal the data of our citizens," said Attorney General Paxton. "That's why I'm announcing a thorough investigation and calling on Google and Apple to cooperate immediately by providing all relevant documents related to the DeepSeek app. The United States <u>and Texas will continue to be at the forefront of global AI innovation, and any CCP-aligned company that tries to undermine that dominance by violating the rights of Texans</u> and illegally undercutting American technology companies will face the full force of the law."

On January 28, Attorney General Paxton directed that DeepSeek's platform be banned on all Office of the Attorney General devices over concerns about security and the company's blatant allegiance to the CCP, including its willingness to censor any information critical of the Chinese government.

<u>Back to Top</u>

App. 127

# **TAB 21**

**Table X-1A.**
**U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship**
**During the 12-Month Period Ending June 30, 2025**

| District | Judgeships | Unweighted Filings per Judgeship | | | | Weighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Civil | Criminal | Supervision Hearings | Total | Civil | Criminal | Supervision Hearings |
| Total | 674 | 562 | 409 | 114 | 39.2 | 511 | 392 | 116 | 3.7 |
| DC | 15 | 299 | 252 | 36 | 11.2 | 317 | 265 | 50 | 1.0 |
| ME | 3 | 262 | 187 | 55 | 20.0 | 248 | 165 | 81 | 2.0 |
| MA | 13 | 348 | 286 | 44 | 17.4 | 350 | 283 | 66 | 1.5 |
| NH | 3 | 222 | 153 | 45 | 23.7 | 225 | 156 | 67 | 2.0 |
| RI | 3 | 258 | 199 | 37 | 22.3 | 265 | 206 | 56 | 2.3 |
| PR | 7 | 275 | 89 | 134 | 51.7 | 279 | 89 | 186 | 4.5 |
| CT | 8 | 303 | 247 | 28 | 28.6 | 285 | 237 | 46 | 2.4 |
| NY,N | 5 | 446 | 326 | 90 | 29.6 | 387 | 290 | 94 | 2.5 |
| NY,E | 15 | 578 | 524 | 38 | 17.0 | 547 | 479 | 66 | 1.7 |
| NY,S | 28 | 430 | 378 | 25 | 27.1 | 486 | 442 | 41 | 3.5 |
| NY,W | 4 | 644 | 457 | 91 | 96.3 | 516 | 373 | 134 | 7.8 |
| VT | 2 | 852 | 703 | 97 | 52.0 | 441 | 293 | 143 | 4.4 |
| DE | 4 | 404 | 365 | 34 | 6.0 | 618 | 574 | 44 | 1.0 |
| NJ | 17 | 1,008 | 951 | 43 | 13.5 | 905 | 841 | 63 | 1.1 |
| PA,E | 22 | 369 | 337 | 22 | 9.8 | 349 | 315 | 33 | 0.9 |
| PA,M | 6 | 484 | 401 | 66 | 17.0 | 468 | 368 | 97 | 2.2 |
| PA,W | 10 | 300 | 235 | 44 | 20.2 | 303 | 231 | 69 | 3.2 |
| MD | 10 | 511 | 397 | 90 | 23.6 | 408 | 358 | 48 | 2.0 |
| NC,E | 4 | 1,176 | 851 | 264 | 61.8 | 981 | 785 | 189 | 6.1 |
| NC,M | 4 | 446 | 280 | 85 | 82.0 | 363 | 232 | 123 | 7.9 |
| NC,W | 5 | 434 | 292 | 78 | 63.4 | 377 | 255 | 115 | 6.2 |
| SC | 10 | 1,009 | 915 | 59 | 35.3 | 788 | 695 | 89 | 3.5 |
| VA,E | 11 | 513 | 361 | 120 | 32.5 | 422 | 318 | 101 | 3.7 |
| VA,W | 4 | 416 | 345 | 45 | 26.0 | 339 | 275 | 62 | 3.1 |
| WV,N | 3 | 346 | 194 | 106 | 46.3 | 317 | 154 | 158 | 4.1 |
| WV,S | 5 | 231 | 168 | 47 | 15.8 | 198 | 128 | 69 | 1.5 |
| LA,E | 12 | 196 | 160 | 30 | 6.7 | 200 | 161 | 38 | 0.6 |
| LA,M | 3 | 407 | 355 | 46 | 5.0 | 423 | 363 | 59 | 0.6 |
| LA,W | 7 | 321 | 260 | 48 | 12.1 | 314 | 250 | 63 | 1.4 |

**Table X-1A.**
**U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship**
**During the 12-Month Period Ending June 30, 2025**

| District | Judgeships | Unweighted Filings per Judgeship | | | | Weighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Civil | Criminal | Supervision Hearings | Total | Civil | Criminal | Supervision Hearings |
| MS,N | 3 | 335 | 256 | 63 | 15.7 | 378 | 280 | 96 | 2.0 |
| MS,S | 6 | 363 | 272 | 72 | 19.7 | 355 | 255 | 97 | 3.6 |
| TX,N | 12 | 613 | 454 | 117 | 42.3 | 601 | 443 | 154 | 4.4 |
| TX,E | 8 | 620 | 512 | 107 | 0.3 | 891 | 729 | 162 | 0.0 |
| TX,S | 19 | 849 | 385 | 387 | 76.8 | 659 | 377 | 275 | 6.9 |
| TX,W | 13 | 1,192 | 369 | 709 | 113.8 | 804 | 409 | 386 | 9.6 |
| KY,E | 6 | 286 | 181 | 78 | 27.0 | 276 | 156 | 117 | 2.6 |
| KY,W | 4 | 454 | 305 | 123 | 25.8 | 435 | 283 | 149 | 2.4 |
| MI,E | 15 | 318 | 243 | 53 | 21.3 | 306 | 235 | 69 | 2.0 |
| MI,W | 4 | 497 | 410 | 57 | 30.0 | 464 | 380 | 81 | 2.6 |
| OH,N | 11 | 472 | 335 | 60 | 76.7 | 373 | 278 | 88 | 6.7 |
| OH,S | 8 | 405 | 320 | 59 | 26.0 | 394 | 301 | 88 | 4.5 |
| TN,E | 5 | 372 | 233 | 119 | 21.2 | 415 | 234 | 179 | 1.7 |
| TN,M | 4 | 532 | 410 | 59 | 63.3 | 521 | 424 | 91 | 5.9 |
| TN,W | 5 | 452 | 303 | 83 | 66.2 | 409 | 275 | 127 | 6.4 |
| IL,N | 23 | 707 | 673 | 23 | 11.4 | 726 | 688 | 37 | 1.2 |
| IL,C | 4 | 477 | 379 | 55 | 42.8 | 412 | 330 | 77 | 4.3 |
| IL,S | 4 | 695 | 598 | 62 | 35.0 | 532 | 440 | 89 | 3.3 |
| IN,N | 5 | 528 | 456 | 57 | 15.0 | 486 | 405 | 79 | 1.8 |
| IN,S | 5 | 775 | 704 | 69 | 2.0 | 676 | 574 | 101 | 0.3 |
| WI,E | 5 | 451 | 360 | 63 | 28.2 | 420 | 322 | 96 | 2.3 |
| WI,W | 2 | 609 | 525 | 48 | 36.0 | 545 | 471 | 70 | 4.2 |
| AR,E | 5 | 473 | 346 | 90 | 36.8 | 424 | 289 | 132 | 3.6 |
| AR,W | 3 | 385 | 281 | 81 | 22.7 | 357 | 234 | 121 | 2.1 |
| IA,N | 2 | 494 | 202 | 184 | 108.0 | 453 | 169 | 271 | 13.7 |
| IA,S | 3 | 411 | 197 | 119 | 95.3 | 361 | 174 | 173 | 14.0 |
| MN | 7 | 794 | 677 | 64 | 53.4 | 654 | 556 | 94 | 4.7 |
| MO,E | 8 | 445 | 258 | 126 | 61.8 | 436 | 247 | 184 | 5.2 |
| MO,W | 6 | 469 | 297 | 117 | 55.3 | 446 | 274 | 167 | 4.9 |
| NE | 3 | 491 | 310 | 122 | 59.0 | 405 | 249 | 150 | 5.0 |

App. 130

**Table X-1A.**
**U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship**
**During the 12-Month Period Ending June 30, 2025**

| District | Judgeships | Unweighted Filings per Judgeship | | | | Weighted Filings per Judgeship | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Total | Civil | Criminal | Supervision Hearings | Total | Civil | Criminal | Supervision Hearings |
| ND | 2 | 402 | 143 | 188 | 70.5 | 405 | 132 | 266 | 7.1 |
| SD | 3 | 460 | 120 | 201 | 138.7 | 445 | 119 | 312 | 14.7 |
| AK | 3 | 174 | 119 | 55 | 0.7 | 194 | 112 | 82 | 0.1 |
| AZ | 13 | 1,363 | 408 | 847 | 108.0 | 808 | 337 | 462 | 8.7 |
| CA,N | 14 | 835 | 748 | 25 | 62.5 | 705 | 660 | 40 | 5.0 |
| CA,E | 6 | 1,000 | 873 | 58 | 68.8 | 843 | 754 | 83 | 6.3 |
| CA,C | 28 | 674 | 594 | 48 | 32.1 | 731 | 657 | 71 | 2.6 |
| CA,S | 13 | 688 | 226 | 343 | 118.8 | 533 | 237 | 286 | 9.6 |
| HI | 4 | 200 | 142 | 26 | 32.5 | 190 | 148 | 39 | 2.7 |
| ID | 2 | 563 | 333 | 153 | 78.0 | 543 | 318 | 219 | 6.5 |
| MT | 3 | 455 | 237 | 154 | 63.0 | 465 | 223 | 233 | 8.6 |
| NV | 7 | 489 | 413 | 32 | 44.7 | 445 | 401 | 39 | 4.1 |
| OR | 6 | 503 | 362 | 90 | 51.3 | 466 | 330 | 132 | 4.2 |
| WA,E | 4 | 398 | 204 | 95 | 98.3 | 314 | 163 | 142 | 8.7 |
| WA,W | 7 | 594 | 484 | 75 | 35.1 | 532 | 451 | 77 | 3.4 |
| CO | 7 | 618 | 534 | 63 | 21.1 | 669 | 573 | 94 | 1.9 |
| KS | 6 | 331 | 219 | 82 | 29.5 | 318 | 218 | 98 | 2.8 |
| NM | 7 | 753 | 176 | 465 | 111.7 | 410 | 174 | 226 | 9.5 |
| OK,N | 4 | 326 | 163 | 123 | 39.8 | 340 | 161 | 176 | 3.4 |
| OK,E | 1 | 807 | 493 | 252 | 62.0 | 845 | 431 | 404 | 10.4 |
| OK,W | 6 | 387 | 238 | 114 | 34.8 | 358 | 231 | 124 | 3.9 |
| UT | 5 | 463 | 256 | 138 | 68.6 | 452 | 275 | 171 | 5.7 |
| WY | 3 | 211 | 99 | 66 | 46.0 | 190 | 106 | 80 | 3.9 |
| AL,N | 8 | 360 | 252 | 76 | 32.5 | 326 | 239 | 84 | 3.9 |
| AL,M | 3 | 445 | 316 | 120 | 9.3 | 465 | 301 | 164 | 1.0 |
| AL,S | 3 | 339 | 175 | 102 | 62.0 | 326 | 177 | 142 | 6.3 |
| FL,N | 4 | 686 | 552 | 104 | 29.8 | 605 | 488 | 113 | 3.0 |
| FL,M | 15 | 717 | 581 | 109 | 27.6 | 705 | 558 | 144 | 2.6 |
| FL,S | 18 | 612 | 494 | 89 | 28.8 | 663 | 534 | 125 | 3.7 |
| GA,N | 11 | 772 | 701 | 50 | 21.3 | 724 | 656 | 66 | 2.3 |

**Table X-1A.**
**U.S. District Courts—Weighted and Unweighted Filings per Authorized Judgeship**
**During the 12-Month Period Ending June 30, 2025**

| District | Judgeships | Unweighted Filings per Judgeship | | | | Weighted Filings per Judgeship | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Total | Civil | Criminal | Supervision Hearings | Total | Civil | Criminal | Supervision Hearings |
| GA,M | 4 | 478 | 349 | 111 | 17.0 | 419 | 289 | 129 | 1.6 |
| GA,S | 3 | 523 | 358 | 115 | 50.3 | 458 | 310 | 142 | 5.2 |

Note: Case weights are based on the 2015 district court case weighting study conducted by the Federal Judicial Center.  Data for the territorial courts are not included. This table excludes civil cases arising by reopening, remand, or transfer to the district by the order of the Judicial Panel on Multidistrict Litigation. This table includes defendants in all criminal cases filed as felonies or Class A misdemeanors, but includes only those defendants in criminal cases filed as petty offenses that were assigned to district judges rather than magistrate judges. Remands and reopens for criminal defendants are excluded. This table includes trials conducted by district and appellate judges only; all trials conducted by magistrate judges are excluded. Sentencing hearings are excluded. Due to rounding, subtotals may not equal totals.

# **TAB 22**

**Table C-1.**
**U.S. District Courts—Civil Cases Commenced, Terminated, and Pending**
**During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total | | | U.S. Cases | | | Private Cases | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Terminated | Pending | Filed | Terminated | Pending | Filed | Terminated | Pending |
| Total | 287,441 | 494,977 | 417,724 | 48,328 | 45,818 | 41,638 | 239,113 | 449,159 | 376,086 |
| DC | 3,840 | 3,432 | 5,546 | 2,174 | 2,044 | 3,230 | 1,666 | 1,388 | 2,316 |
| 1st | 6,110 | 5,772 | 8,822 | 1,197 | 1,090 | 1,003 | 4,913 | 4,682 | 7,819 |
| ME | 568 | 469 | 484 | 158 | 103 | 129 | 410 | 366 | 355 |
| MA | 3,788 | 2,879 | 5,406 | 654 | 602 | 480 | 3,134 | 2,277 | 4,926 |
| NH | 464 | 1,182 | 1,209 | 113 | 109 | 107 | 351 | 1,073 | 1,102 |
| RI | 639 | 522 | 736 | 129 | 110 | 118 | 510 | 412 | 618 |
| PR | 651 | 720 | 987 | 143 | 166 | 169 | 508 | 554 | 818 |
| 2nd | 26,174 | 25,998 | 30,122 | 6,089 | 6,626 | 4,297 | 20,085 | 19,372 | 25,825 |
| CT | 2,029 | 1,893 | 2,150 | 363 | 396 | 267 | 1,666 | 1,497 | 1,883 |
| NY,N | 1,881 | 1,793 | 1,922 | 443 | 474 | 399 | 1,438 | 1,319 | 1,523 |
| NY,E | 7,970 | 8,133 | 10,515 | 2,079 | 2,335 | 1,278 | 5,891 | 5,798 | 9,237 |
| NY,S | 10,879 | 10,560 | 12,377 | 1,093 | 1,073 | 1,085 | 9,786 | 9,487 | 11,292 |
| NY,W | 2,005 | 2,106 | 2,681 | 838 | 977 | 996 | 1,167 | 1,129 | 1,685 |
| VT | 1,410 | 1,513 | 477 | 1,273 | 1,371 | 272 | 137 | 142 | 205 |
| 3rd | 34,309 | 24,009 | 107,398 | 3,194 | 3,268 | 2,380 | 31,115 | 20,741 | 105,018 |
| DE | 1,505 | 1,481 | 2,080 | 59 | 57 | 84 | 1,446 | 1,424 | 1,996 |
| NJ | 18,675 | 10,252 | 90,457 | 1,268 | 1,335 | 853 | 17,407 | 8,917 | 89,604 |
| PA,E | 8,780 | 6,935 | 8,987 | 828 | 874 | 552 | 7,952 | 6,061 | 8,435 |
| PA,M | 2,491 | 2,368 | 2,461 | 655 | 599 | 540 | 1,836 | 1,769 | 1,921 |
| PA,W | 2,737 | 2,839 | 3,082 | 362 | 380 | 282 | 2,375 | 2,459 | 2,800 |
| VI | 121 | 134 | 331 | 22 | 23 | 69 | 99 | 111 | 262 |
| 4th | 26,648 | 20,659 | 33,528 | 6,889 | 4,802 | 8,176 | 19,759 | 15,857 | 25,352 |
| MD | 4,134 | 3,878 | 4,015 | 1,188 | 1,058 | 956 | 2,946 | 2,820 | 3,059 |
| NC,E | 3,470 | 1,819 | 5,270 | 2,226 | 584 | 4,050 | 1,244 | 1,235 | 1,220 |
| NC,M | 1,124 | 1,026 | 993 | 364 | 359 | 253 | 760 | 667 | 740 |
| NC,W | 1,474 | 1,424 | 1,154 | 455 | 444 | 271 | 1,019 | 980 | 883 |

**Table C-1.**
**U.S. District Courts—Civil Cases Commenced, Terminated, and Pending**
**During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total | | | U.S. Cases | | | Private Cases | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Terminated | Pending | Filed | Terminated | Pending | Filed | Terminated | Pending |
| SC | 9,473 | 6,025 | 15,103 | 523 | 474 | 605 | 8,950 | 5,551 | 14,498 |
| VA,E | 4,052 | 3,832 | 3,227 | 1,194 | 1,187 | 769 | 2,858 | 2,645 | 2,458 |
| VA,W | 1,424 | 1,313 | 1,255 | 240 | 194 | 215 | 1,184 | 1,119 | 1,040 |
| WV,N | 627 | 612 | 510 | 288 | 263 | 154 | 339 | 349 | 356 |
| WV,S¹ | 870 | 730 | 2,001 | 411 | 239 | 903 | 459 | 491 | 1,098 |
| **5th** | **29,892** | **35,577** | **36,410** | **4,325** | **3,936** | **3,595** | **25,567** | **31,641** | **32,815** |
| LA,E | 2,088 | 9,519 | 8,209 | 198 | 193 | 175 | 1,890 | 9,326 | 8,034 |
| LA,M | 1,105 | 1,342 | 1,328 | 78 | 71 | 87 | 1,027 | 1,271 | 1,241 |
| LA,W | 1,886 | 2,318 | 2,636 | 309 | 251 | 437 | 1,577 | 2,067 | 2,199 |
| MS,N | 782 | 737 | 594 | 235 | 249 | 82 | 547 | 488 | 512 |
| MS,S | 1,661 | 1,583 | 3,652 | 133 | 139 | 155 | 1,528 | 1,444 | 3,497 |
| TX,N | 5,797 | 5,444 | 4,375 | 1,097 | 1,058 | 665 | 4,700 | 4,386 | 3,710 |
| TX,E | 4,156 | 3,597 | 4,155 | 464 | 418 | 479 | 3,692 | 3,179 | 3,676 |
| TX,S | 7,470 | 6,686 | 6,846 | 1,015 | 922 | 804 | 6,455 | 5,764 | 6,042 |
| TX,W | 4,947 | 4,351 | 4,615 | 796 | 635 | 711 | 4,151 | 3,716 | 3,904 |
| **6th** | **18,602** | **16,561** | **46,729** | **3,106** | **2,748** | **2,865** | **15,496** | **13,813** | **43,864** |
| KY,E | 1,106 | 1,100 | 1,025 | 378 | 352 | 297 | 728 | 748 | 728 |
| KY,W | 1,247 | 1,283 | 1,252 | 228 | 194 | 214 | 1,019 | 1,089 | 1,038 |
| MI,E | 3,745 | 3,554 | 3,933 | 578 | 479 | 496 | 3,167 | 3,075 | 3,437 |
| MI,W | 1,724 | 1,832 | 1,272 | 245 | 288 | 155 | 1,479 | 1,544 | 1,117 |
| OH,N | 3,739 | 2,446 | 7,237 | 580 | 498 | 493 | 3,159 | 1,948 | 6,744 |
| OH,S | 2,608 | 2,462 | 27,119 | 515 | 418 | 556 | 2,093 | 2,044 | 26,563 |
| TN,E | 1,180 | 1,229 | 1,145 | 226 | 206 | 222 | 954 | 1,023 | 923 |
| TN,M | 1,713 | 1,374 | 1,963 | 175 | 137 | 190 | 1,538 | 1,237 | 1,773 |
| TN,W | 1,540 | 1,281 | 1,783 | 181 | 176 | 242 | 1,359 | 1,105 | 1,541 |
| **7th** | **28,756** | **25,535** | **46,740** | **3,281** | **3,239** | **2,626** | **25,475** | **22,296** | **44,114** |
| IL,N | 15,746 | 13,230 | 22,082 | 1,503 | 1,650 | 1,176 | 14,243 | 11,580 | 20,906 |
| IL,C | 1,568 | 1,523 | 1,561 | 174 | 193 | 149 | 1,394 | 1,330 | 1,412 |
| IL,S | 2,436 | 1,870 | 7,790 | 215 | 196 | 241 | 2,221 | 1,674 | 7,549 |

**Table C-1.**
**U.S. District Courts—Civil Cases Commenced, Terminated, and Pending**
**During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total | | | U.S. Cases | | | Private Cases | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Terminated | Pending | Filed | Terminated | Pending | Filed | Terminated | Pending |
| IN,N | 2,320 | 2,122 | 2,196 | 388 | 322 | 318 | 1,932 | 1,800 | 1,878 |
| IN,S | 3,752 | 4,014 | 10,459 | 513 | 429 | 412 | 3,239 | 3,585 | 10,047 |
| WI,E | 1,854 | 1,834 | 1,644 | 227 | 213 | 158 | 1,627 | 1,621 | 1,486 |
| WI,W | 1,080 | 942 | 1,008 | 261 | 236 | 172 | 819 | 706 | 836 |
| **8th** | **14,059** | **11,954** | **19,397** | **2,606** | **2,572** | **1,954** | **11,453** | **9,382** | **17,443** |
| AR,E | 1,760 | 1,642 | 1,718 | 322 | 261 | 281 | 1,438 | 1,381 | 1,437 |
| AR,W | 888 | 857 | 720 | 173 | 158 | 153 | 715 | 699 | 567 |
| IA,N | 430 | 418 | 373 | 112 | 133 | 76 | 318 | 285 | 297 |
| IA,S | 597 | 611 | 466 | 130 | 180 | 75 | 467 | 431 | 391 |
| MN | 4,852 | 3,053 | 11,361 | 706 | 661 | 404 | 4,146 | 2,392 | 10,957 |
| MO,E | 2,103 | 2,061 | 1,708 | 270 | 342 | 282 | 1,833 | 1,719 | 1,426 |
| MO,W | 1,831 | 1,765 | 1,408 | 403 | 397 | 350 | 1,428 | 1,368 | 1,058 |
| NE | 940 | 887 | 915 | 354 | 293 | 164 | 586 | 594 | 751 |
| ND | 293 | 283 | 293 | 61 | 75 | 83 | 232 | 208 | 210 |
| SD | 365 | 377 | 435 | 75 | 72 | 86 | 290 | 305 | 349 |
| **9th** | **53,710** | **51,516** | **49,829** | **9,320** | **9,564** | **6,797** | **44,390** | **41,952** | **43,032** |
| AK | 364 | 323 | 429 | 81 | 76 | 126 | 283 | 247 | 303 |
| AZ | 5,427 | 3,792 | 4,998 | 916 | 879 | 637 | 4,511 | 2,913 | 4,361 |
| CA,N | 10,814 | 11,879 | 13,505 | 1,539 | 1,481 | 1,173 | 9,275 | 10,398 | 12,332 |
| CA,E | 5,284 | 5,308 | 5,872 | 889 | 932 | 880 | 4,395 | 4,376 | 4,992 |
| CA,C | 17,031 | 16,485 | 11,221 | 2,788 | 3,190 | 1,608 | 14,243 | 13,295 | 9,613 |
| CA,S | 3,153 | 2,667 | 2,409 | 521 | 522 | 344 | 2,632 | 2,145 | 2,065 |
| HI | 620 | 659 | 443 | 129 | 129 | 90 | 491 | 530 | 353 |
| ID | 677 | 600 | 800 | 139 | 119 | 135 | 538 | 481 | 665 |
| MT | 789 | 673 | 699 | 120 | 90 | 131 | 669 | 583 | 568 |
| NV | 2,994 | 2,867 | 3,537 | 287 | 297 | 315 | 2,707 | 2,570 | 3,222 |
| OR | 2,205 | 2,222 | 2,261 | 440 | 457 | 416 | 1,765 | 1,765 | 1,845 |
| WA,E | 842 | 796 | 681 | 386 | 335 | 305 | 456 | 461 | 376 |
| WA,W | 3,454 | 3,213 | 2,640 | 1,076 | 1,049 | 624 | 2,378 | 2,164 | 2,016 |

**Table C-1.**
**U.S. District Courts—Civil Cases Commenced, Terminated, and Pending**
**During the 12-Month Period Ending June 30, 2025**

| Circuit and District | Total | | | U.S. Cases | | | Private Cases | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filed | Terminated | Pending | Filed | Terminated | Pending | Filed | Terminated | Pending |
| GU | 45 | 19 | 293 | 6 | 5 | 11 | 39 | 14 | 282 |
| NMI | 11 | 13 | 41 | 3 | 3 | 2 | 8 | 10 | 39 |
| **10th** | **10,679** | **9,926** | **10,216** | **1,740** | **1,694** | **1,464** | **8,939** | **8,232** | **8,752** |
| CO | 3,827 | 3,498 | 3,437 | 348 | 427 | 299 | 3,479 | 3,071 | 3,138 |
| KS | 1,356 | 1,249 | 1,019 | 215 | 203 | 148 | 1,141 | 1,046 | 871 |
| NM | 1,262 | 1,181 | 1,382 | 324 | 271 | 286 | 938 | 910 | 1,096 |
| OK,N | 661 | 657 | 621 | 154 | 150 | 106 | 507 | 507 | 515 |
| OK,E | 501 | 440 | 529 | 165 | 168 | 131 | 336 | 272 | 398 |
| OK,W | 1,462 | 1,371 | 1,182 | 240 | 209 | 184 | 1,222 | 1,162 | 998 |
| UT | 1,310 | 1,258 | 1,561 | 253 | 228 | 248 | 1,057 | 1,030 | 1,313 |
| WY | 300 | 272 | 485 | 41 | 38 | 62 | 259 | 234 | 423 |
| **11th** | **34,662** | **264,038** | **22,987** | **4,407** | **4,235** | **3,251** | **30,255** | **259,803** | **19,736** |
| AL,N | 2,042 | 1,792 | 2,330 | 277 | 265 | 327 | 1,765 | 1,527 | 2,003 |
| AL,M | 976 | 906 | 977 | 152 | 130 | 168 | 824 | 776 | 809 |
| AL,S | 537 | 450 | 577 | 66 | 45 | 99 | 471 | 405 | 478 |
| FL,N | 2,394 | 233,130 | 1,794 | 167 | 146 | 153 | 2,227 | 232,984 | 1,641 |
| FL,M | 9,064 | 9,089 | 6,294 | 1,331 | 1,366 | 1,004 | 7,733 | 7,723 | 5,290 |
| FL,S | 9,278 | 9,047 | 4,047 | 1,021 | 982 | 488 | 8,257 | 8,065 | 3,559 |
| GA,N | 7,857 | 7,430 | 4,958 | 803 | 839 | 587 | 7,054 | 6,591 | 4,371 |
| GA,M | 1,404 | 1,240 | 1,136 | 333 | 232 | 248 | 1,071 | 1,008 | 888 |
| GA,S | 1,110 | 954 | 874 | 257 | 230 | 177 | 853 | 724 | 697 |

NOTE: The number of pending cases in this report includes cases that have been transferred under a Multidistrict Litigation (MDL) order. Large numbers of civil cases may be temporarily assigned by the Judicial Panel on Multidistrict Litigation to a district judge for pretrial management.  As MDL cases vary greatly among districts, it is advisable to check with the relevant district court before drawing statistical conclusions about the number of pending cases for that district.
[1] The higher number of pending cases reported for the Southern District of West Virginia is the result of reconciliation efforts conducted for pretrial management for the three-month period ending June 30, 2018.

App. 137

# **TAB 23**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **X CORP.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-CV-01175-O** |
| | § | |
| **MEDIA MATTERS FOR AMERICA,** | § | |
| **ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Defendants' Motion to Transfer Venue (ECF No. 152) is back before the Court. The Fifth Circuit vacated the Court's order denying Defendants' Motion to Transfer Venue and instructed the Court to do a more thorough venue analysis. *See In re Media Matters for Am.*, 143 F.4th 631 (5th Cir. 2025). After analyzing the eight private and public interest factors prescribed by the Fifth Circuit, the Court does not find good cause to transfer this action. Accordingly, Defendants' Motion to Transfer Venue is **DENIED**.

## I.    BACKGROUND

### a.  Factual Background

On November 20, 2023, X Corp. ("Plaintiff" or "X") brought this action against Media Matters for America, Eric Hananoki, and Angelo Carusone (collectively, "Defendants") claiming interference with contract, business disparagement, and interference with prospective economic advantage. Pursuant to these claims, Plaintiff alleges that Defendants knowingly and maliciously fabricated side-by-side images on Plaintiff's X platform of various advertisers' posts that X depicted next to neo-Nazi or other extremist content and portrayed these designed images as if they were what the average user experiences on the X platform. Plaintiff asserts that Defendants

1

intended to harm the X platform by publicly portraying X as a social media platform dominated by neo-Nazism and anti-Semitism, and thereby alienate major advertisers, publishers, and users from the X platform through its actions.

### b. Procedural Background

Defendants filed their Notice of Motion to Transfer Venue[1] and Brief in Support[2] on March 6, 2025. Plaintiff timely filed its Response,[3] and Defendants appropriately replied.[4] The Court then denied Defendants' transfer motion.[5] Defendants subsequently appealed to the Fifth Circuit. The Fifth Circuit vacated this Court's prior order and remanded with instructions for the Court to conduct a more complete venue analysis using eight public and private interest factors. *See Media Matters*, 143 F.4th at 640. Following the Fifth Circuit's remand, on August 11, 2025, Defendants filed their Supplemental Brief in Support of Transferring Venue,[6] and Plaintiff filed its Supplemental Brief in Opposition.[7] A week later, Defendants and Plaintiff filed their responses.[8] Defendants' Motion to Transfer is now ripe for the Court's review.

## II.  LEGAL STANDARDS

### A.  Transfer Under 28 U.S.C. § 1404(a)

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In considering motions to transfer venue under 28 U.S.C. § 1404(a), district

---

[1] Defs.' Mot. Transfer Venue, ECF No. 152.
[2] Defs.' Br. Supp. Mot. Transfer Venue, ECF No. 153-1.
[3] Pl.'s Resp., ECF No. 168-3.
[4] Defs.' Reply, ECF No. 172-1.
[5] Order, May 5, 2025, ECF No. 190.
[6] Defs.' Suppl. Br. Supp. Mot. Transfer Venue, ECF No. 231-1.
[7] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue, ECF No. 228.
[8] Defs.' Suppl. Resp. Br. Supp. Mot. Transfer Venue, ECF No. 232; Pl.'s Suppl. Resp. Br. Opp'n Mot. Transfer Venue, ECF No. 233.

courts consider "the convenience of the parties and various public-interest considerations." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 62 (2013). "District courts have broad discretion in deciding whether to order a transfer." *In re Volkswagen of Am. Inc.*, 545 F.3d 304, 311 (5th Cir. 2008) (citation omitted).

Transfer based on 28 U.S.C. § 1404(a) is only warranted if the moving party "clearly establishes good cause by clearly demonstrating that a transfer is for the convenience of parties and witnesses, in the interest of justice." *Media Matters*, 143 F.4th at 638 (quoting *In re Clarke*, 94 F.4th 502, 508 (5th Cir. 2024)). Establishing good cause requires a movant to "show (1) that the marginal gain in convenience will be *significant*, and (2) that its evidence makes it plainly obvious—i.e., clearly demonstrated—that those marginal gains will actually materialize in the transferee venue." *Id.* (quoting *Clarke*, 94 F.4th at 508) (emphasis in original). The movant must "clearly demonstrate" that its chosen venue is "clearly more convenient." *Clarke*, 94 F.4th at 508. If the transferee venue is only "more likely than not to be more convenient," the "good cause" standard is not met. *Id.*

The preliminary question under § 1404(a) is "whether the case 'might have been brought' in the destination venue." *In re Planned Parenthood Fed'n of Am., Inc.*, 52 F.4th 625, 630 (5th Cir. 2022) (quoting 28 U.S.C. 1404(a)). Step two of the analysis requires the Court to consider eight public and private interest factors. *Media Matters*, 143 F.4th at 638. No factor carries dispositive weight, and the Fifth Circuit has "cautioned against a raw counting of the factors that weighs each the same." *Id.* (citation omitted).

The private factors are: "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious

3

and inexpensive[.]" *Id.* And the public factors are: "(5) the administrative difficulties flowing from court congestion; (6) the local interest in having localized interests decided at home; (7) the familiarity of the forum with the law that will govern the case; and (8) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.*

"Where there is no demonstration by the movant, let alone a clear one, the district court cannot weigh a factor against the non-movant and in favor of transfer." *Clarke*, 94 F.4th at 509 (quoting *Def. Distributed v. Bruck*, 30 F.4th 414, 434 (5th Cir. 2022)). When "the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Volkswagen*, 545 F.3d at 315.

### B. Transfer or Dismissal Under 28 U.S.C. § 1406(a)

"The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406. Transfer or dismissal under § 1406(a) is conditioned on the initial forum being wrong. *Atl. Marine*, 571 U.S. at 59. Congress enacted § 1406(a) to permit "a transfer when venue was improper but justice nonetheless weighed in favor of transfer to a proper venue rather than dismissal." *Franco v. Mabe Trucking Co., Inc.*, 3 F.4th 788, 793 (5th Cir. 2021).

## III.    ANALYSIS

Defendants argue that "[u]nder any legal framework, this Court should transfer the case."[9] Specifically, Defendants advance three sources of authority for the Court to transfer this action: (1) the forum selection clause in X's terms of service; (2) 28 U.S.C. § 1404(a); and

---

[9] Defs.' Br. Supp. Mot. Transfer Venue 2, ECF No. 153-1.

(3) 28 U.S.C. § 1406(a). Each is addressed in turn below, and for the following reasons, the Court concludes the Motion is **DENIED**.

### A. Forum Selection Clause

The Fifth Circuit's Order does not call into question this Court's prior determination that Defendants waived their right to assert the forum selection clause. *See Media Matters*, 143 F.4th at 631. Likewise, Judge Chhabria found no disagreement with this Court's waiver analysis and held that "Media Matters has waived the right to sue for breach of contract" under the forum selection clause because "Media Matters, despite being aware of the forum selection clause from the start, did not invoke it with respect to the Texas litigation for over a year and a half, until after it had moved to dismiss twice, engaged in multiple discovery disputes, and pursued an interlocutory appeal."[10] Accordingly, the Court maintains its prior analysis.[11]

The Court next considers transfer under 28 U.S.C. § 1404(a).

### B. 28 U.S.C. § 1404(a)

Defendants contend "this case has nothing to do with the Northern District of Texas" and request that the Court transfer this case to the Northern District of California under 28 U.S.C. § 1404(a).[12] Plaintiff opposes transferring and points to its Texas law claims, advertisers pertinent to those claims being headquartered in this District—for example, AT&T—, and this Court's central location in relation to the rest of the country and its history with this case.[13]

---

[10] Judge Chhabria is presiding over a related action where Media Matters sued X for breach of contract for filing this lawsuit in the Northern District of Texas instead of the Northern District of California. *See* Order 2, July 3, 2025, ECF No. 92, *Media Matters for Am. et al. v. X Corp. et al.*, No. 3:25-CV-02397-VC (N.D. Cal. 2025) (Chhabria, J.).

[11] Order 4–6, May 2, 2025, ECF No. 190.

[12] Defs.' Suppl. Br. in Supp. Mot. Transfer Venue 1, ECF No. 231-1.

[13] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue 1, ECF No. 228.

The threshold question for the Court under 28 U.S.C. § 1404(a) is whether this case could have been brought in the destination venue. *Planned Parenthood*, 52 F.4th at 630. Because neither party disputes that this case could have been brought in the Northern District of California, the Court turns to the private and public interest factors. The Court now considers the private and public interest factors.

### 1. Relative Ease of Access to Sources of Proof

The first private interest factor "focuses on the location of documents and physical evidence relating to the case." *In re TikTok, Inc.*, 85 F.4th 352, 358 (5th Cir. 2023) (citation modified). "The question is *relative* ease of access, not *absolute* ease of access." *Id.* (quoting *In re Radmax, Ltd.*, 720 F.3d 285, 288 (5th Cir. 2013)) (emphasis in original). Defendants argue that key evidence—"sensitive electronic materials such as source code or algorithms"—are located in the Northern District of California.[14] Plaintiff rebuts this by asserting that (1) its source code is stored on servers in Atlanta and Portland and (2) that the parties have agreed to review the source code at Plaintiff's counsels' offices in Texas.[15] Defendants further argue that Plaintiff "has not identified a single document in this district,"[16] but as Plaintiff points out, this ignores Plaintiff's claims against AT&T and the evidence that is likely to be found in this District.[17]

When "the vast majority of the evidence is electronic, and therefore equally accessible in either forum, this factor bears less strongly on the transfer analysis." *TikTok*, 85 F.4th at 358 (citation modified). However, as both parties agree, this factor retains more significance here because Plaintiff's claims hinge on sensitive electronic information. *See id.* at 359 ("As the district court recognized, the petitioners' source code is the most important evidence in this case.").

---

[14] Defs.' Br. Supp. Mot. Transfer Venue 19, ECF No. 153-1.
[15] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue 3, ECF No. 228.
[16] Defs.' Suppl. Br. Supp. Mot. Transfer Venue 2, ECF No. 231-1.
[17] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue 3, ECF No. 228.

6

Although the storage locations of the source code, Atlanta and Portland, are each closer to one district, the Court gives weight to the parties' agreement to view the source code at Plaintiff's counsel's offices in Texas, at least one of which is located in the Northern District of Texas. Additionally, Plaintiff contends that evidence as to at least one company, AT&T, is located in the Northern District of Texas. Moreover, despite Defendants' insistence that Plaintiff maintains two offices in the Northern District of California,[18] Plaintiff moved its headquarters to Bastrop, Texas and submits that information central to this case—"network equipment, many employees, documents and their custodians"—are located in Texas, not the Northern District of California.[19] Thus, on balance, the Court concludes that this factor weighs against transfer because Defendants have not shown that the Northern District of California is clearly more convenient.

### 2. Availability of Compulsory Process

The second factor evaluates "the availability of compulsory process to secure the attendance of witnesses." *Id.* at 360 (citation omitted). Whether either the current venue or the transfer venue "enjoy absolute subpoena power for both depositions and trial" is the relevant consideration. *Id.*

Defendants claim that two companies, Dropbox and Uber, have indicated they will not willingly provide witnesses.[20] In response, Plaintiff presents evidence that it has already voluntarily removed Uber from its damages case.[21] This leaves Dropbox. However, the parties have yet to identify any specific Dropbox employees for which compulsory process would be necessary for the parties to present their case to a jury. As the Fifth Circuit recently explained, this

---

[18] Defs.' Suppl. Resp. Br. Supp. Mot. Transfer Venue 1, ECF No. 232.
[19] Pl.'s Resp. 18, ECF No. 168-3.
[20] Defs.' Suppl. Br. Supp. Mot. Transfer Venue 2, ECF No. 231-1.
[21] Defs.' Suppl. Resp. Br. Supp. Mot. Transfer Venue 2, ECF No. 232.

factor deserves "less weight when it has not been alleged or shown that any witness would be unwilling to testify." *Planned Parenthood*, 52 F.4th at 631 (quoting *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d at 488, 499 (6th Cir. 2016)). Additionally, Dropbox has offices throughout the country, and Defendants have offered no evidence that any potential witness would lie within the Northern District of California's subpoena powers. Witnesses for this case will likely come from across the country, and no one district would have subpoena power for all unwilling witnesses. Thus, on balance, the Court finds that Defendants have not clearly shown that this factor supports transfer.

### 3. Costs of Attendance for Willing Witnesses

The third factor assess the cost of attendance for willing witnesses. *TikTok*, 85 F.4th at 361. The Fifth Circuit uses a 100-mile threshold when evaluating this factor. *Id.* "When the distance between an existing venue for trial and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to the witnesses increases in direct relationship to the additional distance to be traveled." *Id.* (citation modified).

Defendants attempt to argue that Northern District of California would be more convenient by citing tens of thousands of documents involving Plaintiff's employees located in the Northern District of California.[22] But a closer reading shows that these documents correspond to only four employees. As Plaintiff observes, many key witnesses and advertisers live on the east coast.[23] For example, Plaintiff alleges that Defendant Eric Hananoki lives in Maryland and Defendant Angelo Carusone lives in the District of Columbia.[24] Likewise, four out of Defendant Media Matters's five executives are alleged to live in the District of Columbia.[25] And advertisers IBM, ESPN, and the

---

[22] *Id.*
[23] Pl.'s Suppl. Resp. Br. Opp'n Mot. Transfer Venue 3, ECF No. 233.
[24] Pl.'s Resp. 19, ECF No. 168-3.
[25] *Id.*

NBA are also based on the East Coast.[26] Moreover, Plaintiff asserts that it plans to call as witnesses at least one Texas based employee and a representative from AT&T.[27]

The Court declines to weigh the bare number of potential witnesses in each location as that appears to be nothing more than a numerical guess that fails to illuminate which witnesses are the most relevant. The Court merely highlights the geographical spread of potential witnesses, and notes that the Northern District of Texas is over 1,000 miles closer to the District of Columbia and New York than is the Northern District of California. As the Fifth Circuit recently explained, "the primary witness in this case—must now travel over one thousand additional miles to testify. As should be plain, that is a massive inconvenience." *Clarke*, 94 F.4th at 514. The same is true here. Making witnesses travel more than 1,000 additional miles is massively inconvenient. The Court concludes that this factor weighs in favor of keeping this action in the Northern District of Texas.

### 4. All Other Practical Problems

"The fourth factor considers all other practical problems that make trial of a case easy, expeditious and inexpensive." *TikTok*, 85 F.4th at 362 (citation omitted). Defendants assert that "doubts about whether this Court has personal jurisdiction and venue risk serious inefficiencies with proceeding in this venue."[28] The Court disagrees with Defendants' doubts. Further, as the Fifth Circuit has explained "hypothetical questions of jurisdiction cannot tip this factor against transfer." *Id.* at 363 (citing *Def. Distributed*, 30 F.4th at 434–35).

This factor does weigh against transfer when the defendants "inexcusably delay" bringing their motion until "late in the litigation." *Id.* The Fifth Circuit affirmed a finding of inexcusable delay when petitioners filed their motion to transfer "seven months after th[e] case was unsealed

---

[26] Pl.'s Suppl. Resp. Br. Opp'n Mot. Transfer Venue 3, ECF No. 233.
[27] *Id.*
[28] Defs.' Suppl. Br. Supp. Mot. Transfer Venue 4, ECF No. 231-1.

and months into the discovery period." *Planned Parenthood*, 52 F.4th at 631. The court further explained that "[t]his conclusion is only strengthened by the fact that Petitioners waited to seek transfer until after the district court denied their motion to dismiss and motion for reconsideration." *Id.*

Defendants waited over 500 days[29] and filed 11 motions[30] before moving to transfer this case to the Northern District of California. Even so, Defendants argue they filed their Motion with "reasonable promptness" because they sought "transfer soon after the Court denied certification of its order finding personal jurisdiction and venue in this district and based on recent discovery that shows the Northern District of California to be the most convenient forum."[31] Defendants mischaracterize the litigation in this action. First, Defendants did not seek to transfer venue "soon after" the denial of certification of an immediate appeal. Instead, they waited over two months.[32] Second, Defendants waited until after the Court denied two motions to dismiss and a motion to certify an appeal before filing their transfer motion.[33] It certainly appears that Defendants are attempting to take multiple bites at the apple. *See id.* at 631 ("Given the timing of Movant's motion to transfer, it would emphatically not serve the interest of justice to allow him to take a second bite at the apple in [a new state], just after learning he would lose in [the current state]."). Given that the Court has now invested almost two years into this litigation, resolved no fewer than seven

---

[29] *See* Pl.'s Original Compl., ECF No. 1 (filed November 20, 2023).

[30] *See* Defs.' Mot. Dismiss Pl.'s Original Compl., ECF No. 31; Defs.' Mot. Stay Disc. Pending Ruling on Mot. to Dismiss, ECF No. 35; Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 40; Defs.' Renewed Mot. Stay Disc. Pending Ruling on Mot. Dismiss, ECF No. 43; Defs.' Mot. to Compel Corrected Certificate of Interested Person, ECF No. 73; Defs.' Mot. Certify Immediate Appeal, ECF No. 93; Defs.' Emergency Mot. Stay; ECF No. 99; Defs.' Mot. Compel Disc. Resp., ECF No. 113; Defs.' Mot. Compel Disc., ECF No. 182; Defs.' Mot. for Leave to Increase Dep. and to Amend Scheduling Order, ECF No. 185; Defs.' Mot. for Status Conference, ECF No. 186.

[31] Defs.' Br. Supp. Mot. Transfer Venue 21, ECF No. 153-1.

[32] The Court issued its Order denying Defendants Motion on January 2, 2025. Defendants did not file their Notice of Motion to Transfer Venue until March 6, 2025.

[33] *See* Order, Feb. 28, 2024, ECF No. 39; Order, Aug. 29, 2025, ECF No. 82; Order, Jan. 2, 2025, ECF No. 134.

motions,[34] and an interlocutory appeal remains at the Fifth Circuit,[35] the Court finds that this factor weighs against transfer.[36]

### 5. Administrative Difficulties Flowing from Court Congestion

The first public interest factor and fifth overall factor assesses "the administrative difficulties flowing from court congestion." *TikTok*, 85 F.4th at 362 (citation omitted). "The focus is on docket efficiency, an issue we have recognized the district court is better placed to evaluate." *Id.*

Defendants cite to the Court's explanation in a prior order regarding the busyness of the Court's docket as a reason to support transfer.[37] Plaintiff in turn cites statistics contrasting Northern District of Texas courts and Northern District of California courts to support denying transfer.[38] Without opining on the accuracy of Plaintiff's statistics or their applicability here, the Court maintains that it does carry a very busy docket. However, due to this, <u>the Court manages its docket very efficiently</u>. Neither party has alleged that this Court has not been efficiently trying to move this case to trial. In fact, much of the delay in this case has been Defendants' jurisdictional challenges and related appeals. The Court originally set this case for trial on January 6, 2025[39] and has needed to reset trial three times.[40] But for Defendants' delays, this case would likely be resolved by now. In spite of these delays, the Court has consistently moved this case forward

---

[34] *See* Order, Feb. 28, 2024, ECF No. 39; Order, Apr. 26, 2024, ECF No. 54; Order, Aug. 16, 2024, ECF No. 81; Order, Aug. 29, 2024, ECF No. 82; Order, Sept. 27, 2024, ECF No. 98; Order, Oct. 3, 2024, ECF No. 106; Order, Jan. 2, 2025, ECF No. 134.

[35] *See X v. Media Matters*, No. 24-10900 (5th Cir., notice of appeal filed Oct. 2, 2024).

[36] Indeed, the Fifth Circuit has said that a district court lacks jurisdiction to transfer a case when an appeal is pending before them. *See In re Fort Worth Chamber of Commerce*, 100 F.4th 528, 537 (5th Cir. 2024).

[37] Defs.' Br. Supp. Mot. Transfer Venue 17, ECF No. 153-1.

[38] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue 6, ECF No. 228.

[39] *See* Scheduling Order 1, Jan. 22, 2024, ECF No. 14.

[40] *See* Order, June 13, 2024, ECF No. 69; Order, Nov. 18, 2024, ECF No. 130; Order, May 9, 2025, ECF No. 194.

toward trial. The Court would not be so bold as to evaluate the docket efficiency of its counterparts in the Northern District of California, but it can unequivocally say that it has capacity to handle this case. Accordingly, the Court finds that this factor does not support transfer.

### 6. Local Interest in Having Localized Interests Decided at Home

The sixth factor focuses on "the local interest in having localized interests decided at home." *TikTok*, 85 F.4th at 364 (citation omitted). The Court looks at the "significant connections between a particular venue and the events that gave rise to a suit." *Def. Distributed*, 30 F.4th at 435. However, "[n]ot all cases are 'localized.'" *In re Chamber of Commerce of United States of Am.*, 105 F.4th 297, 308 (5th Cir. 2024). Some cases involve "defendants and . . . witnesses [who are] located across the state and across the country." *Id.* In these instances, the Court cannot say that one jurisdiction has a greater stake in the litigation than another. *Id.*

As the Court discussed above, Defendants and witnesses are located across the country. Defendants contend that the Northern District of California has a local interest in this case due to Plaintiff's headquarters being located there at the time the suit was initiated. Although that may have been true at the time, the same is not true now. *See Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 34 (1988) (Scalia, J., dissenting) ("[T]he courts in applying § 1404(a) have examined a variety of factors, each of which pertains to facts that currently exist or will exist."); *see also Lynk Labs, Inc. v. Home Depot USA, Inc.*, No. 6:21-CV-00097-ADA, 2022 WL 1593366, at *6 (W.D. Tex. May 19, 2022) (quoting *Seagen Inc. v. Daiichi Sankyo Co., Ltd.*, No. 2:20-CV-00337-JRG, 2021 WL 3620428, at *2 (E.D. Tex. Apr. 19, 2021)) ("Whether to transfer a case for convenience bears primarily on post-complaint matters."). Plaintiff has relocated its headquarters to Texas. And Texas has an interest in protecting Texas based business from potential interference. Even though Plaintiff's headquarters are not located within the Northern District of Texas, residents of the

12

Northern District have an interest in protecting Texas businesses—including AT&T which employs several thousand Dallas-Fort Worth residents.[41] Plaintiff is now at home in Texas. Thus, on balance, this factor is neutral or favors the Northern District of Texas. Because Defendants have not demonstrated that the Northern District of California is "clearly more convenient than the venue chosen by the plaintiff" the Court weighs this factor against transfer. *Volkswagen*, 545 F.3d at 315.

### 7. Familiarity of the Forum with the Law

The seventh factor assesses the current district's "familiarity with the law that will govern the case." *TikTok*, 85 F.4th at 365 (citation omitted). "This factor most commonly applies where the destination venue is in a different State—in which case that State's familiarity with the applicable law would be especially probative to the transfer analysis." *Id.*

Plaintiff brought Texas state law claims against Defendants. Despite filing two motions to dismiss citing Texas law,[42] Defendants assert that California law should apply to this dispute due to a choice of law provision in Plaintiff's then-applicable terms of service.[43] Plaintiff disputes this, contending that Defendants' invocation of the choice of law provision is untimely or that the choice of law provision is inapplicable to its claims.[44] It also asserts that "two of the three Defendants are not parties to the Former [terms of service] that contains the forum selection clause."[45]

Although the Court has not held which law applies (namely because the issue has not been presented here), Plaintiff raises plausible arguments that Texas law should apply, and the Court

---

[41]Nick Wooten, *AT&T Searching For Office Space Outside of Downtown Dallas*, THE DALLAS MORNING NEWS (Sep. 12, 2025), https://www.dallasnews.com/business/real-estate/2025/09/12/att-searching-for-office-space-outside-of-downtown-dallas/ [https://perma.cc/9GHM-URDV].

[42] Defs.' Mot. Dismiss Pl.'s Original Compl., ECF No. 31; Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 40.

[43] Defs.' Br. Supp. Mot. Transfer Venue 2, ECF No. 153-1.

[44] *See* Pl.'s Resp., ECF No. 168-3.

[45] *Id*. at 13.

applied Texas law when deciding Defendants' Motion to Dismiss.[46] *See Cory v. Stewart*, 103 F.4th 1067, 1076 (5th Cir. 2024) ("In Texas, to access Texas law despite a [differing] choice-of-law clause, the [movant] must prove the clause is either (1) unenforceable or (2) inapplicable to the asserted claim.") (internal citations omitted); *see also Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 726 (5th Cir. 2003), opinion modified on denial of reh'g, 355 F.3d 356 (5th Cir. 2003) ("We hold that, because the parties entered into a narrow choice of law clause, Texas law applies to and, at least conceptually, preserves some of those noncontractual claims."). The Court recognizes that "federal judges routinely apply the law of a State other than the one in which they sit" and that the parties have not pointed to some "exceptionally arcane features of Texas law that are likely to defy comprehension by a federal judge sitting in California." *TikTok*, 85 F.4th at 365 (citation modified). Balancing these considerations, the Court concludes that this factor is neutral. However, because Defendants have not demonstrated that the Northern District of California is "clearly more convenient than the venue chosen by the plaintiff," the Court weighs this factor against transfer. *Volkswagen*, 545 F.3d at 315.

### 8.  Unnecessary Conflict of Laws

The final factor considers "the avoidance of unnecessary problems of conflict of laws or in the application of foreign law." *TikTok*, 85 F.4th at 366 (citation omitted). Defendants assert this factor is neutral.[47] Plaintiff contests this, citing Defendants desire to invoke California's anti-SLAPP law.[48] Because neither party weighs this in favor of transfer, neither does the Court. The Court finds credence in Plaintiff's argument that transferring could result in unnecessary litigation regarding the applicability of California's anti-SLAPP provision. But given Defendants late-in-

---

[46] *See* Order, Aug. 29, 2024, ECF No. 82.
[47] Defs.' Suppl. Br. Supp. Mot. Transfer Venue 5, ECF No. 231-1.
[48] Pl.'s Suppl. Br. Opp'n Mot. Transfer Venue 9, ECF No. 228.

14

the-game assertion that California law applies, that fight may come regardless of venue. Thus, the Court finds this factor to be neutral. And because Defendants have not demonstrated that the Northern District of California is "clearly more convenient than the venue chosen by the plaintiff," the Court weighs this factor against transfer. *Volkswagen*, 545 F.3d at 315.

* * *

Weighing the private and public interest factors, the Court finds that Defendants have not clearly demonstrated that a transfer would be significantly more convenient for the parties and witnesses. Even outside of the eight factors, Defendants' failure to promptly move for transfer weighs heavily against transferring this action. *See Media Matters*, 143 F.4th at 639. As such, Defendants have not clearly established good cause to transfer. Accordingly, the Court respects the venue chosen by Plaintiff. Defendants' Motion to Transfer under 28 U.S.C. § 1404(a) is **DENIED**.

### C.  28 U.S.C. § 1406(a)

Finally, Defendants request transfer or dismissal under 28 U.S.C. § 1406(a).[49] Transfer and dismissal under § 1406(a) are conditioned on the initial forum being wrong. *Atl. Marine*, 571 U.S. at 59. The Court has previously found that venue is proper in the Northern District of Texas.[50] Defendants continue to argue "no substantial part of the events giving rise to this claim arose" in the Northern District of Texas.[51] Defendants' discovery evidence is insufficient to support their position that the Northern District of Texas is an improper venue. Therefore, the Court reaffirms its previous holding that venue is proper in the Northern District of Texas. Accordingly, the Court **DENIES** Defendants Motion to Transfer or Dismiss pursuant to 28 U.S.C. § 1406(a).

---

[49] Defs.' Br. Supp. Mot. Transfer Venue 24, ECF No. 153-1.
[50] *See* Order, Aug. 29, 2024, ECF No. 82.
[51] Defs.' Br. Supp. Mot. Transfer Venue 24, ECF No. 153-1; Defs.' Suppl. Br. Supp. Mot. Transfer Venue 9, ECF No. 231-1.

## IV.    CONCLUSION

For the reasons explained above, Defendants' Motion to Transfer Venue based on the forum selection clause, 28 U.S.C. § 1404, or 28 U.S.C. § 1406 is **DENIED**. The Court also **DENIES** Defendants' Motion to Dismiss based on 28 U.S.C. § 1406(a).

**SO ORDERED** on this **16th day** of **September, 2025**.

Reed O'Connor
**CHIEF UNITED STATES DISTRICT JUDGE**

16

App. 154

# **TAB 24**

Case 4:25-cv-00914-P    Document 46    Filed 10/08/25    Page 156 of 172    PageID 528

TRY GROK



# Terms of Service – Consumer

*Effective: June 9, 2025 (previous version)*

## Welcome to xAI!

These Terms of Service (”**Terms**”) apply to your use of Grok and xAI's other services for individuals, including associated applications and websites (collectively, the "**Service**"). These Terms form an agreement between you and X.AI LLC, a Nevada company ("**xAI**," "**we**," "**our**," or "**us**"). By using our Services, you acknowledge and agree to these Terms.

Please note:

- We reserve the right to modify these Terms.

- Our Enterprise Terms of Service govern the use of our services for developers and businesses, including xAI APIs and PromptIDE.

- If you reside in the European Economic Area, United Kingdom, or Switzerland (collectively, "**Europe**"), your use of the Service is governed in part by the Europe Specific Terms ("**EST**").

- Please read our Privacy Policy, which describes how we collect, use and disclose personal information. Although it does not form part of these Terms, it is an important document you should read.

- Another helpful resource is our Consumer FAQs that, while not part of these Terms, give further information about our Service.

# Who We Are

TRY GROK

xAI is a company working on building artificial intelligence to accelerate human scientific discovery. We are guided by our mission to advance our collective understanding of the universe. As part of our mission, we have developed "**Grok**," a conversational generative AI powered by xAI's large language models. For more information about xAI, please visit https://x.ai/. xAI is a separate company from X Corp. ("**X**", previously Twitter).

# Registration and Access

**Minimum age.** You must be at least 13 years old or the minimum age required in your country to use the Service, and you must confirm that you meet the minimum age requirement. If you are a teenager between the ages of 13 and 17 years old, you must have your parent or legal guardian's permission to use the Service, and they must agree to our Terms of Service. While we have taken measures to limit undesirable training data and outputs, depending on the features that you choose to use, the Service could produce output that is not appropriate for all ages. For instance, if users choose certain features or input suggestive or coarse language, the Service may respond with some dialogue that may involve coarse language, crude humor, sexual situations, or violence. We urge parents to exercise care in monitoring the use of the Service by their teenagers. Parents or guardians who choose to use certain features of the Service to aid in their interactions with their children, including regarding educational, enlightening, or entertaining discussions they have with their children, must make use of the data controls provided in the Service to select the appropriate features for their needs.

**Registration.** You must provide accurate and complete information to register for an account to use our Service. You may not share your account credentials or make your account available to anyone else, and are responsible for all activities that occur under your account. If you create an account or use the Service on behalf of another person or entity, you must have the authority to accept these Terms on their behalf.

**Logging in through a third-party service.** By choosing to login to our Service by using a third-party service, such as Google, Apple, or X, you give us permission to access, use, and store your information from that service, as permitted by that service, which may include log-in credentials and/or access tokens for that service. If connecting to our Service using your X

credentials, you may elect (opt-in) to bring your X user profile (including date of birth), X account and location information, X preferences, X post history (your X posts viewable on your X account including posts to and from all accounts (public or protected) that you can view), X usage data, and your Grok in X conversation history to your xAI account.

# Using our Service

**What you can do.** Subject to your compliance with these Terms, you may access and use our Service. You must comply with all applicable laws as well as our Acceptable Use Policy and any other documentation, guidelines, or policies we make available to you, including on our website.

**What you cannot do.** Prohibited uses of our Service include any illegal, harmful, or abusive activities, including but not limited to::

- *Detrimentally impacting the Service, including by:*

  - Modifying, copying, leasing, selling, reselling, distributing, distilling, using bots to access, reverse engineering, or decompiling our Service

  - Using the Service or any Output to develop models or services that compete with xAI, scraping or reselling any Input or Output, or distilling model data

  - Disrupting, interfering with, or unauthorized access to the Service or its safety systems

- *Causing harm or engaging in abusive activity, including by:*

  - Critically harming or promoting critically harming human life (yours or anyone else's), including pro-terrorist activities

  - Violating copyright, trademark, or other intellectual property law

  - Violating a person's privacy or their right to publicity

  - The sexualization or exploitation of children

  - Espionage, hacking, defrauding, defamation, scamming, spamming, or phishing

- *Not complying with laws or regulations, including by:*

  - Taking unauthorized actions on behalf of others

App. 158

- Operating in a regulated industry without complying with those regulations or in a region where we do not offer Service

TRY GROK

- Making high-stakes automated decisions that affect a person's safety, legal or material rights, or well-being (such as making financial credit, educational, employment, housing, insurance, legal, medical, or other important decisions about or for them)

- Misleading others or not being transparent regarding your use of AI

**Who Is Prohibited From Using the Service.**

- Anyone who violates these Terms, Acceptable Use Policy, other documentation, guidelines, or policies we make available to you.

- Anyone who has been previously removed from the Service.

- We reserve the right to decide, at our sole discretion, not to contract with you. If you do not have a valid contract with us, you are prohibited from using our Service.

**Third-party services and software.** Our Service may include or be integrated with third-party software, products, or services that are subject to their own terms. Our software may include open source software that is governed by its own licenses.

# User Content

**You Own Your User Content.** You may provide input (e.g., text, audio, images, video, code, files, folders, drives, etc.) to the Service ("**Input**") and receive output from the Service based on the Input ("**Output**"). Collectively, Input and Output are "**User Content**." You are responsible for User Content, including ensuring that it does not violate any applicable law or these Terms. You represent and warrant that you have all rights, licenses, and permissions needed to provide Input to our Service. To the extent permitted by applicable law, and as between you and xAI, you retain your ownership rights to the User Content. We ask that when using Output, you attribute the Service as having generated the Output, as detailed in our Brand Guidelines.

**Our Use of User Content.** You grant, an irrevocable, perpetual, transferable, sublicensable, royalty-free, and worldwide right to xAI to use, copy, store, modify, distribute, reproduce, publish, display in public forums, list information regarding, make derivative works of, and

aggregate your User Content and derivative works thereof for any purpose, including but not limited: (i) to maintain and provide the Service; (ii) to improve our products and the Service and for our other business purposes, such as data analysis, customer and market research, developing new products or features, or identifying or displaying usage or User Content trends; and (iii) to perform such other actions to enforce these Terms, comply with our Privacy Policy, comply with applicable law, or keep our Service safe.

Automated systems that analyze your use of the Service and User Content may be used for business, safety, and compliance purposes. A limited number of our authorized personnel may review how you use the Service and your User Content for specific business purposes, including improving product features, investigating security incidents and potential misuse of our Services, and complying with our legal obligations.

**Electing whether your User Content is used for product development or model training.** When logged into our Service, you can select whether or not you want us to use your User Content to improve our products and services and train our models. Private Chat and User Content that you request to be deleted will be queued for deletion, which may take up to 30 days. Where available, you may access our Service without logging in; when doing so, where permitted, you grant us full rights to use any data you provide to or obtain from our Service for product development and model training purposes. Further details are available in our Privacy Policy and Consumer FAQs.

**Accuracy.** Artificial intelligence is rapidly evolving and is probabilistic in nature; therefore, it may sometimes: a) result in Output that contains "hallucinations," b) be offensive, c) not accurately reflect real people, places or facts, or d) be objectionable, inappropriate, or otherwise not suitable for your intended purpose.

**Similarity of content.** Due to the nature of artificial intelligence, outputs may not be unique, and different users may receive similar output from our Service. Your rights to the Output do not extend to other's rights.

**Connecting to third-party services.** Certain features of the Service may facilitate your ability to connect to a third-party service, such as X or other companies. If you select a feature that involves sending your User Content to such a third-party service, you are instructing and authorizing xAI to send your User Content out of the Service. Please review the policies

App. 160

of any third-party service providers for additional information about how they may use
those materials.                                                                                   TRY GROK

**When you use our Service, you understand and agree that:**

- Output may not always be accurate. Output from our services is not professional advice. You should conduct your own thorough research and should not rely on Output as the truth.

- You are responsible for evaluating the Output for accuracy and appropriateness for your use, including using human review and supervision, before using or sharing Output.

- Our Service may provide incomplete, incorrect, or offensive Output that does not represent xAI's views. Outputs are not meant to endorse a person or third-party's views.

- At our sole discretion, we may implement rate limitations to accommodate system resources or usage needs.

## The Services Are Available "As Is"

We continue to add new models and other features, some which may be in beta testing where indicated. You accept that all of our services, including but not limited to such beta technologies, are provided "AS IS" and may contain errors, defects, bugs or inaccuracies that could fail or cause corruption or loss of data and information. You agree that use of any of our technologies is at your own risk.

## xAI's Intellectual Property Rights

**We own our Service.** We and our affiliates own all rights, title, and interest in and to the Service.

**Usage data relating to our Service.** We may collect, or you may provide to us, diagnostic, technical, usage, and/or related information, including information about your computers, mobile devices, systems, and software (collectively, "**Usage Data**"). All Usage Data is and will be owned solely and exclusively by us, and, to the extent any ownership rights in or to the Usage Data vest in you, you hereby assign to us all rights (including intellectual property

App. 161

rights), title, and interest in and to the same. Accordingly, we may use, maintain, and/or process the Usage Data or any portion thereof for any lawful purpose, including, without limitation: (a) to provide and maintain the Service; (b) to improve or develop our products and services; (c) to monitor your usage of the Service; (d) for research and analytics, including, without limitation, data analysis, identifying usage trends, and/or customer or market research; and (e) to share analytics and other derived Usage Data with third-parties.

**Feedback.** To the extent you provide us any suggestions, recommendations, or other feedback relating to the Service or to any other xAI products or services (collectively, "**Feedback**"), you hereby assign to us all rights (including all intellectual property rights), title, and interest in and to the Feedback. Accordingly, we are free to use the Feedback and any ideas, know-how, concepts, techniques, and/or other intellectual property contained in the Feedback, without providing any attribution or compensation to you, for any purpose whatsoever. We are not required to use any Feedback.

# Privacy and Data Security

**Privacy.** We care about your privacy. By using the Service, you acknowledge that we may collect, use, and disclose your personal information and aggregated, pseudonymized, and/or de-identified data as set forth in our Privacy Policy, and that your personal information will be transferred to, and/or processed in, the United States.

**Security.** We care about the security of your personal information. However, we cannot guarantee that unauthorized third-parties will never be able to defeat our security measures or to use your data for improper purposes. You acknowledge that you provide your data at your own risk. You will notify us immediately of any breach of security or unauthorized use of your User Account, and you will immediately take action to secure your account, including by changing your password.

# Paid Accounts

**Fees; Payments; Cancellation.** If you purchase any aspect of the Service, you must provide complete and accurate billing information, including a valid payment method. For paid subscriptions, we will automatically charge your payment method on each periodic renewal

App. 162

until you cancel. We will charge tax when required. If your payment is not successful, we may downgrade your account or suspend your access to the Service until payment is received. You can cancel your paid subscription at any time; however, payments already made are non-refundable, except where required by law. For questions regarding payments or cancellation, please contact support@x.ai.

**Price changes.** We may adjust subscription prices periodically. If prices increase, we will provide 30 days' notice, and the new price will apply at your next renewal, allowing you to cancel if you disagree with the change.

**Paid subscriptions through X.** Use of Grok on the X platform is not governed by these Terms. To access Grok on X, you must agree to the X Terms of Service.

# Termination, Suspension, Discontinuation

**Termination or Suspension.** You are free to stop using our Service at any time and close your account. We may terminate or suspend your access to our Service or delete your account at any time without notice to you if we determine, at our sole discretion, that:

- You breached these Terms or our Acceptable Use Policy, guidelines, or other policies;

- We must do so to comply with the law;

- Your use of our Service could cause risk or harm to xAI, our users, or anyone else; or

- Your account has been inactive for over a year and you do not have a paid account.

**No refund.** Upon Service termination, you will not be entitled to any refund, except where required by law.

**Appeals.** If you believe we have suspended or terminated your account in error, you can file an appeal with us by contacting support@x.ai.

**Discontinuation.** We may decide to discontinue our Service. If we do, we will provide you notice and any applicable refund for prepaid, unused services.

# Disclaimer of Warranties

App. 163

TO THE FULLEST EXTENT PERMITTED BY LAW, THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. YOUR USE OF THE SERVICE IS AT YOUR OWN RISK. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE SERVICE, THE INTELLECTUAL PROPERTY, AND ANY OTHER INFORMATION AVAILABLE ON OR THROUGH THE SERVICE ARE PROVIDED WITHOUT WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND/OR NON-INFRINGEMENT. XAI DOES NOT GUARANTEE THAT THE FUNCTIONS OR FEATURES OF THE SERVICE WILL BE UNINTERRUPTED OR ERROR-FREE OR THAT DEFECTS WILL BE CORRECTED. YOU ACCEPT AND AGREE THAT ANY USE OF OUTPUTS FROM OUR SERVICE IS AT YOUR SOLE RISK AND YOU WILL NOT RELY ON OUTPUT AS THE SOLE SOURCE OF TRUTH OR FACTUAL INFORMATION, OR AS PROFESSIONAL ADVICE.

## Indemnity

To the fullest extent permitted by law, you will defend, indemnify, and hold xAI and our parents, subsidiaries and affiliates, and our and their respective agents, suppliers, licensors, employees, contractors, officers, and directors (collectively the "**xAI Indemnitees**") harmless from and against any and all claims, damages (whether direct, indirect, incidental, consequential, or otherwise), obligations, losses, liabilities, costs, debts, and expenses (including, but not limited to, legal fees) arising from or related to your use of the Service and Output, your Input, or any violation of these Terms.

## Limitation of Liability

TO THE FULLEST EXTENT PERMITTED BY LAW, IN NO EVENT WILL XAI OR ANY XAI INDEMNITEE BE LIABLE (A) FOR ANY INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR EXEMPLARY DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF PROFITS, GOODWILL, USE, OR DATA, OR OTHER INTANGIBLE LOSSES, ARISING OUT OF OR RELATING TO THE USE OF, OR INABILITY TO USE, THE SERVICE OR ANY PORTION THEREOF; AND (B) TO YOU FOR ANY CLAIMS, DAMAGES OR COSTS IN AN AMOUNT EXCEEDING THE AMOUNT YOU PAID TO US HEREUNDER OR ONE

App. 164

HUNDRED U.S. DOLLARS ($100.00), WHICHEVER IS GREATER. THESE LIMITATIONS OF
LIABILITY APPLY EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

Some countries and states do not allow the disclaimer of certain warranties or the limitation of certain damages, so some or all of the terms above may not apply to you, and you may have additional rights.

## Copyright Complaints

If you believe that your copyrighted work or other right to your work or image has been infringed and is accessible via the Service, you agree to first notify our copyright agent by following these instructions. We may, if feasible, delete or disable content that we believe violates these Terms or is alleged to be infringing and will terminate accounts of repeat infringers at our sole discretion. Written claims concerning copyright infringement must include all of the following information:

- An electronic or physical signature of a person authorized to act on behalf of the copyright owner

- A description of the copyrighted work that you claim has been infringed upon

- A description of where the allegedly infringing material is located on our Service, so we can find it

- Your address, telephone number, and e-mail address

- A statement by you that you have a good-faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law

- A statement by you, made under penalty of perjury, that the above information is accurate, and that you are the copyright owner or are authorized to act on behalf of the copyright owner.

The above information must be submitted to our Copyright Agent at: Attn: Legal - Copyright Agent, X.AI LLC, legal@x.ai

## Dispute Resolution

App. 165

**Class Action and Jury Trial Waiver** BY ENTERING INTO THESE TERMS, YOU AND XAI ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO BRING, JOIN, OR PARTICIPATE IN ANY PURPORTED CLASS ACTION, COLLECTIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR OTHER REPRESENTATIVE PROCEEDING OF ANY KIND AS A PLAINTIFF OR CLASS MEMBER. THE FOREGOING APPLIES TO ALL USERS (BOTH NATURAL PERSONS AND ENTITIES), REGARDLESS OF WHETHER YOU HAVE OBTAINED OR USED THE SERVICE FOR PERSONAL, COMMERCIAL, OR OTHER PURPOSES.

**Governing Law; Jurisdiction and Venue.** This agreement and all claims or disputes between You and xAI shall be governed by the laws of Texas without regard to conflict of law principles, and shall be brought exclusively in the state and federal courts in Tarrant County, Texas, and the parties hereby irrevocably consent to the exclusive jurisdiction and venue of such courts.

**Limitations Period.** Any claims or causes of action between You and xAI must be filed within two (2) years after such claim or cause of action accrues, and if not so filed will be forever barred to the fullest extent permitted by law. For purposes of this section, a claim or cause of action accrues when the event giving rise to the claim occurs, or when the claimant knew or should have known of the event, whichever is earlier.

# General Provisions

**Assignment.** These Terms, and any rights and licenses granted hereunder, may not be transferred or assigned by you, but may be assigned by us without restriction. Any attempted transfer or assignment by you in violation hereof will be null and void.

**Changes to Terms.** When we change these Terms in a material manner, we will update the 'Effective' date at the top of this page. **Your continued use of the Service after any change to these Terms constitutes your acceptance of the new Terms of Service.** If you do not agree to any part of these Terms or to any future Terms of Service, do not access or use (or continue to access or use) the Service.

**Entire Agreement; Severability.** These Terms, together with any amendments and any additional written agreements you may enter into with us in connection with the Service, will constitute the entire agreement between you and us concerning the Service. Any statements or comments made between you and any of our employees or representatives are expressly

App. 166

excluded from these Terms and will not apply to you or us, or to your access to or use of the Service. If any provision of these Terms is deemed invalid by a court of competent jurisdiction, the invalidity of such provision will not affect the validity of the remaining provisions of these Terms, which will remain in full force and effect.

**No Waiver.** No waiver of any term of these Terms will be deemed a further or continuing waiver of such term or of any other term, and our failure to assert any right or provision under these Terms will not constitute a waiver of such right or provision.

**Export Controls.** You will comply with all applicable import and export and re-export control and trade and economic sanctions laws and regulations in your use of the Service, including the Export Administration Regulations maintained by the U.S. Department of Commerce, trade and economic sanctions maintained by the U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**"), and the International Traffic in Arms Regulations maintained by the U.S. State Department. You represent and warrant that you are not, and that no person to whom you make the Service available or that is acting on your behalf, is (a) listed on the List of Specially Designated Nationals and Blocked Persons or on any other list of sanctioned, prohibited, or restricted parties administered by OFAC or by any other governmental entity, or (b) located in, a national or resident of, or a segment of the government of, any country or territory for which the United States maintains trade or economic sanctions or embargoes or that has been designated by the U.S. Government as a "terrorist supporting" region.

**How to Contact Us.** These Terms are with X.AI LLC, a Nevada company. For questions about these Terms, contact xAI at legal@x.ai. If you have any questions about the Service, please contact us at support@x.ai.

## Mobile App Specific Terms

To use any mobile App, you must have a mobile device that is compatible with such App. xAI does not warrant that any App will be compatible with your mobile device. You may use mobile data in connection with an App and may incur additional charges from your wireless provider in connection with such App. You understand and acknowledge that you are solely responsible for any such charges. Mobile Apps may update automatically to ensure you are using the latest version. We hereby grant you a non-exclusive, limited, non-transferable, and freely revocable license to use a compiled code copy of the App(s) under your User Account on one (1) or more

App. 167

mobile devices owned or controlled solely by you (except to the extent Apple or Google permits any shared access and/or use of the iOS App or Android App (as each of those terms is defined below), respectively), solely in accordance with these Terms. The foregoing license grant is not a sale of any App or of any copy thereof. You consent to such automatic upgrading on your mobile device.

**iOS App.** This paragraph applies to any App you acquire from the Apple App Store (such App, "**iOS App**"). You and xAI understand and acknowledge that these Terms are solely between you and xAI, not Apple, Inc. ("**Apple**"), and that Apple has no responsibility for the iOS App or content thereof. Your access to and use of the iOS App must comply with the usage rules set forth in Apple's then-current Apple Media Services Terms and Conditions and with the applicable Volume Content Terms. You acknowledge that Apple has no obligation whatsoever to furnish any maintenance and support services with respect to the iOS App. In the event of any failure of the iOS App to conform to any applicable warranty, you may notify Apple, and Apple will refund the purchase price (if any) for the iOS App to you; to the maximum extent permitted by applicable law, Apple will have no other warranty obligation whatsoever with respect to the iOS App, and any other claims, losses, liabilities, damages, costs, or expenses attributable to any failure to conform to any warranty will be governed solely by these Terms and any law applicable to xAI as provider of the iOS App. You and xAI acknowledge that Apple is not responsible for addressing any claims of you or any third-party relating to the iOS App or your possession and/or use of the iOS App, including, but not limited to: (a) product liability claims; (b) any claim that the iOS App fails to conform to any applicable legal or regulatory requirement; and (c) claims arising under consumer protection or similar legislation. You acknowledge that, in the event of any third-party claim that the iOS App, or your possession and use of that iOS App, infringes that third-party's intellectual property rights, xAI, not Apple, will be solely responsible for the investigation, defense, settlement, and discharge of any such intellectual property infringement claim, to the extent required by these Terms. You and xAI acknowledge and agree that Apple and Apple's subsidiaries are third-party beneficiaries of these Terms as relates to your license of the iOS App, and that, upon your acceptance of the terms and conditions of these Terms, Apple will have the right (and will be deemed to have accepted the right) to enforce these Terms as relates to your license of the iOS App against you as a third-party beneficiary thereof.

**Android App.** This paragraph applies to any App you acquire from the Google Play Store (such App, "**Android App**"): (a) you acknowledge that these Terms are between you and xAI only, and

App. 168

not Google LLC or any affiliate thereof (collectively, "**Google**"); (b) your access to and use of the Android App must comply with Google's then-current Google Play Terms of Service; (c) Google is only a provider of the Google Play Store where you obtained the Android App; (d) xAI, and not Google, is solely responsible for the Android App; (e) Google has no obligation or liability to you with respect to the Android App or these Terms; and (f) you understand and acknowledge that Google is a third-party beneficiary to these Terms as they relate to the Android App.

# Regional Specific Terms

**Australian Residents.** If you are an Australian resident, you may report child safety issues to the eSafety Commission with this webform.

**California Residents.** The provider of the Service is set forth herein. If you are a California resident, in accordance with Cal. Civ. Code §1789.3, you may report complaints to the Complaint Assistance Unit of the Division of Consumer Services of the California Department of Consumer Affairs by contacting it in writing at 1625 North Market Blvd., Suite N 112 Sacramento, CA 95834, or by telephone at (800) 952-5210 or (916) 445-1254.

**European Economic Area (EEA), United Kingdom (UK) or Switzerland Residents ("Europe Specific Terms" or "EST")**

- **EST Definition of Consumer.** For the purposes of these Europe Specific Terms "European Consumers" are individuals with a habitual place of residence in the EEA, UK or Switzerland acting for purposes that are wholly or mainly outside that individual's trade, business, craft or profession.

- **EST Order Process.** As a European-Consumer, you are responsible for ensuring that your information is complete and accurate. The order process allows you to check and amend any errors before submitting your registration. Once you submit, we will begin processing it immediately. We will not file a copy of any contract formed between you and us.

- **EST Governing Law.** The Terms above provide the governing law, excluding applicable conflict of laws principles. As a European-Consumer, you will benefit from the applicable mandatory provisions of the law of the country in which you are resident.

App. 169

- **EST Venue of Jurisdiction.** As a European-Consumer, you may bring a dispute which may arise under these Terms or in connection with the use of the Service, in the applicable courts of the country in which you are habitually resident.

- **EST Right of Withdrawal.** As a European-Consumer, you have the right to close your account and withdraw from this contract within 14 days of entering into the contract. To exercise your right of withdrawal, you must inform us of your decision to withdraw from this contract by an unequivocal statement sent to support@x.ai. You may use the Model Withdrawal Form below, but it is not obligatory.

- **EST Consequences of Exercising Right of Withdrawal.** If you withdraw from this contract and you have signed-up for a paid subscription, we will repay you for payments that we verify have already been received by us from you for the subscription term active at the time of your withdrawal notice, within 14 days from the day on which we received the notification of your withdrawal from this contract. For this repayment, we will use the same means of payment that you used for the original transaction, unless expressly agreed otherwise with you. Please note this does not include X Premium or X Premium+ account charges because that is not part of this Service. Please refer to the X Premium Terms of Use for further details of how to claim a refund for those charges.

- **EST Withdrawal Form.** If you wish to withdraw from the contract, send an email requesting withdrawal to support@x.ai and include the following information: Full legal name, login/user name (e.g., email and/or X user name), residential address, date of order/subscription, date submitting withdrawal.

- **EST Limitation of Liability.** For European-Consumers, provided that we have acted with professional diligence, we do not take responsibility for loss or damage caused by us, unless it is caused by our breach of these Terms or is reasonably foreseeable at the time of entering into these Terms. We do not take responsibility for loss or damage caused by events beyond our control. We do not limit our liability to you where it would be unlawful for us to do so. You have the full protections of the applicable laws and statutory rights.

- **EST Consumer Guarantee.** For European-Consumers, the applicable European consumer laws provide you with a guarantee covering the Service. Questions regarding the Service can be directed to support@x.ai.

App. 170

- **EST No Release; Indemnity.** The Release Section and Indemnity Section of the Terms shall not be applicable to European-Consumers subject to these Europe Specific Terms.

- **EST Changes to the Terms.** With respect to European-Consumers, xAI may unilaterally make changes to these Terms (including the Europe Specific Terms) when it is necessary to do so, particularly as a result of changes of law or to ensure a better functionality of the Service. xAI shall take proportionate measures, if required, to notify Users in advance of such changes to the Terms, such notification may take the form of an in-Service notification or an email for a material change. If you do not agree to the amended Terms, you may object and must discontinue your use of the Service. If you do not object and continue to use the Service, you will be deemed to have acknowledged the amendment and agreed to be bound by it.

TRY GROK ON

Web

iOS

Android

Grok on X

PRODUCTS

Grok

API

App. 171

Case 4:25-cv-00914-P　　Document 46　　Filed 10/08/25　　Page 172 of 172　　PageID 544

Grok Enterprise

TRY GROK

## COMPANY

Company

Careers

Contact

News

## RESOURCES

Documentation

Privacy policy

Security

Safety

Legal

Status

Case 4:25-cv-00914-P　　Document 46　　Filed 10/08/25　　Page 172 of 172　　PageID 544

App. 172