**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC, <br><br> Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**PLAINTIFFS X CORP. AND X.AI LLC'S OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS AND BRIEF IN SUPPORT**


Bradley Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036

Caroline P. Boisvert
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103

Judd E. Stone II
Christopher D. Hilton
STONE | HILTON PLLC
600 Congress Ave., Suite 2350
Austin, TX 78701

Craig M. Reiser
Scott A. Eisman
Eva Yung
Christopher Erickson
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111

Alex More
Monica E. Gaudioso
Robert C. Rowe
CARRINGTON, COLEMAN, SLOMAN
& BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ..................................................................................................... 4

ARGUMENT .......................................................................................................... 7

I.    Plaintiffs Plausibly Allege That Apple And OpenAI
Violated Section 1 Of The Sherman Act (Counts 1 and 9)................................... 9

    A.    Plaintiffs Plausibly Allege That The
Apple-OpenAI Arrangement Is Exclusive................................. 10

    B.    Plaintiffs Plausibly Allege
Substantial Foreclosure In The Relevant Markets ................................... 14

        1.    Plaintiffs' Allegations Of Qualitative And Quantitative
Foreclosure Are More Than Enough To State A Claim .............. 15

        2.    The Availability Of Worse Distribution Channels Does
Not Negate Plaintiffs' Allegations Of Substantial Foreclosure.... 18

        3.    Plaintiffs Allege Substantial
Foreclosure In The Relevant Markets ........................................... 19

    C.    Plaintiffs Plausibly Allege An Agreement To Preference ChatGPT ........ 22

II.    Plaintiffs Plausibly Allege That Apple And OpenAI
Violated Section 2 Of The Sherman Act (Counts 2-6 and 10) .......................... 24

    A.    Plaintiffs Plausibly Allege Anticompetitive Conduct.............................. 24

    B.    Plaintiffs Plausibly Allege Specific Intent................................................ 25

III.    Plaintiffs Have Antitrust Standing ................................................................. 27

    A.    Apple's Antitrust Standing Arguments Are Meritless.............................. 28

        1.    Plaintiffs Plausibly Allege Causation
As Competitive Threats To Apple's Smartphone ......................... 28

        2.    Plaintiffs Plausibly Allege Antitrust
Injury As Competitors To Smartphones ....................................... 30

    B.    OpenAI's Antitrust Standing Arguments Are Meritless.......................... 32

        1.    Plaintiffs Plausibly Allege Causation As
Competitive Threats To OpenAI's Generative AI Chatbot .......... 32

        2.    Plaintiffs Plausibly Allege Antitrust
Injury By Alleging That Consumers Would
Prefer xAI's Products To OpenAI's Products .............................. 34

IV.    Plaintiffs Plausibly Allege Claims For Common-Law
Civil Conspiracy And Unfair Competition (Counts 7-8)...................................... 35

CONCLUSION.................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*,
   2020 WL 4050243 (E.D. La. July 17, 2020), *granting recons. in part*,
   2021 WL 5029418 (May 14, 2021) ................................................................21, 22

*Am. Airlines, Inc. v. Travelport Ltd.*,
   2012 WL 3737037 (N.D. Tex. Aug. 7, 2012)................................................15, 26

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   128 F. Supp. 2d 988 (N.D. Tex. 2001), *aff'd*, 300 F.3d 620 (5th Cir. 2002)..........................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)................................................................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985)........................................................................................25, 26

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)........................................................................................27, 30

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990)..............................................................................................27

*Bakay v. Apple Inc.*,
   2024 WL 3381034 (N.D. Cal. July 11, 2024).......................................................30

*Bell v. Dow Chem. Co.*,
   847 F. 2d 1179 (5th Cir. 1988) .....................................................................26, 33

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
   49 F.4th 520 (5th Cir. 2022) ..............................................................13, 14, 17

*Campbell v. Wells Fargo Bank, N.A.*,
   781 F.2d 440 (5th Cir. 1986) ..............................................................................30

*Centennial Bank v. Holmes*,
   717 F. Supp. 3d 542 (N.D. Tex. 2024) ...............................................................35

*Chase Mfg., Inc. v. Johns Manville Corp.*,
   84 F.4th 1157 (10th Cir. 2023) ...........................................................................18

*CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*,
   2023 WL 2468742 (C.D. Cal. Feb. 23, 2023),
   *aff'd in part and rev'd in part*, 150 F.4th 1056 (9th Cir. 2025)..............................13

*CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*,
  150 F.4th 1056 (9th Cir. 2025) ...............................................................13, 14, 17

*Dexon Comput. Inc. v. Cisco Sys., Inc.*,
  2023 WL 2941414, at *37 (E.D. Tex. Feb. 7, 2023), *report and
  recommendation adopted*, 2023 WL 2730656 (E.D. Tex. Mar. 31, 2023).............................31

*Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos
  Co.*, 567 F.2d 1299 (5th Cir. 1978).......................................................................14

*In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*,
  2013 WL 812143 (D.N.J. Mar. 5, 2013).................................................................16

*E.I. DuPont de Nemours & Co. v. Kolon Indus.*,
  637 F.3d 435 (4th Cir. 2011) .............................................................................16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
  504 U.S. 451 (1992).........................................................................................25

*Epic Games, Inc. v. Apple Inc.*,
  781 F. Supp. 3d 943 (N.D. Cal. 2025) ................................................................19

*JSW Steel (USA) Inc. v. Nucor Corp.*,
  586 F. Supp. 3d 585 (S.D. Tex. 2022),
  *aff'd*, 2025 WL 832801 (5th Cir. Mar. 17, 2025) ...................................................9

*Kaye v. Lone Star Fund V (U.S.), L.P.*,
  453 B.R. 645 (N.D. Tex. 2011).............................................................................7

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)..............................................................16, 20

*Leaf Trading Cards, LLC v. Upper Deck Co.*,
  2018 WL 2971135 (N.D. Tex. Mar. 16, 2018)..............................................9, 10, 20

*Lorain Journal Co. v. United States*,
  342 U.S. 143 (1951)........................................................................................23

*McWane, Inc. v. FTC*,
  783 F.3d 814 (11th Cir. 2015) .....................................................................19, 25

*Methodist Health Servs. Corp. v. OSF Healthcare Sys.*,
  2015 WL 1399229 (C.D. Ill. Mar. 25, 2015).......................................................16

*In re Microsoft Corp. Antitrust Litig.*,
  2005 WL 1398643 (D. Md. June 10, 2005), *aff'd sub nom. Novell, Inc. v.
  Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007)....................................................30

*MVConnect, LLC v. Recovery Database Network, Inc.,*
    2011 WL 13128799 (N.D. Tex. May 27, 2011) ....................................10, 17, 22, 23

*N. Miss. Commc'ns, Inc. v. Jones,*
    792 F.2d 1330 (5th Cir. 1986) .............................................................................27

*Nexstar Broadcasting v. Granite Broadcasting Corp.,*
    2012 WL 2838547 (N.D. Ind. July 9, 2012)...........................................................33

*Norris v. Hearst Tr.,*
    500 F.3d 454 (5th Cir. 2007) ..........................................................................30, 31

*Novell, Inc. v. Microsoft Corp.,*
    505 F.3d 302 (4th Cir. 2007) ....................................................................28, 29, 30

*Nukote of Ill., Inc. v. Clover Holdings, Inc.,*
    2012 WL 13093942 (N.D. Tex. Mar. 15, 2012).........................................14, 15, 17

*OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC,*
    2017 WL 1213629 (E.D. Tex. Apr. 3, 2017)......................................................12, 17

*Pub. Health Equip. & Supply Co., Inc. v. Clarke Mosquito Control Prods., Inc.,*
    2009 WL 10670089 (W.D. Tex. June 5, 2009) ......................................................13

*Pulse Network, L.L.C. v. Visa, Inc.,*
    30 F.4th 480 (5th Cir. 2022) .............................................................14, 32, 33, 34

*Sanger Ins. Agency v. HUB Int'l, Ltd.,*
    802 F.3d 732 (5th Cir. 2015) .............................................................................31

*Smith v. Sch. Bd. of Concordia Par.,*
    88 F.4th 588 (5th Cir. 2023) ..............................................................................32

*Spectators' Commc'n Network Inc. v. Colonial Country Club,*
    253 F.3d 215 (5th Cir. 2001) .............................................................................21

*TCA Bldg. Co. v. Nw. Res. Co.,*
    861 F. Supp. 1366 (S.D. Tex. 1994) ....................................................................33

*United Shoe Mach. Corp. v. United States,*
    258 U.S. 451 (1922).........................................................................................13

*United States v. Apple, Inc.,*
    2025 WL 1829127 (D.N.J. June 30, 2025)...............................................3, 29, 30

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015)...............................................................................22

iv

*United States v. Bi-Co Pavers, Inc.*,
   741 F.2d 730 (5th Cir. 1984) ...........................................................................22

*United States v. E.I. du Pont de Nemours & Co.*,
   351 U.S. 377 (1956)..........................................................................................27

*United States v. Google LLC*,
   747 F. Supp. 3d 1 (D.D.C. 2024) .....................................................11, 18, 19, 20

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ...........................8, 11, 13, 18, 20, 25, 28, 29

*Universal Hosp. Servs. v. Hill-Rom Holdings, Inc.*,
   2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) ...........................................16, 25, 31

*Vaughn Med. Equip. Repair Serv., LLC v. Jordan Reses Supply Co.*,
   2010 WL 3488244 (E.D. La. Aug. 26, 2010) ...........................................................31

*Walker v. U-Haul Co. of Miss.*,
   747 F.2d 1011 (5th Cir. 1984) .........................................................................33

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)..........................................................................18, 25, 34

**Other Authorities**

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of
   Antitrust Principles and Their Application (5th ed. 2025) ...........................................11

## PRELIMINARY STATEMENT

Over a year ago, Apple and OpenAI joined forces to quash the competitive threats to OpenAI's monopoly in the generative artificial intelligence ("AI") chatbot market and Apple's monopoly in the smartphone market.[1] Apple and OpenAI's illegal conduct has harmed not only competition and X and xAI, but also consumers, who are increasingly turning to generative AI for services ranging from content creation to having an engaging conversation. If Defendants' anticompetitive scheme is not stopped, Americans will be forced to use one monopolist's generative AI chatbot and be unable to benefit from super apps that allow consumers to pay less for smartphones.

Apple and OpenAI do not and cannot dispute that OpenAI's ChatGPT is the only generative AI chatbot natively integrated with Apple Intelligence; that other generative AI chatbots—including xAI—have sought an integration with Apple Intelligence and been denied; that Apple preferences its exclusive chatbot partner in its critical "Must-Have Apps" list in the App Store; and that competitors like X and xAI have been excluded from that list. Instead, they have submitted 46 pages of duplicative motion to dismiss briefing asserting purported facts that are nowhere alleged in Plaintiffs' Complaint.

Defendants are forced to make factual arguments better suited for trial because there is no real question Plaintiffs have stated multiple claims. As noted by the primary author of one of the leading antitrust treatises on which OpenAI relies, the claims in Plaintiffs' Complaint are "quite

[1] "X" refers to X Corp. and "xAI" refers to X.AI LLC. X and xAI are referred to collectively as "Plaintiffs." "Apple" refers to Apple Inc., and "OpenAI" refers to OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC. Apple and OpenAI are referred to collectively as "Defendants." Apple's brief in support of its motion to dismiss, Dkt. No. 37, is referred to as "Apple Br.," while OpenAI's brief in support of its separate motion to dismiss, Dkt. No. 41, is referred to as "OpenAI Br." "App'x Tab __" refers to the tab in the accompanying Appendix.

plausible." App'x Tab 1, at App. 8. And as at least one regulator has recognized, Apple and OpenAI's anticompetitive scheme threatens to "limit[] competition and hinder[] innovation in the AI space." App'x Tab 2, at App. 10. None of Defendants' 22 extrinsic sources change the fact that Plaintiffs have plausibly pleaded their claims.

*First*, Plaintiffs plausibly allege that Apple and OpenAI conspired to restrain trade (Counts 1 and 9) by entering into an exclusive arrangement to make ChatGPT the only generative AI chatbot available for native integration on iPhones and other Apple products. This has foreclosed competition from other generative AI chatbots and super apps. Apple and OpenAI concede that their agreement is exclusive by acknowledging—as they must—that no other chatbot is or ever has been integrated with Apple Intelligence.

Unable to contend with the Complaint's allegations that Apple has rebuffed attempts by xAI and other generative AI chatbot makers to integrate their products into the iPhone, Defendants claim their conduct is not anticompetitive because their undisclosed written agreement purports to be non-exclusive such that Apple may integrate with others in the future. But even if they put such language into their written agreement—which Defendants claim without substantiation—Plaintiffs have plausibly alleged that the Apple-OpenAI arrangement is anticompetitive and illegal because of its exclusivity in practice: Defendants have foreclosed competing generative AI chatbots and super apps using generative AI chatbot technology from a key input (user prompts) and a critical distribution channel (native iPhone integration). Plaintiffs have further alleged that this foreclosure is both qualitatively and quantitatively substantial. What matters is what Apple and OpenAI have done and continue to do, not what they allegedly said to try to paper over their ongoing exclusionary conduct.

Plaintiffs also plausibly allege that Apple and OpenAI have violated the antitrust laws and

2

amplified the effects of their illegal exclusive arrangement by inhibiting rival apps from being downloaded in Apple's App Store. Favoring OpenAI's ChatGPT over rivals that threaten Apple's and OpenAI's respective monopolies is not editorial choice—it is foreclosure of another key distribution channel (App Store downloads) that harms competition.

*Second*, Plaintiffs plausibly allege that Apple and OpenAI have monopolized and conspired to monopolize their respective markets (Counts 2-6 and 10). Anticompetitive conduct by monopolists like Apple and OpenAI is exactly what Section 2 of the Sherman Act is designed to protect against. Plaintiffs have plausibly pleaded that Defendants' conduct of entering an exclusive agreement and preferencing OpenAI in the App Store is illegal. Plaintiffs likewise allege Defendants' specific intent by, among things, detailing Apple's and OpenAI's incentives to impede generative AI chatbot and super app competition in order to defend their monopolies, extract supracompetitive prices, and exclude competitors like Plaintiffs.

*Third*, Plaintiffs have antitrust standing to bring their claims because X and xAI are competitive threats to Apple and OpenAI that have been illegally excluded. As Apple itself admits, Plaintiffs have antitrust standing if they are "competitors in the market attempted to be restrained." Apple Br. 2 (quotation marks omitted). That is the case here: OpenAI concedes that xAI competes with it, both Defendants admit that xAI is integrated with X, and the Complaint makes clear that both the Grok app and the X app are super apps that threaten Apple's monopoly. Indeed, the U.S. District Court for the District of New Jersey has already held that super apps are competitive threats to Apple's smartphone monopoly. *United States v. Apple, Inc.*, No. 24-CV-4055, 2025 WL 1829127, at *13, *14-15 (D.N.J. June 30, 2025) (holding the "exclusionary requirements" Apple "imposes" on super apps "indicate that Apple acts in a manner to protect its monopoly power").

*Finally*, because Plaintiffs have plausibly alleged numerous antitrust claims, there is no

3

basis for dismissing Plaintiffs' civil conspiracy and unfair competition claims (Counts 7-8) on account of there being no underlying antitrust claims.

Artificial intelligence is the most powerful technology humanity has ever created, and its development will be hindered if the market irreversibly tips. *See* App'x Tab 3, at App. 14 (explaining, in a speech about AI, that antitrust enforcement "is crucial where the technology is still developing rapidly"). Since at least June 2024, Apple and OpenAI have stymied that development for Plaintiffs and other competitors by handing to OpenAI's ChatGPT the crucial Siri and other native prompts on iPhones and other Apple devices. Moreover, despite their appeal to extrinsic sources and unsupported factual averments about what the agreement between Apple and OpenAI says and Apple's purported future intentions, there is no end in sight to Apple and OpenAI's unlawful and monopolistic scheme. Defendants' motions to dismiss should be denied in their entirety.

## BACKGROUND

Artificial intelligence is now a fact of modern life. Generative AI chatbots can hold human-like conversations and generate original content like written prose or fantastical images. Compl. ¶¶ 36-37, 128, 134. OpenAI's ChatGPT is one such generative AI chatbot that first became available to the public in 2022. *Id.* ¶¶ 36, 40. OpenAI dominates the generative AI chatbot market: it controls over 80 percent of the market, with no sign of its monopoly abating. *Id.* ¶ 157.

Plaintiff xAI is a leading AI innovator whose generative AI chatbot, Grok, has been heralded by independent sources as one of the most intelligent generative AI chatbots available. *Id.* ¶ 68. Plaintiff X is a digital town square, connecting users to each other and to functions such as shopping and payment. *Id.* ¶¶ 67, 69. X has integrated Grok into its platform. *Id.*

Given its recognized quality, Grok poses a direct competitive threat to OpenAI's ChatGPT.

4

*Id.* ¶¶ 14, 68. And both the X app and Grok offer features that, if not stifled by Defendants' anticompetitive conduct, can reduce consumers' dependence on smartphones like Apple's iPhone. *Id.* ¶ 58. Apple has recognized that generative AI and super apps threaten its smartphone monopoly, with an Apple manager calling super apps "fundamentally disruptive" to Apple's smartphone business, *id.* ¶ 65, and another executive expressing fear that generative AI would obliterate Apple out of relevance, *id.* ¶¶ 57-58. xAI's Grok and the X app therefore directly challenge both OpenAI's and Apple's respective monopolies.

Rather than compete with xAI and X, Apple and OpenAI unlawfully banded together in mutual defense of each other's monopoly. In June 2024, Apple and OpenAI entered into an exclusive arrangement to integrate ChatGPT into Apple's iPhone. *Id.* ¶ 71. Instead of charging a fee for its services, OpenAI provides ChatGPT to Apple for free. *Id.* ¶ 94. In exchange, and since announcing its arrangement in June 2024, Apple made ChatGPT the only generative AI chatbot natively integrated into Apple Intelligence—through which iPhone and other Apple-device users receive answers from Siri, get information from viewing things through the iPhone's camera, or draft messages using Apple's Writing Tools. *Id.* ¶¶ 74-75, 97. As a result, iPhone users who ask Siri questions get ChatGPT's answer with no ability to hear from any of OpenAI's competitors. *Id.* ¶¶ 76-77. This integration advantages OpenAI's ChatGPT: although users could download another generative AI chatbot app, ChatGPT is the default, and using a web browser or mobile app "do[es] not provide the same level of functionality, usability, integration, or access to user prompts as ChatGPT's first-party integration with Apple." *Id.* ¶ 77. While Apple's CEO had touted the integration with ChatGPT as "built to protect user privacy at every step" on X, *id.* ¶ 99, Apple's own head of AI lobbied against the integration due to concerns about OpenAI, *id.* ¶¶ 73, 99.

Generative AI chatbots involve significant network effects. More users generate more

prompts that allow model training and product improvement, leading to even more users. *Id.* ¶¶ 107-108, 161-162. Accordingly, and given smartphones' popularity, native integrations on smartphones are an important source of inputs to generative AI chatbots. *Id.* ¶¶ 104-105, 131, 151. In 2024, Siri represented 1.5 billion user requests worldwide daily. *See id.* ¶ 104. This means that through Apple and OpenAI's illegal arrangement, up to 55 percent of the generative AI chatbot market goes to ChatGPT and ChatGPT alone. *Id.*

Beyond guaranteeing ChatGPT exclusive access to prompts, Apple has protected its own dominant position in the smartphone market—as well as OpenAI's position in the generative AI chatbot market—by manipulating its App Store lists and delaying approvals for app updates. *Id.* ¶¶ 79-89. There are two types of App Store lists: "Top" lists that rank apps based on popularity or other metrics, and curated lists, such as "Must-Have Apps." *Id.* ¶ 83. Being featured on curated lists, especially the "Must-Have Apps" list that appears first in the App Store, is key to increasing the number of user downloads and access to prompts for generative AI chatbot apps. *Id.* ¶ 81. Although the X and Grok apps often appear on the "Top" apps lists based on objective metrics, ChatGPT has consistently been the only generative AI chatbot app featured on the curated "Must-Have Apps" list. *Id.* ¶¶ 84-88. Apple likewise leverages its enforcement of its App Store Review Guidelines to reject updates to apps—such as Grok—that compete with it and its exclusive chatbot partner. *Id.* ¶¶ 88-89. The former director of app review for the Apple App Store admitted that App Store enforcement has been "arbitrary" and weaponized against competitive threats. *Id.* ¶ 82.

Since Apple and OpenAI announced their exclusive integration, no other generative AI chatbot has been integrated with Apple Intelligence. This is not for lack of trying—OpenAI's rivals such as xAI, Google, and Anthropic have all been denied from integrating with iPhones, *see id.* ¶¶ 71-72, even though other smartphones like Motorola integrate with multiple generative AI

chatbots, *id.* ¶ 109. Indeed, while Google was able to integrate its Gemini generative AI chatbot with both Samsung and Motorola phones, Apple was "an area where [Google] didn't have success," because "ChatGPT has a *distribution relationship* with Apple." OpenAI App'x A054 at 2474:10-19 (emphasis added); *see also* Compl. ¶ 72. As a result of this exclusive integration, both OpenAI and Apple have been empowered to increase prices: OpenAI plans to raise the subscription for ChatGPT at a rate of almost 20 percent per year, and Apple has already been raising prices for the iPhone by a similar percentage annually. Compl. ¶¶ 97, 155.

In short, Apple and OpenAI have used their exclusive deal to block competitive threats like xAI's Grok and the X app. OpenAI has already cornered over 80 percent of the generative AI chatbot market. With Apple funneling iPhone and other Apple-device user prompts exclusively to ChatGPT and deprioritizing competitors on the App Store, the generative AI market is set to permanently break, entrenching OpenAI as a monopolist. Likewise, hobbling AI-powered super apps will only further entrench Apple's smartphone monopoly. Plaintiffs accordingly brought this action to halt Defendants' anticompetitive scheme and recover billions in damages.

## ARGUMENT

A motion to dismiss turns on one "narrow[] question": whether the plaintiff "plead[ed] factual matter that, if taken as true, states a claim" that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 666 (2009). Plaintiffs have pleaded multiple such claims. Ignoring that documents attached to a motion to dismiss may not be considered unless they are both "referred to in the plaintiff's complaint" and "central to the plaintiff's claim," *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 662 (N.D. Tex. 2011), Defendants attach more than 20 documents to their motions and make factual assertions about their undisclosed agreement.

Even so, Defendants do not challenge the vast majority of the elements of Plaintiffs' claims

under the Sherman Act, including that Plaintiffs have (1) pleaded proper product and geographic markets, (2) demonstrated that Defendants' conduct affects a substantial amount of interstate commerce, and (3) alleged that Apple and OpenAI have monopoly power.

Instead, parroting each other's factual spin and legal arguments, Defendants challenge Plaintiffs' Section 1 and related state-law claim (Counts 1 and 9) only as to Plaintiffs' allegations that (1) Defendants entered into an exclusive deal that restrains trade, and (2) Defendants' conduct substantially foreclosed trade. Apple Br. 10-17; OpenAI Br. 10-15. Defendants are wrong on both counts. Plaintiffs have plausibly alleged that Defendants' agreement that makes ChatGPT the only native integration available on iPhones and other Apple products is exclusive, and Plaintiffs have alleged substantial foreclosure of both a key input and a key distribution channel.

Apple's unique arguments fare no better. Apple argues that Plaintiffs have not plausibly alleged a conspiracy between Apple and OpenAI to deprioritize competitors' apps in Apple's App Store. Apple Br. 18. But as Plaintiffs have alleged, in addition to agreeing to provide ChatGPT an exclusive native integration with Apple Intelligence, Apple puts its thumb on the scale for OpenAI through the App Store, including featuring ChatGPT in its key "Must-Have Apps" list and blocking rivals from being similarly featured or able to timely update their apps.

Defendants' challenge to Plaintiffs' Section 2 and related state-law claims (Counts 2-6 and 10) largely overlaps with their challenge to Plaintiffs' Section 1 claims. Apple Br. 19; OpenAI Br. 15-16. But because monopolists are held to a higher standard, conduct that is illegal under Section 1 is certainly illegal under Section 2—especially given the uncontested allegations of Apple's and OpenAI's monopoly power. *See United States v. Microsoft Corp.*, 253 F.3d 34, 70 (D.C. Cir. 2001). Defendants also challenge the "specific intent" element of attempted monopolization and conspiracy to monopolize (Counts 3, 5, 6, and 10), *see* Apple Br. 19; OpenAI Br. 15-16, but their

8

argument ignores the allegations concerning Apple and OpenAI's intention to exclude competition and raise prices, *see, e.g.*, Compl. ¶¶ 58-66, 90-97, 155-156, 167-168. And while Defendants assert that Plaintiffs do not have antitrust standing to pursue their antitrust claims (Counts 1-6, 9-10), Apple Br. 20-24; OpenAI Br. 17-20, the law is clear that causation and antitrust injury are easily satisfied here: xAI is a direct competitor to OpenAI and integrated with the X app, and both the X app and xAI's Grok app are super apps that threaten Apple's monopoly in the smartphone market.

Finally, Defendants argue that Plaintiffs cannot maintain their state-law claims for civil conspiracy and unfair competition (Counts 7-8) because they cannot maintain their underlying antitrust claims. Apple Br. 24-25; OpenAI Br. 20-21. As discussed, Defendants are wrong.

## I.   Plaintiffs Plausibly Allege That Apple And OpenAI Violated Section 1 Of The Sherman Act (Counts 1 and 9)

Plaintiffs have stated a claim under Section 1 of the Sherman Act and the analogous section of the Texas Free Enterprise and Antitrust Act (the "TFEAA") because they have plausibly alleged that Defendants agreed to engage in exclusionary conduct that restrained trade in the generative AI chatbot and smartphone markets.[2] Plaintiffs' exclusive-dealing allegations are plausible because Plaintiffs allege an "exclusive agreement[] . . . that effectively bar[s] [them] from certain distribution channels" constituting a "substantial share" of the relevant market. *Leaf Trading Cards, LLC v. Upper Deck Co.*, No. 3:17-CV-03200-N, 2018 WL 2971135, at *3 (N.D. Tex. Mar. 16, 2018) (denying motion to dismiss exclusive-dealing claims). And Plaintiffs' preferencing allegations state a claim because Plaintiffs plausibly allege that Apple has delayed update

---

[2] The TFEAA "utilizes the same standard as the Sherman Act." *JSW Steel (USA) Inc. v. Nucor Corp.*, 586 F. Supp. 3d 585, 601 (S.D. Tex. 2022), *aff'd*, No. 22-20149, 2025 WL 832801 (5th Cir. Mar. 17, 2025).

approvals for and deprioritized the apps of generative AI chatbot and super apps in its App Store to further inhibit their ability to compete, while bolstering its partner OpenAI. *See MVConnect, LLC v. Recovery Database Network, Inc.,* No. 3:10-cv-1948, 2011 WL 13128799, at *2-3, *5 (N.D. Tex. May 27, 2011) (denying motion to dismiss related to preferencing conduct). There is no basis for Defendants' argument that the Apple-OpenAI arrangement is not exclusive or that the relevant markets were not substantially foreclosed.

### A.    Plaintiffs Plausibly Allege That The Apple-OpenAI Arrangement Is Exclusive

Plaintiffs' allegations make clear that the Apple-OpenAI arrangement is exclusive: no other generative AI chatbot is natively integrated with iPhones and other Apple devices, and OpenAI's rivals who have tried to distribute their products through native integrations with Apple have been denied. *See* Compl. ¶¶ 71-72, 77-78, 94, 97; Apple Br. 3. Nothing more is needed to plausibly plead exclusive dealing.

In *Leaf Trading*, for instance, the plaintiff "allege[d] in its complaint that [the defendant's] distributor agreements are exclusive." 2018 WL 2971135, at *3. Pointing to language from an agreement that said its distribution agreements were not expressly exclusive, the defendant argued that plaintiff's contrary allegation was not enough to plausibly plead exclusive dealing. *Id*. The Court rejected the defendant's argument as "a nonstarter": at the motion-to-dismiss-stage, the court had to "credit[]" the plaintiff's allegations that the defendant's "agreements with distributors" were "exclusive" because they "effectively bar[red]" competitors like the plaintiff "from certain distribution channels." *Id*. In other words, what mattered was the agreements' effect, not their words. Here, as Apple and OpenAI concede, Plaintiffs have alleged exclusivity numerous times. *See* Apple Br. 10; OpenAI Br. 10. As *Leaf Trading* demonstrates, Plaintiffs' allegation of

exclusivity should be credited, especially because Plaintiffs have also alleged specific facts showing that the agreement is exclusive:

- The agreement made ChatGPT the only generative AI chatbot option for native iPhone and other Apple device use, *id*. ¶¶ 71-72, 74-75, 97;

- The agreement made ChatGPT the default generative AI chatbot on iPhones—native or not, *id*. ¶ 74, 78, 91;

- ChatGPT remains the only generative AI chatbot that has a native distribution agreement with Apple sixteen months after the deal was launched, *id*. ¶¶ 71-72, 74-75;

- Others—specifically xAI, Google, and Anthropic—have tried to integrate and been denied, *id*. ¶¶ 71-72; and

- Other smartphone manufacturers, like Motorola, have integration deals with multiple generative AI chatbots, *id*. ¶ 109.

Under blackletter exclusive-dealing law, these market realities that Plaintiffs have alleged make clear the Apple-OpenAI arrangement is exclusive. *See*, *e.g.*, *Microsoft*, 253 F.3d at 75 (finding "exclusive dealing" when "the deals were exclusive in practice because they required developers to make Microsoft's [Java] the default in the software they developed"); *United States v. Google LLC*, 747 F. Supp. 3d 1, 147 (D.D.C. 2024) (finding agreements to be exclusive because they "establish Google as the out-of-the-box default search engine"). The preeminent antitrust treatise, co-authored by Prof. Herbert Hovenkamp, explains why:

> [S]uppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

PHILIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1802c (5th ed. 2025); *see* OpenAI Br. 10 (citing the same treatise). As Plaintiffs have alleged, OpenAI faces competition from "aggressive young rival[s]"

11

like xAI and entered an exclusive arrangement with Apple to slow rivals' expansion, leaving them with inferior distribution channels. Compl. ¶¶ 68, 78, 80-81.

Apple and OpenAI do not contest that they have entered into an agreement, but they insist that Plaintiffs' claims cannot proceed because the agreement—which has never been publicly disclosed—is "expressly not exclusive." Apple Br. 1 (emphasis omitted); *see also* OpenAI Br. 1. Yet elsewhere in their briefs, they concede that the agreement is exclusive, claiming, for example, that Apple intends to integrate with other generative AI chatbots only at some unspecified point in the future, Apple Br. 4 (citing multiple sources from *June 2024*); OpenAI Br. 11-12, and that Apple's concerns about safety and privacy justify its decision to integrate ChatGPT—and only ChatGPT—with Apple Intelligence.[3] *See, e.g.*, Apple Br. 12-13; OpenAI Br. 20 & n.19. These excuses only undercut Defendants' argument that the never-produced agreement is not exclusive.[4]

Moreover, before any discovery has taken place, Defendants' claims about the terms of the agreement are as irrelevant as they are improper. *See*, *e.g.*, *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC,* No. 4:16-CV-00350-ALM, 2017 WL 1213629, at *4 n.2 (E.D. Tex. Apr. 3, 2017) (denying partial motion to dismiss and reasoning that discovery is necessary because it "may or may not reveal that the AcceleDent NOW Program is a de facto exclusionary contract"). None

---

[3] Defendants' premature factual arguments that ChatGPT is safer than its competitors ignore Plaintiffs' allegations that Apple's own head of AI "lobbied against the deal with OpenAI" because of serious concerns about its safety. Compl. ¶¶ 73, 99; *see also id.* ¶¶ 44-46, 50-53. Apple, relying on extrinsic materials, admits that the concerns about OpenAI were so significant that Apple had to develop bespoke "privacy protections" to attempt to safeguard its customers from OpenAI. Apple Br. 3; *see also* Apple App'x 004 (indicating there were publicly known concerns about the "the trustworthiness of [ChatGPT]" in early 2024).

[4] Defendants also invoke X's integration with Grok to justify their unlawful conduct, Apple Br. 5, 13 n.7; OpenAI Br. 4, ignoring, among other things, that Grok has a single-digit market share. *Compare* Compl. ¶ 146 (Apple's market share is 65 percent) *and id.* ¶ 157 (OpenAI's market share is over 80 percent), *with id.* ¶ 7 (xAI's Grok has a single-digit market share).

of the cases on which Defendants rely—most of which were decided on summary judgment or post-trial—support Defendants' claim that the purported terms of their written agreement insulate them from antitrust liability.[5]

To the contrary, whether the agreement actually says it is not exclusive—as Defendants claim without any support—is legally irrelevant. Contract terms expressing non-exclusivity do not bar an exclusive-dealing claim. This has been blackletter law for more than a century. *See United Shoe Mach. Corp. v. United States,* 258 U.S. 451, 454, 457 (1922) (affirming judgment for a Clayton Act violation based on exclusive dealing where the agreements expressly contemplated the lessee entering agreements with defendant's rivals but the "practical effect" was exclusionary), *cited in* OpenAI Br. 11; *Microsoft,* 253 F.3d at 75 (finding certain agreements "exclusive in practice because they required developers to make Microsoft's [program] the default").

*CoStar Group, Inc. v. Commercial Real Estate Exchange* is instructive. 150 F.4th 1056 (9th Cir. 2025). There, as Defendants insist is the case here, the agreement between the parties (which, unlike here, was available to the plaintiff) contained an "express promise of non-exclusivity." *Id.* at 1073-74. The trial court dismissed the plaintiff's exclusive-dealing claim on this basis. *CoStar Grp., Inc. v. Com. Real Est. Exch. Inc.*, No 2:20-CV-08819-CBM-AS, 2023 WL 2468742, at *3 (C.D. Cal. Feb. 23, 2023). But as the Ninth Circuit recognized, such "non-exclusivity" terms were not dispositive of whether the agreement was exclusive. *CoStar*, 150 F.4th at 1073-74. As the Ninth Circuit explained, "dismiss[ing] an exclusive dealing claim just because

---

[5] The few motion-to-dismiss cases Defendants do cite are inapposite. *See Pub. Health Equip. & Supply Co., Inc. v. Clarke Mosquito Control Prods., Inc.*, No. SA-08-CA-895-OG, 2009 WL 10670089 (W.D. Tex. June 5, 2009) (breach-of-contract claim based on "vague[] assertions" of acceptance dismissed under statute of frauds doctrine); *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526-27 (5th Cir. 2022) (plaintiff failed to plausibly allege there was an agreement via "threat-and-accession").

a contract does not expressly require exclusivity would be the type of overly formalistic rule that the Supreme Court has cautioned against in antitrust cases." *Id*. at 1073. It thus reversed the trial court's dismissal of the plaintiff's exclusive-dealing claim. *Id*. at 1074-75.

The Fifth Circuit likewise recognizes that an exclusive-dealing claim does not require an agreement that formally declares the parties' arrangement to be exclusive. *See Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos Co.*, 567 F.2d 1299, 1302 (5th Cir. 1978) ("In the absence of an express exclusivity requirement, however, an antitrust plaintiff is not foreclosed from making out a case."); *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494-95 (5th Cir. 2022) ("[A] reasonable jury could find" that the "quasi-exclusive" volume-discount agreements "amount to exclusive-dealing contracts designed to squeeze Pulse out of the [relevant] market"), *cited in* Apple Br. 11; OpenAI Br. 10. Contrary to Defendants' assertions, *BRFHH Shreveport, LLC v. Willis-Knighton Medical Center*, 49 F.4th 520 (5th Cir. 2022), does not hold otherwise. There, the plaintiff attempted to plead an exclusive agreement based on a distinct "threat-and-accession theory"—*i.e.*, that one party's actions "in response to [the other's] threat" constituted a tacit agreement. 30 F.4th at 526. Because the plaintiff's own complaint alleged that the threatened party acted out of its own self-interest rather than in response to a threat, the plaintiff had not pleaded the existence of an agreement at all. *Id*. at 527-28. Here, by contrast, Defendants concede that they have reached an agreement and dispute only the factual question whether their arrangement is exclusive—albeit, based on their say-so of what the agreement they entered says. Defendants' actions speak louder than their supposed words.

**B.    Plaintiffs Plausibly Allege Substantial Foreclosure In The Relevant Markets**

At the pleading stage, a plaintiff can establish substantial foreclosure either qualitatively or quantitatively. *See Nukote of Ill., Inc. v. Clover Holdings, Inc.*, 3:10-CV-00580-P, 2012 WL

14

13093942, at *8 (N.D. Tex. Mar. 15, 2012) (substantial foreclosure satisfied without quantification); *Am. Airlines, Inc. v. Travelport Ltd.*, No. 4:11-CV-244-Y, 2012 WL 3737037, at *9 (N.D. Tex. Aug. 7, 2012) (substantial foreclosure satisfied by quantification). Plaintiffs have plausibly alleged both qualitative and quantitative substantial foreclosure.

Specifically, Plaintiffs have plausibly alleged that both Apple and OpenAI are monopolists, Compl. ¶¶ 145-168; that the unlawful agreement locks up the most important distribution channel on the dominant iPhone smartphone, *id.* ¶¶ 74-75, 77-78, 91, 94, 104-105; that the unlawful agreement forces distribution through other, inferior channels, *id.* ¶¶ 74, 77-78, 91; and that this foreclosure is amplified by data network effects because OpenAI's exclusive access to prompts from Apple devices provides it more access to data rivals cannot compete for that can improve its models and attract users, creating a feedback loop allowing it to maintain its monopoly, *id.* ¶¶ 92-94, 107-108, 161, 164. In addition to those qualitative allegations, Plaintiffs, relying on pre-discovery information, quantified the amount of market foreclosure as "up to 55 percent" based on ChatGPT's exclusive access to Siri alone, and *conservatively excluded* other Apple Intelligence use cases where ChatGPT has exclusivity, like Apple Writing Tools. *Id.* ¶¶ 104-105.

Despite these allegations, Apple and OpenAI assert that Plaintiffs' claims premised on exclusive dealing fail because (1) Plaintiffs have not properly quantified the alleged foreclosure, Apple Br. 13-17; OpenAI Br. 12-15; (2) the existence of alternative distribution channels defeats substantial foreclosure, Apple Br. 16; OpenAI Br. 13; and (3) the foreclosure is not in the markets Plaintiffs allege, Apple Br. 14-16; OpenAI Br. 12-13. Defendants are mistaken.

### 1.    Plaintiffs' Allegations Of Qualitative And Quantitative Foreclosure Are More Than Enough To State A Claim

Defendants' contention that Plaintiffs' allegations are deficient because they do not

precisely quantify the foreclosure, *see* Apple Br. 16; OpenAI Br. 13, ignores that Plaintiffs have quantitatively *and* qualitatively alleged substantial foreclosure.

Contrary to Defendants' contentions, there is "no authority, binding or otherwise, to suggest that dismissal of a plaintiff's antitrust claims for failing to allege an exact percentage foreclosure . . . is appropriate." *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 1:13-cv-01054, 2015 WL 1399229, at *7 (C.D. Ill. Mar. 25, 2015). Defendants nonetheless insist that alleging "up to 55 percent" market foreclosure based on exclusive distribution through Siri is too vague to state a claim. *See* Apple Br. 16-17; OpenAI Br. 14. But "[i]t would be problematic" to reject claims "at the pre-discovery, motion-to-dismiss stage, when [plaintiff] likely has insufficient information to calculate a precise number" regarding "market foreclosure." *E.I. DuPont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 452 n.12 (4th Cir. 2011). That is why courts repeatedly reject Defendants' argument that Plaintiffs were required to precisely quantify the foreclosure Defendants' misconduct has caused in their Complaint. *See Universal Hosp. Servs. v. Hill-Rom Holdings, Inc.*, No. 15-cv-00032, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015) (finding plaintiff plausibly alleged substantial foreclosure based on allegation that "*as much as 66% in regional markets*" were foreclosed (emphasis added)); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 238 (S.D.N.Y. 2019) (collecting cases and noting that "[a]t the motion to dismiss stage, such specific mathematical pleading" of substantial foreclosure "is unnecessary"); *In re Ductile Iron Pipe Fitting Direct Purchaser Antitrust Litig.*, Civ. No. 12–711, 2013 WL 812143, at *19 (D.N.J. Mar. 5, 2013) ("The question of whether the alleged exclusive dealing arrangements foreclosed a substantial share of the line of commerce is a merits question not proper for the pleading stage.").

Moreover, substantial foreclosure can be demonstrated qualitatively and without

quantification—as Plaintiffs have also done. For example, a plaintiff can plead "substantial foreclosure" by alleging that the "exclusive agreements cover a market in which the defendant allegedly holds monopoly power." *CoStar*, 150 F.4th at 1067; *see also OrthoAccel*, 2017 WL 1213629, at *4 (concluding exclusive dealing was plausibly alleged where plaintiff alleged the counterclaim defendant's "dominance" without quantification of foreclosure). Likewise, in *Nukote*, the court held that plaintiff plausibly alleged an exclusive-dealing claim under the TFEAA even though plaintiff made no allegations about the share of the market foreclosed. 2012 WL 13093942, at *8. As the court explained, the plaintiff's allegation that the defendant "ha[d] entered into exclusive arrangements with the large office supply retailers" sufficed to plead substantial foreclosure. *Id*.; *see also MVConnect*, 2011 WL 13128799, at *5 (rejecting dismissal of exclusive-dealing claims under Sections 1 and 2 without any quantification of the amount of foreclosure in the relevant markets); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 128 F. Supp. 2d 988, 994 (N.D. Tex. 2001) (explaining that the test for assessing foreclosure is "qualitative"), *aff'd*, 300 F.3d 620 (5th Cir. 2002), *cited in* Apple Br. 15 & OpenAI Br. 8-9, 20.[6] Plaintiffs have made such allegations of qualitative substantial foreclosure. *See supra* Part I.B. Defendants' argument that more is required at this stage, *see* Apple Br. 13-17; OpenAI Br. 12-15, is wrong as a matter of law.

---

[6] OpenAI again misplaces reliance on *BRFHH* by superficially comparing it to Plaintiffs' allegations. *See* OpenAI Br. 12 (quoting *BRFHH*, 49 F.4th at 530-31). Unlike here, the plaintiff in *BRFHH* was not "entirely clear" on its theory of harm (the court inferred that plaintiff alleged a conditional refusal to deal), and failed to "adequately connect[]" the alleged upstream foreclosure with the downstream market the plaintiff defined. 49 F.4th at 529-31. Nor are the allegations here comparable to the conclusory ones in *BRFHH*. While OpenAI plucks a single Complaint paragraph in claiming otherwise, *see* OpenAI Br. 13 (citing Compl. ¶ 188), it ignores that the paragraph is supported by numerous factual allegations, *see id.* ¶¶ 104-106 (foreclosure); *id.* ¶¶ 92-94, 107-108, 161-162 (scale and network effects); *id.* ¶¶ 9, 109-111 (harms to choice, competition, innovation, and investment); *id.* ¶¶ 62-64, 113-115, 175-176 (harms to super apps and smartphone customers).

### 2.    The Availability Of Worse Distribution Channels Does
### Not Negate Plaintiffs' Allegations Of Substantial Foreclosure

Apple's and OpenAI's arguments that Plaintiffs cannot plead substantial foreclosure because websites or mobile apps can be used to distribute generative AI chatbots to users, Apple Br. 16; OpenAI Br. 13, amount to a claim that an exclusive agreement cannot be unlawful unless 100 percent of the market is foreclosed. That is not the law. *See, e.g., ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 283 (3d Cir. 2012) ("'[T]otal foreclosure' is not required for an exclusive dealing arrangement to be unlawful."); *Chase Mfg., Inc. v. Johns Manville Corp.*, 84 F.4th 1157, 1175 (10th Cir. 2023) (same); *Google*, 747 F. Supp. 3d at 147 (explaining that the availability of alternative distribution channels does not "immunize" the challenged agreements).

As discussed in detail above, Plaintiffs have plausibly alleged substantial foreclosure both qualitatively and quantitatively. For example, Plaintiffs allege that Defendants' conduct forecloses 55 percent of the *entire* relevant generative AI chatbot market, even when accounting for distribution through app stores and websites. *See* Compl. ¶ 104. This percentage—which is conservative because it considers only distribution through Siri (and not other Apple Intelligence uses) and which Plaintiffs did not need to plead—indisputably is substantial foreclosure. *See* Apple Br. 13-17; OpenAI Br. 12-15; *see also Microsoft*, 253 F.3d at 70 (identifying 40 percent market foreclosure as a "usual[]" lower bound under Section 1).

Moreover, these "alternative" distribution channels, Apple Br. 16; OpenAI Br. 13, are inferior to the ChatGPT-exclusive native iPhone integration. Compl. ¶¶ 77-78. Plaintiffs explained in their Complaint that these "alternative" distribution channels create additional frictions, such as decreased functionality, usability, integration, and access to user prompts, that make it harder for OpenAI's rivals to reach customers compared to distribution through native Apple product usage.

18

*Id.* ¶ 77. Contrary to OpenAI's assertion that users can "freely access" generative AI chatbots besides ChatGPT in the Apple App Store, OpenAI Br. 2, distribution through the Apple App Store is impeded by the Defendants' illegal preferencing of ChatGPT in the App Store. *See infra* Part I.C. Furthermore, the Apple App Store—covering 65 percent of smartphones, *id.* ¶ 146—charges an "unjustified" and "supracompetitive" fee of 30 percent on in-app sales such as generative AI chatbot subscriptions. *Epic Games, Inc. v. Apple Inc.*, 781 F. Supp. 3d 943, 991 (N.D. Cal. 2025). Such frictions reinforce the unlawful exclusivity of Apple and OpenAI's arrangement. *See, e.g.*, *Google*, 747 F. Supp. 3d at 45-46, 154, 156 (concluding that the defendant's agreement to be the default provider harmed competitors by depriving them of scale through the "friction" they introduced in customer choice patterns); *McWane, Inc. v. FTC*, 783 F.3d 814, 832 (11th Cir. 2015) ("[A]n exclusive dealing arrangement can be harmful when it allows a monopolist to maintain its monopoly power by *raising its rivals' costs* sufficiently to prevent them from growing into effective competitors." (emphasis added)).

Apple itself admits that other channels are not substitutes for native integration, conceding that ChatGPT functions better through the native integration because it "allow[s] users to access ChatGPT without the need to jump between tools" and lets users "opt into accessing ChatGPT through Siri and Writing Tools without creating a separate ChatGPT account." Apple Br. 3. OpenAI's improperly submitted extrinsic materials also reveal that the integration allows ChatGPT to get additional data access to train its models from at least some Apple user accounts. OpenAI App'x A038-039 (stating that "OpenAI will not receive any information tied to your Apple Account" only where users lack a ChatGPT account); *see also* Compl. ¶ 164.

### 3. Plaintiffs Allege Substantial Foreclosure In The Relevant Markets

Finally, OpenAI asserts that the alleged substantial foreclosure is not in the generative AI

chatbot market alleged, OpenAI Br. 12-13, while Apple makes the same argument as to the smartphone market only, Apple Br. 14-16. Defendants are incorrect.

OpenAI is wrong because Plaintiffs allege that there is substantial foreclosure in the generative AI chatbot market: both a key input into that market and key distribution channel in that market are substantially foreclosed. Compl. ¶¶ 77-78, 91-94, 104-105, 171-173, 177. It is hornbook law that foreclosing a product's key distribution channel represents foreclosure in the relevant market for that product. *See*, *e.g.*, *Leaf Trading*, 2018 WL 2971135 at *3 (finding substantial foreclosure where plaintiff alleged it was foreclosed from "certain distribution channels" for selling its cards); *Microsoft*, 253 F.3d at 69-71 (assessing substantial foreclosure in the browser market based on defendant's browser distribution agreements with internet providers); *Google*, 747 F. Supp. 3d at 146-47, 153-54 (foreclosure of "access points" that connect users with the relevant product represented foreclosure in the relevant product market). And here, Plaintiffs plead as much by alleging that "ChatGPT's status as the exclusive default generative AI chatbot for the iPhone drives prompt volume exclusively to ChatGPT through that access point." Compl. ¶ 91, *see also id.* ¶¶ 74-75, 77-78, 94, 164; OpenAI App'x A054 ("ChatGPT has a distribution relationship with Apple."). Foreclosing key inputs also gives rise to substantial foreclosure. *See Keurig*, 383 F. Supp. 3d at 238 (plaintiff plausibly alleged exclusive dealing where conduct "block[ed] competitors from accessing inputs and distribution networks"). Plaintiffs allege this, too. *See*, *e.g.*, Compl. ¶¶ 92-93, 104-105, 172. OpenAI's claim that prompts are solely an "input," OpenAI Br. 12-13, is thus beside the point: foreclosing an input gives rise to an exclusive-dealing claim. Regardless, OpenAI is wrong: prompts are not just an input, but also a measure of generative AI chatbots' ability to distribute their services to customers, *see id.* at 3 ("prompt" is "an industry term referring to the messages that a user sends to a generative AI service during a conversation");

20

Compl. ¶ 128 (similar), the blocking of which gives rise to an exclusive-dealing claim.

Apple is wrong because Plaintiffs plead foreclosure in the smartphone market. As Plaintiffs allege, Defendants' conduct has hindered super apps that threaten Apple's monopoly. *See* Compl. ¶¶ 60-62, 74-75, 77-78, 81, 84-88, 95, 112-115, 175-176. Super apps replace iPhone functionality and threaten to turn Apple's $1,599 smartphone into a "commodity." *Id.* ¶¶ 63-65. As Apple has done against other competitors or entrants, it has used its App Store that covers 65 percent of the smartphone market as a "weapon" to exclude Plaintiffs by impeding the distribution of their super apps, *id.* ¶¶ 79-89, 146, and provided native integration exclusively to OpenAI, foreclosing other competitors, *id.* ¶¶ 71-72, 74-75, 103-105. This conduct has excluded super apps from competing to disrupt Apple's smartphone monopoly. *Id.* ¶¶ 95, 112-115, 175-176.

Regardless, Apple also misstates the law. Apple offers no authority holding that a Section 1 claim requires the plaintiff to plead substantial foreclosure in the market *in which the defendant competes*. And for good reason: under binding caselaw, a plaintiff states a Section 1 claim by alleging that the defendant "(1) engaged in a conspiracy (2) that restrained trade (3) in *a particular market*." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220 (5th Cir. 2001) (emphasis added). Contrary to Apple's assertion, the Fifth Circuit has held there is a "combination within the meaning of the Sherman Act" even where "[c]onspirators who are not competitors of the victim . . . share in an anticompetitive scheme." *Id.* at 221-22 (reversing grant of summary judgment for defendant beverage maker that was a customer, not competitor, in the relevant market for on-site advertising at golf tournaments); *see also Acad. of Allergy & Asthma in Primary Care v. La. Health Serv. & Indem. Co.*, No. CV 18-399, 2020 WL 4050243, at *7 (E.D. La. July 17, 2020) (rejecting "flawed" argument that defendant could not further a conspiracy because it did not participate in the relevant market), *granting recons. in part*, 2021 WL 5029418

21

(May 14, 2021); *United States v. Apple, Inc.*, 791 F.3d 290, 316-17 (2d Cir. 2015) (holding Apple liable for coordinating a price-fixing conspiracy among book publishers). So even if Apple were correct that Plaintiffs alleged only that the conspiracy restrains trade in the generative AI chatbot market, that still would be enough to allege that Apple violated Section 1.

### C.    Plaintiffs Plausibly Allege An Agreement To Preference ChatGPT

Though their other arguments are largely duplicative, Apple and OpenAI diverge when it comes to Plaintiffs' allegations about deprioritization of competitors' apps in Apple's App Store. For its part, OpenAI does not contest that allegations of preferencing ChatGPT in Apple's App Store can state a claim under the antitrust laws. Taking a different tack, Apple argues that Plaintiffs' de-preferencing allegations are "irrelevant" to Plaintiffs' Section 1 claim because Section 1 prohibits agreements between separate entities. Apple Br. 18. This argument not only ignores that acts in furtherance of a conspiracy are part of the course of conduct that violates Section 1, *see United States v. Bi-Co Pavers, Inc.*, 741 F.2d 730, 734 (5th Cir. 1984), but also (and yet again) ignores Plaintiffs' allegations. The Complaint alleges that as part of the arrangement between Apple and OpenAI, Apple protected OpenAI's dominant position by using its App Store as a "weapon" to harm OpenAI's rivals. *See* Compl. ¶¶ 79-89, 102, 179. This is enough to allege that Apple and OpenAI *together* conspired to entrench their exclusive agreement through Apple's deprioritization of competing super apps.

Plaintiffs' preferencing allegations mirror those at issue in *MVConnect,* a case involving claims under both Sections 1 and 2 of the Sherman Act. There, plaintiffs alleged that defendants had entered into an agreement "with the goal of harming Plaintiffs' business" by, among other things, "influenc[ing] . . . an industry trade group[] to promote [the defendants] to the exclusion of their competitors." 2011 WL 13128799, at *2-3, *5. Even though the complaint also "allege[d] a

number of actions that [the defendants] undertook individually," the court found it plausible that influencing the trade association was "concerted action[]" that harmed competition by increasing a rival's costs and excluding it from the market. *Id.* at *5. The same logic applies here. The only material difference between Plaintiffs' allegations and those in *MVConnect* is that Apple and OpenAI did not need to influence a *third party* to promote ChatGPT to the exclusion of xAI's Grok app and the X app; Apple's tight control over the App Store allowed Apple to implement the de-preferencing on its own platform. *See* Compl. ¶ 83; Apple Br. 18.

Nor can Apple escape antitrust liability by characterizing its misconduct as editorial speech protected by the First Amendment. Apple Br. 18. Plaintiffs have not, as Apple suggests, alleged that Apple's editorial choices are anticompetitive. What they do allege is that curating the "Must-Have Apps" list is part of Apple and OpenAI's overall anticompetitive scheme to maintain their monopolies by limiting a key distribution channel for super apps and the generative AI chatbots that fuel them. *See* Compl. ¶¶ 79-89. Because Apple's curated lists are part of a larger scheme to violate the antitrust laws, the First Amendment does not immunize their conduct. *See Lorain Journal Co. v. United States*, 342 U.S. 143, 155-56 (1951) (rejecting a First Amendment defense because the "exercise [of First Amendment rights] as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act").

Apple also relies on extrinsic materials to claim that "generative AI chatbots besides ChatGPT"—such as Google's Gemini—"have topped the App Store rankings." Apple Br. 6 n.4. If anything, these materials support *Plaintiffs*' theory. To start, these materials concern the objective download charts, Apple App'x A017 (discussing a "most popular free app" list), and not the "editorial" lists Apple has weaponized against Plaintiffs. Compl. ¶¶ 79-89. The materials also show that Gemini's stay at the top was short-lived: while "Gemini bump[ed] ChatGPT down to

23

second place," Apple App'x A017, another source reported Gemini was "likely to lose momentum in the coming days," App'x Tab 4, at App. 25, *cited in* Apple Br. 6 n.4. In other words, Apple's own improper extrinsic source suggests that the best a rival could do was very briefly rank higher than ChatGPT on the objective download rankings list—not that any competitor received similar exposure on the "Must-Have Apps" lists that are crucial for user discovery of generative AI chatbots. Compl. ¶¶ 81, 83. Moreover, Gemini topping a secondary list is beside the point, given that Gemini—like xAI—has been denied native integration into the iPhone. *Id.* ¶¶ 72, 74. Nor does it change the uncontested allegations that OpenAI holds monopoly power in the generative AI chatbot market and that ChatGPT has exclusive access to Apple Intelligence. *Id.* ¶¶ 74, 157-168.

## II.    Plaintiffs Plausibly Allege That Apple And OpenAI
## Violated Section 2 Of The Sherman Act (Counts 2-6 and 10)

Plaintiffs have plausibly stated claims for monopolization, attempted monopolization, and conspiracy to monopolize under the Sherman Act and the analogous section of the TFEAA. Of all the requirements for these three categories of monopolization claims, Apple and OpenAI challenge only Plaintiffs' allegations of (1) anticompetitive conduct and (2) specific intent. Because Plaintiffs have plausibly alleged anticompetitive conduct in support of their Section 1 claim, *see supra* Part I, they have also done so for purposes of Section 2. And Plaintiffs have likewise included in their Complaint detailed allegations of specific intent.

### A.    Plaintiffs Plausibly Allege Anticompetitive Conduct

Defendants focus their anticompetitive-conduct arguments almost exclusively on whether Plaintiffs have plausibly alleged a claim under Section 1 of the Sherman Act. *See*, *e.g.*, Apple Br. 13-19; OpenAI Br. 10-12. In doing so, Defendants nowhere address that their conduct as monopolists faces heightened scrutiny under Section 2.

24

Exclusive agreements by monopolists are particularly concerning because they can "keep usage of [a rival's product] below the critical level necessary for [that rival] or any other rival to pose a real threat to [the defendant's] monopoly," thus "preserving" the monopoly. *Microsoft*, 253 F.3d at 70-71. Foreclosing rivals may also "deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete." *ZF Meritor*, 696 F.3d at 271. For this reason, while substantial foreclosure is still a requirement for a Section 2 claim, courts have held that "a lesser degree of foreclosure is required when the defendant is a monopolist." *McWane*, 783 F.3d at 837; *Microsoft*, 253 F.3d at 70; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 488 (1992) (Scalia J., dissenting) ("Behavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." (citation omitted)). As discussed earlier, Plaintiffs have pleaded substantial foreclosure for their Section 1 claim, and have therefore pleaded substantial foreclosure under Section 2 as well.

### B.    Plaintiffs Plausibly Allege Specific Intent

Again ignoring the allegations in the Complaint, Apple and OpenAI say that Plaintiffs have not plausibly alleged a specific intent to monopolize. *See* Apple Br. 19; OpenAI Br. 15-16. At this stage, specific intent can be inferred from Defendants' anticompetitive conduct. *See Universal Hosp.*, 2015 WL 6994438, at *7 (inferring specific intent where Universal "plausibly alleged anticompetitive conduct as part of its attempted monopolization claim"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602-603 (1985) (endorsing the proposition that "[i]mproper exclusion . . . is always deliberately intended"), *cited in* OpenAI Br. 15. Plaintiffs have pleaded anticompetitive conduct. *See supra* Parts I, II.A.

Additionally, specific intent may be shown by "failure to offer any efficiency justification

25

. . . for [the] pattern of conduct." *Aspen Skiing*, 472 U.S. at 608. Plaintiffs have alleged that there is no procompetitive justification for making the ChatGPT integration exclusive and amplifying the exclusivity through preferencing of ChatGPT in Apple's App Store on the dominant iPhone. *See* Compl. ¶¶ 98-102. Defendants try to justify the exclusivity based on "privacy or safety considerations." Apple Br. 1, OpenAI Br. 18. That argument is premature. *See Bell v. Dow Chem. Co.*, 847 F. 2d 1179, 1186 (5th Cir. 1988) ("[W]hether the defendant has a legitimate business reason" for its conduct is a "fact determination."). Moreover, if user safety and security were really a priority, Defendants would open up their exclusive arrangement to allow additional generative AI chatbots to be integrated into Apple products so that users can avoid ChatGPT, which, as recognized by Apple's head of AI, poses serious privacy and safety concerns. Compl. ¶¶ 73, 99; *see id.* ¶¶ 44-46, 50-53. Despite their improper factual claims about xAI, Defendants nowhere argue there are such concerns with Gemini and Anthropic, which were also denied native distribution through Apple products. *Id.* ¶ 72.

Moreover, the Complaint details how Defendants both have acted with an intent to exclude rivals to continue to receive supracompetitive profits. Both Apple and OpenAI share an incentive to forestall competition among generative AI chatbots, as generative AI chatbot competition threatens their monopoly positions. *Id.* ¶¶ 58-66, 90-97. Indeed, hindering generative AI chatbot competition allows Apple and OpenAI to maintain durable power over price, which benefits them both. *Id.* ¶¶ 95, 115, 155, 167. They therefore share an interest in preserving the "status quo" in which they are the dominant providers in their respective monopolies. *See Travelport*, 2012 WL 3737037, at *3 (specific intent alleged where defendants "share[d] an interest in excluding plaintiff" which threatened their business model).

While all of that is more than enough to adequately plead intent, the intent allegations are

further bolstered by Defendants' immense market power. "[W]hen an alleged monopolist has power over price and competition, an intention to monopolize in a proper case may be assumed." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 392 (1956); *see also N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1336 (5th Cir. 1986) (a firm's "dominan[ce]" can "support[] an inference of monopolistic intent"), *cited in* Apple Br. 19; OpenAI Br. 15. Here, because Plaintiffs have pleaded Apple's and OpenAI's monopoly power, *see* Compl. ¶¶ 145-168, Plaintiffs' specific-intent allegations are even more plausible.

## III.    **Plaintiffs Have Antitrust Standing**

X and xAI have antitrust standing to maintain their claims because Grok is a direct competitor to ChatGPT and because Plaintiffs develop super apps that are competitive threats to Apple's smartphone monopoly. Compl. ¶¶ 63-68, 112-115, 175-176. Apple's and OpenAI's contrary arguments, relegated to the back of their briefs, are premised on a fundamental mischaracterization of Plaintiffs' allegations.

Antitrust standing is a judicially created set of threshold requirements a private plaintiff must satisfy to pursue claims under the antitrust laws. *See Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 531, 535 n.31 (1983). It has two components relevant here. First, there must be "a causal connection between an antitrust violation and harm" to the plaintiff. *Id.* at 537. Second, there must be antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

Apple's and OpenAI's causation challenges are foreclosed because Plaintiffs are competitive threats to Apple and OpenAI. And though Apple and OpenAI raise different antitrust injury challenges, those arguments fare no better. Apple argues Plaintiffs are not the right kind of

27

market participants to pursue claims based on the challenged conduct, ignoring that developers of super apps like Plaintiffs have already been found to be a competitive threat to Apple. OpenAI argues that the alleged injuries do not flow from "a competition-*reducing* aspect or effect of the defendant's behavior," *id.* at 344, ignoring Plaintiffs' allegations to the contrary.

### A.    Apple's Antitrust Standing Arguments Are Meritless

Apple argues that Plaintiffs lack antitrust standing because (1) their alleged injuries are based on a causal chain too far removed from the alleged harm, and (2) Plaintiffs are purportedly not competitors of Apple. It is wrong. Plaintiffs are competitive threats to Apple because they develop super apps, and the causal chain is straightforward.

### 1.    Plaintiffs Plausibly Allege Causation As Competitive Threats To Apple's Smartphone

Courts have long "infer[red] causation when exclusionary conduct is aimed at producers" of new competitive technologies. *Microsoft*, 253 F.3d at 79. Courts recognize that producers of new technologies can directly compete with and threaten existing market participants because, for example, those new technologies "could enable competitors to gain a foothold" in the relevant market. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 318 (4th Cir. 2007). Indeed, it "would be inimical to the purpose of the Sherman Act to allow monopolists free reign" to destroy competitive threats—"particularly in industries marked by rapid technological advance and frequent paradigm shifts." *Microsoft*, 253 F.3d at 79.

Plaintiffs pose exactly this kind of competitive threat. Contrary to Apple's assertions, Plaintiffs have not alleged that the super app functionality of the X app is "a decade away"[7] or that

---

[7] In making this argument, Apple not only fails to take Plaintiffs' allegations as true, but also improperly conflates complete replacement of the iPhone with the ability of super apps to pose a competitive threat to iPhones. *Compare* Compl. ¶ 58, *with* Apple Br. 15.

the X app will "develop into a super app at some unidentified point in the future." Apple Br. 15. Instead, the Complaint is clear that the X and Grok apps are super apps *already*. Compl. ¶¶ 62-63, 67-68, 85, 115. And though super apps are not encompassed in Plaintiffs' alleged smartphone market, they threaten Apple's dominant iPhone by allowing lower-cost smartphone competitors to gain a stronger foothold against Apple. *Id.* ¶¶ 64-65.

The resulting causal chain is simple: Apple and OpenAI's conduct harms competition among generative AI chatbots, harms the quality and innovation of AI-powered super apps, and prevents customers from switching from iPhone functionality to super app functionality. *Id.* ¶¶ 103, 109, 112-115, 179-180; *see Novell*, 505 F.3d at 316 (explaining that "[t]he analysis of the causal link between . . . [a monopolist's] use of its monopoly power . . . to foreclose distribution channels" and harm in the form of loss in market share "is straightforward"). Apple benefits from exclusivity, de-preferencing, and delaying approval of updates that impede the threat of super apps.

Apple attempts to complicate this straightforward causal sequence by insisting that super apps are not a competitive threat to smartphones. *See* Apple Br. 8-9, 24. In doing so, Apple fails to even address *United States v. Apple* beyond a footnote proclaiming it is "inapposite." Apple Br. 11 n.5. There, the court rejected dismissal of monopolization claims based on Apple's weaponization of its App Store to "effectively block[]" the development of super apps in an effort to maintain its smartphone monopoly. 2025 WL 1829127, at *2, 13. In so holding, the court relied on many alleged statements by Apple (including those also alleged by Plaintiffs here) recognizing the competitive threat that super apps pose to Apple's smartphone monopoly. *Compare id.* at *15, *with* Compl. ¶¶ 65, 113. The ruling in *United States v. Apple* confirms that the causal chain here is

not too remote for super apps to sue Apple as competitors of smartphones.[8]

### 2. Plaintiffs Plausibly Allege Antitrust Injury As Competitors To Smartphones

Apple contends that in the Fifth Circuit, only "consumers [or] competitors in the market attempted to be restrained" may bring antitrust claims and that Plaintiffs therefore fail to plead antitrust injury and lack standing. Apple Br. 2 (citing *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007)). Apple is wrong both on the facts alleged and the law.

On the facts, Plaintiffs have plausibly alleged that their existing super apps are a competitive threat to Apple in the smartphone market. *See supra* Part III.A.1. This alone dooms Apple's antitrust injury argument.

*Novell* is instructive. There, the court held that an emerging software competitor (referred to as "middleware") to Microsoft had plausibly alleged antitrust injury because the plaintiff (1) cited a Microsoft document stating that it had to protect its operating systems monopoly from the threat of middleware, and (2) alleged that the plaintiff was "of particular concern to Microsoft." *In re Microsoft Corp. Antitrust Litig.*, No. MDL 1332, Civ. JFM–05–1087, 2005 WL 1398643, at *2-3 (D. Md. June 10, 2005), *aff'd sub nom. Novell,* 505 F.3d at 311-12 (declining to adopt a bright line "consumer-or-competitor" rule for antitrust standing). Plaintiffs have far exceeded these

---

[8] In fact, in *Bakay v. Apple Inc.*, Apple itself acknowledged that other types of apps would have standing as potential competitors of Apple's operating system and apps. No. 24-cv-00476-RS, 2024 WL 3381034, at *2, *5-7 (N.D. Cal. July 11, 2024), *cited in* Apple Br. 22. None of Apple's remaining cited cases help Defendants because those cases did not involve claims by a competitor. *See, e.g.*, *AGC*, 459 U.S. at 539 (plaintiff was a union representing employees in the relevant market and it was "not clear whether the [u]nion's interests would be served or disserved by enhanced competition in the market"). *Campbell v. Wells Fargo Bank, N.A.*, which OpenAI also cites, involved a plaintiff who alleged harm from a third party's "inability to meet its [financial] obligations," 781 F.2d 440, 443 (5th Cir. 1986), not injury caused by harm to competition, *see, e.g.*, Compl. ¶¶ 169-180.

allegations, pleading that super apps are "fundamentally disruptive" to Apple's smartphone monopoly and that the rapid development of AI is of particular concern to Apple. Compl. ¶¶ 58, 65. Moreover, Plaintiffs have cited statements from Apple personnel that Apple must protect its smartphone monopoly from super apps and alleged that Plaintiffs are of particular concern to Apple—as evidenced by Apple's exclusive agreement with ChatGPT, its deprioritizing of the Plaintiffs' apps in the App Store, and its delayed approvals for the apps of super app competitors. *See, e.g.*, Compl. ¶¶ 57-58, 65, 71-72, 74-75, 79-89, 112-115.

On the law, Fifth Circuit jurisprudence allows companies attempting to challenge incumbents to sue under the antitrust laws. Later cases within the Fifth Circuit have clarified *Norris*, explaining that the Fifth Circuit "has not held as a matter of law that antitrust standing is limited to competitors and consumers exclusively," but instead engages in a more holistic analysis. *Universal Hosp.*, 2015 WL 6994438, at *12 (finding plausible allegations of antitrust injury even though plaintiff was neither a consumer nor current competitor); *see also Vaughn Med. Equip. Repair Serv., LLC v. Jordan Reses Supply Co.*, No. 2:10-cv-00124-HGB-KWR, 2010 WL 3488244, at *12 (E.D. La. Aug. 26, 2010) (similar); *Dexon Comput. Inc. v. Cisco Sys., Inc.*, No. 5:22-CV-53-RWS-JBB, 2023 WL 2941414, at *37 (E.D. Tex. Feb. 7, 2023), *report and recommendation adopted*, 2023 WL 2730656 (E.D. Tex. Mar. 31, 2023) (similar). For example, in *Sanger Insurance Agency v. HUB International, Ltd.*, the Fifth Circuit explained that a *potential* competitor could have antitrust standing if it met certain requirements, including "an intention to enter the business" and "a showing of preparedness to enter the business." 802 F.3d 732, 738, 740-41 (5th Cir. 2015) (reversing summary judgment for defendant in part based on lack of antitrust injury where plaintiff went beyond "the most basic preparatory steps" to challenge incumbent but was stymied by the incumbent's conduct). Plaintiffs exceed those requirements by pleading that

31

super apps—including Plaintiffs' super apps—would soon "replace iPhone functionality." Compl. ¶¶ 16, 60-66; *see, e.g.*, *id.* ¶ 58 ("[G]enerative AI chatbots and related super apps stand to reduce consumers' dependence on smartphones like Apple's iPhone."); *id.* ¶ 175 (explaining how "[s]uper apps threaten Apple's monopoly position in smartphones").

### B.    OpenAI's Antitrust Standing Arguments Are Meritless

OpenAI argues that (1) causation is too attenuated and (2) customers' choice of one competitor's product over another cannot give rise to antitrust injury. These arguments fail.

### 1.    Plaintiffs Plausibly Allege Causation As Competitive Threats To OpenAI's Generative AI Chatbot

OpenAI first argues that Plaintiffs fail to allege causation because their harm is "far removed from any act by OpenAI" and instead stems from "Apple's choice to start its integration roll-out with ChatGPT." OpenAI Br. 17. As discussed in detail above, *see supra* Part I, this argument mischaracterizes the Complaint, which alleges that Apple and OpenAI *together* stifled competition by agreeing to enter an exclusive arrangement. OpenAI concedes that xAI is its direct competitor in the market for generative AI chatbots, *see* OpenAI Br. 2, 4, meaning the resulting causal chain is straightforward.[9]

The summary judgment case OpenAI cites for the causation requirement—*Pulse Network*—shows that Plaintiffs plausibly plead causation. In reversing dismissal by the trial court, the Fifth Circuit ruled that Pulse, a direct competitor to Visa in the debit network market, was a

---

[9] In a footnote, OpenAI argues that injury to X is derivative of injury to xAI. *See* OpenAI Br. 18 n.18. Not only is this argument "forfeited," *Smith v. Sch. Bd. of Concordia Par.*, 88 F.4th 588, 596 (5th Cir. 2023), but X independently has standing as a competitor threatening Apple's monopoly in smartphones—a monopoly Apple and OpenAI have together conspired to protect. *See supra* Part III.A. Moreover, Grok is integrated into the X app, meaning X is independently harmed by reduced quality or innovation in generative AI chatbots. *See* Compl. ¶¶ 67-68, 180.

proper plaintiff to challenge a Visa policy requiring that merchants pay a fixed monthly fee for using Visa's debit networks. As the court explained:

> [Pulse] alleges [the policy] has caused merchants to use its debit network less . . . [and] claims [the policy] squeezes it out of the debit network market, reducing Pulse's transaction volume and market share. Based on the record, a reasonable jury could find a non-speculative causal link between these claimed injuries and [the challenged policy].

30 F.4th at 491, 493-94. The same logic applies here: Apple and OpenAI's conduct "has caused [consumers] to use [competing chatbots] less," *id.*, which in turn harms the quality and innovation of super apps fueled by those chatbots, causing Grok and X to lose out on market share, customers, and sales. Compl. ¶¶ 74-75, 84-88, 103-115, 169-180. OpenAI's cases—where plaintiffs are not direct competitors—do not say otherwise and are thus inapposite. *See, e.g.*, *Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011, 1014 (5th Cir. 1984) (franchisee of defendant); *Bell*, 847 F.2d at 1183-84 (inventor of product in an adjacent market).

Courts routinely find causation satisfied in cases challenging the denial of a key input or distribution channel to a competitor like Plaintiffs here. Indeed, "no party is in a better position to vindicate the purposes of the antitrust laws" than a competitor plaintiff that has "lost sales" to a monopolist engaged in "unlawful agreement to exclude competitors." *TCA Bldg. Co. v. Nw. Res. Co.*, 861 F. Supp. 1366, 1379-80 (S.D. Tex. 1994) (finding standing met for plaintiff's exclusive dealing and monopolization claims). For example, in *Nexstar Broadcasting v. Granite Broadcasting Corp.*, the court ruled that a competitor in the television local spot advertising market had plausibly alleged "injuries [that] appear to be direct" as part of its claims that the defendant had entered into exclusive deals that foreclosed plaintiff's access to must-have programming. 2012 WL 2838547, at *6 (N.D. Ind. July 9, 2012). Put simply, as these cases show, the law does not require Plaintiffs to plead the litany of facts OpenAI claims Plaintiffs should have alleged, *see,*

*e.g.*, OpenAI Br. 18, all of which are factual issues that OpenAI can test in discovery.

### 2.    Plaintiffs Plausibly Allege Antitrust Injury By Alleging That Consumers Would Prefer xAI's Products To OpenAI's Products

OpenAI next argues that loss "from customers[] choosing the competitor's goods and services over the plaintiff's," OpenAI Br. 19 (quoting *Pulse Network*, 30 F.4th at 489), is insufficient for antitrust injury, and that Plaintiffs have alleged "no . . . basis to infer that users would have preferred xAI's offerings over a competing integration from OpenAI or other providers." *Id*. 19 (alteration in original). But unlike in *Pulse Network*, the core of Plaintiffs' injury is not that "[customers], when given the option of [the defendant's product] or [the plaintiff's product], are choosing [the defendant's product]." 30 F.4th at 489. Instead, Plaintiffs' injury arises from customers *not being given the choice* because Defendants' conduct has foreclosed competition, *see* Compl. ¶¶ 9, 14-15, 74-75, 78, 84-88, 103-111. That is "textbook antitrust injury." *Pulse Network*, 30 F.4th at 491 (explaining that there is antitrust injury when "an excluded competitor . . . is prevented from selling its product"); *see also ZF Meritor*, 696 F.3d at 289 (antitrust injury satisfied where the defendant's conduct "unlawfully foreclosed a substantial share of the [relevant] market," resulting in "[p]laintiffs' inability to grow").

Moreover, the Complaint contains ample allegations from which it is plausible to infer that, given the choice, many iPhone users would choose Grok. Plaintiffs allege that Grok has received overwhelmingly positive feedback since its launch, maintains a 4.9 rating in Apple's App Store, and is one of the most—if not the most—intelligent generative AI chatbots. Compl. ¶ 68. Apple's own Support Community shows customer desire to use Grok. *Id*. ¶ 76. OpenAI's resort to extrinsic sources to argue that users might not choose the Grok app, *see* OpenAI Br. 20 n.19 (citation omitted), is not only inappropriate on a motion to dismiss but underscores that OpenAI has no

antitrust-injury argument rooted in the four corners of the Complaint.

Finally, OpenAI asserts in a footnote that Plaintiffs have not alleged harm to competition, such as OpenAI's "exercis[ing] its power to control prices or exclude competitors from the relevant market." OpenAI Br. 15 n.17 (citation omitted). This argument is forfeited, *see supra* n.9, and would not help OpenAI in any event because Plaintiffs have specifically alleged OpenAI conspired to maintain its power to control prices and exclude competitors, *see* Compl. ¶¶ 91, 166-168.

## IV.    Plaintiffs Plausibly Allege Claims For Common-Law Civil Conspiracy And Unfair Competition (Counts 7-8)

Plaintiffs have stated claims for common-law civil conspiracy and unfair competition. Defendants argue that both must be dismissed because they are derivative claims that rise and fall with Plaintiffs' antitrust claims. Apple Br. 25; OpenAI Br. 20-21.

Under Texas common law,[10] claims for civil conspiracy and unfair competition require an underlying illegal act. *See Centennial Bank v. Holmes*, 717 F. Supp. 3d 542, 583 (N.D. Tex. 2024). Because Plaintiffs have plausibly stated their underlying antitrust claims, *see supra* Parts I-II, and Defendants do not dispute that Plaintiffs have plausibly alleged all other requirements of their civil conspiracy and unfair competition claims, these common-law claims should not be dismissed.

## CONCLUSION

For all these reasons, Apple's and OpenAI's motions to dismiss should be denied in their entirety. In the alternative, should the Court dismiss any counts in the Complaint, Plaintiffs request leave to amend.

---

[10] Because a choice-of-law analysis is unnecessary to respond to Defendants' motions, Plaintiffs accept for present purposes that Texas law applies to their common-law claims.

Dated: October 21, 2025

Respectfully submitted,

/s/ Bradley Justus

Bradley Justus*
DC Bar No. 1007988
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036
T: (202) 912-4700
F: (202) 912-4701
bjustus@axinn.com

Caroline P. Boisvert*
CT State Bar No. 441323
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
Hartford, CT 06103
T: (860) 275-8100
F: (860) 275-8101
cboisvert@axinn.com

/s/ Judd E. Stone

Judd E. Stone II
TX State Bar No. 24076720
Christopher D. Hilton
TX State Bar No. 24087727
STONE | HILTON PLLC
600 Congress Ave., Ste. 2350
Austin, TX 78701
T: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com

*admitted pro hac vice

/s/ Craig M. Reiser

Craig M. Reiser*
NY State Bar No. 4886735
Scott A. Eisman*
NY State Bar No. 4905287
Eva Yung*
NY State Bar No. 5497300
Christopher Erickson*
NY State Bar No. 5800628
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111
T: (212) 728-2200
F: (212) 728-2201
creiser@axinn.com
seisman@axinn.com
eyung@axinn.com
cerickson@axinn.com

/s/ Alex More

Alex More
TX State Bar No. 24065789
Monica E. Gaudioso
TX State Bar No. 24084570
Robert C. Rowe
TX State Bar No. 24086253
CARRINGTON, COLEMAN, SLOMAN &
BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, TX 75202
T: (214) 855-3000
F: (214) 580-2641
amore@ccsb.com
mgaudioso@ccsb.com
rrowe@ccsb.com

Attorneys for Plaintiffs X Corp.
and X.AI LLC

36

### CERTIFICATE OF SERVICE

I certify that on October 21, 2025, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing. A notice of electronic filing was transmitted to all ECF registrants of record.

/s/ Craig M. Reiser
Craig M. Reiser