**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| X CORP. and X.AI LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:25-cv-00914-P |
| | § | |
| APPLE INC., OPENAI, INC., OPENAI, L.L.C., | § | |
| and OPENAI OPCO, LLC, | § | |
| | § | |
| Defendants. | § | |

**REPLY BRIEF OF DEFENDANT APPLE INC.**
**IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

I.     Plaintiffs' Opposition Fails to Identify Factual Allegations to Support an
Exclusive-Dealing Claim. ................................................................................. 2

II.    Plaintiffs' Opposition Confirms that Their Smartphone-Market Claims Against
Apple Should Be Dismissed. ............................................................................. 6

       A.    Plaintiffs Fail to Allege Anticompetitive Conduct by Apple................................. 7

       B.    Plaintiffs Fail to Allege Foreclosure or Harm in the Smartphone Market.............. 8

       C.    Plaintiffs Lack Antitrust Standing to Pursue Smartphone-Related Claims. ........... 9

CONCLUSION........................................................................................................... 10

## INTRODUCTION

Plaintiffs insist that the integration of ChatGPT into Apple Intelligence constitutes a straightforward "exclusive dealing" violation. But what matters is the facts Plaintiffs allege, not the label they use. And those facts do not come close to stating an exclusive-dealing claim.

The main flaw in both the complaint and opposition brief is Plaintiffs' fundamental misunderstanding of what "exclusive dealing" means under the antitrust laws. An agreement with a single supplier (OpenAI) to purchase a product (ChatGPT) is not "exclusive" where, as here, the agreement allows the buyer (Apple) to add or switch suppliers. But Plaintiffs' opposition concedes that the crux of their exclusivity allegations is simply that (1) "no other generative AI chatbot is natively integrated with iPhones" at present and (2) competing chatbots that have sought such integrations "have been denied." ECF 63 at 10. Those allegations fail to plead the central element of an exclusive dealing claim—that Apple is prohibited by its agreement with OpenAI from partnering with any other AI chatbot.

The consequences of accepting Plaintiffs' theory of exclusive dealing are hard to overstate. It would mean that any time a sufficiently large company decides to partner with a supplier—and rejects proposals from other suppliers—it has entered an "exclusive" deal in violation of the antitrust laws, even if all suppliers remain free to compete for the company's business moving forward. Any supplier that was not chosen would be entitled to seek a different outcome through the courts, subjecting defendants to the threat of trebled damages under the antitrust laws—plus "the potentially enormous expense" of antitrust discovery—in cases in which no amount of discovery could cure the legal defects in the case. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). And it would stifle, not protect, competition: companies like Apple would be forced to partner with all suppliers, not whoever best serves their customers and other business needs. Plaintiffs identify no court that has ever accepted this theory of exclusive dealing. Each case they

cite involved agreements with provisions that *demanded* exclusivity expressly or in practice. Plaintiffs allege no such provision here. This alone requires dismissal of Plaintiffs' entire case.

Even putting aside Plaintiffs' flawed understanding of exclusive dealing, there are several additional reasons to dismiss the claims against Apple. Plaintiffs have not plausibly alleged that Defendants eliminated competition in a substantial part of their alleged relevant markets. Indeed, as Plaintiffs' opposition confirms, the complaint fails to allege *any* foreclosure of competition in the smartphone market. Further, under controlling Fifth Circuit precedent, Plaintiffs lack standing to bring any smartphone-based claims: neither Plaintiff alleges that it currently competes in or plans to enter a smartphone market. The whole complaint—and, at minimum, Plaintiffs' Section 1 and Section 2 smartphone-market claims against Apple—should be dismissed.

## ARGUMENT

### I.    Plaintiffs' Opposition Fails to Identify Factual Allegations to Support an Exclusive-Dealing Claim.

The core of Plaintiffs' complaint is their "exclusive-dealing allegations." ECF 63 at 9. But Plaintiffs' brief misstates what it means for an agreement to be "exclusive" under the antitrust laws. Because Plaintiffs' allegations do not rise to the level of an unlawful exclusive agreement, the complaint should be dismissed. *See* ECF 37 at 10–13.

"Unlawful exclusive dealing requires (1) an *agreement* (2) *not to deal* in the goods of another." Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 1821a (5th ed. 2025); *see also, e.g.*, *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494 n.23 (5th Cir. 2022) (similar). A plaintiff cannot allege merely that a defendant has chosen only one partner; it must plead facts plausibly showing that the defendant also *agreed* with that partner *not to deal* with other competitors. After all, when a firm independently decides that a single partner is best for its business, that outcome is the product of

competition, not the frustration of it. In short, a firm may lawfully "decide to direct all of its business to a single supplier" if it does so "independently." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 972 (7th Cir. 1995); *cf. Paddock Publ'ns, Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe, and it is common.").

Consider the following example. To obtain fuel, pretzels, airport lounge chairs, and more, airlines contract with suppliers. Potential suppliers compete for the business, and each airline chooses partners that best serve its needs. Said differently, an airline's choice of suppliers is the product of a competitive process. And that is true whether the airline decides to work with multiple suppliers or just one. Any supplier that loses out on the airline's business today can try win it tomorrow. For example, American Airlines can choose a single pretzel company if it wishes. But the antitrust laws do not require American Airlines to purchase pretzels from everyone, regardless of price or quality or whether working with multiple suppliers is more burdensome and costly.

The same logic dooms Plaintiffs' exclusive-dealing claims. As Plaintiffs' opposition makes clear, the complaint fails to allege that Apple *agreed* with OpenAI not to integrate any generative AI chatbot besides ChatGPT. Rather, Plaintiffs' claims rest solely on their allegations that ChatGPT is currently "the only generative AI chatbot natively integrated with Apple Intelligence." ECF 63 at 1; *see also id.* at 10–11 (describing allegations purportedly supporting exclusivity). But those allegations describe only the outcome of competition—like an airline picking one fuel, food, or furniture supplier. What is missing is any factual allegation suggesting that this outcome is the result of a requirement in the Apple-OpenAI agreement, or some other agreement between the parties, rather than Apple's independent business judgment to pick a single supplier. *Cf.* ECF 37 at 12–13. At most, Plaintiffs' allegations that Apple has thus far only integrated with ChatGPT are

"merely consistent with" both possibilities. *Twombly*, 550 U.S. at 557. But that is not enough to survive a motion to dismiss: Plaintiffs instead "need . . . allegations plausibly suggesting" an unlawful agreement not to deal with others rather than an independent business decision. *Id.*

Plaintiffs identify no case endorsing their position that a plaintiff may plausibly allege exclusivity by alleging that a defendant has partnered with just one counterparty. ECF 63 at 10. Instead, every case they cite for that sweeping proposition, *see id.* at 10–14, found exclusive dealing because the plaintiff alleged (or proved) the existence of *specific*, *agreed-upon restrictions* that, in practice if not expressly, prohibited a party from working with other competitors:

- In *Leaf Trading Cards, LLC v. Upper Deck Co.*, a producer of hockey cards alleged that Upper Deck's hockey card distribution agreements "effectively prohibit[ed]" distributors from carrying cards made by Upper Deck's competitors, because they barred distributors from selling cards featuring players to whom Upper Deck had exclusive publicity rights. Original Complaint ¶ 8, 2018 WL 2971135 (N.D. Tex. Mar. 16, 2018) (No. 3:17-CV-03200), 2017 WL 5663009.

- In *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001), the federal government proved that Microsoft entered into a series of distribution agreements that, though "not literally exclusive," were "exclusive in practice because they required developers to make Microsoft's [software] the default," *id.* at 75, in a way that left developers with little practical ability to distribute non-Microsoft software, *United States v. Microsoft Corp.*, 84 F.Supp.2d 9, 108–09 (D.D.C. 1999) (describing operation of default clause). The court in *United States v. Google LLC*, 747 F.Supp.3d 1 (D.D.C. 2024), which found liability based on a web of challenged agreements and contractual provisions across different distribution channels, *see id.* at 146–81, relied on similar logic. *See id.* at 89, 147–48 (describing how bespoke default clauses effectively meant that only Google's search engine would be preloaded on covered devices and browsers).

4

- *United Shoe Mach. Corp. v. United States*, 258 U.S. 451 (1922), involved seven "drastic" contractual provisions that together had "the practical effect" of "prevent[ing]" the use of a competitor's equipment. *Id.* at 456–57.

- *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056 (9th Cir. 2025), involved "contractual provisions" that "condition[ed]" real-estate brokers' "access to [CoStar's services] on an agreement not to support or share [certain] data with CoStar's competitors." *Id.* at 1074. The plaintiff's "allegations of actual de facto exclusivity," moreover, were "not speculation," as brokers had cited CoStar's contracts in refusing to work with competitors. *Id.*

Plaintiffs' allegations are not remotely comparable. They do not allege that the Apple-OpenAI agreement contains *any* provision that expressly or in practice prohibits Apple from integrating other chatbots. *Cf. Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181–82 (9th Cir. 2016) (describing the type of contractual terms that may qualify as *de facto* exclusive, if not expressly exclusive).[1] Instead, all Plaintiffs purport to allege is that Apple and OpenAI agreed to integrate ChatGPT into Apple Intelligence; that Apple has not yet integrated other chatbots (though Plaintiffs allege no facts suggesting that is because of the agreement between Apple and OpenAI); and that at least one other manufacturer has made a different business decision to partner with multiple chatbots. *See* ECF 63 at 11 (citing ECF 1 ¶¶ 71–72, 74–75, 78, 91, 97, 109)).

Plaintiffs have thus alleged only an agreement "to deal," and not an agreement "*not to deal*." Areeda & Hovenkamp, *supra*, ¶ 1821a. Nothing in the complaint indicates that the Apple-OpenAI agreement explicitly or in practice bars Apple from agreeing to integrate with another

---

[1] Apple is seeking dismissal based on the complaint's failure to plausibly allege exclusive dealing—not Apple's "say-so" about the agreement's content. ECF 63 at 14. Apple noted the agreement's lack of exclusivity—which was documented by Plaintiffs' own cited sources and well known when Plaintiffs filed their complaint—only to highlight *why* the complaint is so deficient.

chatbot.[2] As the Fifth Circuit explained in one of Plaintiffs' cited cases, ECF 63 at 14, there cannot be illegal exclusive dealing absent "even an informal agreement or understanding of exclusivity," *Dillon Materials Handling, Inc. v. Albion Indus., Div. of King-Seeley Thermos Co*., 567 F.2d 1299, 1304 (5th Cir. 1978). And it is "well settled" that absent an agreement about exclusivity "a seller may unilaterally refuse to do business with a buyer," or vice versa, "without running afoul of the antitrust laws." *Id*. at 1306 (citing *United States v. Colgate & Co*., 250 U.S. 300, 307 (1919)). Plaintiffs' assertion that the agreement is "exclusive" is therefore just a conclusory "label." *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (citation modified).

Finally, Plaintiffs' exclusive-dealing claims independently fail because Plaintiffs have not plausibly alleged substantial foreclosure of competition. As discussed below, Plaintiffs all but admit that the agreement has not foreclosed any *smartphone* distribution channels or prevented any smartphone manufacturer from competing for customers in a smartphone market. And Plaintiffs' speculative assertions of foreclosure in the generative AI chatbot market are facially implausible considering the vast universe of alternative sources for user prompts that the complaint itself concedes. Because ChatGPT's competitors "are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors," the "[a]ntitrust laws require no more." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997).

## II.    Plaintiffs' Opposition Confirms that Their Smartphone-Market Claims Against Apple Should Be Dismissed.

The entire complaint should be dismissed because Plaintiffs have not plausibly alleged any violations of the antitrust laws. But even if the Court concludes that Plaintiffs have stated a Section 1 exclusive-dealing claim in a generative AI chatbot market, it should at least dismiss Plaintiffs'

---

[2] It is thus irrelevant that a plaintiff may state an exclusive dealing claim absent a contractual provision explicitly precluding a party from working with anyone else. *See id.* at 13–14.

speculative smartphone-market claims against Apple, which fail for additional reasons. Plaintiffs' opposition confirms that they have failed to plausibly allege that Apple engaged in anticompetitive conduct or foreclosed competition in the smartphone market. And it underscores that neither Plaintiff is an actual or potential competitor with standing to bring smartphone-market claims.

### A.    Plaintiffs Fail to Allege Anticompetitive Conduct by Apple.

Beyond their flawed assertions of exclusive dealing, all that is left of Plaintiffs' case against Apple are allegations that it has "deprioritized" Grok and X and "preferenced" ChatGPT in the App Store. *See* ECF 63 at 22–24. But those allegations also fail to state an antitrust violation.

In contending otherwise, Plaintiffs first rewrite their complaint. Recognizing that Section 1 of the Sherman Act prohibits only anticompetitive agreements "between *separate* entities," *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984), Plaintiffs insist that they alleged that "Apple and OpenAI *together* conspired" to preference ChatGPT in the App Store, ECF 63 at 22 (citing ECF 1 ¶¶ 79–89, 102, 179). But the complaint asserts only that *Apple* engaged in that conduct; OpenAI is nowhere to be found in the relevant allegations. *See* ECF 1 ¶¶ 79–89, 102, 179. These allegations therefore do not advance Plaintiffs' Section 1 claim (as to the smartphone market or the generative AI chatbot market).

Nor do the allegations support Plaintiffs' Section 2 monopolization claim. Plaintiffs' opposition fails to identify any concrete fact suggesting that X's and Grok's absences from the Must-Have Apps List are the product of a scheme to monopolize the smartphone market, rather than Apple's First Amendment-protected editorial judgment. Indeed, even Plaintiffs' conclusory assertions do not go so far: Plaintiffs declare only that "Apple protected *OpenAI's* dominant position by using its App Store as a 'weapon' to harm *OpenAI's* rivals." ECF 63 at 22 (emphasis added). Plaintiffs also have not alleged that Apple's supposed "deprioritization" and "preferencing" harmed competition, in the smartphone market or otherwise. *See* ECF 37 at 18–19.

Indeed, Plaintiffs' allegations that X and Grok have been wildly successful in the App Store's Top Charts (based on recent download volume), *see* ECF 1 ¶ 84 & Figure 4, directly undermine any suggestion that inclusion on Apple's Must-Have Apps List is necessary to attract users.

### B.     Plaintiffs Fail to Allege Foreclosure or Harm in the Smartphone Market.

Competition in a market is "foreclosed" when "opportunities for [competitors] to enter into or remain in that market" are "significantly limited." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961). But Plaintiffs do not allege that any smartphone manufacturer has been or will be "frozen out" from the market as a result of the ChatGPT integration. *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring in the judgment); *see* ECF 37 at 14. Plaintiffs' opposition does not dispute that every smartphone manufacturer, from Apple to Samsung to Google to Motorola, can still compete for every customer. To concede that is to concede an utter *lack* of foreclosure in the smartphone market.

Lacking any allegations of *smartphone*-market foreclosure, Plaintiffs pivot to other markets. First, they insist that Defendants have "excluded *super apps* from competing." ECF 63 at 21 (emphasis added). But "super apps" do not compete in Plaintiffs' alleged smartphone market, which they describe as smartphone hardware "incorporat[ing] a display screen and an operating system." ECF 1 ¶ 117. These allegations, therefore, are irrelevant to Plaintiffs' smartphone-market claims. *See Tampa Elec.*, 365 U.S. at 327 ("[T]he threatened foreclosure of competition must be in relation to the market affected."). Then, Plaintiffs argue that they need only show foreclosure in the *generative AI chatbot market* for their Section 1 exclusive-dealing claim to proceed. *See* ECF 63 at 21–22 (emphasis added). But that too does not advance Plaintiffs' Section 1 and 2 smartphone-based claims against Apple, which require smartphone-market foreclosure. *See* ECF 37 at 14–15 (explaining that foreclosure requirement is market-specific).

### C.    Plaintiffs Lack Antitrust Standing to Pursue Smartphone-Related Claims.

Plaintiffs do not dispute that they must have antitrust standing as to the smartphone market to pursue their smartphone-market claims. *See* ECF 37 at 22. Yet Plaintiffs do not contend that they satisfy the established standing test as to that market. *Cf. id.* at 21–24. Instead, Plaintiffs insist they have standing under a more relaxed test because they are, based on a highly speculative causal chain, "competitive threats" to Apple. *See* ECF 63 at 28–29. That is wrong legally and factually.

**Antitrust Injury.** With a narrow exception not alleged or applicable here, the Fifth Circuit has held that only competitors or consumers in the alleged market can suffer the antitrust injury necessary to bring antitrust claims involving that market. *See* ECF 37 at 22–24 & n.10. Plaintiffs resist that clear rule by claiming standing on the basis that they "develop super apps that are competitive threats to Apple's smartphone monopoly." ECF 63 at 27. But Plaintiffs improperly conflate "competitive threats" with "nascent competitors."  And the Fifth Circuit has held only that entities that plead both intent to enter the relevant market and preparation to do so may be "nascent competitors" with standing. *See, e.g.*, *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737–38 (5th Cir. 2015). Here, Plaintiffs have not alleged any intent or preparation to build smartphones (described as "mobile telephones that incorporate a display screen and an operating system"). *Id.* ¶ 117. Plaintiffs' opposition further confirms that "super apps are *not* encompassed in Plaintiffs' alleged smartphone market." ECF 63 at 29 (emphasis added). And contrary to Plaintiffs' assertions (at 29–30), *United States v. Apple, Inc.*, No. 24-CV-4055 (JXN)(LDW), 2025 WL 1829127 (D.N.J. June 30, 2025), says nothing different. That case was brought by the federal government, which, unlike private plaintiffs, does not have to satisfy the Sherman Act's heightened antitrust standing requirement. *See, e.g.*, *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006). That case, therefore, does not address the standing question at issue here.

Plaintiffs thus also fail to allege injury in the relevant market. They claim to have lost "billions." ECF 63 at 7. But even if that speculative claim were true, such injury would have occurred in a separate market for apps. Plaintiffs whose injuries "are experienced in another market do not suffer antitrust injury." *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001).

**Proximate Causation.** Plaintiffs' convoluted and speculative causal chain cannot support smartphone-market standing. ECF 37 at 21–22. Plaintiffs insist that the "resulting causal chain is simple," ECF 63 at 29, and point to *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007), to argue that standing exists when a defendant harms technology allegedly poised to change competition in the defendant's market, *see* ECF 63 at 28, 30. But there, the Fourth Circuit held that plaintiffs' allegations went "beyond mere speculation" to support the claim that Microsoft "*directly* targeted [the plaintiff's] products" as part of its effort to monopolize a separate operating-systems market. 505 F.3d at 317–18 (emphasis added). Thus, the court found standing based on "the directness . . . of the plaintiff's injury," as precedent requires. *Id.* at 315.

By contrast, Plaintiffs allege that Apple has entered an agreement with OpenAI that has harmed certain competitors in a generative AI chatbot market, "in turn" hindering the development of "super apps," which Plaintiffs assert might cause iPhone users to switch to more basic smartphones in the future. *See* ECF 37 at 15, 21–22; ECF 63 at 33. Plaintiffs cite no case finding antitrust standing on such an indirect and remote causal chain.[3]

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' complaint.

---

[3] Plaintiffs' alleged chain of causation is so speculative that they lack standing even as to the generative AI chatbot market claims. *See* ECF 37 at 20–24; *see also* ECF 41 at 17–20.

Dated: November 4, 2025                    Respectfully submitted,

                                           */s/ Dee J. Kelly, Jr.*
                                           Dee J. Kelly, Jr.
                                           State Bar No. 11217250
                                           dee.kelly@kellyhart.com
                                           Julia G. Wisenberg
                                           State Bar No. 24099146
                                           julia.wisenberg@kellyhart.com
                                           KELLY HART & HALLMAN LLP
                                           201 Main Street, Suite 2500
                                           Fort Worth, TX 76102
                                           Telephone: (817) 332-2500
                                           Facsimile: (817) 878-9280

                                           Emily Johnson Henn (admitted *pro hac vice*)
                                           ehenn@cov.com
                                           COVINGTON & BURLING LLP
                                           3000 El Camino Real
                                           5 Palo Alto Square, 10th Floor
                                           Palo Alto, CA 94306
                                           Telephone: (650) 632-4700

                                           Henry Liu (admitted *pro hac vice*)
                                           hliu@cov.com
                                           Lauren Willard Zehmer (admitted *pro hac vice*)
                                           lzehmer@cov.com
                                           Carol Szurkowski Weiland (admitted *pro hac vice*)
                                           cweiland@cov.com
                                           COVINGTON & BURLING LLP
                                           One CityCenter
                                           850 Tenth Street, NW
                                           Washington, DC 20001
                                           Telephone: (202) 662-6000
                                           Facsimile: (202) 662-6302

                                           **ATTORNEYS FOR DEFENDANT APPLE INC.**

11

### CERTIFICATE OF SERVICE

I certify that on November 4, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

_/s/ Julia G. Wisenberg_
Julia G. Wisenberg