**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC., OPENAI, INC., OPENAI,<br>L.L.C., and OPENAI OPCO, LLC,<br><br>    Defendants. | Civil Action No. 4:25-cv-00914-P |

**THE OPENAI DEFENDANTS' ANSWER TO
PLAINTIFFS X CORP. AND X.AI LLC'S COMPLAINT**

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC (the "OpenAI Defendants") hereby answer the Complaint of Plaintiffs X Corp. and X.AI LLC. All allegations not expressly admitted herein, including those contained in the structural headings or footnotes of the Complaint, are denied. By acknowledging the existence of or referring the Court to documents, reports, or testimony, OpenAI makes no admission as to the truth of the contents of such documents, reports, or testimony, and reserves all rights (and waives no rights) to argue that such documents, reports, or testimony, or any documents, reports, or testimony referenced therein, are objectionable as hearsay or on any other ground.

**<u>INTRODUCTION</u>**

1.    This is a tale of two monopolists joining forces to ensure their continued dominance in a world rapidly driven by the most powerful technology humanity has ever created: artificial intelligence ("AI"). Working in tandem, Defendants Apple and OpenAI have locked up markets to maintain their monopolies and prevent innovators like X and xAI from competing.[1] Plaintiffs

---

[1]Apple Inc. is referred to as "Apple." OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC are collectively referred to as "OpenAI." Apple and OpenAI are collectively referred to as "Defendants." X Corp. is referred to as "X" and X.AI LLC is referred to as "xAI." X and xAI are collectively referred to as "Plaintiffs."

bring this suit to stop Defendants from perpetrating their anticompetitive scheme and to recover billions in damages.

**RESPONSE**: Denied.

2.      AI is fundamentally reshaping our world.  Technology powered by AI has not only become embedded in our daily lives but is also transforming critical sectors like healthcare, education, and finance.  The consensus among global business leaders, academics, and scientists is that AI adoption is both unavoidable and transformational—and businesses that do not plan for it risk falling behind.

**RESPONSE**: The OpenAI Defendants admit that technology powered by AI has had a substantial impact on a number of industries, but otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 2 and deny them on that basis.

3.      Apple illustrates the risks that can befall a company that fails to innovate in AI. With its myopic focus on making iterative changes to its smartphones—a market in which Apple has a 65 percent share and has long enjoyed a monopoly—Apple was blindsided by major innovations in AI.  And when Apple, years after other technology companies, finally attempted to engage with and integrate AI, many, including those within the company, felt it was too little, too late.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3 and deny them on that basis.

4.      As Apple now recognizes, AI poses an existential threat to its business.  For example, AI is rapidly advancing the rise of "super apps"—i.e., multi-functional platforms that offer many of the services of smartphones, such as social connectivity and messaging, financial services, e-commerce, and entertainment—that do not require a customer to be tied to a particular device.  In other words, super apps, like those being developed by X and xAI, stand ready to upend the smartphone market and Apple's entrenched monopoly in it.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 and deny them on that basis.

5.      The writing is on the wall.  Apple's Senior Vice President for Services, Eddy Cue, has expressed worries that AI might destroy Apple's smartphone business, just as Apple's iPhone did to Nokia's handsets.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 5 to the extent they purport to characterize a statement of an Apple employee and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 5.

6.      Apple knows it cannot escape the inevitable—at least not alone. In a desperate bid to protect its smartphone monopoly, Apple has joined forces with the company that most benefits from inhibiting competition and innovation in AI: OpenAI, a monopolist in the market for generative AI chatbots.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 6 and deny them on that basis. The OpenAI Defendants deny the allegations in the second sentence of Paragraph 6.

7.      OpenAI quickly rose to dominance in the generative AI chatbot market after introducing its flagship service, ChatGPT, in 2022. Today, OpenAI controls at least 80 percent of the market. Because of OpenAI's monopoly, other generative AI chatbots have struggled to gain share. xAI's Grok has yet to gain more than a few percent of the market despite accolades about its superior features.

**RESPONSE**: The OpenAI Defendants admit that they introduced ChatGPT in 2022 and otherwise deny the allegations in Paragraph 7.

8.      Just like Apple, OpenAI has incentive to protect its monopoly by thwarting competition and innovation in the generative AI chatbot market. And just like Apple, it has done so in violation of the antitrust laws.

**RESPONSE**: Denied.

9.      In June 2024, Apple and OpenAI announced that Apple would integrate OpenAI's ChatGPT into Apple's iPhone operating system ("iOS"). Apple and OpenAI's exclusive arrangement has made ChatGPT the only generative AI chatbot integrated into the iPhone. This means that if iPhone users want to use a generative AI chatbot for key tasks on their devices, they have no choice but to use ChatGPT, even if they would prefer to use more innovative and imaginative products like xAI's Grok. An OpenAI strategy document recognized the importance of competition in this emerging and transformational space: "Real choice drives competition and benefits everyone. Users should be able to pick their AI assistant." Yet Apple and OpenAI have colluded to prevent exactly that.

**RESPONSE**: To the extent that the allegations in Paragraph 9 purport to characterize announcements made by Apple and OpenAI in June 2024, the OpenAI Defendants respectfully refer the Court to those announcements for their complete and accurate contents. The OpenAI Defendants admit that, in June 2024, OpenAI announced that ChatGPT would be integrated into certain Apple Intelligence functions in some versions of Apple's iOS. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 9 to the extent that they purport to quote from and characterize an unidentified "OpenAI strategy document," and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 9.

10.     Generative AI chatbots improve their models based on a continuous feedback loop. More users beget more prompts, and more prompts offer more opportunities to train the model, whose better features then attract even more users.

**RESPONSE**: The OpenAI Defendants admit that subsets of user requests are among the many sources of data used to train certain of the artificial intelligence models for which ChatGPT can serve as an interface, and otherwise deny the allegations in Paragraph 10.

11.     As a result of Apple and OpenAI's exclusive arrangement, ChatGPT is the *only* generative AI chatbot that benefits from billions of user prompts originating from hundreds of millions of iPhones. This makes it hard for competitors of ChatGPT's generative AI chatbot and super apps powered by generative AI chatbots to scale and innovate.

**RESPONSE**: Denied.

12.     Worse still, Apple has taken further steps to protect its monopoly in smartphones and to preference OpenAI by deprioritizing the apps of competing generative AI chatbots and super apps in its App Store rankings, and it has dragged out its App Store app review processes for those competitors.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 and deny them on that basis.

13.     As a result of Apple and OpenAI's anticompetitive conduct, Plaintiffs have been foreclosed from a significant number of generative AI chatbot prompts, deprived of scale, and thwarted in their abilities to innovate and improve the quality and competitiveness of their

offerings. Moreover, due to the presence of network effects and other scale advantages, the harm from this foreclosure on competition is amplified.

**RESPONSE**: Denied.

14.    In a competitive market for generative AI chatbots, usage of chatbots would be determined by customer choice. Generative AI chatbots would vigorously compete with one another to get customers to use their generative AI chatbot over rival ones. Defendants' anticompetitive conduct has prevented this competition by handing a substantial portion of the market to ChatGPT. This conduct prevents ChatGPT's rivals, such as Grok, from fairly competing with ChatGPT.

**RESPONSE**: The OpenAI Defendants admit that companies other than OpenAI develop

and distribute interfaces through which users can interact with an artificial intelligence model

through natural language dialogue, and otherwise deny the allegations in Paragraph 14.

15.    The result of this scheme is that customers have less choice and receive generative AI chatbots with fewer features and capabilities than they would absent Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

16.    Just as Defendants' conduct has harmed competition in the market for generative AI chatbots, it has locked up the market for smartphones. In a competitive market for smartphones, Apple would compete by lowering prices or innovating to develop features like generative AI to compete against super apps. Instead, Apple has stifled competition. Apple's conduct inhibits the growth of AI and super apps by allowing OpenAI to maintain its monopoly and curtail innovation and investment in generative AI chatbots that would develop into super apps that replace iPhone functionality.

**RESPONSE**: Denied

17.    Customers in the smartphone market are harmed by this conduct because they cannot readily switch to less expensive smartphones and use generative AI chatbots and super apps that match or replace the features offered by the iPhone. Absent Defendants' misconduct, consumers would be able to pay less for smartphones and achieve the same or higher quality.

**RESPONSE**: Denied.

18.    Defendants' conduct has also harmed Plaintiffs by reducing Grok's ability to scale and introduce new features, thus interfering with Plaintiffs' efforts to build super apps. If not for Defendants' conduct, Plaintiffs' apps would be more widely used, generating more revenue for Plaintiffs and accelerating their innovation.

**RESPONSE**: Denied.

19.     Unless the Court enjoins Apple and OpenAI's unlawful conduct, Defendants will continue to thwart competition, and their competitors, like Plaintiffs, will continue to suffer the anticompetitive consequences.  Plaintiffs bring this action to stop Apple and OpenAI from continuing to engage in their anticompetitive scheme and to recover the damages that have been caused—and will be caused—by Apple and OpenAI's misconduct.

**RESPONSE**:  Denied.

## PARTIES

20.     Plaintiff X Corp. is a corporation organized and existing under the laws of Nevada, with its principal place of business in Bastrop, Texas.  X Corp. owns and operates the social media platform X (formerly known as Twitter), accessible through X.com, twitter.com, and various mobile applications.  X Corp. merged with Twitter, Inc. in April 2023, and was acquired by X.AI Holdings Corp. in March 2025.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and deny them on that basis.

21.     Plaintiff X.AI LLC is a limited liability company formed under the laws of Nevada, with a place of business in Palo Alto, California.  Its ultimate parent company is X.AI Holdings Corp.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and deny them on that basis.

22.     Defendant Apple Inc. is a corporation organized and existing under the laws of California, with a place of business in Cupertino, California.  Apple designs, markets, and sells smartphones (the iPhone), personal computers (Macs), tablets (the iPad), wearables, and accessories, as well as a variety of related services.  Apple also owns and operates the Apple App Store.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 22 and deny them on that basis.  The OpenAI Defendants admit the allegations in the second and third sentences of Paragraph 22.

23.     Defendant OpenAI, Inc. is a registered nonprofit organization incorporated under the laws of Delaware, with a place of business in San Francisco, California.

**RESPONSE**: The OpenAI Defendants admit that, as of the filing of the Complaint in this action, Defendant OpenAI, Inc. was a registered nonprofit organization incorporated under the laws of Delaware, with a place of business in San Francisco, California. The OpenAI Defendants aver that OpenAI, Inc. has since been renamed and is now called OpenAI Foundation. OpenAI Foundation is a nonprofit organization registered under the laws of Delaware, with a place of business in San Francisco, California.

24.    Defendant OpenAI, L.L.C. is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California and members that are citizens of Texas.

**RESPONSE**: The OpenAI Defendants admit that OpenAI, L.L.C. is a limited liability company formed under the laws of Delaware, with a place of business in San Francisco, California. The OpenAI Defendants otherwise deny the allegations in Paragraph 24.

25.    Defendant OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware, with a place of business in California and members that are citizens of Texas.

**RESPONSE**: The OpenAI Defendants admit that OpenAI OpCo, LLC is a limited liability company formed under the laws of Delaware, with a place of business in California. The OpenAI Defendants otherwise deny the allegations in Paragraph 25.

## JURISDICTION AND VENUE

26.    The Court has subject-matter jurisdiction over Plaintiffs' federal claims under 15 U.S.C. § 4 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367.

**RESPONSE**: Paragraph 26 sets forth a legal conclusion to which no response is required.

27.    The Court has personal jurisdiction over all Defendants under 15 U.S.C. § 22. Alternatively, the Court has personal jurisdiction over all Defendants under Texas's long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, because Defendants transact substantial business within Texas and this District, and this action arises from that business.

**RESPONSE**: Paragraph 27 sets forth a legal conclusion to which no response is required.

28.    For example, Apple sells smartphones in Texas—including at its nearly 20 Apple Stores within the state—and to Texas residents, and the OpenAI entities sell ChatGPT or otherwise make it available to residents of Texas and are constructing a data center in Abilene, Texas. Defendants likewise force iPhone users within Texas who enable Apple Intelligence to use ChatGPT as the integrated generative AI chatbot on their devices, and Defendants have caused fewer Texas iPhone users to download Plaintiffs' apps by manipulating App Store rankings and delaying approval for updates to xAI's Grok app.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 28 that pertain to where Apple sells smartphones and deny them on that basis.  The OpenAI Defendants admit that OpenAI entities sell subscriptions to ChatGPT, or otherwise make it available, to residents of Texas.  The OpenAI Defendants otherwise deny the allegations in Paragraph 28.

29.    Moreover, a substantial portion of the antitrust injury resulting from Defendants' business in Texas forms the basis of this lawsuit because Defendants have targeted X, a Texas resident, in an effort to stifle X's ability to function as a super app. Defendants have also used X's platform to spread disinformation about their anticompetitive scheme.

**RESPONSE**: Denied.

30.    Venue is proper in this District under 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391 because Defendants transact a substantial volume of business in the United States and in this District, including without limitation selling smartphones to customers located in this District (Apple) and selling or making ChatGPT available to customers in this District (OpenAI).  A substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.  Defendants' conduct has harmed the U.S. markets for smartphones and generative AI chatbots, including harming customers within this District.

**RESPONSE**: The first and second sentences of Paragraph 30 set forth legal conclusions to which no response is required.  The OpenAI Defendants deny the allegations in the third sentence of Paragraph 30.

31.    Plaintiffs have standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

**RESPONSE**:  Paragraph 31 sets forth a legal conclusion to which no response is required.

32.    Because Apple sells smartphones and OpenAI sells or otherwise makes ChatGPT available throughout the United States, across state lines, and internationally, Defendants' conduct substantially affects interstate commerce.

**RESPONSE**: Paragraph 32 sets forth a legal conclusion to which no response is required.

## FACTUAL ALLEGATIONS

### A.    *The Rise of AI:  From Turing to Billions*

33.    Can machines think?  Within a century after Alan Turing, the recognized father of artificial intelligence, first asked that question, machines are not only thinking; they are thinking for us faster than we ever could.  AI could beat its programmer at checkers by 1959, engage in conversation by 1966 (ELIZA), defeat the world's reigning chess champion by 1997 (IBM Deep Blue), and topple former *Jeopardy!* champions by 2011 (IBM Watson).

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and deny them on that basis.

34.    ELIZA was the world's first chatbot—i.e., AI that can simulate human conversation.  While ELIZA could simulate a conversation with a psychotherapist, it used keyword recognition to produce replies to questions from a set of predefined scripts and could not produce new responses outside that set of scripts.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and deny them on that basis.

35.    Unlike ELIZA, generative AI chatbots today can generate new content in response to a user's prompt (i.e., a user question or request) and are not limited to answers from a predefined set of information.  For example, if a user were discussing Shakespeare but suddenly pivoted to talking about lunch, a generative AI chatbot would be able to keep up with that drastic change in topic, while a non-generative AI chatbot would be limited to preexisting topics and keywords it had access to, breaking the natural flow of the conversation.

**RESPONSE**:  The OpenAI Defendants admit that users can use ChatGPT to generate new content in response to a prompt (*i.e.*, a user question or request) and that ChatGPT is not limited to answers from a predefined set of information.  The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and deny them on that basis.

36.    2022 saw the launch of a wave of generative AI products that the general public could use, including products that generate images in response to text prompts (Meta's Make-A-Scene, OpenAI's DALL-E-2, and Stability's Stable Diffusion), and generative AI chatbots like ChatGPT, which can mimic human interactions by predicting the word most statistically likely to appear next.

**RESPONSE**: The OpenAI Defendants admit that Meta's Make-A-Scene, OpenAI's DALL-E-2, and Stability's Stable Diffusion are products that generate images in response to text requests, and that each was first released in 2022. The OpenAI Defendants further admit that ChatGPT was first released in 2022. The OpenAI Defendants otherwise deny the allegations in Paragraph 36.

37. Since then, generative AI chatbots have only become a bigger part of our daily lives. By 2024, two years after generative AI chatbots became available to the general public, 39 percent of working-age adults in the U.S. reported using generative AI chatbots, either for work or personal use. Researchers have credited the rapidity of this widespread use to several factors, including that generative AI chatbots do not require purchasing additional, specialized hardware to use.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and deny them on that basis.

38. Large-scale investment in generative AI, particularly from private sources, has quickly followed, signaling the move of generative AI from a niche academic field into a cash cow industry worth billions. Private investment in generative AI globally was $33.9 billion in 2024, an increase of 18.7 percent from the prior year. Of those private investments, the U.S. alone exceeded the combined total investment from China, the European Union, and the U.K. by $25.4 billion.

**RESPONSE**: The OpenAI Defendants admit that private investment in generative AI companies has increased since 2022. The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and deny them on that basis.

**B.    *OpenAI Emerges As A Dominant Player In Generative AI Chatbots***

39. Founded in 2015 with the stated goal of developing AI tools to "benefit humanity as a whole, unconstrained by a need to generate financial return," OpenAI quickly rose to dominance in the market for generative AI chatbots. Today, OpenAI reigns as a monopolist in generative AI chatbots, controlling more than 80 percent of the market based on web usage, with an even higher share of mobile app usage.

**RESPONSE**: The OpenAI Defendants admit that OpenAI was founded in 2015. To the extent that Paragraph 39 purports to quote from a document that discusses the "stated goal" of

OpenAI, the OpenAI Defendants respectfully refer the Court to that document for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 39.

40.    OpenAI released the first iteration of its flagship product, now known as ChatGPT, in 2022. A mere 5 days after launch, ChatGPT had acquired 1 million users, making it the fastest-growing application in history at that time. By comparison, it took Instagram 2.5 months and Netflix 3.5 *years* to reach the same 1-million-user metric.

**RESPONSE**: The OpenAI Defendants admit that ChatGPT is OpenAI's flagship product and was first released in 2022 and that 1 million people used ChatGPT in the five days after it launched. The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and deny them on that basis.

41.    ChatGPT's exponential growth has only continued. Two months after launch, OpenAI had amassed 100 million monthly active users for ChatGPT, and today ChatGPT has approximately 700 million weekly active users worldwide. ChatGPT can be accessed through a web browser—and as Apple's arrangement with OpenAI has demonstrated, it is increasingly accessed as an app or through a native integration on smartphones.

**RESPONSE**: The OpenAI Defendants admit the allegations in the second sentence of Paragraph 41. The OpenAI Defendants further admit that ChatGPT can be accessed through a web browser; and that ChatGPT's user base on apps and smartphones has grown since ChatGPT was released in 2022. The OpenAI Defendants otherwise deny the allegations in Paragraph 41.

### C.    *OpenAI Shifts From Benefitting Humanity To Putting Profit Over Safety*

42.    The blockbuster success of ChatGPT seduced OpenAI into taking actions at odds with its altruistic beginnings. When OpenAI first applied for tax-exempt status in 2016, it stated that it would "be a nonprofit corporation organized exclusively for charitable and/or educational purposes"; that "the specific purpose of this corporation is to provide funding for research, development and distribution of technology related to artificial intelligence"; and that "[t]he corporation is not organized for the private gain of any person." It also promised that "OpenAI does not plan to play any role in developing commercial products or equipment."

**RESPONSE**: Paragraph 42 purports to quote from and characterize several statements from OpenAI, to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 42.

43.     OpenAI's philanthropic ideals lasted only three years.  Lured by the size of the AI startup investment pie (which by 2019 totaled $40.4 billion globally), OpenAI announced on March 11, 2019 the formation of OpenAI LP, a for-profit entity that would ostensibly help "raise investment capital and attract employees" by promising its investors "a capped return" of "100x their investment"—a cap that OpenAI buried in the text of the announcement.

**RESPONSE**:  Paragraph 43 purports to quote from and characterize an announcement by OpenAI, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegation that the "size of the AI startup investment pie" in 2019 was $40.4 billion and deny it on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 43.

44.     OpenAI's switch to focus on profit coincided with a slew of concerns about the privacy and security of ChatGPT.  In 2021, eleven members of OpenAI's safety team left to form a rival generative AI startup, Anthropic, because they were concerned that beyond simply "scaling models up," generative AI needed better safety, including privacy and storage of customer data. Anthropic cofounder Dario Amodei had written most of OpenAI's charter, which committed OpenAI to its high-minded ideals.  He shared years after his departure that he had to leave OpenAI because he believed in responsible AI development that was both ethical and profitable, and "it [was] incredibly unproductive to try and argue with someone else's vision."

**RESPONSE**:  The OpenAI Defendants deny the allegations in the first sentence of Paragraph 44.  The OpenAI Defendants admit that certain employees left OpenAI in 2021 and formed Anthropic PBC and that Dario Amodei was one of the founders of OpenAI and participated in writing OpenAI's charter.  The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the other allegations in the second, third, and fourth sentences of Paragraph 44 and deny them on that basis.

45.     On March 30, 2023, the Center for AI and Digital Policy submitted a 46-page complaint to the U.S. Federal Trade Commission (the "FTC"), alleging violations of Section 5 of the FTC Act for unfair and deceptive practices and urging an investigation into OpenAI's cybersecurity and data privacy risks.  One incident described in the complaint involved a stunning privacy breach in which users reported seeing the prompt history from *other ChatGPT users*.

**RESPONSE**: Paragraph 45 purports to characterize a complaint filed with the U.S. Federal Trade Commission, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.

46.    In July 2023, the FTC launched an investigation into OpenAI's security and data privacy practices, including "how the start-up trains its A.I. models and treats personal data" and "how the company collects, sources, and retains data, as well as how it trains ChatGPT and evaluates the accuracy and reliability of its outputs."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 to the extent that they purport to characterize and quote an unidentified source describing an FTC investigation, and deny them on that basis. To the extent Paragraph 46 otherwise purports to characterize a Civil Investigative Demand served upon OpenAI by the U.S. Federal Trade Commission, the OpenAI Defendants respectfully refer the Court to that document for its complete and accurate contents.

47.    That same month, OpenAI established a team called "Superalignment" to address concerns about ChatGPT around security, monitoring, safety, and social impact. OpenAI further promised to dedicate 20 percent of its then-available computing resources to support that team's efforts.

**RESPONSE**: The OpenAI Defendants admit that OpenAI established a "Superalignment" team in July 2023 and committed to dedicating 20 percent of its then-available computing resources to support that team's efforts. The OpenAI Defendants otherwise deny the allegations in Paragraph 47.

48.    By November 2023, OpenAI's own Board believed the company had strayed so far from its original mission to "benefit humanity as a whole" that they ousted CEO Sam Altman from the company. In their November 17, 2023 press release, the OpenAI Board stated that Altman was "not consistently candid in his communications with the [B]oard, hindering its ability to exercise its responsibilities," and that the Board "no longer ha[d] confidence in his ability to continue leading OpenAI." However, this too was short-lived: the Board caved to pressure from Microsoft and other investors and reinstated Altman only a few days later, with Altman making vague promises to be more responsible.

**RESPONSE**:  Paragraph 48 purports to quote from and characterize a November 17, 2023 press release, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  The OpenAI Defendants further admit that Sam Altman was briefly removed as CEO of OpenAI and then reinstated.  The OpenAI Defendants otherwise deny the allegations in Paragraph 48.

49.     Soon after Altman returned, the FTC launched yet another inquiry into OpenAI's practices on January 25, 2024, this time focused on antitrust concerns.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 to the extent that they purport to characterize and quote an unidentified source describing an unspecified FTC investigation, and deny them on that basis.  To the extent Paragraph 49 otherwise purports to characterize a Section 6(b) Order served upon OpenAI and several other companies by the U.S. Federal Trade Commission, the OpenAI Defendants respectfully refer the Court to that document for its complete and accurate contents.

50.     The FTC inquiry was followed by a May 21, 2024 *Fortune* article, which revealed that the team that OpenAI had promised would address safety concerns had quietly been disbanded.  Former team members revealed that not only did OpenAI never provide them with the promised 20 percent of computing resources—OpenAI actively denied them access to resources needed to fulfill the team's stated mission.  The veteran OpenAI researcher leading the team resigned, later posting on the X platform that "safety culture and processes have taken a backseat to shiny products."

**RESPONSE**:  Paragraph 50 purports to characterize a May 21, 2024 *Fortune* article, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  Paragraph 50 further purports to quote from and characterize a post on the social media platform X (formerly known as Twitter), to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  The OpenAI Defendants admit that an OpenAI employee resigned.  The OpenAI Defendants otherwise deny the allegations in Paragraph 50.

14

51.    Others at OpenAI shared that former researcher's sentiments.  In June 2024, eleven current and former OpenAI employees published an open letter to "advanced AI companies," flagging the need to keep the public informed about the inherent risks involved in AI and urging that those companies protect their employees' rights to raise risk-related concerns, including refraining from enforcing any non-disparagement agreements.  That all the current OpenAI employees who signed on felt the need to do so anonymously is telling.

**RESPONSE**: Paragraph 51 purports to characterize a June 2024 letter, to which the

OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  The

OpenAI Defendants otherwise deny the allegations in Paragraph 51.

52.    In December 2024, OpenAI announced that it was restructuring its core business into a for-profit corporation that would no longer be controlled by its nonprofit Board and that it would give Altman equity in the for-profit corporation.  This announcement was particularly tone-deaf given the continued alarms about OpenAI's practices sounding from inside and outside the company.  OpenAI has since walked back this plan after public backlash.

**RESPONSE**: Paragraph 52 purports to characterize a December 2024 announcement

from OpenAI, to which the OpenAI Defendants respectfully refer the Court for its complete and

accurate contents.  The OpenAI Defendants otherwise deny the allegations in Paragraph 52.

53.    OpenAI's rapid growth—fueled by the controversial business decisions for which it has been criticized and investigated—has so entrenched its dominance that it is now widely recognized that "[t]his company, more than any other, has set the tone for the generative-AI era." Yet the concerns that have dogged OpenAI since it first established a for-profit arm remain, with former OpenAI employees and Board members accusing OpenAI of putting profit over safety.

**RESPONSE**: Denied.

**D.    *AI And Super Apps Threaten Apple's Monopoly Over Smartphones***

54.    OpenAI's rapid growth in developing generative AI tools stands in stark contrast to that of Apple, which was blindsided by ChatGPT's launch in 2022 and has been scrambling to develop its AI capabilities ever since.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 54 and deny them on that basis.

55.    Apple is the dominant provider of smartphones in the United States.  Siri, Apple's voice-activated chatbot, has been a household name since its launch and integration with the iPhone in 2011.  But instead of investing in Apple's own generative AI for iPhones, Apple has

been content to provide routine annual tweaks to the iOS and use its cash to buy back its own stock ($77 billion in the 2023 fiscal year).

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 55 and deny them on that basis.

56.     According to an Apple executive, Apple's only generative AI offering, Apple Intelligence, "wasn't even an idea" when ChatGPT launched. Not until June 2024—thirteen years after Siri—did Apple finally launch Apple Intelligence, which is built into iOS. And although Apple announced in September 2024 that the iPhone 16 had been "built from the ground up" for Apple Intelligence, the iPhone 16 did not have any AI features when it launched later that month, triggering a slew of ongoing class actions on behalf of customers who believed they had purchased AI-enabled devices. Apple does not offer its own generative AI chatbot, and its executives have recently confirmed that the company is not building a publicly available generative AI chatbot.

**RESPONSE**: The OpenAI Defendants admit that Apple announced Apple Intelligence in

June 2024, and that Apple Intelligence features are available through iOS version 18.1 and later

versions of iOS. The OpenAI Defendants otherwise lack knowledge or information sufficient to

form a belief as to the truth of the allegations in Paragraph 56 and deny them on that basis.

57.     Members of Apple's AI team have admitted that Apple's failure to innovate in the AI space reflects "a crisis" and that Apple's AI effort has "been sinking for a long time." Indeed, Apple's Senior Vice President for Services, Eddy Cue, has expressed worries that AI could obliterate Apple out of relevance, just as the iPhone did to Nokia's handsets.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 57 and deny them on that basis.

58.     AI poses an existential threat to Apple because, among other things, generative AI chatbots and related super apps stand to reduce consumers' dependence on smartphones like Apple's iPhone. Put differently, as Cue testified under oath, the development of AI means that consumers "may not need an iPhone 10 years from now."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 58 and deny them on that basis.

59.     A world in which iPhones are irrelevant would be devastating for Apple. Smartphones are the heart of Apple's business, with the iPhone driving approximately half of Apple's overall revenue every year since at least 2012. And with 65 percent market share, Apple is the dominant player in the United States smartphone market.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and deny them on that basis.

60.    Smartphones like Apple's iPhone offer users a range of functionality.  Much of the iPhone's functionality is available through apps that users can download through Apple's digital storefront, the App Store.  Through various apps, smartphone users can, among other things, make phone calls and send messages; access the Internet; access entertainment such as music, videos, and games; receive up-to-date information on a range of topics like current weather or stock prices; shop; manage banking; and create content.  Apple controls which apps it allows on the App Store through its "App Review Guidelines."

**RESPONSE**: The OpenAI Defendants admit that Apple's iPhone offers users a range of functionalities and that users can download third-party apps from the App Store.  The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and deny them on that basis.

61.    Generative AI chatbots have already replaced much of the functionality smartphone users desire.  For example, many things that require separate apps on an iPhone—like checking the weather, learning about a particular topic, following current events, getting directions, editing photos, and tracking current stock prices—can be accomplished through a single generative AI chatbot.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and deny them on that basis.

62.    Generative AI chatbots have also accelerated the rise of super apps, which combine additional functions offered by smartphones—like banking, messaging a friend, or playing a game—into a single platform that can work the same across any browser or device.  In other words, super apps can host apps and services without relying on a smartphone's operating system.  And when leveraging the capabilities of AI, super apps become even more powerful and take on even more functionality.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and deny them on that basis.

63.    The more a user relies on the functionality offered by a generative AI chatbot for a significant number of tasks, the less important other features of a smartphone become.  For example, a user who relies on a generative AI chatbot to edit photos will become agnostic to the relative quality in photo-editing tools offered on various smartphones, such as Apple Photos on the iPhone.  As this becomes true for more and more categories of functionality, it begins to erode Apple's value proposition that it is worth spending up to $1,599 on an iPhone when a user could

access his or her preferred generative AI chatbot through some less expensive option.  In other words, generative AI chatbots reduce switching costs for users in the smartphone market.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 and deny them on that basis.

64.    Similarly, the more a user interacts with a super app, the more the user turns to the super app itself rather than the smartphone software hosting the app. Eventually, a user can rely solely on the super app for the functionality he or she desires and can port that functionality across smartphones or devices.  In this way, super apps likewise reduce switching costs for users in the smartphone market.  Super apps also lower barriers to entry for smartphone competitors.  Users who have the functionality they desire in a super app can purchase a simpler—and less expensive—smartphone to run the super app and replace the functionality offered by the iPhone, which is priced above competitive levels.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 64 and deny them on that basis.

65.    Apple understands that demand for smartphones like the iPhone decreases as super apps become more popular, and it has characterized the rise of super apps as a "major headwind" to iPhone sales in countries where those apps are popular.  This is why Apple for years effectively blocked app developers from developing super apps and denied its users access to certain functionalities offered by those apps—conduct that the U.S. Department of Justice (the "DOJ") recently alleged to be anticompetitive in a lawsuit filed in the District of New Jersey that has survived a motion to dismiss.  As alleged in the DOJ case, one Apple manager explained that allowing super apps to become "the main gateway where people play games, book a car, make payments, etc." would "let the barbarians in at the gate."  Apple has also acknowledged the risk that a potential super app created by a specific U.S. company would "replace[ ] usage of native OS and apps resulting in commoditization of smartphone hardware."  From Apple's perspective, super apps are "fundamentally disruptive" to "existing app distribution and development paradigms."  This "paradigm" maintains Apple's monopoly because with super apps, "demand for iPhone[s] is reduced."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and deny them on that basis.

66.    Apple has similar incentives to stymie AI innovation:  as one super app developer touts on its website, AI "will be a cornerstone of super app evolution."  A tech company CEO agrees:  "With the advent and mass adoption of generative AI . . . super apps have the potential to become more powerful and expand the scope of use cases further."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66 and deny them on that basis.

E.    *X And xAI Leverage AI Capabilities To Compete With OpenAI and Apple*

67.    Fueled by a vision to make an "everything app," Plaintiffs are working collaboratively to develop super apps.  For example, X is creating a super app combining social connectivity and messaging, financial services, and AI-driven tools.  Among the steps X has taken to make this vision a reality in the past year alone, X partnered with Visa to help build the financial services portion of its super app (which will serve as an alternative to Apple Pay), partnered with Crush Capital to license and distribute its interactive investment show, and partnered with Shopify to allow users to shop.  Indeed, X has been building its app to be a super app ever since it merged with Twitter—for example, soon after the 2023 merger, it added features that allow users to make audio and video calls.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 and deny them on that basis.

68.    xAI's generative AI chatbot, Grok, is a key piece of Plaintiffs' super app endeavor. Launched by xAI in November 2023, Grok—which is available through web browsers and apps, and can be made available through integrations with devices or other apps—directly competes with ChatGPT.  Since its launch, Grok has received overwhelmingly positive feedback.  For example, one tech executive testified that Grok is "really, really strong."  The Grok app currently has over 500,000 reviews and a rating of 4.9 stars in Apple's App Store, and it is consistently ranked by independent sources as one of the most (if not the most) intelligent generative AI chatbots.  But despite these accolades, Grok has yet to attain more than a few percent of the generative AI chatbot market, stifled by anticompetitive actions taken by Apple and OpenAI.

**RESPONSE**:  The OpenAI Defendants admit that Grok is an interface through which users can interact with an artificial intelligence model through natural language dialogue and that it was publicly launched by xAI in November 2023.  The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 and deny them on that basis.

69.    X's integration of Grok's functionality into its digital town square is a major undertaking that has required substantial investment.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and deny them on that basis.

F.    *The Exclusive Apple-OpenAI Arrangement*

70.    Rather than contending on the merits with the competitive threat posed by Plaintiffs, Apple and OpenAI instead joined forces to stifle competition in their respective markets.

**RESPONSE**: Denied.

71.    In June 2024, Apple and OpenAI announced a deal:  Apple would integrate ChatGPT into iOS.  This deal is exclusive.  Apple has not integrated with any other generative AI chatbots, including xAI's Grok.  xAI has asked Apple to integrate Grok with iOS, but Grok has not been allowed to do so.

**RESPONSE**: The OpenAI Defendants admit that in June 2024, Apple and OpenAI announced that Apple would integrate ChatGPT into iOS. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 71 and deny them on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 71.

72.    Others have also been locked out of integration with iOS due to Apple and OpenAI's illegal arrangement.  As Google's CEO Sundar Pichai testified earlier this year, Google could not reach an agreement to integrate with Apple because Apple had decided to integrate ChatGPT.  Anthropic was also an unsuccessful competitor for the deal with Apple that ChatGPT won.

**RESPONSE**: The OpenAI Defendants deny the allegations in the first sentence of Paragraph 72.  The second sentence of Paragraph 72 purports to characterize testimony from Google's CEO Sundar Pichai, to which the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.   The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72 and deny them on that basis.

73.    Apple's head of AI, John Giannandrea, lobbied against the deal with OpenAI, voicing concerns that OpenAI is untrustworthy.  But in the end, Apple's corporate development team overruled the concerns of the AI product team and allowed the integration to proceed.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73 and deny them on that basis.

74.    As a result of the Apple-OpenAI deal, ChatGPT is not just the default—it is the *only* generative AI chatbot with a first-party integration into Apple's smartphones.  As reflected in Figure 1, this means that iPhone users who want to use a generative AI chatbot for certain tasks on their iPhones can use *only* ChatGPT.

*Figure 1*



**RESPONSE**:  The OpenAI Defendants admit that as of the filing of the Complaint in this action, there were some features of Apple Intelligence for which ChatGPT was the only integrated third-party generative AI service. The OpenAI Defendants otherwise deny the allegations in

Paragraph 74. Paragraph 74 also purports to reproduce several images of iPhones; the OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the reproductions are accurate or genuine and deny the allegations related to the reproductions on that basis.

75.     With this integration, users who use Apple Intelligence on their iPhones can do things like receive answers from Apple's voice assistant, Siri, based on information provided by ChatGPT; natively use their iPhone camera to learn information from ChatGPT about the places or objects around them; and use ChatGPT with Apple's Writing Tools to compose text from a description. So if an iPhone user wants to ask Siri a question and receive a response that taps into generative AI chatbot capabilities, the user can do so only through ChatGPT. There is nothing the iPhone user can do—no app the user can download, no setting the user can change—that allows the user to receive information from Siri provided by any other generative AI chatbot.

**RESPONSE**: The OpenAI Defendants admit that Siri sometimes allows users to choose to receive answers provided by ChatGPT; that visual intelligence allows users to ask ChatGPT for information about what is captured by the iPhone's cameras, including places or objects around them; and that Writing Tools allows users to ask ChatGPT for help composing text. The OpenAI Defendants otherwise deny the allegations in Paragraph 75.

76.     As reflected in Figures 2 and 3, iPhone users have posted on Apple's official Support Community that they would like to be able to choose between ChatGPT and other alternatives like Grok and Gemini:

*Figure 2*



**TarHeel1776**  Author
Level 1 · 12 points

May 14, 2025 4:35 PM in response to Phil0124

Thank you. I think it would it be helpful to at least have a choice between OpenAI and xAI. I'll try suggesting directly

⬆ (10)  ⬇   Reply

*Figure 3*



**empathy227**  Author
Level 1 · 7 points

# Can I switch from Siri to Gemini on iPhone?

I want to use Gemini instead of Siri as my assistant how can I make this switch

[Re-Titled by Moderator]

*iPhone 15 Pro Max, iOS 18*
Posted on Dec 31, 2024 11:37 AM

**RESPONSE**: Paragraph 76 purports to reproduce and characterize posts on Apple's official Support Community; the OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the reproductions are accurate or genuine and deny the allegations in Paragraph 76 on that basis.

77.     Although iPhone users can still access other generative AI chatbots on their iPhones by using a web browser or by downloading a particular generative AI chatbot's app, those options do not provide the same level of functionality, usability, integration, or access to user prompts as ChatGPT's first-party integration with Apple.  For example, there is currently no way for Siri to provide answers from a generative AI chatbot other than ChatGPT.  This means that ChatGPT has exclusive access to billions of potential prompts.  Additionally, Apple's Writing Tools (e.g., using AI to draft emails) and Apple's camera application have native integrations with ChatGPT.  This, too, provides ChatGPT exclusive access to user prompts in these apps.

**RESPONSE**:  The OpenAI Defendants admit that ChatGPT can be accessed from Apple's Writing Tools and Apple's camera application.  The OpenAI Defendants otherwise deny the allegations in Paragraph 77.

78.     Moreover, because OpenAI's ChatGPT is the only generative AI chatbot integrated with Apple's iPhone and can be accessed by users through that integration, users that might otherwise download other generative AI chatbots from Apple's App Store have no reason to do so.  In other words, other generative AI chatbots not only miss out on user prompts they would be

able to access were they given the ability to integrate with iOS like ChatGPT; they also miss out on prompts by users who never download a generative AI chatbot through the App Store because the integration makes it unnecessary for them to do so.  In addition, ChatGPT is advantaged even as to users who do download generative AI chatbots through the App Store because Apple's integration with ChatGPT amounts to an endorsement and award of default status.

**RESPONSE**:  Denied.

G.    ***Apple Further Protects Its Smartphone Monopoly And Its Anticompetitive Arrangement With OpenAI***

79.    Beyond promoting ChatGPT by making it the sole generative AI chatbot integrated with iOS, Apple has taken further and separate steps to protect not only its dominant position in the smartphone market, but also OpenAI's dominant position in the market for generative AI chatbots.

**RESPONSE**:  Denied.

80.    For example, Apple has deprioritized the apps of super app and generative AI chatbot competitors, like the products offered by Plaintiffs, in its App Store rankings to favor OpenAI and undermine developing threats to its own monopoly.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 80 and deny them on that basis.

81.    Being prominently featured in Apple's App Store rankings is crucial for app developers like Plaintiffs because the rankings influence an app's number of downloads, which in turn affects the revenue generated by the app.  Indeed, App Store rankings are so important that there is now an entire ecosystem of tools and services aimed at facilitating "app store optimization," or the art of increasing a given app's visibility through its App Store rankings.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 81 and deny them on that basis.

82.    Though Apple provides little transparency about the selection criteria and processes for its App Store rankings, it has publicly stated that it features apps using "algorithmic recommendations" and "curated lists selected by experts."  Both methods are prone to bias, and that bias has played out in favor of Apple and OpenAI.  Phillip Shoemaker, the former director of app review for Apple's App Store, acknowledged that App Store rules are often "arbitrary" and "arguable," and that "Apple has struggled with using the App Store as a weapon against competitors."  He also admitted that Apple has favored its own apps over those of competitors and has used pretextual reasons to remove apps from Apple's competitors.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 82 and deny them on that basis.

83.     When accessed from an iPhone, the "Apps" landing page on the App Store contains various lists of recommended apps—for example, "Must-Have Apps" and "Top Free Apps."  The category of "Must-Have Apps" is the first to appear and thus has the most visibility to iPhone users.  Apple exercises more editorial control over the "Must-Have Apps" rankings than it does over other lists.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83 and deny them on that basis.

84.     The X app and the Grok app are consistently highly ranked in Apple's subject-specific "Top Apps" charts in the App Store, which take into account criteria such as usability, positive reviews and ratings, and downloads.  As reflected in Figure 4 below, on August 24, 2025, the X app ranked as the number 1 free app for "News" and the Grok app ranked as the number 2 free app for "Productivity."

*Figure 4*



**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84, including whether the reproductions of screenshots of Apple's App Store are complete and accurate, and deny them on that basis.

85.    Despite their high rankings in the subject-matter-based "Top Apps" lists, neither the X app nor the Grok app appeared in the "Must-Have Apps" section of the App Store on August 24, 2025.  Instead, as reflected in Figure 5 below, the first 11 listed apps in the "Must-Have Apps" section on August 24, 2025 do not include the X app or the Grok app.  Neither the X app nor the Grok app appears further down on the list, either.  This is also true of other generative AI chatbot and super app competitors.  In fact, ChatGPT is the *only* generative AI chatbot with an app that appeared in the "Must-Have Apps" section of the App Store on August 24, 2025.

*Figure 5*

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85, including whether the reproductions of screenshots of Apple's App Store are complete and accurate, and deny them on that basis.

86.    By contrast, other apps that are ranked lower than the X app and the Grok app in their respective "Top Apps" lists are featured in the "Must-Have Apps" section of the App Store.  For example, on August 24, 2025, Dropbox was featured in "Must-Have Apps" despite being

ranked as the 24th free app for "Productivity." Similarly, Tinder was featured second in "Must-Have Apps" despite being ranked as the 9th free app for "Lifestyle."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 86 and deny them on that basis.

87.    Apple's statements that the App Store "is designed to be fair and free of bias" are undermined by the mismatch in the popularity of the X app and the Grok app and those apps' visibility in the App Store.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 87 and deny them on that basis.

88.    In addition to deprioritizing the X app and the Grok app in its App Store rankings, Apple has also protected its arrangement with OpenAI and OpenAI's dominant market position by delaying approvals for updates to the Grok app and by rejecting numerous requests by xAI for the Grok app to be featured in the App Store, including when it launched and when innovative enhancements were added to its offering, such as its new "Imagine" feature.

**RESPONSE**: The OpenAI Defendants deny the allegations in Paragraph 88 insofar as those allegations assert an anticompetitive "arrangement" between Apple and OpenAI or that OpenAI has a monopoly in a relevant antitrust market. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 88 and deny them on that basis.

89.    Just last year, the DOJ alleged in its lawsuit against Apple that Apple had engaged in widespread "use [of] App Store rules and restrictions to penalize and restrict developers that take advantage of technologies that threaten to disrupt, disintermediate, compete with, or erode Apple's monopoly power." Apple is doing just that to Plaintiffs.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89 and deny them on that basis.

### H.    *The Apple-OpenAI Arrangement Entrenches The Two Monopolists' Positions In Their Respective Markets*

90.    The exclusive Apple-OpenAI arrangement helps both monopolists fend off emerging competition.

**RESPONSE**: Denied.

91.    OpenAI's strategy is to build "moats" to protect its monopoly position.  OpenAI's exclusive deal with Apple creates a moat—and thus protects OpenAI—because of Apple's monopoly in smartphones.  Specifically, ChatGPT's status as the exclusive default generative AI chatbot for the iPhone drives prompt volume exclusively to ChatGPT through that access point. With Apple controlling 65 percent of the smartphone market, the integration gives ChatGPT exclusive access to potentially billions of user prompts originating from hundreds of millions of iPhones.

**RESPONSE**: Denied.

92.    Prompt volume is critical for generative AI chatbots like ChatGPT because generative AI chatbots derive significant advantages from scale.  More prompts result in more responses, giving the AI model more training data.  Because generative AI chatbots continually improve their algorithms as they receive additional user prompts, additional prompts improve a generative AI chatbot's model.  These improvements draw in more users and create more prompts. And because the Apple-OpenAI arrangement deprives other generative AI chatbots of all prompts natively originating from iPhones, it deprives those competitors of scale and opportunities to improve their technology.

**RESPONSE**: The OpenAI Defendants admit that a subset of user requests is among the

many sources of data used to train certain of the artificial intelligence models for which ChatGPT

can serve as an interface and otherwise deny the allegations in Paragraph 92.

93.    Nick Turley, OpenAI's head of ChatGPT, testified that "the more people use [ChatGPT], especially for niche things, the more we're able to improve [it]."  This creates a feedback loop:  scale begets more scale, making it hard for rivals to grow.  A blog post from the FTC's Bureau of Competition and Office of Technology has recognized this phenomenon in generative AI chatbots:  "A first mover could secure a significant advantage over its competitors because its models, by virtue of having interacted with a greater number of users over a longer period, are able to generate more engaging and useful content than rival products.  Because positive feedback loops can improve the performance of generative AI models, generative AI products can get better the more people use them."  The blog post concluded that "network effects can supercharge a [generative AI chatbot] company's ability and incentive to engage in unfair methods of competition."

**RESPONSE**: Paragraph 93 purports to quote and characterize testimony from Nick

Turley and a blog post from the FTC's Bureau of Competition and Office of Technology, to which

the OpenAI Defendants respectfully refer the Court for their complete and accurate contents.  The

OpenAI Defendants otherwise deny the allegations in Paragraph 93.

94.    The importance of scale is evidenced by the Apple-OpenAI arrangement.  OpenAI charges fees for ChatGPT integrations with other products.  This is because these integrations

create additional prompts that, in the aggregate, are tremendously costly due to the computing resources required to generate a response. But OpenAI has provided ChatGPT to Apple for free and is functionally paying for the arrangement itself. A report explained the reason for doing so: "Apple . . . pushing OpenAI's brand and technology to hundreds of millions of its devices is of equal or greater value than monetary payments." In other words, the access to exclusive prompts that ChatGPT receives is so valuable—allowing ChatGPT to insulate its market position from competition due to network advantages and other advantages from scale—that OpenAI is willing to sacrifice short-term profits in exchange for such access.

**RESPONSE**: Denied.

94. Apple benefits from the arrangement's denial of prompts to rival generative AI chatbots because the resulting hindrance to scale and innovation slows or prevents those generative AI chatbots from emerging as part of AI-powered super apps, which Apple hopes will squeeze out OpenAI's competitors so the two monopolists can continue to benefit from each other's monopoly rents. In fact, as discussed further below, Apple and OpenAI have already agreed on a way to share those rents as the arrangement between Apple and OpenAI grows.

**RESPONSE**: Denied.

96. Moreover, there is no telling how long this exclusive arrangement will last. OpenAI itself has complained that a six-month moratorium on its AI-development work would be enough for its competition to catch up. Plaintiffs suffer harm every moment they are illegally denied access to these prompts.

**RESPONSE**: Denied.

97. While Apple currently receives OpenAI's product for free, Apple ultimately aims to further profit from the deal by striking a revenue-sharing agreement with OpenAI through which Apple gets an eventual cut of OpenAI's monetization of ChatGPT prompts through its iPhones and other devices. In other words, OpenAI will be supplying Apple with its technology and paying Apple for that privilege, while ChatGPT becomes the default generative AI for iPhone and other Apple device users. OpenAI strategy documents reveal that OpenAI plans to increase its "Pro" subscription from its current pricing of $20 per month to $44 per month by 2029—annualized price increases of approximately 20 percent per year. Apple will in turn take its slice of these monopoly rents extracted by OpenAI.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 97 to the extent that they purport to quote from and characterize unidentified "OpenAI strategy documents," and deny them on that basis. The OpenAI Defendants lack knowledge or information sufficient to form a

belief as to the truth of the allegations in the first sentence of Paragraph 97 and deny them on that

basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 97.

I.    *There Is No Valid Business Reason for Apple And OpenAI's Conduct*

98.    There is no valid business reason for the Apple-OpenAI deal to be exclusive. Any benefits to users from integrating the iPhone with ChatGPT could have been accomplished without providing exclusivity to OpenAI's ChatGPT, instead allowing customers to choose which generative AI chatbot to use. OpenAI has recognized as much, acknowledging in a strategy document that "[r]eal choice drives competition and benefits everyone" and that "[u]sers should be able to pick their AI assistant."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in the third sentence of Paragraph 98 to the extent that

they purport to quote from and characterize an unidentified "strategy document," and deny them

on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 98.

99.    Potential security issues also do not justify Apple's choice to integrate only with OpenAI. In fact, although Apple CEO Tim Cook posted on the X platform that the Apple-OpenAI integration is "built to protect user privacy at every step," Apple still partnered with OpenAI despite internal concerns over OpenAI's safety and security so that both companies could jointly pursue their anticompetitive ends.

**RESPONSE**: To the extent that the allegations in Paragraph 99 purport to characterize a

post from Tim Cook on the X platform, the OpenAI Defendants respectfully refer the Court to the

post for its complete and accurate contents. The OpenAI Defendants otherwise deny the

allegations in Paragraph 99.

100.    Plaintiffs are also aware of no technical reason preventing Apple from integrating with multiple generative AI chatbots. Other generative AI chatbots, like Grok, offer Application Programming Interfaces ("APIs") that can integrate with third-party applications like Apple's Siri.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 100 and deny them on that basis.

101.    Moreover, by making the deal exclusive, Apple sacrificed the profits it would have earned had it integrated with multiple generative AI chatbots. Apple will earn a revenue share from its integration with ChatGPT. But by limiting the integration to ChatGPT, Apple forgoes a revenue share from other generative AI chatbots. Such chatbots would drive additional usage of

their tools through Apple Intelligence and would thus cause additional revenue to flow to Apple. Instead, Apple has sacrificed short-term profits in lieu of a share of OpenAI's future monopoly rents.

**RESPONSE**: To the extent that the allegations in Paragraph 101 purport to characterize the terms of a written agreement, the OpenAI Defendants respectfully refer the Court to that agreement for its complete and accurate contents. The OpenAI Defendants otherwise deny the allegations in Paragraph 101.

102.    If not for its exclusive deal with OpenAI, Apple would have no reason to refrain from more prominently featuring the X app and the Grok app in its App Store. Indeed, Apple's explanations for the ranking inconsistencies are nothing more than pretext. For example, while Apple touts on its website that apps offered on the App Store "are held to the highest standards for privacy, security, and content," many of the apps Apple promotes or has promoted in its "Must-Have Apps" raise content or security issues. The streaming app Crunchyroll, for instance, was embroiled in litigation alleging that it disclosed users' personally identifiable information to third parties without their consent, and the streaming app Twitch has been sued for unlawfully prohibiting users from criticizing the site.

**RESPONSE**: The OpenAI Defendants deny the allegations in Paragraph 102 insofar as those allegations imply an anticompetitive arrangement between Apple and OpenAI. The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102 and deny them on that basis.

**J.    *The Effects Of The Apple-OpenAI Arrangement***

103.    The Apple-OpenAI arrangement has foreclosed competition among generative AI chatbots, deprived competing generative AI chatbots of scale, and reduced quality and innovation. All of these impacts have, in turn, helped OpenAI and Apple maintain their monopolies.

**RESPONSE**: Denied.

104.    In and of itself, ChatGPT's exclusive access to prompts from Siri represents a substantial share of the generative AI chatbot market that is now closed to generative AI chatbot competitors. As of 2024, Siri represented 1.5 billion user requests per day globally. This is more than the total prompts for generative AI chatbots in 2024 and amounts to giving OpenAI exclusive access to up to 55 percent of all potential generative AI chatbot prompts. On information and belief, Siri prompts represent a similar percentage of U.S. generative AI chatbot prompts. And these percentages are even higher when considering only generative AI chatbot prompts from smartphones, the market in which Apple maintains its monopoly.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 104 and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 104.

105. Beyond Siri, ChatGPT's exclusive access to prompts sent from iPhones when using Apple's Writing Tools (e.g., using ChatGPT to help draft an email in Apple's email application) or using Apple's camera application (e.g., prompts for information about objects in the camera's view) represent additional prompts available to ChatGPT that are unavailable to rival generative AI chatbots.

**RESPONSE**: Denied.

106. OpenAI is also advantaged by Apple using its dominant position in smartphones to preference the ChatGPT app in Apple's App Store, boosting its downloads relative to other generative AI chatbots.

**RESPONSE**: Denied.

107. The Apple-OpenAI arrangement has driven scale to ChatGPT and away from ChatGPT's rivals, including Grok. Generative AI chatbots involve significant network effects and scale advantages that exacerbate the economic effects of foreclosure. Where scale begets scale, exclusive access to a massive number of prompts has cemented and will continue to cement ChatGPT's market position and insulate it from competition. ChatGPT was already the largest AI chatbot before the arrangement with Apple. Since Apple and OpenAI entered into the arrangement, rivals have had little hope to catch up on the scale needed to fairly compete with ChatGPT.

**RESPONSE**: Denied.

108. The network effects are so strong that despite billions in investments by established tech companies, no competitor has been able to challenge ChatGPT's stranglehold on the market, with a market share of 80 percent or more.

**RESPONSE**: Denied.

109. The Apple-OpenAI arrangement also discourages innovation. Because OpenAI has been able to deprive rivals of scale, the amount of investment and innovation in the industry is lower than it would be but for the unlawful agreement between the two monopolists: scale affects the availability of data used for product development, which in turn affects competitors' ability to obtain funding for continued innovation and product development. Moreover, ChatGPT's competitors' innovative efforts have been stymied because they do not have native integration into iPhones. In a but-for world where Apple allowed iPhone users to choose which generative AI chatbot to use, generative AI chatbots would compete for users by innovating—for example, by developing new technologies to incorporate into the existing Siri functionality—to be selected by users as their generative AI chatbot within the iPhone. (Other smartphone manufacturers have

shown that this approach is feasible:  Motorola, for example, has made deals with multiple generative AI chatbots to provide users choice among AI tools.)  Instead, the competition ended before it even began:  Apple's users have been served to OpenAI.  The result is that OpenAI does not need to spend much effort to innovate, because its position has been secured by the Apple-OpenAI arrangement.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding Motorola in Paragraph 109 and deny them on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 109.

110.    The Apple-OpenAI arrangement also discourages investment in startups. OpenAI's dominant position and power over price have attracted immense funding.  In March 2025, OpenAI had an investment round attracting an additional $40 billion in investment valuing OpenAI at $300 billion.  While funding has coalesced around the market leader, funding for other generative AI chatbot startups has been limited in comparison.  A leaked memo from Anthropic (whose generative AI chatbot, Claude, competes with ChatGPT) revealed that Anthropic's CEO decided to court investment from the Middle East, despite having moral qualms about doing so, because he thought it was necessary to stay competitive.

**RESPONSE**: The OpenAI Defendants admit that in March 2025, OpenAI had an investment round that attracted $40 billion in funding, valuing OpenAI at $300 billion and that Anthropic offers a generative AI service called "Claude," which features an interface through which users can interact with an artificial intelligence model through natural language dialogue. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations regarding Anthropic in Paragraph 110 and deny them on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 110.

111.    These effects on the market—less competition, less scale necessary to compete, less investment, and less innovation—ultimately harm consumers through lower quality, less choice, and higher prices than would exist in the but-for world without Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

112.    The anticompetitive conduct done to maintain ChatGPT's dominant position helps Apple maintain its smartphone monopoly and harms smartphone customers.

**RESPONSE**: Denied.

113.    Apple has long feared a smartphone market where "all that matters is who has the cheapest hardware" and consumers could "buy[] a [expletive] Android for 25 bux at a garage sale and . . . have a solid cloud computing device." In that world, customers do not need to pay supracompetitive iPhone prices to achieve high-level functionality, because they can substitute iPhone functionality with that from super apps integrating generative AI chatbots.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113 and deny them on that basis.

114.    Apple has recognized that the "stickiness" of iPhones—customers' inability to switch to competing products—is due in part to the lack of super apps in the United States. Apple's presentations to its Board have highlighted that Apple faces "headwinds" in countries where super apps are common. Apple has also expressed concern about the competitive threat of cloud computing to its smartphone monopoly due to cloud computing's ability to replace features offered through Apple's iPhone.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114 and deny them on that basis.

115.    Defendants' conduct has inhibited super apps from taking hold. As described above, super apps prominently feature generative AI chatbots. Thus, the better the generative AI chatbot, the more attractive the super app. But Defendants' conduct has made all generative AI chatbots other than ChatGPT less attractive. Put another way, by disadvantaging Grok relative to ChatGPT, Defendants have also made it harder for users to switch to cheaper smartphones.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding the "attractive[ness]" of super apps or how they "feature" generative AI products in Paragraph 115 and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 115.

### K.    *Relevant Markets*

### 1.    *Smartphones*

116.    Smartphones are a relevant antitrust market.

**RESPONSE**: Paragraph 116 sets forth a legal conclusion to which no response is required.

117.    Smartphones are mobile telephones that incorporate a display screen and an operating system that allows software systems to be installed on the smartphone. Smartphones also typically incorporate hardware such as cameras for recording and transmitting photos and videos, and technology for accessing Wi-Fi.

**RESPONSE**: Admitted.

118. "Feature phones" are not reasonable substitutes for smartphones. Feature phones have basic operating systems compared to smartphones and have limited support for third-party software, such as mobile apps. Feature phones offer only basic versions of calendar, email, and browsers, while smartphones have versions of these tools that are integrated with the smartphone's operating system (or can be supplied via mobile apps), allowing more features unavailable on feature phones, such as push notifications. Smartphones are substantially more expensive than feature phones.

**RESPONSE**: The first sentence of Paragraph 118 sets forth a legal conclusion to which no response is required. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 118 and deny them on that basis.

119. Other portable devices, such as laptops and other computing devices (e.g., tablets and smart watches) are not reasonable substitutes for smartphones. Smartphones are designed to be usable with one hand and can typically fit in a person's pocket, unlike tablets and laptops. And unlike tablets and laptops, smartphone hardware emulates traditional phones—with a receiver and speaker corresponding to where a user's ear and mouth are—making smartphones better suited for phone calls, particularly when the smartphone user is on the go. Smartwatches have smaller displays than smartphones, making smartwatches unsuitable to many smartphone use cases (e.g., watching a movie via a streaming platform is not feasible on a smartwatch). Apple's own smartwatches are designed to be used with an iPhone and offer specific features that cannot be used without a customer using both the Apple Watch and the iPhone.

**RESPONSE**: The first sentence of Paragraph 119 sets forth a legal conclusion to which no response is required. The OpenAI Defendants admit that smartphones are designed to be usable with one hand and may fit in a person's pocket; that tablets and laptops do not typically fit in a person's pocket; and that smartwatches typically have smaller displays than smartphones. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the other allegations in Paragraph 119 and deny them on that basis.

120. Given the feature and price differences, a hypothetical monopolist of smartphones could implement a small but significant non-transitory increase in smartphone prices without smartphone customers switching to feature phones or other portable digital devices to discipline such a price increase.

**RESPONSE**: Paragraph 120 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information

sufficient to form a belief as to the truth of the allegations in Paragraph 120 and deny them on that basis.

121.    Smartphones are recognized as distinct from other products by industry sources and by the public at large.  Apple and Samsung, for example, market "smartphones" on their websites.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121 and deny them on that basis.

122.    The relevant geographic market for smartphones is the United States.

**RESPONSE**:  Paragraph 122 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122 and deny them on that basis.

123.    U.S. smartphone customers often purchase smartphones together with a mobile phone plan.  In such cases, the carrier helps the customer set up the smartphone.  Additionally, U.S. mobile carriers often provide promotions where the smartphone and phone plan are discounted when purchased together.  Any customer who would purchase a smartphone outside of the United States would lose access to these benefits.  Additionally, smartphone warranties are typically restricted to the country of purchase, which means that U.S. purchases of smartphones abroad are done at the customers' own risk of manufacturing or other defects.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and deny them on that basis.

124.    Smartphones made for regions outside the U.S. use different components designed for use with different cellular technologies than those used in the United States.  Mobile networks outside the U.S. can use different cellular bands than are used within the United States.  The difference in cellular technologies in the U.S. and the country of purchase can limit the functionality of smartphones purchased abroad or even render them unusable in the United States.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and deny them on that basis.

125.    U.S. regulations—including Federal Communications Commission and trade regulations—also constrain the sale of non-U.S. smartphones within the United States.

**RESPONSE**:  Paragraph 125 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 125 and deny them on that basis.

126.    Because U.S. smartphone customers cannot reasonably substitute to non-U.S. smartphones, the relevant geographic market for smartphones is the United States.

**RESPONSE**:  Paragraph 126 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126 and deny them on that basis.

### 2.    *Generative AI Chatbots*

127.    Generative AI chatbots are a relevant antitrust market.

**RESPONSE**:  Paragraph 127 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 127.

128.    Generative AI chatbots are artificial intelligence systems that engage in humanlike conversations based on a user's prompt.  These products rely on innovative technologies— including large language models ("LLMs"), deep learning, and natural language understanding (i.e., understanding prompts and responding using human-like communication)—to create new content as opposed to relying on scripted replies.  Generative AI chatbots can recognize, summarize, translate, predict, and create content in response to a user prompt.  Generative AI chatbots are self-learning:  they continually improve their algorithms as they receive additional user prompts.

**RESPONSE**: The OpenAI Defendants admit that ChatGPT relies on innovative technologies—including large language models ("LLMs"), deep learning, and natural language understanding (i.e., understanding user requests and responding using human-like communication)—to create new content as opposed to relying on scripted replies and that the artificial intelligence models accessible through ChatGPT can recognize, summarize, translate,

predict, and create content in response to a user prompt.  The OpenAI Defendants otherwise deny the allegations in Paragraph 128.

129.    OpenAI's ChatGPT provided the following definition of a generative AI chatbot:

*Figure 6*

what is a generative AI chatbot?

A **generative AI chatbot** is an artificial intelligence system designed to simulate human-like conversation and **generate original responses** based on input it receives. Unlike rule-based chatbots that rely on predefined scripts, **generative chatbots use machine learning models**—especially large language models (LLMs)—to understand context, infer meaning, and produce coherent, often creative, replies.

**RESPONSE**: Paragraph 129 purports to reproduce a screenshot of an interaction with ChatGPT.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the reproduction is complete or accurate and deny the allegations in Paragraph 129 on that basis.

130.    ChatGPT recognizes itself as an "AI chatbot" that "can understand and generate human-like text":

*Figure 7*

what is chatgpt

ChatGPT is an **AI chatbot developed by OpenAI**. It's based on a family of advanced language models called **GPT (Generative Pre-trained Transformer)**. ChatGPT can understand and generate human-like text, making it useful for a wide range of tasks like:

- Answering questions
- Writing and editing text (emails, essays, code, etc.)
- Translating languages
- Explaining concepts
- Brainstorming ideas
- Simulating conversations

**RESPONSE**: Paragraph 130 purports to reproduce and characterize a screenshot of an interaction with ChatGPT.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the reproduction is complete or accurate and deny the allegations in Paragraph 130 on that basis.

131.    Generative AI chatbots can be accessed on websites, by downloading an app onto a smartphone, and by interacting with a generative AI chatbot that has been integrated into a device, including via APIs.  For example, a user could submit a prompt to ChatGPT by going to chatgpt.com or by using the Siri assistant feature on iPhone.  Generative AI chatbot prompts are increasingly submitted via smartphones.

**RESPONSE**: The OpenAI Defendants admit that interfaces through which users may interact with an artificial intelligence model through natural language dialogue can be accessed on websites, by downloading an app onto a smartphone, and via interfaces that have been integrated into other software or devices using APIs, and that a user could submit a prompt to ChatGPT by going to chatgpt.com. A user may also submit a prompt to ChatGPT by using the Siri assistant feature on iPhone after enabling ChatGPT and either requesting that Siri query ChatGPT or consenting to a suggestion by Siri to query ChatGPT.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 131 and deny them on that basis.   The OpenAI Defendants otherwise deny the allegations in Paragraph 131.

132.    Non-chatbot generative AI tools are not reasonable substitutes for generative AI chatbots.  For example, generative AI tools that are limited to making images and videos (like Midjourney) are not substitutes for generative AI chatbots because they cannot respond to the diverse range of prompts that a generative AI chatbot can respond to.  Midjourney, for example, cannot answer a user's questions or provide human-like responses to user prompts.   Other specialized generative tools—like computer-coding assistants—similarly cannot respond to the broad range of prompts that a generative AI chatbot can and instead are limited to a single purpose.  Generative AI chatbots provide unique value to customers by providing responses to the entire spectrum of potential prompts.

**RESPONSE**: The first sentence of Paragraph 132 sets forth a legal conclusion to which no response is required.  To the extent a response is required to the first sentence of Paragraph 132, the OpenAI Defendants deny the allegations in that sentence.  The OpenAI Defendants admit that certain generative AI products, like Midjourney, do not respond to certain user requests through natural language dialogue.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132 regarding what unspecified

"specialized generative tools" can do and deny them on that basis. The OpenAI Defendants

otherwise deny the allegations in Paragraph 132.

133.    Non-generative AI tools, including non-generative AI chatbots, are not reasonable
substitutes for generative AI chatbots because generative AI chatbots provide significant additional
functionality. Non-generative AI tools cannot understand natural language prompts, and they
provide scripted—not natural language—responses. A non-generative AI chatbot relies on
scripted flows in conversations and provides scripted responses. Accordingly, such chatbots have
limited flexibility in responding to novel user prompts and will provide non-responsive answers.
Other AI chatbots that do not use LLMs or deep learning struggle with complexities and nuances
and thus provide less accurate responses than generative AI chatbots. And unlike other non-
generative AI chatbots, generative AI chatbots can produce completely new content, including
conversation, computer code, images, videos, and music.

**RESPONSE**: The first sentence of Paragraph 133 sets forth a legal conclusion to which

no response is required. To the extent a response is required to the first sentence of Paragraph 133,

the OpenAI Defendants deny the allegations in that sentence. The OpenAI Defendants admit that

there are non-generative AI products that cannot communicate through natural language dialogue

and rely on pre-programmed scripts to provide scripted responses to user requests. The OpenAI

Defendants further admit that generative AI services can produce new content, and that for some

of those services, that content can include conversation, computer code, images, videos, and music.

To the extent that the allegations in Paragraph 133 pertain to the capabilities of unspecified "tools"

and "chatbots," the OpenAI Defendants lack knowledge or information sufficient to form a belief

as to the truth of those allegations and deny them on that basis. The OpenAI Defendants otherwise

deny the allegations in Paragraph 133.

134.    As an example, the below images in Figure 8 were created using xAI's Grok by
typing in the input "Draw a giraffe playing chess against an android."

*Figure 8*



**RESPONSE**: Paragraph 134 purports to reproduce and characterize a screenshot of an interaction with Grok; the OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the characterization and reproduction are complete and accurate and deny the allegations in Paragraph 134 on that basis.

135.    A chatbot without generative AI technology—such as a tool to help a customer in making orders or managing their bank account—cannot generate new content like the images in Figure 8.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135 about the capabilities of an unspecified "chatbot" and deny them on that basis.

136.    Vertical AI chatbots—which focus on a specific industry vertical such as healthcare and typically do not have built-in generative AI functionality—are not reasonable substitutes for generative AI chatbots.  Users of generative AI chatbots desire responses to *all* of the user's prompts.  They cannot reasonably substitute to vertical AI chatbots that can provide responses to

only a narrow set of pre-specified topics. Nor can vertical AI chatbots readily enter the market for generative AI chatbots. To do so, the vertical AI chatbot would have to find completely new data sources to ingest and retrain its algorithms to be able to respond to general—and not vertical-based—prompts.

**RESPONSE**: The first sentence of Paragraph 136 sets forth a legal conclusion to which

no response is required. To the extent a response is required to the first sentence of Paragraph 136,

the OpenAI Defendants deny the allegations in that sentence. The OpenAI Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph

136 about what unspecified "users" desire or about the capabilities or training regimes of

unspecified "vertical AI chatbots," and deny them on that basis. The OpenAI Defendants

otherwise deny the allegations in Paragraph 136.

137.    Search engines are not reasonable substitutes for generative AI chatbots. Search engines like Bing or vertical search engines like Amazon rely on different technologies than generative AI chatbots. Moreover, as an internal OpenAI document recognizes, search engines do not provide the same features that generative AI chatbots do. Generative AI is a general-purpose technology with many uses entirely unrelated to search, including the ability to create new content. This could include creating a travel itinerary, teaching a user how to code, or even providing emotional support. Accordingly, search engines do not constrain generative AI chatbots.

**RESPONSE**: The first and sixth sentences of Paragraph 137 set forth legal conclusions to

which no response is required. To the extent a response is required to the first or sixth sentences

of Paragraph 137, the OpenAI Defendants deny the allegations in those sentences. The OpenAI

Defendants lack knowledge or information sufficient to form a belief as to the truth of the

allegations about the features offered or technologies relied upon by Bing and Amazon, and deny

them on that basis. The OpenAI Defendants admit that generative AI technology offers many uses

unrelated to search. The OpenAI Defendants otherwise lack knowledge or information sufficient

to form a belief as to the truth of the allegations in Paragraph 137 and deny them on that basis.

138.    Industry and public sources support that generative AI chatbots are distinct from other products. An OpenAI strategy document recognizes an "AI chatbot space"—i.e., that ChatGPT's only competitors are other generative AI chatbots. Other industry sources recognize

similar competitors. The FTC has also recognized generative AI chatbots as a distinct product market.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in the first, third, and fourth sentences of Paragraph 138

about positions taken by unspecified "sources" or by the FTC and deny them on that basis. The

OpenAI Defendants deny the allegations in the second sentence of Paragraph 138.

139.    A hypothetical monopolist could implement a small but significant non-transitory increase in the price of generative AI chatbots without customers switching to non-generative AI tools or search engines to discipline such a price increase.

**RESPONSE**: Denied.

140.    There is also a subset of generative AI chatbot customers that use such products via smartphones. For such customers, using a generative AI chatbot via a desktop or laptop computer is not a substitute for using a generative AI chatbot via a smartphone because a smartphone is highly portable and allows access to generative AI almost anywhere. Over 60 percent of generative AI use today is on mobile devices. Reflecting such demand, technology companies have integrated generative AI chatbots into their smartphones.

**RESPONSE**: The second sentence of Paragraph 140 sets forth a legal conclusion to

which no response is required; to the extent a response is required, the OpenAI Defendants deny

the allegations in that sentence. The OpenAI Defendants admit that some people use smartphones

to access interfaces through which users can interact with an artificial intelligence model through

natural language dialogue, and that some companies have integrated interfaces through which

users can interact with an artificial intelligence model through natural language dialogue into

smartphones. The OpenAI Defendants lack knowledge or information sufficient to form a belief

as to the truth of the allegations in Paragraph 140 pertaining to the portion of "generative AI use"

on mobile devices and deny them on that basis.

141.    The relevant geographic market for generative AI chatbots is the United States.

**RESPONSE**: Paragraph 141 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 141.

142.    U.S. customers are most familiar with generative AI chatbots offered by U.S. companies, and the lack of brand recognition is an impediment for foreign generative AI chatbots to attract U.S. customers.

**RESPONSE**: The OpenAI Defendants deny that lack of brand recognition is an impediment for foreign generative AI services to attract U.S. customers. The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 142 and deny them on that basis.

143.    Differences in language also affect the performance of U.S. generative AI chatbots relative to ex-U.S. generative AI chatbots. Generative AI chatbots have better performance in the languages where the AI model has more inputs and does more training. For example, U.S. chatbots train more on English language inputs and thus have higher accuracy when responding to prompts in English. Non-U.S. chatbots—that train more on non-English inputs—will perform worse in responding to English prompts, which is another impediment for attracting U.S. customers.

**RESPONSE**: The OpenAI Defendants admit that, all else being equal, interfaces through which users can interact with an artificial intelligence model through natural language dialogue may improve their performance in languages on which the AI model has had more training and received more inputs of high-quality data. The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143 related to the training regimes and performance of unspecified "U.S. chatbots" and "non-U.S. chatbots" and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 143.

144.    In the alternative, the relevant geographic market for generative AI chatbots is worldwide.

**RESPONSE**: Paragraph 144 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 144.

**L.**    ***Monopoly Power***

***1.***    ***Apple Has Monopoly Power In The Relevant Market For Smartphones***

145.    Apple is the dominant provider of smartphones in the United States.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 145 and deny them on that basis.

146.    As of 2025, Apple's share of smartphones in the United States is 65 percent. Apple's U.S. market share has steadily increased over the past decade.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 146 and deny them on that basis.

147.    Apple's dominant position in the smartphone market is protected by multiple barriers to entry that inhibit the entrance of new competitors and discourage switching from iPhone to other smartphones.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 147 and deny them on that basis.

148.    Smartphones exhibit significant network effects.  iPhones, for example, have functionalities that are severely limited unless the iPhone user communicates with another iPhone user.  For example, messages sent from iPhones to non-iPhones are displayed in green (rather than blue, which creates stigma for the green texters), are not encrypted, and transmit videos at lower resolutions.  Apple's FaceTime can be initiated only by an iPhone user and can be used by non-iPhone users only if the iPhone user provides a link (as opposed to being able to join a call by swiping or pressing a button).  Given the iPhone's dominance, non-iPhone users are encouraged to switch to iPhones to reduce friction when communicating with others (who mostly use iPhones) and discouraged to switch to rivals.  When faced with a complaint from an iPhone user who could not send videos to his mother's Android, Apple CEO Tim Cook responded, "Buy your mom an iPhone."

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form

a belief as to the truth of the allegations in Paragraph 148 and deny them on that basis.

149.    There are also significant network effects due to the incentives of mobile app developers.  App developers must configure their apps to work with the operating systems of the smartphone manufacturer.  A new phone manufacturer that wants to provide an innovative operating system in its smartphone—e.g., something besides the incumbent iOS and Android operating systems—faces significant challenges to attract app developers to make apps for that operating system.  The smartphone must attract enough users so that app developers make apps

for the operating system, but to attract users, a smartphone needs sufficient coverage of mobile apps. There is thus a chicken-or-egg problem that provides a significant hurdle to potential new smartphone entrants.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 149 and deny them on that basis.

150.    The smartphone market is also marked by high switching costs that discourage customers from switching away from the iPhone. Customers seeking to change smartphones face additional hurdles, including the costs associated with learning how to use a new operating system and user interface, transferring all the relevant data (e.g., phone contacts, email addresses, photos) and apps between devices, and changing the management of subscriptions. These switching costs help lock in Apple's position as the dominant incumbent. In countries where super apps have become prominent, these switching costs are reduced because many of the smartphone functions are handled within the app (e.g., management of subscriptions).

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 150 and deny them on that basis.

151.    The effect of these frictions is that iPhone users continue to use the iPhone despite increases in price and reductions in quality. Most Americans—91 percent—already own a smartphone, meaning most smartphone purchases are to replace an existing smartphone. And almost all iPhone customers—89 percent—replace their iPhone with another iPhone.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 151 and deny them on that basis.

152.    These barriers to switching that keep iPhone customers using iPhones have prevented well-capitalized technology companies from successfully entering the market. There are multiple examples of companies that attempted to enter the U.S. smartphone market but failed due to the significant barriers to entry and high customer switching costs. Prominent examples include Amazon (which exited in 2015), Microsoft (which exited in 2017), and LG (which exited in 2021).

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152 and deny them on that basis.

153.    Apple's monopoly power is also demonstrated by its ability to earn consistent monopoly profits. Apple's net income has been positive since at least 2009 and reached over $93 billion in 2024, driven largely by iPhone sales. In January 2025, Apple CEO Tim Cook boasted that "Apple is reporting our best quarter ever," marked by record-high earnings per share.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153 and deny them on that basis.

154.    Beyond indirect indicia of Apple's monopoly power, Apple has exhibited direct evidence of monopoly power through its ability to control prices and exclude competitors.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154 and deny them on that basis.

155.    Apple has been able to consistently raise the price of its iPhones.  In 2020, for example, Apple implemented a nearly 20 percent increase in the price of the iPhone.  Such a large price increase indicates that Apple is not constrained by smartphone rivals in setting its prices. Industry sources report that Apple will increase the price of its iPhones again this fall by more than five percent.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155 and deny them on that basis.

156.    Apple's monopoly power is also evident from its ability to impede the threat from super apps.  Apple's control of the App Store and the intentional lack of interoperability with other smartphones allows it to protect itself from competitive challengers.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156 and deny them on that basis.

### 2.    *OpenAI Has Monopoly Power In The Relevant Market For Generative AI Chatbots*

157.    An OpenAI executive testified under oath that ChatGPT's 2024 U.S. market share reached 85 percent, and other executives in the industry have testified that ChatGPT is the "market leader."  Other sources similarly demonstrate that ChatGPT's U.S. market share based on web usage is around 80 percent and that ChatGPT enjoys a similar market share globally.  Few rivals to ChatGPT have ever reached a market share in excess of 10 percent.  When limited to mobile phones, ChatGPT's market share based on web usage is close to 90 percent both in the U.S. and globally.

**RESPONSE**: Paragraph 157 purports to characterize testimony from an OpenAI executive, to which testimony the OpenAI Defendants respectfully refer the Court for its complete and accurate contents.  The OpenAI Defendants otherwise lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157 about what unspecified

"[o]ther sources" demonstrate, or the share of other products of an undefined "market," and deny them on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 157.

158.    ChatGPT's mobile app has been downloaded 938 million times as of July 2025, nearly five times more than the second place mobile app (200 million).  Total global spending on the ChatGPT app reached $2 billion in August 2025—30 times higher than the combined spending on rival generative AI chatbot mobile apps—yielding a revenue-based market share above 90 percent.

**RESPONSE**: The OpenAI Defendants admit that ChatGPT's mobile app had been downloaded approximately 938 million times as of July 2025 and that total global spending on the ChatGPT app reached approximately $2 billion in August 2025.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158 about an unnamed "second place mobile app" or the amounts spent on other apps with interfaces through which users can interact with an artificial intelligence model through natural language dialogue, and deny them on that basis.  The OpenAI Defendants otherwise deny the allegations in Paragraph 158.

159.    ChatGPT receives over 5 billion visits monthly as of 2025, more than ten times the number of monthly visits of other leading generative AI chatbots.

**RESPONSE**:  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159.

160.    OpenAI's dominant market position is protected because the market for generative AI chatbots is marked by several barriers to entry that inhibit entry and discourage customer switching.

**RESPONSE**:  Denied.

161.    Generative AI chatbots exhibit significant network effects.  Chatbots with more users receive more prompts, allowing more model training and improvement and, in turn, attracting more customers.  Additional customers using a generative AI chatbot will thus attract additional customers in the future.  Academic research has labeled these network effects as "data network effects" and has found that the success of AI companies is dependent on such network effects.  Given these network effects, an FTC blog post explained, "[t]he volume and quality of data required to pre-train a generative AI model from scratch may impact the ability of new players to enter the market."  A new entrant must absorb these costs to even develop a generative AI

model, meaning there is significant financial risk for entrants if the data collection does not result in a viable generative AI model.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 161 that refer to conclusions drawn in unspecified "academic research" and statements made in an unspecified "FTC blog post." The OpenAI Defendants otherwise deny the allegations in Paragraph 161.

162.    According to ChatGPT, network effects among generative AI chatbots "play a pivotal role in shaping competition":

*Figure 9*

How do network effects affect competition among generative AI chatbots?

Network effects play a **pivotal** role in shaping competition among generative-AI chatbots—both reinforcing dominance for incumbents and making it increasingly tough for new entrants to catch up. Here's how they operate in this space:

**RESPONSE**: Paragraph 162 purports to reproduce and characterize a screenshot of an interaction with ChatGPT; the OpenAI Defendants lack knowledge or information sufficient to form a belief as to whether the reproduction is complete and accurate and deny the allegations in Paragraph 162 on that basis.

163.    Additionally, resource scarcity poses another impediment to entry and expansion. Generative AI chatbots require immense investments in computing resources, including graphics processing units ("GPUs"). Demand for GPUs from generative AI tools and other sources (such as cryptocurrency mining) has made securing sufficient computing resources a challenge for new market entrants. Highly skilled AI scientists and engineers are also in limited supply.

**RESPONSE**: The OpenAI Defendants admit that training an interface through which users can interact with an artificial intelligence model through natural language dialogue can be a resource-intensive process. The OpenAI Defendants otherwise deny the allegations in Paragraph 163.

164.    The Apple-OpenAI arrangement represents another barrier to new entry or expansion.  Because a substantial amount of generative AI prompts are locked up by the illegal agreement between Apple and OpenAI, new entrants or expanding competitors have fewer opportunities to gain scale.  This hurts their ability to improve their models.  Moreover, the Apple integration with ChatGPT gives ChatGPT exclusive access to data about how users interact via native iPhone features like Siri.  OpenAI—and not its rivals—can use this information to improve ChatGPT's models and thus attract more iPhone users.  By interacting with a greater number of users and exploiting access to vast quantities of data, an essential input, ChatGPT can leverage network effects by creating a powerful positive feedback loop that locks in users and locks out rivals.  Access to data is critical to develop generative AI models, and ChatGPT's unique data access inhibits entry and expansion by rival generative AI chatbots.

**RESPONSE**: Denied.

165.    Brand recognition also serves as a barrier to entry and expansion.  ChatGPT is the most widely recognized brand in generative AI chatbots, with some rivals fearing that it has become synonymous with AI.

**RESPONSE**: Denied, except to admit that ChatGPT is a widely recognized service through which users can interact with artificial intelligence models through natural language dialogue.

166.    OpenAI has also demonstrated monopoly power directly by its ability to control prices and exclude competitors.

**RESPONSE**: Denied.

167.    OpenAI documents reveal a plan to double the price of its "plus" subscription over the next four years.  Such a plan would be unfeasible unless OpenAI has power over marketwide prices.

**RESPONSE**: Paragraph 167 purports to characterize unspecified "OpenAI documents," to which the OpenAI Defendants respectfully refer the Court for their complete and accurate contents.  The OpenAI Defendants otherwise deny the allegations in Paragraph 167.

168.    Additionally, OpenAI has been able to take action to exclude competitors.  The Apple-OpenAI arrangement did just that by providing ChatGPT exclusive access to prompts based on native iPhone usage.

**RESPONSE**: Denied.

**M.**     ***Apple and OpenAI's Conduct Has Injured Competition, Plaintiffs, And The Public***

169.     Apple and OpenAI's exclusive deal and related conduct harm competition in the generative AI chatbot and smartphone markets.

**RESPONSE**: Denied.

170.     Their unlawful agreement has excluded ChatGPT's rivals—including xAI's Grok—from iPhone-based integrated prompts (e.g., via Siri), and together with the other conduct favoring ChatGPT on iPhones (including promoting ChatGPT in the App Store while delaying approval of rival apps), has prevented super app competitors from disrupting the smartphone market.

**RESPONSE**: Denied.

171.     Defendants' conduct has harmed competition in the market for generative AI chatbots by providing ChatGPT massive scale advantages while depriving ChatGPT's rivals, like Grok, from obtaining the scale needed to improve their generative AI models and thus attract more customers.  Defendants have completely foreclosed Grok and other rivals from a massive pool of valuable native iPhone user prompts that are available only to ChatGPT.  On top of this, Apple's use of its monopoly power to favor ChatGPT in its App Store rankings and to delay reviews of Grok app updates prevents Grok—one of the biggest threats to ChatGPT—from gaining access to user prompts needed to scale.

**RESPONSE**: Denied.

172.     The deprivation of scale through substantial foreclosure has augmented effects due to the significant data network effects exhibited in the generative AI chatbot market.  Without scale, generative AI models perform worse and cannot effectively compete with ChatGPT, the dominant incumbent.

**RESPONSE**: Denied.

173.     Apple and OpenAI's anticompetitive conduct also discourages investment and innovation in the generative AI chatbot market.  The foreclosure caused by the unlawful agreement inhibits innovation on iPhones—the dominant smartphone—because ChatGPT's rivals have no reason to develop better models for native iPhone prompts they cannot access.  The denial of scale caused by Defendants' conduct limits rival generative AI chatbots from developing new innovations.  Moreover, with ChatGPT's lock on the market through its exclusive deal with Apple and with Apple's thumb pressed firmly on the scale for ChatGPT in its App Store, investors face significant risk in backing anyone but the dominant market leader.  While OpenAI raised $40 billion in a single funding round, other generative AI startups have struggled to raise the funding needed to compete while at the same time being raided by established tech companies for their employees.

**RESPONSE**: The OpenAI Defendants admit that OpenAI raised $40 billion in an investment round.  The OpenAI Defendants otherwise deny the allegations in Paragraph 173.

174.    Because Defendants' conduct has harmed competition in the market for generative AI chatbots, Defendants' conduct has also harmed competition in the market for smartphones.

**RESPONSE**: Denied.

175.    Super apps are a competitive threat to Apple's iPhone monopoly.  Apple's iPhone offers a number of features and functionality, including serving as a platform for mobile apps. Super apps similarly offer the ability to serve as a platform for the functions offered by other apps that a user might download from Apple's App Store.  Super apps threaten Apple's monopoly position in smartphones because super apps take over much of the functionality that is offered by the iPhone.  Super apps commoditize native functionality offered by the iPhone (including its default apps), which allows customers to pick a super app first and then decide which smartphone will best support that app (as opposed to picking a smartphone first and being locked into that smartphone's ecosystem).

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 175 and deny them on that basis.

176.    Defendants' conduct harms competition by inhibiting the development of super apps.  As described above, Defendants engaged in multiple acts to limit Grok (and other competitors) from becoming competitive threats to ChatGPT.  By inhibiting competition in generative AI chatbots—including by excluding a substantial portion of the generative AI market and exercising bias against Plaintiffs' apps—Defendants have reduced innovation that would facilitate the development by X and xAI of super apps providing a meaningful alternative to smartphone users.  By eliminating the threat from super apps, Apple maintains the flow of monopoly rents it receives on iPhone sales.

**RESPONSE**: The OpenAI Defendants deny the allegations in the first, second, and third sentences of Paragraph 176.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 176 and deny them on that basis.

177.    Consumers have been harmed by Defendants' anticompetitive conduct.  In the but-for world, customers would have more choice because they could choose Grok or other generative AI chatbots like Claude to fulfill their native iPhone prompts.  Instead, they are forced to take ChatGPT.  Customers in the but-for world would also have access to higher-functionality generative AI chatbots because Defendants' conduct would not have deprived ChatGPT's rivals of scale.  And by impeding the super app threat, Defendants prevent customers from replacing

their iPhones with cheaper smartphones complemented by super apps.  Instead, customers must pay supracompetitive prices for their iPhones.

**RESPONSE**:  The OpenAI Defendants deny the allegations in the first, second, third, and fourth sentences of Paragraph 177.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the fifth and sixth sentences of Paragraph 176 and deny them on that basis.

178.    xAI and X have both been injured by this conduct, which has already caused them significant damages that will amount to billions of dollars in combined lost sales and enterprise values.

**RESPONSE**:  Denied.

179.    But for Defendants' anticompetitive conduct—including making ChatGPT the exclusive integrated generative AI chatbot for iPhone users, causing the Grok app to perform worse in Apple's App Store rankings, and delaying reviews to Grok app updates—xAI would not have been foreclosed from a substantial portion of the market and would have more customers; more app downloads, sales, and profits; and greater scale than it has.  Instead, more users would pick Grok for their prompts, either via native iPhone integrations or via mobile app downloads, which would give Grok more scale.  This self-reinforcing scale would allow more innovations in Grok's models and attract both more customers and more investment.

**RESPONSE**:  Denied.

180.    In turn, the harms to xAI and its generative AI chatbot, Grok, also harm X's "everything app."  Because Grok's functionality is a key feature of the X app, the X app is more attractive the better Grok performs.  And because Defendants' conduct makes Grok less able to fairly compete with ChatGPT, X's app (and thus X) suffers in the process.  This results in fewer X app customers and subscriptions, and less revenue and profits, ultimately creating a depressed enterprise value for X relative to the but-for world.  This injury has been compounded by Apple's biasing of the rankings in its App Store—aimed at inhibiting its growth and corresponding evolution into a super app—which further decreases X's revenues, profits, and enterprise value.

**RESPONSE**:  Denied.

## CAUSES OF ACTION

### First Claim For Relief:  Unlawful Agreement In Violation Of Section 1 Of The Sherman Act 15 U.S.C. § 1 (Against All Defendants)

181.    Plaintiffs incorporate the allegations of paragraphs 1 through 180 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

182.    Defendants, by and through their officers, directors, employees, or other representatives, entered into an unlawful agreement with each other in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**RESPONSE**:  Denied.

183.    Defendants entered an unlawful agreement to leverage Apple's monopoly power in the U.S. smartphone market to maintain OpenAI's monopoly power in generative AI chatbots and foreclose OpenAI's rivals, and, relatedly, to leverage OpenAI's monopoly power in generative AI chatbots to maintain Apple's monopoly power in the U.S. smartphone market and foreclose super app competitors.

**RESPONSE**:  Denied.

184.    Smartphones in the U.S. is a relevant antitrust market.

**RESPONSE**:  Paragraph 184 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184 and deny them on that basis.

185.    Generative AI chatbots in the U.S. is a relevant antitrust market.  Alternatively, generative AI chatbots worldwide is a relevant antitrust market.

**RESPONSE**:  Paragraph 185 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 185.

186.    OpenAI possesses significant market power in the U.S. and worldwide generative AI chatbot markets.

**RESPONSE**:  Paragraph 186 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 186.

187.    Apple possesses significant market power in the U.S. smartphone market.

**RESPONSE**: Paragraph 187 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 187 and deny them on that basis.

188.    Defendants' agreement harms competition.  The agreement forecloses OpenAI's rivals from a substantial share of the relevant generative AI chatbot market and the scale necessary to compete while artificially advantaging ChatGPT, the dominant generative AI chatbot.  This conduct, in turn, prevents super apps from effectively competing in the U.S. market for smartphones.  Defendants' unlawful agreement reduces customer choice, competition, and marketwide innovation and investment.  As a result, both the ability to innovate and output in the market for generative AI chatbots is significantly lower than in the but-for world without the anticompetitive agreement.  Moreover, if not for Defendants' agreement, super apps would emerge to provide customers more flexibility and choice when choosing a smartphone.  In that but-for world, customers could substitute lower-priced smartphones (in combination with the use of super apps), increasing consumer welfare.  And where lower-priced smartphones are a more viable option, marketwide smartphone prices would decline with a corresponding increase in marketwide output.

**RESPONSE**: The OpenAI Defendants deny the allegations in the first, second, third, fourth, fifth, and sixth sentences of Paragraph 188.  The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the seventh sentence of Paragraph 188 and deny them on that basis.

189.    xAI's injury flows from the same conduct causing harm to competition.  xAI was injured, and continues to be injured, as a proximate cause of Defendants' unlawful agreement. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT.  Relative to the but-for world without the unlawful agreement, xAI has less scale and receives less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues.  These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

190.    X's injury likewise flows from the same conduct causing harm to competition.  X was injured, and continues to be injured, as a proximate cause of Defendants' unlawful agreement. X is a user of generative AI chatbots and has incorporated Grok functionality into the X app. Defendants' conduct deprives Grok of scale and investment, which, among other harms, reduces Grok's ability to innovate and develop product features relative to the but-for world without Defendants' anticompetitive conduct.  Because X relies on Grok functionality to add value to the X app, X is injured by the loss of innovation for Grok that Defendants' anticompetitive conduct

causes.  X also suffers a loss in the value of its business as the reduced innovation in the X app depresses the number of X app users and thus X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

**RESPONSE**:  Denied

191.    There are no procompetitive justifications for Defendants' unlawful agreement. Defendants' anticompetitive agreement has no purpose or effect other than to reduce competition between generative AI chatbots and to insulate Apple from competition from super apps.

**RESPONSE**:  Denied

### *Second Claim For Relief:  Monopolization Of The Market For Smartphones In Violation Of Section 2 Of The Sherman Act*
### *15 U.S.C. § 2*
### *(Against Apple)*

192.    Plaintiffs incorporate the allegations of paragraphs 1 through 191 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

193.    Smartphones in the U.S. is a relevant antitrust market.

**RESPONSE**: Paragraph 193 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants.  If it is determined that a response is required, the OpenAI Defendants respond that Paragraph 193 sets forth a legal conclusion to which no response is required, and furthermore that the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 193 and deny them on that basis.

194.    Apple possesses monopoly power in the U.S. smartphone market.

**RESPONSE**: Paragraph 194 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants.  If it is determined that a response is required, the OpenAI Defendants respond that Paragraph 194 sets forth a legal conclusion to which no response is required, and furthermore that the OpenAI Defendants lack

knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194 and deny them on that basis.

195.    Apple willfully maintains its monopoly power through its anticompetitive conduct. Apple's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with OpenAI, manipulating the App Store rankings to cause the X and Grok apps to perform worse, and delaying reviews of updates to the Grok app. Apple's conduct harms competition in the U.S. smartphone market. But for Apple's conduct, rival developers would be able to compete against the iPhone by offering super apps as an alternative to iPhone features. Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away from the iPhone.

**RESPONSE**: Paragraph 195 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that Paragraph 195 sets forth a legal conclusion to which no response is required, and furthermore that the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195 and deny them on that basis, except to specifically deny that OpenAI and Apple entered into an exclusive agreement.

196.    Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

**RESPONSE**: Paragraph 196 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants deny the allegations in Paragraph 196.

197.    xAI's and X's injuries flow from the same conduct causing this harm to competition. xAI and X were injured, and continue to be injured, as a proximate cause of Apple's unlawful conduct maintaining its monopoly. Super apps are a threat to the iPhone's monopoly position as they can replace functionality offered by the iPhone. Apple's conduct reduces scale, investment, and innovation on apps like Grok and X, and it prevents these and other apps from evolving into replacements for iPhone features. But for Apple's conduct, Grok and the X app would be higher quality (i.e. have more features) and have more customers, which would substantially increase the revenues and values of xAI and X.

**RESPONSE**: Paragraph 197 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants deny the allegations in Paragraph 197.

198.    There are no procompetitive justifications for Apple's anticompetitive conduct. Apple's conduct has no purpose or effect other than to inhibit the threat from super apps to protect Apple's monopoly power in smartphones.

**RESPONSE**: Paragraph 198 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants deny the allegations in Paragraph 198.

### *Third Claim For Relief:  Attempted Monopolization Of The Market For Smartphones In Violation Of Section 2 Of The Sherman Act*
### *15 U.S.C. § 2*
### *(Against Apple)*

199.    Plaintiffs incorporate the allegations of paragraphs 1 through 198 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

200.    Smartphones in the U.S. is a relevant antitrust market.

**RESPONSE**: Paragraph 200 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that Paragraph 200 sets forth a legal conclusion to which no response is required, and furthermore that the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 200 and deny them on that basis.

201.    Apple has a dangerous probability of monopolizing the U.S. smartphone market. Apple has significant market power in that market and has increased its market power through the acts described below.

**RESPONSE**: Paragraph 201 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 201 and deny them on that basis.

202.    Apple is aware that super apps are a competitive threat to iPhones.

**RESPONSE**: Paragraph 202 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202 and deny them on that basis.

203.    Apple engages in anticompetitive conduct with the specific intent to monopolize the U.S. smartphone market. Apple's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with OpenAI, manipulating the App Store rankings to cause the X and Grok apps to perform worse, and delaying reviews to updates to the Grok app. Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away from iPhones to rival manufacturers.

**RESPONSE**: Paragraph 203 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that Paragraph 203 sets forth a legal conclusion to which no response is required, and furthermore that the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203 and deny them on that basis, except to specifically deny that OpenAI and Apple entered into an exclusive agreement.

204.    Compared to the but-for world absent Apple's anticompetitive conduct, customers have less choice and smartphones have lower quality and higher prices, lowering marketwide output.

**RESPONSE**: Paragraph 204 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants deny the allegations in Paragraph 204.

205.    xAI's and X's injuries flow from the same conduct causing harm to competition. xAI and X were injured, and continue to be injured, as a proximate cause of Apple's unlawful conduct maintaining its monopoly. Super apps are a threat to the iPhone's monopoly position as they can replace functionality offered by the iPhone. Apple's conduct reduces scale, investment, and innovation on apps like Grok and X, and it prevents these and other apps from evolving into replacements for iPhone features. But for Apple's conduct, Grok and the X app would be higher quality (i.e., have more features) and have more customers, which would substantially increase the revenues and values of xAI and X.

**RESPONSE**: Paragraph 205 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants respond that they lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 205 and deny them on that basis.

206.    There are no procompetitive justifications for Apple's anticompetitive conduct. Apple's conduct has no purpose or effect other than to inhibit the threat from super apps to protect Apple's monopoly power in smartphones.

**RESPONSE**: Paragraph 206 is directed at a party other than the OpenAI Defendants and therefore does not require a response from the OpenAI Defendants. If it is determined that a response is required, the OpenAI Defendants deny the allegations in Paragraph 206.

### Fourth Claim For Relief:  Monopolization Of The Market For Generative AI Chatbots In Violation Of Section 2 Of The Sherman Act
### 15 U.S.C. § 2
### (Against OpenAI)

207.    Plaintiffs incorporate the allegations of paragraphs 1 through 206 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

208.    Generative AI chatbots in the U.S. is a relevant antitrust market.  In the alternative, generative AI chatbots worldwide is a relevant antitrust market.

**RESPONSE**:  Paragraph 208 sets forth a legal conclusion to which no response is required.

To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph

208.

209.    OpenAI possesses monopoly power in the U.S. and worldwide generative AI chatbot markets.

**RESPONSE**:  Paragraph 209 sets forth a legal conclusion to which no response is required.

To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph

209.

210.    OpenAI willfully maintains its monopoly power through its anticompetitive conduct.  OpenAI's anticompetitive conduct includes, but is not limited to, entering into an exclusive agreement with Apple.  But for OpenAI's conduct, rival generative AI chatbots would be able to compete against ChatGPT by developing scale through access to prompts locked up by the Apple-OpenAI arrangement.  OpenAI's conduct forecloses rivals from a substantial portion of the relevant market, deprives rivals of scale, and suppresses innovation and investment in the market for generative AI chatbots, foreclosing customer choice and resulting in generative AI chatbots with fewer new features.

**RESPONSE**:  Denied.

211.    Compared to the but-for world absent OpenAI's anticompetitive conduct, customers have less choice, and generative AI chatbots have fewer new features and higher prices, lowering marketwide output.

**RESPONSE**:  Denied.

212.    xAI's injury flows from the same conduct causing harm to competition.  xAI was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct.  xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT.  Relative to the but-for world without the unlawful agreement, xAI has less scale and has received less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues.  These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

**RESPONSE**:  Denied.

213.    X's injury flows from the same conduct causing harm to competition.  X was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct.  X is a

user of generative AI chatbots and has incorporated the Grok functionality into its popular X app. OpenAI's conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on the Grok functionality to add value to the X app, X is injured by the loss of product improvement data for the Grok functionality that OpenAI's anticompetitive conduct causes. X also suffers a loss in the value of its business as reduced innovation for the X app depresses the number of X app users and, thus, X revenue relative to the but-for world without OpenAI's anticompetitive conduct.

**RESPONSE**: Denied.

214.    There are no procompetitive justifications for OpenAI's anticompetitive conduct. OpenAI's conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to deprive them of the scale necessary to effectively compete.

**RESPONSE**: Denied.

### Fifth Claim For Relief:  Attempted Monopolization Of The Market For Generative AI Chatbots In Violation Of Section 2 Of The Sherman Act 15 U.S.C. § 2 (Against OpenAI)

215.    Plaintiffs incorporate the allegations of paragraphs 1 through 214 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

216.    Generative AI chatbots in the U.S. is a relevant antitrust market.  In the alternative, generative AI chatbots worldwide is a relevant antitrust market.

**RESPONSE**:  Paragraph 216 sets forth a legal conclusion to which no response is required.

To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph

216.

217.    OpenAI has a dangerous probability of monopolizing the U.S., or alternatively worldwide, generative AI chatbot markets.  OpenAI has significant market power in those markets and has increased its market power through the acts described below.

**RESPONSE**:  Denied.

218.    OpenAI engages in anticompetitive conduct with specific intent to monopolize the relevant market for generative AI chatbots.  OpenAI's conduct includes, but is not limited to, entering into an exclusive agreement with Apple.  OpenAI's conduct forecloses rivals from a substantial portion of the relevant market, deprives rivals of scale, and suppresses innovation and

investment in the markets for generative AI chatbots, foreclosing customer choice and resulting in generative AI chatbots with fewer new features. OpenAI expects to be able to charge supracompetitive prices in the future.

**RESPONSE**: Denied.

219. Compared to the but-for world absent OpenAI's anticompetitive conduct, customers have less choice, and generative AI chatbots have fewer new features and higher prices, lowering marketwide output.

**RESPONSE**: Denied.

220. xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful agreement, xAI has less scale and has received less investment to develop innovations to its generative AI models, which has depressed xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

221. X's injury flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of OpenAI's unlawful conduct. X is a user of generative AI chatbots and has incorporated Grok functionality into its popular X app. OpenAI's conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on Grok functionality to add value to the X app, X is injured by the loss of product improvement data for the Grok functionality that OpenAI's anticompetitive conduct causes. X also suffers a loss in the value of its business as the reduced innovation for the X app depresses the number of X app users and, thus, X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

222. There are no procompetitive justifications for OpenAI's anticompetitive conduct. OpenAI's conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to deprive them of the scale necessary to effectively compete.

**RESPONSE**: Denied.

### Sixth Claim For Relief: Conspiracy To Monopolize The Markets For Generative AI Chatbots And Smartphones In Violation Of Section 2 Of The Sherman Act
### 15 U.S.C. § 2
### (Against All Defendants)

223. Plaintiffs incorporate the allegations of paragraphs 1 through 222 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

224.    Defendants, by and through their officers, directors, employees, or other representatives, entered into a conspiracy to monopolize the markets for smartphones and generative AI chatbots in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**RESPONSE**: Denied.

225.    Defendants entered an unlawful agreement and conspiracy to leverage Apple's monopoly power in the U.S. smartphone market to maintain OpenAI's monopoly power in generative AI chatbots and foreclose OpenAI's rivals, and, relatedly, to leverage OpenAI's monopoly power in generative AI chatbots to maintain Apple's monopoly power in the U.S. smartphone market and foreclose super app competitors.

**RESPONSE**: Denied.

226.    Smartphones in the U.S. is a relevant antitrust market.

**RESPONSE**:  Paragraph 226 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 226 and deny them on that basis.

227.    Generative AI chatbots in the U.S. is a relevant antitrust market.  Alternatively, generative AI chatbots worldwide is a relevant antitrust market.

**RESPONSE**:  Paragraph 227 sets forth a legal conclusion to which no response is required. To the extent a response is required, the OpenAI Defendants deny the allegations in Paragraph 227.

228.    Defendants are taking overt acts in furtherance of their conspiracy including, but not limited to, entering into an exclusive agreement, deprioritizing competing apps in Apple's App Store, and delaying review processes for competing apps.

**RESPONSE**: Denied.

229.    Defendants engage in anticompetitive conduct with the specific intent to monopolize the relevant smartphone and generative AI chatbot markets.  For example, Apple is aware that super apps are a competitive threat to iPhones.  Apple's conduct suppresses innovation and inhibits the development of super apps, which in turn prevents customers from switching away

from iPhones to rival manufacturers. Similarly, OpenAI expects to be able to charge supracompetitive prices in the generative AI chatbot market in the future.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 229 related to Apple's awareness or conduct and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 229.

230. Defendants' conspiracy has the effect of harming competition. The conspiracy forecloses OpenAI's rivals from a substantial share of the relevant generative AI chatbot market and the scale necessary to compete while artificially advantaging ChatGPT, the dominant generative AI chatbot. This conduct, in turn, prevents super apps from effectively competing in the U.S. market for smartphones. Defendants' unlawful conspiracy reduces customer choice, competition, and marketwide innovation and investment. As a result, both the ability to innovate and output in the market for generative AI chatbots is significantly lower than in the but-for world without the anticompetitive agreement. Moreover, if not for Defendants' agreement, super apps would emerge to provide customers more flexibility and choice when choosing a smartphone. In that but-for world, customers could substitute lower-priced smartphones (in combination with the use of super apps), increasing consumer welfare. And where lower-priced smartphones are a more viable option, marketwide smartphone prices decline with a corresponding increase in marketwide output.

**RESPONSE**: The OpenAI Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the last sentence of Paragraph 230 and deny them on that basis. The OpenAI Defendants otherwise deny the allegations in Paragraph 230.

231. xAI's injury flows from the same conduct causing harm to competition. xAI was injured, and continues to be injured, as a proximate cause of Defendants' unlawful conspiracy. xAI's Grok is foreclosed from the ability to compete for additional customers against OpenAI's ChatGPT. Relative to the but-for world without the unlawful conspiracy, xAI has less scale and receives less investment to develop innovations to its generative AI models, which depresses xAI's sales and revenues. These effects combine to substantially reduce the value of xAI's business relative to the but-for world without Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

232. X's injury likewise flows from the same conduct causing harm to competition. X was injured, and continues to be injured, as a proximate cause of Defendants' unlawful conspiracy. X relies on generative AI chatbots and has incorporated Grok functionality into the X app. Defendants' conduct deprives Grok of scale and investment, which, among other harms, reduces the data available for product development for Grok relative to the but-for world without Defendants' anticompetitive conduct. Because X relies on Grok functionality to add value to the

X app, X is injured by the loss of product improvement data for the Grok functionality that Defendants' anticompetitive conduct causes. X also suffers a loss in the value of its business as the reduced innovation for the X app depresses the number of X app users and thus X revenue relative to the but-for world without the Defendants' anticompetitive conduct.

**RESPONSE**: Denied.

233.    There are no procompetitive justifications for Defendants' unlawful conspiracy. Defendants' anticompetitive conduct has no purpose or effect other than to reduce competition between generative AI chatbots and to insulate Apple from competition from super apps.

**RESPONSE**: Denied.

### Seventh Claim For Relief: Civil Conspiracy
### (Against All Defendants)

234.    Plaintiffs incorporate the allegations of paragraphs 1 through 233 above.

**RESPONSE**: The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

235.    Defendants, by and through their officers, directors, employees, or other representatives, conspire to violate the antitrust and other competition laws, including without limitation Sections 1 and 2 of the Sherman Act.

**RESPONSE**: Denied.

236.    Defendants acted on this conspiracy by entering into an unlawful agreement in restraint of trade.

**RESPONSE**: Denied.

237.    Defendants' conspiracy causes ongoing injury to Plaintiffs, which are injured by reductions of sales and loss of value of their ongoing businesses.

**RESPONSE**: Denied.

### Eighth Claim For Relief: Unfair Competition
### (Against All Defendants)

238.    Plaintiffs incorporate the allegations of paragraphs 1 through 237 above.

**RESPONSE**: The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

239.    Defendants, through their conspiracy, have committed one or more illegal acts, including violations of antitrust law.

**RESPONSE**:  Denied.

240.    Defendants' conduct is contrary to honest practice in commercial matters and interferes with Plaintiffs' ability to conduct their businesses, including Plaintiffs' ability to attract and retain users and to scale their apps.

**RESPONSE**:  Denied.

241.    Defendants' conduct threatens an incipient violation of the antitrust laws or violates the policy and spirit of those laws.

**RESPONSE**:  Denied.

242.    The harm from Defendants' conduct outweighs the utility of that conduct.

**RESPONSE**:  Denied.

243.    Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

**RESPONSE**:  Denied.

### Ninth Claim For Relief:  Violations Of Texas Free Enterprise & Antitrust Act
### (Against All Defendants)

244.    Plaintiffs incorporate the allegations of paragraphs 1 through 243 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses

to the foregoing allegations in the Complaint.

245.    Defendants' conduct violates Texas Business and Commerce Code § 15.01 *et seq.*, including § 15.05(a), because Defendants are engaging in a contract, combination, or conspiracy in restraint of trade.

**RESPONSE**:  Denied.

246.    Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

**RESPONSE**:  Denied.

### Tenth Claim For Relief: *Violations Of Texas Free Enterprise & Antitrust Act*
### *(Against All Defendants)*

247.    Plaintiffs incorporate the allegations of paragraphs 1 through 246 above.

**RESPONSE**:  The OpenAI Defendants repeat and incorporate by reference their responses to the foregoing allegations in the Complaint.

248.    Defendants' conduct violates Texas Business and Commerce Code § 15.01 *et seq.*, including § 15.05(b), because Defendants are monopolizing, attempting to monopolize, and/or conspiring to monopolize their respective relevant markets.

**RESPONSE**:  Denied.

249.    Defendants' wrongful conduct has caused and will continue to cause Plaintiffs significant commercial harm.

**RESPONSE**:  Denied.

250.    Defendants' conduct is willful.  Apple and OpenAI have joined together to exercise their monopoly power to harm competition and customers.  Their targeting of Plaintiffs through an anticompetitive agreement reflects their anticompetitive intent.

**RESPONSE**:  Denied.

## PRAYER FOR RELIEF

Answering the prayer for relief, the OpenAI Defendants deny that Plaintiffs are entitled to any of the relief sought.

## AFFIRMATIVE AND OTHER DEFENSES

The OpenAI Defendants state the following defenses and reserve their right to assert other and additional defenses, cross claims, and third-party claims not asserted herein of which they become aware through discovery or other investigation as may be appropriate at a later time. In asserting these defenses, the OpenAI Defendants do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon Plaintiffs. The OpenAI Defendants aver that some of the following defenses are actually

elements of Plaintiffs' claims on which Plaintiffs bear the burden of proof, but plead them as defenses out of an abundance of caution.

### FIRST DEFENSE: FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief may be granted.

### SECOND DEFENSE: LACK OF ANTITRUST STANDING

Plaintiffs' antitrust claims are barred, in whole or in part, insofar as Plaintiffs lack antitrust standing to assert any or all of the claims alleged in the Complaint, including failure to establish injury-in-fact and antitrust injury.

### THIRD DEFENSE: LACK OF ARTICLE III STANDING

Plaintiffs' antitrust claims are barred, in whole or in part, insofar as Plaintiffs lack Article III standing to assert any or all of the claims alleged in the Complaint.

### FOURTH DEFENSE: NO INJURY OR THREATENED INJURY

Plaintiffs' claims are barred, in whole or in part, because Plaintiffs neither have sustained nor are threatened by any injury-in-fact or antitrust injury proximately caused by any alleged act or omission by the OpenAI Defendants, or because any such alleged damages are speculative, precluding their right to obtain relief.

### FIFTH DEFENSE: NO CAUSATION

Plaintiffs' claims are barred, in whole or in part, because of a lack of causation, including without limitation because any injuries that may have been suffered were caused proximately by the intervening and superseding acts and omissions of, or solely by, others over whom the OpenAI Defendants have no power, authority, or control, including Plaintiffs themselves.

### SIXTH DEFENSE: LEGITIMATE BUSINESS JUSTIFICATIONS

Without admitting any liability whatsoever, any and all of the OpenAI Defendants' actions alleged by Plaintiffs were reasonable, lawful, justified, procompetitive, and carried out in good

faith to advance the OpenAI Defendants' legitimate business interests and constitute bona fide procompetitive activity, the benefits of which significantly outweigh any alleged anticompetitive effects.

### SEVENTH DEFENSE: NO HARM TO COMPETITION OR CONSUMERS

Plaintiffs' claims are barred, in whole or in part, because the alleged conduct did not and does not harm competition or consumers.

### EIGHTH DEFENSE: NO SPECIFIC INTENT

Plaintiffs' claims are barred, in whole or in part, because the OpenAI Defendants did not specifically intend to monopolize any market.

### NINTH DEFENSE: NO CONSPIRACY

Plaintiffs' claims are barred, in whole or in part, because the OpenAI Defendants did not enter into any conspiracy.

### TENTH DEFENSE: PROTECTED INTELLECTUAL PROPERTY AND OTHER STATUTORY RIGHTS

Plaintiffs' claims are barred, in whole or in part, because they make claims or seek remedies that would contravene the OpenAI Defendants' rights under intellectual property law or other statutes.

### ELEVENTH DEFENSE: PROTECTED FIRST AMENDMENT RIGHTS

Plaintiffs' claims are barred, in whole or in part, because they challenge the exercise of rights protected by the First Amendment of the United States Constitution.

### TWELFTH DEFENSE: RELIEF CONTRARY TO PUBLIC INTEREST, INEQUITABLE, IMPRACTICAL, AND UNWORKABLE

The relief sought by Plaintiffs would be contrary to the public interest, harm consumers, and is otherwise inequitable, impractical, and unworkable.

**THIRTEENTH DEFENSE: NO UNLAWFUL OR TORTIOUS ACT**

Plaintiffs' claims are barred, in whole or in part, because the OpenAI Defendants did not commit any unlawful or tortious acts.

**FOURTEENTH DEFENSE: LACHES**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of laches.

**FIFTEENTH DEFENSE: UNCLEAN HANDS**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of unclean hands.

**SIXTEENTH DEFENSE: IN PARI DELICTO**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of *in pari delicto*.

**SEVENTEENTH DEFENSE: ESTOPPEL**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of estoppel.

**EIGHTEENTH DEFENSE: FOREIGN TRADE ANTITRUST IMPROVEMENTS ACT**

Plaintiffs' claims are barred, in whole or in part, by the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, insofar as Plaintiffs make claims concerning transactions or alleged conduct involving trade or commerce with foreign nations outside U.S. jurisdiction.

**NINETEENTH DEFENSE: INTERNATIONAL COMITY**

Plaintiffs' claims are barred, in whole or in part, by the doctrine of international comity, insofar as Plaintiffs seek relief affecting transactions and conduct occurring outside U.S. jurisdiction.

**TWENTIETH DEFENSE: DUE PROCESS**

Plaintiffs' Texas state law claims are barred, in whole or in part, by the Due Process Clause of the United States Constitution, insofar as Plaintiff makes claims based on alleged conduct occurring outside the state of Texas.

## TWENTY-FIRST DEFENSE: NO ENTITLEMENT TO INTEREST, ATTORNEY'S FEES OR COSTS

Plaintiffs are not entitled to interest, attorney's fees, or costs in connection with this action.

## ADDITIONAL DEFENSES

The OpenAI Defendants presently have insufficient knowledge or information to determine whether they may have additional, as yet unstated defenses. The OpenAI Defendants have not knowingly and intentionally waived any applicable defenses and reserve the right to assert additional defenses as they become known to them through discovery in this matter. The OpenAI Defendants reserve the right to amend this Answer to add, withdraw, or modify defenses based upon legal theories that may be or will be divulged through clarification of Plaintiffs' Complaint, through discovery, or through further legal analysis of Plaintiffs' position in this litigation.

Dated:  December 11, 2025

Respectfully submitted,

*/s/ Michael K. Hurst*
Michael K. Hurst
mhurst@lynnllp.com
Texas Bar No. 10316310
Chris W. Patton
cpatton@lynnllp.com
Texas Bar No. 24083634
Andy Kim
akim@lynnllp.com
Texas Bar No. 24136638
**LYNN PINKER HURST &**
**SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 (Telephone)
(214) 981-3839 (Facsimile)

William Savitt
WDSavitt@wlrk.com
N.D. Tex. Bar No. 2900058NY
Kevin S. Schwartz
KSchwartz@wlrk.com
N.D. Tex. Bar No. 4564241NY
Stephen D. Levandoski (admitted *pro hac vice*)
SDLevandoski@wlrk.com
**WACHTELL, LIPTON, ROSEN &**
**KATZ**
51 West 52nd Street
New York, New York 10019
(212) 403-1000 (Telephone)
(212) 403-2000 (Facsimile)

*Attorneys for Defendants OpenAI*
*Foundation (f/k/a OpenAI, Inc.), OpenAI,*
*L.L.C., and OpenAI OpCo, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 11, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Michael K. Hurst*
Michael K. Hurst