# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| X CORP. and X.AI LLC, | § |
| | § |
| Plaintiffs, | § |
| | § |
| v. | § Civil Action No. 4:25-cv-00914-P |
| | § |
| APPLE INC., OPENAI, INC., OPENAI, L.L.C., | § |
| and OPENAI OPCO, LLC, | § |
| | § |
| Defendants. | § |

## APPENDIX OF APPLE INC. IN SUPPORT OF ITS
## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DISCOVERY

Pursuant to Local Rule 7.1(i), Defendant Apple Inc. ("Apple") files this Appendix in support of its Opposition to Plaintiffs' Motion to Compel Discovery.

| Tab No. | Pages in Brief | Description | Appendix Pages |
|---|---|---|---|
| 1 | 5, 13 | Email thread titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," with the latest-in-time email sent on Jan. 30, 2026, at 7:09 PM ET from Scott A. Eisman to Emily Henn, Henry Liu, Lauren W. Zehmer, et al. | App'x 1–5 |
| 2 | 5, 13 | Email titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," sent on Jan. 6, 2026, at 8:55 PM ET from Scott A. Eisman to Emily Henn, Henry Liu, Lauren W. Zehmer, et al. | App'x 6–10 |
| 3 | 6 | Email titled "Your lunch week ahead at xAI /X Popup" sent on June 2, 2025, from info@fooda.com to ██████ (X-XAI-000009499) | App'x 11–13 |
| 4 | 8, 9 |  (APL-XAI_00114931) | App'x 14–56 |
| 5 | 11 | Excerpts from Plaintiffs' First Set of Requests for Production to Apple Inc. | App'x 57–78 |

1

| Tab No. | Pages in Brief | Description | Appendix Pages |
|---|---|---|---|
| 6 | 12 | Email thread titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," with the latest-in-time email sent on April 7, 2026, at 9:56 A.M. PT from Sean Berman to Scott A. Eisman, Hope E. Brinn, Richard D. Abidor et al. | App'x 79–92 |
| 7 | 14 | Email titled ██████████ ███████████ (OAI_NDTX_0003240) | App'x 93–94 |
| 8 | 14, 15 | Email titled ██████████ ███████████ (APL-XAI_00114920) | App'x 95–97 |
| 9 | 16 | Email titled ██████████ ███████████ (APL-XAI_00007321) | App'x 98–99 |

Dated: April 29, 2026

Respectfully submitted,

*/s/ Dee J. Kelly, Jr.*
Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telephone: (817) 332-2500
Facsimile: (817) 878-9280

Emily Johnson Henn (admitted *pro hac vice*)
ehenn@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: (650) 632-4700

Henry Liu (admitted *pro hac vice*)
hliu@cov.com
Lauren Willard Zehmer (admitted *pro hac vice*)
lzehmer@cov.com
Carol Szurkowski Weiland (admitted *pro hac vice*)
cweiland@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6302

**ATTORNEYS FOR DEFENDANT APPLE INC.**

**CERTIFICATE OF SERVICE**

I certify that on April 29, 2026, I electronically transmitted the foregoing document to the

Clerk of the Court using the ECF system for filing. A notice of electronic filing was transmitted to

all ECF registrants of record.

/s/ *Julia G. Wisenberg*
Julia G. Wisenberg

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| X CORP. and X.AI LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 4:25-cv-00914-P |
| | § | |
| APPLE INC., OPENAI, INC., OPENAI, L.L.C., | § | |
| and OPENAI OPCO, LLC, | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF LAUREN ZEHMER IN SUPPORT OF**
**APPLE INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**
**DISCOVERY**

I, Lauren Zehmer, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am a partner at the law firm Covington & Burling LLP, and I am counsel for Defendant Apple Inc. ("Apple") in the above-captioned matter. I have been admitted to practice before this court *pro hac vice*.

2.    I submit this declaration in support of Apple's Opposition to Plaintiffs' Motion to Compel Discovery.

3.    During the course of this lawsuit, Apple has produced 19,957 documents and 114,965 pages of discovery.

4.    Based on my searches and review of the documents produced by Plaintiffs thus far in discovery, Plaintiffs have produced 1,196 documents from Fooda (info.fooda.com), which appear to describe lunch options for Plaintiffs' employees, a representative example of which is included in Tab 3 of this Appendix.

5.    Based on my searches and review of the documents produced by Plaintiffs thus far in discovery, Plaintiffs have produced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

6.    Based on my searches and review of the documents produced by Plaintiffs thus far in discovery, Plaintiffs have produced approximately 803 emails that were sent from an "x.ai" domain email address to another "x.ai" domain email address.

7.    Based on my searches and review of the parties' productions thus far in discovery, Apple has produced more text messages authored by Plaintiffs' custodians Elon Musk, Evan Jones, and Seth Fuchs than Plaintiffs themselves have produced.

8.      Attached hereto as Tab 1 is a true and correct copy of an email thread titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," with the latest-in-time email sent on Jan. 30, 2026, at 7:09 PM ET from Scott A. Eisman to Emily Henn, Henry Liu, Lauren W. Zehmer, et al.

9.      Attached hereto as Tab 2 is a true and correct copy of an email thread titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," sent on Jan. 6, 2026, at 8:55 PM ET from Scott A. Eisman to Emily Henn, Henry Liu, Lauren W. Zehmer, et al.

10.     Attached hereto as Tab 3 is a true and correct copy of an email titled "Your lunch week ahead at xAI /X Popup" sent on June 2, 2025, from info@fooda.com to ████████ and Bates-stamped X-XAI-000009499.

11.     Attached hereto as Tab 4 is a true and correct copy of ███████████████ ████████████████████████████████████████ ████████████████████████████ designated Highly Confidential – Outside Counsels' Eyes Only by Apple and Bates stamped APL-XAI_00114931.

12.     Attached hereto as Tab 5 is a true and correct copy of Plaintiffs' First Set of Requests for Production to Apple Inc. This document is excerpted to only include the requests relevant to the motion to minimize the burden on the Court.

13.     Attached hereto as Tab 6 is a true and correct copy of an email thread titled "RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)," with the latest-in-time email sent on April 7, 2026, at 9:56 AM PT from Sean Berman to Scott A. Eisman, Hope E. Brinn, Richard D. Abidor et al. The email thread is excerpted to only include the correspondence relevant to the motion to minimize the burden on the Court.

14.    Attached hereto as Tab 7 is a true and correct copy of an email titled ███████████ ███████████████████████████████████████████████ designated Highly Confidential by OpenAI and Bates stamped OAI_NDTX_0003240.

15.    Attached hereto as Tab 8 is a true and correct copy of an email thread titled ████ ██████████████████████████████████████████ designated Highly Confidential – Outside Counsels' Eyes Only and Bates stamped APL-XAI_00114920.

16.    Attached hereto as Tab 9 is a true and correct copy of an email titled ███████ ██████████████████████████████████████████████ ████ designated Highly Confidential Outside Counsels' Eyes Only by Apple and Bates stamped APL-XAI_00007321.

I certify that matters herein are within my personal knowledge and are true and correct.

Dated: April 29, 2026                               Respectfully submitted,

                                                   */s/ Lauren Zehmer*
                                                   Lauren Zehmer

# TAB 1

| From: | Eisman, Scott A. |
|---|---|
| To: | Willard Zehmer, Lauren; Saunders, Brendan; Brinn, Hope E.; Tan, Zhi Yang; Abidor, Richard D.; dee.kelly@kellyhart.com; julia.wisenberg@kellyhart.com; Henn, Emily; Liu, Henry; Weiland, Carol; Sidhu, Elizabeth; Berman, Sean |
| Cc: | Reiser, Craig M.; Justus, Bradley; Yung, Eva H.; Erickson, Christopher; chris@stonehilton.com; judd@stonehilton.com |
| Subject: | RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.) |
| Date: | Friday, January 30, 2026 7:09:13 PM |
| Attachments: | image001.png image002.png |

[EXTERNAL]

Lauren,

While we disagree with some of the characterizations in your email, including about why John Giannandrea's post–May 2024 custodial files are relevant to our claims, we are willing to accept Apple's proposed custodian list: Adrian Perica, Eddy Cue, John Giannandrea, Carson Oliver, Trystan Kosmynka, Smokey Fontaine, Arun Singh, Jenny Mo, Steve Smith, Steven Duplinsky, and Josh Shaffer. We also agree that we will not seek to add more custodians based on the information currently available to us and the representations that you have made to date, but we reserve our right to seek to add custodians based on facts we don't yet know, including based on our review of documents that Defendants have yet to produce.

Please advise when we can expect to receive these custodial documents.

Best regards,
Scott



**Scott A. Eisman**
Partner
T: 212.261.5642

---

**From:** Willard Zehmer, Lauren <LZehmer@cov.com>
**Sent:** Friday, January 30, 2026 5:12 PM
**To:** Eisman, Scott A. <seisman@axinn.com>; Saunders, Brendan <BSaunders@cov.com>; Brinn, Hope E. <hbrinn@axinn.com>; Tan, Zhi Yang <ZTan@cov.com>; Abidor, Richard D. <rabidor@axinn.com>; dee.kelly@kellyhart.com; julia.wisenberg@kellyhart.com; Henn, Emily <ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Weiland, Carol <CWeiland@cov.com>; Sidhu, Elizabeth <ESidhu@cov.com>; Berman, Sean <SBerman@cov.com>
**Cc:** Reiser, Craig M. <creiser@axinn.com>; Justus, Bradley <bjustus@axinn.com>; Yung, Eva H. <eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com; judd@stonehilton.com
**Subject:** RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)


**Caution: External Email**

---

App'x 2

Scott,

As discussed on our call today, we believe that the request of all of John Giannandrea's documents—across the entire date range and all search strings / RFPs—is unduly burdensome and not proportional to the needs of the case. When asked during our prior meet-and-confers why Plaintiffs need John Giannandrea's documents despite Apple already offering more relevant and overlapping senior executives, you explained that he may have unique documents related to his purported views on the decision to pick ChatGPT as an integration partner in the spring of 2024. Specifically, on January 19, you wrote that John purportedly "lobbied against the Apple-ChatGPT Integration and that his custodial documents are needed to understand his concerns, as well as why he was ultimately overruled." While disagreeing with that characterization or its relevance to Plaintiffs' claims, we proposed today that we could produce John Giannandrea's documents between 3/1/2023 to 5/3/2024 (the date of the ChatGPT agreement) to capture the relevant time period you identified. You agreed to take that back to your client to consider.

You have since responded that Plaintiffs need *all* of John Giannandrea's documents—regardless of date or RFP—because of his title. This is inconsistent with your prior statements and fails to provide any specific basis for which John Giannandrea would likely have a material amount of relevant and unique information not captured by the existing custodians and other go-get materials.

While we believe that is not a reasonable position, in the spirit of compromise and to advance us past these custodial discussions, we have permission to include John Giannandrea in the custodial set on the agreement that this is full set of Apple custodians that Plaintiffs will request. As you have stated on our prior meet-and-confers and in your email of January 28, John Giannandrea is the only outstanding custodian disputed between the parties.

Please confirm in writing that Plaintiffs agree not to seek any additional Apple custodians in exchange for Apple agreeing to offer as document custodians: Adrian Perica, Eddy Cue, John Giannandrea, Carson Oliver, Trystan Kosmynka, Smokey Fontaine, Arun Singh, Jenny Mo, Steve Smith, Steven Duplinsky, and Josh Shaffer.

If Plaintiffs confirm today that this is the final and global agreement on Apple custodians, we can proceed with reviewing and producing responsive documents from these individuals based on our agreed-upon RFPs and search terms.

Best,
Lauren

---

**From:** Eisman, Scott A. <seisman@axinn.com>
**Sent:** Wednesday, January 28, 2026 6:27 PM
**To:** Saunders, Brendan <BSaunders@cov.com>; Brinn, Hope E. <hbrinn@axinn.com>; Willard

App'x 3

Zehmer, Lauren <LZehmer@cov.com>; Tan, Zhi Yang <ZTan@cov.com>; Abidor, Richard D.
<rabidor@axinn.com>; dee.kelly@kellyhart.com; julia.wisenberg@kellyhart.com; Henn, Emily
<ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Weiland, Carol <CWeiland@cov.com>; Sidhu,
Elizabeth <ESidhu@cov.com>; Berman, Sean <SBerman@cov.com>
**Cc:** Reiser, Craig M. <creiser@axinn.com>; Justus, Bradley <bjustus@axinn.com>; Yung, Eva H.
<eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com;
judd@stonehilton.com
**Subject:** RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)

<mark>[EXTERNAL]</mark>
Lauren and Brendan,

We write to follow up on our meet-and-confer this afternoon. We'll be sending a summary
email later but, in the meantime, wanted to set out our position on the custodial discussion.

### John Giannadrea

As we have explained in several meet-and-confers and in our January 19 email, John
Giannandrea is a proper custodian. Until recently, Mr. Giannandrea was Apple's Senior
Vice President of Learning and AI Strategy. According to public reporting, Apple decided to
implement the Apple-ChatGPT integration "after [two] executives, Craig Federighi and John
Giannandrea spent weeks testing . . . ChatGPT." Tripp Mickle et al., *Apple Will Revamp Siri
to Catch Up to Its Chatbot Competitors*, N.Y. Times, May 10, 2024. And according to other
public reporting, which we cited in our January 19 email, Mr. Giannandrea "lobbied hard"
against the Apple-ChatGPT integration, voicing concerns about privacy. Indeed, Plaintiffs
cited that fact and mentioned Mr. Giannandrea by name in paragraph 73 of the Complaint.
As we've noted, Mr. Giannandrea's privacy concerns are relevant to the claims and
defenses in the case, including because Apple and its CEO have justified the integration as
one "built to protect user privacy at every step." Compl. ¶ 93. Mr. Giannandrea's concerns
about ChatGPT's privacy are also relevant to Plaintiffs' claims that Apple's reasons for
preferencing ChatGPT over competitors in the App Store—based on supposed differences
in "privacy, security, and content"—are "pretext[ual]." *Id.* ¶ 102. Moreover, we believe that
Mr. Giannandrea is likely to have custodial files unique from the other custodians Apple has
agreed to, given that he reported directly to Apple's CEO.

As for the burden and proportionality concerns you raised: We understand that Mr.
Giannandrea has stepped down from his executive role, now serves in an advisory
capacity, and will be retiring this spring. Any burden on Apple from collecting an executive's
documents is thus diminished. And if, as you say, many of Mr. Giannandrea's relevant
documents will also be in the custodial files of other custodians, then the deduplication
process will minimize any burden of reviewing and producing those documents.

You mentioned on our call that Apple may be willing to add Mr. Giannandrea as a custodian
based on limitations in timeframe or search terms applicable to his custodial files. While we
are doubtful that our client would agree to any such limitations, we are willing to consider a
proposal. As we noted, however, we cannot agree to your proposal to exclude Mr.
Giannandrea as a deponent at this stage, when we've received fewer than 750 documents
from Apple.

App'x 4

***Additional Custodians***

It is also improper for Apple to hold up production of custodial files from additional custodians, beyond the five Apple proposed, if we cannot agree on whether to include Mr. Giannandrea as a custodian. Although you pointed out that the decision to add Mr. Giannandrea as a custodian might affect your client's willingness to include other *executives* as custodians, that should not change the fact that we have agreed on *non-executive* custodians, such as Jenny Mo and Arun Singh, whose inclusion doesn't hinge on whether Mr. Giannandrea is also a custodian. Apple cannot hold hostage documents of custodians with relevant documents while we iron out whether to include a single other custodian—especially when Plaintiffs have expert reports due in March and when we've otherwise agreed that Apple would be producing documents from agreed-upon custodians. You agreed on our meet-and-confer to take this point back.

****

Please let us know by 1 p.m. ET on Friday, January 30, Apple's position on the points raised above. If we don't hear from you, we will assume we are at an impasse.

We reserve all rights.

Best regards,
Scott

**Scott A. Eisman**
Partner
T: 212.261.5642

---

**From:** Saunders, Brendan <BSaunders@cov.com>
**Sent:** Tuesday, January 27, 2026 2:47 PM
**To:** Brinn, Hope E. <hbrinn@axinn.com>; Willard Zehmer, Lauren <LZehmer@cov.com>; Eisman, Scott A. <seisman@axinn.com>; Tan, Zhi Yang <ZTan@cov.com>; Abidor, Richard D. <rabidor@axinn.com>; dee.kelly@kellyhart.com; julia.wisenberg@kellyhart.com; Henn, Emily <ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Weiland, Carol <CWeiland@cov.com>; Sidhu, Elizabeth <ESidhu@cov.com>; Berman, Sean <SBerman@cov.com>
**Cc:** Reiser, Craig M. <creiser@axinn.com>; Justus, Bradley <bjustus@axinn.com>; Yung, Eva H. <eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com; judd@stonehilton.com
**Subject:** RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)

**Caution: External Email**

---

Thanks, Hope. Tomorrow at 3:30pm ET works on our end. Thank you for sending the

# TAB 2

| | |
|---|---|
| **From:** | Eisman, Scott A. |
| **To:** | Tan, Zhi Yang; Willard Zehmer, Lauren; dee.kelly@kellyhart.com; julia.wisenberg@kellyhart.com; Henn, Emily; Liu, Henry; Weiland, Carol; Sidhu, Elizabeth; Berman, Sean |
| **Cc:** | Reiser, Craig M.; Justus, Bradley; Yung, Eva H.; Boisvert, Caroline P.; Erickson, Christopher; chris@stonehilton.com; judd@stonehilton.com |
| **Subject:** | RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.) |
| **Date:** | Tuesday, January 6, 2026 8:55:25 PM |
| **Attachments:** | image001.png image002.png |

[EXTERNAL]

Counsel,

I write to follow up on our January 2 meet-and-confer regarding Plaintiffs' proposed custodians and certain outstanding issues from Plaintiffs' first set of discovery requests. We will respond separately to Apple's edits to Plaintiffs' proposed search terms.

### Custodians

**Rolling productions.** We sought clarification on whether Apple would be making rolling productions for RFPs, custodians, and search terms that the parties have agreed on. Apple said that it would, but that it, like OpenAI, would not review documents twice. We agreed, and we reiterate what we told OpenAI's counsel: any review of documents should be based on the responsiveness criteria on which we've agreed, and any future changes in the scope of production will not require a second responsiveness review of documents captured by the existing, agreed-upon search terms and sources, so long as the understanding is mutual (i.e., Plaintiffs need not review documents twice based on later changes to responsiveness criteria).

**Executive team members.** We continued to discuss which of Apple's executive team members would be appropriate custodians for documents related to the Apple-ChatGPT integration. We summarize our discussion of these individuals below:

*Eddy Cue.* We noted that we had sent you the transcript cites from Eddy Cue's testimony at the Google Search remedies hearing and asked whether that changed Apple's position on him being an appropriate custodian. You said that he may have been a witness for reasons other than him being relevant to genAI, but that you would take this information back to your client.

*Tim Cook, Craig Federighi, and John Giannandrea.* Following up from our last meet-and-confer, we explained that we needed some combination of these executive members as custodians because while we did not know how the story played out, we knew that John Giannandrea was against integrating with ChatGPT based on its privacy record and that he was ultimately overruled. You said you did not think that was an accurate depiction of the story. You also asked us to clarify whether we were proposing that adding just Eddy Cue would address the executive team, or if we were seeking Eddy Cue and one other member. We responded that we were seeking Eddy Cue and at least one other person from this trio (i.e., Cook, Federighi, or Giannandrea), reserving our rights to request others if the emails go cold. You said you would take this back to your client.

We also note that, two days after our meet-and-confer, you produced emails showing periodic reporting of ChatGPT's performance as a result of the Apple-OpenAI integration.

App'x 7

That reporting was distributed to, among others, Giannandrea and Federighi, suggesting that one or both would be appropriate custodians.

*Additional custodians for integration requests.* We then asked you about our standing request for more non-executive custodians for our integration requests. You said that you did not think we would find anyone else in this category besides the custodians you proposed: Steve Smith, Steve Duplinsky, and Josh Shaffer.

*App Store custodians.* We noted that we were trying to get a mix of people who dealt with the day-to-day work in this area, people who handled the outward-facing roles, and people who made the ultimate decisions. We noted that the three things we are focused on with our App Store claims are (1) the treatment of X and Grok apps themselves, including delays in approvals for updates; (2) the weaponization of App Store, including arbitrary enforcement of App Store rules including to harm rivals of Apple and OpenAI; and (3) editorial decisions, such as decisions about the Must Have Apps list. You said that you would take this back. We also confirmed that we would not need a custodian from the Developer Relations team if you were willing to represent that the Developer Relations Team was not relevant to the three App Store topics. And we said that we would not need both Trystan Kosmynka and Bill Havlicek if you represented that their documents would be duplicative of each other's. You said that you would take these proposals back as well.

*Other custodians.* We agreed to withdraw Sabih Khan because his relevance was based on the fact that he is slated to inherit many of John Giannandrea's responsibilities in the future, and you represented that he therefore would not have custodial files relevant to Plaintiffs' claims.

Given the discovery schedule, we believe that it makes sense to reach agreement on custodians as soon as possible. We therefore look forward to discussing custodians further on our meet-and-confer this week.

### Discovery Requests

**RFA Nos. 21, 22, 25-27, and 48-50.** In your December 30 letter, you informed us that Apple would be amending its responses to these RFAs. We asked when we would receive the amended responses. You said that you did not know, but that you would work expeditiously. Please let us know when we can expect your amended responses.

**Relevant Period and documents related to the Service Integration Agreement.** In your December 30 email, you agreed that Apple would produce documents going back to March 1 2023, and it would be willing to consider an earlier start date for specific RFPs where Plaintiffs show a need for doing so.





***RFP Nos. 28, 36, and 46.*** These Requests seek documents regarding how Apple treats apps that compete with its own native apps, how it assesses the privacy risks of apps in the App Store, and how it enforces its App Review Guidelines. Apple refused to answer these RFPs as written, instead proposing to narrow them to Apple's treatment of genAI chatbot apps.

We asked you to explain why you were proposing this narrowing, given that one of our core allegations is that Apple has wielded its control of the App Store to de-preference competing apps generally. You said you thought this modification was appropriate because the Complaint discusses Apple's treatment of only genAI chatbot apps and super apps like the X and Grok apps, which have genAI chatbot functionality. You further explained that, as drafted, these RFPs would require you to produce documents about the de-preferencing of, e.g., a clock app that competes with Apple's clock app, even though clock apps are not relevant to Plaintiffs' claims.

We proposed working together to narrow these RFPs, and said that we would come back to you with a proposal. Those proposals are as follows:

- Modified RFP No. 28: "All Documents regarding Apple's restriction or removal of Super Apps or Generative AI Chatbots from the Apple App Store, as well as the removal or restriction of any 'rival apps,' as that practice is described on pp. 307-10 of the *Investigation of Competition in Digital Markets*, available at https://www.govinfo.gov/content/pkg/CPRT-117HPRT47832/pdf/CPRT-117HPRT47832.pdf."

  We believe that this modification captures documents responsive to Plaintiffs' App Store requests and addresses your concern that the Request would require Apple to produce documents relating to its removal of apps unrelated to the claims at issue.

- Modified RFP No. 36: "Documents sufficient to show how Apple assesses the privacy and/or privacy risks of Generative AI Chatbot apps and Super Apps available in the Apple App Store."

- Modified RFP No. 46: **"**Documents sufficient to show how Apple enforces its Apple

App Store Guidelines, including Documents sufficient to show: a. policies, rules, and requirements for App Developers seeking to display or update Apps in the Apple App Store; b. changes to the Apple App Store Guidelines, including when they happened, Apple's reasons for the changes, the impact of such changes, and the individuals, groups, departments, or teams involved; c. reviews Apple conducted of Generative AI Chatbot apps and Super Apps and the procedures followed, including any ultimate decisions (e.g., bans), considerations, and reasons behind the enforcement decisions; and d. communications about or with X and/or xAI related to the X App and/or the Grok App being in the Apple App Store."

> We propose modifying this Request by restricting subpart (c) to Apple's reviews of genAI chatbot apps and super apps. We believe modifications to subparts (a), (b), and (d) are not warranted because they seek a narrow set of documents responsive to Plaintiffs' App Store allegations as written.

Please let us know by Friday, January 9, whether Apple will respond to these requests as modified.

***DeepSeek requests.*** Apple has refused to answer Interrogatory No. 3 and RFA No. 17 which pertain to DeepSeek on relevance and burden grounds. As we've explained, we believe that Interrogatory No. 3 and RFA No. 17 are relevant to our App Store claims, including because they seek information probative of security and privacy concerns with DeepSeek, which would show that DeepSeek—an app that Apple mentioned in its motion to dismiss—is not a substitute for ChatGPT and thus should be excluded from the genAI chatbot market.

Even so, you claimed on our call that these requests were "far afield." We explained that to the extent that DeepSeek is representative of Chinese chatbots, Apple's responses to these Requests would be probative of whether all such apps are substitutes for genAI chatbots like ChatGPT. We also noted that you hadn't articulated with any granularity the burden of answering these Requests. For instance, it should be straightforward for Apple to admit or deny whether it has a corporate policy forbidding its own employees from downloading the DeepSeek GenAI Chatbot on their work devices.

Moreover, these Requests are also probative of whether Apple applies its App Review Guidelines inconsistently and pretextually. For instance, if Apple's security and privacy concerns with DeepSeek are so great that it forbids its employees from using the app, yet continues to offer the app on the App Store, it would show that Apple is not consistently applying the App Store Guidelines.

Given this additional information, please let us know by Friday, January 9, whether Apple will answer Interrogatory No. 3 and RFA No. 17.

Best regards,
Scott


**Scott A. Eisman**

App'x 10

# TAB 3

**From:** Fooda [info@fooda.com]
**Sent:** 6/2/2025 12:02:15 AM
**To:** ███████
**Subject:** Your lunch week ahead at xAI / X Popup



Delicious food is a good reason to look forward to the week ahead. Here's your weekly Fooda lineup:

Monday: Urban Kitchen ( Kitchen (Salad Popup)), Koja Kitchen (Kitchen (Popup))
Tuesday: Urban Kitchen ( Kitchen (Salad Popup)), Tannourine Restaurant (Kitchen (Popup))
Wednesday: Urban Kitchen ( Kitchen (Salad Popup)), Bistro Bites (Kitchen (Popup))
Thursday: Urban Kitchen ( Kitchen (Salad Popup)), Nina's Taqueria (Kitchen (Popup))
Friday: Urban Kitchen ( Kitchen (Salad Popup)), Pia's Thai Kitchen (Kitchen (Popup))


See you at lunch!


## DOWNLOAD THE FOODA APP

App'x 12

X-XAI-000009499

 

HAVE A GREAT IDEA FOR FOODA?

Submit it Here

{{Sender_Name}}

{{Sender_Address}}, {{Sender_City}}, {{Sender_State}} {{Sender_Zip}}

Unsubscribe - Unsubscribe Preferences

Unsubscribe From This List | Manage Email Preferences

App'x 13

X-XAI-000009500

# TAB 4

# TAB 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| X CORP.; and X.AI LLC,<br><br>  Plaintiffs,<br><br>  v.<br><br> APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>  Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION TO APPLE INC.**

Pursuant to Federal Rules of Civil Procedure 26 and 34, Plaintiffs, through their counsel, hereby request that Defendant Apple answer the following document requests (the "Requests") and produce responsive documents. Documents produced must adhere to the Definitions and Instructions set forth below, the Federal Rules of Civil Procedure, and the Local Rules of this Court. Apple is directed to answer within 30 days.

**INSTRUCTIONS**

1.     In addition to the specific instructions set forth below, these Requests incorporate the instructions set forth in Federal Rules of Civil Procedure 26 and 34, and the Local Rules of this Court.

2.     Produce all requested documents in Your possession, custody, or control, or available to You, or to which You may gain access through reasonable effort, including information in the possession of Your past and present attorneys, accountants, investigators, consultants, agents, or other persons directly or indirectly employed or retained by You, or anyone else otherwise subject to Your control who maintains records on Your behalf, in Your name, or

otherwise under Your control.

3.      Documents must be produced either (a) as they are kept in the usual course of business (in which case they must be produced in such fashion as to identify the department, branch, or office in whose possession the document was found or the server or central file in which it was found, and the address of each document's custodian(s)), or (b) segregated as responsive to a specific Request enumerated herein, with such specific Request identified.

4.      If any portion of any document is responsive to any Request, a legible version of the entire document must be produced, together with all non-identical copies, versions, and drafts of that document, including all attachments, hyperlinked documents, and enclosures.

5.       You must retain all of the original documents for inspection or copying throughout the pendency of this Action, any appeal(s), and any related proceedings.

6.      You must produce all documents and associated metadata according to the Federal Rules of Civil Procedure, the Local Rules of this Court, and any applicable order governing the production of electronically stored information in this Action. Provide instructions and all other materials necessary to use or interpret Your data compilations, such as a data dictionary, with Your production.

7.      Data and materials that are stored electronically or in machine-readable form should be produced in electronic form with sufficient information to allow counsel to readily access or read such data or materials.

8.      If You object to all or any portion of any of the below Requests, You must identify the objectionable Request or portion thereof, and the nature and basis of the objection. Notwithstanding any objection to any portion of any Request, You must produce all documents and information to which such objection does not apply.

9.      If any document responsive to a particular Request no longer exists, describe the circumstances under which it was lost or destroyed, describe the information lost or destroyed, list

2

the Request to which it was responsive, and list persons with knowledge of the document.

10.    If You are unable to produce a document that is responsive to a Request, describe the document, state why it cannot be produced and, if applicable, state the whereabouts of such document when last in Your possession, custody, or control.

11.    If there are no documents or information responsive to all or any portion of any Request, so state in writing.

12.    Pursuant to Federal Rule 26(b)(5), if You believe that any Request calls for information subject to a claim of privilege, then:

     a.    Produce Documents responsive to all parts of the Request to which You do not object;

     b.    Explain the basis for Your claim of privilege as to each part of the Request to which You object; and

     c.    Identify the general nature of the information withheld.

13.    In construing the Requests herein:

     a.    terms not specifically defined shall be given their ordinary meaning as You understand them to be used in the trade;

     b.    the use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all other tenses, moods, or voices, whenever necessary, to bring within the scope of any Request all information that might otherwise be construed to be outside its scope;

     c.    the use of the singular form of any word includes the plural and vice versa;

     d.    words in the masculine, feminine, or neutral gender shall include each of the other genders;

     e.    the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside of its scope; and

     f.    the terms "all," "any," and "each" shall each be construed as encompassing any and all.

14.    These Requests are continuing in nature. In the event that You become aware of

3

responsive documents or information in addition to, or in any way inconsistent with, that which You previously have produced, prompt supplementation of Your responses is required.

15. Plaintiffs specifically reserve the right to seek supplementary responses and the additional supplementary production of documents before trial.

16. Unless otherwise stated, the Requests call for the production of documents from the Relevant Period.

## **DEFINITIONS**

1. "**Action**" means the above-captioned action.

2. "**Agreement**" means contracts, agreements, memorandums of understanding, partnerships or other formal or informal bilateral or multi-lateral arrangements or understandings.

3. "**AliPay App**" means the App available in the Apple App Store, as described in Appendix Tab 1 inclusive of other versions of that App available outside of the United States unless otherwise specified.

4. "**App Developer**" means any Person that owns or creates Apps.

5. "**App Store**" means a digital distribution platform that allows customers to purchase and/or download Apps (for free or for purchase) onto their devices, such as a Smartphone. An example of an App Store is the Apple App Store.

6. "**Apple**," "**You**," and "**Your**" mean Apple Inc., inclusive of any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

7. "**Apple App Store**" or "**Apple's App Store**" means Apple's digital platform making Applications available for download and/or purchase as described in Compl. ¶¶ 22, 60, 81-89 and Appendix Tab 2.

4

8.      "**Apple App Store Guidelines**" means the rules and policies governing Apple's App Store and how Apps are approved to be in the Apple App Store, as well as other Apple App Store-related requirements, including but not limited to the rules and policies described in Compl. ¶¶ 60, 88-89 and Appendix Tab 3.

9.      "**Apple App Store List**" means the listing or ranking of Applications in the Apple App Store. Apple App Store Lists include, but are not limited to, Must-Have Apps, Top Free Apps, Top Paid Apps, Top Productivity Apps, and Top New Apps. *See* Compl. ¶¶ 80-87.

10.     "**Apple Intelligence**" means a personal intelligence system built into iOS, including Siri, Apple's Writing Tools, and other native functionality on iPhones and Other Apple Products as described, for example, in Compl. ¶¶ 56, 75 and Appendix Tab 4.

11.     "**Apple Product**" means any product marketed by Apple for individual consumer use, including but not limited to: iPhone, iPod, iPad, Macbook, Apple Watch. *See, e.g.*, Compl. ¶ 22.

12.     "**Apple User Guides**" means any written, printed, or electronically stored information ("ESI") of any kind produced by Apple regarding the features or functions of iPhones or Other Apple Products that are intended to be read by customers or prospective customers of Apple Products. Examples of Apple User Guides are available at Appendix Tabs 5-8.

13.     The "**Apple-ChatGPT Integration**" means how Apple Intelligence and/or iOS have native access to ChatGPT, including through Siri, Apple Writing Tools, and Apple Visual Intelligence, as described in Compl. ¶¶ 70-78, 104-115 and Appendix Tab 9.

14.     "**Apple-OpenAI Agreement**" means any agreement, arrangement, understanding, or partnership, whether formal or informal, between Apple and OpenAI relating in any way to the Apple-ChatGPT Integration. *See, e.g.*, Compl. ¶¶ 70-89, 91-97.

App'x 62

15.    "**Apple Visual Intelligence**" means the feature described in Compl. ¶¶ 75, 77, 105 and Appendix Tab 10.

16.    "**Apple Writing Tools**" means the feature described in Compl. ¶¶ 75, 77, 105 and Appendix Tab 11.

17.    "**Application**" or "**App**" means software that is designed to perform certain tasks for the end user. An App can be installed on mobile devices such as Smartphones. The ChatGPT App is an example of an App.

18.    "**ChatGPT**" means all versions of the GenAI Chatbot offered by OpenAI as described in Compl. ¶¶ 7, 40-41, 75, 77, 130-131 and Appendix Tab 12.

19.    "**ChatGPT App**" means all versions of the App ever made available in the Apple App Store as described in Compl. ¶¶ 71, 74-75, 77-78, 105-106 and Appendix Tab 13, inclusive of other versions of that App available outside of the United States.

20.    "**Claude App**" means all versions of the App ever made available in the Apple App Store as described in Compl. ¶ 110 and Appendix Tab 14, inclusive of other versions of that App available outside of the United States.

21.    "**Cloud-Based Apps**" means Apps that rely on cloud computing to operate or to store data, as opposed to relying solely on local storage and computing for the App to function, including without limitation GenAI Chatbots.

22.    "**Complaint**" or "**Compl.**" means the complaint filed by Plaintiffs in the Action on August 25, 2025 and any subsequent amendments thereto.

23.    "**Copilot App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 15, inclusive of other versions of that App available outside of the United States.

6

24.     **"DeepSeek"** means the Person or Persons doing business as "DeepSeek," including Hangzhou DeepSeek Artificial Intelligence Basic Technology Research Co., Ltd. and any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

25.     **"DeepSeek App"** means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 16, inclusive of other versions of that App available outside of the United States.

26.     **"Defendants"** means Apple and OpenAI.

27.     **"Documents"** means all written, printed, or ESI of any kind in Your possession, custody, or control. Examples of Documents include, but are not limited to:

a.      chats, text messages, instant messages, other messaging applications (such as Slack, Teams, etc.);

b.      emails and other forms of correspondence;

c.      presentations and slide decks;

d.      notes and minutes;

e.      analyses, reports, studies, experiments;

f.      data, analyses of data, and any associated working documents, such as Excel spreadsheets or other software or tools;

g.      Agreements;

h.      product-requirement documents;

i.      product-design documents;

j.      training and/or on-boarding materials; and

k.      source code.

The term "Documents" is inclusive of any metadata or other embedded information, including documents hyperlinked within a document and comments. The term "Documents" does not include Apple User Guides for iPhones or Other Apple Products. "Documents" does not

7

include legal documents from other litigations unless the Request expressly references another litigation.

28.    "**Feature Phone**" means a mobile phone that provides limited computing functionality, limited ability to download and use Apps, low-resolution displays, basic or no camera hardware, and often has physical keypads instead of touchscreens. *See, e.g.*, Compl. ¶ 118.

29.    "**Gemini App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 17, inclusive of other versions of that App available outside of the United States.

30.    "**General Search Engine**" means a software system designed to find and provide information based on technologies that trawl the internet, index and rank webpages, and retrieve information.

31.    "**Generative AI**" means a type of artificial intelligence ("AI") that creates new, original content through the use of large language models, natural language processing, and deep learning.

32.    "**Generative AI Chatbots**" or "**GenAI Chatbots**" means systems relying on Generative AI that can understand natural language and generate human-like text or other outputs such as text, images, or code in response to Prompts.

33.    "**Grab App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 18, inclusive of other versions of that App available outside of the United States.

34.    "**Grok App**" means all versions of the App ever made available in the Apple App Store as described in Compl. ¶¶ 68, 71, 84, 134 and Appendix Tab 19, inclusive of other versions of that App available outside of the United States.

8

35. "**iOS**" means Apple's operating system on any version of the iPhone and/or any Other Apple Product applicable.

36. "**iPhone**" or "**the iPhone**" means all versions or models of phones Apple ever marketed or sold under the brand iPhone unless otherwise specified.

37. "**KakaoTalk App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 20 inclusive of other versions of that App available outside of the United States.

38. "**Landline Phone**" means a phone that relies on metal conductors, fiber optic cable, or other wire or cable technology to make phone calls. Landline Phones do not use cellular networks to make phone calls.

39. "**Meta AI App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 21, inclusive of other versions of that App available outside of the United States.

40. "**Mistral App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 22, inclusive of other versions of that App available outside of the United States.

41. "**Must-Have Apps**" means the list of Apps titled "Must-Have Apps," or any predecessor list fulfilling the same function under a different name, in the Apple App Store, including as described in Compl. ¶¶ 83, 85-86.

42. "**Non-Generative AI Chatbot**" or "**Non-GenAI Chatbot**" means Applications that can simulate human conversation, but do not use Generative AI as described in Compl. ¶¶ 34-35, 132.

9

43.     "**OpenAI**" means OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC, inclusive of any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

44.     "**OpenAI Models**" means all the Generative AI models ever offered by OpenAI, including as described in Appendix Tab 23.

45.     "**Other Apple Product**" means any Apple Product excluding the iPhone, such as MacBooks or other Apple laptops, iPads, and/or Apple Watches.

46.     "**Person**" means any natural person, corporate entity, business entity, partnership, association, joint venture, governmental entity, or trust.

47.     "**Plaintiffs**" means X and xAI.

48.     "**Preset Apps**" means Apps that are pre-installed on a user's Smartphone, such as default internet browsers, email hosts, or payment/wallet apps.

49.     "**Prompt**" means a user's input into a GenAI Chatbot. Prompts are requests for the GenAI Chatbot to take certain actions or reach certain outcomes or results.

50.     "**Rakuten App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 24, inclusive of other versions of that App available outside of the United States.

51.     "**Relevant Period**" means June 10, 2022 to present unless otherwise stated.

52.     "**Siri**" means the Apple feature described in Compl. ¶ 55 and Appendix Tab 25.

53.     "**Smartphone**" means a device that has the functionality of a traditional mobile phone (i.e., can make and receive calls via a cellular network) combined with an operating system

10

that mimics the functionality and ease of use of a computer (e.g., browse the internet, watch videos, or check email), including as described in Compl. ¶ 117.

54.    "**Smart Watch**" means a mobile device designed to be worn around a wrist that has a touchscreen display, cellular, Bluetooth, and/or Wi-Fi functionality, as well as the ability to run Apps.

55.    "**Super App**" means Apps that combine multiple services or functions, such as messaging, payments, and social media, in a single App, including, without limitation, the WeChat App, the Grab App, the KakaoTalk App, the Grok App, and the X App. *See, e.g.*, Compl. ¶¶ 4, 62-64, 67-68.

56.    "**TataNeu App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 26, inclusive of other versions of that App available outside of the United States.

57.    "**Top Free Apps**" means the list of Apps in the "Free Apps" category of the "Top Charts" in the Apple App Store, including any predecessor lists fulfilling the same function under different names. *See, e.g.*, Compl. ¶¶ 83-86.

58.    "**Top Paid Apps**" means the list of Apps in the "Paid Apps" category of the "Top Charts" in the Apple App Store, including any predecessor lists fulfilling the same function under different names. *See, e.g.*, Compl. ¶¶ 83-84.

59.    "**Top Productivity Apps**" means the list of Apps that is displayed after selecting the "Productivity" category in the Apple App Store, including any predecessor lists fulfilling the same function under different names. *See, e.g.*, Compl. ¶¶ 84, 86.

11

60.    "**Top News Apps**" means the list of Apps that is displayed after selecting the "News" category in the Apple App Store, including any predecessor lists fulfilling the same function under different names. *See, e.g.*, Compl. ¶¶ 83-84.

61.    "**User Data**" means data associated with, entered or generated by, or corresponding to, a particular customer or user of a product or service and/or that customer or users use of the product or service, regardless of the control or ownership of such data and regardless of whether such data is anonymized or pseudonymized. Examples of User Data include personal data such as a user's name and address, behavioral data such as how a user interacts with a product or service, demographic data such as a user's age and gender, technical data such as the user's device and operating system, and content data such as messages sent or Prompts submitted.

62.    "**Vertical Chatbot**" means Applications, including those that rely on Generative AI, that simulate human conservation only as to particular pre-programmed topics or purposes. An example of a Vertical Chatbot is Florence Chat, as described in Appendix Tab 27, which is limited to health-focused interactions.

63.    "**WeChat App**" means all versions of the App ever made available in the Apple App Store as described in Appendix Tab 28, inclusive of other versions of that App available outside of the United States.

64.    "**X**" means X Corp., inclusive of any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

65.    "**xAI**" means X.AI LLC, inclusive of any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives of the foregoing.

12

66. "**X App**" means all versions of the App ever made available in the Apple App Store, as described in Compl. ¶¶ 67-69, 84-85 and Appendix Tab 29.

67. "**ZaloPay App**" means all versions of the App ever made available in the Apple App Store, as described in Appendix Tab 30 inclusive of other versions of that App available outside of the United States.

## REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 1**

All Agreements that Apple has ever had with OpenAI and all Documents regarding those Agreements, including but not limited to Documents regarding:

    a.    the genesis, negotiation, and execution of the Apple-OpenAI Agreement, including any communications, calendar invites, message transcripts, texts, notes, presentations, reports, and drafts;

    b.    revenue-sharing;

    c.    any licensing or integration of OpenAI's technology, including ChatGPT or OpenAI Models;

    d.    design and integration Documents, and communications relating thereto, for ChatGPT into Apple products, services, and operating systems (including iOS);

    e.    payment, fees, compensation, and consideration for data and materials;

    f.    access to customer User Data, including usage metrics and Prompt history;

    g.    customer-privacy and content-moderation obligations;

    h.    the promotion of ChatGPT in the Apple App Store; and

    i.    any individuals, groups, teams, departments, and/or divisions involved in any of the above, such as organizational charts or spreadsheets.

**REQUEST FOR PRODUCTION NO. 2**

All Documents regarding any procompetitive business justification for the Apple-OpenAI Agreement, including any benefit to customers.

13

Apple Products;

p.   format of the data shared;

q.   tools, platforms, or databases involved in storing, parsing, or sharing the data from Prompts and ChatGPT results; and

r.   User Data shared with Siri.

**REQUEST FOR PRODUCTION NO. 6**

All Documents regarding integrating GenAI Chatbots into the operating system of the iPhone and Other Apple Products, and/or into Apple Intelligence, including but not limited to:

a.   any technical or performance issues with the iOS when (i) running Preset Apps; (ii) downloading and/or running Apps; (iii) downloading and/or running Cloud-Based Apps; (iv) running Apps in the background; (v) running Siri; (vi) downloading and/or running GenAI Chatbots;

b.   any technical or performance issues with Apple Intelligence when (i) running Preset Apps; (ii) downloading and/or running Apps; (iii) downloading and/or running Cloud-Based Apps; (iv) running Apps in the background; (v) running Siri; (vi) downloading and/or running GenAI Chatbots;

c.   technical and source code specifications for integrating ChatGPT with iOS and/or any other operating system for Other Apple Products;

d.   technical and source code specifications for integrating ChatGPT with Apple Intelligence;

e.   customer security and privacy concerns;

f.   impact of the integration on competition between GenAI Chatbots; and

g.   impact of the integration on Apple's incentives to develop its own GenAI Chatbot.

**REQUEST FOR PRODUCTION NO. 7**

All Documents relating to Your plans regarding Generative AI Chatbots or Smartphones, including about the Apple-OpenAI Agreement and/or the Apple-ChatGPT Integration that were presented or provided to:

a.   Your board of directors;

b.   Your executives or executive committees; or

c.   Your shareholders and/or investors.

15

a.  moat;

b.  wall;

c.  pricing power;

d.  market power;

e.  monopoly;

f.  efficient scale;

g.  entry barriers;

h.  entrench;

i.  disintermediate;

j.  dominant;

k.  market leader;

l.  market position; or

m.  network effects.

**REQUEST FOR PRODUCTION NO. 17**

All Documents discussing, analyzing, evaluating, or documenting ChatGPT as a proprietary eponym or otherwise comparing ChatGPT to bandaids, kleenex, aspirin, chapstick, velcro, post-its, xerox, or "googling" information.

**REQUEST FOR PRODUCTION NO. 18**

All Agreements regarding or concerning the licensing of ChatGPT or OpenAI Models, including but not limited to any Agreements licensing OpenAI's GenAI Models to Microsoft.

**REQUEST FOR PRODUCTION NO. 19**

All Documents regarding switching costs, capital requirements, brand loyalty, default biases, economies of scale, information or data asymmetries, network effects, interoperability with other Smartphones, patents, and access to inputs or customers challenges faced by any actual or potential competitors to iPhones.

19

**REQUEST FOR PRODUCTION NO. 20**

All Documents regarding competition in Smartphones including but not limited to:

a.      analyses, studies, projections, and/or models comparing the iPhone's sales, market share, performance, or competitive position to that of its perceived competitors in the U.S. and worldwide;

b.      the relative strength or weakness of companies providing Smartphones in the U.S. and worldwide;

c.      the relative quality of the Smartphones offered by competitors in the U.S. and worldwide; and

d.      supply and demand conditions for Smartphones, including but not limited to assessments of income, in the U.S. and worldwide.

**REQUEST FOR PRODUCTION NO. 21**

All Documents regarding iPhones or Smartphones that use any of the following terms:

a.      moat;

b.      wall;

c.      pricing power;

d.      market power;

e.      monopoly;

f.      efficient scale;

g.      entry barriers;

h.      entrench;

i.      disintermediate;

j.      dominant;

k.      market leader;

l.      market position; or

m.      network effects.

**REQUEST FOR PRODUCTION NO. 22**

Documents sufficient to show Your policies and practices regarding:

a.      the retention, storage, and deletion or destruction of Documents;

20

    a.        the number of requests to Siri in the U.S. and globally;

    b.        the number of requests to Siri on Apple Products where ChatGPT was enabled in the U.S. and globally; and

    c.        the number of requests to Siri filled by ChatGPT in the U.S. and globally.

**REQUEST FOR PRODUCTION NO. 31**

All Documents regarding products that Apple has considered substitutes for or reasonably interchangeable with the iPhone, including but not limited to Documents regarding their:

    a.        sales;

    b.        performance, including but not limited to RAM, GPU, and digital storage capacity;

    c.        pricing;

    d.        Preset Apps upon purchase;

    e.        types of Apps available for download and use; and

    f.        new features, including but not limited to the development of foldable Smartphones or improved camera function.

**REQUEST FOR PRODUCTION NO. 32**

Documents reflecting iPhone customers' feedback regarding the following iPhone specifications or features:

    a.        default settings;

    b.        privacy;

    c.        use of User Data;

    d.        content moderation, including R-rated content; and

    e.        Generative AI options (or lack thereof).

**REQUEST FOR PRODUCTION NO. 33**

All Documents regarding

    a.        features designed to be available when customers communicate, sync, or otherwise interconnect between Apple Products that are not available when customers communicate, sync, or otherwise interconnect between an Apple Product and non-Apple Products;

23

b.    the benefits to Apple of interoperability of iPhones with Other Apple Products;

c.    Apple's consideration of the prices of Other Apple Products in setting iPhone prices;

d.    how iPhone feature or pricing changes affect Other Apple Products, including changes in their prices, usage, sales, marketing, and technological developments;

e.    how Other Apple Product feature or pricing changes affect the iPhone, including changes in iPhone prices, usage, sales, marketing, and technological developments;

f.    the propensity of iPhone customers to purchase Other Apple Products; and

g.    the propensity of Other Apple Product customers to purchase iPhones.

**REQUEST FOR PRODUCTION NO. 34**

Documents sufficient to show, for each model of the iPhone Apple has released, which Apps are pre-downloaded on each iPhone.

**REQUEST FOR PRODUCTION NO. 35**

Documents sufficient to show the precautions Apple takes to prevent malware from being in the Apple App Store or downloaded by customers.

**REQUEST FOR PRODUCTION NO. 36**

Documents sufficient to show how Apple assesses the privacy and/or privacy risks of Apps available in the Apple App Stores.

**REQUEST FOR PRODUCTION NO. 37**

Documents sufficient to show prices, price lists, pricing plans, and pricing policies for every iPhone model and/or version Apple ever marketed or sold in the U.S. and worldwide since 2022.

**REQUEST FOR PRODUCTION NO. 38**

Documents sufficient to show non-U.S. Smartphones' ability to operate on U.S. internet and cellular networks.

**REQUEST FOR PRODUCTION NO. 39**

Documents sufficient to show the technical specifications for iPhones sold within the United States and for iPhones sold outside the United States.

**REQUEST FOR PRODUCTION NO. 40**

Documents sufficient to show any market research, surveys, analyses, or studies regarding U.S. consumers' perception of the Apple and iPhone brands, including any assessments of the brand strength of iPhone relative to its Smartphone competitors.

**REQUEST FOR PRODUCTION NO. 41**

Documents sufficient to show the geographic scope of warranties for iPhones sold within the United States and for iPhones sold outside the United States.

**REQUEST FOR PRODUCTION NO. 42**

Documents sufficient to show the terms of service for iPhones sold within the United States and for iPhones sold outside the United States.

**REQUEST FOR PRODUCTION NO. 43**

Documents sufficient to show the costs to customers of switching from an iPhone to another Smartphone including but not limited to:

a.      data transfer between devices;

b.      familiarity with the Smartphone operating system and layout;

c.      subscriptions; and

d.      saved passwords and payment options.

**REQUEST FOR PRODUCTION NO. 44**

All Documents analyzing, evaluating, or documenting why iPhone customers switch to other Smartphones and vice versa.

25

**REQUEST FOR PRODUCTION NO. 50**

Documents sufficient to show the iPhone's Generative and non-Generative AI capabilities, or lack thereof, including but not limited to Documents showing:

a.    comparisons with Generative AI capabilities of competitor Smartphones;

b.    plans, projections, strategies, presentations, and reports on developing the iPhone's Generative AI capabilities;

c.    advantages, disadvantages, and costs involved in creating or developing a Generative AI Chatbot;

d.    advantages, disadvantages, and costs involved in integrating a GenAI Chatbot with the iPhone;

e.    comparisons of Apple Intelligence, excluding the Apple-ChatGPT Integration, to GenAI Chatbots in terms of performance and functions;

f.    efforts to improve, update, or otherwise upgrade the functionality of Siri; and

g.    the development of Apple Intelligence.

**REQUEST FOR PRODUCTION NO. 51**

All Documents regarding Apple's competitive assessment of Super Apps, including but not limited to the (i) X App, (ii) Grok App, (iii) WeChat App, (iv) AliPay App, (v) Grab App, (vi) KakaoTalk App, (vii) TataNeu App, (viii) Rakuten App, and (ix) ZaloPay App, and their impact on the iPhone, including Documents regarding:

a.    the competitive threat such Super Apps present to iPhone;

b.    analyses of iPhone's market share in China, Thailand, Vietnam, Malaysia, Singapore, South Korea, and India;

c.    any restrictions on the features such Super Apps can offer in the United States and the features for which Apple takes a commission; and

d.    Super Apps that have been rejected from appearing in the Apple App Store.

**REQUEST FOR PRODUCTION NO. 52**

All Documents regarding the importance of the Apple App Store as a distribution channel for App Developers.

28

Dated: October 10, 2025

| | |
|---|---|
| */s/ Bradley Justus* | */s/ Craig M. Reiser* |
| Bradley Justus* | Craig M. Reiser* |
| DC Bar No. 1007988 | NY State Bar No. 4886735 |
| AXINN, VELTROP & HARKRIDER LLP | Scott A. Eisman* |
| 1901 L Street NW | NY State Bar No. 4905287 |
| Washington, DC 20036 | Eva Yung* |
| T: (202) 912-4700 | NY State Bar No. 5497300 |
| F: (202) 912-4701 | Christopher Erickson* |
| bjustus@axinn.com | NY State Bar No. 5800628 |
| | AXINN, VELTROP & HARKRIDER LLP |
| Caroline P. Boisvert* | 630 Fifth Avenue, 33rd Floor |
| CT State Bar No. 441323 | New York, NY 10111 |
| AXINN, VELTROP & HARKRIDER LLP | T: (212) 728-2200 |
| 90 State House Square | F: (212) 728-2201 |
| Hartford, CT 06103 | creiser@axinn.com |
| T: (860) 275-8100 | seisman@axinn.com |
| F: (860) 275-8101 | eyung@axinn.com |
| cboisvert@axinn.com | cerickson@axinn.com |
| | |
| *admitted *pro hac vice* | |
| | */s/ Judd E. Stone II* |
| | Judd E. Stone II |
| | TX State Bar No. 24076720 |
| | Christopher D. Hilton |
| | TX State Bar No. 24087727 |
| | STONE \| HILTON PLLC |
| | 600 Congress Ave., Ste. 2350 |
| | Austin, TX 78701 |
| | T: (737) 465-3897 |
| | judd@stonehilton.com |
| | chris@stonehilton.com |
| | |
| | *Attorneys For Plaintiffs X Corp. and X.AI LLC* |

32

# TAB 6

| | |
|---|---|
| **From:** | Berman, Sean |
| **To:** | Eisman, Scott A.; Brinn, Hope E.; Abidor, Richard D. |
| **Cc:** | Justus, Bradley; Reiser, Craig M.; Yung, Eva H.; Erickson, Christopher; chris@stonehilton.com; judd@stonehilton.com; julia.wisenberg@kellyhart.com; dee.kelly@kellyhart.com; Henn, Emily; Liu, Henry; Sidhu, Elizabeth; Willard Zehmer, Lauren; Weiland, Carol; Saunders, Brendan; Tan, Zhi Yang |
| **Subject:** | RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.) |
| **Date:** | Tuesday, April 7, 2026 9:56:02 AM |
| **Attachments:** | image002.png |
| | image001.png |

Scott,

Since your March 2 letter, we have reviewed Plaintiffs' requests in good faith to identify a mutually agreeable path forward, considering both their asserted relevance and the burden of collection, review, and production. But in the month since, Plaintiffs have not budged an inch on any issue, including those we told you—less than one business day before your correspondence—that we were actively considering with our client. Conferrals are not just a box-checking exercise to run to court, and though you claim to believe discovery is a "two-way" street, Plaintiffs' discovery conduct demonstrates the opposite.

Take the Apple-Google Agreement, for example. In mid-March, we asked Plaintiffs to identify the redacted provisions of the agreement that they deem relevant to the claims and defenses of the parties so that we could discuss responsiveness and commercial sensitivity in concrete terms, rather than theoretical principles of contract interpretation. ██████████████████████████████████████ ██████████ For the first time on March 26, you set out several specific redactions you thought would "help explain how the Apple-Google agreement works." Just two business days ago, we informed you that we were discussing this request with our client and would consider providing high-level explanations of certain provisions to assure you of any redacted information's non-responsiveness and commercial sensitivity. In search of a dispute, you decided to fall back to your March 2 position by asserting without any explanation that you can "only" understand "what [the Agreement] means" without any redactions. To be clear, we are still actively discussing your requests regarding the Apple-Google Agreement with our client, and we do not believe we are at an impasse. Consideration of requests of this nature takes time, and the rules of this District require that the parties not utilize discovery scheduling to unduly burden others, for example, by imposing a 24-hour deadline to make consequential decisions about the production of non-responsive, highly commercially sensitive information of a third-party business partner. *Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284, 288 (N.D. Tex. 1988).

The same goes for your requests to add Mr. Cook and Mr. Federighi as custodians. Your

correspondence below claims that "what matters" is that these individuals "were key decisionmakers on matters relevant to this case." Rule 26(b)(1) nevertheless requires consideration of more than just relevance for documents to be discoverable, including, for example, "the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." That is why courts have rejected attempts to add document custodians long past the substantial completion deadline where the proposed custodians would not "lead to unique relevant evidence not already produced." *See, e.g.*, *Dexon Computer, Inc. v. Cisco Sys., Inc.*, 2023 WL 9648853, at *2 (E.D. Tex. May 31, 2023). We have closely reviewed every document you sent us to weigh whether there are gaps in our productions that can be remedied by a proportional search. No documents you have sent over the past month have led us to the conclusion that searching Mr. Cook's or Mr. Federighi's documents would provide such a remedy, as demonstrated by our correspondence below. Yet you have refused to budge from your unsupported March 2 position. ██████████

█████████████████████████████████

████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████████████

█████████████████████

Your requests to add a custodian on "smartphone competition" follows this same pattern. We have conferred to identify exactly what documents you felt were missing from Apple's productions. When we shared that we satisfied this request by running your proposed search terms across all of Apple's custodians, you asked that we share a sample document for the purpose of getting on the same page about what each side understood "smartphone competition" documents to mean. We provided some sample documents in the interest of compromise and on the understanding that we would thereafter discuss potential go-gets on this topic. Instead, you decided to retreat to the position in your March 2 letter that collection and review of a custodian's files was necessary. We maintain that adding a document custodian on "smartphone competition" at this stage of the case would not be proportional to the needs of the case, but we remain willing to discuss a more tailored go-get request, as we previously understood the plan to be.

Your requests for internal generative AI policies (RFP No. 59, Set One) and lifetime customer valuation of Apple Intelligence (RFP No. 7, Set Two) track this course, too. We have maintained that there is limited relevance to these requests, but we have always expressed a willingness to take back to our client your shifting ideas of relevance to

App'x 81

consider the burden of your requests. ███████████████████████████ ████████████████████████████████████████████ ████████████████████████████ Although you have never once expressed an interest in narrowing these requests following our conferrals, in the interest of compromise, to avoid burdening the Court, and after appropriately assessing the burden of these requests in light of the articulated relevance, we are willing (1) to produce Apple's AI Policy for all employees that outlines the requirements for the use of AI across Apple, and (2) to conduct a reasonable search for and produce non-privileged responsive documents for RFP No. 7 of Set Two.

Lastly, throughout your correspondence below, you claim that Plaintiffs' own document productions are "irrelevant" to your requests for documents from Apple. This is a remarkable assertion, though perhaps an unsurprising one considering Apple has somehow produced more text messages involving Elon Musk than have Plaintiffs. And more importantly, it misses the point. Apple is not "holding hostage" documents or "embargoing relevant discovery" in retaliation for Plaintiffs' insufficient productions. For instance, although Plaintiffs refuse to provide any post-Complaint discovery on Grok's generation of CSAM, CSEM, or NCII (despite the clear relevance to the claims and defenses in this case), Apple has been willing to consider producing weekly ChatGPT integration reports months past the agreed-upon time period. We do not quite understand how you reverted to seeking these reports through the close of fact discovery after clearly appreciating our position on why doing so would exclusively prejudice Apple in expert discovery, but we remain willing to discuss a mutually agreeable solution to this particular request. Whether Plaintiffs offer similar cooperation on Apple's requests without judicial intervention remains to be seen.

Best,
Sean

**Sean Berman**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5644 | sberman@cov.com
www.cov.com

**COVINGTON**

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** Eisman, Scott A. <seisman@axinn.com>

**Sent:** Monday, April 6, 2026 1:16 PM
**To:** Berman, Sean <SBerman@cov.com>; Brinn, Hope E. <hbrinn@axinn.com>; Abidor, Richard D. <rabidor@axinn.com>
**Cc:** Justus, Bradley <bjustus@axinn.com>; Reiser, Craig M. <creiser@axinn.com>; Yung, Eva H. <eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com; judd@stonehilton.com; Saunders, Brendan <BSaunders@cov.com>; Tan, Zhi Yang <ZTan@cov.com>; julia.wisenberg@kellyhart.com; dee.kelly@kellyhart.com; Henn, Emily <ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Sidhu, Elizabeth <ESidhu@cov.com>; Willard Zehmer, Lauren <LZehmer@cov.com>; Weiland, Carol <CWeiland@cov.com>
**Subject:** RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)

[EXTERNAL]
Counsel,

We write in response to your April 3 email, which reflects Apple's latest effort to stall discovery into topics that bear directly on the claims and defenses in this matter. We have been discussing many of these topics for a month or more and cannot abide further delay. Please let us know by 1 p.m. ET tomorrow whether Apple will agree to our proposals. If not, we will be at an impasse and forced to seek judicial relief.

**The Apple-Google Agreement**

*Redactions*

As we've explained repeatedly since March 2, Apple's redactions of the Apple-Google Agreement are improper. Plaintiffs need to see the full agreement to understand its terms. And we need to do so in order to respond to OpenAI's defense that the Apple-Google Agreement renders the Apple-OpenAI Agreement "non-exclusive." Only by viewing the full agreement can we understand what it means and how it relates to the Apple-OpenAI Agreement. Your argument about why specific redacted sections are irrelevant is thus beside the point. The agreement must be interpreted as a whole, not by reading the limited parts that Apple has shared.

Nor are your redactions justified by your claim that the redacted portions are "of utmost sensitivity." The parties signed a confidentiality agreement to safeguard such sensitive documents. Documents that are highly sensitive can be designated "Outside Counsel's Eyes Only." But Apple cannot unilaterally refuse to share them.

If Apple will not agree to produce the unredacted Apple-Google Agreement by 1 p.m. ET tomorrow, then we are at an impasse.

*Documents about the Apple-Google Agreement*

Documents about the Apple-Google Agreement, including documents interpreting or contextualizing it, are likewise relevant to OpenAI's defense that the Apple-Google Agreement makes the Apple-OpenAI Agreement non-exclusive. Your email notes that documents clarifying ambiguities in the Apple-Google Agreement are relevant. But so are other documents that shed light on the agreement's context or meaning. As long as OpenAI

insists on pressing its defense, these documents remain relevant.

It is beside the point that some documents about the Apple-Google Agreement may be produced in response to other RFPs that use different search terms for a different timeframe. We have asked you to search for documents about the Apple-Google Agreement until that agreement was announced, using terms that we proposed. While we agree that discovery is a two-way street, Apple can't hold hostage documents that are clearly relevant to a core defense because it wishes that Plaintiffs would produce more documents. *See, e.g.*, *Samsung Elecs. Am., Inc. v. Chung*, 321 F.R.D. 250, 287 (N.D. Tex. 2017) (""A party [may not] condition its compliance with its discovery obligations on receiving discovery from its opponent." (quotation marks omitted)). If Apple will not agree by 1 p.m. ET tomorrow to do so, then we are at an impasse.

### Document custodians

It appears that we are at an impasse over our request to add Tim Cook and Craig Federighi as custodians. As we noted in our March 26 email, there is no basis for Apple's "substantially unique involvement" test or for your assertion that they are appropriate custodians only if they have "a substantial amount of non-duplicative documents." They were key decisionmakers on matters relevant to this case. That is what matters. And in any event, we have shown that Mr. Cook and Mr. Federighi were uniquely involved, including through meetings they attended with no other custodians present.

### Smartphone competition

Apple's production of documents about competition in the smartphone market remains deficient. The two examples that you provide are far afield: ███████████████████████████████████████████ ███ ████████████████ ████████████████████████████████████████████████████ ████████████████████████ As Plaintiffs explained in their March 2 deficiency letter and have reiterated in meet-and-confers, Plaintiffs were surprised that Apple had not "produced any *internal* documents analyzing competition in [the smartphone] market, including any comparison of major smartphone manufacturers in the U.S. and abroad." Ltr. from S. Eisman (Mar. 2, 2026). Neither of the documents Apple has identified undermines Plaintiffs' asserted deficiency. While we agree that Apple need not "identify every document" it has produced on this topic, the fact that the only documents Apple has identified fall short underscores Apple's failure to produce responsive documents—a point our own review has confirmed.

Given your own statement that there might not have been a relevant custodian on these topics, we have repeatedly asked you to search the custodial files of an appropriate custodian for documents responsive to our requests on smartphone competition. You've refused to do so. We will thus understand that we are at an impasse unless you agree by 1 p.m. ET tomorrow to add a custodian.

### Weekly Integration Reports

Your April 3 email is wrong that we misquoted your colleague and that we waited several weeks to memorialize the conversation about producing Weekly Integration Reports through the close of discovery. The discussion occurred on February 17, and we sent our email on February 23.

Apple cannot go back on its commitment to produce these reports a month after agreeing to do so. Doing so prejudices Plaintiffs. For instance, Plaintiffs' damages expert,

As for the "middle ground" you offered—of producing data through the end of March—our note reflects that we did consider your position but ultimately concluded that we needed these reports through the close of discovery. The reports provide key information about the integration at the heart of this case, and Apple has no basis to withhold relevant evidence. And although you cite Plaintiffs' position on refusing to provide post-Complaint discovery on relevance grounds, that is a separate matter. Again, Apple cannot embargo relevant discovery merely because it wants Plaintiffs to produce more.

### Policies on genAI chatbot usage

We've explained since November that Apple's policies on genAI chatbot usage are relevant to Plaintiffs' pretext allegations. Although Apple claimed it had no relevant policies, documents produced so far (including by OpenAI) suggest that Apple did have such a policy—one that forbade Apple employees from using ChatGPT in certain circumstances.

Contrary to what you claim in your email, those documents (some of which Apple didn't produce) are insufficient to satisfy Apple's obligation to respond to this request. The documents show that Apple had a policy but don't explain what the policy said, which employees it applied to, when it became effective, and what other genAI chatbots were covered.

We appreciate that you are investigating whether you can provide go-get documents responsive to this request, but we served this request in October and have been discussing it since November. If Apple won't agree by 1 p.m. ET tomorrow to produce responsive documents, then we will be at an impasse.

### Lifetime Customer Valuation

For several months, Apple has taken the position that it has produced documents about the value of the ChatGPT integration that would obviate the need to provide the LCV documents Plaintiffs have requested. Though you claim that those documents "have already been produced," you do not identify them. Please do. Please also let us know by 1 p.m. ET tomorrow Apple's position on this request.

Best regards,
Scott

**Scott A. Eisman**
Partner
T: 212.261.5642

**From:** Berman, Sean <SBerman@cov.com>
**Sent:** Friday, April 3, 2026 4:43 PM
**To:** Brinn, Hope E. <hbrinn@axinn.com>; Eisman, Scott A. <seisman@axinn.com>; Abidor, Richard D. <rabidor@axinn.com>
**Cc:** Justus, Bradley <bjustus@axinn.com>; Reiser, Craig M. <creiser@axinn.com>; Yung, Eva H. <eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com; judd@stonehilton.com; Saunders, Brendan <BSaunders@cov.com>; Tan, Zhi Yang <ZTan@cov.com>; julia.wisenberg@kellyhart.com; dee.kelly@kellyhart.com; Henn, Emily <ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Sidhu, Elizabeth <ESidhu@cov.com>; Willard Zehmer, Lauren <LZehmer@cov.com>; Weiland, Carol <CWeiland@cov.com>
**Subject:** RE: X Corp. and X.AI LLC v. Apple Inc. et al., No. 4:25-cv-00914-P (N.D. Tex.)

**Caution: External Email**

Counsel,

We write in response to your March 26 correspondence.  We are available to meet and confer next week.

Apple's Production of the Apple-Google Agreement

Contrary to your summary, during our meet-and-confers on both March 12 and March 24, we explained that we had redacted only terms in the Agreement that are *both* irrelevant to the claims or defenses in this case *and* commercially sensitive. This is a critical distinction from your characterization of our position: Apple is not refusing to provide information on relevance grounds, but instead is properly protecting highly sensitive commercial information (which belongs both to Apple and to third-party Google) only in instances where that information is not relevant to the claims or defenses in this case.

In addition, in an effort to understand your specific concerns, on both March 12 and

March 24, we invited you to explain what it is about the Agreement — the large majority of which is produced — you feel you are unable to understand given the targeted redactions we have applied. But Plaintiffs have failed to articulate any specific need for any redacted material in light of the claims and defenses in this case. The only attempt you have made has been to argue that ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

This position is nonsensical. Plaintiffs are not entitled to discovery of commercially-sensitive portions of this highly-sensitive Agreement based solely on speculation that such information might help Plaintiffs respond to arguments that another party has not yet made — particularly where Plaintiffs cannot articulate how the information they already have would prevent them from rebutting those same anticipated arguments. *Crosby v. Louisiana Health Serv. & Indem. Co.*, 647 F.3d 258, 264 (5th Cir. 2011) ("Rule 26(b) has never been a license to engage in an unwieldy, burdensome, and speculative fishing expedition."). Apple would consider explaining at a high level what information has been redacted, but Plaintiffs have instead continued to push us to produce the entire, unredacted Agreement (even after admitting that certain redactions, ████████████████████████████████ , are likely appropriate). For similar reasons, your argument that the contract "must be interpreted as a whole" does not make sense. This case challenges the Service Integration Agreement between Apple and OpenAI — not Apple's Agreement with Google — and only certain aspects of the Agreement between Apple and Google have any relevance to this case. While the entire Agreement is extremely commercially sensitive, we have agreed to produce the vast majority of the Agreement, redacting only the terms that are both of utmost sensitivity and that do not have any relevance to the issues in this case.

Far from refusing to consider lifting any of the redactions to the Agreement, we have consistently invited Plaintiffs to explain what information they believe is critical to their anticipated arguments, so that we could consider whether a compromise might be reached. Each time we made this suggestion, you agreed to take it back, but not until your March 26 email did you identify with any specificity which additional information you thought you needed to see. Although Plaintiffs' March 26 explanation of their need for the identified information is weak (contending only that "[t]hese provisions all help explain how the Apple-Google agreement works"), we are willing to discuss your request to lift the redactions on the identified information with our client.

App'x 87

<u>Documents Regarding the Apple-Google Agreement</u>

Regarding Plaintiffs' further request for documents regarding the Apple-Google Agreement, as we have now explained several times, we have already agreed to produce such documents to the extent they are responsive to other agreed-upon RFPs.  As a result, Plaintiffs have received, and will continue to receive, documents about the effect of the Apple-Google Agreement on the ChatGPT integration, and documents discussing how the two Agreements might interact, as well as similarities or differences between the two.

When we asked Plaintiffs to identify what other relevant information about the Agreement they were seeking, and which would not already be covered by our existing agreements on Plaintiffs' RFPs, the only explanation Plaintiffs could provide was that there may be other documents that could somehow help to resolve unidentified "ambiguities" in the Agreement.  You could not explain what those ambiguities are, nor how they might relate to the issues in this case.

You then insisted that we agree to produce documents regarding the Agreement up until the date it was signed in November 2025.  But when we pointed out that our requests for documents post-dating August 2025 have been either ignored or rebuffed by your colleagues, you asserted that Plaintiffs' and Defendants' discovery agreements should not be linked.  As we explained on the call, however, discovery is a two-way street.  Your demand that we accede to your post-August 2025 document requests while you refuse to engage with ours is fundamentally inconsistent with the professionalism and parity the Court expects of the parties during the discovery process.  We are willing to continue discussing whether post-complaint document discovery is warranted on certain topics, but if Plaintiffs want to seek such discovery from Defendants, we expect that Plaintiffs will agree to provide post-complaint discovery on certain identified topics as well.

<u>Plaintiffs' Late-Breaking Request to Add Document Custodians</u>

Since the parties first began negotiating custodians in December 2025, Apple has stated that Plaintiffs' requests for documents from senior Apple executives are unduly burdensome and not proportional to the needs of the case.  This is because their documents would be duplicative of other already-agreed-upon custodians that were involved with the ChatGPT integration, such as Adrian Perica.  *See e.g.,* Z. Tan Email to S. Eisman, January 16, 2026; *see also* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case," taking into consideration "whether the burden or expense of the proposed discovery outweighs its likely benefit"); Fed R. Civ. P. 26(b)

(2)(c)(i) (limiting "unreasonably cumulative or duplicative" discovery).  However, in the spirit of compromise, we agreed to add both Eddy Cue and John Giannandrea as custodians, giving Plaintiffs access to documents from three of Apple's most senior executives.

Apple has been willing to consider further custodial requests, but only if Plaintiffs can demonstrate that the executives have unique documents or knowledge about the claims at issue not available from other custodians.  *See* S. Berman Email to H. Brinn, March 24, 2026; *Robinson v. Nexion Health at Terrell, Inc.*, 2014 WL 12915533, at *2 (N.D. Tex. Apr. 16, 2014) ("Unless the executive possesses unique personal knowledge about the controversy, the court should regulate the discovery process to avoid oppression, inconvenience, and burden to the executive and the corporation.").  But to date, months after the parties reached an agreement on custodians and over a month after Apple's substantial completion deadline, Plaintiffs still have not provided any meaningful support for their assertion that Tim Cook and Craig Federighi have any number of documents that reflect their "unique involvement in the Integration" and justify burdensome custodial discovery from them.  *See Dexon Computer, Inc. v. Cisco Sys., Inc.*, 2023 WL 9648853, at *2 (E.D. Tex. May 31, 2023) (denying motion to add custodians where request was months after substantial completion deadline and movant failed to "show[] that including the four additional individuals would lead to unique relevant evidence not already produced" (quotations omitted)).

As noted in our prior correspondence, the documents that Plaintiffs cited as their best evidence for why Tim and Craig would be proper custodians all confirmed that they would be duplicative of existing Apple custodians.  In response, Plaintiffs pointed to one of the documents produced by OpenAI ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████ This document therefore does not justify adding Mr. Cook and Mr. Federighi as custodians.

As we explained on the call, any documents that Plaintiffs subsequently identified would not have been the rationale prompting the custodian request—or else Plaintiffs would have cited them in our previous correspondence.  Notwithstanding Plaintiffs' post hoc attempt to justify this request, the additional documents cited in Plaintiffs' March 26 email fare no better. ████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████

 Certainly, nothing in the newly cited documents provide a basis that Mr. Cook or Mr. Federighi have a substantial amount of non-duplicative documents necessary for the claims and defenses in this case.

Given the lack of evidence supporting Plaintiffs' assertions, Apple believes it would be unduly burdensome and disproportional to the needs of the case to collect and review thousands of additional documents that are likely to be irrelevant or duplicative at this juncture of the case. Apple will therefore not agree to include Mr. Cook or Mr. Federighi as custodians, or produce any additional custodial documents belonging to them, at this time.

<u>RFP No. 59 (Set One)</u>

On our call, you explained that RFP No. 59 is relevant because, if Apple "prohibited" its employees from using ChatGPT, then it would be relevant to "pretext." We again noted that we denied RFA No. 57 ("Admit that Apple prohibits U.S. Apple employees from downloading ChatGPT on their work devices."), subject to relevance objections, and you claimed that this denial, based upon a reasonable investigation, is essentially meaningless.

Your interpretation of Apple's documents (which we dispute) provides no basis for the additional discovery you request through RFP No. 59. As we've repeatedly explained, whatever limited "pretext" relevance exists for Apple's internal policies for AI usage pales in comparison to the burden imposed by the overbroad RFP No. 59. And as your correspondence makes clear, you already have access to what you believe to be documents responsive to this request. We are nevertheless conferring with our client about whether a proportional go-get production can satisfy this RFP.

<u>RFP No. 7 (Set Two)</u>

On our call, you claimed that the lifetime customer valuation ("LCV") of Apple Intelligence, Siri, and Visual Intelligence—separate and apart from the ChatGPT integration—is relevant because ███████████████████████████████████████ ████████ In your correspondence below, you further explain that LCV would be

relevant for damages, particularly "subscriber churn."

We are conferring with our client about this entirely new basis for the relevance of this RFP. In the meantime, you incorrectly assert that Apple has not produced documents concerning the value of the ChatGPT integration. As discussed, documents that discuss the value of the ChatGPT Integration have already been produced in both parties' productions.

<u>Smartphone Competition and Montara Sponsor Review Decks</u>



On our call, you asked us to identify specific documents responsive to your requests for documents analyzing competition in the smartphone market. We asked you to provide more specificity as to what categories of documents you believe are missing, but you have not provided us with any description of the missing documents apart from the broad, vague, and unhelpful description of "marketplace analyses, one-off emails about competition, and everything in-between." Apple can confirm that it has produced documents ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

Your claim that "Apple failed to produce documents concerning competition in the smartphone market" is therefore untrue.

You also asked us to confirm whether our production includes tentpole or sponsor review decks for the ChatGPT integration into Apple Intelligence from before the integration agreement was executed. As we represented on the call, ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

While we have provided a few illustrative examples of the above categories, we note that it is not Apple's burden to identify every document in our productions responsive to these specific requests.

<u>Weekly Integration Reports</u>

On our call, we corrected your misquote of our colleague in your February 23 correspondence, which was several weeks following the meet-and-confer from which

App'x 91

you purported to quote.  Our colleague only stated that it would be reasonable to consider your request to produce weekly integration reports after the agreed-upon December 31, 2025 default date for data productions.

In your note below, you again mischaracterize our conversation.  We never agreed to produce data past the fact discovery period.  Instead, we noted that we could consider producing data to the end of March 2026 so that each party's experts had an opportunity to rely upon the same data.  You stated that you appreciated this clarification, understood the unfairness of requiring us to produce data that only Plaintiffs' experts could reply on, and would take it back.

In your note below, you revert to your original position of needing weekly integration reports through the close of fact discovery after appearing open to considering a middle ground on our call.  We are conferring with our client about this request.  As noted on our call, however, Plaintiffs have refused to provide relevant discovery after the date of the complaint, making it difficult for Apple to understand why it must unilaterally make exceptions to the agreed-upon time period—especially for a set of data that Plaintiffs already have up to December 31, 2025.

Best,
Sean

**Sean Berman**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5644 | sberman@cov.com
www.cov.com

**COVINGTON**

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

**From:** Berman, Sean
**Sent:** Monday, March 30, 2026 5:30 PM
**To:** 'Brinn, Hope E.' <hbrinn@axinn.com>; Eisman, Scott A. <seisman@axinn.com>; Abidor, Richard D. <rabidor@axinn.com>
**Cc:** Justus, Bradley <bjustus@axinn.com>; Reiser, Craig M. <creiser@axinn.com>; Yung, Eva H. <eyung@axinn.com>; Erickson, Christopher <cerickson@axinn.com>; chris@stonehilton.com; judd@stonehilton.com; Saunders, Brendan <BSaunders@cov.com>; Tan, Zhi Yang <ZTan@cov.com>; julia.wisenberg@kellyhart.com; dee.kelly@kellyhart.com; Henn, Emily <ehenn@cov.com>; Liu, Henry <HLiu@cov.com>; Sidhu, Elizabeth <ESidhu@cov.com>; Willard Zehmer, Lauren

# TAB 7

# TAB 8

# TAB 9