**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>    Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**APPENDIX IN SUPPORT OF PLAINTIFFS X CORP. AND
X.AI LLC'S BRIEF IN SUPPORT OF OBJECTION TO MAGISTRATE
<u>JUDGE HAL R. RAY'S MAY 13, 2026 RULING PURSUANT TO RULE 72(a)</u>**

Bradley Justus
AXINN, VELTROP & HARKRIDER LLP
1901 L Street NW
Washington, DC 20036

Charles W. Fillmore
BROWN PRUITT WAMBSGANSS
DEAN FORMAN & MOORE, P.C.
201 Main Street, Suite 700
Fort Worth, TX 76102

Alexander M. Dvorscak
STONE | HILTON PLLC
2000 West Loop South, Suite #1500
Houston, TX 77027

Craig M. Reiser
Scott A. Eisman
Eva Yung
Christopher Erickson
AXINN, VELTROP & HARKRIDER LLP
630 Fifth Avenue, 33rd Floor
New York, NY 10111

Judd E. Stone II
Christopher D. Hilton
STONE | HILTON PLLC
600 Congress Ave., Ste. 2350
Austin, TX 78701

Noah Schottenstein
STONE | HILTON PLLC
301 Commerce St., Suite 2360
Fort Worth, TX 76102

**APPENDIX IN SUPPORT OF PLAINTIFFS X CORP. AND
X.AI LLC'S BRIEF IN SUPPORT OF OBJECTION TO MAGISTRATE
JUDGE HAL R. RAY'S MAY 13, 2026 RULING PURSUANT TO RULE 72(a)**

| Tab No. | Pages of Brief | Description | Appendix Pages(s) |
|---|---|---|---|
| Tab 1 | 6, 10-11, 14, 16 | May 13, 2026 Discovery Order Re: Dkt. Nos. 172, 178, 195 filed at Dkt. No. 274 in *X Corp. et al v. Apple Inc. et al.*, No. 4:25-cv-00914-P (N.D. Tex.) | App. 9-17 |
| Tab 2 | 3, 5-6, 13-16 | Transcript of May 15, 2026 Hearing Before Hon. Hal R. Ray Re: Dkt. Nos. 172, 178, 195 | App. 18-76 |
| Tab 3 | 5, 15 | Messages between Adrian Perica and Elon Musk, in which the earliest message was sent on August 17, 2024 at 5:58 PM GMT, APL-XAI_00097136 through APL-XAI_00097143 | App. 77-87 |
| Tab 4 | 5, 15 | Email thread titled ██████ ███████████████ in which the latest-in-time email was sent on August 28, 2025 at 6:13 PM from Jon Shulkin to Elon Musk, X-XAI-000020566 | App. 88-89 |
| Tab 5 | 5,9 | Declaration of Samantha Birkenfeld-Malpass in Support of Plaintiffs X Corp. and X.AI LLC's Opposition to the OpenAI Defendants' Motion to Compel and for Appropriate Remedy | App. 90-92 |
| Tab 6 | 12 | September 17, 1997 L.A. Times Article titled *Apple Formally Appoints Jobs Interim CEO* | App. 93-96 |
| Tab 7 | 12 | Excerpt of Pixar's Form 10-K Annual Report for Fiscal Year 2002 | App. 97-107 |
| Tab 8 | 12 | Excerpt of Pixar's Form 10-K Annual Report for Fiscal Year 2005 | App. 108-114 |
| Tab 9 | 12 | August 24, 2011 Apple Press Release titled *Steve Jobs Resigns as CEO of Apple* | App. 115-118 |

App. 2

| Tab 10 | 14 | Excerpts of Deposition Transcript of Sam Altman, *In re OpenAI, Inc. Copyright Infringement Litig.*, No. 1:25-md-03143-SHS-OTW (S.D.N.Y. Feb. 10, 2026) | App. 119-130 |
|--------|----|----|----|
| Tab 11 | 4 | OpenAI Subpoena to Tesla, dated December 29, 2025 | App. 131-191 |
| Tab 12 | 4 | OpenAI Subpoena to SpaceX, dated December 29, 2025 | App. 192-252 |

Dated: May 20, 2026                                     Respectfully submitted,

*/s/ Bradley Justus*                                    */s/ Scott A. Eisman*

Bradley Justus                                          Craig M. Reiser
N.D. Tex. Bar No. 1007988DC                             N.D. Tex. Bar No. 4886735NY
DC Bar No. 1007988                                      NY State Bar No. 4886735
AXINN, VELTROP & HARKRIDER LLP                          Scott A. Eisman
1901 L Street NW                                        N.D. Tex. Bar No. 4905287NY
Washington, DC 20036                                    NY State Bar No. 4905287
T: (202) 912-4700                                       Eva Yung*
F: (202) 912-4701                                       NY State Bar No. 5497300
bjustus@axinn.com                                       Christopher Erickson
                                                        N.D. Tex. Bar No. 5800628NY
Charles W. Fillmore                                     NY State Bar No. 5800628
Texas Bar No. 00785861                                  AXINN, VELTROP & HARKRIDER LLP
BROWN PRUITT WAMBSGANSS                                 630 Fifth Avenue, 33rd Floor
DEAN FORMAN & MOORE, P.C.                               New York, NY 10111
201 Main Street, Suite 700                              T: (212) 728-2200
Fort Worth, TX 76102                                    F: (212) 728-2201
T: (817) 338-4888                                       creiser@axinn.com
cfillmore@brownpruitt.com                               seisman@axinn.com
                                                        eyung@axinn.com
Alexander M. Dvorscak                                   cerickson@axinn.com
Texas Bar No. 24120461
STONE | HILTON PLLC                                     */s/ Judd E. Stone*
2000 West Loop South, Suite #1500
Houston, TX 77027                                       Judd E. Stone II
T: (281) 619-8843                                       Texas Bar No. 24076720
alex@stonehilton.com                                    Christopher D. Hilton
                                                        Texas Bar No. 24087727
*admitted *pro hac vice*                                STONE | HILTON PLLC
                                                        600 Congress Ave., Ste. 2350
                                                        Austin, TX 78701
                                                        T: (737) 465-3897
                                                        judd@stonehilton.com
                                                        chris@stonehilton.com

                                                        Noah Schottenstein
                                                        Texas Bar No. 24100661
                                                        STONE | HILTON PLLC
                                                        301 Commerce St., Suite 2360
                                                        Fort Worth, TX 76102
                                                        T: (737) 465-3897
                                                        noah@stonehilton.com

                                                        *Attorneys for Plaintiffs X Corp. and
                                                        X.AI LLC*

                                                                                          App. 4

## CERTIFICATE OF SERVICE

I certify that on May 20, 2026, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF system for filing. A notice of electronic filing was transmitted to all ECF registrants of record.

/s/ Scott A. Eisman
Scott A. Eisman

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| X CORP. and X.AI LLC,<br><br>        Plaintiffs,<br><br>        v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>        Defendants. | **Civil Action No. 4:25-cv-00914-P** |

**DECLARATION OF SCOTT A. EISMAN IN SUPPORT OF PLAINTIFFS
X CORP. AND X.AI LLC'S BRIEF IN SUPPORT OF OBJECTION TO MAGISTRATE
JUDGE HAL R. RAY'S MAY 13, 2026 RULING PURSUANT TO RULE 72(a)**

App. 6

I, Scott A. Eisman, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am an attorney admitted to practice before this Court, and I am a partner at the law firm of Axinn, Veltrop & Harkrider LLP, counsel for Plaintiffs X Corp. and X.AI LLC in the above-captioned matter. I submit this declaration in support of Plaintiffs' Objection to Magistrate Judge Hal R. Ray's May 13, 2026 Ruling Pursuant to Rule 72(a). The matters in this declaration are within my personal knowledge and are true and correct.

2.    Attached hereto as Tab 1 is a true and correct copy of the May 13, 2026 Discovery Order Re: Dkt. Nos. 172, 178, 195 filed at Dkt. No. 274 in *X Corp. et al v. Apple Inc. et al.*, No. 4:25-cv-00914-P (N.D. Tex.).

3.    Attached hereto as Tab 2 is a true and correct copy of a transcript of the May 15, 2026 hearing before the Honorable Magistrate Judge Hal R. Ray regarding Dkt. Nos. 172, 178, and 195.

4.    Attached hereto as Tab 3 is a true and correct copy of messages between Adrian Perica and Elon Musk, in which the earliest message was sent on August 17, 2024 at 5:58 PM GMT, Bates-stamped APL-XAI_00097136 through APL-XAI_00097143.

5.    Attached hereto as Tab 4 is a true and correct copy of an email thread titled ███████████████████████████ in which the latest-in-time email was sent on August 28, 2025 at 6:13 PM from Jon Shulkin to Elon Musk, Bates-stamped X-XAI-000020566.

6.    Attached hereto as Tab 5 is a true and correct copy of the Declaration of Samantha Birkenfeld-Malpass in Support of Plaintiffs X Corp. and X.AI LLC's Opposition to the OpenAI Defendants' Motion to Compel and for Appropriate Remedy.

7.      Attached hereto as Tab 6 is a true and correct copy of a September 17, 1997 L.A. Times article titled *Apple Formally Appoints Jobs Interim CEO*.

8.      Attached hereto as Tab 7 is a true and correct copy of an excerpt of Pixar's Form 10-K Annual Report for Fiscal Year 2002.

9.      Attached hereto as Tab 8 is a true and correct copy of an excerpt of Pixar's Form 10-K Annual Report for Fiscal Year 2005.

10.     Attached hereto as Tab 9 is a true and correct copy of an August 24, 2011 Apple press release titled *Steve Jobs Resigns as CEO of Apple*.

11.     Attached hereto as Tab 10 is a true and correct copy of excerpts of a deposition transcript of Sam Altman in *In re OpenAI Inc., Copyright Infringement Litigation*, No. 1:25-md-03143-SHS-OTW (S.D.N.Y. Feb. 10, 2026).

12.     Attached hereto as Tab 11 is a true and correct copy of OpenAI's subpoena to Tesla, dated December 29, 2025.

13.     Attached hereto as Tab 12 is a true and correct copy of OpenAI's subpoena to SpaceX, dated December 29, 2025.


Dated: May 20, 2026                                  Respectfully submitted,

                                                     */s/ Scott A. Eisman*
                                                     Scott A. Eisman

# Tab 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

**X CORP. AND X.AI LLC,**

    Plaintiffs,

v.

                                    **No. 4:25-cv-00914-P**

**APPLE INC., *ET AL.*,**

    Defendants.

## ORDER

Before the Court are the Motion to Compel Plaintiffs to Produce Discovery (ECF No. 172) that OpenAI OpCo, LLC ("OpenAI") filed on April 3, 2026, the Motion to Compel Discovery from the OpenAI Defendants (ECF No. 178) that X Corp. and X.AI LLC ("Plaintiffs") filed on April 9, 2026, the Motion to Compel Discovery from Apple (ECF No. 195) that Plaintiffs filed on April 15, 2026, and the Notice Regarding Certain Issues from Pending Motions to Compel (ECF No. 271) that OpenAI filed on May 12, 2026. The Notice represented that the parties resolved portions of OpenAI's Motion (ECF No. 172) and all the substantive requests in Plaintiffs' first Motion (ECF No. 178) prior to the hearing. *See* ECF No. 271 at 1.

By orders entered April 6, 10, and 16, 2026, United States District Judge Mark T. Pittman referred the motions to the undersigned for further proceedings. ECF Nos. 175, 181, 201. The Court heard the Motions in a hearing held on May 13, 2026. After considering the pleadings, arguments of counsel, applicable legal authorities, and for the reasons stated at the hearing and the additional reasons explained below, the

Court finds that the remaining live Motions (ECF Nos. 172, 195) should be and are hereby **GRANTED in part**.

## I.     BACKGROUND

"In June 2024, Apple and OpenAI announced that Apple would integrate OpenAI's ChatGPT into Apple's iPhone operating system ("iOS")." ECF No. 1 at 3. The "exclusive arrangement . . . made ChatGPT the only generative AI chatbot integrated into the iPhone." *Id.* Plaintiffs sue OpenAI and Apple because they claim that this arrangement "makes it hard for competitors" and unfairly excludes other generative AI models including Plaintiffs' own "Grok" from use on the Apple iOS. *Id.*

Plaintiffs allege that the two companies are "monopolists" who "locked up" markets to prevent innovators from competing and that Plaintiffs suffered significant harm as a result. *Id.* at 1. They sue "to stop Defendants from perpetrating their anticompetitive scheme and to recover billions in damages." *Id.* Plaintiffs and OpenAI now bring the present Motions to Compel concerning various discovery obligations of the parties.

## II.    LEGAL STANDARD

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). "Under Rule 26(b)(1), discoverable matter must be both relevant and proportional to the needs of the case—which are related but distinct

2

requirements." *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 279 (N.D. Tex. 2017) (Horan, J.).

> To be relevant under Rule 26(b)(1), a document or information need not, by itself, prove or disprove a claim or defense or have strong probative force or value. If it were otherwise, it would make little sense for Rule 26(b)(1) to direct courts to consider whether discovery that is relevant to any party's claim or defense is also important in resolving the issues.

*Id.* at 280.

Federal Rule of Civil Procedure 34 allows a party to serve a request for production that is within the scope of Rule 26(b). If the responding party fails to produce documents requested under Rule 34, then Rule 37(a)(3)(B) allows the party seeking discovery to move for an order compelling production or answers against the nonresponsive party. "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond." Fed. R. Civ. P. 37(a)(4).

The burden is on the party opposing a discovery request to show that it calls for irrelevant or otherwise objectionable information or documents. *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 580 (N.D. Tex. 2018) (citing *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485 (5th Cir. 1990)).

## III.    ANALYSIS

### A.    OpenAI's Motion (ECF No. 172)

The remaining live issue in OpenAI's Motion (ECF No. 172) concerns Tesla and SpaceX email accounts of Elon Musk, Plaintiffs' officer, and other chat and XChat accounts belonging to Musk. OpenAI requests that Plaintiffs search Musk's "email

3

and instant messaging accounts, including at SpaceX and Tesla" for responsive documents. *Id.* at 2.

Under Rule 34(a)(1), a "party may serve on any other party a request within the scope of Rule 26(b)" providing the items are within the "responding party's possession, custody, or control." Fed. R. Civ. P 34(a)(1). When an executive uses other accounts to conduct company business, such accounts are under company control. *Ultravision Techs., LLC v. Govision*, LLC, No. 218CV00100JRGRSP, 2020 WL 10692709, at *2 (E.D. Tex. Aug. 28, 2020).

Here, Musk is a high-level executive at both Tesla and SpaceX with "control" over his business email accounts. *See Musk v. Altman*, No. 24-cv-04722-YGR (TSH), 2025 WL 2348769, at *1 (N.D. Cal. July 1, 2025) (finding that Musk controls business email accounts at the companies and therefore the email accounts fall within the scope of Federal Rule of Civil Procedure 34(a)(1).). Because Musk controls his business email accounts at both entities, they fall within the scope of Federal Rule of Civil Procedure 34(a)(1). The Court also finds that responsive documents in Musk's emails at both Tesla and SpaceX, and his other text and XChat accounts, are relevant and proportional to the needs of this case, to the extent they relate to the claims and defenses at issue. Fed. R. Civ. P. 26(b)(1). Accordingly, the Court **GRANTS** OpenAI's Motion, and Plaintiffs **SHALL** produce responsive documents from Musk's accounts at Tesla and SpaceX by **June 3, 2026**.

At the hearing, Plaintiffs represented that they were still in the process of complying with their discovery obligations relating to their production of XChats and

text messages. Plaintiffs **SHALL** complete their production of this category of discovery by **June 3, 2026**.

### B.    Plaintiffs' Motion (ECF No. 195)

Plaintiffs request several categories of discovery from Apple. First, they request production of the Apple-Google agreement ("the Agreement") without redactions. ECF No. 195 at 1. Plaintiffs waived this argument at the hearing. They also request documents related to the Agreement, arguing that because OpenAI has put the Agreement at issue as part of its defense, documents relating to the Agreement are now squarely at issue in this case. ECF No. 196 at 15. Specifically, they seek "documents discussing the genesis of the Agreement, surrounding negotiations, and whether other entities competed for the Agreement." *Id.*

This request is overly broad and encompasses information that goes beyond the scope of material relevant to OpenAI's defense. However, the Court finds that related documents that refer to potential exclusivity clauses of the artificial intelligence provider for Apple products are relevant and proportional to the needs of this case. Therefore, the Court **GRANTS** the Motion (ECF No. 195) in part as to this point, and **ORDERS** Apple to produce such category of documents by **June 17, 2026**.

Next, Plaintiffs seek appointment of an additional Apple custodian to produce responsive documents that relate to issues of smartphone competition. ECF No. 196 at 18. Specifically, they seek information about Apple's plans regarding smartphones, information regarding iPhone sales and market share, and other generalized information regarding Apple and competitors in the smartphone industry. *Id.* at 14.

5

App. 14

But this is an antitrust case relating to Apple's integration of OpenAI's software into Apple Intelligence. Documents regarding competition in the smartphone industry writ large far exceed the scope of the claims in this case and therefore are not relevant or proportional under Rule 26(b)(1). The Court **DENIES** this part of the Motion.

Plaintiffs also seek appointment of Apple's CEO Tim Cook and Senior Vice President of Software Engineering Craig Federighi as custodians. ECF No. 196 at 19. "A responding party is generally entitled to select the custodians most likely to possess responsive information." *Firefighters' Ret. Sys. v. Citco Group Ltd.*, No. CV 13-373-SDD-EWD, 2018 WL 276941, at *4 (M.D. La. Jan. 3, 2018) (citing *Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank*, N.A., 15 CV 0293, 2017 WL 2305398, at * 2 (S.D.N.Y. May 18, 2017)). "A party seeking to compel another party to search the files of additional custodians bears the burden of establishing the relevance of the documents it seeks from those custodians." *Id.* (cleaned up). A court may designate additional custodians when the requesting party shows that the individual has "unique relevant evidence not already produced." *Entergy Gulf States La., L.L.C. v. La. Generating, L.L.C.*, No. CV 14-385-SDD-RLB, 2021 WL 24686, at *8 (M.D. La. Jan. 4, 2021). And courts may designate a high-level executive as a custodian when the requesting party shows the executive is a "key decision-maker." *See id.*

Here, Plaintiffs argue both Cook and Federighi "made high-level, strategic decisions about the Apple-OpenAI Agreement." ECF No. 196 at 19. Plaintiffs have sufficiently met this standard as to Federighi. They argue that Federighi may have

6

unique relevant evidence not already produced relating to Apple's integration of OpenAI into Apple Intelligence, because as Senior Vice President of Software Engineering he likely was a key decision maker regarding Apple's software development. However, Plaintiffs have not made this showing as to Cook. Plaintiffs do not explain how Cook is likely to have any unique relevant evidence that was not already produced, or that designating Federighi as a custodian would not provide. *Entergy Gulf States La., L.L.C.*, 2021 WL 24686, at *8. Accordingly, the Court **GRANTS** in part Plaintiffs request, and designates Craig Federighi as a custodian. Apple shall provide responsive discoverable documents in Federighi's possession by **June 17, 2026**.

Plaintiffs next request that the court extend the ending date of Apple's obligation to produce weekly integration reports. ECF No. 196 at 22. The Court's amended scheduling order (ECF No. 202) extended the deadline for discovery to July 31, 2026. The Court finds that it is appropriate to extend the deadline for Apple's production of the weekly integration reports to July 31, 2026, and therefore **GRANTS** the Motion (ECF No. 195) as to this point.

Finally, Plaintiffs ask the Court to compel Apple to produce all documents relating to its internal policies regarding employee usage of generative artificial intelligence products and chatbots. ECF No. 196 at 25. However, it is unclear how Apple's internal policies for its employees regarding artificial intelligence are related to Plaintiffs' antitrust claims. Plaintiffs argue that Apple publicly touted the safety of OpenAI's products yet was concerned enough about the same products to limit its

7

employees' use of them on Apple devices. *Id*. But this argument does not follow. Just because Apple may impose guardrails on its employees' use of a program does not mean that Apple was "misrepresenting" the safety and privacy of the programs when it described them as "the safest generative AI chatbot." *Id*.

For example, perhaps Apple thought it prudent to impose safeguards for its employees as to all AI technologies. Or maybe OpenAI's products were the safest on the market, and Apple still thought it wise to have a policy regarding their use. Either way, all documents concerning Apple's internal policies for its employees are not relevant or proportional to the needs of this case. While Apple must still produce the AI policies themselves, the Court **DENIES** the Motion to Compel production of all documents relating to these policies.

It is so **ORDERED** on May 13, 2026.

_____
Hal R. Ray, Jr.
UNITED STATES MAGISTRATE JUDGE

8

# Tab 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

X CORP., et al.,                    )    **Case No. 4:25-cv-00914-P**
                                    )
        Plaintiffs,                 )
                                    )    Fort Worth, Texas
v.                                  )    May 13, 2026
                                    )    9:00 a.m.
APPLE, INC., et al.,                )
                                    )    MOTIONS TO COMPEL
        Defendant.                  )    [172, 178, 195]
_____    )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HAL R. RAY, JR.,
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:

For the Plaintiffs:         Alexander Mark Dvorscak
                            STONE HILTON, PLLC
                            2000 West Loop South, Suite 1500
                            Houston, TX  77027
                            (713) 655-1101

For the Plaintiffs:         Scott Andrew Eisman
                            Eva Yung
                            AXINN VELTROP & HARKRIDER, LLP
                            630 Fifth Avenue, 33rd Floor
                            New York, NY  10111
                            (212) 261-5642

For Defendant OpenAI,       Graham W. Meli
Inc.:                       Stephen R. DiPrima
                            WACHTELL LIPTON ROSEN & KATZ
                            51 W. 52nd Street
                            New York, NY  10019
                            (212) 403-1390

For Defendant OpenAI,       Ralph H. Duggins
Inc.:                       CANTEY HANGER, LLP
                            Cantey Hanger Plaza
                            600 W. 6th Street, Suite 300
                            Fort Worth, TX  76102
                            (817) 877-2800

APPEARANCES, cont'd.:

For Defendant Apple, Inc.:    Dee J. Kelly, Jr.
                              KELLY HART & HALLMAN, LLP
                              201 Main Street, Suite 2500
                              Fort Worth, TX  76102-3194
                              (817) 332-2500

For Defendant Apple, Inc.:    Henry Liu
                              COVINGTON & BURLING, LLP
                              One CityCenter
                              850 Tenth Street NW
                              Washington, DC  20001
                              (202) 662-5870

Recorded by:                  Elsherie Moore
                              UNITED STATES DISTRICT COURT
                              510 W. 10th Street
                              Fort Worth, TX  76102
                              (817) 850-6664

Transcribed by:               Kathy Rehling
                              311 Paradise Cove
                              Shady Shores, TX  76208
                              (972) 786-3063

          Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.

App. 20

FORT WORTH, TEXAS - MAY 13, 2026 - 8:59 A.M.

THE BAILIFF:  All rise.

THE COURT:  Thank you.  Please be seated.

The Court calls for some motion hearings today Cause No. 4:25-cv-00914-P, X Corp. and X.AI, LLC, Plaintiffs, versus Apple, Inc. and others, Defendants.  Would counsel state their appearances for the record, please, beginning with counsel for Plaintiff?

MR. EISMAN:  Good morning, Your Honor.  Scott Eisman from Axinn for Plaintiffs X Corp. and X.AI.

MS. YUNG:  Good morning, Your Honor.  Eva Yung also from Axinn representing Plaintiffs X Corp. and X.AI.

MR. DVORSCAK:  And Alex Dvorscak from Stone Hilton also representing Plaintiffs.

THE COURT:  Good morning.  You all may be seated.

Counsel for the --  I guess for Apple, Inc.?

MR. LIU:  Good morning, Your Honor.  Henry Liu from Covington & Burling for Apple.

MR. KELLY:  Good morning, Judge.  Dee Kelly.

THE COURT:  Good morning.  And then for the OpenAI Defendants?

MR. DIPRIMA:  Good morning, Your Honor.  Stephen DiPrima from Wachtell Lipton Rosen & Katz.

MR. MELI:  Good morning, Your Honor.  Graham Meli also from Wachtell Lipton Rosen & Katz.

THE COURT: Good morning. Well, I thought we would take up these motions in the order that they were filed, and so I guess that'll be starting with OpenAI's Motion to Compel. I'm going to tell everybody, I've read the paper, and thank you very much for your extensive briefing, and I'm just ready to hear from you.

MR. DIPRIMA: Good morning, Your Honor. Thank you. We do have some resolutions of the issues on our motion to report. We put in a notice to the Court last night. We've been able to work out all of the issues on OpenAI's Motion to Compel and Plaintiffs' Motion to Compel against OpenAI, with the exception of the Musk Documents. And so, with the Court's permission, I would argue that point. And I think -- the briefing was extensive, but I think most of it now has been mooted by the parties' agreement.

THE COURT: Well, I got educated nevertheless.

MR. DIPRIMA: Thank you.

THE COURT: So always good to learn about moot things.

MR. DIPRIMA: So, Your Honor, the issue we're talking about today concerns Mr. Musk's documents. Mr. Musk is the CEO of X.AI, and to date, we've gotten next to no documents from his own files. We've gotten no XChats, no Signal messages. We've gotten two text messages that were produced on Sunday, just a couple days ago, that had been previously

produced by Apple.  And we've gotten 10 emails where he's actually said something.  Most of those emails are one word: sure, okay, that kind of thing.

And this case, I mean, it's not a case where the CEO would be removed from the events.  These go -- the issues in the case go to core issues that would concern the CEO.  And so we're troubled by the fact that we've gotten next to no documents.

And against that backdrop, we've asked the Plaintiffs to search Mr. Musk's email accounts at Tesla and at SpaceX, and the response we've gotten is:  Outside of our custody and control.  These are -- this isn't party discovery.  It's third-party discovery.  Go get those documents from the third parties.

And we disagree.  These are documents that are in Mr. Musk's custody and control.  He's the CEO of all of these companies, and these are accounts that he clearly uses for business for all of these companies.  And we put the evidence that we have on that before the Court.  We've got a text message from 2024 where he directs a counterpart at Apple to email him using those two email accounts.

We've got internal documents where his own CFO at X.AI is emailing him about X.AI business at his SpaceX account.

And in one of the text messages we got on Sunday, there's a notation of the Tesla email account on a text chain, one of

the two we've gotten where he's discussing artificial intelligence.

And so it's clear from what we have seen that these accounts very well may include relevant party information, business of the Plaintiffs. And we've been basically told, you know, go get 'em -- get 'em elsewhere.

And so on the issue of custody and control, the case law we think is very clearly on our side. In fact, this issue, the very same issue came up in the case that's being heavily reported in California, the *Musk v. Altman* trial. And it was the same situation. The parties in that case, Mr. Musk said, you know, go get them from these other companies. And the court there treated it as a category error. This is not third-party discovery, this is party discovery, and you can go -- if those other entities want to use counsel to help with the production, fine, but the burden of the discovery falls on the parties and their lawyers.

And the basis for the ruling applies equally here. Mr. Musk is the CEO here for the Plaintiffs, he's the CEO of those companies, and he controls those accounts. And he can snap his fingers and cause those documents to be reviewed and produced.

And Plaintiffs say, well, you know, you can subpoena these other entities. And we have. We sent subpoenas out in December. We've gotten no documents. Nothing. We've gotten

nothing from Tesla.  SpaceX has now retained a firm.  They're doing some searches and giving us hit counts.  But we've gotten no documents from them.

And just to put that in perspective, we did get an extension of the schedule here, but under the old schedule we were supposed to be done at the end of May or near the end of May.  May 22nd, I believe.

And so the idea that we're left to go chase these documents and that parties can sort of wash their hands of this discovery puts a real burden on us, because the other lawyers, they don't -- sure, they'll pay some respect maybe to the schedule in this case, but this really should be party discovery.

And the Texas cases we've cited in our brief are to the same effect as the *Musk v. Altman* case.  They recognize that the limits of Rule 34 aren't narrowly confined to the corporate party.  If there's an executive who uses personal email accounts or has accounts elsewhere, that executive has control over those accounts and the search can and should be ordered.

And so we would respectfully request that Your Honor order that those accounts be searched and produced.

Again, to the extent they want to enlist other lawyers to help, that's fine.  But the obligation to do the search, to make the production, in this case should fall on the parties.

And the idea that this is just third-party discovery, as the court in California put it, is a category error.

I'd like to talk a little bit about the text messages. As I said, we've gotten two of them. This request stands on slightly different footing. The Plaintiffs aren't saying -- refusing to produce. But we're constantly being told the check's in the mail, we're going to produce, we will be producing. We got our first text messages in this case on Sunday.

Now, they had been previously produced by Apple. We all knew they existed. So it's repetitive discovery in that regard. But that's it. That's all we've gotten.

And we know Mr. Musk uses texts. He told, in the 2024 text message that I was referencing, he tells his counterpart at Apple, Email me at Tesla or SpaceX, but I prefer text. We've only gotten two. Two messages. And we know that Apple has been -- has produced text messages that include Mr. Musk that we haven't seen, at least three of them from the weeks before the lawsuit was filed, when there was, you know, a buildup of tension, threats, and then a suit.

And so where are they? We need the Court's help, we believe, to get this discovery because it hasn't been forthcoming. I don't know why it hasn't been forthcoming, but it hasn't been forthcoming. And without an order, we're concerned that this is just going to drift for weeks more and

we're going to lose the opportunity to take that discovery.

THE COURT:  All right.  Thank you.

MR. DIPRIMA:  Unless the Court has any questions.

THE COURT:  Not for you.

MR. DIPRIMA:  Thank you.

THE COURT:  Thank you.

Response?  First off, are we just talking -- is what Counsel indicated, we're just talking about the material from Mr. Musk?

MR. EISMAN:  That's right, Your Honor.

THE COURT:  Okay.

MR. EISMAN:  We think we have resolved the other issues.

THE COURT:  Very well.

MR. EISMAN:  And may it please the Court.  Scott Eisman from Axinn for Plaintiffs.

So, before getting into the specific Musk items that OpenAI seeks, it's worth just taking a moment to understand what the dispute is really about here.

As Your Honor knows, this case involves claims that Defendants entered into an unlawful exclusive deal, monopolized their respective markets.  And discovery has already provided support for many of Plaintiffs' core allegations.

And so the motion to compel on issues, one of which we

don't even think is right, is really an effort to distract from sort of bad documents in the case substantively for them. And as I've mentioned, we've thankfully been able to resolve most of that motion to compel. But what remains is, first, whether Plaintiffs should be forced to produce emails from other companies, from Tesla and from SpaceX, which are distinct from X.AI and X and are not parties to this litigation.

And second, whether Plaintiffs must be ordered to produce text messages, Signal messages, XChats, which they've already agreed to produce to the extent that they're responsive. Indeed, this Court has already rejected OpenAI's spoliation motion, and discovery remains ongoing. And OpenAI also overlooks this Court's holding that Plaintiffs didn't have a preservation obligation back in 2024 when OpenAI says that we did.

So the bottom line is, Your Honor, the Plaintiffs have been cooperating in discovery, have already produced four times the number of documents that OpenAI has produced, and there's no reason here to compel Plaintiffs to do anything else.

So if I may, Your Honor, I'd like to turn first to the Tesla and SpaceX emails.

OpenAI has no basis to demand that Plaintiffs produce Mr. Musk's emails from separate companies. And in demanding that

we do, they run roughshod over a bedrock principle of American corporate law, that separate companies are, in fact, separate, even if they share owners, employees, and the like.  And as I mentioned, Your Honor, SpaceX and Tesla are different companies from X and X.AI.  And the fact that these companies are separate means that Plaintiffs don't have possession, custody, or control over SpaceX and Tesla emails.

OpenAI tries to dodge this issue by saying that it's not asking Plaintiffs to produce Tesla's and SpaceX's emails. What it's actually asking us to do is to force our CEO to produce those emails.

But that's just swapping one problem in for another, Your Honor.  Instead of collapsing Plaintiffs with Tesla and SpaceX, OpenAI is collapsing Plaintiffs into Mr. Musk, who is not a plaintiff in this case.  He's not a party to this lawsuit at all.  And OpenAI hasn't even tried to show that Plaintiffs have no separate identity from Mr. Musk.  OpenAI gives no reason, none, to treat Plaintiffs and Mr. Musk as one and the same.

OpenAI also hasn't met its burden to show that Plaintiffs must force Mr. Musk to turn over his Tesla and SpaceX emails because he's used those emails to conduct the business that's relevant to this case.  OpenAI's only supposed evidence for this is that Mr. Musk used his Tesla and SpaceX emails to conduct --  was that he told Adrian Perica from Apple to email

him at his SpaceX email accounts. But there is no evidence in the record, Your Honor -- again, nothing -- to suggest that Mr. Perica or anyone from Apple then went ahead and emailed Mr. Musk at those accounts. And we'd expect there to be some evidence of that since Mr. Perica himself is a custodian from Apple in this case.

All that's left is the fact that other people sent Mr. Musk emails at those addresses, but that doesn't mean that Mr. Musk was conducting business himself from those addresses. As OpenAI itself has taken the position in discovery so far, you know, just merely receiving emails at an email address doesn't mean that a person is conducting their business from those email addresses.

So, you know, all they've got is the receipt of a few inbound emails at these email addresses. That's an awfully thin basis to require the Plaintiffs to force their CEO to direct that other companies, one of which is a public company, just turn over email boxes that they own to Plaintiffs so that Plaintiffs can produce them in this case.

What OpenAI is really asking for, Your Honor, is a new invented multi-step process that the Court should ask the Plaintiffs to compel their CEO, who is, again, not a party to this case, to produce documents from yet other companies who are likewise not parties to this case. And that's all the more unreasonable, given that OpenAI has subpoenas out to

Tesla and SpaceX, as they mentioned. And they can negotiate with Tesla and SpaceX to get documents that they need that are in Tesla and SpaceX's possession, custody, or control, not Plaintiffs'.

*Musk v. Altman*, which my friend mentioned, is a different situation, because there Mr. Musk himself is a party to the case. So the court ordered him to produce his own emails that he had control over. That is not the situation here. Mr. Musk is not a party.

Turning to the question of messages, OpenAI is also wrong that there is a ripe dispute over text messages, which is what my friend mentioned, as well as things like XChat messages, which were all also in the briefing. We have searched for and are continuing to search for and review and produce responsive communications. There is still more than two and a half months to go in discovery. Text messages: still gathering, reviewing, producing. As to XChats, our client has had to build a tool to process and review these XChats.

So, Your Honor, we're still in the discovery process. We've substantially completed by producing more than 30,000 documents, but the process remains ongoing.

And it's worth remembering, Your Honor, that just over two months ago this Court rejected OpenAI's claim that Plaintiffs had an obligation to preserve documents dating back to 2024. As Plaintiffs' in-house counsel explained in a declaration,

Plaintiffs did not reasonably contemplate bringing the suit until August of 2025.

We've done what we're supposed to do in discovery. We've collected and reviewed the evidence that we had a duty to preserve and that we have preserved. We've produced anything that's responsive. We're continuing to do so. But as I've said, there's no ripe dispute over text messages or any other messages.

An opinion ordering us to produce what we've already agreed to produce would simply be advisory, Your Honor. We're already undertaking this process.

So, unless Your Honor has any questions.

THE COURT: I have a couple.

MR. EISMAN: Sure.

THE COURT: If I were to order Mr. Musk to make his SpaceX and Tesla email accounts available for review, how long would it take you to complete that task? How much time would you need an order to give you?

MR. EISMAN: I'm not sure, Your Honor. I mean, we would have to coordinate with SpaceX and Tesla, as there's a declaration from an employee of my client in the record that we don't actually have access to those emails. So it's not as simple as OpenAI says, that it's just the press of a button. Again, it would be -- if Your Honor is talking about an order directed to Mr. Musk, who's not a party to the case, there

would be some legwork to do on our end.

And again, that's I think part of why we think this task is inappropriate. These are emails that we don't have access to.

THE COURT: But if you could instruct your -- or pass along the Court's order to the CEO of X to make his email accounts in those other companies available for some sort of a review, how long is reasonable to require -- how long would be reasonable to require him to do so? And then to conduct a review to see if there are email messages back and forth regarding the issues here in this case?

MR. EISMAN: Your Honor, standing here today, I don't know exactly how long it would take. It would be an order from the Court. We'd obviously make every effort to comply as quickly as possible. But part of that would be liaising with companies that, again, are not my client. So a little bit of it would be out of our hands personally.

But if Your Honor were to issue such an order, we'd make every effort to comply as expeditiously as possible, recognizing that the time frame for -- that the parties' agreed-upon default time frame is more than two years, and we'd have to review for responsiveness and privilege. So it would take a little bit of time, but we'd move as quickly as possible, if so ordered.

THE COURT: All right. And then as to the texts and

the XChats that you say it's not a ripe issue because you're in the process of producing all those, how much longer do you need to get all that taken care of?  Because you can't just, you're cooperating, you're cooperating, cooperating, and even with the extension on the discovery cutoff, there's a hard stop there, so --

MR. EISMAN:  Understood.  And we are working through that as quickly as possible.  As I mentioned, with the XChats in particular, we've had to build a tool, so that's taken a little bit of time.  But we are working to produce those as quickly as possible.  I don't know that I have a firm deadline standing here today, but we understand, with depositions coming up, too, that we need to get documents out the door. So we are working.

THE COURT:  What's the thinking in terms of when those depositions are going to be?  Is that two weeks or thirty days or --

MR. EISMAN:  The depositions are still being scheduled.  We are in discussions with the other side about that, Your Honor.

THE COURT:  Okay.  Very well.

MR. EISMAN:  Any other questions, Your Honor?

THE COURT:  No, sir.  That's all I have.

MR. EISMAN:  Thank you very much.

THE COURT:  Reply?  Thank you.

MR. DIPRIMA:  Quickly, Your Honor.  On the timing, substantial completion was March 18th.  We're almost two months from that.  We're about to embark on a very heavy deposition schedule.  I don't know, 40, 50 depositions, or more.  We got our first two text messages on Sunday, so almost two months from the substantial completion deadline, with no explanation as to why, where these came from, whether there are more, why it took so long to get those documents.

And so, respectfully, we feel we need an order at this point to make this happen.  The XChat tool, that's the first I'm hearing about it, that we might be getting XChat messages.  Maybe someone else on my team heard that.  But that's the first I'm learning of it.  And we know there's discovery to be had from these other entities.

I mentioned earlier the email from the CFO of X to the SpaceX account doing regular X business.  He knows where to -- the CFO knows where to reach his boss, and he reached his boss at the SpaceX email account.

SpaceX, by the way, there has been an announcement that it's all dissolving up into SpaceX.  It's the parent company of Plaintiffs.  And I don't even know if Plaintiffs are going to continue to exist as separate entities.

And so the idea that there's some forcing that has to go on of Mr. Musk, no one is saying that Mr. Musk is going to be forced to do anything.  He's the boss.  We're here because of

him.  He caused these entities to initiate this lawsuit. These are his email accounts.  The only reason we're not getting cooperation on this discovery is because he isn't making it happen.  And leaving us to third-party subpoenas burdens the Court, it makes our -- the jobs of the lawyers more difficult in preparing the case, and it's completely inefficient.  This is party discovery, Your Honor, and we respectfully request that the Court grant our motion.

THE COURT:  So wait just a minute, Mr. Duggins.

So when are you planning to tee off on these 40 or 50 depositions?

MR. DIPRIMA:  Our first deposition is in about two weeks.

THE COURT:  Two weeks?

MR. DIPRIMA:  And we have a new discovery deadline at the end of July.  So July 31st.

THE COURT:  All right.

MR. DIPRIMA:  But we have a lot to do, and we -- and these are -- could be the most important documents in the case.  They're from the CEO of these entities.  And so we want them for examination.

THE COURT:  So if the Court were to enter an order, as I asked opposing counsel, how long is reasonable to require Mr. Musk to make those other email accounts available and then look and see if there are documents responsive regarding this

case?

MR. DIPRIMA: If we got the documents in two or three weeks, even if we don't have them for the first deposition or two, we would be very happy with that, and we could use those documents for the bulk of the deposition program.

THE COURT: Okay. Thank you.

MR. DIPRIMA: Thank you.

THE COURT: Mr. Duggins?

MR. DUGGINS: I didn't get to announce when you asked who was --

THE COURT: I'm sorry. I didn't. I jumped the gun.

MR. DUGGINS: No, that's okay. But I'm Ralph Duggins on behalf of OpenAI. I just want to echo a couple of comments that Mr. DiPrima made.

The Plaintiffs chose to file this case here, no doubt at the direction of Elon Musk. And to come to this Court and say he has no duty as CEO of the company to retrieve his emails sent in connection with this case is gamesmanship like I've never seen. And the Court needs to set, in our judgment, set a deadline. This business, how long is it going to take, great question. You got no answer. They've had weeks and weeks to search for this.

And to say there is no basis to require the Plaintiff to produce emails the Plaintiffs' CEO sent because he chose to use another email account is unheard of.

So I hope the Court will set a deadline for both of these and not just live with a statement from Counsel, we're working on producing text messages.  Let's have a deadline.  And I bet if you do that, we'll see action from the Plaintiffs.  We need deadlines on this, and we need this for the depositions that are scheduled.  And I thank you.

THE COURT:  All right.  Thank you, Duggins.  Mr. Eisman?

MR. EISMAN:  Thank you, Your Honor.  Just a few more points, if I may.

First, you heard a little bit from my friend Mr. DiPrima about the SpaceX merger.  SpaceX is a parent company of X.AI.  It is presumed to be a different entity.  There has been no showing that, as a result of X.AI's becoming a subsidiary of SpaceX, that X.AI and SpaceX are somehow the same.

There has also been some assumption by both my friends who just spoke that Mr. Musk was the one who brought this lawsuit.  That is untrue.  The Plaintiffs are X and X.AI.

There was also an assumption that Mr. Musk has used his SpaceX and Tesla emails to conduct business related to this case.  But they have not made that showing, Your Honor.  They've shown, at most, that he received some emails at those accounts, not that he actually did anything from those accounts.

In terms of deposition scheduling, while there are

depositions of Plaintiffs' employees that are scheduled to start soon, Mr. Musk's deposition has not yet been scheduled. And in fact, we've stipulated with Defendants not to schedule Mr. Musk's depositions or the depositions of other high-ranking members of Apple or OpenAI until later in the process. We have a June 17th deadline to meet and confer, a June 24th deadline to move for protective orders as to those depositions.

So while it sounded from Mr. DiPrima that there was actually some urgency, we would expect that the emails of -- or other messages of custodians who are going to be deposed in this case to have been produced in advance of their deposition. So it's not as though Mr. Musk is being deposed in two weeks, and I don't want Your Honor to get that misimpression.

You know, finally, we've talked about the subpoenas out to Tesla and SpaceX already. It just seems like a bit of an odd result, to be compelling those companies to be turning over their emails to us to have us produce, when those companies have separately received subpoenas that they're negotiating with with OpenAI. It just, as I said, Your Honor, it seems like OpenAI is collapsing distinctions between Mr. Musk, X and X.AI, SpaceX, and Tesla all into one and trying to get an order that requires Plaintiffs who are separate from Mr. Musk and those other companies to produce documents here.

THE COURT:  All right.  Thank you.

MR. EISMAN:  Thank you, Your Honor.

THE COURT:  The Court is going to grant OpenAI's motion regarding the email accounts for Mr. Musk as to the Tesla and the SpaceX email accounts.  The reason for that is I think, on the facts of the case and the evidence presented, that Mr. Musk's email account at X or X.AI is clearly relevant and proportional to the needs of the case as to emails that were sent and received in connection with the matters at issue in this case.

And if there is some suggestion that there's a dearth of those emails, it causes one to wonder, both as a party to the case and as the Court, where are the emails?  If this is such an awful monopolistic endeavor that's costing the Plaintiffs billions of dollars, where are the emails from Mr. Musk?  Well, there's some suggestion that they're offloaded to these other accounts.

So you can't avoid your obligation to produce responsive documents by playing a shell game and you move the nut from one shell to the next.  And so, for that reason, the Court decided as it did.

Maybe there aren't any.  And that's fine.  But we're going to look.  And I think that's the main response here.

Now, as to the text messages, the XChats and so forth, they are going to continue to produce those, but I think that

Counsel is right that what needs to happen is we need to enter an order setting a deadline, both for production of the documents, if any, from the Musk email accounts at Tesla and SpaceX, and for any responsive text messages or XChats or any similar messaging products. And I'm going to set that deadline for 21 days from today, I guess three weeks from today. And that will be my order as to that motion.

Now, does the action on that motion, then, on OpenAI's motion, does that take care of Plaintiffs' Motion to Compel back against OpenAI as well?

MR. EISMAN: Yes, Your Honor, it does. Can I just ask one --

THE COURT: Sure.

MR. EISMAN: -- point of clarification about your order?

THE COURT: Absolutely.

MR. EISMAN: The 21-day deadline, does that apply to all parties to produce documents they've committed to produce so far, if part of the concern is about --

THE COURT: No, it's just --

MR. EISMAN: Okay.

THE COURT: Just on the motion that's in front of the Court.

MR. EISMAN: Okay.

THE COURT: And then if you all want to work out

something else, that's fine.  But I'm --

MR. EISMAN:  Okay.

THE COURT:  I'm just trying to take it one at a time.

MR. EISMAN:  Understood.  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

So then what's left, then, is just the Motion to Compel Discovery from Apple.  I'd be pleased to hear what's left on that.

MR. EISMAN:  Thank you, Your Honor.  I am going to be addressing a portion of this motion, and my co-counsel Mr. Dvorscak, will be handling the portion related to the Apple-Google Agreement.  I'll handle the rest.

THE COURT:  Okay.

MR. EISMAN:  So we're here today on Apple's motion, Your Honor -- on Plaintiffs' motion against Apple because Apple, when left up to its own devices, has not played fairly throughout discovery.

So our position on adding Tim Cook and Craig Federighi as custodians is really a case in point.  In January, we agreed with Apple on a set of custodians, and we reserved all rights to seek additional custodians after reviewing the documents produced to us.  We had no organizational chart from Apple at the time, so we had to take Apple's word for who the relevant Apple employees were.

And even during our negotiations, we had shifting representations from Apple about who was involved. Eddy Cue, an executive at Apple who Apple now says was central to the events at issue, was someone we had to ask Apple to add multiple times over several weeks. They said he had no involvement. Now they say he's central.

Apple also said that Mr. Cook and Mr. Federighi were hardly involved in the Apple-OpenAI Agreement, hardly involved in implementing the Apple-ChatGPT integration. Then, February, when Apple purported to substantially complete productions, we saw that, contrary to Apple's representations, Mr. Cook and Mr. Federighi were actually quite involved in negotiating and implementing the ChatGPT integration.

So just a few examples, Your Honor. Mr. Cook, in his role as CEO of Apple, attended a product demonstration from OpenAI, together with Mr. Federighi. So that's something that no other Apple custodian would have documents about. He analyzed potential generative AI chatbot partners for integration into Apple Intelligence. He negotiated, alongside other Apple executives, to decide whether to partner with OpenAI. He met with OpenAI's CEO, Sam Altman, to discuss the integration. He personally reviewed and approved the term sheet for the deal.

Craig Federighi was similarly involved at a deep level. He was described by someone as the ultimate decision-maker for Apple Intelligence. He helped make the final decision on

which generative AI chatbot to integrate into Apple Intelligence.  He assessed the reasoning capabilities of multiple GenAI chatbots.  He arranged to even meet with Mr. Musk about potentially integrating Grok into Apple Intelligence.  And he personally stood up at Apple's Worldwide Developer Conference in 2024 and unveiled Apple Intelligence and discussed the integration of ChatGPT into Apple products.

Now, Your Honor, even without Mr. Cook's and Mr. Federighi's custodial files, we've seen enough to know that these two individuals were key decision-makers.  And that's all that's needed under the *Entergy* case for them to be custodians here.

It doesn't matter that they're high-ranking executives. There's no such thing as apex custodians, as Apple's own case, *DoorDash*, notes.  And in fact, all the other parties to this case have included their CEOs as custodians.  As we just discussed, Mr. Musk is one.  Mr. Altman is one for OpenAI.

And by the way, Your Honor, if Apple is right that Mr. Cook and Mr. Federighi were really not involved beyond the other custodians in this case, then it should be really no burden at all to review their documents once they're de-duplicated against the rest of the custodial set.  So that alone would be enough for Mr. Cook and Mr. Federighi to be added as custodians.

But there's actually another important reason, too.  So

based on the documents we've seen so far, we noticed the depositions of these two individuals. And Apple first sought to block the depositions. They filed a motion for a protective order. We later stipulated, as I noted earlier, Your Honor, to postpone the depositions of executives on both sides, including Mr. Cook and Mr. Federighi. And we set a June 17th deadline to meet and confer about whether all of the depositions covered by the stipulation are necessary.

Now, Apple, for its part, has argued that we can't take the depositions of Mr. Cook and Mr. Federighi unless we can show that they have substantially-unique knowledge. We're not looking to take these depositions for no reason. We believe, from what we've seen so far, that these individuals are likely to have such knowledge, but we need their documents to know more.

An easy way to facilitate a productive meet-and-confer between the parties is for Apple to produce the custodial documents of these two individuals. And if it turns out there's nothing more than what's in the other custodial files, then, as we've said, this will be minimally burdensome for Apple.

Now, for what it's worth, Your Honor, this isn't the only way that Apple is trying to starve us of the information that we need to have a productive meet and confer and to claim that we need the depositions of these two individuals. They've

said repeatedly that we need to first depose other Apple executives -- namely, Eddy Cue and Adrian Perica. But then they said that neither Mr. Cue nor Mr. Perica would be available for a deposition before June 17th, when we have to meet and confer about this. In fact, Mr. Cue is not going to be produced for his deposition until July 29th, two days before the discovery deadline.

So we really need information to have a productive discussion with the other side about these depositions.

So as I've said, Your Honor, we don't think this is a heavy lift. With more than two months to go in discovery, we're asking for two custodians that Apple says have only marginal involvement beyond the other custodians. And we're asking based on specific information that we've learned in discovery that shows that these two individuals made key decisions about the events at issue here that shows they were much more involved than Apple represented in custodial meet-and-confers.

Now, Apple has also very likely collected much of this material already, given that it's already litigating other cases about its monopoly of the smartphone market, including a case against the Department of Justice where Apple has 53 custodians and likely has custodial documents from these two individuals.

We've met our burden, we think, of showing that these two

men are proper custodians, and there's every reason to suspect, Your Honor, that they have more documents that weren't captured in the production so far and that those documents would be squarely relevant to Plaintiffs' claims.

Your Honor, the next issue I would like to cover is the weekly integration reports. So these are reports that get produced every week that track metrics about the integration of ChatGPT into Apple Intelligence. And Apple's refusal to produce these reports through the close of discovery defies the Federal Rules, it defies *Dondi*, it defies the parties' understanding about the default time frame for document production in this case.

The documents are undisputedly relevant. As I just mentioned, Your Honor, they track the very integration that we are suing about. And they are undisputedly easy to collect. It's a single email each week.

Apple's only objection to producing them is that they're outside the default time frame. But the parties meant what they said when they said that this time frame was a default. They set that so that it could be modified as appropriate. And it's appropriate here, Your Honor.

Apple even acknowledged this initially, that it would be appropriate to modify the time frame for these weekly integration reports. Now they're saying they'll only modify the time frame if Plaintiffs will agree to modify the time

frame for separate unrelated requests. But the big difference is that the materials that Apple wants us to modify the time frame for are not undisputedly relevant and easy to gather. We have relevance and proportionality objections to producing beyond the time frame, but there really can't be any such objection to the integration reports here, and Apple can't handcuff these two items together.

It should produce the unquestionably-relevant and easy-to-gather integration reports now through the end of discovery. And if there is a dispute over documents that Apple wants Plaintiffs to produce, Apple can take that up at the appropriate time. At the appropriate time, as Your Honor said, and that the issues that are before the Court are what are appropriate for the Court to decide.

Turning next, Your Honor, to the question of a custodian who has documents about smartphone competition, our position here is straightforward. We assert claims that Apple monopolized, attempted to monopolize, conspired to monopolize the smartphone market. And as part of those claims, which survived a motion to dismiss from both Defendants, we allege that Apple's monopoly harms super apps like the ones Plaintiffs -- or, the one Plaintiffs are building.

And we asked Apple to produce documents about competition in the smartphone market, and Apple agreed to run our search terms and produce responsive documents. Then, after Apple

claimed to have substantially completed document production, we got essentially nothing about smartphone competition.

Now, Apple didn't deny that they agreed to produce documents about smartphone competition or that our search terms would have turned up relevant documents. They said instead that there simply may not be a smartphone custodian. And we think, Your Honor, frankly, that was an absurd position to take, given that they'd represented back in December that their proposed custodians, the ones they proposed, all of whom were in our agreed-upon set were, quote, more than sufficient to cover all of Plaintiffs' claims.

And, you know, we had to take their representation, again, at face value, because they hadn't produced an organizational chart to us.

In its briefing, Apple disputes none of this. It says that it's late in the discovery process for them to add a custodian now and that Plaintiff should instead settle for go-gets, for searches of centralized files or for one-off documents that Apple goes and then produces.

But we moved when we did because we had relied on their representation, which we had no reason to question until they substantially completed or claimed to have substantially completed document production on February 27th, and then we moved with all deliberate speed. We sent a letter three days later saying, where are the documents on smartphone

competition?

It's not fair for Apple to run out the clock by telling us that we have all the custodians we need, stringing us along for months, and then once they tell us they've substantially completed, they say, oh, now it's too late for you to seek a smartphone custodian.

Apple also tries to paint Plaintiffs' claims as narrow. And in support of that, they cite this Court's decision on our Motion to Compel against OpenAI on source code which held that the boundaries of discovery are set by the exclusive dealing claim. But that decision, Your Honor, respectfully, can't possibly bear the weight that Apple was putting on it. It was deciding a limited dispute, as I said, about whether OpenAI had to produce source code. It didn't knock Plaintiffs' monopolization claims out of the case. Again, these were claims that survived motions to dismiss. And it didn't say that that Plaintiffs could seek discovery only about the integration or not about topics that are relevant to their several monopolization claims.

So Apple can't use this Court's decision on source code to artificially limit what's in scope for discovery in the rest of the case, again, on many claims that have survived a motion to dismiss and remain alive.

Finally, Your Honor, Apple still hasn't complied with our request to produce artificial intelligence policies and

documents about them.  So, part of our claims here, Your Honor, are that Apple has given pretextual reasons for integrating ChatGPT into Apple Intelligence, to the exclusion of other chatbots, and for promoting ChatGPT in Apple's App Store.

Apple has said publicly that ChatGPT is safe, it protects user privacy.  At the same time, we've seen documents saying that Apple bars its own employees from logging into ChatGPT in Apple Intelligence because of privacy and safety concerns.  So that directly supports our pretext allegations.  Apple is telling the public that ChatGPT is safe.  It protects user privacy.  It's telling its own employees something different.

Apple, on the eve of our motion and shortly after, produced several AI policies, but even those refer to yet more policies, such as model regional restrictions.  We shouldn't have to chase Apple to produce additional restrictions like this every time we see this turn up in the policies.  They should just produce all of them that are responsive.

Apple should also produce documents about its policies. While the policies themselves sort of give the official party line from Apple, they don't give the full picture of the rationales behind the policies.  If the rationale behind the policy limiting use of ChatGPT, for instance, is that ChatGPT is unsafe, then that goes directly to our pretext allegations, as I just mentioned.

So, Your Honor, unless you have any questions, I'll yield to Mr. Dvorscak.

THE COURT:  I wanted to ask a question about the two custodians that you want documents from, Mr. Cook and Mr. Federighi.  What's your theory about Mr. Cook having documents regarding AI that Mr. Federighi wouldn't already have or be a part of?

What I'm trying to figure out is, is there any room for what Mr. -- if the Court decided to order Apple to look through or designate Mr. Federighi's documents as subject to review as a custodian, why would you need to look at Mr. Cook as well?  Because I'm guessing that Mr. Federighi is reporting all this information to Mr. Cook.  What is there independently of that that would be relevant or proportional?

MR. EISMAN:  Well, Your Honor, to be fair, we just don't know because Mr. Cook hasn't been a custodian.  We don't know who else he might have been communicating with that wasn't a custodian also about this.  As I mentioned, we had 11 agreed-upon custodians.  That's very narrow compared to what you would see in a big antitrust case where there are tens of custodians.

So Mr. Cook may well have communications beyond his -- what he said to Mr. Federighi and others.  And so it's sort of a known unknown.  It's a little bit hard for us to prove the negative about who else Mr. Cook was communicating with that

we haven't seen in the custodial files yet.  And so we think that the appropriate step is to add him as a custodian.

Again, if it's really as limited as Apple said, they'll de-dupe Mr. Cook's documents and there will be nothing as compared to Mr. Federighi's.  And if there turn out to be a lot of documents, well, then those are probably ones that they should be reviewing and producing.

So we think the easy answer is to designate both individuals as custodians.  We can de-dupe their documents against the custodial set and then produce what's responsive.

THE COURT:  All right.  Thank you.

MR. EISMAN:  Thank you, Your Honor.

THE COURT:  Response?

MR. DVORSCAK:  Your Honor, I'm happy to let Counsel respond, but if we can finish the motion, that might be easier.

THE COURT:  I'm sorry.  Yes.  Go ahead.

MR. DVORSCAK:  Thank you, Your Honor.  Alex Dvorscak on behalf of the Plaintiffs.

I am here to speak on a relatively discrete topic, and that is Plaintiffs' RFP #4 from their third set of RFPs to Apple concerning the Apple-Google Agreement.

Now, Plaintiffs' motion also sought to fully unredact this document.  The parties have met and conferred quite a bit over the last several weeks, and we have reached a resolution on

the redaction piece. So that has been resolved. There's nothing for the Court to solve there.

However, what is still live is Plaintiffs' request for all of the related documents that contextualize and relate to this agreement.

So I want to start by saying that Plaintiffs agree that this -- with Apple that this agreement should have limited relevance to this case. But unfortunately, Defendant OpenAI sees this differently. They placed this agreement at issue in the case, and they have clearly stated by email, which is in our appendix, that they intend -- they fully intend to rely on the Apple-Google Agreement, in part to argue against Plaintiffs' claim of exclusivity.

As the Court is well aware, discovery is for both claims and defenses. If this agreement is going to be a key part of OpenAI's defense, then our position is that it's a proper subject of discovery, regardless of the merits of the agreement.

Apple has objected to producing these related documents on several grounds, but these can largely be collapsed to that this is outside the default discovery period and then they make some relevance arguments. Our position is Apple has not articulated any specific burden arguments in their response.

The two arguments they do make will fail. The discovery period I think we can dispatch with quickly. There is no

agreement between the parties that prohibits discovery after August of 2025. It's merely a default period. And that is also confirmed via emails between the parties, which is also cited in our appendix. I'd point the Court at Appendix 252 for that.

Beyond that, there's really a selective disclosure issue if we were to keep and make the discovery period apply to that. The issue essentially boils down to the agreement is at issue in the case, whether Apple wants it to be or not. They have produced the agreement, and so therefore we need discovery into the related documents that contextualize it and that would allow Plaintiffs to fully argue that -- argue against OpenAI and defeat their defense. And we've cited a couple sword-and-shield cases to that effect.

On relevance, I'll just address this quickly. We think that the related documents, really, their purpose is just to contextualize the agreement, and communications about the agreement will be critical to that. We, of course, have already seen in this case about how agreements and provisions in agreements need to be interpreted in light of what the parties' actual intent is. And so we think that the communications will show that.

We also know that OpenAI was bidding for this agreement, and we think that discussions about that bid will be -- will just show how, once again, how different this agreement is and

how it does not defeat Plaintiffs' exclusivity claim.

With that, the last thing I would just note is that Plaintiffs have reached an agreement on the redaction piece. So we would expect -- and allowing Apple to maintain sort of this very sensitive pricing information that both Apple and Google seek to keep confidential, and we believe that would apply to this search. And so it's our position that that will take care of the third-party issue that otherwise might be at play here.

With that, I'd just invite the Court to ask any questions on this.

THE COURT: Well, help me understand. If the relevance of the Apple-Google Agreement is only as to the point of its exclusivity, business about -- that the Plaintiff claims that OpenAI and Apple got together and agreed to a sole AI provider arrangement and that was monopolistic, and then here's this agreement where Apple is agreeing with Google to also provide AI services, how is just the nuts and bolts of how the agreement came to be or why you'd want to -- Paragraph 3 says this as opposed to that. I mean, just the normal flow of documents in terms of negotiating an agreement. How is that relevant to anything?

I can understand the document itself, and I can understand asking in a deposition when did all this start, when did you first consider it, is it just tactical, are you -- is Google

somehow propping up Apple to win against X in this case?  Is that it?  Because if it isn't, I mean, all documents relating to the drafting and execution of this agreement, it seems to me it might kind of create a sideshow here.

MR. DVORSCAK:  Your Honor, respectfully, I don't think it is Plaintiffs' intention to create a sideshow here. Really, what we're trying to do is gather the documents that contextualize the various provisions.  And I think the back and forth and/or discussions about what the intent of certain provisions are would go directly towards that.

THE COURT:  Give me an example.  Can you tell me something?  I'm having a hard time kind of thinking through what that might be.

MR. DVORSCAK:  Sure.

THE COURT:  Is there an exclusivity provision, for instance?

MR. DVORSCAK:  I do not believe there's an -- offhand, I don't believe that there's exclusivity provision, as it were.  I think -- to oversimplify the agreement, the Google-Apple Agreement refers a lot to backend support for Apple Intelligence.  And it's our position that that is -- is distinctly different.  But I think it's these sort of communications about that, explanations that the various individuals involved would have about the agreement that will really show that.

And without kind of knowing what those documents are in advance, it's hard to point to a specific, Here is the document that we're looking for.  Quite frankly, we don't know what those documents are exactly.  But I think that all of that would go towards refuting the arguments that we know OpenAI is going to make and will really kind of put the nail in the coffin for that defense.

THE COURT:  All right.  Thank you.

MR. LIU:  Good morning, Your Honor.  Henry Liu for Apple.

THE COURT:  Good morning.

MR. LIU:  I'll begin with Plaintiffs' request for three additional custodians, unless Your Honor would prefer I begin at another place.

THE COURT:  No, I'm fine with that.

MR. LIU:  Excellent.

THE COURT:  You said three, or are we just talking about two?

MR. LIU:  Your Honor, there are the requests for Mr. Cook, the CEO's documents, Mr. Federighi's documents, as well as an additional smartphone custodian that they have requested.

THE COURT:  Okay.

MR. LIU:  I'll begin first with the request for Apple CEO's documents, as well as Senior Vice President Craig

Federighi.  We believe that request should be denied.  And to put in context what we have produced to date, the parties have spent months negotiating the scope of custodial discovery in this case.  And we ultimately agreed to 11 Apple custodians that include the lead negotiators of the ChatGPT agreement, the lead product and engineering folks that were responsible for the integration, senior App Store personnel, as well as three very senior executives at Apple that had more direct roles in the integration.

And those individuals are Eddy Cue, John Giannandrea, and Adrian Perica.  Using agreed-upon search terms, Apple ultimately produced about 20,000 documents from those 11 individuals that cover various scopes of the integration and issues responsible -- at issue in this case.

Now, during those custodial negotiations, Plaintiffs insisted that we search the files of Mr. Cue, Mr. Perica, and Mr. Giannandrea.  In exchange, they expressly agreed not to seek the files of Mr. Cook and Mr. Federighi.  And that agreement is reflected at Tab 1 and Tab 2 of Apple's appendix to the motion, the opposition.

And in fact, Plaintiffs indicated that they were seeking Eddy Cue and at least one other person from the trio of Mr. Cook, Mr. Federighi, and Mr. Giannandrea.  They ultimately selected Mr. Giannandrea.  Now, there's no basis, in our view, to allow Plaintiffs to backtrack from that negotiation that

set the stage for discovery on an expedited schedule over the next few months.  To do so, Plaintiffs would have to show that Mr. Cook and Mr. Federighi possess unique non-duplicative documents and that our choice of custodians was either manifestly unreasonable or deficient in some manner.  And that's the standard from the *Entergy*, the *Dexman*, and the *Firefighters* case cited in our briefs.

They haven't made that showing here as to those two individuals.  Both Mr. Cook and Mr. Federighi are extremely senior folks at Apple that have wide-ranging roles.  Mr. Cook, of course, is the CEO of the company.  Mr. Federighi is the senior vice president in charge of all of Apple's software platforms.

Given those roles, it is undoubtedly true that they had awareness and involvement in the ChatGPT integration, but it was not unique involvement, and any involvement they had was necessarily high-level and substantially overlapping with the other senior executives that we have ultimately agreed to custodians in this case.

The documents in the various instances that Plaintiffs cited in their argument this morning are illustrative at that point.  They cite product demonstrations, the negotiation and assessment of the integration, and various other communications involving these two individuals.  But in nearly every instance of these cited communications, Apple's other

custodians -- in particular, Mr. Cue, Mr. Giannandrea, and Mr. Perica -- are present, are communicating, and are reflected as relevant decision-makers for the ChatGPT integration.

The mere presence of Mr. Cook and Mr. Federighi in these documents, with respect, Your Honor, we don't believe is enough to indicate that they had unique non-duplicative information or that our production is otherwise somehow deficient.

Otherwise, custodial discovery of apex custodians, of individuals that are seniors, senior executives at the company, would be presumptively the default and generally automatic to the extent a decision, a business decision, ultimately came within their purview.

Your Honor, I'll next turn to the smartphone custodian issue.  Again, Plaintiffs now seek to renegotiate the discovery limits that we reached earlier in the case that drove several months of extensive document discovery and productions from Apple.  And they seek now to add a custodian relating to Apple's iPhone business for documents relating to smartphone competition that are unrelated to the ChatGPT integration in this case.

And respectfully, Your Honor, that request seeks documents that go well beyond the claims in this case relating to the ChatGPT integration.

To give you an example of that, Request #20 that drives a

44

lot of this request, that drives the smartphone custodian request, seeks all documents relating to, quote, competition in smartphones, and regardless of whether those documents have any relationship to the integration.

Now, in the argument this morning, Plaintiffs' counsel indicated that they need that information to support their smartphone claims. But that's incorrect for at least two reasons.

Number one is Apple has produced, at Plaintiffs' request, certain revenue and sales data for its iPhone business. We have also offered and remain willing to give additional information on a targeted basis. There's no reason for a custodial search.

And second is on the merits. This is not a general challenge to Apple's iPhone business. Even Plaintiffs' smartphone claims are tied to the question of whether the ChatGPT integration forecloses competition for other generative AI providers. And that question does not require broad custodial discovery into Apple's iPhone strategy unconnected from the integration itself.

The main issue we had heard this morning from Counsel is some concept of a misunderstanding or a misrepresentation during custodial negotiations. And with respect, Your Honor, we disagree with those assertions and those characterizations. From the start, Apple has consistently taken the position that

requests targeted at smartphones generally, unconnected to the ChatGPT integration, they're overbroad and seek information that's not relevant or proportional to this case.

Now, to avoid a dispute, we agreed to produce data on Apple's iPhone business as well as run the proposed search terms over the 11 agreed-upon custodians. Now, we didn't promise what those search terms would yield or otherwise agree with the relevance of those requests.

Now Plaintiffs obviously didn't find the documents they speculate exist, but that's not a basis to reopen custodial negotiations on a topic that's far afield from the integration at issue in this case.

Your Honor, I'll turn next to Plaintiffs' request for both the weekly reports and the documents about the AI policy. We're surprised that both of these issues remain an issue at this hearing today.

With respect to the weekly reports, Apple's principle objection has been always the same. The parties agreed to date range limits precisely to avoid ongoing evergreen obligations, particularly as we enter into the deposition phase of the case.

Now, even so, Apple has agreed to produce the requested reports through May 22nd, which is the date they requested on their motion. We ask only that Plaintiffs reciprocate by producing narrow sets of documents that they have likewise

objected to based on the parties' negotiated date range.

We're optimistic that Plaintiffs will work in good faith with us to resolve those issues. But ultimately, at the end of the day, we have agreed to produce or remove our objections to producing those weekly reports based on the parties agreed-upon date range.

As to the AI policies, we understand Plaintiffs' request to be for AI use policies applicable to Apple employees. And we don't see how those policies relate to any claim or issue in this case. You know, most companies these days have an employee AI use policy, and it's unclear how our internal employee policies has any connection to whether the ChatGPT integration harms competition.

Now, in any event, we have agreed to produce those policies. And to the extent that Plaintiffs seek all documents, internal documents, drafts, communications concerning the development of those policies, that request should be denied. It's overbroad, untethered from this case, it might include HR information, legal communications, other internal discussions about the employee policies that is far removed from the challenged conduct.

Lastly, Your Honor, I'll address Plaintiffs' request for the internal documents or all documents relating to the Google Agreement. In their motion paper, the Plaintiffs themselves took the position that the Apple Agreement has, quote, nothing

to do with the native integration and promotion of ChatGPT at issue in this case. And they, of course, opposed OpenAI's motion seeking discovery on similar topics.

And so it's hard to understand how internal communications on the Apple-Google Agreement are relevant to the claim. They now have the agreement. They can understand what it does and doesn't do. They can understand the issues of exclusivity. But the request for all documents relating to, quote, the genesis, negotiation, and execution of the agreement, you know, as written, that would include virtually every internal communication about the agreement: legal, technical communications that have no bearing on the issues here. And with respect, Your Honor, that's not proportional to the needs of the case, and we ask that that separate request be denied as well.

THE COURT: All right. Thank you. Replies?

MR. EISMAN: Thank you, Your Honor. On custodians, I think it's important to remember how we got here, because my friend's presentation didn't mention this, right? The negotiations that he describes over custodians were based in large part on our lack of knowledge about who exactly did what at Apple.

And so we didn't have organizational charts. We had to rely on Apple's representations. Apple repeatedly told us during the meet-and-confer process that they weren't going to

produce org charts. And they said, we'll just tell you, you know, who did what and who the proper custodians are. And so when we were seeking custodians and we ended up agreeing to John Giannandrea as one of the trio of Cook, Federighi, and Giannandrea, that was based on Apple's representation that, of those three individuals, none would have non-duplicative documents of the others. And that turned out not to be true, as we point out in our motion papers. There are many indications that Mr. Cook and Mr. Federighi had communications with others and involvement, deep involvement, beyond what Mr. Giannandrea did. And so we think that they are appropriate custodians for that reason.

Now, Mr. Liu also pointed out that these are senior executives. But as I mentioned earlier, Your Honor, there's no apex custodian doctrine or rationale. That's not a reason not to make someone a custodian. And in fact, their documents is going to inform the discussions about whether they are apex deponents. And so the documents are needed so that the parties can have a productive discussion about this.

Mr. Liu also didn't mention the specific documents themselves. For instance, a document pointing out that Mr. Federighi was the one who was called the ultimate decision-maker for Apple Intelligence. Not Mr. Perica, not Mr. Cue, not Mr. Giannandrea, but Mr. Federighi.

Mr. Cook, likewise, deeply involved in meetings. Was

asking probing questions about which GenAI chatbot to integrate with.  Personally reviewing the term sheet for the deal.

Now, granted, these are high-ranking executives who deal with lots of things in their portfolios.  But they were deeply involved in this.  I mean, you need to look no further than Mr. Federighi personally on stage at Apple's Worldwide Developer Conference debuting this to the world.  This was something that he, again, the ultimate decision-maker for Apple Intelligence, was championing.  So we think it's appropriate to add both of them as custodians.

On the smartphone custodian piece, Your Honor, this is Apple once again trying to read our monopolization claims out of the case.  It is not -- our case is not just about the integration.  To prove our monopolization claims, we need to prove that Apple had monopoly power in the smartphone market. Now, granted, part of our claims are about integration, but that ignores that we have to still meet the basic elements of monopolization, and documents about competition in the relevant market are precisely the types of documents that courts routinely look at when deciding whether somebody is a monopolist.

We cite the *United States v. Google* case and the *Apple v. Epic* case as examples of courts deciding monopolization claims focusing precisely on defendant's own internal analyses of the

markets at issue.  And so for Apple to say, well, we gave you revenue and pricing information, when, in fact, we know, Your Honor, that there are documents about competition in the smartphone market that are exhibits, trial exhibits, in other cases, that Apple hasn't produced here.

Now Apple is saying, well, it'll do targeted searches and go get those documents or some more documents for us, but we were entitled to have the search terms that we proposed run over an appropriate custodian.  Apple told us that they were going to run those search terms, and we assumed from their representation that their custodians that they were proposing were more than sufficient to cover all of our claims, not just the claims that they decide to focus on now.  Left us in a position where we thought, okay, well, we're going to get these documents.  So we shouldn't have to settle for go-gets at this stage.  Instead, we are entitled to a proper custodial search for those documents.

Again, just, you know, Mr. Liu said that we were speculating that these documents might exist.  But I think the fact that there are already documents that we know about in the public domain that are along these lines suggest that that's just the tip of the iceberg.  That's what we can see. There are more documents out there, and Apple should have to go search for them.

On the weekly integration reports, it sounds like from

what Mr. Liu said that Apple will be dropping its time frame objection.  That's at least how I understood this.  So I would expect that means we'll get the weekly integration reports through the close of discovery.

Mr. Liu said he expects us to continue to negotiate in good faith.  We will, of course, honor that commitment to negotiate in good faith going forward.

And finally, as to the AI policies, we are not looking for -- you know, Mr. Liu mentioned documents with legal.  We're not looking for anything privileged.  Obviously, they don't need to produce privileged communications for us.  What we are really focused on here is documents explaining the rationales behind these policies.  Because the policies, to the extent they limit Apple's own employees from using ChatGPT, the very version of ChatGPT in the integration here, suggests that ChatGPT is not as safe and as private as Apple has publicly touted.  And that supports allegations of pretext that we have throughout our complaint that help explain Apple's monopolistic intent.  Not only an element of our claims, but an element that Apple already challenged at the motion to dismiss stage.  So we bear the burden here.  We need documents about that.

So unless Your Honor has any further questions, I'll turn it over to my co-counsel, Mr. Dvorscak, on the last two points.

THE COURT:  All right.  Thank you.

Mr. Dvorscak?

MR. DVORSCAK:  Thank you, Your Honor.

Very quickly, we'd like to just cover a couple of points here.

The first is that my colleague on the other side referenced our briefing with OpenAI.  That briefing has since been resolved and we have agreed to produce our internal documents or some of our internal documents concerning the Apple-Google Agreement.  I think that reflects the fact that this agreement is at issue in the case, and so we would expect them to also produce similar documents about the agreement.

The other thing that I would like to focus on is, you know, I think we discussed a lot about documents, about specific provisions of the agreement.  The one thing that I would like to stress is that we are also seeking documents about OpenAI or with -- with or about OpenAI and how the Apple-Google Agreement affects the Apple-OpenAI Agreement, and also about OpenAI's own bid for this type of service, which I think would contextualize the agreement and provide additional context of what the agreements do and do not do.  And that's sort of separate from deal discussions.

So I just wanted to focus on some of the other parts of our request.  It is one request, but they're multifaceted, and I think that some of those distinctions are important.

THE COURT: All right.

MR. DVORSCAK: Any further questions, Your Honor?

THE COURT: No. Thank you very much.

MR. DVORSCAK: Thank you.

THE COURT: All right. So let me go down the list as it came up in Plaintiffs' motion.

I will grant the motion as to the Apple-Google Agreement-related documents to the extent that the document concerns exclusivity.

In terms of an additional custodian, I'll grant the motion to the extent that we add Mr. Federighi. I don't think that Mr. Cook is warranted, and I have questions about Mr. Federighi, but I think that you should look at his documents and see if there are documents that are producible.

On the weekly reports, maybe I missed it, but I didn't think that Mr. Liu had agreed to produce them through the end of the discovery period. But I will order that they be produced through the end of the discovery period.

On the smartphone competition, I deny the motion to designate a custodian there. I think that's an issue of relevance and proportionality. If the review of the other documents does not prove sufficient, then Plaintiff can come back and present further evidence and argument to me on that point.

I deny the motion as to documents related to the AI

policies, though I do order Apple to produce all the AI policies that it has for its own employees.  That's a fun little argument to make, but I don't think that that justifies having to search through all those documents to explain why ChatGPT is fine for the integration and for the normal folk but not for the Apple employees.

On the Apple-Google Agreement, what is a reasonable time period to produce any documents that are responsive to that point?

MR. LIU:  Your Honor, for the --

THE COURT:  And I guess for the other document as well.

MR. LIU:  Your Honor, for both the Apple-Google Agreement, since it requires a search of all the existing custodians and Mr. Federighi, we believe those two are tied together, and we'd respectfully ask for 35 days, 5 weeks, because we have not yet collected Mr. Federighi's documents. It will take a significant amount of time to collect, review, privilege review, and then ultimately produce those documents. That would give Plaintiffs sufficient time to have those documents at least a month before the end of discovery.

THE COURT:  Is that reasonable?  It seems reasonable to the Court, but I can be persuaded.

MR. EISMAN:  All that I'll say on Mr. Federighi, Your Honor, is that we do have this June 17th deadline to meet and

confer about whether he's an appropriate deponent.  And so I think 35 days is going to put us precisely one day past that deadline.  Right?  And so that's not really going to work to have a productive meet-and-confer.  So either that deadline needs to move back or --

THE COURT:  I think you need to move it back.

MR. EISMAN:  Okay.  Then --

THE COURT:  At least as to him.

MR. EISMAN:  Yeah, it might make sense as to him and to Mr. Cook, if the theory is that Mr. Cook's documents will be captured with Mr. Federighi's.  So maybe, maybe we move that deadline back.

THE COURT:  Is that agreeable, Mr. Liu?

MR. LIU:  Yes, Your Honor.

THE COURT:  Okay.  Then that deadline, then, will be 35 days --

MR. EISMAN:  Thank you, Your Honor.

THE COURT:  -- from today.

Did I hit everything?  Because the last thing I'd like is for you all to all go back home and then file a hundred more pages for something we could take care of.  No offense.

MR. EISMAN:  Just for a point of clarification, Your Honor, on the smartphone competition documents, you had said, you know, we could come back, essentially, if the documents we have prove insufficient.  Does that mean that that anticipates

Apple producing the targeted go-gets, then, in the meantime, or --

THE COURT:  Well, yes.  I mean, I'm --

MR. EISMAN:  Okay.

THE COURT:  I'm assuming that that Apple is going to be producing those documents, but we're not going morph this -- I can't speak for what Judge Pittman is going to do.  Judge Pittman may want to morph this into whatever it is.  But I don't see the case becoming all of a sudden the Apple smartphone monopoly case, at least the lead one.  So I'm assuming that Apple is going to continue to produce those limited documents, in part because the Court understands that Plaintiff has to present its claim about what Apple's market power is and so forth, but not starting from day one in terms of smartphones.

MR. EISMAN:  Okay.  Thank you, Your Honor.

THE COURT:  Does that answer your question?

MR. EISMAN:  Yeah, that was it.  It was just about those go-gets.

THE COURT:  Okay.

MR. EISMAN:  So thank you very much, Your Honor.

THE COURT:  Sure.  Am I missing anything else, Counsel?

MR. LIU:  No, Your Honor.

THE COURT:  Anything from the OpenAI bunch?

MR. DIPRIMA:  No, Your Honor.

THE COURT:  Okay.  Very well.  Then I'll draw up an order.  Thank you very much for your diligence and professionalism.  We'll be in recess.

(Proceedings concluded at 10:18 a.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling**                                   **05/14/2026**

_____        _____
Kathy Rehling, CETD-444                                      Date
Certified Electronic Court Transcriber

58

INDEX

PROCEEDINGS                                                            3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                                          22/53

     Motion to Compel Discovery from the OpenAI
     Defendants and for Expedited Briefing (178)

     Motion to Compel Discovery from Apple and for
     Expedited Briefing (195)

     Motion to Compel Plaintiffs to Produce Documents
     (172)

END OF PROCEEDINGS                                                    57

INDEX                                                                 58

# Tab 3

# Document produced as
# APL-XAI_00097136

# Document produced as
# APL-XAI_00097141

# Tab 4

# Tab 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| X CORP. and X.AI LLC,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>　　　Defendants. | **Civil Action No. 4:25-cv-00914-P** |

## DECLARATION OF
## SAMANTHA BIRKENFELD-MALPASS
## IN SUPPORT OF PLAINTIFFS X CORP. AND X.AI LLC'S
## OPPOSITION TO THE OPENAI DEFENDANTS' MOTION TO COMPEL

I, Samantha Birkenfeld-Malpass, hereby swear under penalty of perjury:

1.　　I am Senior Legal Counsel II at Plaintiff X Corp. ("X") and am authorized to execute this declaration on behalf of X and Plaintiff X.AI LLC ("xAI," and, together with X, "Plaintiffs"). I have been involved with this lawsuit and I am familiar with the claims in the above-captioned case (the "Action").

2.　　Based on my personal knowledge of the facts set forth below, if called upon to testify as a witness, I could and would testify competently thereto under oath.

3.　　Through my duties as Senior Legal Counsel II at X, I am personally familiar with the corporate relationship between Plaintiffs, Space Exploration Technologies Corp. ("SpaceX"), and Tesla, Inc. ("Tesla").

4.　　The parent company of xAI is X.AI Corp., whose parent is X.AI Holdings LLC.

5.　　The parent of X is X Holdings Corp., whose parent is X.AI Holdings LLC.

App. 91

6. SpaceX is the parent company of X.AI Holdings LLC (previously X.AI Holdings Corp.) as of February 2, 2026.

7. SpaceX continues to be a separate corporate entity from Plaintiffs after February 2, 2026.

8. SpaceX's files are maintained separately from Plaintiffs' files, and Plaintiffs do not have the right to access SpaceX's files barring specific business circumstances, nor are SpaceX files made accessible to Plaintiffs' employees.

9. Tesla is a separate corporate entity from Plaintiffs.

10. Tesla's files are maintained separately from Plaintiffs' files, and Plaintiffs do not have the right to access Tesla's files, nor are Tesla's files made accessible to Plaintiffs' employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 17th day of April, 2026.

/s/ Samantha Birkenfeld-Malpass*
Samantha Birkenfeld-Malpass

*signed with permission

App. 92

# Tab 6

## Los Angeles Times

TECHNOLOGY AND THE INTERNET

# Apple Formally Appoints Jobs Interim CEO

**By GREG MILLER**

Sept. 17, 1997 12 AM PT

TIMES STAFF WRITER

SAN FRANCISCO — Apple Computer Inc. appointed Steve Jobs interim chief executive on Tuesday, formalizing a role the controversial co-founder has effectively held since a management shake-up at the company two months ago.

Jobs will serve as chief executive until a permanent replacement is found, according to Apple officials. They said the search should be concluded before the end of the year.

Analysts said the move was little more than a formality, given Jobs' role as the de facto leader of the struggling Cupertino-based computer maker since former CEO Gilbert Amelio was ousted in July. Experts also said it's unlikely that Jobs will become Amelio's permanent replacement.

"I'd be surprised if he turned into a permanent chief executive unless he saw some fairly immediate signs of an upturn in Apple's fortunes," said Daniel Kunstler, an analyst at J.P. Morgan in San Francisco. "There's still a lot of fixing to be done."

Jobs, who was unavailable for comment, had previously turned down an offer to be the permanent CEO at Apple, partly because he is already chairman and chief executive of Pixar Inc., a successful digital-animation company.

Despite its temporary nature, the appointment puts Jobs in the position he sought before he was ousted from Apple a decade ago in a boardroom fight with then-CEO John Sculley.

App. 94

ADVERTISEMENT

  

After years in exile, Jobs returned as an advisor late last year, when he sold his Next Software Inc. to Apple for $400 million. Jobs then forced Amelio out.

Since then, Jobs has been head of the company in all but title, engineering a stunning partnership with Microsoft Corp., a sweeping overhaul of the board of directors and Apple's recent about-face on cloned Macintosh computers. He has also made sweeping internal changes, resetting employees' stock option prices and dismantling the company's generous sabbatical program.

The moves have returned an aura of decisiveness to a company that has lost more than $1.5 billion over the last six quarters and that was increasingly perceived as rudderless.

But analysts caution that Apple's troubles are far from over, and many say that Jobs may not be interested in a long-term commitment as CEO, partly because the company's problems are so intractable.

Jobs' appointment was made last week during the first regularly scheduled meeting of Apple's board of directors since its overhaul last month.

App. 95

The board also met with its executive recruiter, John Thompson of Heidrick & Struggles, to review the status of its search for a CEO. Company officials declined to comment on whether any leading candidates had emerged.

---

## More to Read

### Apple's next era: After Tim Cook's dream run, new CEO has to help the company catch up

April 22, 2026



### Tim Cook steps back as Apple appoints hardware chief as new CEO

April 20, 2026



### Disney's CEO succession: A timeline of key events

Feb. 3, 2026



---

Copyright © 2026, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

App. 96

# Tab 7

10-K 1 f88774ore10vk.htm FORM 10-K

App. 98

# SECURITIES AND EXCHANGE COMMISSION

## Washington, D.C. 20549

---

# Form 10-K

---

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 28, 2002**

**Commission File Number 0-26976**

---

# Pixar

*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| **California** | **68-0086179** |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |
| **1200 Park Avenue, Emeryville, California** | **94608** |
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**

**(510) 752-3000**

---

**Securities registered pursuant to Section 12(b) of the Act:**

**None**

**Securities registered pursuant to Section 12(g) of the Act:**

**Common Stock, no par value per share**
*(Title of Class)*

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "Act") during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.     Yes ☑          No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.     ☑

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Rule 12b-2 of the Act).     Yes ☑          No ☐

App. 99

Case 4:25-cv-00914-P    Document 281    Filed 05/20/26    Page 100 of 252    PageID 12613

As of June 29, 2002, the last day of the Registrant's most recently completed second fiscal quarter, there were 50,175,152 shares of the Registrant's Common Stock outstanding, and the aggregate market value of such shares held by non-affiliates of the Registrant (based on the closing sale price of such shares on the Nasdaq National Market on June 28, 2002) was approximately $497 million. Shares of the Registrant's Common Stock held by each executive officer and director and by each entity that owns 5% or more of the Registrant's outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of March 4, 2003, there were 53,180,410 shares of the Registrant's Common Stock outstanding.

App. 100

## TABLE OF CONTENTS

PART I
    Item 1. Business
    Item 2. Properties
    Item 3. Legal Proceedings
    Item 4. Submission of Matters to a Vote of Security Holders
PART II
    Item 5. Market for Registrant's Common Stock and Related Shareholder Matters
    Item 6. Selected Financial Data
    Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations
    Item 7A. Quantitative and Qualitative Disclosures About Market Risk
    Item 8. Financial Statements and Supplementary Data
    Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure
PART III
    Item 10. Directors and Executive Officers of the Company
    Item 11. Executive Compensation
    Item 12. Security Ownership of Certain Beneficial Owners and Management andRelated Shareholder Matters
    Item 13. Certain Relationships and Related Transactions
    Item 14. Controls and Procedures
PART IV
    Item 15. Exhibits, Financial Statement Schedules and Reports on Form 8-K
SIGNATURES
CERTIFICATIONS
INDEX TO EXHIBITS
EXHIBIT 10.2
EXHIBIT 23.1
EXHIBIT 99.1

App. 101

**Table of Contents**

with a maturity of 24 months or less, with only government obligations exceeding 12 months. Our investments are primarily fixed rate obligations and carry a certain degree of interest rate risk. A rise in interest rates could adversely impact the fair market value of these securities.

All of our financial instruments are held for purposes other than trading and are considered "available for sale" according to SFAS No. 115. The table below provides information regarding our investment portfolio at December 28, 2002. The table presents principal cash flows and related weighted-average fixed interest rates presented by expected maturity date (dollars in thousands):

| | Less than 1 year | Over 1 year | Total |
|---|---|---|---|
| Available-for-sale securities | $162,525 | $132,127 | $294,652 |
| Weighted-average interest rate | 3.46% | 3.06% | 3.28% |

*Impact of Foreign Currency Rate Changes.* While Disney and its affiliates distribute our products in foreign markets, we are not directly exposed to foreign currency rate fluctuations. We recognize revenues from foreign territories based on an average foreign currency exchange rate used by Disney for revenue reporting. This rate may differ from the actual exchange rate at the time cash is remitted to Disney and subsequently to us. Therefore, there may be some indirect foreign currency exchange rate exposure as managed by Disney.

**Item 8. *Financial Statements and Supplementary Data***

The financial statements required pursuant to this item are included in Part IV, Item 15 of this Form 10-K and are presented beginning on page 50. The supplementary financial information required by this item is included in the notes to the financial statements under the subsection entitled "Quarterly Financial Information (Unaudited)," beginning on page 69.

**Item 9. *Changes in and Disagreements with Accountants on Accounting and Financial Disclosure***

Not applicable.

**PART III**

**Item 10. *Directors and Executive Officers of the Company***

**Directors**

The members of our Board of Directors as of March 4, 2003 are as follows:

| Name | Age | Position with Pixar |
|---|---|---|
| Steve Jobs | 48 | Chairman and Chief Executive Officer |
| Edwin E. Catmull | 57 | President and Director |
| Skip M. Brittenham | 61 | Director |
| Joseph A. Graziano | 59 | Director |
| Lawrence B. Levy | 43 | Director |
| Joe Roth | 54 | Director |
| Larry W. Sonsini | 62 | Director |
| John S. Wadsworth, Jr. | 63 | Director |

*Mr. Jobs* is a co-founder of Pixar and has served as Chairman since March 1991, and as Chief Executive Officer since February 1986. He has been a director of Pixar since February 1986. In addition, Mr. Jobs is currently Chief Executive Officer and a member of the Board of Directors of Apple Computer, Inc. ("Apple"). Mr. Jobs was also a co-founder of NeXT Software, Inc. ("NeXT"), which developed and

App. 102

Case 4:25-cv-00914-P    Document 281    Filed 05/20/26    Page 103 of 252    PageID 12616

marketed object-oriented software for client/server business applications and the Internet, and served as the Chairman and Chief Executive Officer of NeXT from October 1985 until February 1997, when NeXT was

42

App. 103

**Table of Contents**

acquired by Apple. Mr. Jobs then served as an advisor to Apple on a limited basis and served as interim Chief Executive Officer until assuming his current role as Chief Executive Officer at Apple.

*Dr. Catmull* is a co-founder of Pixar and in January 2001 was promoted to President. He has served as a member of the executive team and as Chief Technical Officer of Pixar since the incorporation of the company. In 1979, Dr. Catmull brought his high-technology expertise to the film industry as vice president of the Computer Division of Lucasfilm, Ltd. During that time, Dr. Catmull managed four development efforts in the areas of computer graphics, video editing, video games and digital audio. He was also a key developer of RenderMan®, the program that creates realistic digital effects for computer graphics and animation. Dr. Catmull has been honored with three Scientific and Technical Engineering Awards from The Academy of Motion Picture Arts and Sciences for his work, including an Oscar "for significant advancements to the field of motion picture rendering as exemplified in Pixar's RenderMan®." He also won the Coons Award, which is the highest achievement in computer graphics, for his lifetime contributions. Dr. Catmull is a member of the Academy of Motion Picture Arts and Sciences and the Science and Technical Awards Committee. Dr. Catmull earned his B.S. degrees in computer science and physics and his Ph.D. in computer science from the University of Utah.

*Mr. Brittenham* has served as a director of Pixar since August 1995. He is a senior partner with the law firm of Ziffren, Brittenham, Branca, Fischer, Gilbert-Lurie & Stiffelman LLP, an entertainment law firm, founded in 1978. Mr. Brittenham currently serves on the board of, or is a trustee of numerous charitable organizations, including Conservation International, KCET, the Environmental Media Association and the Alternative Medical AIDS Foundation. Mr. Brittenham received a B.S. from the United States Air Force Academy and a J.D. from the University of California at Los Angeles.

*Mr. Graziano* has served as a director of Pixar since August 1995. From June 1989 to December 1995, he was the Executive Vice President and Chief Financial Officer of Apple and was a member of the Board of Directors of Apple from June 1993 until October 1995. From May 1987 to June 1989, Mr. Graziano served as Chief Financial Officer of Sun Microsystems, Inc. and from October 1981 to May 1985 as Chief Financial Officer of Apple. In addition, he has held accounting positions with various technology companies in the Silicon Valley. Mr. Graziano also serves as a director of Packeteer, Inc. Mr. Graziano received a B.S. in accounting from Merrimack College and is a certified public accountant.

*Mr. Levy* has served as a director of Pixar since April 1999. From June 2000 to December 2000, Mr. Levy was President and Chief Executive Officer and a director of Shockwave.com. Mr. Levy served as Executive Vice President and Chief Financial Officer of Pixar from February 1995 to March 1999. Mr. Levy served as Secretary of Pixar from October 1995 to March 1999. Prior to joining Pixar, he was Vice Chairman and Chief Financial Officer of Electronics for Imaging, Inc. (EFI), a provider of hardware products for the digital color imaging market. Prior to his tenure at EFI, he was head of the Technology Licensing and Distribution Department at the law firm of Wilson Sonsini Goodrich & Rosati. Mr. Levy received a B.S. in business and accounting from Indiana University and a J.D. from Harvard Law School.

*Mr. Roth*, founder of Revolution Studios, has served as a director of Pixar since October 2000. Mr. Roth formed Revolution Studios in May 2000 to independently produce and finance films in partnership with Sony Pictures, Starz!/ Encore Group and Fox Entertainment Group. Prior to founding Revolution Studios, Mr. Roth served as Chairman of the Walt Disney Studios from April 1996 to January 2000, Chairman of the Walt Disney Motion Picture Group from August 1994 to April 1996, and Chairman of Twentieth Century Fox from July 1989 to November 1992. In addition, Mr. Roth ran Caravan Pictures from 1992 to 1994. Prior to his time at Twentieth Century Fox, Mr. Roth was a producer/director and co-founded Morgan Creek Pictures. Mr. Roth is a graduate of Boston University.

*Mr. Sonsini* has served as a director of Pixar since April 1995 and served as Secretary from April 1995 to October 1995. He has been an attorney with the law firm of Wilson Sonsini Goodrich & Rosati since 1966 and currently serves as Chairman and Chief Executive Officer. Mr. Sonsini also serves as a director for Brocade Communications Systems, Inc., Echelon Corporation, Lattice Semiconductor Corporation, and LSI Logic Corporation. Mr. Sonsini received A.B. and L.L.B. degrees from the University of California, Berkeley.

43

App. 104

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on this 28th day of March, 2003.

PIXAR

By:                           /s/ ANN MATHER

_____

Ann Mather
*Executive Vice President,*
*Chief Financial Officer and Secretary*

## POWER OF ATTORNEY

KNOW ALL THESE PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Steve Jobs, Ann Mather and Edwin E. Catmull and each of them, jointly and severally, his or her attorneys-in-fact, each with full power of substitution, for him or her in any and all capacities, to sign any and all amendments to this Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each said attorneys-in-fact or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/ STEVE JOBS<br>Steve Jobs | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | March 28, 2003 |
| /s/ ANN MATHER<br>Ann Mather | Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | March 28, 2003 |
| /s/ EDWIN E. CATMULL<br>Edwin E. Catmull | President and Director | March 28, 2003 |
| /s/ SKIP M. BRITTENHAM<br>Skip M. Brittenham | Director | March 28, 2003 |
| /s/ JOSEPH A. GRAZIANO<br>Joseph A. Graziano | Director | March 28, 2003 |
| /s/ LAWRENCE B. LEVY<br>Lawrence B. Levy | Director | March 28, 2003 |

73

App. 105

**Table of Contents**

App. 106

| Signature | Title | Date |
|---|---|---|
| /s/ JOE ROTH<br>Joe Roth | Director | March 28, 2003 |
| /s/ LARRY W. SONSINI<br>Larry W. Sonsini | Director | March 28, 2003 |
| /s/ JOHN S. WADSWORTH, JR.<br>John S. Wadsworth, Jr. | Director | March 28, 2003 |

74

**Table of Contents**

## CERTIFICATIONS

I, Steve Jobs, certify that:

1.     I have reviewed this annual report on Form 10-K of Pixar;

2.     Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.     Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

     a) designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

     b) evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

     c) presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

     a) all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

     b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.     The registrant's other certifying officer and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

/s/ STEVE JOBS

_____
Steve Jobs
*Chairman and Chief Executive Officer*

Date: March 28, 2003

75

App. 107

# Tab 8

10-K 1 d10k.htm FORM 10-K

**Table of Contents**

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# Form 10-K

### ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

**For the fiscal year ended December 31, 2005**

**Commission File Number 0-26976**

# Pixar

*(Exact name of registrant as specified in its charter)*

| **California** | **68-0086179** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

| **1200 Park Avenue, Emeryville, California** | **94608** |
|---|---|
| *(Address of principal executive offices)* | *(Zip Code)* |

**Registrant's telephone number, including area code:**
**(510) 752-3000**

**Securities registered pursuant to Section 12(b) of the Act:**
**None**

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, no par value per share**
*(Title of Class)*

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act of 1933.   Yes ☑   No ☐

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act").   Yes ☐   No ☑

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Exchange Act during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☑

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer" and "large accelerated filer" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑    Accelerated filer ☐    Non-accelerated filer ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

As of July 2, 2005, the last day of the Registrant's most recently completed second fiscal quarter, there were 118,568,761 shares of the Registrant's Common Stock outstanding, and the aggregate market value of such shares held by non-affiliates of the Registrant (based on the closing sale price of such shares on the NASDAQ National Market on July 1, 2005) was $2,480,647,889. Shares of the Registrant's Common Stock held by each executive officer and director have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

As of February 15, 2006, there were 120,429,073 shares of the Registrant's Common Stock outstanding.

App. 109

**Table of Contents**

## TABLE OF CONTENTS

**Page**

### PART I

| | | |
|---|---|---|
| Item 1. | Business | 3 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 33 |
| Item 2. | Properties | 33 |
| Item 3. | Legal Proceedings | 34 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 35 |
| | Executive Officers of the Company | 35 |

### PART II

| | | |
|---|---|---|
| Item 5. | Market for Company's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. | Selected Financial Data | 37 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 46 |
| Item 8. | Financial Statements and Supplementary Data | 47 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 47 |
| Item 9A. | Controls and Procedures | 47 |
| Item 9B. | Other Information | 47 |

### PART III

| | | |
|---|---|---|
| Item 10. | Directors and Executive Officers of the Company | 48 |
| Item 11. | Executive Compensation | 50 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 53 |
| Item 13. | Certain Relationships and Related Transactions | 54 |
| Item 14. | Principal Accounting Fees and Services | 55 |

### PART IV

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 56 |
| Signatures | | 86 |

2

App. 110

**Table of Contents**

*This Annual Report on Form 10-K contains forward-looking statements that have been made pursuant to the provisions of the Private Securities Litigation Reform Act of 1995, particularly statements referencing the scheduled release dates of our feature films, our anticipated revenues and operating expenses, our expectations on DVD penetration and the resulting effect on our home video sales. In some cases, forward-looking statements can be identified by the use of words such as "may," "could," "would," "might," "will," "should," "expect," "forecast," "predict," "potential," "continue," "anticipates," "expects," "intends," "plans," "believes," "seeks," "estimates," "is scheduled for," "scheduled," and variations of such words and similar expressions. Such forward-looking statements are based on current expectations, estimates and projections about our industry and management's beliefs and assumptions. These statements are not guarantees of future performance and are subject to various risks, uncertainties and assumptions that are difficult to predict; therefore, actual results and outcomes may differ materially from what is expressed or forecasted in any such forward-looking statements. Such risks and uncertainties include those set forth herein under "Risk Factors" on pages 18 through 33. Unless required by law, we undertake no obligation to update publicly any forward-looking statements, whether as a result of new information, future events or otherwise.*

## PART I

**Item 1.**     *Business*

**Recent Developments**

*Merger Agreement with the Walt Disney Company.*     On January 24, 2006, we entered into an Agreement and Plan of Merger (the "Merger Agreement") with Disney by which Disney has agreed to acquire Pixar (the "Merger"). The Merger Agreement has been approved by the Boards of Directors of both Pixar and Disney.

Subject to the terms and conditions of the Merger Agreement, at the effective time of the Merger (the "Effective Time"), each issued and outstanding share of Common Stock of Pixar will be converted into the right to receive 2.3 shares of common stock of Disney. In addition, each outstanding option to purchase Pixar Common Stock will be converted at the Effective Time into an option to purchase 2.3 shares of Disney common stock and will be assumed by Disney.

Consummation of the Merger is subject to several closing conditions, including the approval of the principal terms of the Merger Agreement and approval of the Merger by the shareholders of Pixar, the receipt of antitrust approvals or the expiration of applicable waiting periods in certain jurisdictions, the absence of certain governmental restraints, and effectiveness of a Form S-4 registration statement filed by Disney. The Merger is intended to qualify as a tax-free reorganization under Section 368(a) of the Internal Revenue Code of 1986, as amended.

The Merger Agreement contains certain termination rights for both Pixar and Disney and provides that in certain specified circumstances, Pixar must pay Disney a termination fee of $210,000,000 (generally in the event the Board of Directors of Pixar changes its recommendation that its shareholders approve the principal terms of the Merger Agreement and the Merger, or elects to pursue a superior acquisition proposal from a third party).

Concurrently with the execution of the Merger Agreement, Disney entered into a voting agreement (the "Voting Agreement") with Steve Jobs, the Chief Executive Officer of Pixar, pursuant to which Mr. Jobs has agreed to vote a number of his shares of Pixar Common Stock (representing forty percent (40%) of the shares of Pixar Common Stock outstanding and entitled to vote on the record date for any vote of shareholders of Pixar on the Merger Agreement and the transactions contemplated thereby) in favor of the approval of the principal terms of the Merger Agreement and approval of the Merger. In addition, pursuant to the Voting Agreement, Mr. Jobs is entitled to vote the balance of his shares of Pixar Common Stock in any manner he deems appropriate.

*Distribution Letter Agreement.*     Pixar entered into a Distribution Letter Agreement (the "Distribution Letter Agreement") dated as of January 27, 2006 with Disney regarding the distribution of a feature length animated film currently entitled *Ratatouille*. Pursuant to the Distribution Letter Agreement, *Ratatouille* will be

3

App. 111

**Table of Contents**

deemed a "Picture" under and in accordance with the terms of the Co-Production Agreement, subject to certain exceptions, including but not limited to those noted below.

The Distribution Letter Agreement provides that the term of the Co-Production Agreement shall be extended until delivery to Disney of *Ratatouille*. In addition, Pixar will finance all production costs and receive all gross receipts of *Ratatouille* after deduction of (1) a distribution fee paid to Disney, (2) any participations paid to third parties and (3) Disney's distribution costs. Pixar shall have creative control and control of production for *Ratatouille* and shall own all rights to derivative works based on *Ratatouille*, except that Disney shall own theme park rights to *Ratatouille* in perpetuity.

Under the Distribution Letter Agreement, Pixar shall have sole ownership of copyrights, trademarks and other intellectual property rights in and to *Ratatouille*. In addition, Disney's exclusive distribution and exploitation rights with respect to *Ratatouille* shall be for a period of 10 years from initial theatrical exhibition of *Ratatouille* or 11 years from delivery of *Ratatouille*, whichever is earlier.

*Stock Split.*    On March 23, 2005, we announced that our Board of Directors had approved a two-for-one stock split of our Common Stock and a proportional increase in the number of authorized shares of our Common Stock from 100 million to 200 million. Shareholders of record at the close of trading on April 4, 2005 were entitled to receive one additional share of Pixar Common Stock for every outstanding share held on such date. The additional shares were distributed on April 18, 2005, and reporting of our share price on a post-split basis commenced on April 19, 2005. All issued and outstanding shares and per share amounts and stock prices related to Pixar's Common Stock in this report have been restated to reflect the stock split for all periods presented.

**General**

Pixar was formed in 1986 when Steve Jobs purchased the computer division of Lucasfilm and incorporated it as a separate company. We are a leading digital animation studio with the creative, technical and production capabilities to create animated feature films and related products. Our objective is to create, develop and produce computer-animated feature films with heartwarming stories and memorable characters that appeal to audiences of all ages. Through the creation of entertaining, enduring and successful films, we seek to maintain our position as a leading brand in animated feature films.

To date, we have created and produced six full-length computer-animated feature films, which were marketed and distributed by The Walt Disney Company (along with its subsidiaries hereinafter referred to as "Disney"). Pixar has won 20 Academy Awards® for its films and technical achievements, and our six films have grossed an aggregate of more than $3.2 billion at the worldwide box office. Our next film, *Cars,* is scheduled for release on June 9, 2006. *Cars* is directed by Pixar's two-time Academy Award®-winner John Lasseter, who directed *Toy Story*, *A Bug's Life*, and *Toy Story 2*. We are also currently in production on *Ratatouille*, which is scheduled for a summer 2007 release.

Our principal executive offices are located at 1200 Park Avenue, Emeryville, California 94608. Our telephone number is (510) 752-3000, and our website is located at www.pixar.com; however, the information in, or that can be accessed through our website is not part of this report. Our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to such reports are available, free of charge, on the "Investors Relations" section of our website (www.pixar.com) as soon as reasonably practicable after we electronically file such material with, or furnish it to, the Securities and Exchange Commission.

The statements in this Form 10-K regarding the scheduled release dates for our next films are forward-looking, and the actual release dates may differ. Factors that could cause delays in the release of our films include, but are not limited to (1) the uncertainties related to production delays, (2) financing requirements or marketing or distribution factors, (3) personnel availability, (4) external socioeconomic and political events, and (5) the release dates of competitive films. See "Risk Factors" in Item 1A of this Form 10-K.

### *Distribution of Our Films*

In February 1997, we entered into the Co-Production Agreement (which, except for certain economic provisions applicable to *Toy Story*, superseded the Feature Film Agreement) with Disney pursuant to which we,

4

App. 112

**Table of Contents**

## PART III

**Item 10.** *Directors and Executive Officers of the Company*

**Directors**

The members of our Board of Directors as of February 15, 2006 are as follows:

| Name | Age | Position with Pixar |
|---|---|---|
| Steve Jobs | 50 | Chairman and Chief Executive Officer |
| Edwin E. Catmull | 60 | President and Director |
| Skip M. Brittenham | 63 | Director |
| Susan L. Decker | 42 | Director |
| Joseph A. Graziano | 61 | Director |
| Lawrence B. Levy | 46 | Director |
| Joe Roth | 56 | Director |
| Larry W. Sonsini | 65 | Director |

*Mr. Jobs* is a co-founder of Pixar and has served as Chairman since March 1991 and as Chief Executive Officer since February 1986. He has been a director of Pixar since February 1986. In addition, Mr. Jobs is currently Chief Executive Officer and a member of the Board of Directors of Apple Computer, Inc.

*Dr. Catmull* is a co-founder of Pixar and has served as President since January 2001. Dr. Catmull also served as Chief Technical Officer from the Company's inception until January 2001. Previously he was Vice President of the Computer Division of Lucasfilm, Ltd., where he managed four development efforts in the areas of computer graphics, video editing, video games and digital audio. Dr. Catmull has been honored with four Scientific and Technical Engineering Awards from The Academy of Motion Picture Arts and Sciences for his work, including an Oscar®. He also won the Coons Award, which is the highest achievement in the computer graphics field, for his lifetime contributions and was awarded the animation industry's Ub Iwerks Award. Dr. Catmull is a member of the Academy of Motion Picture Arts and Sciences and the National Academy of Engineering. Dr. Catmull earned his B.S. degrees in computer science and physics and his Ph.D. in computer science from the University of Utah.

*Mr. Brittenham* has served as a director of Pixar since August 1995. He is a senior partner with the entertainment law firm of Ziffren, Brittenham, Branca, Fischer, Gilbert-Lurie, Stiffelman & Cook LLP, which was founded in 1978. Mr. Brittenham currently serves on the board of, or is a trustee of numerous charitable organizations, including Conservation International, KCET, the Environmental Media Association and the Alternative Medical AIDS Foundation. Mr. Brittenham received a B.S. from the United States Air Force Academy and a J.D. from the University of California, Los Angeles.

*Ms. Decker* has served as a director of Pixar since June 2004. She has served as Yahoo!'s Chief Financial Officer since June 2000 and as Executive Vice President, Finance and Administration since January 2002. Prior to that, Ms. Decker also served as Yahoo!'s Senior Vice President, Finance and Administration from June 2000 to January 2002. From August 1986 to May 2000, Ms. Decker held several positions for Donaldson, Lufkin & Jenrette, including Director of Global Research from 1998 to 2000. Prior to 1998, she was a Publishing & Advertising Equity Securities Analyst for 12 years. Ms. Decker also serves as a director on the boards of Costco Wholesale and the Stanford Institute of Economic and Policy Research. Ms. Decker holds a B.S. degree from Tufts University with double majors in computer science and economics and a M.B.A. from Harvard Business School.

*Mr. Graziano* has served as a director of Pixar since August 1995. From June 1989 to December 1995, he was the Executive Vice President and Chief Financial Officer and a member of the Board of Directors of Apple Computer, Inc. from June 1993 until October 1995. From May 1987 to June 1989, Mr. Graziano served as Chief Financial Officer of Sun Microsystems, Inc. and from October 1981 to May 1985 as Chief Financial Officer of Apple. Mr. Graziano also serves as a director of Packeteer, Inc. Mr. Graziano received a B.S. in accounting from Merrimack College and is a certified public accountant.

48

App. 113

**Table of Contents**

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this Form 10-K to be signed on its behalf by the undersigned, thereunto duly authorized, on this 7th day of March, 2006.

PIXAR

By:      /s/   SIMON T. BAX
_____

Simon T. Bax
*Executive Vice President,*
*Chief Financial Officer and Secretary*

## POWER OF ATTORNEY

KNOW ALL THESE PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Steve Jobs, Simon T. Bax, and Edwin E. Catmull and each of them, jointly and severally, his or her attorneys-in-fact, each with full power of substitution, for him or her in any and all capacities, to sign any and all amendments to this Form 10-K, and to file the same, with exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that each said attorneys-in-fact or his substitute or substitutes, may do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this Form 10-K has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /S/   STEVE JOBS<br>Steve Jobs | Chairman of the Board and Chief Executive Officer (Principal Executive Officer) | March 7, 2006 |
| /S/   SIMON T. BAX<br>Simon T. Bax | Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer) | March 7, 2006 |
| /S/   EDWIN E. CATMULL<br>Edwin E. Catmull | President and Director | March 7, 2006 |
| /S/   SKIP M. BRITTENHAM<br>Skip M. Brittenham | Director | March 7, 2006 |
| /S/   SUSAN L. DECKER<br>Susan L. Decker | Director | March 7, 2006 |
| /S/   JOSEPH A. GRAZIANO<br>Joseph A. Graziano | Director | March 7, 2006 |
| /S/   LAWRENCE B. LEVY<br>Lawrence B. Levy | Director | March 7, 2006 |
| /S/   JOE ROTH<br>Joe Roth | Director | March 7, 2006 |
| /S/   LARRY W. SONSINI<br>Larry W. Sonsini | Director | March 7, 2006 |

App. 114

# Tab 9

**PRESS RELEASE**
August 24, 2011

# Steve Jobs Resigns as CEO of Apple

## Tim Cook Named CEO and Jobs Elected Chairman of the Board

CUPERTINO, California—August 24, 2011—Apple's Board of Directors today announced that Steve Jobs has resigned as Chief Executive Officer, and the Board has named Tim Cook, previously Apple's Chief Operating Officer, as the company's new CEO. Jobs has been elected Chairman of the Board and Cook will join the Board, effective immediately.

"Steve's extraordinary vision and leadership saved Apple and guided it to its position as the world's most innovative and valuable technology company," said Art Levinson, Chairman of Genentech, on behalf of Apple's Board. "Steve has made countless contributions to Apple's success, and he has attracted and inspired Apple's immensely creative employees and world class executive team. In his new role as Chairman of the Board, Steve will continue to serve Apple with his unique insights, creativity and inspiration."

"The Board has complete confidence that Tim is the right person to be our next CEO," added Levinson. "Tim's 13 years of service to Apple have been marked by outstanding performance, and he has

**Newsroom**

🔍 Search

Jobs submitted his resignation to the Board today and strongly recommended that the Board implement its succession plan and name Tim Cook as CEO.

As COO, Cook was previously responsible for all of the company's worldwide sales and operations, including end-to-end management of Apple's supply chain, sales activities, and service and support in all markets and countries. He also headed Apple's Macintosh division and played a key role in the continued development of strategic reseller

App. 116

Case 4:25-cv-00914-P    Document 281    Filed 05/20/26    Page 117 of 252    PageID 12630

and supplier relationships, ensuring flexibility in response to an increasingly demanding marketplace.

Apple designs Macs, the best personal computers in the world, along with OS X, iLife, iWork and professional software. Apple leads the digital music revolution with its iPods and iTunes online store. Apple has reinvented the mobile phone with its revolutionary iPhone and App Store, and has recently introduced iPad 2 which is defining the future of mobile media and computing devices.

## Press Contacts

**Apple Media Helpline**

[media.help@apple.com](mailto:media.help@apple.com)

**Apple Media Helpline**

[media.uk@apple.com](mailto:media.uk@apple.com)

Apple, the Apple logo, Mac, Mac OS and Macintosh are trademarks of Apple. Other company and product names may be trademarks of their respective owners.

 Newsroom

**The latest news and updates, direct from Apple.**

**Read more**

Newsroom        Steve Jobs Resigns as CEO of Apple

| Shop and Learn | ⌄ |
| --- | --- |
| Apple Wallet | ⌄ |
| Account | ⌄ |
| Entertainment | ⌄ |
| Apple Store | ⌄ |
| For Business | ⌄ |
| For Education | ⌄ |
| For Healthcare | ⌄ |
| For Government | ⌄ |
| Apple Values | ⌄ |
| About Apple | ⌄ |

App. 117

More ways to shop: Find an Apple Store or other retailer near you. Or call 1-800-MY-APPLE (1-800-692-7753).

United States    Español

Copyright © 2026 Apple Inc. All rights reserved.

Privacy Policy     Terms of Use     Sales and Refunds     Legal     Site Map

App. 118

# Tab 10



**Planet Depos**
We Make It *Happen*™

# HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

# Transcript of Samuel H. G. Altman

**Date:** February 10, 2026
**Case:** OpenAI, Inc. Copyright Infringement Litigation, In re:

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Samuel H. G. Altman
Conducted on February 10, 2026

17

A   I am an investor in other companies that OpenAI has invested in.

Q   What companies are those?

A   I wouldn't be able to do a list off the top of my head.

Q   Can -- can you name any of them?

A   No, not off the top of my head, but I know it's happened, because we have a board conflict process for that.

Q   Okay.  And those investments, are those through the OpenAI start-up fund?

A   Yes.

Q   All right.  And who decides what OpenAI start-up fund invests in?

A   Ian Hathaway, who runs the fund; Brad Lightcap, who is his manager.

And then if there is a conflict -- or if it's a company that I have exposure to, for example, and I can't provide final signoff, then that would go to the board.  And we have got a rigorous process in place for that.

Q   What is the value of your investment in companies in which OpenAI has invested for the OpenAI start-up fund?

A   I'm not aware --

18

Q   You're --

A   -- but not a significant.

Q   Not a significant?

A   No.

Q   So like, less than a million?

A   I -- I really don't know.

Q   What is your current net worth?

A   I don't keep track of that.

Q   Do you have any equity in OpenAI?

A   I have no direct equity in OpenAI.  I have a small amount of indirect exposure.

There was a Y Combinator fund that invested in OpenAI that I have a carried interest in.  And depending on how that fund performs, I could have some value there.  It would be an insignificant amount.

Q   Have you had your deposition taken before?

A   Once.

Q   In what case?

A   The Elon Musk case.

Q   When was that?

A   Last year.

Q   And you were sworn in that deposition to tell the truth, the whole truth, and nothing but the truth?

19

A   Yes.

Q   Just like in this one?

A   Yes.

Q   Did you participate in having your documents collected for production in this case?

A   Yes.  I had to provide some passwords and stuff to my lawyers.

Q   Did you provide your personal devices to your lawyers to collect documents in this case?

A   Only devices that I used for any work purpose.

Q   But every device that you used for work --

A   Yes.

Q   -- purpose -- you have got to let me finish --

A   Sorry.

Q   -- before you answer.

Every device you used for a work purpose, you tried -- provided to your lawyers to collect documents in this case?

A   Yes.

Q   All right.  Did you identify your -- to them every email account that you used to conduct business?

A   Yes.

20

Q   And you gave them the name and password for those accounts as well to access those materials?

A   Yes.

Q   What messaging apps do you use to conduct business?

A   Slack, iMessage, WhatsApp, email, occasionally Signal.  I think that's all off the top of my head.

Q   Did you provide access to all of those applications to your lawyers?

A   Everything -- everything my lawyers asked for, yes.

Q   Okay.  Including your Y Combinator email?

A   I had my Y Combinator email set up to forward to my Gmail, so you'll probably see in the documents where it says a Y Combinator address via a Gmail account.

Q   Okay.  So your lawyers did not directly access your Y Combinator email account; is that correct?

A   We don't have direct access to that account anymore.

Q   Okay.  And so all your email that you receive via that email address --

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

21

A Was --

Q -- forwards -- you have got to let me finish -- forwards to the Gmail account that you gave your lawyers access to --

A Yes.

Q -- correct?
Got it. Okay. Let's go ahead. And mark Altman Exhibit 1.
(Exhibit 1 was marked for identification and is attached to the transcript.)

Q (BY ATTORNEY CROSBY) So I'm handing you an email chain that's been marked as Altman Exhibit 1. And I'm actually interested in an exchange at the bottom of the chain. It begins May 18 -- or I'm sorry.
May 9, 2018 from Joshua Schachter to you and your response to Joshua Schachter.
Do you see that?

A Yes.

Q And at the time that you engaged in this email exchange with Mr. Schachter, were you employed by an OpenAI entity?

A I don't think so.

Q Well, your email -- so who is Mr. Schachter?

22

A He was the founder of a company called Delicious and has sort of been an acquaintance of my mine for many years.

Q Okay. And you write to him on May 9, 2018:
"We have a new natural
language model at OpenAI."
What was your relationship to OpenAI at that time?

A Can I have a moment just to review the document?

Q You certainly may.

A Okay.

Q All right. You wrote to Mr. Schachter on May 9, 2018:
"We have a new natural
language model at OpenAI."
What was your relationship to OpenAI at that time?

A I was a cochair of the nonprofit, and I was spending -- I was working full time at Y Combinator, but I was spending some time helping out OpenAI --

Q Okay. And so you --

A -- informally.

23

Q Did you send this email in your role as cochair of the OpenAI nonprofit at that time?

A I don't recall the specific mind-set I was in when I sent it, but it looks like I was somehow trying to help out.

Q Okay. And Y Combinator was a backer of the OpenAI nonprofit?

A I don't believe so. I think OpenAI -- Y Combinator was a backer of OpenResearch, which was a more general-purpose research funding nonprofit, but not OpenAI itself --

Q Well --

A -- but I'm not -- I'm not sure on that.

Q Why were you using your Y Combinator email address to email somebody about a new natural language model at OpenAI?

A I work on many projects. I'm involved with hundreds -- or I was at the time involved with a hundred companies. I used one email address for everything.

Q You describe OpenAI in this email as a "nonprofit research company," correct?

A Yes.

Q And at that time the only OpenAI entity was the OpenAI nonprofit, correct?

24

A Correct.

Q Had you not determined prior to May 9, 2018, that you would need to undertake commercial for-profit activities in order to raise funds to pursue OpenAI's mission?
ATTORNEY VAN NEST: Objection to form.
ATTORNEY HURST: Same.
ATTORNEY VAN NEST: You may answer.

A At this time we were still only a nonprofit entity. I believe we were thinking about what kind of entity we would need to be, but we didn't have anything else, as I recall, at this time.

Q (BY ATTORNEY CROSBY) You hadn't made a decision that you were going to pursue a for-profit entity at that point?

A I don't remember when in 2018 we kind of agreed on what the structure was going to be, but my guess -- my best guess would be that by -- by May, we had not, but I don't recall.

Q So my recollection from Mr. Brockman's testimony was that that decision was made by the end of 2017. I'm not asking you to validate that, but is that consistent with your recollection?
ATTORNEY VAN NEST: Objection to form.

25

ATTORNEY HURST: Same.

A   As mentioned earlier, I was not employed by OpenAI yet. I was not involved in a deep way at the time. I was -- Mr. Brockman and Mr. Sutskever were mostly running the show then. I was employed at Y Combinator.

Q   (BY ATTORNEY CROSBY) So you don't recall having been involved in any decision to pursue a for-profit entity by the end of 2017?

A   Like, I was very busy with other projects. I don't remember the timeline on this one.

Q   Okay. And what -- cochair -- what were the responsibilities for the cochair at OpenAI?

A   Sir, this was a research lab with, I don't know, at the time maybe 40 researchers running around trying to figure out what to do. It was a ragtag group. We had very little resources. We had very little structure.

This was like a -- at that time a sort of academic institution. I think if you could see it, a question about responsibilities would strike you as somewhat comical. But we were -- you know, we were trying to figure out how we were going to discover the secrets that have led to this deep learning revolution. But at the time it was, you

26

know, a very small, informal effort trying to do some science.

Q   Maybe I should be a little more focused on that. Who had responsibility, for example, to write checks for this organization -- or authority, I mean?

A   I don't know who the officers of the organization were at that time.

Q   Did you have any ability to make decisions on behalf of this entity?

A   Like could I write a check?

Q   No. Could you make decisions that would bind the entity in any way?

ATTORNEY VAN NEST: Object to form.

A   I'm not familiar what the official duties of -- or powers of cochair was in this setup. But as a board member of a nonprofit entity, I would expect that I had whatever the standard board member abilities were. I didn't have a heavy operational role.

Q   (BY ATTORNEY CROSBY) Let's go ahead and mark Altman Exhibit 2.

(Exhibit 2 was marked for identification and is attached to the transcript.)

ATTORNEY CROSBY: Pass that on down to

27

Annette, please.

Q   (BY ATTORNEY CROSBY) So Altman Exhibit 2, I believe, is a Slack message channel between yourself and several other folks with a date of 2 -- of March 3, 2019.

Does that appear correct to you?

A   It looks correct.

Q   All right. And this is an OpenAI business Slack channel, right? This is on their Slack platform?

A   Yes.

Q   And by this time had OpenAI formed a for-profit entity?

A   I believe by now we had, but I don't have a strong recollection of the exact date.

Q   And that would be the company that you referred to as OPCO?

A   I believe that would be the entity, although I'm not sure of the exact. The names have changed a few times.

Q   At the top of this chain -- so who is David Luan?

A   David Luan was a VP of research at -- he at one point was a VP of research. I don't know what his title was at this time.

28

Q   And he emails to you:

"@Sam Altman, do you have any news on Bill's scheduling?

Does that refer to scheduling a meeting with Bill Gates?

A   I believe so.

Q   And what was the purpose of wanting to schedule a meeting with Bill Gates?

A   Let me review the document for a minute and see if it can jog my memory.

I believe what happened is we had had a meeting with Satya. And then as a follow-up, he wanted us to meet with Bill Gates.

Q   And what was the purpose of meeting with Satya?

A   We were trying to raise money for the entity.

Q   And if you go down to the page, you'll see the bottom right corner there are these stamped numbers called -- we call them Bates numbers. The one ending in 8216. And at the top of that page Bob McGrew writes you a messages -- or writes a message, I should say, that ends with:

"But if commercialization opportunities are important for

custom version of it for me with like a special chapter, which I thought was like a cool example of the technology. That -- you could do a different one for every person.

Q   Do you expect that to be widespread?

A   Like customized books like that?

Q   Sure.

A   I go back and forth on this. I -- the -- I think the shared cultural experience of things like music and the great books is so important that even if we could as a society produce the ideal book for each individual person, but it was different, it -- most of us want to be able to talk to other people about books and have a shared thing. Or music is this, like, important cultural connector, and I think you want that too.

So my guess -- and obviously no one knows what's going to happen here, but my guess is that to a surprising degree, the super custom stuff have -- is more than limited in its appeal. And it'll have a place, and people will, you know, like, do very customized fan fiction with themselves in it or whatever.

But on the whole, we want -- we will want the shared cultural objects, and there's something deep there.

Q   And you're certainly aware of niche audiences where the audience might be in the dozens or hundreds or even single digits, and you would agree that AI would allow the creation of those types of very niche books to be created where it, for example, would otherwise might not be the case?

ATTORNEY VAN NEST:  Object to form.

A   Not -- not yet. Like, I don't -- I mean, you could -- you could -- again, you could write some version of a hundred thousand words, but I don't know of nobody who would be -- who would say: This is -- this is a great book. Thank you.

Q   (BY ATTORNEY NELSON) I'm going to introduce as Exhibit 28, another early document.

(Exhibit 28 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) This is from November of 2018. It says "OpenAI Asilomar Off-Site."

Do you see that?

A   Yes.

Q   What is Asilomar?

A   It's the name of, like, a conference center. Maybe it's a city, but it's like a place on -- on the Central Coast of California.

Q   And OpenAI had its off-site there?

A   We did.

Q   I want to turn your attention to -- it's a native document, so it's about six pages in.

Do you see it says: "What happens next?"

A   Yes.

Q   And what does that say?

A   It says:

"AI can take humanity to the stars or result in world's most powerful dictatorship and concentration of power. We have disproportionate say in that outcome."

Q   And certainly, sir, you are aware that with the generation of these powerful technologies, there's tremendous risk in these new systems, correct?

ATTORNEY VAN NEST:  Object to form.

ATTORNEY HURST:  Same.

A   Our -- a significant part of our founding mission is to develop technology and also to figure out how to bring that technology to a way -- to society in a way that mitigates those risks.

And look, I'm sure you don't like me very much, but I --

Q   (BY ATTORNEY NELSON) I never said that.

A   -- oh, okay. One thing that I'm very proud of -- of what we have done for the world is to democratize this technology and to figure out super important safety research and techniques to put out a model that most of our field thought a model with this capability, we would be looking at the potential of catastrophic risk to humanity, to put out something for a tremendous benefit and not have some of those huge risks facing the world.

Q   You understand -- and I think I just heard you say it -- that as much as you mitigate that risk, it's still out there, right?

ATTORNEY VAN NEST:  Object to form.

ATTORNEY HURST:  Object to form.

A   Out there for sure. I mean, there's many other companies making models. There's many open-source models.

We are shifting more and more towards an approach where it's not just about the safety of what we create, but society-based resilience. Because right now, you know, there are certainly companies putting models out that I think are quite bad for the world.

193

So yes, it's out there. It might not be ours, but it's out there.

Q   (BY ATTORNEY NELSON) What companies do you think are making models that are bad for the world?

ATTORNEY VAN NEST:  Object to form.

A   Oh, I would love to get to answer.

Q   (BY ATTORNEY NELSON) You get to answer.

ATTORNEY VAN NEST:  You can answer. I'm objecting to the form of the question.

A   I -- I think one example of what -- one example is I think what xAI is putting out with this sort of sexy chatbot avatars is probably going to turn bad for the world if they keep doing it in the way they're doing it.

There are open-source models that are getting very good at biology, and I could imagine new pandemics coming from those. They don't have restrictions on them. That's two categories.

Q   (BY ATTORNEY NELSON) Are you concerned -- let me back up.

Do you see in that slide you're looking at, it says "result in the concentration of power"?

Do you see that, sir?

A   Yes.

Q   Are you concerned by the concentration of

194

power and wealth that is accruing to AI companies?

ATTORNEY VAN NEST:  Object to form.

A   I am not concerned at current levels. I think that -- I mean, I can speak for our company in particular.

The -- there -- there was a belief that some other people had in the field around the time of this off-site, which is that AGI was going to be such a dangerous technology that we couldn't tell the world about it; we certainly couldn't give the world access, and it needed to be a few kind of brilliant AI scientists in secret rooms deciding what to do here.

We -- we, in one of our, I think, most important decisions ever, adopted a principle that we call "iterative deployment" where we decided we were going to put out these models in the world, even if early -- even if imperfect specifically to make sure that the power didn't accrue all to one company or in one place and that society as a whole got to benefit from the power and capability of these -- of these models.

Now almost a billion people use ChatGPT, comp -- many companies, lots of scientists. This is -- this is what we wanted to do; this is what we

195

set out to do to avoid that kind of concentration of power.

Q   (BY ATTORNEY NELSON) You're still concerned by it?

ATTORNEY VAN NEST:  Object to form.

A   I have a deep-seeded, personal continual anxiety that things can always go horribly wrong and that believing that is the best way to prevent them from doing so.

So I hope to always be concerned about what could happen in the future and then work as hard as we can to get to the good outcome, which, you know, over the last decade I think we have had a pretty nice track record on.

Q   (BY ATTORNEY NELSON) Okay.  Let's mark as -- Exhibit 29.

(Exhibit 29 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) Sir, this is an email from Mira Murati to David Luan, and you're CC'd in -- with the chain that starts with an email from you on January 14, 2019.

Do you see that?

A   Yes.

Q   Okay.  And you write in that first page

196

that you want to send Microsoft some thoughts on a proposal for collaborating together; is that fair?

A   Yes.

Q   And the second bullet point says:

"We set up a meeting with Bill, Satya, and Kevin to discuss the $10 billion short-term investment."

Do you see that?

A   Yes.

Q   Who are Bill, Satya, and Kevin?

A   Bill Gates, Satya Nadella, and Kevin Scott.

Q   And then you say:

"For this meeting, I would like to show them an improved language model (and huge bonus points if it could do Gates' pet project, after being trained on language, then read a book and answer questions about it)."

Do you see that, sir?

A   Yes.

Q   Why did you want to pursue that particular project?

197

A   Bill had said to us that one thing -- he didn't believe in these models' ability to generalize and one-shot learn.

And that if you could train a book generically on language and then -- train a model generically on language and then show it a book it hadn't seen before and it could do what a human could do, which is look at that book for the first time and answer questions about it, that that to him would be convincing evidence of understanding and generalization.

Q   And then if you turn the page, there's an "Executive Summary." You see it's -- the attachment is with a document.

A   Yeah.

Q   And then on the first page of the attachment, it says:

"Business Proposal:  Microsoft and OpenAI initially commit to a transaction structure for Azure compute access and a TPU v3 pod-equivalent machine and establish nonbinding Letters of Interests outlining the agreements for supercomputing machines,"

198

right?

A   Yes.

Q   Why did you want to work with Microsoft?

A   We weren't capable of building systems at this scale.  And there were only a handful of companies in the world -- maybe Microsoft, Google, and Amazon at the time -- that could, and Microsoft was very value aligned with us in the way that the other companies were more skeptical of.

Q   You were then on the Google platform, correct, in 2018 and 2019 --

A   I thought --

Q   -- and --

A   -- we were on Amazon.

Q   Okay.

A   I could -- maybe both.

Q   Okay.  Were you concerned about the power of Google, if they were to develop an AI model first?

ATTORNEY VAN NEST:  Object to form.

A   I had some concerns about some of their people's stance that AI should not be widely democratized and that it should be, you know, run by a small group.

Q   (BY ATTORNEY NELSON) Okay.  Let's go to

199

the next exhibit, which is Exhibit 30.

(Exhibit 30 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) And then this is an email exchange between you and Ms. Daniela Amodei and others.

Do you see that, sir?

A   Yes.

Q   Okay.  And you say that you think it's a good idea to "train on Bill Gates's tweets and blog posts.  Then generate more Bill Gates's style."

Do you see that in the middle of the page?

A   I do see that.  It looks like I'm quoting somebody else there.

Q   Yes.  If you go, actually, to the next page, you see that there's -- Ms. Amodei is talking about potential options, right?

A   Yes.

Q   And Option 2, in fact, is "Essay Ghostwriter."

Do you see that, sir?

A   Yes.

Q   What was "Essay Ghostwriter" supposed to be?

A   I don't remember this.  I'll speculate.  I

200

don't remember this particularly, but it looks like, you know, a user starts writing.  The model then gives some ideas for what goes next.  The user picks that.  The model keeps going and so on.

Q   And you respond on the previous page, Number 2, "this would be cool," right?

A   Yes.

Q   And you understood from the beginning that one of the purposes of the AI models was to help with writing; is that fair?

A   Yes.

ATTORNEY VAN NEST:  Object to form.

Slow down.

THE DEPONENT:  Sorry.

Q   (BY ATTORNEY NELSON) And during this time frame, because of this emphasis on language, OpenAI was relooking again to acquire book sets?

ATTORNEY VAN NEST:  Object to form.

A   I can't reproduce the timeline in my head. If you -- I mean, it was seven years ago.  I would believe you if you said that were true, but I don't recall.

Q   (BY ATTORNEY NELSON) Okay.  I'm going to introduce as -- Exhibit 31.

(Exhibit 31 was marked for identification

Transcript of Samuel H. G. Altman
Conducted on February 10, 2026

201

and is attached to the transcript.)
Q   (BY ATTORNEY HURST) This is an email exchange with some OpenAI employees, including Ms. Amodei on it.
Do you see that?
A   Um-hum.
Q   And do you see the title is "Expanding our books (for long-form text) corpus"?
A   "Or long form."
Q   Excuse me.  You're right.
"Expanding our books (or long-form text) corpus."
A   Yeah.
Q   Do you see that?
And you understood that books were a way to obtain long-form text, right?
A   Yes.
Q   Is long-form text important for model training?
A   It's important to have something that is -- "long-form," I don't think, means the same thing than an author would mean by it.  It's important to have something that is, like, more than a few sentences of coherence, but you don't need the kind of crazy long stuff.

202

Q   If you go to the last page of the document, do you see it says "Thoughts from Mira"?
Do you see that?
A   Yes.
Q   And it lists various different sources of books.  Do you see that, sir?
A   Yes.
Q   And it says:
"Free books we can access without need for partnership," right?
A   Yes.
Q   It also discusses "Publishers."
Do you see that?
A   Yes.
Q   Did OpenAI reach out to publishers during this time frame?
A   I believe we did have some conversations, but I don't recall what they were specifically.
Q   You're just aware that there were conversations?
A   I'm not even totally sure I believe there were.
Q   Oh.
A   This was still before I was, like, full

203

time at OpenAI.
Q   Okay.  It's fair to say you were still actively involved at OpenAI during this time frame?
A   I mean, I had a very busy day job, but yes, I was spending some time; but I was not in the details.
Q   You were helping set up the Microsoft deal --
A   Yes.
Q   -- correct?
And you were planning to attend the forthcoming meetings with Mr. Nadella and Mr. Gates, correct?
A   I was very involved in the financing piece.  That was like -- you know, I sort of said: I'll take on this one thing.  I have limited bandwidth, but this one I can do.
Q   And "the financing piece" means what?
A   Raising the -- like, figuring out the fundraising and the structure.
Q   And so that's why you were so involved in raising money and meeting with Microsoft?
A   Yeah.
Q   And on that -- later on on that same page, it says "Thoughts from David Lansky."  And then it

204

says:
"Just learned about this search engine that links to free book downloads, LibGen.IO."
Do you see that, sir?
A   I do.
Q   And then with code, how "to do bulk downloads."
Do you see that, sir?
A   Yes.
Q   Have you heard of LibGen at this point?
A   I don't know.  I don't recall hearing it before this, and it doesn't stick out in memory from this.
Q   Okay.  To the best of your recollection, have you ever heard of LibGen or Library Genesis?
A   I have heard of it since.
Q   When was the first time that you remember hearing about Library Genesis?
A   Well, I heard about it in conjunction with this case.
Q   Prior to this case, had you heard of Library Genesis?
A   I don't recall with certainty.
Q   You're aware that one of the allegations

Transcript of Samuel H. G. Altman
Conducted on February 10, 2026

---

205

in this case is that OpenAI visited Library Genesis and did a bulk download?

A   I am aware of that.

Q   Okay.  And were you involved, sir, in trying to figure out where these books might come from?

A   I -- I was never particularly involved in the data -- what we called the data prep or the data mix.

When someone would ask me:  Could you make an introduction to this company -- in fact, there was a -- this jogs the memory of when I spent a lot of time trying -- trying to get something -- with the HathiTrust to work with us.

But generally speaking, data was not my area of focus, and I was not closely involved in what we did there.

Q   And if we go back -- actually, let's go back to Altman Exhibit 1, the very first exhibit.

That email is actually dated -- it's a forward, and you're forwarding it to Ms. Amodei in February of 2019.

Do you see that?

A   Yes.

Q   And if you go back to what we just looked

---

206

at, that's the same time frame as the discussion about books here, correct?

A   I believe you.  Yes.

Q   And you forwarded it to Ms. Amodei here because you were helping her trying to source where books might come from, correct?

ATTORNEY VAN NEST:  Object to form.

A   The way I work and I think the way many CEOs work is the people that work at the company ask me for help with things.  I am effectively a glorified email router.  I forward a lot of things.  I make introductions.  I search for stuff in the past.

I can't speculate on which of those that was in this case.  But you know, if someone is, like -- I have my areas where I'm very deep and that I really focus on, and that comes down to a lot of things.  So mostly I entrust other executives or leaders to do things.  And I help them, when needed, which could be an introduction or forwarding an email or something like that.

Q   (BY ATTORNEY NELSON) You were aware that OpenAI was searching for large databases?

A   Very much so, yeah.

Q   Did you have a discussion about Library

---

207

Genesis during this time frame in February of 2019?

A   Not that I recall.

Q   And eventually you met with Mr. Nadella in late February of 2019.  Do you recall that, sir?

A   I remember seeing something about that meeting in February earlier in this -- today, but I wouldn't independently recollect when that meeting was.

Q   Okay.  Let's mark as -- Exhibit 32.

(Exhibit 32 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) And, sir, this is a Slack thread entitled "MSFT 2-28."

Do you see that, sir?

A   Yes.

Q   And you're on that, right?

A   Yep.

Q   Okay.  And it's talking about a bunch of details for -- I'm actually going to point you to the page near the end that ends in 636.

A   Okay.

Q   And it's a discussion of how that meeting went after it.  Do you see that, sir?  It's -- I'm looking at it.  It's at 8:33 p.m. UTC.

ATTORNEY VAN NEST:  Mr. Altman, you can

---

208

review the document to get context.

A   I would rather not spend timing reading the whole thing.  Is there something --

Q   (BY ATTORNEY NELSON) No.

A   -- important?  If it's just about the center --

Q   It really is about that, sir.

A   All right.

Q   And so Mr. McGrew is trying to sum up what happened at the meeting.  And it's:

"Sam, David, and I just had a very positive meeting with the CEO, CTO, and CFO of Microsoft.  David really nailed the language demo using the new, larger model that finished training just last night. The Dota and robotics demos were also very well received.  The excitement in the room was palpable.  They would like us to brief Bill Gates soon."

Do you see that?

A   Yes.

Q   Is that consistent with your recollection of the February 28, 2019 meeting?

209

A   I -- yeah.  In fact, I -- I mean, it was, I would say, something even strong -- like, we kind of left that meeting being like:  Let's -- let's do this.

Like, sure there's some steps, but like, there was intention, I think, on both sides out of that meeting to figure it out.

Q   Do you recall what happened specifically at that meeting?

A   Yeah, we showed them these demos.  We said:  Look, we don't know yet how we're going to -- we know we need a lot of compute.  We don't know yet how we're going to make money, but we think that Microsoft is the right partner here, and we would like you to invest.

And I remember Satya saying some version of:  Okay, let's do it; let's figure it out.

Q   And he wanted you to meet with Mr. Gates --

A   Yes.

Q   -- after that?

Did you understand that the meeting with Mr. Gates was important in trying to establish the Microsoft deal?

ATTORNEY VAN NEST:  Object to form.

210

A   Mr. Gates was skeptical of us.  I don't think I understood at the time just how skeptical.

So maybe with what I now know, I would have said:  Yes, it was more important than I thought it was at the time.

At the time it was like -- I thought it was sort of like a just -- you know, it would be cool for Gates to hear it.  I thought it would be very cool to get to show it to Gates.

So it sounded like a -- I don't think I understood that it was, like, as important as it turned out to be.

Q   (BY ATTORNEY NELSON) Well, you certainly took it seriously when the CEO of Microsoft says:  Please present to Bill Gates, right?

ATTORNEY VAN NEST:  Object to form.

A   I mean, more than that.  It's like:  Bill Gates is a legend.

I was like:  This is an awesome opportunity.  I really want to go do this thing.

Q   (BY ATTORNEY NELSON) And in fact, you later did present this model --

A   Yeah.

Q   -- or a similar-type model, right?

A   Several times.  I don't think we were

211

convincing to Mr. Gates really truly until GPT-4.

Q   Well, we'll get to that.  But just -- I'm trying to just really focus in on this 2019 --

A   Yeah.

Q   -- time frame for right now.

A   We did present after this meeting.

Q   Okay.  And you recall approximately that it was in late April of 2019?

A   That sounds right, but I'm not certain.

Q   Okay.  We'll get to it.  It's --

A   Okay.

Q   -- not a memorization --

A   Okay.

Q   -- test.  Okay.  Let's mark as -- Exhibit 33.

(Exhibit 33 was marked for identification and is attached to the transcript.)

Q   (BY ATTORNEY NELSON) And this is a Slack channel again with "MSFT 2-28" on it from a little bit later.  And Mr. Luan is asking you about any news on Bill's scheduling.

Do you see that --

A   Yes.

Q   -- sir?  And he's telling you that he:
"Spent all day Friday pivoting

212

the language, music, and program synthesis folks toward shipping whatever we can in the new, short timeline and prioritizing fine-tunes to have them out of the way in case Bill needs to meet next week, for example."

Do you see that?

A   Yes.

Q   Okay.  And you respond that you're "meeting with Kevin" that "Monday afternoon," correct?

A   Yes.

Q   And you were, in fact, having discussions with Mr. Scott about when to schedule the Bill Gates demo, correct?

A   I don't remember.  It looks like I say "I may know more."

It may have just been like:  Let me ask if he has got --

THE COURT STENOGRAPHER:  May know more?

A   -- I may know more.  If -- Kevin may know more.

It says -- my message says "No," period.
"I may know more after meeting Kevin Monday

213

afternoon." It could just mean I was going to ask him --

Q (BY ATTORNEY NELSON) Okay.

A -- about scheduling.

Q Okay. Let's go to Exhibit 34.

(Exhibit 34 was marked for identification and is attached to the transcript.)

Q (BY ATTORNEY NELSON) I'm going to skip ahead a little bit to April. And this just got produced to us last night, so bear with us on the temporary Bates number. But do you see -- let's start at the beginning of the chain, which you're CC'd on.

But it's an email from Kevin Scott, but you're eventually CC'd on it, to Greg Martinez and Umesh Madan on OpenAI.

Do you see that, sir?

A I see it, but I don't see that I'm CC'd on --

Q You're --

A -- it.

Q -- eventually --

A Oh --

Q -- CC'd --

A -- got it. Yes. Yes.

214

Q Okay. So -- and you see Mr. Scott asking Mr. Martinez for 30 to 60 minutes of Bill's time --

A Yes.

Q -- correct?

And that's consistent with your understanding that Microsoft was trying to help you set up a presentation with Mr. Gates and yourself, correct?

A Yes.

Q And do you see eventually at the top ending in 434, it says it's scheduled for 10:00 a.m., on Monday, April 22.

Do you see that, sir?

A Yes.

Q And then you come into the picture at 4:33, about CC'ing Sam Altman, and you confirm that time, correct?

A Yes.

Q And then going to the second page, on the -- at 4:20 p.m., on April 17, there's an email from Mr. Martinez.

Do you see that, sir?

A Yes.

Q Who is Mr. Martinez?

A He works for Mr. Gates. I don't know his

215

exact job title.

Q Okay. And he's asking you, along with Mr. Scott and Mr. Madan:

"Are there any materials that Bill can look at ahead of time?"

Do you see that?

A Yes.

Q And in fact, you did send Mr. Gates's team some materials beforehand, correct?

A I don't recall.

Q Okay. We'll get to that. On the first page, there's a question about who else was going to attend the meeting aside from yourself, and you write "Dario Amodei and Ilya Sutskever."

Do you see that, sir?

A I do.

Q In fact, they did both attend that presentation with you, right?

A That is my recollection.

Q Okay. And that -- that was your recollection, that they attended --

A Yeah.

Q -- the meeting?

And it was in person?

A That's also my recollection.

216

Q Okay.

A But there were several meetings with Bill, and I wouldn't stake too much on that.

Q Okay. Let's mark as -- Exhibit 35.

(Exhibit 35 was marked for identification and is attached to the transcript.)

THE COURT STENOGRAPHER: Watch the crosswalk, please.

ATTORNEY VAN NEST: I'm sorry, Mary?

THE COURT STENOGRAPHER: I said watch the crosswalk, please.

ATTORNEY NELSON: Oh, thank you.

Q (BY ATTORNEY NELSON) And I -- actually, I think that this was marked earlier today --

A Yes.

Q -- that you are pasting in an email that you received from Mr. Scott, correct?

A Yes.

Q And Bill, in general, likes to read stuff, so any White Papers that you have is something that he wanted you to send ahead of time for his reading --

A Yes.

Q -- correct?

ATTORNEY VAN NEST: Wait until he finishes

# Tab 11

WACHTELL, LIPTON, ROSEN & KATZ

51 WEST 52ND STREET
NEW YORK, N.Y. 10019-6150

TELEPHONE: (212) 403-1000
FACSIMILE:  (212) 403-2000

| | |
|---|---|
| MARTIN LIPTON | STEPHEN R. DiPRIMA |
| HERBERT M. WACHTELL | NICHOLAS G. DEMMO |
| EDWARD D. HERLIHY | IGOR KIRMAN |
| DANIEL A. NEFF | JONATHAN M. MOSES |
| STEVEN A. ROSENBLUM | T. EIKO STANGE |
| SCOTT K. CHARLES | WILLIAM SAVITT |
| JODI J. SCHWARTZ | GREGORY E. OSTLING |
| ADAM O. EMMERICH | DAVID B. ANDERS |
| RALPH M. LEVENE | ADAM J. SHAPIRO |
| ROBIN PANOVKA | NELSON O. FITTS |
| DAVID A. KATZ | JOSHUA M. HOLMES |
| ILENE KNABLE GOTTS | DAMIAN G. DIDDEN |
| ANDREW J. NUSSBAUM | IAN BOCZKO |
| RACHELLE SILVERBERG | MATTHEW M. GUEST |
| STEVEN A. COHEN | DAVID E. KAHAN |
| DEBORAH L. PAUL | DAVID K. LAM |
| DAVID C. KARP | BENJAMIN M. ROTH |
| RICHARD K. KIM | JOSHUA A. FELTMAN |
| JOSHUA R. CAMMAKER | ELAINE P. GOLIN |
| MARK GORDON | EMIL A. KLEINHAUS |
| JEANNEMARIE O'BRIEN | KARESSA L. CAIN |

GEORGE A. KATZ (1965–1989)
JAMES H. FOGELSON (1967–1991)
LEONARD M. ROSEN (1965–2014)

OF COUNSEL

| | |
|---|---|
| DAVID M. ADLERSTEIN | ERIC S. ROBINSON |
| ANDREW R. BROWNSTEIN | ERIC M. ROSOF |
| WAYNE M. CARLIN | JOHN F. SAVARESE |
| BEN M. GERMANA | MICHAEL J. SEGAL |
| SELWYN B. GOLDBERG | WON S. SHIN |
| PETER C. HEIN | DAVID M. SILK |
| JB KELLY* | ELLIOTT V. STEIN |
| JOSEPH D. LARSON | LEO E. STRINE, JR.** |
| RICHARD G. MASON | PAUL VIZCARRONDO, JR. |
| PHILIP MINDLIN | JEFFREY M. WINTNER |
| THEODORE N. MIRVIS | AMY R. WOLF |
| DAVID S. NEILL | MARC WOLINSKY |
| TREVOR S. NORWITZ | |

COUNSEL

| | |
|---|---|
| SUMITA AHUJA | MICHAEL W. HOLT |
| LOREN BRASWELL | DONGHWA KIM |
| HEATHER D. CASTEEL | MARK A. KOENIG |
| FRANCO CASTELLI | J. AUSTIN LYONS |
| ANDREW J.H. CHEUNG | ALEXANDER S. MACKLER** |
| PAMELA EHRENKRANZ | ALICIA C. McCARTHY |
| ALINE R. FLODR | JUSTIN R. ORR |
| KATHRYN GETTLES-ATWA | JOSEPH S. PAYNE |
| LEDINA GOCAJ | NEIL M. SNYDER |
| ADAM M. GOGOLAK | JEFFREY A. WATIKER |
| ANGELA K. HERRING | |

*ADMITTED IN THE DISTRICT OF COLUMBIA AND NORTH CAROLINA
**ADMITTED IN DELAWARE

Direct Dial: (212) 403-1062
Direct Fax: (212) 403-2062
E-Mail: KSSchwartz@wlrk.com

| | |
|---|---|
| RONALD C. CHEN | RAAJ S. NARAYAN |
| BRADLEY R. WILSON | MICHAEL J. SCHOBEL |
| GRAHAM W. MELI | ELINA TETELBAUM |
| GREGORY E. PESSIN | ERICA E. AHO |
| CARRIE M. REILLY | LAUREN M. KOFKE |
| MARK F. VEBLEN | RACHEL B. REISBERG |
| SARAH K. EDDY | MARK A. STAGLIANO |
| VICTOR GOLDFELD | CYNTHIA FERNANDEZ |
| RANDALL W. JACKSON | LUMERMANN |
| BRANDON C. PRICE | CHRISTINA C. MA |
| KEVIN S. SCHWARTZ | NOAH B. YAVITZ |
| MICHAEL S. BENN | BENJAMIN S. ARFA |
| ALISON Z. PREISS | NATHANIEL D. CULLERTON |
| TIJANA J. DVORNIC | ERIC M. FEINSTEIN |
| JENNA E. LEVINE | ADAM L. GOODMAN |
| RYAN A. McLEOD | STEVEN R. GREEN |
| ANITHA REDDY | MENG LU |
| JOHN L. ROBINSON | |
| STEVEN WINTER | |
| EMILY D. JOHNSON | |
| JACOB A. KLING | |

December 29, 2025

**By Personal Service**

Tesla Inc.
c/o CT Corporation System
1999 Bryan Street, Suite 900
Dallas, TX 75201

Re:    *X Corp., et al.* v. *Apple, et al.*, Case No.
4:25-cv-00914-P (N.D. Tex.)

To Tesla Inc.:

Please find enclosed a subpoena calling for the production of certain documents and electronically stored information in connection with the above-referenced proceeding.

If you have any questions or wish to discuss this matter, please contact me or my colleague Stephen Levandoski (SDLevandoski@wlrk.com).

App. 132

WACHTELL, LIPTON, ROSEN & KATZ

By Personal Service
Page 2

Sincerely,

*/s/ Kevin S. Schwartz*
Kevin S. Schwartz

Enclosures:

U.S. District Court Subpoena to Produce Documents
Exhibit A
Appendix to Exhibit A

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Texas

| | |
|---|---|
| X Corp. and X.AI LLC | ) |
| *Plaintiff* | ) |
| v. | )  Civil Action No.  4:25-cv-00914-P |
| Apple Inc.; OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC | ) |
| *Defendant* | ) |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To:                                           Tesla Inc.
c/o CT Corporation System, 1999 Bryan Street, Ste. 900, Dallas, TX 75201-3136
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A

| Place: Serving By Irving, Inc. <br> c/o Austin Process <br> 1100 Nueces St., Austin, TX 78701 | Date and Time: <br><br> 01/12/2025 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      12/29/2025

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Kevin S. Schwartz <br> _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  OpenAI Foundation (f/k/a OpenAI, Inc.); OpenAI, L.L.C.; and OpenAI OpCo, LLC        , who issues or requests this subpoena, are:

Kevin Schwartz, Wachtell, Lipton, Rosen & Katz, 51 W 52nd St., New York, NY 10019, KSchwartz@wlrk.com, 212-403-1062

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

App. 134

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:25-cv-00914-P

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

App. 135

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

 **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## EXHIBIT A

## INSTRUCTIONS

The following Instructions are applicable to these Requests:

1.      The terms "any," "all," "each," and "every" shall be construed to encompass any and all.

2.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responsive information that might otherwise be construed to be outside of its scope.

3.      The singular form of any word includes the plural and vice versa.

4.      The present tense of a verb includes the past tense, and vice versa.

5.      The use of the article "the" shall not be construed as limiting the scope of any Request.

6.      The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

7.      Each Request shall be construed independently and not in any way that limits the scope of any other Request.

8.      These Requests require You to produce all Documents that are in Your actual or constructive possession, custody, or control or in the possession, custody, or control of Your attorneys, accountants, representatives, consultants, agents, employees, and any other persons or entities acting on Your behalf or otherwise subject to Your direction or control.

9.      If You object to any part of a Request, state with specificity the part to which You object, each basis for the objection, and the extent, if any, to which responsive Documents have been withheld on that basis.

1

10.     If You withhold a responsive Document pursuant to a claim of privilege, immunity or protection from disclosure, including the attorney-client privilege or work product doctrine, You shall provide a written privilege log that sets forth the information required by Federal Rule of Civil Procedure 45(e)(2) unless You and OpenAI agree otherwise.

11.     If You object to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that You claim to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which You provide a response.

12.     If You object to any Request as overbroad, explain the nature of the purported over-breadth, narrow the Request so as to eliminate the purported over-breadth, state with specificity how You narrowed the Request, and produce Documents responsive to the narrowed Request.

13.     If no Documents exist that are responsive to a Request, state so in Your response.

14.     Subject to any protocol governing the production and use of ESI that may be agreed to by You and OpenAI or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields:   BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

15.     Unless otherwise specified, the relevant time period for these Requests is March 9, 2023 to the present.

**DEFINITIONS**

1.      **"Action"** refers to the litigation *X Corp. et al.* v. *Apple Inc. et al.*, No. 4:25-cv-00914-P (N.D. Tex.).

2.      **"Agreement"** refers to any contract, agreement, memorandum of understanding, partnership, or other formal or informal bilateral or multi-lateral arrangement or understanding.

3.      **"Apple"** refers to Defendant Apple Inc. and its employees.

4.      **"ChatGPT"** refers to any and all versions of the Generative AI Chatbot developed by OpenAI.

5.      **"ChatGPT-iOS Integration"** refers to the option for users to access ChatGPT as natively integrated within Apple Intelligence (including Siri, Writing Tools, Image Playground, and Visual Intelligence) in certain Apple models, as announced on June 10, 2024.

6.      **"Communication(s)"** means the transmittal of information in any form (including but not limited to verbally, in writing, or by email, text message, messaging app, or social media), including but not limited to facts, ideas, and inquiries, as well as any notes, records, or other memorialization thereof.

7.      **"Complaint"** refers to the Complaint filed in the Action on August 25, 2025 in the United States District Court for the Northern District of Texas, Fort Worth Division (ECF No. 1) and any subsequent amendments thereto.

8.      **"Document(s)"** means "documents or electronically stored information" as those terms are used in Federal Rule of Civil Procedure 34(a)(1)(A), including but not limited to any drafts and non-identical copies thereof. "Document(s)" shall include "Communication(s)," as defined above.

9.      **"Dual Hat Employee"** refers to any director, officer, employee, or contractor of

3

Tesla that has, since March 9, 2023: (1) held any title or professional role at xAI; (2) provided professional services to xAI in a formal or informal capacity; or (3) otherwise participated in the development of Grok.  For the avoidance of doubt, Elon Musk and Jared Birchall are each Dual Hat Employees.

10.    **"Ephemeral Messaging Tools"** means applications or services that facilitate communication with ephemerality features that, when enabled, cause content to be deleted after being read or after a set period of time, instead of being stored or saved indefinitely. Examples of Ephemeral Messaging Tools include Snapchat, Signal, and WhatsApp.

11.    **"Generative AI Chatbot"** refers to an artificial intelligence (**"AI"**) assistant that provides conversational access to large language models (**"LLMs"**) to create a response to User Prompts for tasks such as answering questions, generating content, and assisting with reasoning and problem solving. For the avoidance of doubt, Claude, Gemini, ChatGPT, and Grok are each Generative AI Chatbots.

12.    **"Generative AI Technologies"** refers to the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, LLMs, neural networks, natural language processing, reinforcement learning, and deep learning.

13.    **"Grok"** refers to the Generative AI Chatbot developed by Plaintiffs X Corp. and/or X.AI LLC and marketed under the brand Grok.

14.    **"Integrate"** or **"Integration"** refers to combining, connecting, or incorporating various systems so they can work together.

15.    **"OpenAI"** refers to OpenAI Inc., OpenAI L.L.C., and OpenAI OpCo LLC.

16.    **"Person(s)"** shall refer not only to natural persons, but also, without limitation, to firms, partnerships, corporations, associations, unincorporated associations, organizations,

businesses, trusts, and/or any other type of legal entities.

17.    **"Relate to"** or **"Relating to"** means concerning, reflecting, referring to, describing, evidencing, proving, disproving, summarizing, containing, analyzing, explaining, mentioning, discussing, describing, supporting, or constituting.

18.    **"User Prompts"** refers to any requests, commands, instructions, or queries submitted by a user that elicit a response from an AI chatbot, including but not limited to Generative AI Chatbots.

19.    **"X"** refers to X Corp. and the online social media platform formerly known as Twitter, and all other persons acting on or purporting to act on X's behalf, including but not limited to representatives and agents.

20.    **"xAI"** refers to (1) X.AI LLC, and all other persons acting on or purporting to act on xAI's behalf, including but not limited to representatives and agents, and/or (2) any Generative AI Chatbot or other AI model developed by X Corp. or X.AI LLC.

21.    **"You,"** or **"Your,"** or **"Tesla"** refers to Tesla, Inc. and all other persons acting on or purporting to act on Your behalf, including but not limited to any domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives.

22.    All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

## REQUESTS FOR PRODUCTION

1. All Documents and Communications Relating to any Integration of Grok into any of Your products, devices, or customer support systems, including but not limited to:

   a. Documents sufficient to show Your rationale for each such Integration;

   b. Documents or data sufficient to show the daily, weekly, and/or monthly volume of User Prompts from each such Integration that have been made available to Grok, for training, processing, or otherwise; and/or

   c. Documents sufficient to show the terms of any Agreement whereby xAI has been permitted, in conjunction with each such Integration, to train the Generative AI Technologies underlying Grok using User Prompts made available through such Integration.

2. Documents sufficient to show the volume and sources of any data or information that You have provided to xAI for use in training the Generative AI Technologies underlying Grok, and any consideration provided by xAI in return for that data or information. For the avoidance of doubt, OpenAI is not seeking the training data itself.

3. All Documents and Communications Relating to any assessment of Grok, including but not limited to any assessment of Grok's features, characteristics, functionality, privacy, safety, content moderation, and/or number of users.

4. All Documents and Communications Relating to OpenAI, including the ChatGPT-iOS Integration.

5. All Communications sent or received by any Dual Hat Employee Relating to xAI, including all such Communications responsive to any of the Requests for Production served on X or xAI in the Action enclosed in the attached Appendix.

6. Documents sufficient to show Your policies and practices concerning (i) the

6

retention, preservation, storage, and/or destruction of Documents and Communications; (ii) the use of personal electronic devices for work purposes; and (iii) the use of chats or other messaging systems, including Ephemeral Messaging Tools.

7

# APPENDIX TO EXHIBIT A

| Description | Appendix Page(s) |
|---|---|
| OpenAI's First Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served November 6, 2025) | A001-A018 |
| Apple's First Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served November 12, 2025) | A019-A036 |
| OpenAI's Second Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served December 26, 2025) | A037-A047 |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC., OPENAI, INC., OPENAI, L.L.C., and OPENAI OPCO, LLC,<br><br>    Defendants. | Civil Action No. 4:25-cv-00914-P |

## THE OPENAI DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFFS X CORP. AND X.AI LLC

Propounding Party:          OpenAI Defendants

Responding Party:           Plaintiffs X Corp. and X.AI LLC

Set No.:                    One

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC (the "OpenAI Defendants" and together with Apple Inc., "Defendants"), by and through their attorneys, hereby request, pursuant to Federal Rules of Civil Procedure 26 and 34, that Plaintiffs X Corp. and X.AI LLC ("Plaintiffs") respond to this First Set of Requests for Production ("Requests") separately and fully. These Requests are governed by the Definitions and Instructions that follow.

## DEFINITIONS

The following definitions shall apply to the Requests contained herein.

1.      "Action" means the above-captioned action.

2.      "AI Technologies" means the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, Large Language Models, neural networks, natural language processing, reinforcement learning, and deep learning.

3.      "Apple" means Apple Inc.

4.      "App" means software that allows users to perform a specific task (such as checking the weather or editing shoots) and can run on a device like a smartphone or computer or be accessed through a web browser without being downloaded.

5.      "Apple Intelligence" means Apple's personal intelligence system integrated into Apple devices, as announced by Apple on June 10, 2024.

6.      "ChatGPT," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraph 7 of the Complaint) and means OpenAI's Generative AI Chatbot that was first publicly released on November 30, 2022, together with any and all subsequent versions.

7.      "ChatGPT-iOS Integration" means the option for users to access ChatGPT as natively integrated within Apple Intelligence, Siri, and Apple's Writing Tools in certain

upcoming Apple models, as announced on June 10, 2024. *See* ECF 42, OpenAI Defendants' Appendix Tabs 6 and 8.

8.      "Communication" and "Communications" means any act or instance of transferring, transmitting, passing, delivering, or giving information by oral, written, or electronic means, including but not limited to by notes, letter, telegram, facsimile, electronic mail, electronic message (including text message), or voicemail.

9.      "Complaint" means the complaint filed on August 25, 2025 in the Action.

10.     "Document" and "Documents" shall have the broadest meaning permitted under the Federal Rules of Civil Procedure and shall include, without limitation, the original and all non-identical copies of any handwritten, printed, typed, recorded, or graphic material, or ESI (as defined below), of any kind and nature, including all drafts and transcriptions thereof, however produced or reproduced, and including but not limited to accounting materials, accounts, agreements, analyses, appointment books, books, books of account, brochures, calendars, catalogs, checks, computer data, computer disks, contracts, correspondence, data sheets, date books, diaries, diskettes, drawings, email messages, faxes, guidelines, instructions, inter-office communications, invoices, letters, logs, manuals, memoranda, minutes, notes, opinions, payments, plans, presentations, purchase confirmations, receipts, records, regulations, reports, sound recordings, spreadsheets, statements, studies, surveys, tickets, text messages, instant messages, timesheets, trade records, video recordings, voice-mail messages, vouchers, word processing materials (however stored or maintained), and all other means by which information is stored for retrieval.

11.     "Ephemeral Messaging Tools" means applications or services that facilitate communication with ephemerality features that, when enabled, cause content to be deleted after being read or after a set period of time, instead of being stored or saved indefinitely. Examples of Ephemeral Messaging Tools include Snapchat, Signal, and WhatsApp.

12.     "ESI" means information that is stored in an electronic format, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in

perceivable form and includes but is not limited to metadata, system data, deleted data, and fragmented data.

13.    "Generative AI Chatbot," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraphs 35, 37, and 127 to 131) to include an interface through which users can communicate with AI Technologies through natural language dialogue.

14.    "Generative AI Chatbot Market" means the generative AI chatbot market as alleged in, *e.g.*, Paragraphs 104, 172, 173, and 188 of the Complaint.

15.    "Grok" means xAI's Generative AI Chatbot and its underlying AI Technologies (including its Large Language Models).

16.    "Grok-X Integration" means any agreement, arrangement, understanding, or partnership, whether formal or informal, between Grok and X relating in any way to X's "integration of Grok's functionality into its digital town square" and network as alleged in, *e.g.*, Paragraphs 69 and 180 of the Complaint.

17.    "iOS" means Apple's proprietary mobile operating system.

18.    "iOS App" means an application designed for Apple's iOS.

19.    "iOS Safari" means the default web browser developed by Apple for iOS.

20.    "Large Language Models," or "LLMs," means a type of artificial intelligence model that has been trained on large amounts of data using deep learning to process and generate language.

21.    "Neuralink" means Neuralink Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

22.    "OpenAI" means the OpenAI Defendants and any of their parents, subsidiaries, or affiliates.

23.    "Person" means any natural person, individual, corporation, limited liability company, trust, partnership, proprietorship, association, joint venture, group, business entity, governmental or public entity, or any other form or organization of legal entity.

24.    "Project Eagle" means any projects, analysis, Training, comparison, or research by xAI or X regarding OpenAI or any OpenAI product, services, or research, including without limitation, use, comparison, reinforcement learning from human feedback, or distillation of outputs from any OpenAI model, product, or service for Training by xAI or X, whether by human or automated means.

25.    "Tesla" means Tesla, Inc. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

26.    "Train" or "Training" means the process of causing an LLM to process data in order to refine its capacity to process and generate language or the equivalent process for any other AI Technology.

27.    "Siri" means Apple's voice-activated chatbot, as alleged in Paragraph 55 of the Complaint.

28.    "SpaceX" means Space Exploration Technologies Corporation and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

29.    "xAI" means X.AI LLC and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates (including the entities X Corp. and XAI Holdings Corp.), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

30.    "X" means X Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, affiliates (including the entities X.AI LLC and XAI Holdings Corp.), or any associated lines of business (including the social media platform called X), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

31.    "You" and "Your" mean xAI and X.

32.    The terms "any" and "all" mean any and all in the most inclusive sense of those terms.

33.     The terms "concerning" and "with respect to" shall be read and applied as interchangeable and shall be construed in the broadest sense permitted to mean discussing, supporting, describing, concerning, regarding, with regard to, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed in connection or in conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

34.     The term "including" shall be read to mean "including without limitation."

35.     Whenever used herein, (i) the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; (ii) the masculine shall be deemed to include the feminine, and the feminine shall be deemed to include the masculine; (iii) the disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); (iv) each of the functional words "each," "every," "any," and "all" shall be deemed to include each of the others; and (v) the use of the present or past tense shall be construed to include both the present and past tenses as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## INSTRUCTIONS

The following instructions shall apply to the Requests contained herein.

1. These Requests require the production of all responsive Documents and Communications that are in Your possession, custody, or control, wherever located, including, for the avoidance of doubt, any email or other electronic messages sent or received by You from accounts or platforms maintained, hosted, or stored by You, or any of Your respective affiliates, predecessors, or successors, and whether active, in storage, or otherwise, including in the possession of Your agents or advisors.

2. You are obligated to undertake and produce all responsive Documents in Your possession, custody, or control even if You believe that another Person has already produced the same or similar Documents or may produce such Documents in the future.

3. All Documents shall be produced as kept in the ordinary course of business, in the form and in the same order within each file in which they were located prior to production. Where a portion of a Document is responsive to the Requests set forth below, the entire Document, along with all transmittal sheets, cover letters, attachments, appendices, enclosures, and exhibits to such Document, shall be produced.

4. Each Request shall be construed independently, and none of the Requests shall be construed as limiting the scope of any of the other Requests.

5. Each Request shall be considered as including all non-identical copies and, to the extent applicable, preliminary drafts of Documents that, as to content, differ in any respect from the original or final draft or from each other.

6. If any Documents called for by these Requests are withheld under a claim of privilege or protection, You are requested at the time of responding to these Requests, or at such other time as may be mutually agreed by You and the OpenAI Defendants, to produce a log that separately identifies each such Document and both (i) specifies the assertion(s) of privilege or protection asserted for withholding the Document; and (ii) sets forth all information necessary to support the assertion(s) of privilege or protection for withholding the Document, including the

7

type or nature of the Document (*e.g.*, letter, memorandum, e-mail, etc.), its author, all recipients, all Persons to whom it was shown or otherwise made available or with whom it was discussed, the date of the Document, and a description of the substance of the Document, all in a manner sufficient to allow the Court to rule on the validity of the claim(s) of privilege or protection asserted for withholding each Document from production.

7.      You must produce all portions of requested Documents that are not subject to a claim of privilege or protection by excising or otherwise protecting the portions of such Document for which a claim of privilege or protection is asserted and producing the remainder.

8.      If no Documents exist that are responsive to a particular Request, so state in Your response to such Request.

9.      Each of these Definitions and Instructions shall be fully applicable to all of the Requests, notwithstanding that a particular Definition or Instruction above may, in whole or in part, be reiterated in certain Requests or that certain Requests may incorporate supplemental instructions or definitions.

10.     Unless otherwise specified in the Request, each Request shall be deemed to include all Documents prepared, sent, received, written, reviewed, or marked upon from January 1, 2024 through the date of production.

11.     Subject to any protocol governing the production and use of ESI that may be agreed to by You and the OpenAI Defendants or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields:  BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

## REQUESTS FOR PRODUCTION

**Request For Production No. 1:**

Documents sufficient to show all direct or indirect subsidiaries of X.AI Holdings that have any roles or responsibilities relating to Grok at any time between January 1, 2024 and the present.

**Request For Production No. 2:**

All Documents and Communications concerning the existence or definition of a market for Generative AI Chatbot services, including all Documents and Communications regarding any other reasonably interchangeable product or service that is identical to, or substantially competes with, Generative AI Chatbot services.

**Request For Production No. 3:**

All Documents and Communications concerning competition in the Generative AI Chatbot Market, including all Documents and Communications with respect to that market regarding pricing, switching costs, capital requirements for entry, brand loyalty, default biases, economies of scale, information or data asymmetries, network effects, or barriers to entry.

**Request For Production No. 4:**

All Documents and Communications concerning any market survey of, study of, report on, or other analysis of user preferences with respect to or user demand for (i) Generative AI Chatbot services or (ii) any Generative AI Chatbot (including Grok or ChatGPT).

**Request For Production No. 5:**

All Documents concerning the magnitude of the Generative AI Chatbot Market, including as measured by global or domestic volume of user prompts, number of users, and revenues.

**Request For Production No. 6:**

All Documents concerning Grok's share of the Generative AI Chatbot Market, including all Documents concerning Grok's historical, current, or projected share of that market.

**Request For Production No. 7:**

All Documents concerning ChatGPT's share of the Generative AI Chatbot Market, including all Documents concerning ChatGPT's historical, current, or projected share of that market.

**Request For Production No. 8:**

All Documents Relating to or supporting Your allegation that user prompts from Apple Intelligence (including Siri or Writing Tools) represent (i) "up to 55 percent of all potential generative AI Chatbot prompts"; and (ii) "a substantial share of the generative AI chatbot market," as alleged in Paragraph 104 of the Complaint.

**Request For Production No. 9:**

All Documents and Communications concerning any current, past, or proposed xAI policy with respect to Grok's user privacy protection, security, or content moderation.

**Request For Production No. 10:**

All Documents and Communications concerning agreements to acquire or access data sources used in connection with the Training of the AI Technologies (including LLMs) underlying Grok, including all Documents and Communications concerning any commercial arrangement between xAI and any other Person concerning such agreement to acquire or access data sources used for such Training, including Tesla, SpaceX, Neuralink, and any division or subdivision of the United States government.

**Request For Production No. 11:**

All Documents and Communications concerning any effort to acquire or access the output of ChatGPT for use in such Training. For the avoidance of doubt, the OpenAI Defendants are not seeking production of the Training data sources themselves.

10

**Request For Production No. 12:**

All Documents and Communications concerning the utility or effectiveness of "generative AI chatbot prompts" (as used in Paragraph 104 of the Complaint) as a data source for the Training of the AI Technologies (including LLMs) underlying Grok. For the avoidance of doubt, the OpenAI Defendants are not seeking production of the Training data sources themselves.

**Request For Production No. 13:**

All Documents and Communications concerning (i) any use, whether through human or automated means, of the output of ChatGPT to Train the AI Technologies (including LLMs) underlying Grok; (ii) any effort, whether through human or automated means, to distill, conduct reinforcement learning with respect to, or compare ChatGPT in connection with Training the AI Technologies (including LLMs) underlying Grok; and (iii) any analysis, study, comparison, or review, whether through human or automated means, that xAI has conducted concerning the output of ChatGPT. For the avoidance of doubt, the OpenAI Defendants are not seeking production of any such output used for purposes of Training.

**Request For Production No. 14:**

All Documents and Communications concerning Project Eagle, including (i) Documents sufficient to identify any OpenAI account used by any xAI employee or contractor to gather information for Project Eagle; and (ii) Documents concerning any internal rubric used in connection with Project Eagle. For the avoidance of doubt, the OpenAI Defendants are not seeking production of any Training data collected in connection with Project Eagle.

11

**Request For Production No. 15:**

All Documents and Communications concerning the Grok-X Integration, including all Documents and Communications concerning (i) the terms of any commercial arrangement between xAI and X related to that integration; (ii) xAI's access to X posts or other X user data (other than access to the public version of the X website); (iii) xAI's use of that data to Train the AI Technologies (including LLMs) underlying Grok; (iv) the business rationale for the Grok-X Integration; and (v) any plans, discussions, efforts with respect to the integration of any Generative AI Chatbot other than Grok into X.  For the avoidance of doubt, the OpenAI Defendants are not seeking access to any X user data used for purposes of Training.

**Request For Production No. 16:**

All Documents and Communications concerning the native integration of Grok into any software, hardware, interface, or platform developed by any Person other than xAI, X, or Apple, including, but not limited to, any such software, hardware, interface, or platform created, developed, or maintained by or on behalf of Tesla, SpaceX, Neuralink, or any division or subdivision of the United States government.

**Request For Production No. 17:**

Documents sufficient to show (i) the daily volume of user interactions with Grok, including the daily volume of user prompts to Grok, since January 1, 2024; and (ii) the contribution to that daily volume through each of the following channels: (a) iOS Safari; (b) any iOS App that provides web browsing capabilities; and (c) any other iOS App.

**Request For Production No. 18:**

Documents sufficient to show the daily, monthly, and annual number of posts on X since January 1, 2024 and the proportion of daily, monthly, and annual number of posts on X used to Train the AI Technologies (including its LLMs) underlying Grok.

**Request For Production No. 19:**

All Documents and Communications concerning the ChatGPT-iOS Integration, including all Documents and Communications concerning the actual or anticipated impact of the ChatGPT-iOS Integration on Plaintiffs.

**Request For Production No. 20:**

Documents sufficient to show the minutes or other memorialization of each meeting of the board of directors of X or the managing member(s) of xAI concerning (i) ChatGPT, (ii) the ChatGPT-iOS Integration, or (iii) the native integration of Grok into any software, hardware, interface, or platform developed by any Person other than xAI, X, or Apple, including any such software, hardware, interface, or platform created, developed, or maintained by or on behalf of Tesla, SpaceX, Neuralink, or any division or subdivision of the United States government.

**Request For Production No. 21:**

All Documents and Communications concerning the actual, proposed, or contemplated integration into iOS of any Generative AI Chatbot other than ChatGPT, including Grok, Anthropic PBC's Claude, Alphabet Inc.'s Gemini, Meta Platforms' Llama, Microsoft Corporation's Copilot, Mistral AI's Mistral, and Perplexity AI, Inc.'s Perplexity, including all Documents or Communications concerning (i) any Communications or proposed Communications with Apple in connection with any such integration; (ii) any negotiation in connection with any such integration; or (iii) any implementation of any such integration.

**Request For Production No. 22:**

All Documents and Communications concerning the impact of the ChatGPT-iOS Integration on xAI's capacity to acquire new users of Grok or maintain existing users of Grok, including all Documents and Communications concerning any instance in which any Person identified the ChatGPT-iOS Integration as a factor influencing that Person's decision to interact with Grok.

**Request For Production No. 23:**

All Documents and Communications concerning any actual or anticipated harm or damages to xAI relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) pricing pressures with respect to Grok; (ii) any "foreclose[ure] from the ability to compete for additional customers against OpenAI's ChatGPT"; (iii) Grok's reduction in "scale" and "investment to develop innovations," as alleged in, *e.g.*, Paragraphs 189, 212, and 221 of the Complaint; (iv) any loss of users or subscribers; or (v) any reduction in revenue.

**Request For Production No. 24:**

Documents sufficient to show (i) xAI's profits, revenues, expenses, and capital outlays on a quarterly basis from January 1, 2023 to present; and (ii) any projection of xAI's future profits, revenues, expenses, or capital outlays that has been prepared by xAI since January 1, 2024.

**Request For Production No. 25:**

All Documents and Communications concerning any actual or anticipated harm or damages to X relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) Grok's impaired "scale and investment" and "ability to innovate and develop product features" or (ii) the "loss in the value of [X's] business as the reduced innovation in the X app depresses the number of X app users and thus X revenue," as alleged in, *e.g.*, Paragraphs 190 and 213 of the Complaint.

**Request For Production No. 26:**

All Documents and Communications concerning any actual or anticipated harm or damages to any competitors in the Generative AI Chatbot Market other than xAI relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of any such competitor's deprivation of scale, the ability to innovate, or the ability to raise funding as alleged in, *e.g.*, Paragraphs 109, 110, 170, 171, 172, and 173 of the Complaint.

**Request For Production No. 27:**

All Documents and Communications concerning any actual or anticipated harm or damages to new or future entrants in the Generative AI Chatbot Market relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of barriers to entry in that market, as alleged in, *e.g.*, Paragraphs 163 and 165 of the Complaint.

**Request For Production No. 28:**

All Documents and Communications concerning any actual or anticipated harm or damages to Generative AI Chatbot users relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) any reduction in user choice among Generative AI Chatbots; (ii) any reduction in Generative AI Chatbot quality; or (iii) any increase in the prices charged for Generative AI Chatbot services, as alleged in, *e.g.*, Paragraphs 15 and 111 of the Complaint.

**Request For Production No. 29:**

All Documents that Plaintiffs reviewed or relied upon in preparing the Complaint or any subsequent amendments thereto.

**Request For Production No. 30:**

All Documents (including affidavits, declarations, and any other sworn testimony) Plaintiffs intend to rely upon at trial or at any evidentiary hearing in this Action.

**Request For Production No. 31:**

All Documents and Communications received from third parties in connection with any subpoena in this Action.

**Request For Production No. 32:**

All Documents and Communications identified in connection with Plaintiffs' responses to the OpenAI Defendants' First Set of Interrogatories.

**Request For Production No. 33:**

All Documents and Communications identified in connection with Plaintiffs' responses to the OpenAI Defendants' First Set of Requests for Admission.

15

**Request For Production No. 34:**

Documents sufficient to show Plaintiffs' policies and practices concerning (i) the retention, preservation, storage, and/or destruction of documents and communications; (ii) the use of personal electronic devices for work purposes; and (iii) the use of chats or other messaging systems, including Ephemeral Messaging Tools.

16

Dated: November 6, 2025           Respectfully submitted,

*/s/ Michael K. Hurst*
Michael K. Hurst
mhurst@lynnllp.com
Texas Bar No. 10316310
Chris W. Patton
cpatton@lynnllp.com
Texas Bar No. 24083634
Andy Kim
akim@lynnllp.com
Texas Bar No. 24136638
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 (Telephone)
(214) 981-3839 (Facsimile)

William Savitt
WDSavitt@wlrk.com
N.D. Tex. Bar No. 2900058NY
Kevin S. Schwartz
KSchwartz@wlrk.com
N.D. Tex. Bar No. 4564241NY
Stephen D. Levandoski (admitted *pro hac vice*)
SDLevandoski@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
(212) 403-1000 (Telephone)
(212) 403-2000 (Facsimile)

*Attorneys for Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC*

17

## **CERTIFICATE OF SERVICE**

I certify that on November 6, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Michael K. Hurst*
Michael K. Hurst

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC,<br><br>    Defendants. | Civil Action No. 4:25-cv-00914-P<br><br>Honorable Mark T. Pittman<br><br>**APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS** |

Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendant Apple Inc. hereby propounds the following First Set of Requests for Production of Documents to Plaintiffs X Corp. and X.AI LLC ("Plaintiffs"). These Requests are to be responded to fully and separately as required by the Federal Rules of Civil Procedure.

Apple requests that Plaintiffs serve their responses to these Requests upon counsel for Apple at Covington & Burling LLP, 850 Tenth Street, NW, Washington, DC 20001, within thirty (30) days. The following Definitions and Instructions are applicable to these Requests.

**DEFINITIONS**

1.     **"Action"** refers to the above-captioned litigation, *X v. Apple*, No. 4:25-cv-00914-P (N.D. Tex.).

2.     **"Agreement"** refers to a binding contract between two or more parties.

3.     **"Application"** or **"App"** refers to a software program or web-based service designed to perform specific tasks on a computer, mobile phone, or other device.

4.     **"Apple"** refers to Defendant Apple Inc. and its employees.

5.     **"Apple App Store"** refers to the online storefront operated by Apple that allows

1

developers to offer for download apps compatible with Apple devices.

6.      **"Apple Intelligence"** means the suite of over 20 personal intelligence features available on Apple devices that offer ways for users to simplify and accelerate everyday tasks, enhance their writing, communicate effectively, and express themselves creatively, including but not limited to Genmoji, Writing Tools, and Smart Replies.

7.      **"ChatGPT"** refers to any and all versions of the Generative AI Chatbot developed by OpenAI.

8.      **"Communication(s)"** means the transmittal of information in any form (including but not limited to verbally, in writing, or by email, text message, messaging app, or social media), including but not limited to facts, ideas, and inquiries, as well as any notes, records, or other memorialization thereof.

9.      **"Complaint"** refers to the Complaint filed in this Action on August 25, 2025 in the United States District Court for the Northern District of Texas, Fort Worth Division (ECF No. 1) and any subsequent amendments thereto.

10.     **"Defendants"** refers to Apple Inc., OpenAI Inc., OpenAI LLC, and OpenAI OpCo LLC.

11.     **"Document(s)"** means "documents or electronically stored information" as that term is used in Federal Rule of Civil Procedure 34(a)(1)(A), including but not limited to any drafts and non-identical copies thereof. "Document(s)" shall include "Communication(s)," as defined above.

12.     **"Generative AI Chatbot"** refers to an artificial intelligence ("AI") assistant that provides conversational access to large language models ("LLMs") to create a response to User Prompts for tasks such as answering questions, generating content, and assisting with reasoning

and problem solving. For the avoidance of doubt, Generative AI Chatbot includes but is not limited to ChatGPT and Grok.

13.     **"Grok"** refers to the Generative AI Chatbot developed by Plaintiffs X Corp. and/or X.AI LLC.

14.     **"Integrate"** or **"Integration"** refers to combining, connecting, or incorporating various systems so they can work together.

15.     **"Must-Have Apps List"** refers to the Apple App Store's editorially curated list of Applications currently titled "Must-Have Apps," as well as any substantially similar editorially curated list that may bear a different name in the future.

16.     "**OpenAI**" refers to OpenAI Inc., OpenAI LLC, and OpenAI OpCo LLC.

17.     **"Person(s)"** shall refer not only to natural persons, but also, without limitation, to firms, partnerships, corporations, associations, unincorporated associations, organizations, businesses, trusts, and/or any other type of legal entities.

18.     **"Relate to"** or **"Relating to"** means concerning, reflecting, referring to, describing, evidencing, proving, disproving, summarizing, containing, analyzing, explaining, mentioning, discussing, describing, supporting, or constituting.

19.     **"Smartphone"** refers to a mobile phone that includes additional computing functions.

20.     "**Smartphone App Store**" refers to any online storefront that allows developers to offer for download apps compatible with Smartphones.

21.     **"Super Apps"** refers to multi-functional platforms that offer services such as social connectivity and messaging, financial services, e-commerce, and entertainment that do not require a customer to be tied to a particular device, as described in paragraphs 4 and 62 through 64 of the

3

Complaint.

22.    **"User Prompts"** refers to the requests sent by a user to an AI chatbot, including but not limited to Generative AI Chatbots.

23.    **"X"** refers to X Corp. and the online social media platform formerly known as Twitter, and all other persons acting on or purporting to act on X's behalf, including but not limited to representatives and agents.

24.    **"xAI"** refers to (1) X.AI LLC, and all other persons acting on or purporting to act on xAI's behalf, including but not limited to representatives and agents, and/or (2) any Generative AI Chatbot or other AI model developed by X Corp. or X.AI LLC.

25.    **"You"** or **"Your"** refers to X Corp. and X.AI LLC, the Plaintiffs in this Action to whom these requests for production are addressed, and all other persons acting on or purporting to act on Your behalf, including but not limited to representatives and agents.

26.    All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

## INSTRUCTIONS

The following Instructions are applicable to these Requests:

1.    The terms "any," "all," "each," and "every" shall be construed to encompass any and all.

2.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responsive information that might otherwise be construed to be outside of its scope.

3.    The singular form of any word includes the plural and vice versa.

4.    The present tense of a verb includes the past tense, and vice versa.

4

5. The use of the article "the" shall not be construed as limiting the scope of any request.

6. The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

7. Each Request shall be construed independently and not in any way that limits the scope of any other Request.

8. These Requests require You to produce all Documents that are in your actual or constructive possession, custody, or control or in the possession, custody, or control of your attorneys, accountants, representatives, consultants, agents, employees, and any other persons or entities acting on your behalf or otherwise subject to your direction or control.

9. If You object to any part of a Request, state with specificity the part to which You object, each basis for the objection, and the extent, if any, to which responsive Documents have been withheld on that basis.

10. If You withhold a responsive Document pursuant to a claim of privilege, immunity or protection from disclosure, including the attorney-client privilege or work product doctrine, You shall provide a written privilege log that sets forth the information required by Federal Rule of Civil Procedure 26(b)(5) unless the parties agree otherwise.

11. If You object to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that You claim to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which You provide a response.

12. If You object to any request as overbroad, explain the nature of the purported over-breadth, narrow the request so as to eliminate the purported over-breadth, state with specificity how You narrowed the request, and produce Documents responsive to the narrowed

5

request.

13.     If no Documents exist that are responsive to a request, state so in Your response.

14.     All responsive and non-privileged electronic documents shall be produced in the format agreed upon by the parties and/or ordered by the Court in a forthcoming ESI order.

15.     Unless otherwise specified, the relevant time period for these Requests is January 1, 2024 to August 25, 2025, or any other time period required for Plaintiffs' First Set of Requests for Production to Defendants dated October 10, 2025.

## REQUESTS FOR PRODUCTION

1.     All Documents or Communications referenced in, relied on, or otherwise used to prepare the Complaint in this Action.

2.     All Documents Relating to any Integration of Grok or xAI with any hardware or software designed, developed, maintained, manufactured, or sold by Apple, including but not limited to:

   a.   The date, location, and individuals involved in any outreach to and any meetings or discussions with Apple Relating to any Integration of Grok or xAI at any point in time;

   b.   All drafts and final versions of any presentations or other Documents about Grok or xAI given by You to Apple, as well as any underlying data used to create any such presentations or other Documents;

   c.   Internal Documents Relating to any Integration of Grok or xAI; and/or

   d.   Communications (including but not limited to text messages and emails) from or involving Elon Musk Relating to any Integration of Grok or xAI.

3.     All Documents from the time period of November 3, 2023 to August 25, 2025

Relating to any contemplated, proposed, or actual Integration of Grok or xAI with any Smartphone, device, Application, or other partner, including but not limited to:

   a.  Communications between You and any company or other partner regarding any contemplated, proposed, or actual Integration of Grok or xAI, including but not limited to any proposals, responses to proposals, or executed Agreements; and/or

   b.  All Documents Relating to Your efforts to seek any Integration of Grok or xAI with any Smartphone, including but not limited to Smartphones manufactured or sold by Apple, Samsung, Motorola, or Google.

4.     All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to any Communications between You and the developers of other Generative AI Chatbots, including but not limited to OpenAI, Google, Microsoft, Anthropic, Perplexity AI, and DeepSeek, regarding a contemplated, proposed, or actual Integration of a Generative AI Chatbot with any Smartphone, device, Application, or other hardware or software, including but not limited to any Integration with Apple Intelligence.

5.     All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to the performance of Grok, including but not limited to Documents discussing Grok's functionality, capabilities, popularity, factual accuracy, latency of response time, adversarial robustness, transparency, and responsiveness to user inquiries.

6.     All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to the privacy features of Grok, including but not limited to:

   a.  Policies, procedures, and practices Relating to the retention, storage, and deletion of user data;

7

b. Policies, procedures, and practices Relating to ensuring that user data cannot be accessed by third parties; and/or

c. An incident in August 2025 whereby conversations between users and Grok were made publicly available through Google search results, the cause of the issue, and the steps You took to address the issue. *See Hundreds of thousands of Grok chats exposed in Google results*, BBC (August 21, 2025), https://www.bbc.com/news/articles/cdrkmk00jy0o.

7. All Documents Relating to the safety or content moderation of Grok, including but not limited to:

a. Policies, procedures, and practices Relating to Your ability to remove or restrict Grok's ability to generate text, images, audio, or video of any particular type(s) of material due to safety concerns;

b. Parental controls (or the lack thereof), child safety, groupthink, jailbreaking, display of non-consensual intimate imagery, graphic and/or violent content, racism, sexism, antisemitism, hate speech, hostility to a protected class or characteristic, bias, and quality;

c. An incident in May 2025 whereby Grok responded to various User Prompts with unrelated references to "white genocide" in South Africa, the cause of the issue, and the steps You took to address the issue. *See Musk's xAI updates Grok chatbot after 'white genocide' comments*, REUTERS (May 16, 2025), https://www.reuters.com/business/musks-xai-updates-grok-chatbot-after-white-genocide-comments-2025-05-17/; and/or

d. An incident in July 2025 whereby there were reported increases in violent, racist,

8

sexist, or antisemitic content generated by Grok, the cause of the issue, and the steps You took to address the issue. *See Elon Musk's AI chatbot, Grok, started calling itself 'MechaHitler'*, NPR (July 9, 2025), https://www.npr.org/2025/07/09/nx-s1-5462609/grok-elon-musk-antisemitic-racist-content.

8.     All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to customer feedback or complaints regarding Grok, including but not limited to complaints or reports relating to functionality, privacy, safety, accuracy (or inaccuracy), hallucinations, parental controls (or lack thereof), child safety, groupthink, jailbreaking, display of non-consensual intimate imagery, graphic and/or violent content, racism, sexism, antisemitism, hate speech, hostility to a protected class or characteristic, bias, and quality.

9.     All Documents Relating to comparisons between, or analyses of, Generative AI Chatbots, including but not limited to: features, characteristics, functionality, privacy, safety, content moderation, number of users, timing of public launch, strategic partnerships, and volume of available User Prompts.

10.    All Documents Relating to comparisons between Grok (on the one hand) and ChatGPT, Gemini, Copilot, Claude, Perplexity, DeepSeek, or any other Generative AI Chatbot (on the other).

11.    All Documents from the time period of January 1, 2023 to August 25, 2025 Relating to the initial release for Grok or xAI and any material updates to Grok or xAI, including but not limited to the timing and nature of any updates to Grok or xAI.

12.    Documents and data sufficient to show the total usage and profits earned by Grok or xAI, on a quarterly basis from January 1, 2024 to present, including but not limited to:

a. Total number of users and subscribers (broken out by each category of user or subscription);

b. Total number and sources of User Prompts (broken out by user subscription status);

c. Total number of downloads of the Grok App (broken out by device model and manufacturer);

d. Total revenue (broken out by each source of revenue);

e. Total gross revenue;

f. Total expenses; and/or

g. Any estimates, analyses, or calculation of Grok's or xAI's share of the Generative AI Chatbot market.

13. Documents and data sufficient to show the total usage and profits earned by the X App on a quarterly basis from January 1, 2024 to present, including but not limited to:

a. Total number of users and subscribers (broken out by each category of user or subscriber);

b. Total number of downloads of the X App (broken out by device model and manufacturer);

c. Total revenue (broken out by each source of revenue);

d. Total gross revenue; and/or

e. Total expenses.

14. All Documents Relating to any economic damages You claim to have suffered from the conduct alleged in the Complaint.

15. All Documents Relating to any non-economic damages You claim to have suffered from the conduct alleged in the Complaint.

10

App. 172    A028

16.    Documents and data sufficient to show the sources and volume of User Prompts available to Grok or xAI, including but not limited to:

   a. Documents sufficient to show any device, Application, or other service on which users can access, download, or otherwise use Grok or xAI, including but not limited to web browsers (including on mobile devices and computers), Integrations with devices (including but not limited to other Smartphones, computers, or tablets), or other Applications (including on both Apple and non-Apple devices);

   b. Data sufficient to show the total number of User Prompts available to Grok or xAI each month (broken out by each source of User Prompts);

   c. Data sufficient to show the total number of User Prompts You use to train Grok's or xAI's large language models each month (broken out by each source of User Prompts); and/or

   d. Documents sufficient to show any other sources in addition to User Prompts used to train Grok or xAI.

17.    Documents sufficient to show any agreements or arrangements with another company or partner, including but not limited to X, Tesla, SpaceX, Starlink, or Neuralink, to receive data that may be used to train Grok or xAI's models.

18.    All Documents Relating to how Grok or xAI uses data and information, including but not limited to text, images, audio, video, likes, reposts, trends, and other metrics from X, Tesla, SpaceX, Starlink, or Neuralink to train Grok or xAI's models.

19.    Documents sufficient to show the relationship between Grok or xAI and the following entities, including but not limited to the volume of User Prompts or other data received from each entity: X, Tesla, SpaceX, Starlink, Neuralink, and the United States Government.

11

20. All Documents Relating to any plans or effort to Integrate the X App with any Generative AI Chatbots other than Grok, including but not limited to:

a. Documents sufficient to show any communications with any Generative AI Chatbot developers Relating to any contemplated, proposed, or actual Integration with the X App;

b. Documents sufficient to show the number of Your employees who worked on any such Integrations;

c. Documents sufficient to show the total expenses associated with any such Integrations; and/or

d. Documents sufficient to show the amount of time You spent on any such Integrations.

21. All Documents Relating to any plans or effort to Integrate Tesla with any Generative AI Chatbots other than Grok, including but not limited to:

a. Documents sufficient to show any communications with any Generative AI Chatbot developers Relating to any contemplated, proposed, or actual Integration with Tesla;

b. Documents sufficient to show the number of Your employees who worked on any such Integrations;

c. Documents sufficient to show the total expenses associated with any such Integrations; and/or

d. Documents sufficient to show the amount of time You spent on any such Integrations.

22. All Documents Relating to or supporting Your allegation that the integration of

12

ChatGPT with Apple Intelligence results in "Plaintiffs [being] foreclosed from a significant number of generative AI chatbot prompts, deprived of scale, and thwarted in their abilities to innovate and improve the quality and competitiveness of their offerings."

23.    All Documents Relating to or supporting Your allegation that User Prompts from Apple Intelligence (including Siri or Writing Tools) represent "a substantial share of the generative AI chatbot market."

24.    All Documents Relating to or supporting Your allegation that User Prompts from Apple Intelligence (including Siri or Writing Tools) represent "up to 55 percent of all potential generative AI Chatbot prompts."

25.    All Documents Relating to any technical limitations or challenges posed by an Integration with multiple Generative AI Chatbots, including but not limited to technical limitations or challenges with respect to X, Tesla, or any Smartphones or other devices or applications.

26.    All Documents Relating to or supporting Your allegation that "generative AI chatbots and related super apps stand to reduce customers' dependence on smartphones like Apple's iPhone," including but not limited to:

   a.    Assessments, analyses, or projections of the number of downloads of Generative AI Chatbots or Super Apps;

   b.    Assessments, analyses, or projections of the number of subscribers to Generative AI Chatbots or Super Apps;

   c.    Assessments, analyses, or projections of the respective market share in the United States of Generative AI Chatbots or Super Apps;

   d.    Assessments, analyses, or projections of "functionality" on Smartphones that "Generative AI chatbots have already replaced";

13

e. Assessments, analyses, or projections of the impact of Generative AI Chatbots or Super Apps on consumer demand for Smartphones; and/or

f. Assessments, analyses, or projections of the impact of Generative AI Chatbots or Super Apps on the development of lower-cost Smartphones.

27. All Documents from the time period of January 1, 2023 to August 25, 2025 Relating to or supporting Your allegation that the X App or Grok App will or may develop into a Super App, including but not limited to:

a. Discussions or negotiations with Visa Relating to the development of the financial services portion of the X App or Grok App;

b. Discussions or negotiations with Crush Capital Relating to the licensing and distribution of Crush Capital's "interactive investment show";

c. Discussions or negotiations with Shopify Relating to the development features on the X App or Grok App that will "allow users to shop";

d. Discussions or negotiations with any other business partners Relating to the development of the X App or Grok App's "digital town square"; and/or

e. Discussions or negotiations with non-Apple Smartphone manufacturers Relating to how using the X App or Grok App will enable them to make a lower-cost Smartphone to compete with Apple.

28. All Documents Relating to Your plans or efforts to manufacture Smartphones.

29. All Documents Relating to the Apple App Store's Must-Have Apps List, including but not limited to:

a. All Documents Relating to Your Communications with Apple regarding the X App and Grok App's inclusion on the Must-Have Apps List, including but not limited

14

to any actions You took and changes made to the X App or Grok App in response to Communications with Apple;

b.  All Documents Relating to the effect or impact of inclusion of an app on the Must-Have Apps List, including but not limited to any change in the volume of App downloads, customer ratings, and in-app purchases; and/or

c.  All Documents Relating to Your reactions to the X App and Grok App not being included on the Must-Have Apps List

30.    All Documents and data sufficient to show the number of downloads, customer ratings, and inclusion on any App list or category of the X App and Grok App on all Smartphone App Stores (including but not limited to the Apple App Store, Google Play Store, Microsoft Store, Samsung Galaxy Apps, Sony Apps, and Amazon Appstore) on a quarterly basis.

31.    All Documents Relating to Communications between You and Apple regarding the number of downloads, customer ratings, and inclusion on any App list or category of the X App and Grok App on the Apple App Store.

32.    All Documents Relating to Communications between You and Apple regarding the review of any updates to the X App and Grok App in the Apple App Store.

33.    All Communications between You and any Application developers, including but not limited to members of the Coalition for App Fairness, regarding this Action and Your allegations against Apple in the Complaint.

34.    All Communications between You and any Application developers, including but not limited to members of the Coalition for App Fairness, regarding X's decision to join the Coalition for App Fairness.

35.    All Documents and Communications Relating to the announcement made by the

15

Coalition for App Fairness on October 28, 2025 that X joined the Coalition for App Fairness, *see*

*X Joins Coalition for App Fairness to Champion a Fairer App Ecosystem for Everyone*, COALITION

FOR APP FAIRNESS (Oct. 28, 2025), https://appfairness.org/2066-2/.

36.    All Documents that Plaintiffs reviewed or relied upon in preparing the Complaint

or any subsequent amendments thereto.

37.    All Documents produced to You by any other individual or entity, including but

not limited to third-parties, in connection with this Action.

38.    All Documents (including but not limited to affidavits, declarations, and any other

sworn testimony) Plaintiffs intend to rely upon at trial or at any evidentiary hearing in this Action.

Dated: November 12, 2025                    Respectfully submitted,

/s/ Dee J. Kelly, Jr.
Dee J. Kelly, Jr.
State Bar No. 11217250
dee.kelly@kellyhart.com
Julia G. Wisenberg
State Bar No. 24099146
julia.wisenberg@kellyhart.com
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telephone: (817) 332-2500
Facsimile: (817) 878-9280

Emily Johnson Henn (admitted *pro hac vice*)
ehenn@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: (650) 632-4700

16

Henry Liu (admitted *pro hac vice*)
hliu@cov.com
Lauren Willard Zehmer (admitted *pro hac vice*)
lzehmer@cov.com
Carol Szurkowski Weiland (admitted *pro hac vice*)
cweiland@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6302

**ATTORNEYS FOR DEFENDANT APPLE INC.**

17

## CERTIFICATE OF SERVICE

I certify that on November 12, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Zhi Yang Tan*
Zhi Yang Tan

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

X CORP. and X.AI LLC,

      Plaintiffs,

      v.

APPLE INC., OPENAI, INC., OPENAI, L.L.C., and OPENAI OPCO, LLC,

      Defendants.

Civil Action No. 4:25-cv-00914-P

## THE OPENAI DEFENDANTS' SECOND SET OF REQUESTS FOR PRODUCTION TO PLAINTIFFS X CORP. AND X.AI LLC

1

App. 181   A037

Propounding Party:          OpenAI Defendants

Responding Party:           Plaintiffs X Corp. and X.AI LLC

Set No.:                    Two

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC (the "OpenAI Defendants" and together with Apple Inc., "Defendants"), by and through their attorneys, hereby request, pursuant to Federal Rules of Civil Procedure 26 and 34, that Plaintiffs X Corp. and X.AI LLC ("Plaintiffs") respond to this Second Set of Requests for Production ("Requests") separately and fully. These Requests are governed by the Definitions and Instructions that follow.

## DEFINITIONS

The following definitions shall apply to the Requests contained herein.

1.      "Action" means the above-captioned action.

2.      "AI Technologies" means the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, Large Language Models, neural networks, natural language processing, reinforcement learning, and deep learning.

3.      "Apple" means Apple Inc.

4.      "App" means software that allows users to perform a specific task (such as checking the weather or editing shoots) and can run on a device like a smartphone or computer or be accessed through a web browser without being downloaded.

5.      "Apple Intelligence" means Apple's personal intelligence system integrated into Apple devices, as announced by Apple on June 10, 2024.

6.      "Apple Product" means any device offered by sale by Apple, including the Apple iPhone, iPad, Apple Watch, Mac, iMac, MacBook Pro, MacBook Air, and other personal computers.

7.      "Communication" and "Communications" means any act or instance of transferring, transmitting, passing, delivering, or giving information by oral, written, or electronic means, including but not limited to by notes, letter, telegram, facsimile, electronic

mail, electronic message (including text message), or voicemail.

8.    "Complaint" means the complaint filed on August 25, 2025 in the Action.

9.    "Document" and "Documents" shall have the broadest meaning permitted under the Federal Rules of Civil Procedure and shall include, without limitation, the original and all non-identical copies of any handwritten, printed, typed, recorded, or graphic material, or ESI (as defined below), of any kind and nature, including all drafts and transcriptions thereof, however produced or reproduced, and including but not limited to accounting materials, accounts, agreements, analyses, appointment books, books, books of account, brochures, calendars, catalogs, checks, computer data, computer disks, contracts, correspondence, data sheets, date books, diaries, diskettes, drawings, email messages, faxes, guidelines, instructions, inter-office communications, invoices, letters, logs, manuals, memoranda, minutes, notes, opinions, payments, plans, presentations, purchase confirmations, receipts, records, regulations, reports, sound recordings, spreadsheets, statements, studies, surveys, tickets, text messages, instant messages, timesheets, trade records, video recordings, voice-mail messages, vouchers, word processing materials (however stored or maintained), and all other means by which information is stored for retrieval.

10.    "ESI" means information that is stored in an electronic format, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes but is not limited to metadata, system data, deleted data, and fragmented data.

11.    "Generative AI Chatbot," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraphs 35, 37, and 127 to 131) to include an interface through which users can communicate with AI Technologies through natural language dialogue.

12.    "Grok" means xAI's Generative AI Chatbot and its underlying AI Technologies (including its Large Language Models).

13.    "Grok-X Integration" means any agreement, arrangement, understanding, or

partnership, whether formal or informal, between Grok and X relating in any way to X's "integration of Grok's functionality into its digital town square" and network as alleged in, *e.g.*, Paragraphs 69 and 180 of the Complaint.

14.    "Large Language Models," or "LLMs," means a type of artificial intelligence model that has been trained on large amounts of data using deep learning to process and generate language.

15.    "Neuralink" means Neuralink Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

16.    "Person" means any natural person, individual, corporation, limited liability company, trust, partnership, proprietorship, association, joint venture, group, business entity, governmental or public entity, or any other form or organization of legal entity.

17.    "Tesla" means Tesla, Inc. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

18.    "SpaceX" means Space Exploration Technologies Corporation and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

19.    "xAI" means X.AI LLC and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates (including the entities X Corp. and XAI Holdings Corp.), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

20.    "X" means X Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, affiliates (including the entities X.AI LLC and XAI Holdings Corp.), or any associated lines of business (including the social media platform called X), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

21.    "You" and "Your" mean xAI and X.

22.    The terms "any" and "all" mean any and all in the most inclusive sense of those

4

terms.

23.    The terms "concerning" and "with respect to" shall be read and applied as interchangeable and shall be construed in the broadest sense permitted to mean discussing, supporting, describing, concerning, regarding, with regard to, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed in connection or in conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

24.    The term "including" shall be read to mean "including without limitation."

25.    Whenever used herein, (i) the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; (ii) the masculine shall be deemed to include the feminine, and the feminine shall be deemed to include the masculine; (iii) the disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); (iv) each of the functional words "each," "every," "any," and "all" shall be deemed to include each of the others; and (v) the use of the present or past tense shall be construed to include both the present and past tenses as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## **INSTRUCTIONS**

The following instructions shall apply to the Requests contained herein.

1.      These Requests require the production of all responsive Documents and Communications that are in Your possession, custody, or control, wherever located, including, for the avoidance of doubt, any email or other electronic messages sent or received by You from accounts or platforms maintained, hosted, or stored by You, or any of Your respective affiliates, predecessors, or successors, and whether active, in storage, or otherwise, including in the possession of Your agents or advisors.

2.      You are obligated to undertake and produce all responsive Documents in Your possession, custody, or control even if You believe that another Person has already produced the same or similar Documents or may produce such Documents in the future.

3.      All Documents shall be produced as kept in the ordinary course of business, in the form and in the same order within each file in which they were located prior to production. Where a portion of a Document is responsive to the Requests set forth below, the entire Document, along with all transmittal sheets, cover letters, attachments, appendices, enclosures, and exhibits to such Document, shall be produced.

4.      Each Request shall be construed independently, and none of the Requests shall be construed as limiting the scope of any of the other Requests.

5.      Each Request shall be considered as including all non-identical copies and, to the extent applicable, preliminary drafts of Documents that, as to content, differ in any respect from the original or final draft or from each other.

6.      If any Documents called for by these Requests are withheld under a claim of privilege or protection, You are requested at the time of responding to these Requests, or at such other time as may be mutually agreed by You and the OpenAI Defendants, to produce a log that separately identifies each such Document and both (i) specifies the assertion(s) of privilege or protection asserted for withholding the Document; and (ii) sets forth all information necessary to support the assertion(s) of privilege or protection for withholding the Document, including the

6

type or nature of the Document (*e.g.*, letter, memorandum, e-mail, etc.), its author, all recipients, all Persons to whom it was shown or otherwise made available or with whom it was discussed, the date of the Document, and a description of the substance of the Document, all in a manner sufficient to allow the Court to rule on the validity of the claim(s) of privilege or protection asserted for withholding each Document from production.

7.    You must produce all portions of requested Documents that are not subject to a claim of privilege or protection by excising or otherwise protecting the portions of such Document for which a claim of privilege or protection is asserted and producing the remainder.

8.    If no Documents exist that are responsive to a particular Request, so state in Your response to such Request.

9.    Each of these Definitions and Instructions shall be fully applicable to all of the Requests, notwithstanding that a particular Definition or Instruction above may, in whole or in part, be reiterated in certain Requests or that certain Requests may incorporate supplemental instructions or definitions.

10.    Unless otherwise specified in the Request, each Request shall be deemed to include all Documents prepared, sent, received, written, reviewed, or marked upon from October 1, 2023 through the date of production.

11.    Subject to any protocol governing the production and use of ESI that may be agreed to by You and the OpenAI Defendants or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields:  BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

**REQUESTS FOR PRODUCTION**

**Request For Production No. 1:**

Documents sufficient to show the historical and future-contracted costs associated with data centers used by xAI to operate Grok, including historical and future-contracted capital costs from project construction.

**Request For Production No. 2:**

All Documents and Communications concerning safety, integrity, factual accuracy, and content moderation of Grok, including (a) racism, sexism, antisemitism, hate speech, bias, or hostility to a protected class or characteristic bias; (b) July 2025 references by Grok to "MechaHitler"; (c) May 2025 references by Grok to "white genocide" in South Africa; and (d) citations by Grokipedia to Stormfront, reported in November 2025.

**Request For Production No. 3:**

Documents sufficient to show the AI Technologies involved in or relied upon to develop or operate Grok.

**Request For Production No. 4:**

Documents sufficient to show the funding, investment, and financing that xAI has received and the respective equity ownership of xAI (*e.g.*, capitalization tables).

**Request For Production No. 5:**

All Documents regarding the financial or strategic significance of selling or distributing Grok through the following channels: (a) Apple's App Store; (b) Google's App Store; (c) Samsung's App Store; (d) grok.com; (e) Apple Products via a contemplated Grok integration with Apple Intelligence; (f) integrations with Google, Motorola, Samsung, Tesla, SpaceX, Neuralink, the U.S. Department of Defense (Department of War), or any other division or subdivision of the United States Government; (g) the Grok-X Integration, and (h) any other integrations.

**Request For Production No. 6:**

All Documents and Communications regarding any remarks delivered by xAI's executive

leadership, including Elon Musk, at any "all hands" or companywide meeting of xAI employees, including any audio or audiovisual records of such remarks, notes prepared by Elon Musk or others in connection with such remarks, and presentations delivered or disseminated in connection with such remarks.

9

Dated: December 26, 2025

Respectfully submitted,

*/s/        Michael K. Hurst*
Michael K. Hurst
mhurst@lynnllp.com
Texas Bar No. 10316310
Chris W. Patton
cpatton@lynnllp.com
Texas Bar No. 24083634
Andy Kim
akim@lynnllp.com
Texas Bar No. 24136638
**LYNN PINKER HURST & SCHWEGMANN
LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
(214) 981-3800 (Telephone)
(214) 981-3839 (Facsimile)

William Savitt
WDSavitt@wlrk.com
N.D. Tex. Bar No. 2900058NY
Kevin S. Schwartz
KSchwartz@wlrk.com
N.D. Tex. Bar No. 4564241NY
Stephen D. Levandoski (admitted *pro hac vice*)
SDLevandoski@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
(212) 403-1000 (Telephone)
(212) 403-2000 (Facsimile)

*Attorneys for Defendants OpenAI Foundation (f/k/a
OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo,
LLC*

10

## CERTIFICATE OF SERVICE

I certify that on December 26, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/     Michael K. Hurst*
Michael K. Hurst

11

# Tab 12

## WACHTELL, LIPTON, ROSEN & KATZ

MARTIN LIPTON
HERBERT M. WACHTELL
EDWARD D. HERLIHY
DANIEL A. NEFF
STEVEN A. ROSENBLUM
SCOTT K. CHARLES
JODI J. SCHWARTZ
ADAM O. EMMERICH
RALPH M. LEVENE
ROBIN PANOVKA
DAVID A. KATZ
ILENE KNABLE GOTTS
ANDREW J. NUSSBAUM
RACHELLE SILVERBERG
STEVEN A. COHEN
DEBORAH L. PAUL
DAVID C. KARP
RICHARD K. KIM
JOSHUA R. CAMMAKER
MARK GORDON
JEANNEMARIE O'BRIEN

STEPHEN R. DiPRIMA
NICHOLAS G. DEMMO
IGOR KIRMAN
JONATHAN M. MOSES
T. EIKO STANGE
WILLIAM SAVITT
GREGORY E. OSTLING
DAVID B. ANDERS
ADAM J. SHAPIRO
NELSON O. FITTS
JOSHUA M. HOLMES
DAMIAN G. DIDDEN
IAN BOCZKO
MATTHEW M. GUEST
DAVID E. KAHAN
DAVID K. LAM
BENJAMIN M. ROTH
JOSHUA A. FELTMAN
ELAINE P. GOLIN
EMIL A. KLEINHAUS
KARESSA L. CAIN

**51 WEST 52ND STREET**
**NEW YORK, N.Y. 10019-6150**

TELEPHONE: (212) 403-1000
FACSIMILE:  (212) 403-2000

GEORGE A. KATZ (1965-1989)
JAMES H. FOGELSON (1967-1991)
LEONARD M. ROSEN (1965-2014)

OF COUNSEL

DAVID M. ADLERSTEIN
ANDREW R. BROWNSTEIN
WAYNE M. CARLIN
BEN M. GERMANA
SELWYN B. GOLDBERG
PETER C. HEIN
JB KELLY*
JOSEPH D. LARSON
RICHARD G. MASON
PHILIP MINDLIN
THEODORE N. MIRVIS
DAVID S. NEILL
TREVOR S. NORWITZ

ERIC S. ROBINSON
ERIC M. ROSOF
JOHN F. SAVARESE
MICHAEL J. SEGAL
WON S. SHIN
DAVID M. SILK
ELLIOTT V. STEIN
LEO E. STRINE, JR.**
PAUL VIZCARRONDO, JR.
JEFFREY M. WINTNER
AMY R. WOLF
MARC WOLINSKY

COUNSEL

SUMITA AHUJA
LOREN BRASWELL
HEATHER D. CASTEEL
FRANCO CASTELLI
ANDREW J.H. CHEUNG
PAMELA EHRENKRANZ
ALINE R. FLODR
KATHRYN GETTLES-ATWA
LEDINA GOCAJ
ADAM M. GOGOLAK
ANGELA K. HERRING

MICHAEL W. HOLT
DONGHWA KIM
MARK A. KOENIG
J. AUSTIN LYONS
ALEXANDER S. MACKLER**
ALICIA C. McCARTHY
JUSTIN R. ORR
JOSEPH S. PAYNE
NEIL M. SNYDER
JEFFREY A. WATIKER

RONALD C. CHEN
BRADLEY R. WILSON
GRAHAM W. MELI
GREGORY E. PESSIN
CARRIE M. REILLY
MARK F. VEBLEN
SARAH K. EDDY
VICTOR GOLDFELD
RANDALL W. JACKSON
BRANDON C. PRICE
KEVIN S. SCHWARTZ
MICHAEL S. BENN
ALISON Z. PREISS
TIJANA J. DVORNIC
JENNA E. LEVINE
RYAN A. McLEOD
ANITHA REDDY
JOHN L. ROBINSON
STEVEN WINTER
EMILY D. JOHNSON
JACOB A. KLING

RAAJ S. NARAYAN
MICHAEL J. SCHOBEL
ELINA TETELBAUM
ERICA E. AHO
LAUREN M. KOFKE
RACHEL B. REISBERG
MARK A. STAGLIANO
CYNTHIA FERNANDEZ
  LUMERMANN
CHRISTINA C. MA
NOAH B. YAVITZ
BENJAMIN S. ARFA
NATHANIEL D. CULLERTON
ERIC M. FEINSTEIN
ADAM L. GOODMAN
STEVEN R. GREEN
MENG LU

*ADMITTED IN THE DISTRICT OF COLUMBIA AND NORTH CAROLINA
**ADMITTED IN DELAWARE

Direct Dial: (212) 403-1062
Direct Fax: (212) 403-2062
E-Mail: KSSchwartz@wlrk.com

December 29, 2025

**By Personal Service**

Space Exploration Technologies Corp.
c/o Corporation Service Company dba CSC – Lawyers Incorporating Service Company
211 E 7th Street, Suite 620
Austin, TX 78707

> Re:   *X Corp., et al.* v. *Apple, et al.*, Case No.
> 4:25-cv-00914-P (N.D. Tex.)

To Space Exploration Technologies Corp.:

Please find enclosed a subpoena calling for the production of certain documents and electronically stored information in connection with the above-referenced proceeding.

If you have any questions or wish to discuss this matter, please contact me or my colleague Stephen Levandoski (SDLevandoski@wlrk.com).

WACHTELL, LIPTON, ROSEN & KATZ

By Personal Service
Page 2

Sincerely,

*/s/ Kevin S. Schwartz*
Kevin S. Schwartz

Enclosures:

U.S. District Court Subpoena to Produce Documents
Exhibit A
Appendix to Exhibit A

AO 88B  (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Texas

| | |
|---|---|
| X Corp. and X.AI LLC | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:25-cv-00914-P |
| Apple Inc.; OpenAI, Inc.; OpenAI, L.L.C.; and OpenAI OpCo, LLC | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Space Exploration Technologies Corp.
c/o CSC - Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78707-3218
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A

| Place: Serving By Irving, Inc. c/o Process2Serve, LLC 201 N Brand Blvd., Suite 200, Glendale, CA 91203 | Date and Time: 01/12/2025 5:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/29/2025

| *CLERK OF COURT* | |
|---|---|
| | OR |
| _____ | /s/ Kevin S. Schwartz |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* OpenAI Foundation (f/k/a OpenAI, Inc.); OpenAI, L.L.C.; and OpenAI OpCo, LLC          , who issues or requests this subpoena, are:

 Kevin Schwartz, Wachtell, Lipton, Rosen & Katz, 51 W 52nd St., New York, NY 10019, KSchwartz@wlrk.com, 212-403-1062

## Notice to the person who issues or requests this subpoena
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:25-cv-00914-P

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

App. 196

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

App. 197

# EXHIBIT A

## INSTRUCTIONS

The following Instructions are applicable to these Requests:

1.      The terms "any," "all," "each," and "every" shall be construed to encompass any and all.

2.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responsive information that might otherwise be construed to be outside of its scope.

3.      The singular form of any word includes the plural and vice versa.

4.      The present tense of a verb includes the past tense, and vice versa.

5.      The use of the article "the" shall not be construed as limiting the scope of any Request.

6.      The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

7.      Each Request shall be construed independently and not in any way that limits the scope of any other Request.

8.      These Requests require You to produce all Documents that are in Your actual or constructive possession, custody, or control or in the possession, custody, or control of Your attorneys, accountants, representatives, consultants, agents, employees, and any other persons or entities acting on Your behalf or otherwise subject to Your direction or control.

9.      If You object to any part of a Request, state with specificity the part to which You object, each basis for the objection, and the extent, if any, to which responsive Documents have been withheld on that basis.

1

10.     If You withhold a responsive Document pursuant to a claim of privilege, immunity or protection from disclosure, including the attorney-client privilege or work product doctrine, You shall provide a written privilege log that sets forth the information required by Federal Rule of Civil Procedure 45(e)(2) unless You and OpenAI agree otherwise.

11.     If You object to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that You claim to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which You provide a response.

12.     If You object to any Request as overbroad, explain the nature of the purported over-breadth, narrow the Request so as to eliminate the purported over-breadth, state with specificity how You narrowed the Request, and produce Documents responsive to the narrowed Request.

13.     If no Documents exist that are responsive to a Request, state so in Your response.

14.     Subject to any protocol governing the production and use of ESI that may be agreed to by You and OpenAI or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields: BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

15.     Unless otherwise specified, the relevant time period for these Requests is March 9, 2023 to the present.

## DEFINITIONS

1.      **"Action"** refers to the litigation *X Corp. et al.* v. *Apple Inc. et al.*, No. 4:25-cv-00914-P (N.D. Tex.).

2.      **"Agreement"** refers to any contract, agreement, memorandum of understanding, partnership, or other formal or informal bilateral or multi-lateral arrangement or understanding.

3.      **"Apple"** refers to Defendant Apple Inc. and its employees.

4.      **"ChatGPT"** refers to any and all versions of the Generative AI Chatbot developed by OpenAI.

5.      **"ChatGPT-iOS Integration"** refers to the option for users to access ChatGPT as natively integrated within Apple Intelligence (including Siri, Writing Tools, Image Playground, and Visual Intelligence) in certain Apple models, as announced on June 10, 2024.

6.      **"Communication(s)"** means the transmittal of information in any form (including but not limited to verbally, in writing, or by email, text message, messaging app, or social media), including but not limited to facts, ideas, and inquiries, as well as any notes, records, or other memorialization thereof.

7.      **"Complaint"** refers to the Complaint filed in the Action on August 25, 2025 in the United States District Court for the Northern District of Texas, Fort Worth Division (ECF No. 1) and any subsequent amendments thereto.

8.      **"Document(s)"** means "documents or electronically stored information" as those terms are used in Federal Rule of Civil Procedure 34(a)(1)(A), including but not limited to any drafts and non-identical copies thereof. "Document(s)" shall include "Communication(s)," as defined above.

9.      **"Dual Hat Employee"** refers to any director, officer, employee, or contractor of

3

SpaceX that has, since March 9, 2023: (1) held any title or professional role at xAI; (2) provided professional services to xAI in a formal or informal capacity; or (3) otherwise participated in the development of Grok or any of the Generative AI Technologies underlying Grok. For the avoidance of doubt, Elon Musk is a Dual Hat Employee.

10. **"Ephemeral Messaging Tools"** means applications or services that facilitate communication with ephemerality features that, when enabled, cause content to be deleted after being read or after a set period of time, instead of being stored or saved indefinitely. Examples of Ephemeral Messaging Tools include Snapchat, Signal, and WhatsApp.

11. **"Generative AI Chatbot"** refers to an artificial intelligence (**"AI"**) assistant that provides conversational access to large language models (**"LLMs"**) to create a response to User Prompts for tasks such as answering questions, generating content, and assisting with reasoning and problem solving. For the avoidance of doubt, Claude, Gemini, ChatGPT, and Grok are each Generative AI Chatbots.

12. **"Generative AI Technologies"** refers to the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, LLMs, neural networks, natural language processing, reinforcement learning, and deep learning.

13. **"Grok"** refers to the Generative AI Chatbot developed by Plaintiffs X Corp. and/or X.AI LLC and marketed under the brand Grok.

14. **"Integrate"** or **"Integration"** refers to combining, connecting, or incorporating various systems so they can work together.

15. **"OpenAI"** refers to OpenAI Inc., OpenAI L.L.C., and OpenAI OpCo LLC.

16. **"Person(s)"** shall refer not only to natural persons, but also, without limitation, to firms, partnerships, corporations, associations, unincorporated associations, organizations,

businesses, trusts, and/or any other type of legal entities.

17.    **"Relate to"** or **"Relating to"** means concerning, reflecting, referring to, describing, evidencing, proving, disproving, summarizing, containing, analyzing, explaining, mentioning, discussing, describing, supporting, or constituting.

18.    **"User Prompts"** refers to any requests, commands, instructions, or queries submitted by a user that elicit a response from an AI chatbot, including but not limited to Generative AI Chatbots.

19.    **"X"** refers to X Corp. and the online social media platform formerly known as Twitter, and all other persons acting on or purporting to act on X's behalf, including but not limited to representatives and agents.

20.    **"xAI"** refers to (1) X.AI LLC, and all other persons acting on or purporting to act on xAI's behalf, including but not limited to representatives and agents, and/or (2) any Generative AI Chatbot or other AI model developed by X Corp. or X.AI LLC.

21.    **"You**," **"Your**," or **"SpaceX"** refers to Space Exploration Technologies Corp. and all other persons acting on or purporting to act on Your behalf, including but not limited to any domestic and foreign parents, predecessors, divisions, subsidiaries (including Starlink Services, LLC), affiliates, partnerships and joint ventures, and all directors, officers, employees, agents, and representatives.

22.    All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

## REQUESTS FOR PRODUCTION

1.      All Documents and Communications Relating to any Integration of Grok into any of Your products, devices, or customer support systems, including but not limited to:

      a.      Documents sufficient to show Your rationale for each such Integration;

      b.      Documents or data sufficient to show the daily, weekly, and/or monthly volume of User Prompts from each such Integration that have been made available to Grok, for training, processing, or otherwise; and/or

      c.      Documents sufficient to show the terms of any Agreement whereby xAI has been permitted, in conjunction with each such Integration, to train the Generative AI Technologies underlying Grok using User Prompts made available through such Integration.

2.      Documents sufficient to show the volume and sources of any data or information that You have provided to xAI for use in training the Generative AI Technologies underlying Grok, and any consideration provided by xAI in return for that data or information.  For the avoidance of doubt, OpenAI is not seeking the training data itself.

3.      All Documents and Communications Relating to any assessment of Grok, including but not limited to any assessment of Grok's features, characteristics, functionality, privacy, safety, content moderation, and/or number of users.

4.      All Documents and Communications Relating to OpenAI, including the ChatGPT-iOS Integration.

5.      All Communications sent or received by any Dual Hat Employee Relating to xAI, including all such Communications responsive to any of the Requests for Production served on X or xAI in the Action enclosed in the attached Appendix.

6.      Documents sufficient to show Your policies and practices concerning (i) the

6

Exhibit A to the OpenAI Defendants' Rule 45 Subpoena to Space Exploration Technologies Corp.
Case No.: 4:25-cv-00914-P

App. 203

retention, preservation, storage, and/or destruction of Documents and Communications; (ii) the use of personal electronic devices for work purposes; and (iii) the use of chats or other messaging systems, including Ephemeral Messaging Tools.

# APPENDIX TO EXHIBIT A

| Description | Appendix Page(s) |
|---|---|
| OpenAI's First Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served November 6, 2025) | A001-A018 |
| Apple's First Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served November 12, 2025) | A019-A036 |
| OpenAI's Second Set of RFPs to Plaintiffs X Corp. and X.AI LLC (served December 26, 2025) | A037-A047 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>    Plaintiffs,<br><br>    v.<br><br>APPLE INC., OPENAI, INC., OPENAI, L.L.C., and OPENAI OPCO, LLC,<br><br>    Defendants. | Civil Action No. 4:25-cv-00914-P |

## THE OPENAI DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION TO PLAINTIFFS X CORP. AND X.AI LLC

Propounding Party:            OpenAI Defendants

Responding Party:             Plaintiffs X Corp. and X.AI LLC

Set No.:                      One

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC (the "OpenAI Defendants" and together with Apple Inc., "Defendants"), by and through their attorneys, hereby request, pursuant to Federal Rules of Civil Procedure 26 and 34, that Plaintiffs X Corp. and X.AI LLC ("Plaintiffs") respond to this First Set of Requests for Production ("Requests") separately and fully.  These Requests are governed by the Definitions and Instructions that follow.

## DEFINITIONS

The following definitions shall apply to the Requests contained herein.

1.      "Action" means the above-captioned action.

2.      "AI Technologies" means the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, Large Language Models, neural networks, natural language processing, reinforcement learning, and deep learning.

3.      "Apple" means Apple Inc.

4.      "App" means software that allows users to perform a specific task (such as checking the weather or editing shoots) and can run on a device like a smartphone or computer or be accessed through a web browser without being downloaded.

5.      "Apple Intelligence" means Apple's personal intelligence system integrated into Apple devices, as announced by Apple on June 10, 2024.

6.      "ChatGPT," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraph 7 of the Complaint) and means OpenAI's Generative AI Chatbot that was first publicly released on November 30, 2022, together with any and all subsequent versions.

7.      "ChatGPT-iOS Integration" means the option for users to access ChatGPT as natively integrated within Apple Intelligence, Siri, and Apple's Writing Tools in certain

2

upcoming Apple models, as announced on June 10, 2024. *See* ECF 42, OpenAI Defendants' Appendix Tabs 6 and 8.

8.    "Communication" and "Communications" means any act or instance of transferring, transmitting, passing, delivering, or giving information by oral, written, or electronic means, including but not limited to by notes, letter, telegram, facsimile, electronic mail, electronic message (including text message), or voicemail.

9.    "Complaint" means the complaint filed on August 25, 2025 in the Action.

10.    "Document" and "Documents" shall have the broadest meaning permitted under the Federal Rules of Civil Procedure and shall include, without limitation, the original and all non-identical copies of any handwritten, printed, typed, recorded, or graphic material, or ESI (as defined below), of any kind and nature, including all drafts and transcriptions thereof, however produced or reproduced, and including but not limited to accounting materials, accounts, agreements, analyses, appointment books, books, books of account, brochures, calendars, catalogs, checks, computer data, computer disks, contracts, correspondence, data sheets, date books, diaries, diskettes, drawings, email messages, faxes, guidelines, instructions, inter-office communications, invoices, letters, logs, manuals, memoranda, minutes, notes, opinions, payments, plans, presentations, purchase confirmations, receipts, records, regulations, reports, sound recordings, spreadsheets, statements, studies, surveys, tickets, text messages, instant messages, timesheets, trade records, video recordings, voice-mail messages, vouchers, word processing materials (however stored or maintained), and all other means by which information is stored for retrieval.

11.    "Ephemeral Messaging Tools" means applications or services that facilitate communication with ephemerality features that, when enabled, cause content to be deleted after being read or after a set period of time, instead of being stored or saved indefinitely. Examples of Ephemeral Messaging Tools include Snapchat, Signal, and WhatsApp.

12.    "ESI" means information that is stored in an electronic format, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in

3

perceivable form and includes but is not limited to metadata, system data, deleted data, and fragmented data.

13.    "Generative AI Chatbot," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraphs 35, 37, and 127 to 131) to include an interface through which users can communicate with AI Technologies through natural language dialogue.

14.    "Generative AI Chatbot Market" means the generative AI chatbot market as alleged in, *e.g.*, Paragraphs 104, 172, 173, and 188 of the Complaint.

15.    "Grok" means xAI's Generative AI Chatbot and its underlying AI Technologies (including its Large Language Models).

16.    "Grok-X Integration" means any agreement, arrangement, understanding, or partnership, whether formal or informal, between Grok and X relating in any way to X's "integration of Grok's functionality into its digital town square" and network as alleged in, *e.g.*, Paragraphs 69 and 180 of the Complaint.

17.    "iOS" means Apple's proprietary mobile operating system.

18.    "iOS App" means an application designed for Apple's iOS.

19.    "iOS Safari" means the default web browser developed by Apple for iOS.

20.    "Large Language Models," or "LLMs," means a type of artificial intelligence model that has been trained on large amounts of data using deep learning to process and generate language.

21.    "Neuralink" means Neuralink Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

22.    "OpenAI" means the OpenAI Defendants and any of their parents, subsidiaries, or affiliates.

23.    "Person" means any natural person, individual, corporation, limited liability company, trust, partnership, proprietorship, association, joint venture, group, business entity, governmental or public entity, or any other form or organization of legal entity.

4

24.    "Project Eagle" means any projects, analysis, Training, comparison, or research by xAI or X regarding OpenAI or any OpenAI product, services, or research, including without limitation, use, comparison, reinforcement learning from human feedback, or distillation of outputs from any OpenAI model, product, or service for Training by xAI or X, whether by human or automated means.

25.    "Tesla" means Tesla, Inc. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

26.    "Train" or "Training" means the process of causing an LLM to process data in order to refine its capacity to process and generate language or the equivalent process for any other AI Technology.

27.    "Siri" means Apple's voice-activated chatbot, as alleged in Paragraph 55 of the Complaint.

28.    "SpaceX" means Space Exploration Technologies Corporation and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

29.    "xAI" means X.AI LLC and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates (including the entities X Corp. and XAI Holdings Corp.), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

30.    "X" means X Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, affiliates (including the entities X.AI LLC and XAI Holdings Corp.), or any associated lines of business (including the social media platform called X), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

31.    "You" and "Your" mean xAI and X.

32.    The terms "any" and "all" mean any and all in the most inclusive sense of those terms.

5

33.      The terms "concerning" and "with respect to" shall be read and applied as interchangeable and shall be construed in the broadest sense permitted to mean discussing, supporting, describing, concerning, regarding, with regard to, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed in connection or in conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

34.      The term "including" shall be read to mean "including without limitation."

35.      Whenever used herein, (i) the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; (ii) the masculine shall be deemed to include the feminine, and the feminine shall be deemed to include the masculine; (iii) the disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); (iv) each of the functional words "each," "every," "any," and "all" shall be deemed to include each of the others; and (v) the use of the present or past tense shall be construed to include both the present and past tenses as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

6

## INSTRUCTIONS

The following instructions shall apply to the Requests contained herein.

1.      These Requests require the production of all responsive Documents and Communications that are in Your possession, custody, or control, wherever located, including, for the avoidance of doubt, any email or other electronic messages sent or received by You from accounts or platforms maintained, hosted, or stored by You, or any of Your respective affiliates, predecessors, or successors, and whether active, in storage, or otherwise, including in the possession of Your agents or advisors.

2.      You are obligated to undertake and produce all responsive Documents in Your possession, custody, or control even if You believe that another Person has already produced the same or similar Documents or may produce such Documents in the future.

3.      All Documents shall be produced as kept in the ordinary course of business, in the form and in the same order within each file in which they were located prior to production. Where a portion of a Document is responsive to the Requests set forth below, the entire Document, along with all transmittal sheets, cover letters, attachments, appendices, enclosures, and exhibits to such Document, shall be produced.

4.      Each Request shall be construed independently, and none of the Requests shall be construed as limiting the scope of any of the other Requests.

5.      Each Request shall be considered as including all non-identical copies and, to the extent applicable, preliminary drafts of Documents that, as to content, differ in any respect from the original or final draft or from each other.

6.      If any Documents called for by these Requests are withheld under a claim of privilege or protection, You are requested at the time of responding to these Requests, or at such other time as may be mutually agreed by You and the OpenAI Defendants, to produce a log that separately identifies each such Document and both (i) specifies the assertion(s) of privilege or protection asserted for withholding the Document; and (ii) sets forth all information necessary to support the assertion(s) of privilege or protection for withholding the Document, including the

7

type or nature of the Document (*e.g.*, letter, memorandum, e-mail, etc.), its author, all recipients, all Persons to whom it was shown or otherwise made available or with whom it was discussed, the date of the Document, and a description of the substance of the Document, all in a manner sufficient to allow the Court to rule on the validity of the claim(s) of privilege or protection asserted for withholding each Document from production.

7.    You must produce all portions of requested Documents that are not subject to a claim of privilege or protection by excising or otherwise protecting the portions of such Document for which a claim of privilege or protection is asserted and producing the remainder.

8.    If no Documents exist that are responsive to a particular Request, so state in Your response to such Request.

9.    Each of these Definitions and Instructions shall be fully applicable to all of the Requests, notwithstanding that a particular Definition or Instruction above may, in whole or in part, be reiterated in certain Requests or that certain Requests may incorporate supplemental instructions or definitions.

10.    Unless otherwise specified in the Request, each Request shall be deemed to include all Documents prepared, sent, received, written, reviewed, or marked upon from January 1, 2024 through the date of production.

11.    Subject to any protocol governing the production and use of ESI that may be agreed to by You and the OpenAI Defendants or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields:  BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

## REQUESTS FOR PRODUCTION

**Request For Production No. 1:**

Documents sufficient to show all direct or indirect subsidiaries of X.AI Holdings that have any roles or responsibilities relating to Grok at any time between January 1, 2024 and the present.

**Request For Production No. 2:**

All Documents and Communications concerning the existence or definition of a market for Generative AI Chatbot services, including all Documents and Communications regarding any other reasonably interchangeable product or service that is identical to, or substantially competes with, Generative AI Chatbot services.

**Request For Production No. 3:**

All Documents and Communications concerning competition in the Generative AI Chatbot Market, including all Documents and Communications with respect to that market regarding pricing, switching costs, capital requirements for entry, brand loyalty, default biases, economies of scale, information or data asymmetries, network effects, or barriers to entry.

**Request For Production No. 4:**

All Documents and Communications concerning any market survey of, study of, report on, or other analysis of user preferences with respect to or user demand for (i) Generative AI Chatbot services or (ii) any Generative AI Chatbot (including Grok or ChatGPT).

**Request For Production No. 5:**

All Documents concerning the magnitude of the Generative AI Chatbot Market, including as measured by global or domestic volume of user prompts, number of users, and revenues.

**Request For Production No. 6:**

All Documents concerning Grok's share of the Generative AI Chatbot Market, including all Documents concerning Grok's historical, current, or projected share of that market.

**Request For Production No. 7:**

All Documents concerning ChatGPT's share of the Generative AI Chatbot Market, including all Documents concerning ChatGPT's historical, current, or projected share of that market.

**Request For Production No. 8:**

All Documents Relating to or supporting Your allegation that user prompts from Apple Intelligence (including Siri or Writing Tools) represent (i) "up to 55 percent of all potential generative AI Chatbot prompts"; and (ii) "a substantial share of the generative AI chatbot market," as alleged in Paragraph 104 of the Complaint.

**Request For Production No. 9:**

All Documents and Communications concerning any current, past, or proposed xAI policy with respect to Grok's user privacy protection, security, or content moderation.

**Request For Production No. 10:**

All Documents and Communications concerning agreements to acquire or access data sources used in connection with the Training of the AI Technologies (including LLMs) underlying Grok, including all Documents and Communications concerning any commercial arrangement between xAI and any other Person concerning such agreement to acquire or access data sources used for such Training, including Tesla, SpaceX, Neuralink, and any division or subdivision of the United States government.

**Request For Production No. 11:**

All Documents and Communications concerning any effort to acquire or access the output of ChatGPT for use in such Training. For the avoidance of doubt, the OpenAI Defendants are not seeking production of the Training data sources themselves.

10

**Request For Production No. 12:**

All Documents and Communications concerning the utility or effectiveness of "generative AI chatbot prompts" (as used in Paragraph 104 of the Complaint) as a data source for the Training of the AI Technologies (including LLMs) underlying Grok. For the avoidance of doubt, the OpenAI Defendants are not seeking production of the Training data sources themselves.

**Request For Production No. 13:**

All Documents and Communications concerning (i) any use, whether through human or automated means, of the output of ChatGPT to Train the AI Technologies (including LLMs) underlying Grok; (ii) any effort, whether through human or automated means, to distill, conduct reinforcement learning with respect to, or compare ChatGPT in connection with Training the AI Technologies (including LLMs) underlying Grok; and (iii) any analysis, study, comparison, or review, whether through human or automated means, that xAI has conducted concerning the output of ChatGPT. For the avoidance of doubt, the OpenAI Defendants are not seeking production of any such output used for purposes of Training.

**Request For Production No. 14:**

All Documents and Communications concerning Project Eagle, including (i) Documents sufficient to identify any OpenAI account used by any xAI employee or contractor to gather information for Project Eagle; and (ii) Documents concerning any internal rubric used in connection with Project Eagle. For the avoidance of doubt, the OpenAI Defendants are not seeking production of any Training data collected in connection with Project Eagle.

**Request For Production No. 15:**

All Documents and Communications concerning the Grok-X Integration, including all Documents and Communications concerning (i) the terms of any commercial arrangement between xAI and X related to that integration; (ii) xAI's access to X posts or other X user data (other than access to the public version of the X website); (iii) xAI's use of that data to Train the AI Technologies (including LLMs) underlying Grok; (iv) the business rationale for the Grok-X Integration; and (v) any plans, discussions, efforts with respect to the integration of any Generative AI Chatbot other than Grok into X.  For the avoidance of doubt, the OpenAI Defendants are not seeking access to any X user data used for purposes of Training.

**Request For Production No. 16:**

All Documents and Communications concerning the native integration of Grok into any software, hardware, interface, or platform developed by any Person other than xAI, X, or Apple, including, but not limited to, any such software, hardware, interface, or platform created, developed, or maintained by or on behalf of Tesla, SpaceX, Neuralink, or any division or subdivision of the United States government.

**Request For Production No. 17:**

Documents sufficient to show (i) the daily volume of user interactions with Grok, including the daily volume of user prompts to Grok, since January 1, 2024; and (ii) the contribution to that daily volume through each of the following channels: (a) iOS Safari; (b) any iOS App that provides web browsing capabilities; and (c) any other iOS App.

**Request For Production No. 18:**

Documents sufficient to show the daily, monthly, and annual number of posts on X since January 1, 2024 and the proportion of daily, monthly, and annual number of posts on X used to Train the AI Technologies (including its LLMs) underlying Grok.

**Request For Production No. 19:**

All Documents and Communications concerning the ChatGPT-iOS Integration, including all Documents and Communications concerning the actual or anticipated impact of the ChatGPT-iOS Integration on Plaintiffs.

**Request For Production No. 20:**

Documents sufficient to show the minutes or other memorialization of each meeting of the board of directors of X or the managing member(s) of xAI concerning (i) ChatGPT, (ii) the ChatGPT-iOS Integration, or (iii) the native integration of Grok into any software, hardware, interface, or platform developed by any Person other than xAI, X, or Apple, including any such software, hardware, interface, or platform created, developed, or maintained by or on behalf of Tesla, SpaceX, Neuralink, or any division or subdivision of the United States government.

**Request For Production No. 21:**

All Documents and Communications concerning the actual, proposed, or contemplated integration into iOS of any Generative AI Chatbot other than ChatGPT, including Grok, Anthropic PBC's Claude, Alphabet Inc.'s Gemini, Meta Platforms' Llama, Microsoft Corporation's Copilot, Mistral AI's Mistral, and Perplexity AI, Inc.'s Perplexity, including all Documents or Communications concerning (i) any Communications or proposed Communications with Apple in connection with any such integration; (ii) any negotiation in connection with any such integration; or (iii) any implementation of any such integration.

**Request For Production No. 22:**

All Documents and Communications concerning the impact of the ChatGPT-iOS Integration on xAI's capacity to acquire new users of Grok or maintain existing users of Grok, including all Documents and Communications concerning any instance in which any Person identified the ChatGPT-iOS Integration as a factor influencing that Person's decision to interact with Grok.

**Request For Production No. 23:**

All Documents and Communications concerning any actual or anticipated harm or damages to xAI relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) pricing pressures with respect to Grok; (ii) any "foreclose[ure] from the ability to compete for additional customers against OpenAI's ChatGPT"; (iii) Grok's reduction in "scale" and "investment to develop innovations," as alleged in, *e.g.*, Paragraphs 189, 212, and 221 of the Complaint; (iv) any loss of users or subscribers; or (v) any reduction in revenue.

**Request For Production No. 24:**

Documents sufficient to show (i) xAI's profits, revenues, expenses, and capital outlays on a quarterly basis from January 1, 2023 to present; and (ii) any projection of xAI's future profits, revenues, expenses, or capital outlays that has been prepared by xAI since January 1, 2024.

**Request For Production No. 25:**

All Documents and Communications concerning any actual or anticipated harm or damages to X relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) Grok's impaired "scale and investment" and "ability to innovate and develop product features" or (ii) the "loss in the value of [X's] business as the reduced innovation in the X app depresses the number of X app users and thus X revenue," as alleged in, *e.g.*, Paragraphs 190 and 213 of the Complaint.

**Request For Production No. 26:**

All Documents and Communications concerning any actual or anticipated harm or damages to any competitors in the Generative AI Chatbot Market other than xAI relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of any such competitor's deprivation of scale, the ability to innovate, or the ability to raise funding as alleged in, *e.g.*, Paragraphs 109, 110, 170, 171, 172, and 173 of the Complaint.

**Request For Production No. 27:**

All Documents and Communications concerning any actual or anticipated harm or damages to new or future entrants in the Generative AI Chatbot Market relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of barriers to entry in that market, as alleged in, *e.g.*, Paragraphs 163 and 165 of the Complaint.

**Request For Production No. 28:**

All Documents and Communications concerning any actual or anticipated harm or damages to Generative AI Chatbot users relating to the ChatGPT-iOS Integration, including any such harm or damages arising out of (i) any reduction in user choice among Generative AI Chatbots; (ii) any reduction in Generative AI Chatbot quality; or (iii) any increase in the prices charged for Generative AI Chatbot services, as alleged in, *e.g.*, Paragraphs 15 and 111 of the Complaint.

**Request For Production No. 29:**

All Documents that Plaintiffs reviewed or relied upon in preparing the Complaint or any subsequent amendments thereto.

**Request For Production No. 30:**

All Documents (including affidavits, declarations, and any other sworn testimony) Plaintiffs intend to rely upon at trial or at any evidentiary hearing in this Action.

**Request For Production No. 31:**

All Documents and Communications received from third parties in connection with any subpoena in this Action.

**Request For Production No. 32:**

All Documents and Communications identified in connection with Plaintiffs' responses to the OpenAI Defendants' First Set of Interrogatories.

**Request For Production No. 33:**

All Documents and Communications identified in connection with Plaintiffs' responses to the OpenAI Defendants' First Set of Requests for Admission.

**Request For Production No. 34:**

Documents sufficient to show Plaintiffs' policies and practices concerning (i) the retention, preservation, storage, and/or destruction of documents and communications; (ii) the use of personal electronic devices for work purposes; and (iii) the use of chats or other messaging systems, including Ephemeral Messaging Tools.

16

Dated: November 6, 2025                    Respectfully submitted,

                                           */s/ Michael K. Hurst*
                                           Michael K. Hurst
                                           mhurst@lynnllp.com
                                           Texas Bar No. 10316310
                                           Chris W. Patton
                                           cpatton@lynnllp.com
                                           Texas Bar No. 24083634
                                           Andy Kim
                                           akim@lynnllp.com
                                           Texas Bar No. 24136638
                                           **LYNN PINKER HURST & SCHWEGMANN
                                           LLP**
                                           2100 Ross Avenue, Suite 2700
                                           Dallas, Texas 75201
                                           (214) 981-3800 (Telephone)
                                           (214) 981-3839 (Facsimile)

                                           William Savitt
                                           WDSavitt@wlrk.com
                                           N.D. Tex. Bar No. 2900058NY
                                           Kevin S. Schwartz
                                           KSchwartz@wlrk.com
                                           N.D. Tex. Bar No. 4564241NY
                                           Stephen D. Levandoski (admitted *pro hac vice*)
                                           SDLevandoski@wlrk.com
                                           **WACHTELL, LIPTON, ROSEN & KATZ**
                                           51 West 52nd Street
                                           New York, NY 10019
                                           (212) 403-1000 (Telephone)
                                           (212) 403-2000 (Facsimile)

                                           *Attorneys for Defendants OpenAI Foundation (f/k/a
                                           OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo,
                                           LLC*

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 6, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Michael K. Hurst*
Michael K. Hurst

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| X CORP. and X.AI LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC.; OPENAI, INC.; OPENAI, L.L.C.; and OPENAI OPCO, LLC, <br><br> Defendants. | Civil Action No. 4:25-cv-00914-P <br><br> Honorable Mark T. Pittman <br><br> **APPLE INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS** |

Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendant Apple Inc. hereby propounds the following First Set of Requests for Production of Documents to Plaintiffs X Corp. and X.AI LLC ("Plaintiffs"). These Requests are to be responded to fully and separately as required by the Federal Rules of Civil Procedure.

Apple requests that Plaintiffs serve their responses to these Requests upon counsel for Apple at Covington & Burling LLP, 850 Tenth Street, NW, Washington, DC 20001, within thirty (30) days. The following Definitions and Instructions are applicable to these Requests.

**DEFINITIONS**

1.      **"Action"** refers to the above-captioned litigation, *X v. Apple*, No. 4:25-cv-00914-P (N.D. Tex.).

2.      **"Agreement"** refers to a binding contract between two or more parties.

3.      **"Application"** or **"App"** refers to a software program or web-based service designed to perform specific tasks on a computer, mobile phone, or other device.

4.      **"Apple"** refers to Defendant Apple Inc. and its employees.

5.      **"Apple App Store"** refers to the online storefront operated by Apple that allows

1

developers to offer for download apps compatible with Apple devices.

6.    **"Apple Intelligence"** means the suite of over 20 personal intelligence features available on Apple devices that offer ways for users to simplify and accelerate everyday tasks, enhance their writing, communicate effectively, and express themselves creatively, including but not limited to Genmoji, Writing Tools, and Smart Replies.

7.    **"ChatGPT"** refers to any and all versions of the Generative AI Chatbot developed by OpenAI.

8.    **"Communication(s)"** means the transmittal of information in any form (including but not limited to verbally, in writing, or by email, text message, messaging app, or social media), including but not limited to facts, ideas, and inquiries, as well as any notes, records, or other memorialization thereof.

9.    **"Complaint"** refers to the Complaint filed in this Action on August 25, 2025 in the United States District Court for the Northern District of Texas, Fort Worth Division (ECF No. 1) and any subsequent amendments thereto.

10.    **"Defendants"** refers to Apple Inc., OpenAI Inc., OpenAI LLC, and OpenAI OpCo LLC.

11.    **"Document(s)"** means "documents or electronically stored information" as that term is used in Federal Rule of Civil Procedure 34(a)(1)(A), including but not limited to any drafts and non-identical copies thereof. "Document(s)" shall include "Communication(s)," as defined above.

12.    **"Generative AI Chatbot"** refers to an artificial intelligence ("AI") assistant that provides conversational access to large language models ("LLMs") to create a response to User Prompts for tasks such as answering questions, generating content, and assisting with reasoning

and problem solving. For the avoidance of doubt, Generative AI Chatbot includes but is not limited to ChatGPT and Grok.

13. **"Grok"** refers to the Generative AI Chatbot developed by Plaintiffs X Corp. and/or X.AI LLC.

14. **"Integrate"** or **"Integration"** refers to combining, connecting, or incorporating various systems so they can work together.

15. **"Must-Have Apps List"** refers to the Apple App Store's editorially curated list of Applications currently titled "Must-Have Apps," as well as any substantially similar editorially curated list that may bear a different name in the future.

16. **"OpenAI"** refers to OpenAI Inc., OpenAI LLC, and OpenAI OpCo LLC.

17. **"Person(s)"** shall refer not only to natural persons, but also, without limitation, to firms, partnerships, corporations, associations, unincorporated associations, organizations, businesses, trusts, and/or any other type of legal entities.

18. **"Relate to"** or **"Relating to"** means concerning, reflecting, referring to, describing, evidencing, proving, disproving, summarizing, containing, analyzing, explaining, mentioning, discussing, describing, supporting, or constituting.

19. **"Smartphone"** refers to a mobile phone that includes additional computing functions.

20. **"Smartphone App Store"** refers to any online storefront that allows developers to offer for download apps compatible with Smartphones.

21. **"Super Apps"** refers to multi-functional platforms that offer services such as social connectivity and messaging, financial services, e-commerce, and entertainment that do not require a customer to be tied to a particular device, as described in paragraphs 4 and 62 through 64 of the

3

Complaint.

22.    **"User Prompts"** refers to the requests sent by a user to an AI chatbot, including but not limited to Generative AI Chatbots.

23.    **"X"** refers to X Corp. and the online social media platform formerly known as Twitter, and all other persons acting on or purporting to act on X's behalf, including but not limited to representatives and agents.

24.    **"xAI"** refers to (1) X.AI LLC, and all other persons acting on or purporting to act on xAI's behalf, including but not limited to representatives and agents, and/or (2) any Generative AI Chatbot or other AI model developed by X Corp. or X.AI LLC.

25.    **"You"** or **"Your"** refers to X Corp. and X.AI LLC, the Plaintiffs in this Action to whom these requests for production are addressed, and all other persons acting on or purporting to act on Your behalf, including but not limited to representatives and agents.

26.    All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

## <u>INSTRUCTIONS</u>

The following Instructions are applicable to these Requests:

1.    The terms "any," "all," "each," and "every" shall be construed to encompass any and all.

2.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responsive information that might otherwise be construed to be outside of its scope.

3.    The singular form of any word includes the plural and vice versa.

4.    The present tense of a verb includes the past tense, and vice versa.

4

5. The use of the article "the" shall not be construed as limiting the scope of any request.

6. The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

7. Each Request shall be construed independently and not in any way that limits the scope of any other Request.

8. These Requests require You to produce all Documents that are in your actual or constructive possession, custody, or control or in the possession, custody, or control of your attorneys, accountants, representatives, consultants, agents, employees, and any other persons or entities acting on your behalf or otherwise subject to your direction or control.

9. If You object to any part of a Request, state with specificity the part to which You object, each basis for the objection, and the extent, if any, to which responsive Documents have been withheld on that basis.

10. If You withhold a responsive Document pursuant to a claim of privilege, immunity or protection from disclosure, including the attorney-client privilege or work product doctrine, You shall provide a written privilege log that sets forth the information required by Federal Rule of Civil Procedure 26(b)(5) unless the parties agree otherwise.

11. If You object to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that You claim to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which You provide a response.

12. If You object to any request as overbroad, explain the nature of the purported over-breadth, narrow the request so as to eliminate the purported over-breadth, state with specificity how You narrowed the request, and produce Documents responsive to the narrowed

5

request.

13.    If no Documents exist that are responsive to a request, state so in Your response.

14.    All responsive and non-privileged electronic documents shall be produced in the format agreed upon by the parties and/or ordered by the Court in a forthcoming ESI order.

15.    Unless otherwise specified, the relevant time period for these Requests is January 1, 2024 to August 25, 2025, or any other time period required for Plaintiffs' First Set of Requests for Production to Defendants dated October 10, 2025.

## REQUESTS FOR PRODUCTION

1.    All Documents or Communications referenced in, relied on, or otherwise used to prepare the Complaint in this Action.

2.    All Documents Relating to any Integration of Grok or xAI with any hardware or software designed, developed, maintained, manufactured, or sold by Apple, including but not limited to:

   a.    The date, location, and individuals involved in any outreach to and any meetings or discussions with Apple Relating to any Integration of Grok or xAI at any point in time;

   b.    All drafts and final versions of any presentations or other Documents about Grok or xAI given by You to Apple, as well as any underlying data used to create any such presentations or other Documents;

   c.    Internal Documents Relating to any Integration of Grok or xAI; and/or

   d.    Communications (including but not limited to text messages and emails) from or involving Elon Musk Relating to any Integration of Grok or xAI.

3.    All Documents from the time period of November 3, 2023 to August 25, 2025

6

Relating to any contemplated, proposed, or actual Integration of Grok or xAI with any Smartphone, device, Application, or other partner, including but not limited to:

a. Communications between You and any company or other partner regarding any contemplated, proposed, or actual Integration of Grok or xAI, including but not limited to any proposals, responses to proposals, or executed Agreements; and/or

b. All Documents Relating to Your efforts to seek any Integration of Grok or xAI with any Smartphone, including but not limited to Smartphones manufactured or sold by Apple, Samsung, Motorola, or Google.

4.    All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to any Communications between You and the developers of other Generative AI Chatbots, including but not limited to OpenAI, Google, Microsoft, Anthropic, Perplexity AI, and DeepSeek, regarding a contemplated, proposed, or actual Integration of a Generative AI Chatbot with any Smartphone, device, Application, or other  hardware or software, including but not limited to any Integration with Apple Intelligence.

5.    All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to the performance of Grok, including but not limited to Documents discussing Grok's functionality, capabilities, popularity, factual accuracy, latency of response time, adversarial robustness, transparency, and responsiveness to user inquiries.

6.    All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to the privacy features of Grok, including but not limited to:

a. Policies, procedures, and practices Relating to the retention, storage, and deletion of user data;

    b. Policies, procedures, and practices Relating to ensuring that user data cannot be accessed by third parties; and/or

    c. An incident in August 2025 whereby conversations between users and Grok were made publicly available through Google search results, the cause of the issue, and the steps You took to address the issue. *See Hundreds of thousands of Grok chats exposed in Google results*, BBC (August 21, 2025), https://www.bbc.com/news/articles/cdrkmk00jy0o.

7. All Documents Relating to the safety or content moderation of Grok, including but not limited to:

    a. Policies, procedures, and practices Relating to Your ability to remove or restrict Grok's ability to generate text, images, audio, or video of any particular type(s) of material due to safety concerns;

    b. Parental controls (or the lack thereof), child safety, groupthink, jailbreaking, display of non-consensual intimate imagery, graphic and/or violent content, racism, sexism, antisemitism, hate speech, hostility to a protected class or characteristic, bias, and quality;

    c. An incident in May 2025 whereby Grok responded to various User Prompts with unrelated references to "white genocide" in South Africa, the cause of the issue, and the steps You took to address the issue. *See Musk's xAI updates Grok chatbot after 'white genocide' comments*, REUTERS (May 16, 2025), https://www.reuters.com/business/musks-xai-updates-grok-chatbot-after-white-genocide-comments-2025-05-17/; and/or

    d. An incident in July 2025 whereby there were reported increases in violent, racist,

sexist, or antisemitic content generated by Grok, the cause of the issue, and the steps You took to address the issue. *See Elon Musk's AI chatbot, Grok, started calling itself 'MechaHitler'*, NPR (July 9, 2025), https://www.npr.org/2025/07/09/nx-s1-5462609/grok-elon-musk-antisemitic-racist-content.

8.     All Documents from the time period of November 3, 2023 to August 25, 2025 Relating to customer feedback or complaints regarding Grok, including but not limited to complaints or reports relating to functionality, privacy, safety, accuracy (or inaccuracy), hallucinations, parental controls (or lack thereof), child safety, groupthink, jailbreaking, display of non-consensual intimate imagery, graphic and/or violent content, racism, sexism, antisemitism, hate speech, hostility to a protected class or characteristic, bias, and quality.

9.     All Documents Relating to comparisons between, or analyses of, Generative AI Chatbots, including but not limited to: features, characteristics, functionality, privacy, safety, content moderation, number of users, timing of public launch, strategic partnerships, and volume of available User Prompts.

10.     All Documents Relating to comparisons between Grok (on the one hand) and ChatGPT, Gemini, Copilot, Claude, Perplexity, DeepSeek, or any other Generative AI Chatbot (on the other).

11.     All Documents from the time period of January 1, 2023 to August 25, 2025 Relating to the initial release for Grok or xAI and any material updates to Grok or xAI, including but not limited to the timing and nature of any updates to Grok or xAI.

12.     Documents and data sufficient to show the total usage and profits earned by Grok or xAI, on a quarterly basis from January 1, 2024 to present, including but not limited to:

9

a. Total number of users and subscribers (broken out by each category of user or subscription);

b. Total number and sources of User Prompts (broken out by user subscription status);

c. Total number of downloads of the Grok App (broken out by device model and manufacturer);

d. Total revenue (broken out by each source of revenue);

e. Total gross revenue;

f. Total expenses; and/or

g. Any estimates, analyses, or calculation of Grok's or xAI's share of the Generative AI Chatbot market.

13. Documents and data sufficient to show the total usage and profits earned by the X App on a quarterly basis from January 1, 2024 to present, including but not limited to:

a. Total number of users and subscribers (broken out by each category of user or subscriber);

b. Total number of downloads of the X App (broken out by device model and manufacturer);

c. Total revenue (broken out by each source of revenue);

d. Total gross revenue; and/or

e. Total expenses.

14. All Documents Relating to any economic damages You claim to have suffered from the conduct alleged in the Complaint.

15. All Documents Relating to any non-economic damages You claim to have suffered from the conduct alleged in the Complaint.

10

16. Documents and data sufficient to show the sources and volume of User Prompts available to Grok or xAI, including but not limited to:

    a. Documents sufficient to show any device, Application, or other service on which users can access, download, or otherwise use Grok or xAI, including but not limited to web browsers (including on mobile devices and computers), Integrations with devices (including but not limited to other Smartphones, computers, or tablets), or other Applications (including on both Apple and non-Apple devices);

    b. Data sufficient to show the total number of User Prompts available to Grok or xAI each month (broken out by each source of User Prompts);

    c. Data sufficient to show the total number of User Prompts You use to train Grok's or xAI's large language models each month (broken out by each source of User Prompts); and/or

    d. Documents sufficient to show any other sources in addition to User Prompts used to train Grok or xAI.

17. Documents sufficient to show any agreements or arrangements with another company or partner, including but not limited to X, Tesla, SpaceX, Starlink, or Neuralink, to receive data that may be used to train Grok or xAI's models.

18. All Documents Relating to how Grok or xAI uses data and information, including but not limited to text, images, audio, video, likes, reposts, trends, and other metrics from X, Tesla, SpaceX, Starlink, or Neuralink to train Grok or xAI's models.

19. Documents sufficient to show the relationship between Grok or xAI and the following entities, including but not limited to the volume of User Prompts or other data received from each entity: X, Tesla, SpaceX, Starlink, Neuralink, and the United States Government.

20.    All Documents Relating to any plans or effort to Integrate the X App with any Generative AI Chatbots other than Grok, including but not limited to:

a. Documents sufficient to show any communications with any Generative AI Chatbot developers Relating to any contemplated, proposed, or actual Integration with the X App;

b. Documents sufficient to show the number of Your employees who worked on any such Integrations;

c. Documents sufficient to show the total expenses associated with any such Integrations; and/or

d. Documents sufficient to show the amount of time You spent on any such Integrations.

21.    All Documents Relating to any plans or effort to Integrate Tesla with any Generative AI Chatbots other than Grok, including but not limited to:

a. Documents sufficient to show any communications with any Generative AI Chatbot developers Relating to any contemplated, proposed, or actual Integration with Tesla;

b. Documents sufficient to show the number of Your employees who worked on any such Integrations;

c. Documents sufficient to show the total expenses associated with any such Integrations; and/or

d. Documents sufficient to show the amount of time You spent on any such Integrations.

22.    All Documents Relating to or supporting Your allegation that the integration of

12

ChatGPT with Apple Intelligence results in "Plaintiffs [being] foreclosed from a significant number of generative AI chatbot prompts, deprived of scale, and thwarted in their abilities to innovate and improve the quality and competitiveness of their offerings."

23. All Documents Relating to or supporting Your allegation that User Prompts from Apple Intelligence (including Siri or Writing Tools) represent "a substantial share of the generative AI chatbot market."

24. All Documents Relating to or supporting Your allegation that User Prompts from Apple Intelligence (including Siri or Writing Tools) represent "up to 55 percent of all potential generative AI Chatbot prompts."

25. All Documents Relating to any technical limitations or challenges posed by an Integration with multiple Generative AI Chatbots, including but not limited to technical limitations or challenges with respect to X, Tesla, or any Smartphones or other devices or applications.

26. All Documents Relating to or supporting Your allegation that "generative AI chatbots and related super apps stand to reduce customers' dependence on smartphones like Apple's iPhone," including but not limited to:

    a.  Assessments, analyses, or projections of the number of downloads of Generative AI Chatbots or Super Apps;

    b.  Assessments, analyses, or projections of the number of subscribers to Generative AI Chatbots or Super Apps;

    c.  Assessments, analyses, or projections of the respective market share in the United States of Generative AI Chatbots or Super Apps;

    d.  Assessments, analyses, or projections of "functionality" on Smartphones that "Generative AI chatbots have already replaced";

13

e.  Assessments, analyses, or projections of the impact of Generative AI Chatbots or Super Apps on consumer demand for Smartphones; and/or

f.  Assessments, analyses, or projections of the impact of Generative AI Chatbots or Super Apps on the development of lower-cost Smartphones.

27.  All Documents from the time period of January 1, 2023 to August 25, 2025 Relating to or supporting Your allegation that the X App or Grok App will or may develop into a Super App, including but not limited to:

a.  Discussions or negotiations with Visa Relating to the development of the financial services portion of the X App or Grok App;

b.  Discussions or negotiations with Crush Capital Relating to the licensing and distribution of Crush Capital's "interactive investment show";

c.  Discussions or negotiations with Shopify Relating to the development features on the X App or Grok App that will "allow users to shop";

d.  Discussions or negotiations with any other business partners Relating to the development of the X App or Grok App's "digital town square"; and/or

e.  Discussions or negotiations with non-Apple Smartphone manufacturers Relating to how using the X App or Grok App will enable them to make a lower-cost Smartphone to compete with Apple.

28.  All Documents Relating to Your plans or efforts to manufacture Smartphones.

29.  All Documents Relating to the Apple App Store's Must-Have Apps List, including but not limited to:

a.  All Documents Relating to Your Communications with Apple regarding the X App and Grok App's inclusion on the Must-Have Apps List, including but not limited

14

to any actions You took and changes made to the X App or Grok App in response to Communications with Apple;

b. All Documents Relating to the effect or impact of inclusion of an app on the Must-Have Apps List, including but not limited to any change in the volume of App downloads, customer ratings, and in-app purchases; and/or

c. All Documents Relating to Your reactions to the X App and Grok App not being included on the Must-Have Apps List

30.    All Documents and data sufficient to show the number of downloads, customer ratings, and inclusion on any App list or category of the X App and Grok App on all Smartphone App Stores (including but not limited to the Apple App Store, Google Play Store, Microsoft Store, Samsung Galaxy Apps, Sony Apps, and Amazon Appstore) on a quarterly basis.

31.    All Documents Relating to Communications between You and Apple regarding the number of downloads, customer ratings, and inclusion on any App list or category of the X App and Grok App on the Apple App Store.

32.    All Documents Relating to Communications between You and Apple regarding the review of any updates to the X App and Grok App in the Apple App Store.

33.    All Communications between You and any Application developers, including but not limited to members of the Coalition for App Fairness, regarding this Action and Your allegations against Apple in the Complaint.

34.    All Communications between You and any Application developers, including but not limited to members of the Coalition for App Fairness, regarding X's decision to join the Coalition for App Fairness.

35.    All Documents and Communications Relating to the announcement made by the

15

Coalition for App Fairness on October 28, 2025 that X joined the Coalition for App Fairness, *see*

*X Joins Coalition for App Fairness to Champion a Fairer App Ecosystem for Everyone*, COALITION

FOR APP FAIRNESS (Oct. 28, 2025), https://appfairness.org/2066-2/.

36.    All Documents that Plaintiffs reviewed or relied upon in preparing the Complaint

or any subsequent amendments thereto.

37.    All Documents produced to You by any other individual or entity, including but

not limited to third-parties, in connection with this Action.

38.    All Documents (including but not limited to affidavits, declarations, and any other

sworn testimony) Plaintiffs intend to rely upon at trial or at any evidentiary hearing in this Action.


Dated: November 12, 2025                    Respectfully submitted,

                                            */s/ Dee J. Kelly, Jr.*
                                            Dee J. Kelly, Jr.
                                            State Bar No. 11217250
                                            dee.kelly@kellyhart.com
                                            Julia G. Wisenberg
                                            State Bar No. 24099146
                                            julia.wisenberg@kellyhart.com
                                            KELLY HART & HALLMAN LLP
                                            201 Main Street, Suite 2500
                                            Fort Worth, TX 76102
                                            Telephone: (817) 332-2500
                                            Facsimile: (817) 878-9280

                                            Emily Johnson Henn (admitted *pro hac vice*)
                                            ehenn@cov.com
                                            COVINGTON & BURLING LLP
                                            3000 El Camino Real
                                            5 Palo Alto Square, 10th Floor
                                            Palo Alto, CA 94306
                                            Telephone: (650) 632-4700

16

Henry Liu (admitted *pro hac vice*)
hliu@cov.com
Lauren Willard Zehmer (admitted *pro hac vice*)
lzehmer@cov.com
Carol Szurkowski Weiland (admitted *pro hac vice*)
cweiland@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 662-6302

**ATTORNEYS FOR DEFENDANT APPLE INC.**

17

App. 240    A035

## CERTIFICATE OF SERVICE

I certify that on November 12, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Zhi Yang Tan*
Zhi Yang Tan

18

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and X.AI LLC,<br><br>     Plaintiffs,<br><br>     v.<br><br>APPLE INC., OPENAI, INC., OPENAI, L.L.C., and OPENAI OPCO, LLC,<br><br>     Defendants. | Civil Action No. 4:25-cv-00914-P |

**THE OPENAI DEFENDANTS' SECOND SET OF REQUESTS FOR PRODUCTION
TO PLAINTIFFS X CORP. AND X.AI LLC**

Propounding Party:                OpenAI Defendants

Responding Party:                 Plaintiffs X Corp. and X.AI LLC

Set No.:                          Two

Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo, LLC (the "OpenAI Defendants" and together with Apple Inc., "Defendants"), by and through their attorneys, hereby request, pursuant to Federal Rules of Civil Procedure 26 and 34, that Plaintiffs X Corp. and X.AI LLC ("Plaintiffs") respond to this Second Set of Requests for Production ("Requests") separately and fully. These Requests are governed by the Definitions and Instructions that follow.

## DEFINITIONS

The following definitions shall apply to the Requests contained herein.

1.      "Action" means the above-captioned action.

2.      "AI Technologies" means the artificial intelligence technologies that power Generative AI Chatbots, including, but not limited to, Large Language Models, neural networks, natural language processing, reinforcement learning, and deep learning.

3.      "Apple" means Apple Inc.

4.      "App" means software that allows users to perform a specific task (such as checking the weather or editing shoots) and can run on a device like a smartphone or computer or be accessed through a web browser without being downloaded.

5.      "Apple Intelligence" means Apple's personal intelligence system integrated into Apple devices, as announced by Apple on June 10, 2024.

6.      "Apple Product" means any device offered by sale by Apple, including the Apple iPhone, iPad, Apple Watch, Mac, iMac, MacBook Pro, MacBook Air, and other personal computers.

7.      "Communication" and "Communications" means any act or instance of transferring, transmitting, passing, delivering, or giving information by oral, written, or electronic means, including but not limited to by notes, letter, telegram, facsimile, electronic

2

mail, electronic message (including text message), or voicemail.

8.    "Complaint" means the complaint filed on August 25, 2025 in the Action.

9.    "Document" and "Documents" shall have the broadest meaning permitted under the Federal Rules of Civil Procedure and shall include, without limitation, the original and all non-identical copies of any handwritten, printed, typed, recorded, or graphic material, or ESI (as defined below), of any kind and nature, including all drafts and transcriptions thereof, however produced or reproduced, and including but not limited to accounting materials, accounts, agreements, analyses, appointment books, books, books of account, brochures, calendars, catalogs, checks, computer data, computer disks, contracts, correspondence, data sheets, date books, diaries, diskettes, drawings, email messages, faxes, guidelines, instructions, inter-office communications, invoices, letters, logs, manuals, memoranda, minutes, notes, opinions, payments, plans, presentations, purchase confirmations, receipts, records, regulations, reports, sound recordings, spreadsheets, statements, studies, surveys, tickets, text messages, instant messages, timesheets, trade records, video recordings, voice-mail messages, vouchers, word processing materials (however stored or maintained), and all other means by which information is stored for retrieval.

10.    "ESI" means information that is stored in an electronic format, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes but is not limited to metadata, system data, deleted data, and fragmented data.

11.    "Generative AI Chatbot," for purposes of the Requests in this document, has the meaning ascribed to that term in the Complaint (as alleged in, *e.g.*, Paragraphs 35, 37, and 127 to 131) to include an interface through which users can communicate with AI Technologies through natural language dialogue.

12.    "Grok" means xAI's Generative AI Chatbot and its underlying AI Technologies (including its Large Language Models).

13.    "Grok-X Integration" means any agreement, arrangement, understanding, or

partnership, whether formal or informal, between Grok and X relating in any way to X's "integration of Grok's functionality into its digital town square" and network as alleged in, *e.g.*, Paragraphs 69 and 180 of the Complaint.

14.    "Large Language Models," or "LLMs," means a type of artificial intelligence model that has been trained on large amounts of data using deep learning to process and generate language.

15.    "Neuralink" means Neuralink Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

16.    "Person" means any natural person, individual, corporation, limited liability company, trust, partnership, proprietorship, association, joint venture, group, business entity, governmental or public entity, or any other form or organization of legal entity.

17.    "Tesla" means Tesla, Inc. and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

18.    "SpaceX" means Space Exploration Technologies Corporation and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates.

19.    "xAI" means X.AI LLC and any of its predecessors, successors, parents, divisions, subsidiaries, or affiliates (including the entities X Corp. and XAI Holdings Corp.), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

20.    "X" means X Corp. and any of its predecessors, successors, parents, divisions, subsidiaries, affiliates (including the entities X.AI LLC and XAI Holdings Corp.), or any associated lines of business (including the social media platform called X), and each and all of (i) their present and former employees, agents, representatives, or advisors; (ii) any entity over which they exercised or exercise control; and (iii) any other Persons acting on their behalves.

21.    "You" and "Your" mean xAI and X.

22.    The terms "any" and "all" mean any and all in the most inclusive sense of those

4

terms.

23.    The terms "concerning" and "with respect to" shall be read and applied as interchangeable and shall be construed in the broadest sense permitted to mean discussing, supporting, describing, concerning, regarding, with regard to, relating to, referring to, pertaining to, containing, analyzing, evaluating, studying, recording, memorializing, reporting on, commenting on, reviewed in connection or in conjunction with, evidencing, setting forth, contradicting, refuting, considering, recommending, or constituting, in whole or in part.

24.    The term "including" shall be read to mean "including without limitation."

25.    Whenever used herein, (i) the singular shall be deemed to include the plural, and the plural shall be deemed to include the singular; (ii) the masculine shall be deemed to include the feminine, and the feminine shall be deemed to include the masculine; (iii) the disjunctive ("or") shall be deemed to include the conjunctive ("and"), and the conjunctive ("and") shall be deemed to include the disjunctive ("or"); (iv) each of the functional words "each," "every," "any," and "all" shall be deemed to include each of the others; and (v) the use of the present or past tense shall be construed to include both the present and past tenses as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

## INSTRUCTIONS

The following instructions shall apply to the Requests contained herein.

1.      These Requests require the production of all responsive Documents and Communications that are in Your possession, custody, or control, wherever located, including, for the avoidance of doubt, any email or other electronic messages sent or received by You from accounts or platforms maintained, hosted, or stored by You, or any of Your respective affiliates, predecessors, or successors, and whether active, in storage, or otherwise, including in the possession of Your agents or advisors.

2.      You are obligated to undertake and produce all responsive Documents in Your possession, custody, or control even if You believe that another Person has already produced the same or similar Documents or may produce such Documents in the future.

3.      All Documents shall be produced as kept in the ordinary course of business, in the form and in the same order within each file in which they were located prior to production. Where a portion of a Document is responsive to the Requests set forth below, the entire Document, along with all transmittal sheets, cover letters, attachments, appendices, enclosures, and exhibits to such Document, shall be produced.

4.      Each Request shall be construed independently, and none of the Requests shall be construed as limiting the scope of any of the other Requests.

5.      Each Request shall be considered as including all non-identical copies and, to the extent applicable, preliminary drafts of Documents that, as to content, differ in any respect from the original or final draft or from each other.

6.      If any Documents called for by these Requests are withheld under a claim of privilege or protection, You are requested at the time of responding to these Requests, or at such other time as may be mutually agreed by You and the OpenAI Defendants, to produce a log that separately identifies each such Document and both (i) specifies the assertion(s) of privilege or protection asserted for withholding the Document; and (ii) sets forth all information necessary to support the assertion(s) of privilege or protection for withholding the Document, including the

6

type or nature of the Document (*e.g.*, letter, memorandum, e-mail, etc.), its author, all recipients, all Persons to whom it was shown or otherwise made available or with whom it was discussed, the date of the Document, and a description of the substance of the Document, all in a manner sufficient to allow the Court to rule on the validity of the claim(s) of privilege or protection asserted for withholding each Document from production.

7.      You must produce all portions of requested Documents that are not subject to a claim of privilege or protection by excising or otherwise protecting the portions of such Document for which a claim of privilege or protection is asserted and producing the remainder.

8.      If no Documents exist that are responsive to a particular Request, so state in Your response to such Request.

9.      Each of these Definitions and Instructions shall be fully applicable to all of the Requests, notwithstanding that a particular Definition or Instruction above may, in whole or in part, be reiterated in certain Requests or that certain Requests may incorporate supplemental instructions or definitions.

10.     Unless otherwise specified in the Request, each Request shall be deemed to include all Documents prepared, sent, received, written, reviewed, or marked upon from October 1, 2023 through the date of production.

11.     Subject to any protocol governing the production and use of ESI that may be agreed to by You and the OpenAI Defendants or ordered by the Court, all Documents shall be Bates-labeled and shall be produced electronically in single page Group IV TIF format (except that Microsoft Excel, PowerPoint, and structured data files shall be produced in native format), with load files containing, for each Document, extracted searchable text and all available metadata for at least the following fields:  BegDoc; EndDoc; BegAttach; EndAttach; Pages; DateSent; FamilyDate; Author; To; CC; BCC; Subject; Custodians; File Name; Time Zone; Confidentiality; Redacted; and Hash Value.

7

## REQUESTS FOR PRODUCTION

**Request For Production No. 1:**

Documents sufficient to show the historical and future-contracted costs associated with data centers used by xAI to operate Grok, including historical and future-contracted capital costs from project construction.

**Request For Production No. 2:**

All Documents and Communications concerning safety, integrity, factual accuracy, and content moderation of Grok, including (a) racism, sexism, antisemitism, hate speech, bias, or hostility to a protected class or characteristic bias; (b) July 2025 references by Grok to "MechaHitler"; (c) May 2025 references by Grok to "white genocide" in South Africa; and (d) citations by Grokipedia to Stormfront, reported in November 2025.

**Request For Production No. 3:**

Documents sufficient to show the AI Technologies involved in or relied upon to develop or operate Grok.

**Request For Production No. 4:**

Documents sufficient to show the funding, investment, and financing that xAI has received and the respective equity ownership of xAI (*e.g.*, capitalization tables).

**Request For Production No. 5:**

All Documents regarding the financial or strategic significance of selling or distributing Grok through the following channels: (a) Apple's App Store; (b) Google's App Store; (c) Samsung's App Store; (d) grok.com; (e) Apple Products via a contemplated Grok integration with Apple Intelligence; (f) integrations with Google, Motorola, Samsung, Tesla, SpaceX, Neuralink, the U.S. Department of Defense (Department of War), or any other division or subdivision of the United States Government; (g) the Grok-X Integration, and (h) any other integrations.

**Request For Production No. 6:**

All Documents and Communications regarding any remarks delivered by xAI's executive

leadership, including Elon Musk, at any "all hands" or companywide meeting of xAI employees, including any audio or audiovisual records of such remarks, notes prepared by Elon Musk or others in connection with such remarks, and presentations delivered or disseminated in connection with such remarks.

9

Dated: December 26, 2025                    Respectfully submitted,

                                           */s/      Michael K. Hurst*
                                           Michael K. Hurst
                                           mhurst@lynnllp.com
                                           Texas Bar No. 10316310
                                           Chris W. Patton
                                           cpatton@lynnllp.com
                                           Texas Bar No. 24083634
                                           Andy Kim
                                           akim@lynnllp.com
                                           Texas Bar No. 24136638
                                           **LYNN PINKER HURST & SCHWEGMANN
                                           LLP**
                                           2100 Ross Avenue, Suite 2700
                                           Dallas, Texas 75201
                                           (214) 981-3800 (Telephone)
                                           (214) 981-3839 (Facsimile)

                                           William Savitt
                                           WDSavitt@wlrk.com
                                           N.D. Tex. Bar No. 2900058NY
                                           Kevin S. Schwartz
                                           KSchwartz@wlrk.com
                                           N.D. Tex. Bar No. 4564241NY
                                           Stephen D. Levandoski (admitted *pro hac vice*)
                                           SDLevandoski@wlrk.com
                                           **WACHTELL, LIPTON, ROSEN & KATZ**
                                           51 West 52nd Street
                                           New York, NY 10019
                                           (212) 403-1000 (Telephone)
                                           (212) 403-2000 (Facsimile)

                                           *Attorneys for Defendants OpenAI Foundation (f/k/a
                                           OpenAI, Inc.), OpenAI, L.L.C., and OpenAI OpCo,
                                           LLC*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 26, 2025, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/     Michael K. Hurst*
Michael K. Hurst
