**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| X CORP. and SPACEXAI LLC,<br><br>Plaintiffs,<br><br>- v. -<br><br>APPLE INC., OPENAI, INC., OPENAI, L.L.C., and OPENAI OPCO, LLC,<br><br>Defendants. | No. 4:25-cv-00914-P<br><br>Oral Argument Requested |

**OPENAI'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Dated: September 22, 2026

# TABLE OF CONTENTS

**Page**


PRELIMINARY STATEMENT ........................................................ 1

FACTUAL BACKGROUND ........................................................ 4

A. The parties ........................................................ 4

B. The GenAI industry expands. ........................................................ 5

C. Apple integrates ChatGPT into Apple Intelligence on a nonexclusive basis. ........................................................ 6

D. The integration of ChatGPT into Apple Intelligence struggles to draw users. ........................................................ 7

E. xAI files this action before seriously pursuing its own integration with Apple Intelligence. ........................................................ 9

F. The Apple integration fails to perform, [redacted]. ........................................................ 11

G. Apple partners with Google. ........................................................ 12

H. xAI continues to tout its competitive position, and SpaceX publicly discloses that xAI and Grok are excelling in a highly competitive GenAI industry. ........................................................ 12

SUMMARY JUDGMENT STANDARD ........................................................ 13

ARGUMENT ........................................................ 14

I. The Agreement is nonexclusive. ........................................................ 16

II. The Agreement does not substantially foreclose competition in Plaintiffs' alleged market. ........................................................ 20

A. The Agreement covers, at most, a minuscule fraction of the alleged market. ........................................................ 21

B. The undisputed evidence shows that competition in the alleged market is robust and Plaintiffs believe they are positioned to succeed. ........................................................ 26

III. Plaintiffs cannot establish antitrust standing. ........................................................ 36

A. The Agreement has not proximately caused an injury in fact. ........................................................ 36

B. The Agreement has not caused an antitrust injury. 43

C. Neither xAI nor X is a proper plaintiff. 45

IV. Plaintiffs have not properly defined a "GenAI chatbot" market or shown that OpenAI is close to wielding monopoly power. 46

A. Plaintiffs' alleged market is legally insufficient because it excludes reasonably interchangeable substitute products. 46

B. OpenAI does not wield anything close to monopoly power. 48

V. Plaintiffs' state-law claims fall along with their federal claims. 50

CONCLUSION 50

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*, 776 F.3d 321 (5th Cir. 2015) ....50

*Adams* v. *Alcolac, Inc.*, 974 F.3d 540 (5th Cir. 2020) ....50

*Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016) ....16, 17

*Am. Needle, Inc*. v. *Nat'l Football League*, 560 U.S. 183 (2010)....14, 15

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986)....13

*Apani Sw., Inc.* v. *Coca-Cola Enters., Inc.*, 300 F.3d 620 (5th Cir. 2002) ....14, 50 n.224

*Assoc. Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*, 459 U.S. 519 (1983)....36, 43

*Associated Radio Serv. Co.* v. *Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980) .... 48-49

*Bacchus Indus., Inc*. v. *Arvin Indus., Inc.*, 939 F.2d 887 (10th Cir. 1991) ....48

*Bell* v. *Dow Chem. Co*., 847 F.2d 1179 (5th Cir. 1988) ....36

*BNI Franchising, LLC* v. *Network for Action Int'l, LLC*, 2026 WL 818331 (S.D. Tex. Mar. 24, 2026)....21

*BRFHH Shreveport, LLC* v. *Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022) .... *passim*

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)....43

*Brown* v. *City of Houston*, 337 F.3d 539 (5th Cir. 2003) ....13

*Drs. Hosp. of Laredo* v. *Cigarroa*, 782 F. Supp. 3d 406 (W.D. Tex. 2025)....15

*Endure Indus., Inc.* v. *Vizient, Inc.*,
164 F.4th 405 (5th Cir. 2026) ....................46, 48

*Epic Games* v. *Apple, Inc*.,
67 F.4th 946 (9th Cir. 2023) ....................15

*Felder's Collision Parts, Inc.* v. *All Star Advert. Agency, Inc.*,
777 F.3d 756 (5th Cir. 2015) ....................45

*Hayes* v. *Solomon*,
597 F.2d 958 (5th Cir. 1979) ....................40

*Holmes* v. *Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992)....................36, 43

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
19 F.4th 127 (2d Cir. 2021) ....................36

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
44 F.4th 959 (10th Cir. 2022) ....................14, 22, 23, 26

*Jayco Sys., Inc.* v. *Savin Bus. Machs. Corp.*,
777 F.2d 306 (5th Cir. 1985) ....................38, 40

*Jebaco, Inc.* v. *Harrah's Operating Co.*,
587 F.3d 314 (5th Cir. 2009) ....................45

*Kloth* v. *Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ....................39

*Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*,
748 F.3d 160 (4th Cir. 2014) ....................49

*LePage's Inc.* v. *3M*,
324 F.3d 141 (3d Cir. 2003)....................17

*Major League Baseball Props., Inc.* v. *Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)....................14

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986)....................30

*McCormack* v. *Nat'l Collegiate Athletic Ass'n*,
845 F.2d 1338 (5th Cir. 1988) ....................36, 37, 45

*McWane, Inc.* v. *Fed. Trade Comm'n*,
783 F.3d 814 (11th Cir. 2015) ....................21

*Mid-Texas Commc'ns Sys*. v. *AT&T*,
615 F.2d 1372 (5th Cir. 1980) ....................15

*MM Steel, L.P.* v. *JSW Steel (USA) Inc.*,
806 F.3d 835 (5th Cir. 2015) ....................14

*Monsanto Co.* v. *Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)....................38

*Mostly Media, Inc.* v. *U.S. W. Commc'ns*,
186 F.3d 864 (8th Cir. 1999) ....................41

*Norris* v. *Hearst Tr.*,
500 F.3d 454 (5th Cir. 2007) ....................45

*Novell, Inc.* v. *Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) ....................43, 44

*Omega Env't, Inc.* v. *Gilbarco, Inc.*,
127 F.3d 1157 (9th Cir. 1997) ....................21

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................17

*PSKS, Inc.* v. *Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) ....................47

*Pulse Network, L.L.C.* v. *Visa, Inc.*,
30 F.4th 480 (5th Cir. 2022) .................... *passim*

*Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*,
614 F.3d 57 (3d Cir. 2010)....................14

*Rio Grande Royalty Co.* v. *Energy Transfer Partners, L.P.*,
786 F. Supp. 2d 1190 (S.D. Tex. 2009) ....................49

*Roland Mach. Co.* v. *Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ....................26

*Roy B. Taylor Sales, Inc.* v. *Hollymatic Corp.*,
28 F.3d 1379 (5th Cir. 1994) ....................21

*Rx Sols., Inc.* v. *Caremark, L.L.C.*,
164 F.4th 436 (5th Cir. 2026) .................... *passim*

*Stewart Glass & Mirror, Inc.* v. *U.S. Auto Glass Disc. Ctrs., Inc.*,
200 F.3d 307 (5th Cir. 2000) ....................15, 18 n.77, 50

*Stitt Spark Plug Co.* v. *Champion Spark Plug Co.*,
840 F.2d 1253 (5th Cir. 1988) ....................17, 22

*Stop & Shop Supermarket Co.* v. *Blue Cross & Blue Shield of R.I.*,
373 F.3d 57 (1st Cir. 2004) ....................23

*Tal* v. *Hogan*,
453 F.3d 1244 (10th Cir. 2006) ....................36

*Tampa Elec. Co.* v. *Nashville Coal Co.*,
365 U.S. 320 (1961) .................... *passim*

*Taylor Pub. Co.* v. *Jostens, Inc.*,
216 F.3d 465 (5th Cir. 2000) ....................15, 50, 50 n.224

*TikTok Inc.* v. *Garland*,
604 U.S. 56 (2025) ....................47

*United States* v. *E.I. du Pont de Nemours & Co.*,
351 U.S. 377 (1956) ....................47

*United States* v. *Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) ....................21

*Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) ....................15

*Walker* v. *U-Haul Co. of Miss.*,
747 F.2d 1011 (5th Cir. 1984) ....................36

*Winn-Dixie Stores, Inc.* v. *E. Mushroom Mktg. Coop.*,
89 F.4th 430 (3d Cir. 2023) ....................49

**Statutes and Rules**

15 U.S.C. § 1 .................... *passim*

15 U.S.C. § 2 .................... *passim*

Fed. R. Civ. P. 56(a) ....................13

Texas Free Enterprise & Antitrust Act ....................50

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*
(4th ed. 2019) ....................21, 39

**PRELIMINARY STATEMENT**

Plaintiffs brought this lawsuit alleging that an "exclusive" agreement between OpenAI and Apple violates the antitrust laws by stifling competition in an alleged market for "GenAI chatbots." The summary judgment evidence disproves these premises. On its face, the Agreement is "non-exclusive." It covers, at most, a tiny share—[redacted]—of Plaintiffs' alleged market, which is fiercely competitive. And far from entrenching OpenAI's position as a supposed monopolist, the Agreement has been [redacted] All of Plaintiffs' evidence contradicts their allegations that the Agreement is harming competition, consumers, or their own business. Instead, Plaintiffs' parent, Elon Musk's SpaceX, has told investors that Plaintiffs have a "formidable competitive advantage" over rivals and maintain a "leading position in the development of advanced artificial intelligence." The Court should grant summary judgment in favor of OpenAI on multiple independent grounds, including no exclusivity, no substantial foreclosure of competition, no antitrust standing, and nothing approaching monopoly power in a properly defined market.

*First*, without an exclusive agreement, there is no exclusive-dealing claim. Here, the Agreement involves Apple's integration of ChatGPT into Apple Intelligence, a suite of AI-powered features available on products like the iPhone. But nothing in the expressly nonexclusive Agreement prevents Apple from integrating other GenAI chatbots alongside ChatGPT whenever and however it chooses. And nothing in discovery—no witness, no document—contradicted the fact that the Agreement is nonexclusive. Indeed, [redacted]. The Agreement's nonexclusivity is dispositive of Plaintiffs' lawsuit.

*Second*, exclusive agreements are not illegal; they are not even disfavored. Rather, a plaintiff must further prove that the agreement substantially forecloses competition in the relevant

market. But the Agreement does not require *anyone* to use ChatGPT. Instead, Apple Intelligence users are free to decline use of ChatGPT and to download or use any other chatbot through an array of other distribution channels, including the Apple App Store. And even assuming some degree of foreclosure, on any measure, the number of new users attributable to the Agreement is minuscule: [redacted] of Plaintiffs' alleged market—well below the 40% threshold that courts have found to raise antitrust concerns. As the Supreme Court has held, foreclosure shares of [redacted] are "conservatively speaking, quite insubstantial."

The discovery record confirms there is no substantial foreclosure. Plaintiffs have not produced a single document to support their claim that they are being foreclosed from competition or harmed by not being integrated into Apple Intelligence. The internal documents that Plaintiffs *have* produced confirm their view that they are thriving in the marketplace. And SpaceX's IPO registration statement, signed by Musk and filed with the SEC, is likewise replete with disclosures diametrically opposed to the competitive foreclosure alleged here. On this record, no reasonable jury could find substantial foreclosure.

*Third*, Plaintiffs also lack antitrust standing. To have standing, Plaintiffs must prove an injury-in-fact proximately caused by the alleged violation and an injury to consumers that the antitrust laws were designed to prevent. But Plaintiffs' purported injuries are highly speculative and indirect. Their damages expert posits that, but for the Agreement, Plaintiffs' chatbot, Grok, would have been integrated into Apple Intelligence; and if that happened, Grok would have been better in some undefined way; and if that happened, X would have developed as a "super app"; and if that happened, X would have competed with the App Store; and if that happened, the fee Apple has charged app developers since 2008 and has no plans to change would have dropped from 30% to [redacted] in less than a year; and if all of this happened, Plaintiffs would have had higher

revenues in 2025 and would have raised more money from investors. This highly attenuated chain of hypothetical causes and effects fails the proximate cause requirement. And none of the links establish harm to the *consumers* that the antitrust laws were designed to protect.

*Fourth*, Plaintiffs' market definition and monopoly power allegations fail because Plaintiffs' economist gerrymandered the market to exclude obvious competitors. And even assuming Plaintiffs' implausibly narrow market, there is no evidence that OpenAI has the power to control prices or exclude competitors, which include massive companies like Google, Meta, Anthropic, and SpaceX. No one in the alleged market has raised prices for years or been sidelined. Instead, as SpaceX disclosed in its registration statement, "the consumer AI market is characterized by rapid model iteration, frequent new entrants and intense competition for user attention," while the AI industry as a whole is "rapidly evolving and increasingly competitive."

*Finally*, Plaintiffs' state-law claims are dependent on a viable federal antitrust theory. Because there are no viable federal claims, there are no viable state claims either.

Courts have recognized that summary judgment is especially important in antitrust cases, given the need to avoid wasteful trials and chilling competition. That teaching is particularly apt in this case, where Musk and Plaintiffs have persisted with costly litigation in the face of clear evidence that the Agreement is "non-exclusive" and Musk's own statements directly contradicting the false, made-for-litigation narrative that Plaintiffs can't compete because of the Agreement. Musk, in short, is misusing the antitrust laws to disrupt a competitor—one that has been a recurring target of his baseless legal attacks. The Court should enter summary judgment in favor of OpenAI on all claims asserted against it.

## FACTUAL BACKGROUND[1]

### A. The parties

Plaintiffs brought this action against OpenAI and Apple. OpenAI was established in 2015 with a mission to ensure that artificial general intelligence benefits all of humanity.[2] In November 2022, OpenAI released ChatGPT, which engages conversationally in response to user prompts.[3] ChatGPT was the first GenAI service to gain global recognition.[4] Apple, now dismissed from the lawsuit, manufactures and markets consumer electronics, including the iPhone.[5]

Plaintiff SpaceXAI (formerly X.AI LLC[6] and referred to herein as "xAI") is an AI company founded by Musk and others in 2023.[7] xAI developed a "GenAI chatbot"[8] called Grok, which is powered by an AI model of the same name.[9] Plaintiff X Corp. ("X") owns the X social media

---

[1] "OpenAI" refers to OpenAI Foundation (f/k/a OpenAI, Inc.), OAI International, Inc. (f/k/a OpenAI, L.L.C.), and OpenAI OpCo, LLC, "Apple" to Apple Inc., "X" to X Corp., and "xAI" to SpaceXAI LLC. "Compl. ¶ __" refers to paragraphs in the complaint filed in this action. Dkt. No. 1 ("Complaint" or "Compl."). "Ex. __" refers to exhibits contained in the Appendix in Support of OpenAI's Motion for Summary Judgment filed concurrently with this brief. Unless otherwise indicated, internal quotation marks and citations are omitted.

[2] *Introducing OpenAI*, OpenAI (Dec. 11, 2015), https://tinyurl.com/IntroOAI; *About*, OpenAI, https://tinyurl.com/AboutOAI.

[3] *Introducing ChatGPT*, OpenAI (Nov. 30, 2022), https://tinyurl.com/GPTIntro.

[4] Ex. 1 at A4-5 (McCrary Report ¶ 23); Ex. 2 at A81-82 (Evans Dep. 262:23-263:1). "GenAI" refers to generative artificial intelligence.

[5] Apple Inc., Annual Report (Form 10-K) at 1-2 (Oct. 31, 2025), https://tinyurl.com/AppleAnnualReport25.

[6] X.AI LLC legally changed its name to SpaceXAI LLC on August 13, 2026. *See* Dkt. No. 375 (notice of name change); Dkt. No. 380 (granting Plaintiffs' motion to amend the case caption).

[7] Ex. 3 at A91 (Elon Musk (@elonmusk), X (July 12, 2023), https://tinyurl.com/xAIFoundingPost).

[8] OpenAI uses the terms "GenAI chatbot" and "chatbot" solely for purposes of discussing Plaintiffs' alleged market.

[9] Ex. 4 at A95-96 (Ba Dep. 25:25-26:6).

platform (formerly Twitter), which Musk acquired in 2022.[10] xAI acquired X in March 2025, and both were acquired by SpaceX in February 2026, just before SpaceX went public in June 2026.[11]

**B. The GenAI industry expands.**

Following ChatGPT's public release, other AI developers introduced their own GenAI products beginning in 2023. Google released Gemini, a GenAI chatbot benefitting from Google's billions of users across its many different products.[12] Meta developed its own chatbot, Meta AI.[13] And Anthropic released its chatbot, Claude.[14] Together with ChatGPT and Grok, these products comprise Plaintiffs' alleged five-product GenAI chatbot antitrust market.[15]

Each of these chatbots is available through mobile app stores, including the Apple App Store and the Google Play store, as well as through the developers' own websites.[16] Most are also available through integrations into other platforms, such as Grok on X, Gemini on Android phones and other Google products, and Meta AI on Facebook, Instagram, and WhatsApp.[17] Other GenAI chatbots released in recent years include Google's AI Mode and AI Overview, Microsoft's Copilot, Perplexity, Amazon's Alexa+, and DeepSeek, among others.[18]

---

[10] Ex. 5 at A184 (Space Exploration Techs. Corp., Amendment No. 2 to Registration Statement (Form S-1/A) at F-10 (June 3, 2026)) (hereinafter "SpaceX Registration Statement").

[11] *Id.*; Ex. 6 at A193 (X-XAI-000161819); SpaceX, *xAI joins SpaceX to accelerate humanity's future* (Feb. 2, 2026), https://tinyurl.com/SpaceXAcquiresxAI.

[12] *Introducing Gemini: our largest and most capable AI model*, News from Google (Dec. 6, 2023), https://tinyurl.com/GeminiIntro.

[13] *Introducing New AI Experiences Across Our Family of Apps and Devices*, Meta (Sep. 27, 2023), https://tinyurl.com/NewMetaAI.

[14] *Introducing Claude*, Anthropic (Mar. 14, 2023), https://tinyurl.com/IntroClaude.

[15] Ex. 7 at A202 (Evans Report ¶ 222).

[16] [redacted]

[17] Ex. 1 at A6-8 (McCrary Report ¶ 27).

[18] *See id.* at A10-18, A21 (McCrary Report ¶¶ 57-60, 62, 64-68, 73).

### C. Apple integrates ChatGPT into Apple Intelligence on a nonexclusive basis.

Apple has also sought to develop its AI capabilities. On May 4, 2024, Apple and OpenAI entered into a nonexclusive "Service Integration Agreement" (the "Agreement") in which Apple obtained the right to provide access to ChatGPT's services to its users.[19] Although OpenAI had initially sought a mutual two-year exclusivity period during the negotiations for the Agreement, Apple refused.[20] Instead, in a section of the Agreement titled "Apple Discretion; Non-Exclusivity," OpenAI "acknowledge[d] and agree[d] that this Agreement is non-exclusive," that "Apple may integrate products or services that provide the same or similar functionality as [ChatGPT] with Apple Products," and that "Apple may itself develop products or services that provide the same or similar functionality as [ChatGPT] and integrate such products or services into Apple Products."[21]

In return for the Apple integration, [redacted].[22] [redacted].[23]

On June 10, 2024, Apple publicly announced "Apple Intelligence," an AI system built into the operating system of new Apple devices that offers AI-enabled features built on Apple's AI

[19] Ex. 9 at A264-66 (OAI_NDTX_0000345).

[20] *See* Ex. 10 at A317 (OAI_NDTX_0006878) (Apple term sheet striking OpenAI's exclusivity request and providing that "[t]his agreement is non-exclusive by Apple. Apple may integrate other models."); Ex. 11 at A335 (Cue Dep. 96:16-19) ("[redacted]

[21] Ex. 9 at A267-68 (OAI_NDTX_0000345).

[22] *Id.* at A271, § 5.1; *id.* at A290, Ex. A § 1.15; *id.* at A293, Ex. B.

[23] *Id.* at A271, § 5.1.

models, including writing tools, image generation, and a more capable Siri voice assistant.[24] Apple announced that users would have the option to enable ChatGPT as an extension within Siri.[25] Apple explained that if Siri could not answer a user's query, the user could elect to send the question to ChatGPT and that Siri would provide ChatGPT's answer.[26] Apple also disclosed that it "intend[ed] to add support for other AI models"[27] and was "looking forward to doing integrations with other models, including Google Gemini, for instance, in the future."[28]

Ahead of this public announcement, OpenAI asked Apple about its timeline in dealing with other GenAI firms. OpenAI was told that while Apple had no near-term plans to integrate others,[29] it planned to announce that it would integrate other chatbots in the future.[30]

### D. The integration of ChatGPT into Apple Intelligence struggles to draw users.

Apple's integration of ChatGPT into Apple Intelligence went live on December 11, 2024.[31] By default, the integration is turned off on iPhones.[32] To enable the integration, users must

---

[24] *Introducing Apple Intelligence, the personal intelligence system that puts powerful generative models at the core of iPhone, iPad, and Mac*, Apple (June 10, 2024), https://tinyurl.com/IntroAppleIntelligence.

[25] *Id.*

[26] *Id.*

[27] *Keynote (Worldwide Developer Conference 2024)*, Apple Developer, at 1:39:39 (June 10, 2024), https://tinyurl.com/WWDC24Keynote; *see also* Ex. 12 at A347-49 (Perica Dep. 121:8-123:9).

[28] Brian Heater, *Apple confirms plans to work with Google's Gemini 'in the future'*, TechCrunch (June 10, 2024), https://tinyurl.com/AppleIntegrationPlans. [redacted] *See* Ex. 11 at A323-24 (Cue Dep. 31:17-32:2).

[29] *See* Ex. 13 at A359 (OAI_NDTX_0031423); *cf. also* Ex. 14 at A363 (OAI_NDTX_0007236).

[30] *See* Ex. 13 at A356, A359 (OAI_NDTX_0031423); Ex. 11 at A326 (Cue Dep. 43:9-16).

[31] Ex. 7 at A213 (Evans Report ¶ 288 & n.402).

[32] *See* Ex. 15 at A374 (Martinovic Dep. 122:3-7) (OpenAI 30(b)(6) Deposition); Ex. 16 at A395 (Ghose Report ¶ 78).

navigate a multistep process to affirmatively opt in, either through Siri or by locating the "settings" page for the integration.[33] As a result, [redacted]

From the outset, OpenAI assessed the integration's impact, including both its direct and indirect effects.[35] Direct effects included use or subscriptions coming in directly from Apple Intelligence users.[36] Indirect effects included use or subscriptions through channels other than Apple Intelligence that could be attributed to the intangible benefits of the partnership, such as promotion and brand association, sometimes referred to as a "halo effect."[37]

By January 2025, Apple's integration of ChatGPT appeared to be off to a slow start. OpenAI reported internally that it did not have [redacted] of the integration's outcomes.[38] OpenAI cut its forecast for the number of incremental logged-in weekly active users that it expected to obtain as a direct result of the integration to [redacted].[39] OpenAI's analysis showed that indirect effects were also [redacted]

---

[33] *See* Ex. 17 at A402 (*Turn on ChatGPT on iPhone*, Apple, https://tinyurl.com/EnableChatGPT); Ex. 16 at A396-97 (Ghose Report at 66 fig. 15, ¶ 80 n.213).

[34] Ex. 16 at A399 (Ghose Report ¶ 83).

[35] Ex. 18 at A406-07 (OAI_NDTX_0032169); Ex. 15 at A379 (Martinovic Dep. 254:15-25) (OpenAI 30(b)(6) Deposition).

[36] Ex. 18 at A406-07 (OAI_NDTX_0032169); Ex. 15 at A380 (Martinovic Dep. 255:3-9) (OpenAI 30(b)(6) Deposition); *see also* Ex. 19 at A418-19 (OAI_NDTX_0007073).

[37] *See* Ex. 20 at A422 (OAI_NDTX_0019832); Ex. 21 at A426 (OAI_NDTX_0031855); Ex. 15 at A380 (Martinovic Dep. 255:10-13) (OpenAI 30(b)(6) Deposition).

[38] Ex. 22 at A440 (OAI_NDTX_0007266).

[39] Ex. 23 at A443 (OAI_NDTX_0007269).

[redacted][40] By March 2025, OpenAI [redacted]

**E. xAI files this action before seriously pursuing its own integration with Apple Intelligence.**

When the Apple integration launched in December 2024, xAI's Grok was still not available as a standalone app.[42] xAI did not release the Grok app until January 2025 for Apple users and March 2025 for Android users, long after the Agreement was executed.[43] Once released, xAI gained ground rapidly. In April 2025, [redacted][44]

Nevertheless, [redacted].[45] On August 11, 2025, Musk posted on X that "Apple is behaving in a manner that makes it impossible for any AI company besides OpenAI to reach #1 in the App Store, which is an unequivocal antitrust violation."[46] Musk also threatened: "xAI will take immediate legal action."[47] [redacted]

---

[40] Ex. 24 at A447 (OAI_NDTX_0030464); Ex. 20 at A422-23 (OAI_NDTX_0019832); *see also* Ex. 15 at A376-77 (Martinovic Dep. 209:25-210:25) (OpenAI 30(b)(6) Deposition).

[41] Ex. 25 at A464 (OAI_NDTX_0034353).

[42] [redacted]

[43] [redacted]

[44] Ex. 27 at A497 (X-XAI-000110550); *see also* Ex. 28 at A522-23 (Baseer Dep. 102:16-103:5) (Plaintiffs' 30(b)(6) Deposition) ([redacted]).

[45] Ex. 29 at A530, A532 (APL-XAI_00037200).

[46] Ex. 30 at A534 (Elon Musk (@elonmusk), X (Aug. 11, 2025), https://tinyurl.com/MuskAppStorePost).

[47] *Id.*

[redacted].[48] [redacted].[49] In a follow-up email, [redacted].[50] But on August 25, Plaintiffs filed the Complaint in this action, ending further discussions.[51]

In their Complaint, Plaintiffs alleged that the Agreement was "exclusive" and that it had "foreclosed" xAI "from the ability to compete for additional customers against OpenAI's ChatGPT."[52] Plaintiffs also alleged that they had been "completely foreclosed . . . from a massive pool of valuable native iPhone user prompts," while ChatGPT allegedly enjoyed "exclusive access" to "potentially billions of user prompts."[53] These prompts, Plaintiffs alleged, were necessary to "train," and thereby improve, Grok.[54] According to Plaintiffs, OpenAI and Apple formed a "conspiracy" to entrench their alleged monopolies—Apple's in the smartphone market and OpenAI's in the GenAI chatbot market.[55] Plaintiffs pleaded that, as a result, xAI and other

---

[48] *See* Ex. 31 at A539-40 (X-XAI-000023784); Ex. 32 at A561 (Shulkin Dep. 196:14-24); Ex. 33 at A569-70 (Aluru Dep. 201:22-202:2).

[49] Ex. 32 at A563 (Shulkin Dep. 200:2-21).

[50] Ex. 31 at A537 (X-XAI-000023784).

[51] *See generally* Compl.; *see also* Ex. 11 at A339-40 (Cue Dep. 183:25-184:2) ("[redacted]"); Ex. 34 at A580-81 (Fuchs Dep. 166:5-167:2).

[52] Compl. ¶¶ 9, 11, 71, 188-189.

[53] *Id.* ¶¶ 168, 171.

[54] *Id.* ¶¶ 10-11.

[55] *Id.* ¶¶ 90-95, 224.

competitors had been "deprived of scale" and "thwarted in their abilities to innovate and improve the quality and competitiveness of their offerings."[56]

### F. The Apple integration fails to perform, [redacted]

By the time Plaintiffs filed their Complaint, it was clear that Apple's integration of ChatGPT was dramatically underperforming. In July 2025, [redacted].[57] One OpenAI employee explained that [redacted][58] As a result, on September 8, 2025, [redacted]

On March 25, 2026, with the Apple integration persistently underperforming, OpenAI told Apple that [redacted].[61] OpenAI reiterated that

---

[56] *Id.* ¶ 13; *see also id.* ¶¶ 103-111.

[57] Ex. 35 at A598 (OAI_NDTX_0031919).

[58] Ex. 36 at A603 (OAI_NDTX_0030344).

[59] Ex. 37 at A606 (APL-XAI_00086160).

[60] *Id.*

[61] Ex. 38 at A608 (APL-XAI_00132411).

[redacted]

### G. Apple partners with Google.

Meanwhile, on January 12, 2026, Apple and Google jointly announced "a multi-year collaboration under which the next generation of Apple Foundation Models will be based on Google's Gemini models and cloud technology."[63] They previewed that Google's "models will help power future Apple Intelligence features, including a more personalized Siri coming this year."[64] [redacted].[65]

### H. xAI continues to tout its competitive position, and SpaceX publicly discloses that xAI and Grok are excelling in a highly competitive GenAI industry.

Even after filing this lawsuit, xAI was telling its investors and the public something very different than what it had alleged in this Court. In November 2025, xAI boasted that [redacted][66] The valuations Plaintiffs obtained from investors reflected this positive outlook. On January 6, 2026, xAI announced that it raised $20 billion at a valuation of $230 billion, more than double its valuation of $113 billion in its fundraise in July 2025, just before the lawsuit.[67]

---

[62] *Id.*

[63] Ex. 39 at A612 (*Joint Statement from Google and Apple*, News from Google (Jan. 12, 2026), https://tinyurl.com/AppleGoogleStatement).

[64] *Id.*

[65] Ex. 11 at A333, A337-38 (Cue Dep. 91:4-7, 181:11-182:10); Ex. 40 at A618 (Smith Dep. 273:6-14); Ex. 12 at A351 (Perica Dep. 260:5-20).

[66] Ex. 41 at A641-42 (X-XAI-000161824).

[67] Ex. 42 at A728 (Schulman Report at 95 fig. X.1).

Shortly thereafter, on May 20, 2026, SpaceX filed its registration statement with the SEC ahead of its IPO.[68] The registration statement, signed by Musk, disclosed that Grok had "emerged as one of the world's most advanced frontier models."[69] It also disclosed that Grok had "achiev[ed] one of the fastest iteration cycles in the industry," and that its "accelerated development cadence positions Grok among the fastest-advancing frontier models relative to peers, including OpenAI, Anthropic, and Google."[70] Flatly contradicting Plaintiffs' tale of woe in this lawsuit, SpaceX stated that the "combination of our proprietary AI infrastructure capability, our truth-seeking frontier model, Grok, and our access to real-time data on X creates a formidable competitive advantage, allowing us to maintain a leading position in the development of advanced artificial intelligence."[71] SpaceX, now valued at $2 trillion, made no mention of the Agreement, this lawsuit, OpenAI's supposed monopoly, or any supposed foreclosure of competition.

## SUMMARY JUDGMENT STANDARD

The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsubstantiated assertions, improbable inferences, and unsupported speculation" cannot create a genuine dispute. *Brown* v. *City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). "Summary judgment is of particular importance in the area of antitrust law, because it helps to avoid wasteful

[68] [redacted] SpaceX subsequently filed amended versions of the registration statement on June 1 and June 3.

[69] Ex. 5 at A156 (SpaceX Registration Statement).

[70] *Id.* at A173, A177; *see* Ex. 44 at A750 (Pasini Dep. 169:7-14).

[71] Ex. 5 at A157 (SpaceX Registration Statement).

trials and prevent lengthy litigation that may have a chilling effect on pro-competitive market forces." *Major League Baseball Props., Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (cleaned up); *accord In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022).

**ARGUMENT**

Plaintiffs assert claims against OpenAI under Sections 1 and 2 of the Sherman Act and under state law based on allegations of illegal exclusive dealing with Apple.[72]

Section 1 "applies only to concerted action that restrains trade." *Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 190 (2010); *see* 15 U.S.C. § 1. A plaintiff asserting a Section 1 claim "must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *BRFHH Shreveport, LLC* v. *Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (alteration adopted). Illegal exclusive dealing is one theory of anticompetitive conduct upon which a plaintiff may assert a Section 1 claim. *See Apani Sw., Inc.* v. *Coca-Cola Enters., Inc.*, 300 F.3d 620, 625-27 (5th Cir. 2002). But because such arrangements "in many circumstances . . . may be highly efficient" or "pose no competitive threat at all," *Race Tires Am., Inc.* v. *Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010), they are not *per se* unlawful and are instead subject to the rule of reason, which asks "whether the questioned practice imposes an unreasonable restraint on competition." *MM Steel, L.P.* v. *JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). Thus, an exclusive-dealing arrangement is unlawful only if it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 327 (1961).

[72] *See* Compl. ¶¶ 181-191 (Claim 1), 207-214 (Claim 4), 215-222 (Claim 5), 223-233 (Claim 6), 234-250 (Claims 7-10). Plaintiffs only asserted Claims 2 and 3 against Apple. *See id.* ¶¶ 192-206.

Section 2 prohibits independent or concerted action that "monopolize[s]," "attempt[s] to monopolize," or is in furtherance of a "conspir[acy] . . . to monopolize." 15 U.S.C. § 2; *see Am. Needle*, 560 U.S. at 190. An actual-monopolization claim requires that the defendant has monopoly power in a properly defined market. *BRFHH*, 49 F.4th at 529. But "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). The anticompetitive-conduct requirement of a Section 2 claim is "essentially the same" as the Section 1 rule-of-reason inquiry. *Epic Games* v. *Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023); *see also Mid-Texas Commc'ns Sys*. v. *AT&T*, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980). Thus, "substantial foreclosure is a prerequisite for every exclusive-dealing Section 2 claim." *BRFHH*, 49 F.4th at 530.

An attempted-monopolization claim requires that "(1) the defendant engaged in predatory or exclusionary conduct, (2) the defendant had a specific intent to monopolize, and (3) there was a dangerous probability that the defendant would successfully attain monopoly power." *Taylor Pub. Co.* v. *Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000). "A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc.* v. *U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000). "If a plaintiff cannot show anticompetitive conduct under Section 1, there are no Section 2 claims available." *Drs. Hosp. of Laredo* v. *Cigarroa*, 782 F. Supp. 3d 406, 457 (W.D. Tex. 2025).

To bring a claim under the Sherman Act, a plaintiff must prove "antitrust standing." *Pulse Network, L.L.C.* v. *Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). That requires: "1) injury-in-fact,

an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status." *Id.*

As discussed below, summary judgment in favor of OpenAI on all claims is warranted on the independent grounds that no reasonable jury could find an exclusive agreement, substantial foreclosure of competition, antitrust standing, or a properly defined antitrust market. With respect to Plaintiffs' Section 2 claims, summary judgment in OpenAI's favor is also warranted because no reasonable jury could find monopoly power or a dangerous probability of monopoly power.

## I. The Agreement is nonexclusive (Claims 1, 4-6).

"[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *Aerotec Int'l, Inc.* v. *Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016). Identifying an exclusive-dealing arrangement requires examining the "actual terms of the agreement[]." *Id.* An agreement to deal exclusively "is an agreement in which a buyer agrees to purchase certain goods or services *only* from a particular seller for a certain period of time." *Pulse Network*, 30 F.4th at 494 n.23 (emphasis added).

Apple and OpenAI never had an exclusive agreement. In the Agreement's preamble, the parties recited their "desire to enter into this agreement providing for *non-exclusive* access to and use of [OpenAI's] APIs, data, and services in connection with Apple products."[73] The Agreement effectuates that goal through clear, unambiguous language preserving Apple's right to integrate OpenAI's competitors: "*this Agreement is non-exclusive*, and Apple may integrate products or services that provide the same or similar functionality as [ChatGPT] with Apple Products."[74]

[73] Ex. 9 at A264 (OAI_NDTX_0000345) (emphasis added).

[74] *Id.* at A267-68, § 2.5 (emphasis added).

Thus, Apple is free to deal with and integrate whoever it chooses, and OpenAI's rivals remain free to compete for integration into Apple Intelligence alongside ChatGPT.

Faced with the clear terms of the Agreement, Plaintiffs now argue that the Agreement is [redacted][75] While some courts outside the Fifth Circuit have considered claims of "effective" or "de facto" exclusive dealing, they have made clear that such a claim can only rest on allegations that "*specific features* of the agreement *required* exclusivity." *Aerotec*, 836 F.3d at 1183 (emphasis added). In other words, "[t]he 'de facto' exclusive dealing theory does not provide [plaintiffs] an end run around the obligation to first show that express or implied contractual terms" created the equivalent of an exclusive deal. *Id.* at 1182.

Plaintiffs cannot point to any such terms. Apple can integrate, or decline to integrate, any other GenAI chatbot alongside ChatGPT without incurring "any sanction"—so there is "no reason to believe [Apple does] not feel free" to deal with other GenAI chatbot developers. *Stitt Spark Plug Co.* v. *Champion Spark Plug Co.*, 840 F.2d 1253, 1258 (5th Cir. 1988). Similarly, there are no terms that force Apple to "make an all-or-nothing choice" to deal only with OpenAI or else lose some discount or other favorable treatment. *LePage's Inc.* v. *3M*, 324 F.3d 141, 158 (3d Cir. 2003). Apple thus retains its "free[dom] to choose the parties with whom [it] will deal." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).[76]

---

[75] Ex. 7 at A213, A223-32 (Evans Report ¶¶ 287, 297-311); *see also* [redacted]

[76] In early 2026, xAI initiated regulatory proceedings in Brazil that similarly alleged Apple and OpenAI had an "exclusive dealing agreement[]" based on the Agreement. Ex. 46 at A769 (CADE Decision ¶¶ 1-2). After reviewing the evidence, including the Agreement itself, Brazil's antitrust regulator found that "no exclusivity exists" and dismissed the proceeding. *Id.* at A770 (¶¶ 18, 23).

OpenAI and Apple's course of dealing confirms that the Agreement is nonexclusive and that others have always been free to compete for integration.[77] The language of the Agreement providing for nonexclusivity was explicitly negotiated. OpenAI asked Apple for exclusivity, didn't get it,[78] and then advised its own board that "[b]oth parties' obligations are non-exclusive; [Apple] retains the ability to use our competitors and/or compete with us directly."[79] When the Agreement was publicly announced, Apple made clear that it "intend[ed] to add support for other AI models in the future."[80] Apple's then-CEO, Tim Cook, similarly confirmed that Apple was "not stuck on one person forever" and would be "integrating with other people as well."[81] Those public statements [redacted]"[82] [redacted][83]

While Apple planned to eventually integrate multiple chatbots, Apple told both OpenAI [redacted] in negotiations prior to the Agreement that it would integrate with one provider before moving on to others, [redacted].[84] OpenAI sometimes referred

[77] For this reason, Plaintiffs also cannot show "the existence of a combination or conspiracy" to monopolize and "overt acts in furtherance" thereof based on exclusive dealing. *Stewart Glass & Mirror, Inc.*, 200 F.3d at 316. There is no record evidence to support the implausible notion that OpenAI was acting with intent to facilitate Apple's alleged monopoly or vice versa.

[78] Ex. 10 at A317 (OAI_NDTX_0006878) (Apple term sheet striking OpenAI's exclusivity request and providing that "[t]his agreement is non-exclusive by Apple" and "Apple may integrate other models"); Ex. 11 at A335 (Cue Dep. 96:16-19). [redacted] *See* Ex. 47 at A778 ([redacted]).

[79] Ex. 48 at A790 (OAI_NDTX_0010877).

[80] *Keynote (WWDC 2024)*, *supra* note 27, at 1:39:39; Heater, *supra* note 28.

[81] Josh Tyrangiel, *How Will Apple's New AI Change Your Phone? I Asked Tim Cook*, *Wash. Post* (June 12, 2024), https://tinyurl.com/TCookInterview.

[82] Ex. 49 at A804 (APL-XAI_00023923).

[83] Ex. 50 at A812 (APL-XAI_00079791).

[84] *See* Ex. 11 at A326 (Cue Dep. 43:14-16) [redacted]

to this reality as a "head start."[85] But being Apple's *first* partner on Apple Intelligence is not the same as being Apple's *exclusive* partner. In July 2024, after the Agreement had been signed, Apple [redacted][86] That month, one of OpenAI's key product leaders noted that although OpenAI might have a "one year headstart [redacted]," he was worried that Apple would "want[] to move faster"—as it had the right to do.[87] And when asked earlier by a concerned colleague whether OpenAI enjoyed "any exclusivity in [its] arrangement" with Apple, his response was unequivocal: "Nope[.]"[88] By December 2024, OpenAI [redacted] In fact, [redacted]

---

[redacted]; Ex. 51 at A820 (Godement Dep. 118:18-21) ("It was my understanding at the time that the way Apple operated was to get it right with the first provider, so ChatGPT, before they moved on to other providers."); Ex. 52 at A831-32 (Pancholi Dep. 34:2-35:1) (Google 30(b)(6) Deposition) [redacted]

[85] Ex. 53 at A845 (OAI_NDTX_0020193).

[86] Ex. 54 at A848 (OAI_NDTX_0007488).

[87] Ex. 55 at A852 (OAI_NDTX_0018958).

[88] Ex. 56 at A856 (OAI_NDTX_0026375).

[89] Ex. 57 at A859 (OAI_NDTX_0015232).

[90] *See* Ex. 58 at A873 (APL-XAI_00097265) ([redacted]); Ex. 59 at A885 (APL-XAI_00113424) (similar); Ex. 60 at A895 (APL-XAI_00097275) [redacted]

[91] Ex. 11 at A333 (Cue Dep. 91:4-7).

Apple's subsequent relationship with Google underscores the point. Following the Agreement, [redacted].[92] And in January 2026, Apple announced a partnership with Google to use Gemini to develop Apple models that will "help power future Apple Intelligence features," including the "more personalized Siri" announced in June.[93] As Google understood, [redacted].[94] If Plaintiffs were correct that the Agreement prevents Apple from partnering with OpenAI's rivals to compete with ChatGPT, this deal never could have happened. Because no reasonable jury could find that the Agreement is exclusive on these facts, summary judgment for OpenAI on all claims is warranted on this basis alone.

## II. The Agreement does not substantially foreclose competition in Plaintiffs' alleged market (Claims 1, 4-6).

Under Sections 1 and 2 of the Sherman Act, an exclusive agreement is not unlawful unless the plaintiff also proves it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co.*, 365 U.S. at 327. No reasonable jury could find substantial foreclosure on this record.

---

[92] Ex. 52 at A837-38 (Pancholi Dep. 164:20-165:4) (Google 30(b)(6) Deposition) ([redacted]); Ex. 40 at A616 (Smith Dep. 244:9-22) ([redacted]).

[93] Ex. 39 at A612 (*Joint Statement from Google and Apple*, *supra* note 63); *Apple Intelligence and Siri*, Apple, https://tinyurl.com/IntroSiriAI; *Apple introduces Siri AI, a profoundly more capable and personal assistant*, Apple (June 8, 2026), https://tinyurl.com/CapableSiriAI.

[94] Ex. 52 at A840-41 (Pancholi Dep. 190:13-191:18) (Google 30(b)(6) Deposition) [redacted]

### A. The Agreement covers, at most, a minuscule fraction of the alleged market.

To demonstrate substantial foreclosure, a plaintiff must "show that the competition foreclosed by the arrangement constitutes a substantial share of the relevant market." *BRFHH*, 49 F.4th at 530; *see United States* v. *Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) (explaining that "an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition"). "Foreclosure of 40% to 50% of the relevant market is usually required to establish unlawful exclusive-dealing contracts[.]" *BNI Franchising, LLC* v. *Network for Action Int'l, LLC*, 2026 WL 818331, at *18 (S.D. Tex. Mar. 24, 2026); *see McWane, Inc.* v. *Fed. Trade Comm'n*, 783 F.3d 814, 837 (11th Cir. 2015). Conversely, courts routinely hold that foreclosure shares between 10% and 15% are insufficient to establish liability. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1821c n.34 (4th ed. 2019) (collecting cases). And the Supreme Court has made clear that a foreclosure share of "less than 1%" in an exclusive-dealing case "is, conservatively speaking, quite insubstantial," and thus insufficient to establish a violation under Sections 1 and 2 of the Sherman Act. *Tampa Elec. Co.*, 365 U.S. at 333, 335.

The evidence misses the substantial-foreclosure mark by a wide margin. Plaintiffs' first theory of foreclosure is that the Agreement prevents rivals from competing for users of GenAI chatbots. But where a competitor has another "way to take its product to market . . . there is no ultimate foreclosure to the consumer of a choice of goods." *Roy B. Taylor Sales, Inc.* v. *Hollymatic Corp.*, 28 F.3d 1379, 1384 (5th Cir. 1994); *see Omega Env't, Inc.* v. *Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (no foreclosure where "competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution").

Here, OpenAI's competitors in Plaintiffs' alleged market continue to distribute their chatbots to consumers through the Apple App Store, the Google Play store, via the web through

their respective chatbot websites, and via native integrations in their own products and platforms.[95] xAI, for instance, distributes Grok through X, reaching hundreds of millions of potential users, as well as through each of these other channels.[96] Thus, consumers are free to access any chatbot they want. And Apple users in particular remain free to decline to opt in to the ChatGPT integration, which is turned off by default, and to download or use any other chatbot. Plaintiffs have made no effort to calculate the portion of the alleged market that has supposedly been foreclosed by the Agreement. Having "offered no comparison between the number of distribution outlets available and the number of those foreclosed," Plaintiffs cannot "prove the extent of [the] foreclosure." *Stitt Spark Plug Co.*, 840 F.2d at 1258 (affirming directed verdict); *see In re EpiPen*, 44 F.4th at 993 (affirming summary judgment where the plaintiff "fail[ed] to adequately quantify [the alleged] foreclosure").

Even if the Court assumes that Apple users who elect to use ChatGPT through Apple Intelligence are foreclosed from OpenAI's rivals (which they are not), the amount of foreclosure caused by the Agreement is indisputably *de minimis*. While Plaintiffs' experts declined to calculate foreclosure shares, OpenAI's expert, Dr. Catherine Tucker, calculated the share of GenAI consumers who accessed ChatGPT through Apple Intelligence across multiple metrics using the same data and market definition relied upon by Plaintiffs' experts. On these assumptions, Dr. Tucker found foreclosure shares of [redacted] across all metrics, consistent with OpenAI's internal view that Apple Intelligence saw minimal usage:[97]

---

[95] *See* [redacted] Ex. 61 at A930-32 (Tucker Report ¶¶ 65-68); Ex. 1 at A35-39 (McCrary Report ¶¶ 228-234).

[96] Ex. 27 at A505 (X-XAI-000110550); *see also* Ex. 62 at A1011, A1013-14 (Nordeen Dep. 82:16-20, 105:13-106:3).

[97] *See* Ex. 61 at A922 (Tucker Report at 20 ex. 1).

[redacted]

These foreclosure shares of [redacted] [redacted] [redacted] [redacted] are, "conservatively speaking, quite insubstantial," *Tampa Elec. Co.*, 365 U.S. at 333, and "make dismissal easy," *Stop & Shop Supermarket Co.* v. *Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 68 (1st Cir. 2004). Dr. David S. Evans, Plaintiffs' economist, does not dispute the math underlying these calculations.[98]

Plaintiffs also contend that they have been foreclosed because Apple "preference[s]" OpenAI over other developers, such as by promoting ChatGPT in the App Store and displaying ChatGPT branding in Apple Intelligence.[99] As an initial matter, there is no evidence that OpenAI and Apple had any agreement with respect to the treatment of OpenAI's competitors. And promotion of ChatGPT would not result in the "actual foreclosure" required under the Sherman Act. *In re EpiPen*, 44 F.4th at 992-93. Quite simply, seeing branding for one product does not "prevent customers from accessing" competing products. *Id.* Plaintiffs' complaints about promotion "don't tell a coherent story about how the arrangement prevented [xAI or any other competitor] from providing" products to "any portion of the market." *BRFHH*, 49 F.4th at 531.

In any event, Plaintiffs have no evidence that Apple's alleged promotion of ChatGPT foreclosed a substantial share of the alleged market. OpenAI observed no meaningful benefit from

---

[98] *See* Ex. 2 at A65 (Evans Dep. 131:17-25).

[99] *See* Ex. 7 at A210-11, A235 (Evans Report ¶¶ 280-281, 348); Compl. ¶ 228; *see also* Ex. 7 at A211 (Evans Report ¶ 281); Ex. 63 at A1024-28, A1030 (Chen Report ¶¶ 66-71, 102).

such promotion.[100] But even using the unsupported assumptions of Plaintiffs' damages expert, Dr. Craig T. Schulman, for "indirect effects" from the Agreement, the foreclosure shares would still be nowhere close to the usual thresholds needed to establish liability.[101]

Plaintiffs' second theory that the Agreement forecloses OpenAI's rivals from accessing user "prompts" to train their models fares no better.[102] Given the stringent privacy guardrails contained in the Agreement, the number of training-eligible prompts that OpenAI receives is negligible to begin with.[103] The Agreement prohibits OpenAI from training its models with prompts from users who are not logged in to a ChatGPT account, [redacted] as of May 2025.[104] And to train on data from logged-in users, OpenAI must obtain the user's explicit consent or provide additional notice upon the user's first login if they had previously consented to the use of their data for model training.[105]

---

[100] *See* Ex. 15 at A376-77 (Martinovic Dep. 209:25-210:25) (OpenAI 30(b)(6) Deposition) [redacted] Ex. 24 at A448 (OAI_NDTX_0030464) [redacted]

[101] According to Dr. Schulman, [redacted]. Ex. 42 at A709 (Schulman Report ¶ 142). Applying a corresponding [redacted] multiple to Dr. Tucker's foreclosure shares still yields tiny percentages well below those necessary to show substantial foreclosure. Ex. 64 at A1034-36 (Tucker Dep. 224:24-226:6). In any case, Dr. Schulman's claim [redacted] is without evidentiary support. Dr. Schulman relies on a single Slack message, just weeks after the integration went live, which says, on its face, [redacted] Ex. 65 at A1040 (OAI_NDTX_0007248). [redacted] Ex. 20 at A423 (OAI_NDTX_0019832).

[102] *See* Compl. ¶¶ 103-105.

[103] OpenAI uses Apple user data consistent with the Agreement. *See* Ex. 66 at A1046-47 (OpenAI's Resp. to Pls.' Interrogatory No. 9).

[104] *See* Ex. 9 at A303, Ex. F § 2.3 (OAI_NDTX_0000345); Ex. 19 at A415 (OAI_NDTX_0007073).

[105] Ex. 9 at A303, Ex. F § 3.1 (OAI_NDTX_0000345).

Given these strict constraints, and using data from sources cited in Plaintiffs' expert reports, Dr. Tucker calculated that training-eligible Apple Intelligence prompts accounted for [redacted] between December 11, 2024 and September 30, 2025.[106] [redacted][107]

[redacted]

Again, these calculations are undisputed: Plaintiffs' experts have not provided any alternative calculation of the share of user prompts from which Plaintiffs are allegedly foreclosed.

Plaintiffs' witnesses with responsibilities for training Grok could not recall any internal discussion about needing prompt data from Apple Intelligence to train Grok.[108] Instead, Plaintiffs'

---

[106] *See* Ex. 61 at A926 (Tucker Report at 24 ex. 2).

[107] *Id.* at A934 (Tucker Report at 32 ex. 4).

[108] *See* Ex. 4 at A105-06 (Ba Dep. 264:25-265:3); Ex. 67 at A1055 (Babuschkin Dep. 73:9-24); Ex. 44 at A744 (Pasini Dep. 92:7-19); Ex. 68 at A1070, A1072 (T. Wu Dep. 75:15-18, 80:15-18). xAI's witnesses similarly confirmed that none had seen any documents in which anyone at xAI suggested that the Agreement has caused harm related to Grok's training. *See* Ex. 34 at A584 (Fuchs Dep. 233:13-17); Ex. 33 at A573 (Aluru Dep. 315:8-11); Ex. 68 at A1077 (T. Wu Dep. 111:9-13); Ex. 44 at A747 (Pasini Dep. 143:15-19); Ex. 69 at A1088 (Storm Dep. 26:4-8); Ex. 62

claim that xAI missed out on important user prompts relies [redacted][109] But even he admitted [redacted].[110]

And during SpaceX's most recent earnings call, Musk boasted that the company "expect[s] the cadence of AI development to improve dramatically" because "all the data that SpaceX has ever produced, which is a tremendous amount over the course of a quarter century, will be incorporated into Grok training."[111] Musk predicted that the next version of Grok "will exceed all current models" because "the SpaceX training corpus is so awesome & unique."[112] These are not the words of a company that is starved of training data and unable to develop competitive products.

### B. The undisputed evidence shows that competition in the alleged market is robust and Plaintiffs believe they are positioned to succeed.

In addition to examining foreclosure shares, courts look at whether and to what extent the allegedly exclusive agreement has actually "harm[ed] consumers by excluding rivals" from the alleged market or otherwise "impair[ed] [the plaintiff's] opportunity to compete." *In re EpiPen*, 44 F.4th at 985-86, 988; *see Roland Mach. Co.* v. *Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984) (Posner, J.) ("If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition."). In other words, courts ask whether the "opportunities for other

at A1017 (Nordeen Dep. 121:12-15); *see also* Ex. 28 at A518 (Baseer Dep. 26:10-17) (Plaintiffs' 30(b)(6) Deposition).

[109] *See* Ex. 70 at A1096 (X. Wu Dep. 31:11-18).

[110] *Id.* at A1098, A1100-01 (X. Wu Dep. 177:13-16, 200:23-201:02); *see also* [redacted] Ex. 67 at A1057-58 (Babuschkin Dep. 103:19-104:2); Ex. 4 at A98 (Ba Dep. 45:16-18).

[111] Ex. 71 at A1109 (SpaceX 2Q 2026 Earnings Webcast (Aug. 4, 2026), https://tinyurl.com/Q226SpaceXEarnings).

[112] Ex. 72 at A1122 (Elon Musk (@elonmusk), X (Aug. 12, 2026), https://tinyurl.com/MuskGrokPost).

[competitors] to enter into or remain in [the] market [have been] significantly limited." *Tampa Elec. Co.*, 365 U.S. at 328. Here, no reasonable jury could find that the Agreement has substantially foreclosed competition or significantly impaired any of OpenAI's competitors.

***1. Plaintiffs produced no evidence of competitive harm or substantial foreclosure.*** Plaintiffs have not identified a single communication indicating that the Agreement was foreclosing competition. At a hearing on OpenAI's motion to compel discovery of such materials, Magistrate Judge Ray observed, "[I]t causes one to wonder, both as a party to the case and as the Court, where are the emails? If this is such an awful monopolistic endeavor that's costing the Plaintiffs billions of dollars, where are the emails from Mr. Musk?"[113]

The answer from Plaintiffs is that there are none. After months of discovery, meet and confers, and motions to compel, Plaintiffs have not produced any emails, texts, or other documents from Musk or anyone else at xAI or X that substantiate their claims of competitive harm.[114] Plaintiffs' witnesses were unaware of a single xAI or X document that discusses the impact of the Agreement on Plaintiffs' ability to compete in the alleged market.[115] Nor could Plaintiffs' witnesses recall having any discussions with colleagues about the Agreement's impact on

[113] Ex. 73 at A1127 (Transcript of May 13 Oral Argument); *see also* Dkt. No. 320 at 3 ("[T]here are only ten emails and two text message records from Musk on point. Musk's seemingly monumental concerns about [Apple's and OpenAI's] endeavors leads the Court to believe that relevant records and communications are missing from discovery.").

[114] *See* [redacted]

[115] *See* Ex. 4 at A103 (Ba Dep. 259:2-6); Ex. 67 at A1061 (Babuschkin Dep. 175:15-22); Ex. 69 at A1088 (Storm Dep. 26:9-15); Ex. 33 at A573 (Aluru Dep. 315:18-22); Ex. 74 at A1131 (Bier Dep. 211:11-23); Ex. 75 at A1139 (Jones Dep. 198:17-20); Ex. 34 at A587 (Fuchs Dep. 236:10-12); Ex. 76 at A1145, A1148, A1150 (Stark Dep. 189:1-8, 195:13-16, 264:10-13); Ex. 44 at A747 (Pasini Dep. 143:1-4); *see also* Ex. 28 at A520 (Baseer Dep. 31:9-18) (Plaintiffs' 30(b)(6) Deposition).

Plaintiffs' ability to compete.[116] Jonathan Shulkin, xAI's former CFO and current partner at Valor Equity Partners, one of xAI's and SpaceX's largest investors, was also unable to recall any document in which xAI discussed the Agreement or its impact on xAI's business.[117] And Diego Pasini, an xAI engineer responsible for training Grok, conceded that he was unaware of any documents stating that xAI had been harmed by the ChatGPT integration.[118]

Contrary to the claims advanced here, Plaintiffs' witnesses consistently testified that the Agreement was *not* foreclosing xAI's ability to compete. Shulkin testified that [redacted][119] One xAI co-founder, Tony Wu, agreed that [redacted][120] while another, Ross Nordeen, confirmed that [redacted][121]

The internal documents that Plaintiffs did produce characterized their business as thriving, [redacted]. For example, [redacted]

---

[116] *See* Ex. 44 at A747 (Pasini Dep. 143:5-9); Ex. 76 at A1145 (Stark Dep. 189:9-11); Ex. 74 at A1131-32 (Bier Dep. 211:11-212:9); Ex. 75 at A1139 (Jones Dep. 198:13-24); Ex. 62 at A1017 (Nordeen Dep. 121:6-11); Ex. 67 at A1060-61 (Babuschkin Dep. 174:14-21, 175:15-22); Ex. 4 at A102-03 (Ba Dep. 258:18-259:1); Ex. 33 at A573 (Aluru Dep. 315:12-16).

[117] Ex. 32 at A559 (Shulkin Dep. 174:8-13).

[118] Ex. 44 at A747 (Pasini Dep. 143:1-4); *see also* Ex. 4 at A100 (Ba Dep. 246:16-19); Ex. 67 at A1060-61 (Babuschkin Dep. 174:23-175:4); Ex. 68 at A1076-77 (T. Wu Dep. 110:23-111:1); Ex. 34 at A584-85 (Fuchs Dep. 233:1-4, 234:1-4); Ex. 33 at A572 (Aluru Dep. 314:19-23); Ex. 62 at A1017 (Nordeen Dep. 121:2-5); Ex. 69 at A1087-88, A1090 (Storm Dep. 25:25-26:3, 215:1-15); Ex. 76 at A1147-48 (Stark Dep. 194:25-195:12); Ex. 74 at A1131-33 (Bier Dep. 211:11-213:17).

[119] Ex. 32 at A551-52, A557 (Shulkin Dep. 107:20-108:1, 151:7-19).

[120] Ex. 68 at A1074 (T. Wu Dep. 90:17-22).

[121] Ex. 62 at A1018 (Nordeen Dep. 122:7-10).

[redacted][122] According to xAI, [redacted][123] [redacted][124] xAI’s investors agreed: [redacted].”[125] And [redacted]

***2. xAI’s increasing valuations and projections refute any claim of foreclosure***. Consistent with this outlook, xAI’s valuation has grown sharply during the time that the Agreement has been in effect. The company’s valuation reportedly doubled between July 2025 and January 2026, from $113 billion to $230 billion.[127] xAI then merged with SpaceX at a valuation of $250 billion in February 2026,[128] ahead of SpaceX’s record-setting IPO. xAI’s valuation has increased so much [redacted].[129] Firms that are competitively stifled by an entrenched monopolist don’t double in value in six

---

[122] Ex. 27 at A497 (X-XAI-000110550); *see also* Ex. 28 at A522-23 (Baseer Dep. 102:16-103:5) (Plaintiffs’ 30(b)(6) Deposition) ([redacted]).

[123] Ex. 27 at A505 (X-XAI-000110550).

[124] *Id.*

[125] Ex. 77 at A1156 (VALOR0000167).

[126] Ex. 78 at A1204 (X-XAI-000166638).

[127] Ex. 42 at A728 (Schulman Report at 95 fig. X.1).

[128] [redacted]

[129] Ex. 68 at A1067-68 (T. Wu Dep. 22:20-23:12) [redacted]).

months while adding more than $100 billion to their valuations. Indeed, even after indulging wildly aggressive assumptions, Dr. Schulman calculated that Plaintiffs' lost enterprise value attributable to the Agreement amounted to less than [redacted] of their actual valuation, which is again inconsistent with competitive foreclosure.[130] *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp*., 475 U.S. 574, 596-97 (1986) (rejecting antitrust inferences that are implausible in light of objective economic evidence).

xAI's projections further reflected its optimistic assessment of its competitive position. By November 2025, [redacted].[131] That would translate, the company predicted, [redacted][132] By comparison, Dr. Schulman calculated that [redacted][133] That is a drop in the bucket compared to the business Plaintiffs were forecasting shortly after this lawsuit was filed and inconsistent with any claim of substantial foreclosure.

***3. Months after Plaintiffs filed the Complaint alleging foreclosure to this Court, Musk told xAI's investors and employees a very different story***. In their August 2025 Complaint,

---

[130] Ex. 42 at A728-30 (Schulman Report ¶¶ 193, 196); *see infra* Section III.A (discussing the assumptions underlying Dr. Schulman's damages calculations).

[131] Ex. 80 at A1220 (X-XAI-000021314).

[132] *Id.*

[133] Ex. 42 at A711-13 (Schulman Report at 76 fig. VII.4, ¶ 160 & fig. VII.5).

Plaintiffs alleged that they had been "thwarted in their abilities to innovate and improve the quality and competitiveness of their offerings."[134] But another November 2025 slide deck that [redacted]. The deck [redacted][135] Plaintiffs withheld this deck from discovery and produced it only after OpenAI moved to compel production of Plaintiffs' investor presentations.[136] It is clear why it was withheld: there is no way to reconcile it with Plaintiffs' substantial foreclosure allegations in this case. Indeed, contrary to Plaintiffs' claim that xAI has been "deprived of scale" by the Agreement,[137] the deck [redacted].[138]

Musk presented a similar picture to his employees. During a February 2026 "all-hands" meeting, Musk boasted about xAI's outsized accomplishments:

> So, really an incredible amount of work in a very short period of time. And it's important to consider for competitiveness of any technology company, what matters is not the position at any point in time, but what is your velocity and acceleration, and if you're moving faster than anyone else in any given technology arena, you will be the leader. And xAI is moving faster than any other company. No one's even close.[139]

---

[134] Compl. ¶ 13.

[135] Ex. 41 at A641 (X-XAI-000161824).

[136] *See* Dkt. Nos. 172, 271.

[137] Compl. ¶ 13.

[138] Ex. 41 at A683 (X-XAI-000161824).

[139] *Elon Musk, xAI All-Hands Meeting, February 10, 2026*, YouTube, at 2:29-2:57 (Feb. 11, 2026), https://tinyurl.com/xAIAllHands.

Musk likewise publicly touted Grok in August 2026 as "objectively #1 when considering intelligence, speed & cost."[140] And during a SpaceX presentation that month, Musk previewed that AI will account for "99% of the value of SpaceX" within five years, and that SpaceX's value, already approximately $2 trillion, "will be some astronomical number."[141] Musk's rendition of xAI's continuing success and ability to compete well after Apple and OpenAI entered into the Agreement cannot be reconciled with the substantial foreclosure claims advanced in this litigation.

***4. SpaceX's registration statement boasts of xAI's ability to compete***. SpaceX's registration statement, signed by Musk under penalty of the federal securities laws, likewise bears no resemblance to the doomsaying in this litigation. According to SpaceX, "the combination of our proprietary AI infrastructure capability, our truth-seeking frontier model, Grok, and our access to real-time data on X creates a formidable competitive advantage, allowing us to maintain a leading position in the development of advanced artificial intelligence."[142] SpaceX observed that one of the company's "key competitive differentiator[s] is Grok's deep integration with X," which grants xAI exclusive access to a "massive dataset" that has "allowed [xAI] to achieve industry-leading performance."[143]

According to SpaceX, its advantages have already borne fruit. SpaceX disclosed that "[s]ince launching Grok-1 in November 2023, we have released four major versions and notable

---

[140] Elon Musk (@elonmusk), X (Aug. 12, 2026), https://tinyurl.com/GrokNumber1.

[141] SpaceX (@SpaceX), X, at 25:00-25:24 (Aug. 11, 2026), https://tinyurl.com/MuskSpaceXUpdate.

[142] Ex. 5 at A157 (SpaceX Registration Statement) (emphasis added); *see* Ex. 28 at A525-26 (Baseer Dep. 280:18-281:15) (Plaintiffs' 30(b)(6) Deposition) [redacted]

[143] Ex. 5 at A161 (SpaceX Registration Statement).

variations thereof, achieving one of the fastest iteration cycles in the industry."[144] SpaceX told investors that "Grok achieved frontier-level performance in scientific reasoning."[145] In fact, SpaceX explained, "[o]ur accelerated development cadence positions Grok among the fastest-advancing frontier models relative to peers, including OpenAI, Anthropic, and Google."[146]

Nowhere in its registration statement, which is replete with risk disclosures, does SpaceX mention the Agreement or the harms it is allegedly causing Plaintiffs. The admissions from Plaintiffs' CEO, Musk, and their parent, SpaceX, in the registration statement are irreconcilable with Plaintiffs' claims of substantial foreclosure and warrant summary judgment.

***5. The undisputed evidence confirms the Agreement has not foreclosed any other rival***. There is also no basis for a reasonable jury to conclude that the Agreement has foreclosed OpenAI's other competitors. [redacted].[147]

No other competitor appears to agree with xAI that the Agreement forecloses competition. None joined this lawsuit, and Plaintiffs did nothing to solicit evidence to substantiate their theory of foreclosure from any of them. The undisputed evidence—available only because Defendants subpoenaed Google—shows that the Agreement has not foreclosed Google from vigorously competing in the market for GenAI chatbot services. According to Google, [redacted][148] In fact, [redacted]

---

[144] *Id.* at A173.

[145] *Id.* at A156.

[146] *Id.* at A177; *see also id.* at A165.

[147] Ex. 2 at A79 (Evans Dep. 161:9-13).

[148] Ex. 52 at A827 (Pancholi Dep. 18:21-25) (Google 30(b)(6) Deposition).

[redacted][149] From the last quarter of 2024 when the integration launched to the second quarter of 2026, Gemini's web traffic share has shot up from 5% to 27%.[150] And Google [redacted][151]

Likewise, despite not having its own integration with Apple Intelligence, Anthropic has not been foreclosed by the Agreement either, as its valuation reached "the same ballpark as OpenAI."[152] Between March 2025 and May 2026, Anthropic reported that its valuation grew from $61.5 billion to $965 billion, all without the Siri prompts that Plaintiffs say are so critical.[153] And just two months ago, Musk said that Anthropic is "obviously currently the leader in AI."[154]

***6. Since the Agreement, OpenAI's alleged market share has declined***. Consistent with "the fierce competition in the AI field" that courts have observed,[155] Dr. Evans admitted that [redacted]. According to data cited by Dr. Evans, ChatGPT enjoyed an early lead as a first mover when no other major competitors were in the market.[156] But by June 2026, as other competitors gained traction, data

---

[149] *Id*. at A828 (Pancholi Dep. 19:2-3) (Google 30(b)(6) Deposition).

[150] Ex. 81 at A1245 (McCrary Addendum Report at 6 ex. 4).

[151] Ex. 52 at A834 (Pancholi Dep. 39:12-17) (Google 30(b)(6) Deposition).

[152] Ex. 2 at A52 (Evans Dep. 34:7-20).

[153] Anthropic, *Anthropic raises Series E at $61.5B post-money valuation* (Mar. 3, 2025), https://tinyurl.com/AnthropicSeriesE; Anthropic, *Anthropic raises $65B in Series H funding at $965B post-money valuation* (May 28, 2026), https://tinyurl.com/AnthropicSeriesH; *see* Ex. 82 at A1251 (Anthropic's Supp. Resp. to OpenAI's Request for Production No. 2) (stating that Anthropic "does not use User Prompts . . . to train its model").

[154] Ex. 83 at A1255 (Elon Musk (@elonmusk), X (July 9, 2026), https://tinyurl.com/MuskAnthropicPost).

[155] Ex. 93 at A1403 (Order, *Musk* v. *Altman*, No. 4:24-cv-04722-YGR (June 10, 2026), Dkt. No. 602).

[156] Ex. 84 at A1263 (Evans Rebuttal Report at 82 tbl. 6).

cited by Dr. Evans indicates [redacted].[157] There is no genuine dispute that competition in Plaintiffs' alleged market is only intensifying. As SpaceX's registration statement explains, the AI industry is "rapidly evolving and increasingly competitive."[158] When asked whether there was any explanation for OpenAI's declining market share relative to its competitors other than [redacted][159]

*7.* [redacted] Another fundamental problem with Plaintiffs' claim that the Agreement [redacted] is that the Agreement [redacted]. By September 2025—less than a year after the integration went live—OpenAI told Apple [redacted] Through August 30, 2025, [redacted][4] [redacted] is irreconcilable with any suggestion that the Agreement is cementing OpenAI's supposed dominance. Ironically, the only party that has produced evidence it is being disadvantaged by the Agreement is OpenAI.

---

[157] *Id.*; Ex. 85 at A1267 (Evans Addendum to Opening and Rebuttal Reports at 8 tbl. 4).

[158] Ex. 5 at A144 (SpaceX Registration Statement).

[159] Ex. 2 at A62 (Evans Dep. 126:18-21).

[160] Ex. 7 at A208 (Evans Report ¶ 276).

[161] Ex. 37 at A606 (APL-XAI_00086160).

[162] *See* Ex. 86 at A1274-76 (Metrick Report ¶ 41 & fig. 7).

[163] Ex. 15 at A382 (Martinovic Dep. 271:4-9) (OpenAI 30(b)(6) Deposition).

[164] Ex. 38 at A608 (APL-XAI_00132411).

* * *

No reasonable jury could find that the Agreement substantially foreclosed competition in the alleged market. Summary judgment is warranted on that independent basis as well.

## III. Plaintiffs cannot establish antitrust standing (Claims 1, 4-6).

Plaintiffs' antitrust claims also fail as a matter of law for lack of "antitrust standing." *Pulse Network*, 30 F.4th at 487. "[A]n antitrust plaintiff must do more than meet the requirements of Article III to establish its standing to bring suit." *Rx Sols., Inc.* v. *Caremark, L.L.C.*, 164 F.4th 436, 443 (5th Cir. 2026). To have antitrust standing, a plaintiff must prove: "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Pulse Network*, 30 F.4th at 488. Plaintiffs satisfy none of these three independent requirements.

### A. The Agreement has not proximately caused an injury in fact.

To have antitrust standing, a plaintiff's injury must be "a direct consequence of the alleged antitrust violation," *Walker* v. *U-Haul Co. of Miss.*, 747 F.2d 1011, 1014 (5th Cir. 1984), not based "on some abstract conception or speculative measure of harm." *Assoc. Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 543 (1983). "Courts must be cautious in granting antitrust standing to parties that offer speculative, abstract, or impractical damages theories." *Bell* v. *Dow Chem. Co.*, 847 F.2d 1179, 1183-84 (5th Cir. 1988) (affirming grant of summary judgment for lack of antitrust standing). To satisfy the proximate-cause requirement, the injury must "happen at the first step following the harmful behavior." *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 140 (2d Cir. 2021); *accord McCormack* v. *Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1342 (5th Cir. 1988); *Tal* v. *Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006). "[S]uch directness of relationship" is "one of [the] central elements" of the proximate-cause requirement. *Holmes* v. *Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269 (1992).

Plaintiffs' theories of harm depend on just "the sort of speculative and abstract causal chain that the Supreme Court has held insufficient to support antitrust standing." *McCormack*, 845 F.2d at 1342. Plaintiffs have leaned on an expert-driven narrative built atop layer upon layer of highly unstable assumptions made by Dr. Schulman, who concedes [redacted].[165]

Without any relevant expertise, Dr. Schulman assumes [redacted].[166] Dr. Schulman also assumes [redacted] He next assumes [redacted] He proceeds to assume [redacted].[169] Then, he assumes [redacted]

---

[165] Ex. 87 at A1280, A1284-85 (Schulman Dep. 25:5-22, 29:21-30:15).

[166] Ex. 42 at A690, A712 (Schulman Report ¶¶ 8, 160).

[167] *Id.* at A713-19 (Schulman Report ¶¶ 161-170).

[168] *Id.* at A707 (Schulman Report ¶ 132).

[169] *Id.* at A725 (Schulman Report ¶ 183 & fig. IX.2); *see also* [redacted] Dr. Schulman defines [redacted] Ex. 42 at A695 (Schulman Report ¶ 20).

[redacted][170] [redacted].[171] Following this daisy chain of assumptions, Dr. Schulman opines [redacted]"[172]

Here, the causal chain breaks down at the start because Plaintiffs fail to "show a high likelihood that [they] would have won the competitive bid" for integration into Apple Intelligence "but for the alleged violations of the antitrust laws" or that Apple would have featured Grok and X on the Must-Have Apps list. *Jayco Sys., Inc.* v. *Savin Bus. Machs. Corp.*, 777 F.2d 306, 314 (5th Cir. 1985). Even in Dr. Schulman's counterfactual world, Apple was free to integrate with or promote whatever apps it wanted. *See Monsanto Co.* v. *Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984) ("A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently."). Apple, for instance, could have decided that only Gemini and Claude should be integrated alongside ChatGPT or featured on the Must-Have Apps list. Indeed, [redacted]"[173] Thus, Plaintiffs' assumption that Apple would have integrated Grok into Apple Intelligence and featured their apps on the Must-Have Apps list is pure speculation.

---

[170] Ex. 42 at A699-700 (Schulman Report ¶¶ 116-117); *id.* at A701-702, A705 (Schulman Report at 57 fig. VI.2, 58 fig. VI.3, 61 fig. VI.4).

[171] *Id.* at A727, A729-30 (Schulman Report ¶¶ 191, 196).

[172] *Id.* at A691 (Schulman Report ¶ 10 & fig. I.1).

[173] Ex. 11 at A326, A330 (Cue Dep. 43:9-16, 65:1-16). Indeed, when the Agreement was signed in May 2024, Grok was not yet offered as an independent app; Grok did not launch in the App Store until over seven months later, in January 2025. [redacted]

The next step in Dr. Schulman's damages chain assumes [redacted].[174] But no witness from xAI was able to explain how the company would have improved Grok using Siri prompts.[175] Indeed, the xAI engineers with responsibility for training Grok testified that they had never seen any documents suggesting that the Agreement has impaired Grok's training or that they had even discussed any desire to train Grok using Siri prompts.[176] And xAI already believes [redacted][177] belying any suggestion that access to a small number of training-eligible Siri prompts would have led to a materially improved Grok. As the Fourth Circuit has held, "[i]t would be entirely speculative and beyond the competence of a judicial proceeding to create in hindsight a technological universe that never came into existence." *Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (rejecting antitrust standing); *see also* Areeda & Hovenkamp, *supra* ¶ 340b6 ("Quantifying the losses from any *particular* failure to innovate seems well nigh impossible.").

Dr. Schulman's speculation about further technological innovation in a but-for world continues with his opinion [redacted][178] No witness could explain how or why that would have happened. To the contrary, [redacted]

[174] Ex. 42 at A707 (Schulman Report ¶ 132).

[175] *See*, *e.g.*, Ex. 70 at A1103 (X. Wu Dep. 209:14-19) [redacted].

[176] *See* Ex. 68 at A1077 (T. Wu Dep. 111:9-13); Ex. 44 at A741-42 (Pasini Dep. 67:24-68:10); Ex. 69 at A1088 (Storm Dep. 26:4-8); *supra* note 108.

[177] Ex. 27 at A508 (X-XAI-000110550).

[178] Ex. 42 at A722, A725 (Schulman Report ¶¶ 177, 183 & fig. IX.2).

[redacted][179] And when X's Head of Product, Nikita Bier, was asked [redacted], he testified, [redacted][180] Dr. Schulman himself could not identify even a single feature that X lacks because of the Agreement or what additional features X would have developed with an improved version of Grok.[181] Plaintiffs "cannot recover antitrust damages for the frustration of so ethereal a project." *Hayes* v. *Solomon*, 597 F.2d 958, 976-77 (5th Cir. 1979).

And the speculation keeps going from there. Dr. Schulman assumes [redacted][182] This assumption inflates every category of damages in Dr. Schulman's calculation.[183] Dr. Evans, however, testified [redacted][184] [redacted][185] [redacted]. Because Plaintiffs "allege[] injury to a business expansion [they] never achieved," the lack of evidence that Plaintiffs both "intended" and "[were] prepared" to pursue that expansion absent the Agreement is fatal. *Jayco*, 777 F.2d at 314. Indeed, Dr. Evans admitted [redacted]

[179] Ex. 32 at A554-55 (Shulkin Dep. 133:19-134:2).

[180] Ex. 74 at A1131 (Bier Dep. 211:17-23).

[181] Ex. 87 at A1293, A1301-02 (Schulman Dep. 123:8-12, 213:17-214:10).

[182] Ex. 42 at A699-700 (Schulman Report ¶¶ 116-117); *see* Ex. 7 at A237-38 (Evans Report ¶ 569).

[183] Ex. 87 at A1295-96 (Schulman Dep. 157:24-158:10).

[184] Ex. 2 at A72 (Evans Dep. 152:7-17).

[185] *Id.* (Evans Dep. 152:18-20).

[redacted].[186]

At deposition, none of Plaintiffs' experts supported the notion that Apple's or Google's app store fees would have plummeted in a world without the Agreement. When asked to explain that assumption, Dr. Schulman drew a blank: [redacted][187] And Dr. Evans, [redacted][188] Given those structural forces, Dr. Evans testified [redacted][189] That is simply irreconcilable with Dr. Schulman's theory that [redacted] [redacted] Plaintiffs' super app theory amounts to "nothing more than optimistic projections for an enterprise that never got off the ground." *Mostly Media, Inc.* v. *U.S. W. Commc'ns*, 186 F.3d 864, 867 (8th Cir. 1999).

---

[186] *Id.* at A74 (Evans Dep. 154:14-18); Ex. 87 at A1289, A1299 (Schulman Dep. 98:21-25, 209:12-15).

[187] Ex. 87 at A1291 (Schulman Dep. 100:4-9).

[188] Ex. 2 at A69-70 (Evans Dep. 149:24-150:4 (cleaned up)).

[189] *Id.* at A75-77 (Evans Dep. 155:7-17, 156:23-157:4).

[190] Ex. 42 at A699-700 (Schulman Report ¶¶ 116-117).

As the final step in the damages chain, Dr. Schulman assumes [redacted].[191] [redacted][192] These damages are thus derivative of the same infirm lost-subscriber, app-store commission rate, and super-app revenue theories addressed above, and fail for the same reasons.

But these damages are more speculative still. Plaintiffs refused to produce any evidence to show the terms of the fundraises or how xAI derived the valuations that it presented to investors. Even Dr. Schulman admitted that [redacted]."[193] Dr. Schulman [redacted][194] [redacted][195]

Dr. Schulman conceded [redacted].[196] Indeed, [redacted]

---

[191] *Id.* at A728-30 (Schulman Report ¶¶ 192 & fig. X.1, 196).

[192] *Id.* at A729-30 (Schulman Report ¶ 196).

[193] Ex. 87 at A1308-10 (Schulman Dep. 233:16-235:2).

[194] *Id.* at A1309-10 (Schulman Dep. 234:25-235:2).

[195] *Id.* at A1307 (Schulman Dep. 232:7-9).

[196] *Id.* at A1305-06 (Schulman Dep. 230:23-231:4).

[redacted]"[197]

[redacted].[198] Accordingly, there is no basis for Plaintiffs' speculation that a theoretical [redacted] change in xAI's valuation would have affected the valuation [redacted]

Plaintiffs' assumed causes and effects, each one on shakier footing than the last, offer no "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. Thus, Plaintiffs' claim of attenuated, multistep "consequential harm . . . [is] insufficient as a matter of law." *AGC*, 459 U.S. at 534, 545 ("Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.").

**B. The Agreement has not caused an antitrust injury.**

An "antitrust injury" is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Rx Sols., Inc.*, 164 F.4th at 444 (quoting *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). "Loss from competition itself—that is, loss in the form of customers' choosing the competitor's goods and services over the plaintiff's—does not constitute an antitrust injury[.]" *Pulse Network*, 30 F.4th at 489. Instead, "the question underlying antitrust injury is whether *consumers*—not *competitors*—have been harmed." *Rx Sols., Inc.*, 164 F.4th at 444; *see Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d

[197] Ex. 32 at A548-49 (Shulkin Dep. 57:22-58:9).

[198] Ex. 80 at A1224 (X-XAI-000021314).

1064, 1072 (10th Cir. 2013) (Gorsuch, J.) (explaining that courts must keep "the interests of consumers, not competitors, in mind").

Here, there is no evidence that "*consumers* have been harmed by" the Agreement. *Rx Sols., Inc.*, 164 F.4th at 444. The "[t]ypical" antitrust injury "include[s] increased prices and decreased output." *Id.* Yet it is undisputed that most consumers use ChatGPT for free and that the price of OpenAI's primary subscription tier, "ChatGPT Plus," has remained unchanged since it debuted at $20 per month in February 2023.[199] This price is consistent with that of equivalent tiers offered by Google ($20 per month) and Anthropic ($20 per month), and about 33% *below* what xAI charges.[200] Output, meanwhile, has increased exponentially as measured by total GenAI chatbot user sessions.[201] As the court in the Northern District of California stated with respect to other antitrust claims Musk brought against OpenAI: "Competition law is not there to protect any person. It is there to protect competition. And there is a lot of competition in this particular industry."[202]

The nominal prices of ChatGPT and other chatbots in Plaintiffs' market have remained steady even as their capabilities improved dramatically.[203] As Dr. Evans explained, if anything, [redacted] Far from creating an antitrust injury, "[l]ow prices benefit consumers," are "usually the product of the competitive

---

[199] *See* Ex. 89 at A1337 (*Introducing ChatGPT Plus*, OpenAI (Feb. 1, 2023), https://tinyurl.com/GPTPlusIntro).

[200] Ex. 42 at A697 (Schulman Report at 36 fig. IV.5).

[201] *Id.* at A723 (Schulman Report at 88 fig. IX.1).

[202] Ex. 90 at A1345 (Transcript of Proceedings at 2698:1-3, *Musk* v. *Altman*, No. 4:24-cv-04722-YGR (N.D. Cal. May 18, 2026), Dkt. No. 596).

[203] Ex. 2 at A57-58 (Evans Dep. 110:20-111:4).

[204] *Id.* at A59 (Evans Dep. 112:9-13).

marketplace that the antitrust laws are aimed at promoting," and "do not threaten competition." *Felder's Collision Parts, Inc.* v. *All Star Advert. Agency, Inc.*, 777 F.3d 756, 760-61 (5th Cir. 2015). Without evidence of harm to consumers that the antitrust laws were intended to prevent, Plaintiffs have "no viable Sherman Act claim." *Rx Sols., Inc.*, 164 F.4th at 445.

### C. Neither xAI nor X is a proper plaintiff.

"Antitrust standing requires proper plaintiff status, which assures that other parties are not better situated to bring suit." *Pulse Network*, 30 F.4th at 493. To the extent anyone has been "directly injured" by the alleged conduct, it could only conceivably be consumers and competitors in Plaintiffs' alleged market; thus, they are the only "appropriate parties to sue." *Norris* v. *Hearst Tr.*, 500 F.3d 454, 466 (5th Cir. 2007) (finding a lack of antitrust injury where the plaintiffs were "neither consumers . . . nor competitors . . . in the relevant market"); *see also Jebaco, Inc.* v. *Harrah's Operating Co.*, 587 F.3d 314, 320 (5th Cir. 2009) (similar).

Here, neither xAI nor X is a proper plaintiff. X—a social network, and not an AI company—is not a competitor or a consumer in Plaintiffs' alleged market and cannot pursue claims against OpenAI for that reason.[205] Meanwhile, xAI [redacted] and suffered no direct, nonspeculative harm from the Agreement, as set forth above. *See McCormack*, 845 F.2d at 1341-42. Competitors who meaningfully sought an integration with Apple are better positioned to assert these claims. *See id.* at 1341. Plaintiffs therefore fail each independent element of antitrust standing, and summary judgment should be granted in favor of OpenAI.

---

[205] *See* Ex. 7 at A202 (Evans Report ¶ 222).

[206] *See* Ex. 31 at A536-37 (X-XAI-000023784) ([redacted]).

## IV. Plaintiffs have not properly defined a "GenAI chatbot" market or shown that OpenAI is close to wielding monopoly power (Claims 1, 4-6).

"[T]o sustain claims under either § 1 or § 2 [of the Sherman Act], a plaintiff must define the relevant market." *Rx Sols., Inc.*, 164 F.4th at 442. And under Section 2, the plaintiff must also show that the defendant wielded "monopoly power" or, for attempted monopolization claims, a "dangerous probability" that the defendant will do so. *BRFHH*, 49 F.4th at 529. On this record, no reasonable jury could accept Plaintiffs' overly narrow, five-product chatbot market, much less find that OpenAI wielded durable monopoly power or had a dangerous probability of achieving it.

### A. Plaintiffs' alleged market is legally insufficient because it excludes reasonably interchangeable substitute products.

"[T]he plaintiff bears the burden of establishing a legally sufficient market." *Endure Indus., Inc.* v. *Vizient, Inc.*, 164 F.4th 405, 414 (5th Cir. 2026). Summary judgment is warranted if the plaintiff's alleged market "fail[s] to include reasonably interchangeable substitutes." *Id.* at 415. Here, Dr. Evans [redacted]"[207] Yet Dr. Evans arbitrarily excludes several products that satisfy this definition from the alleged "GenAI chatbot market."[208] When including these competing products, Dr. Justin McCrary, OpenAI's economist, explained [redacted][209]

Dr. Evans, for instance, categorically excludes all GenAI chatbots powered by third-party models, such as Microsoft's Copilot and Perplexity.[210] But Dr. Evans offers no reason why a

---

[207] Ex. 7 at A197-98 (Evans Report ¶ 32).

[208] *Id.* at A202 (Evans Report ¶ 222); *see* Ex. 16 at A392-93 (Ghose Report ¶ 32 & fig. 3).

[209] Ex. 1 at A28-33 (McCrary Report ¶¶ 147-151 & ex. 14).

[210] Ex. 7 at A202 (Evans Report ¶ 222 n.324); Ex. 84 at A1259-60 (Evans Rebuttal Report ¶ 121).

chatbot's mere reliance on a third-party model would mean that the chatbot is no longer "reasonably interchangeable by consumers for the same purposes." *PSKS, Inc.* v. *Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (quoting *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Indeed, OpenAI [redacted] regularly tracked the competitive position of chatbots, like Copilot and Perplexity, that rely on third-party models.[211] Dr. Evans further excludes Google's AI Mode and related AI Overview feature.[212] Yet both of those products allow users to interact with an underlying GenAI model in substantially the same way as the other chatbots in Dr. Evans' market and provide similar functionality.[213] Dr. Evans also appears to exclude Grok on X, even though [redacted].[214]

Equally infirm is Dr. Evans' decision to exclude all Chinese GenAI chatbots, like the chatbot released by open-source developer DeepSeek. Dr. Evans claims that [redacted].[215] But DeepSeek's app topped U.S. app store charts upon its release.[216] And concerns about Chinese control have not prevented U.S. consumers from widely adopting Chinese mobile apps, like TikTok. *See TikTok Inc.* v. *Garland*, 604 U.S. 56, 63 (2025) ("Since its launch in 2017, [TikTok] has accumulated over 170 million users in the United

---

[211] *See* Ex. 15 at A370-71 (Martinovic Dep. 75:15-76:1) (OpenAI 30(b)(6) Deposition); [redacted]

[212] *See* Ex. 7 at A200 (Evans Report ¶ 204).

[213] *See* Ex. 1 at A41-48 (McCrary Report ¶ 264 & exs. 30-34) (providing examples).

[214] Ex. 69 at A1085 (Storm Dep. 18:14-16); Ex. 2 at A55 (Evans Dep. 64:19-24).

[215] *See* Ex. 7 at A204-06 (Evans Report ¶¶ 226-228).

[216] Ex. 68 at A1079 (T. Wu Dep. 190:13-21); Ex. 1 at A25-26 (McCrary Report ¶ 106).

States[.]”). OpenAI [redacted] also regularly tracked DeepSeek’s competitive position as compared to the chatbots included in Plaintiffs’ market.[217]

While Plaintiffs now attempt to exclude these many competitors from their alleged market, they have elsewhere admitted that they compete against them. SpaceX’s registration statement disclosed that “[i]n AI” it “compete[s] with developers of foundational AI models and providers of AI products and services, as well as general purpose and vertical search engines, information services, online advertising platforms and social networks,” including “large technology companies, emerging AI model developers and providers of AI-enabled products and services.”[218] xAI’s “[k]ey competitors in these markets include, among others, AI model developers and platform providers such as OpenAI, Anthropic, Google, Meta, Microsoft, and various open-source model providers.”[219] The existence of numerous “alternatives reasonably available to consumers” that Plaintiffs arbitrarily omitted from their five-product market warrants summary judgment on Plaintiffs’ Section 1 and Section 2 claims. *Endure*, 164 F.4th at 410, 415 (affirming summary judgment where the record “strongly suggest[ed] reasonably available alternatives”).

**B. OpenAI does not wield anything close to monopoly power.**

Even assuming Plaintiffs’ market, no reasonable jury could find that OpenAI had durable monopoly power in that market or that there was a dangerous probability it would. “[M]arket share alone is insufficient to establish market power.” *Bacchus Indus., Inc.* v. *Arvin Indus., Inc.*, 939 F.2d 887, 894 (10th Cir. 1991). Instead, “only the power to exclude competitors from a market or control prices” for a substantial period of time constitutes monopoly power. *Associated Radio*

---

[217] *See* Ex. 15 at A370-71 (Martinovic Dep. 75:15-76:1) (OpenAI 30(b)(6) Deposition); [redacted]

[218] Ex. 5 at A181 (SpaceX Registration Statement).

[219] *Id.*

*Serv. Co.* v. *Page Airways, Inc.*, 624 F.2d 1342, 1356 n.24 (5th Cir. 1980); *see Rio Grande Royalty Co.* v. *Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1196 (S.D. Tex. 2009).

Here, no reasonable jury could conclude that OpenAI has the power to control prices where the quality-adjusted prices of ChatGPT and other GenAI chatbots in the market have been rapidly declining, as shown above [redacted].[220] Nor could a reasonable jury find that OpenAI has the power to exclude rivals—titans like Google, Meta, SpaceX, and Anthropic. As SpaceX's registration statement explains, "the consumer AI market is characterized by rapid model iteration, frequent new entrants[,] and intense competition for user attention."[221] And according to Musk, OpenAI is not even the "biggest" AI company today—its rival Anthropic is.[222] Dr. Evans admitted that other AI companies continue to gain market share relative to OpenAI, which he could not attribute to anything besides [redacted] Thus, the undisputed record indicates a "lack of durable market power" and an "inability to control prices or exclude competition" for a substantial period of time. *Winn-Dixie Stores, Inc.* v. *E. Mushroom Mktg. Coop.*, 89 F.4th 430, 445 (3d Cir. 2023); *see Kolon Indus. Inc.* v. *E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (defendant's "reduced market share" over time supported grant of summary judgment). Summary judgment on Plaintiffs' Section 2 claims is warranted.

---

[220] *See supra* Section III.B; Ex. 2 at A59 (Evans Dep. 112:9-13).

[221] Ex. 5 at A144 (SpaceX Registration Statement). Indeed, in June 2026 Apple announced Siri AI as a "conversational" GenAI assistant that will also be available as a standalone chatbot app. *See Apple introduces Siri AI, a profoundly more capable and personal assistant*, *supra* note 93.

[222] Ex. 92 at A1399 (Transcript of Proceedings at 737:15-23, *Musk* v. *Altman*, No. 4:24-cv-04722-YGR (N.D. Cal. Apr. 30, 2026), Dkt. No. 586).

[223] Ex. 2 at A62 (Evans Dep. 126:18-25); *see supra* Section II.B.6.

### V. Plaintiffs' state-law claims fall along with their federal claims (Claims 7-10).

Plaintiffs' state-law claims for civil conspiracy, unfair competition, and violations of the Texas Free Enterprise & Antitrust Act ("TFEAA") fall along with their federal claims. Because the TFEAA "utilizes the same standards as the Sherman Act for establishing a violation," *Abraham & Veneklasen Joint Venture* v. *Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015), Plaintiffs' claims under the TFEAA fail for all the reasons described above. Civil conspiracy and unfair competition are not independent torts; rather, each requires a predicate unlawful act. *Adams* v. *Alcolac, Inc.*, 974 F.3d 540, 544 (5th Cir. 2020) (civil conspiracy); *Taylor Pub. Co.*, 216 F.3d at 486 (unfair competition).[224] Because Plaintiffs "tied their state law claims to the asserted antitrust violations" and exclusive-dealing allegations addressed above,[225] the common law and federal claims "rise and fall together" as well. *Stewart Glass & Mirror, Inc.*, 200 F.3d at 316.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of OpenAI on all claims asserted against it.

---

[224] A civil conspiracy claim under Texas law requires that a plaintiff establish: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Apani*, 300 F.3d at 635. Unfair competition "requires that the plaintiff show an illegal act by the defendant which interfered with the plaintiff's ability to conduct its business." *Taylor Pub. Co.*, 216 F.3d at 486.

[225] *See* Compl. ¶¶ 235-236, 239.

Dated: September 22, 2026

Respectfully submitted,

/s/ Stephen R. DiPrima

Stephen R. DiPrima
SRDiPrima@wlrk.com
N.D. Tex. Bar No. 2785764NY
Graham W. Meli (admitted *pro hac vice*)
GWMeli@wlrk.com
Kevin S. Schwartz
KSchwartz@wlrk.com
N.D. Tex. Bar No. 4564241NY
Andrew J.H. Cheung (admitted *pro hac vice*)
AJHCheung@wlrk.com
Stephen D. Levandoski (admitted *pro hac vice*)
SDLevandoski@wlrk.com
**WACHTELL, LIPTON, ROSEN & KATZ**
51 West 52nd Street
New York, NY 10019
(212) 403-1000 (Telephone)
(212) 403-2000 (Facsimile)

Michael K. Hurst
mhurst@lynnllp.com
Texas Bar No. 10316310
Chris W. Patton
cpatton@lynnllp.com
Texas Bar No. 24083634
Andy Kim
akim@lynnllp.com
Texas Bar No. 24136638
**LYNN PINKER HURST & SCHWEGMANN LLP**
2100 Ross Avenue, Suite 2700
Dallas, TX 75201
(214) 981-3800 (Telephone)
(214) 981-3839 (Facsimile)

Ralph H. Duggins
rduggins@canteyhanger.com
Texas Bar No. 06183700
Scott A. Fredricks
sfredricks@canteyhanger.com
Texas Bar No. 24012657
Philip Vickers
pvickers@canteyhanger.com
Texas Bar No. 24051699
Kate Hancock
khancock@canteyhanger.com
Texas Bar No. 24106048
Michael Ackerman
mackerman@canteyhanger.com
Texas Bar No. 24120454
**CANTEY HANGER LLP**
600 West 6th Street, Suite 300
Fort Worth, TX 76102
(817) 877-2800 (Telephone)
(817) 877-2807 (Facsimile)

Steve Fahey
steve@sfaheylaw.com
Texas Bar No. 24101249
**LAW OFFICE OF STEVE FAHEY, PLLC**
640 Taylor Street, Suite 1200
Fort Worth, TX 76102
(682) 301-0330 (Telephone)

*Attorneys for Defendants OpenAI Foundation (f/k/a OpenAI, Inc.), OAI International, Inc. (f/k/a OpenAI, L.L.C.), and OpenAI OpCo, LLC*

**CERTIFICATE OF SERVICE**

I certify that on September 22, 2026, I served the foregoing document electronically in accordance with the Federal Rules of Civil Procedure.

*/s/ Michael Ackerman*
Michael Ackerman